ORAL ARGUMENT NOT SCHEDULED

No. 15-1363
(and consolidated cases)

───────────────────────────────

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

───────────────────────────────

STATE OF WEST VIRGINIA, ET AL.,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents.*

───────────────────────────────

On Petitions for Review of Final Action
by the United States Environmental Protection Agency

───────────────────────────────

**RESPONDENT EPA'S OPPOSITION TO MOTIONS TO STAY FINAL RULE**

───────────────────────────────

JOHN C. CRUDEN
Assistant Attorney General

Of Counsel:

Elliott Zenick
Howard J. Hoffman
Scott J. Jordan
Jonathan Skinner-Thompson
Abirami Vijayan
Daniel P. Schramm
Aileen D. Roder
Zach Pilchen
Steve Odendahl
United States Environmental
    Protection Agency
Office of General Counsel
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

ERIC G. HOSTETLER
NORMAN L. RAVE, JR.
BRIAN H. LYNK
AMANDA SHAFER BERMAN
CHLOE H. KOLMAN
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Phone: (202) 305-2326
Email: eric.hostetler@usdoj.gov

December 3, 2015

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

BACKGROUND...................................................................................3

I.   CARBON DIOXIDE EMISSIONS AND CLIMATE CHANGE ..................3

II.  THE CAA AND SECTION 111 STANDARDS OF
     PERFORMANCE ............................................................................4

III. THE CLEAN POWER PLAN ............................................................6

STANDARD OF REVIEW ....................................................................11

ARGUMENT ....................................................................................11

I.   MOVANTS HAVE NOT DEMONSTRATED A
     LIKELIHOOD OF SUCCESS ON THE MERITS.............................11

     A.   The Rule Represents a Lawful and Reasonable Determination
          of $CO_2$ Emission Guidelines........................................................13

     B.   EPA Properly Interpreted its Authority in Premising Guidelines
          for the Regulation of Sources on "the Best System of Emission
          Reduction." ...................................................................................19

          1.   The phrase "best system of emission reduction"
               encompasses a wide range of measures............................................19

          2.   The generation-shifting measures contemplated by the
               Rule can be effectuated through standards of
               performance for existing sources.......................................................23

          3.   Cross-boundary measures have been used to comply with
               other Section 111 programs, including Section 111(d) .................28

          4.   The Rule does not intrude on areas of regulation reserved
               to the States or other federal agencies .............................................31

          5.   EPA's emission guidelines for existing sources are not
               inconsistent with its regulation of new sources...............................35

C.     Prior Regulation of Different Pollutants Emitted by Power Plants, Under a Different Statutory Provision, Does Not Bar $CO_2$ Regulation.......................................................................37

D.     Movants' Constitutional Arguments Lack Merit ......................................43

       1.     Movants' Tenth Amendment and federalism arguments lack merit ............................................................................43

       2.     Peabody's Fifth Amendment argument is meritless ......................47

E.     EPA Has Authority to Set Substantive Emission Guidelines .................50

F.     Movants' Procedural Arguments Lack Merit and Are Not Properly Before the Court ..................................................................51

II.     MOVANTS WILL NOT SUFFER IRREPARABLE INJURY DURING THE PENDENCY OF THE LITIGATION.......................................52

A.     State Movants Have No Likelihood of Irreparable Injury ......................53

       1.     The Rule Does Not Intrude on States' Sovereign Interests ...............................................................................53

       2.     Regulatory Activity by State Agencies Does Not Constitute Irreparable Harm ..................................................54

B.     Industry Movants Also Fail to Show Irreparable Injury or That A Stay Would Address Such Injury ...............................................58

       1.     The Rule does not "require" any immediate action by power plants or non-regulated businesses ........................59

       2.     Movants err in relying on EPA's model to prove irreparable harm ....................................................................64

       3.     Recent experience with the MATS Rule does not support a stay ............................................................................66

III.     A STAY OF THE RULE IS NOT IN THE PUBLIC INTEREST.................67

CONCLUSION ..............................................................................70

## TABLE OF AUTHORITIES

**CASES**

A.O. Smith Corp. v. FTC,
  530 F.2d 515 (3d Cir. 1976)..................................................................................58

* Am. Elec. Power Co. v. Connecticut,
  131 S. Ct. 2527 (2011) ...........................................................5, 12, 32, 42

Anne Arundel Cnty. v. EPA,
  963 F.2d 412 (D.C. Cir. 1992).............................................................................51

ASARCO, Inc. v. EPA,
  578 F.2d 319 (D.C. Cir. 1978).............................................................................25

Ctr. for Biological Diversity v. DOI,
  563 F.3d 466 (D.C. Cir. 2000).............................................................................54

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
  511 U.S. 164 (1994).................................................................................................22

Chaplaincy of Full Gospel Churches v. England,
  454 F.3d 290 (D.C. Cir. 2006).............................................................................61

* Chevron, U.S.A., Inc. v. NRDC,
  467 U.S. 837 (1984) ...................................................12, 19, 24, 25, 26

Crete Carrier Corp. v. EPA,
  363 F.3d 490 (D.C. Cir. 2004).............................................................................62

Cuomo v. NRC,
  772 F.2d 972 (D.C. Cir. 1985).............................................................................11

Del. Dep't of Natural Res. v. EPA,
  785 F.3d 1 (D.C. Cir. 2015)..................................................................................32

Delta Constr. Co. v. EPA,
  783 F.3d 1291 (D.C. Cir. 2015)..........................................................................63

* Cases marked with an asterisk are chiefly relied upon.

Eastern Enterprises v. Apfel,
  524 U.S. 498 (1998) ............................................................49

Envtl. Def. Fund v. EPA,
  82 F.3d 451 (D.C. Cir. 1996) ...............................................41

EPA v. EME Homer City Generation, L.P.,
  134 S. Ct. (1584 (2014) ...............................................26-27

Five Flags Pipe Line Co. v. Dep't of Transp.,
  854 F.2d 1438 (D.C. Cir. 1988) ...........................................40

Freedom Holdings, Inc. v. Spitzer,
  408 F.3d 112 (2d Cir. 2005) ................................................58

Grocery Mfrs. Ass'n v. EPA,
  693 F.3d 169, 17 (D.C. Cir. 2012),
  cert. denied, 133 S. Ct. 2880 (2013) ...................................64

* Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.,
  452 U.S. 264 (1981) .........................................43, 44, 46, 49, 54

Kansas v. United States,
  158 F.3d 1213 (10th Cir. 2001) ...........................................53

King v. Burwell,
  135 S. Ct. 2480 (2015) .................................................20, 42

Massachusetts v. EPA,
  549 U.S. 497 (2007) ..............................................4, 20, 22, 68

Massachusetts v. Mellon,
  262 U.S. 447 (1923) ............................................................47

Mexichem Specialty Resins v. EPA,
  787 F.3d 544 (D.C. Cir. 2015) .......................................52, 58

Michigan v. EPA,
  135 S. Ct. 2699 (2015) ........................................................38

Miss. Comm'n on Envtl. Quality v. EPA,
    790 F.3d 138 (D.C. Cir. 2015).................................................................. 43, 45

Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,
    545 U.S. 967 (2005) ....................................................................................40

Nat'l Fed'n Of Indep. Businesses v. Sebelius,
    132 S. Ct. 2566 (2012) ............................................................. 20, 45, 47, 48

Nat'l Mining Ass'n v. Jackson,
    768 F. Supp. 2d 34 (D.D.C. 2011) ..............................................................59

New Jersey v. EPA,
    Case No. 05-1097, 2007 WL 2155487 (D.C. Cir. July 23, 2007) ................29

New Jersey v. EPA,
    517 F.3d 574 (D.C. Cir. 2008)....................................................................28

New York v. United States,
    505 U.S. 144 (1992) ....................................................................................44

Nken v. Holder,
    129 S. Ct. 1749 (2009) ................................................................................11

Ne. Md. Waste Disposal Auth. v. EPA,
    358 F.3d 936 (D.C. Cir. 2004)....................................................................51

Penn Cent. Transp. Co. v. City of New York,
    438 U.S. 104 (1978) ....................................................................................48

Pa. Coal Co. v. Mahon,
    260 U.S. 393 (1922) ....................................................................................49

Portland Cement Ass'n v. Ruckelshaus,
    486 F.2d 375 (D.C. Cir. 1973)....................................................................36

Printz v. United States,
    521 U.S. 898 (1997) ....................................................................................46

Pub. Citizen v. U.S. Dep't of Justice,
    491 U.S. 440 (1989) .............................................................................. 19, 20

Ruckelshaus v. Monsanto Co.,
  467 U.S. 986 (1984) ..............................................................................49

Safari Club Int'l v. Salazar,
  852 F. Supp. 2d 102 (D.D.C. 2012) ........................................................63

* Scialabba v. Cuellar De Osorio,
  134 S. Ct. 2191 (2014) ...........................................................................41

Sierra Club v. Costle,
  657 F.2d 298 (D.C. Cir. 1981) ............................................................ 15, 16

Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency,
  535 U.S. 302 (2002) ................................................................................48

Utility Air Regulatory Grp. v. EPA,
  134 S. Ct. 2427 (2014) ......................................................................26-27, 31

Utility Air Regulatory Grp. v. EPA,
  744 F.3d 741 (D.C. Cir. 2014).................................................................52

Wash. Hosp. Ctr. v. Bowen,
  795 F.2d 139 (D.C. Cir. 1986)................................................................41

* Wis. Gas Co. v. FERC,
  758 F.2d 669 (D.C. Cir. 1985).........................................................52, 58, 62

## STATUTES

1 U.S.C. § 112..........................................................................................40

1 U.S.C. § 204(a) .....................................................................................40

16 U.S.C. § 824o ......................................................................................47

42 U.S.C. § 7401(b)(1)..............................................................................4

42 U.S.C. § 7410(a)(2)(A) ........................................................................21

42 U.S.C. § 7411 ................................................................................ 4, 12

42 U.S.C. § 7411(a)(1) ................................................................. 2, 5, 6, 12, 13

42 U.S.C. § 7411(a)(2) ................................................................. 25, 36

42 U.S.C. § 7411(a)(4) ................................................................. 24

42 U.S.C. § 7411(a)(7) ................................................................. 20

42 U.S.C. § 7411(b)(1)(A) ................................................................. 5

42 U.S.C. § 7411(b)(1)(B) ................................................................. 5, 36

42 U.S.C. § 7411(d) ................................................................. 1, 5, 12, 21, 22, 38, 39

42 U.S.C. § 7411(d)(1) ................................................................. 6, 21

42 U.S.C. § 7411(d)(2) ................................................................. 6, 50

42 U.S.C. § 7411(e) ................................................................. 23

42 U.S.C. § 7412 ................................................................. 38

42 U.S.C. § 7521 ................................................................. 22

42 U.S.C. § 7607(b) ................................................................. 50

42 U.S.C. § 7607(b)(1) ................................................................. 54

42 U.S.C. § 7607(d)(7)(B) ................................................................. 52

42 U.S.C. § 7607(d)(8)-(9) ................................................................. 51

42 U.S.C. § 7607(d)(9) ................................................................. 46

42 U.S.C. § 7607(d)(9)(A) ................................................................. 11

42 U.S.C. § 7651f(b)(2) ................................................................. 21

Pub. L. No. 101-549, § 108(g), 104 Stat. 2467 (1990) ................................................................. 37

Pub. L. No. 101-549, § 302(a), 104 Stat. 2574 (1990) ............................37, 40, 41

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. Part 60, subpart B ...........................................................................6

40 C.F.R. § 60.21(e) ......................................................................................50

40 C.F.R. § 60.22(a) ......................................................................................50

40 C.F.R. § 60.5736 .......................................................................................45

**FEDERAL REGISTER**

40 Fed. Reg. 53,340 (Nov. 17, 1975) ....................................................... 49, 50

60 Fed. Reg. 65,415 (Dec. 19, 1995)............................................................29

70 Fed. Reg. 15,994 (Mar. 29, 2005)............................................................40

70 Fed. Reg. 28,606 (May 18, 2005) ...................................................... 28, 29

74 Fed. Reg. 66,496 (Dec. 15, 2009)..............................................................4

75 Fed. Reg. 25,324 (May 7, 2010)...............................................................68

75 Fed. Reg. 77,968 (Dec. 13, 2010).............................................................68

76 Fed. Reg. 57,106 (Sept. 15, 2011) ...........................................................68

77 Fed. Reg. 9304 (Feb. 16, 2012) ........................................................ 38, 66

79 Fed. Reg. 28,606 (May 18, 2005) .............................................................28

80 Fed. Reg. 64,662 (Oct. 23, 2015) ................. 4, 6, 7, 11, 14, 16, 21, 23, 28, 29, 32, 33,
................................................................................ 34, 35, 36, 37, 38, 39, 40, 41, 42, 44, 45,
................................................................................ 46, 50, 51, 55, 57, 61, 62, 66, 67, 69, 70

**LEGISLATIVE HISTORY**

S. Rep. No. 91-1196, at 20, reprinted in 1 <u>A Legislative History of the Clean Air Act Amendments of 1970</u>, at 420 (Comm. Print 1970)............................................................42

H.R. Rep. No. 101-952, at 335, reprinted in <u>1 A Legislative History of the Clean Air Act Amendments of 1990</u>, at 1785 (Comm. Print 1993)......................................... 40, 41

S. Rep. No. 101-228 at 133, reprinted in <u>5 A Legislative History of the Clean Air Act Amendments of 1990</u>, at 8338, 8473 (Comm. Print 1993)..............................................37

**STATE EXECUTIVE ORDER**

Executive Order 2015-22.....................................................................................................45

# **GLOSSARY**

| | |
|---|---|
| CAA | Clean Air Act |
| CAMR | Clean Air Mercury Rule |
| $CO_2$ | Carbon Dioxide |
| EPA | Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| GHG | Greenhouse Gas |
| MATS | Mercury and Air Toxics Standards |
| PSD | Prevention of Significant Deterioration |
| RTC | Response to Comments |

# INTRODUCTION

The Environmental Protection Agency's Clean Power Plan rule ("the Rule") addresses the nation's most important and urgent environmental challenge. The Rule will, over its lifetime, secure critically important reductions in carbon dioxide ("$CO_2$") emissions from the largest emitters in the United States – fossil-fuel-fired power plants. Such emissions pose a monumental threat to Americans' health and welfare by causing long-lasting changes in our climate, resulting in an array of severe negative effects, including drought, disease, increasingly serious weather events, and rising sea levels. Section 111(d) of the Clean Air Act ("CAA" or "Act"), 42 U.S.C. § 7411(d), expressly directs EPA to address such dangers by promulgating emission guidelines, and the Rule reflects EPA's reasonable determination of the best system for limiting the amount of $CO_2$ that plants pump into the atmosphere.

The Rule identifies highly cost-effective and proven emission-reduction strategies that are already widely employed by power plants. It then relies on those strategies to set guidelines for states (or, if a state so chooses, EPA acting on its behalf) in establishing performance standards for those plants. Those performance standards will be gradually phased in over an eight-year period beginning in 2022. Until at least that time, power plants will not be subject to any $CO_2$ requirements. And states that intend to establish standards have nearly three years before they would be required to submit such standards to EPA for approval.

State and industry stay movants either oppose any federal regulation of power plants' voluminous $CO_2$ emissions, or seek to limit such regulation to negligible requirements. Even though all significant regulatory deadlines are set well after review in this Court would conclude, Movants seek the immediate and extraordinary relief of a stay. Their requests for a stay should be denied. Movants cannot establish any – let alone all – of the elements required.

First, Movants have no likelihood of merits success. EPA has well-established authority under Section 111(d) to limit air pollution emitted by power plants, and the $CO_2$ performance levels in the Rule reflect EPA's thorough, careful and reasonable application of express statutory factors to the particular facts and circumstances of power generation and $CO_2$. Specifically, they reflect the "application" of the "best system of emission reduction" "adequately demonstrated" for sources, and they reflect an "achievable" degree of limitation. 42 U.S.C. § 7411(a)(1). Many sources are already implementing the measures discussed in the Rule, at least to some degree, on their own. Contrary to Movants' position, Congress did not require that EPA, in determining the "best system of emission reduction" for the largest $CO_2$ sources, disregard the proven strategies these sources are *already* effectively employing, in favor of little or no $CO_2$ limitation.

Second, Movants do not face any irreparable harm during the relatively short period of judicial review in this Court. States have up to *three years* to submit plans for implementing the Rule's emission guidelines, and those plans are less complicated

than other types of plans that states prepare to meet CAA obligations – sometimes within a more compressed time period.  Moreover, each state is free to elect to have EPA do all of the work required to adopt and implement standards within the state, in which case the Rule imposes no deadlines or burdens on the state at all.  Industry movants also face no imminent harm.  The Rule builds upon preexisting industry trends, and Movants have no obligations whatsoever until at least 2022.  After 2022, the Rule phases in moderate reduction requirements gradually, does not make them fully effective until 2030, and allows a broad range of compliance methods.

Third, the public interest and balance of harms strongly weigh in favor of denying Movants' stay request.  The Rule will secure critically important reductions in greenhouse gas emissions from the largest emitters in the United States.  And because $CO_2$ in the atmosphere is long-lived, any delay in implementation of the Rule and securing these emission reductions is highly consequential.[1]

## BACKGROUND

## I.      CARBON DIOXIDE EMISSIONS AND CLIMATE CHANGE

$CO_2$ and other "greenhouse gases" in the atmosphere have risen to unprecedented levels as a result of human activities, and these gases are the root cause

---

[1] State Movants (at 1 n.1) have also moved for expedited briefing.  Because the period for filing petitions for review of the Rule does not close until December 23, 2015, EPA believes this request is premature.  EPA suggests that the Court require the parties to confer and to submit proposed briefing schedules and formats (jointly, if possible) by an appropriate date following the filing deadline.

of ongoing global climate change.  74 Fed. Reg. 66,496, 66,517 (Dec. 15, 2009).

Nineteen of the twenty warmest years on record have all occurred in the past twenty

years, and 2015 is on its way to being the "hottest year ever recorded."[2]  EPA has

determined that greenhouse gases endanger the public health and welfare of current

and future generations and thus require regulation under the CAA.  74 Fed. Reg. at

66,516-36; see also Massachusetts v. EPA, 549 U.S. 497, 527-35 (2007) (clarifying

greenhouse gases are "air pollutants" under the Act).

Fossil-fuel-fired power plants are by far the highest emitting stationary sources

of $CO_2$.  These plants generate approximately 31% of all man-made $CO_2$ emissions in

the United States, almost three times as much as the next ten stationary source

categories combined.[3]  No serious effort to address climate change can succeed

without substantial emission reductions from these major sources.

## II.    THE CAA AND SECTION 111 STANDARDS OF PERFORMANCE

The purpose of the CAA is to promote public health and welfare by protecting

air quality.  42 U.S.C. § 7401(b)(1).  The Act establishes a comprehensive and detailed

program for air pollution control through a system of shared federal and state

responsibility.  Section 111 of the CAA, 42 U.S.C. § 7411, "speaks directly to

---

[2] NOAA, Global Temperature Recap, available at https://www.climate.gov/news-features/videos/2014-global-temperature-recap; Justin Gillis, 2015 Likely to Be Hottest Year Ever Recorded, N.Y. TIMES, Oct. 22, 2015, at A12.

[3] "Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2013," EPA 430-R-15-004, at 3-14 (Apr. 15, 2015); 80 Fed. Reg. 64,662, 64,689 (Oct. 23, 2015).

emissions of carbon dioxide" from the Nation's existing power plants.  Am. Elec.

Power Co. v. Connecticut, 131 S. Ct. 2527, 2537 (2011) ("AEP").

Section 111 "directs the EPA Administrator to list 'categories of stationary

sources' that 'in [her] judgment . . . caus[e], or contribut[e] significantly to, air

pollution which may reasonably be anticipated to endanger public health or welfare.'"

AEP, 131 S. Ct. at 2537 (quoting 42 U.S.C. § 7411(b)(1)(A)).  For each such category,

EPA must directly prescribe federal "standards of performance" for emissions of

pollutants from new or modified sources.  42 U.S.C. § 7411(b)(1)(B).  In addition,

EPA "shall prescribe regulations" under Section 111(d) with respect to existing

sources for pollutants not covered under certain other programs.  Id. § 7411(d).

These regulations are not designed to regulate existing sources directly, but instead to

guide "each State" in submitting to EPA a satisfactory plan that establishes "standards

of performance" for any existing source of the relevant pollutant.  Id.

A "standard of performance" for purposes of Section 111 is defined as:

> a standard for emissions of air pollutants which
> reflects the degree of emission limitation achievable
> through the application of the best system of emission
> reduction which (taking into account the cost of
> achieving such reduction and any nonair quality health
> and environmental impact and energy requirements)
> the [EPA] Administrator determines has been
> adequately                                      demonstrated.

Id. § 7411(a)(1).  Under that definition, the specific emission requirements imposed

on particular sources must "reflect[]" a more overarching, preliminary determination

that is made by EPA. In particular, EPA first identifies those "system[s] of emission reduction" that are "adequately demonstrated" for a particular source category; determines the "best" of these systems, based on the relevant criteria; and then derives from that system an "achievable" emission performance level for the relevant sources. 80 Fed. Reg. at 64,720.

EPA promulgates its determination in a set of regulations known as "emission guidelines." 40 C.F.R. Part 60, Subpart B. The emission guidelines also provide procedures for receipt and approval by EPA of individualized state plans, which specify the precise emission limitations that will be applicable to particular sources within a state, along with other measures necessary for implementation of those emission limitations. 42 U.S.C. § 7411(d)(1). If a state elects not to submit a plan to EPA, or does not submit a "satisfactory" plan, EPA must promulgate a federal plan that directly limits emissions from the state's existing sources. Id. § 7411(d)(2).

## III.   THE CLEAN POWER PLAN

On October 23, 2015, after receiving almost seven million public comments that resulted in numerous changes to the original proposals, EPA published two final rules for $CO_2$ emissions from fossil-fuel-fired power plants. The first rule establishes $CO_2$ emission standards under Section 111(b) for new, modified, and reconstructed plants. 80 Fed. Reg. 64,510 (Oct. 23, 2015). The second, the Rule at issue here,

establishes Section 111(d) emission guidelines for states to follow in developing plans

to limit $CO_2$ from existing plants. 80 Fed. Reg. 64,662.[4]

In the Rule, EPA determined that the "best system of emission reduction"

"adequately demonstrated" for existing plants includes a combination of three

measures, referred to as "building blocks":

(1) improving heat rate at coal-fired steam plants;

(2) substituting increased generation from lower-emitting existing natural gas combined cycle plants for generation from higher-emitting steam plants (which are primarily coal-fired); and

(3) substituting increased generation from new zero-emitting renewable energy generating capacity for generation from fossil-fuel-fired plants (which are primarily coal- or gas-fired).

See 80 Fed. Reg. at 64,667. EPA determined these measures were "adequately

demonstrated" because each of them is already a well-established technique for

reducing $CO_2$ emissions from power plants. Id. at 64,709. EPA determined that

these measures are collectively the "best system of emission reduction" because they

can achieve substantial $CO_2$ reductions at reasonable cost, without adverse impacts on

energy availability or otherwise. Id. at 64,744-51. EPA determined that individual

sources can implement all of these measures, including the second and third

"generation-shifting" measures, through a set of actions that range from making direct

_____

[4] EPA additionally has proposed two approaches to a federal plan for states that do not submit an approvable plan (which can also serve as models for states that do develop their own plans). 80 Fed. Reg. 64,966 (Oct. 23, 2015).

investments in zero- or low-emitting plants to purchasing emission-rate credits from entities that have made such investments. Id. at 64,709.

EPA considered alternative systems and found them inferior. Id. at 64,727-28. Among these, EPA considered technologies to capture and inject $CO_2$ underground ("carbon sequestration"). Id. EPA also considered measures to substitute, in part or in whole, natural gas as the fuel source at coal-fired plants ("gas co-firing"). Id. While these measures are feasible for some existing plants and could achieve substantial reductions, EPA concluded they were less cost-effective for existing plants than the set of measures collectively identified as the "best system." Id.

Having identified the "best" $CO_2$ reduction system, EPA quantified the degree of emission reduction achievable under that system for two subcategories of sources: steam units (which are primarily coal-fired) and combustion turbines (which are primarily gas-fired). Id. at 64,663. To best reflect the Nation's interconnected electrical system, EPA quantified the reductions achievable for each subcategory in 2030 in each of three regions. Id. at 64,738. EPA then established uniform performance levels for each subcategory based on the least stringent of the three calculated regional rates. Id. at 64,742; 64,961 (Table 1).

To enhance state planning flexibility, the Rule translates the uniform performance rates into equivalent statewide emission goals for 2030, expressed in terms of both the rate of emissions per unit of energy production ("rate-based goals") and the total mass of emissions ("mass-based goals"). Id. at 64,820. The Rule then

gives each state the option of either submitting a plan that simply applies the uniform performance rates to all sources within the state, or one that otherwise meets either the equivalent rate-based or mass-based statewide goals.  Id. at 64,832-37.  Under the latter option, states could assign emission standards for particular plants that depart from the uniform performance rates, so long as the equivalent state goals were met. The Rule thus does not require any particular amount of reductions by any particular source at any particular time.

The Rule does *not* limit states and sources to applying the specific "building block" measures identified by EPA as the "best system" for purposes of EPA's establishment of emission guidelines.  Id. at 64,710.  Instead, states and sources have the flexibility to choose from a wide range of measures to achieve the emission limitations, including the ability to rely on technological controls such as sequestration or gas co-firing.[5]  The Rule also accommodates (but does not require) trading-based

---

[5] To enhance state flexibility, the Rule additionally authorizes states to pursue a "state measures" approach, under which they may avoid imposing any direct Section 111(d) emission standards (i.e., "standards of performance") on power plants, and may instead pursue other state-law-only measures to reduce power plant emissions (e.g., programs that encourage more efficient energy usage and thereby reduce demand) by the requisite amount.  States that rely on such a "state measures" approach must include within their state plans a set of approvable Section 111(d) "standards of performance" to be applied directly to sources in case the state measures are unsuccessful.  Id. at 64,836-37.

emission programs and other compliance strategies that significantly enhance flexibility and cost-effectiveness for sources.  Id. at 64,834-35.[6]

The Rule will be gradually phased in over an extended period.  No reductions are required from sources until 2022 at the earliest.  In fact, most states may delay requiring emission reductions from sources until 2024 and still meet the Rule's requirements.  Id. at 64,786.

States have up to three years to submit their plans.  Id. at 64,669.  The Rule directs states to provide either a plan or an initial submission in September 2016.  Id. That initial submission – through which states may request and obtain an extension until September 2018 to complete their plans – need only include minimal information concerning the status of the state's planning efforts, specifically: (a) an identification of the various plan approaches under consideration, including any progress to date, (b) a description of opportunities for public input on the plan, and (c) an appropriate explanation for why the state requires more time.  Id. at 64,947.

States may also entirely decline to prepare and submit their own plans, in which case the only consequence is that EPA will promulgate a federal plan for the affected power plants in that state.  Id. at 64,942.  EPA does not have authority to impose

---

[6] Trading-based emission programs can take different forms, but generally provide companies with an incentive to develop cost-effective emission reduction strategies by enabling companies to earn credits or allowances for projects that reduce emissions, which can then be sold to other facilities to meet emission requirements.

sanctions on a state for failure to submit a state plan. <u>Id.</u> States that do decline to prepare and submit plans by the established deadlines could still choose, at any later point, to adopt an approvable state plan that would supplant any federal plan. <u>Id.</u>

The Rule will not result in any substantial increase in electricity costs to the public. <u>Id.</u> at 64,679-81, 64,748-51; Regulatory Impact Analysis ("RIA"), Docket No. EPA-HQ-OAR-2013-0602-36877, 3-35 to 3-40. The Rule will also not reduce the reliability of the electricity system, 80 Fed. Reg. at 64,671, and is consistent with long-term trends in the generation of energy. <u>Id.</u> at 64,694-96, 64,709.

## STANDARD OF REVIEW

"On a motion for stay, it is the movant's obligation to justify the court's exercise of such an extraordinary remedy." <u>Cuomo v. NRC</u>, 772 F.2d 972, 978 (D.C. Cir. 1985). A movant must demonstrate: (1) a likelihood of success on the merits; (2) irreparable injury if relief is withheld; (3) lack of harm to other parties from a stay; and (4) that a stay would serve the public interest. <u>Nken v. Holder</u>, 129 S. Ct. 1749, 1761 (2009); <u>see also</u> D.C. Cir. R. 18(a)(1).

## ARGUMENT

## I.  MOVANTS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

To establish likelihood of success on the merits, Movants must show that EPA's action is likely to be found "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A). Questions of

statutory interpretation are governed by the two-step test set forth in <u>Chevron, U.S.A., Inc. v. NRDC</u>, 467 U.S. 837, 842 (1984).  If the Congressional intent is clear from the statutory language, that intent must be given effect.  <u>Id.</u> at 842-43.  If the statute is ambiguous, a permissible construction by an agency administering the statute must be upheld.  <u>Id.</u> at 843.  Movants cannot make the necessary showing.

Section 111, 42 U.S.C. § 7411, instructs EPA to establish emission guidelines for existing sources of pollutants that cause, or contribute significantly to, air pollution that may reasonably be anticipated to endanger public health or welfare. The Supreme Court, examining Section 111(d), found it "plain that the Act 'speaks directly' to emissions of carbon dioxide from [fossil-fuel-fired] plants." <u>AEP</u>, 131 S. Ct. at 2537.  Section 111(d) directs EPA to determine "the degree of emission limitation achievable through the application of the best system of emission reduction," which state plans will then "reflect[]" in particularized requirements for specific sources.  42 U.S.C. § 7411(a)(1), (d).  The Rule here fully comports with Congress' direction, reasonably taking into account the particular facts and circumstances for reducing $CO_2$ emissions from sources that are part of an interconnected electric generating system, and reflecting measures that many sources are already undertaking on their own.

Movants' core argument is that EPA erred in including generation-shifting measures within the selected best system of emission reduction, rather than confining emission guidelines to certain limited actions that power plants can take within the

physical boundaries of their particular facilities – actions that no one disputes will fail

to curb $CO_2$ emissions in any meaningful way.  Contrary to Movants' contention,

however, Congress did not disempower EPA, in setting achievable emission

guidelines for $CO_2$, from identifying and building upon proven emission control

strategies that sources are already effectively employing.  The Rule is consistent with

the text and purpose of the Act, see § I.A. & B.1.; properly takes account of the

availability of generation-shifting measures, see §§ I.B.2. & I.B.3.; respects the

traditional regulatory spheres of states and other federal agencies, § I.B.4; and sets the

guidelines at appropriate levels, see § I.B.5.

**A.    The Rule Represents a Lawful and Reasonable Determination of $CO_2$ Emission Guidelines.**

The Administrator's determination of the guidelines applicable to state

regulation of $CO_2$ emissions from existing power plants represents a direct and

straightforward application of the criteria set forth in the statute.  Specifically, the

emission guidelines in the Rule (1) are based on a "system of emission reduction" (2)

that is "adequately demonstrated," and (3) that is the "best" system considering

"costs," "energy requirements" and the amount of reductions obtainable.  They also

(4) reflect an "achievable" degree of limitation.  42 U.S.C. § 7411(a)(1).

**1.**   The three measures that form the basis of the emission performance levels

– improving heat rates at coal-fired plants, ensuring enhanced utilization of existing

low-carbon power generation, and ensuring enhanced use of zero-carbon power

generation – constitute a "system of emission reduction." 80 Fed. Reg. at 64,762-63. The word "system" is expansive, encompassing "a set of things or parts forming a complex whole" or "a set of principles or procedures according to which something is done."[7] Thus, a "system of emission reduction," by its own terms, encompasses any set of measures for reducing emissions. The set of measures identified by EPA will unquestionably do so.

2.    The emission levels specified in the Rule are also premised on an "adequately demonstrated" emission reduction system. Each of the three measures applied by EPA, including the challenged generation-shifting measures, are already widely employed by power plants for multiple purposes, including reducing $CO_2$ emissions. 80 Fed. Reg. at 64,724-26.

Pollution control measures that utilize generation-shifting have been widely successful in the power industry because of that industry's uniquely integrated nature. Id. at 64,667, 64,763 n.468, 64,768-73, 64,795-811. Power generators produce a product – electricity – that is fungible in nature. Id. at 64,776. Power generators operate within an interconnected electricity grid. In this grid, electricity generally cannot be stored in large volumes, so generation and use must be simultaneously balanced in real time. Id. at 64,725. This means that, unlike other industries where

---

[7] See Oxford Dictionary of English (3d ed.) (2010), available at
http://www.oxforddictionaries.com/us/definition/american_english/system.

sources make decisions independently, electric generators must closely coordinate operations at all times.  Id.  Assuming consumer demand is held constant, adding electricity to the grid from one generating unit will result in the instantaneous reduction in generation from other units, and vice versa.  Id. at 64,769.

Because of these circumstances unique to the power industry, power generators have long feasibly implemented generation-shifting as an operating practice to achieve a wide variety of objectives, including as a strategy for achieving pollutant reductions. Id. at 64,782 n.604, 64,795-811.  Congress has also based CAA provisions, and EPA has based previous CAA rules, on the ability of power plants to shift generation to cleaner sources.  Id. at 64,770-73.  Power plants have likewise relied on generation-shifting to achieve $CO_2$ reductions, either to meet the existing requirements of some states or to meet the corporate goals of some companies.  Id. at 64,725, 64,769-72. Indeed, when Utility Movants represent that they have already "significantly reduced $CO_2$ emissions from 2005 levels," and that they intend to reduce their emissions even absent the Rule, Utility Air Regulatory Group et al. ("Utility") Mot. at 19, they are referring in large part to the measures they have already taken or plan to take to shift generation in ways that favor cleaner sources.  80 Fed. Reg. at 64,725, 64,769-72.

**3.**  The Rule's performance levels are premised on the "best" system of emission reduction applying the relevant considerations, including the degree of reductions achieved, costs, and energy requirements.  Id. at 64,748-51.  The selected system is the most effective way to reduce significant amounts of $CO_2$ from these

sources.  Id. at 64,748; see Sierra Club v. Costle, 657 F.2d 298, 326 (D.C. Cir. 1981) (holding that amount of air pollution reduced is an important factor to be considered in selecting the "best" system).

Generation-shifting measures in particular can achieve substantial $CO_2$ reductions especially cost-effectively, and without jeopardizing electric system reliability.  Although other technology-based measures such as gas co-firing and carbon sequestration are feasible for a segment of the industry, those technologies are at this point considerably more expensive to implement than the demonstrated generation-shifting strategies the electricity sector has been employing for decades.  80 Fed. Reg. at 64,727.  Thus, even if EPA had based the performance levels on the application of those technologies, sources would likely still have met their resulting obligations using more cost-effective generation-shifting strategies.  Id. at 64,728.

Limiting the "best system" just to efficiency measures at coal-plants (the first building block), as Movants prefer, is a far inferior approach because it would not achieve significant reductions.  Indeed, implementing those measures in isolation could lead to *increased* emissions, because they would lower high-emitting plants' operating costs, which could lead the energy sector to rely more heavily upon them for generation.  Id. at 64,745, 64,748.

**4.**  The Rule's performance levels are furthermore based upon an "achievable" degree of emission limitation.  As the Agency explained, generation-shifting measures are readily available to individual sources in the power industry because of the

integrated nature of power generation and the industry's existing planning and reliability mechanisms.  Id. at 64,731.  The record also supports EPA's finding that the particular degree of reductions required is achievable by sources.

The record describes in great detail the specific steps that an individual source may take to apply generation-shifting measures for purposes of complying with a particular emission standard that a state might adopt for that source.  Id. at 64,731-35, 64,796, 64,804-06.  For example, if a state imposes a rate-based limitation (i.e., a limit expressed in the form of a rate of emissions per unit of energy production), a source could, among other things, make direct investments in cleaner power generation itself, for which it could receive "emission rate credits," or purchase credits from other sources that have invested in eligible measures.  Id. at 64,731-33.[8]  If a state imposes a mass-based limit (i.e., a limit on the total mass of emissions), a source might be allocated a certain number of emission allowances, and be able to purchase or sell those allowances through a market.  Id.  This approach would provide economic incentives that favor lower-emitting generation, while allowing a particular source to comply with its state-imposed legal obligations by purchasing sufficient allowances to offset any emissions in excess of its limits.

---

[8] Many of the same companies that own steam units own combustion turbines or renewable facilities.  Id. at 64,796; 64,804-05.

A robust record further reflects that there are sufficient amounts of unused existing natural gas-fired generation capacity and potential for new renewable energy capacity to enable all sources in both source subcategories to readily employ these kinds of strategies, and to do so at reasonable cost and without causing adverse impacts on energy supply.  Id. at 64,797-802, 64,806-11.

The Rule will be implemented gradually and is consistent with prevailing trends in the energy sector towards more renewable and gas-fired generation.  Id. at 64,785. These trends are due largely to falling prices for renewables and gas, as well as the aging of existing coal plants.  Id. at 64,678, 64,795, 64,803-04.  Thus, the Rule does not call for any "fundamental redirection of the energy sector," id. at 64,785, but instead builds upon the existing direction of the power industry.  While EPA projects that the Rule will reduce coal-fired generation by the time the Rule is fully implemented in 2030, the amount of that reduction is projected to be less than, and to occur more gradually than, the reduction that has already occurred from 2002 to 2012. RIA 2-5.  EPA further projects that significant reductions in coal-fired generation would occur even in the Rule's absence, and that following full implementation of the Rule in 2030, the amount of coal-fired generation will be 27.4% of total generation, which is only 5.4% less than projected without the Rule.  Id. at 3-27 (Table 3-11) Declaration of Kevin Culligan ¶ 22 (Ex. 3).

**B.    EPA Properly Interpreted its Authority in Premising Guidelines for the Regulation of Sources on "the Best System of Emission Reduction."**

Movants principally argue that EPA exceeded its authority by including generation-shifting measures within the selected "best system of emission reduction." They contend that emission guidelines must be premised exclusively on actions that individual power plants can take within the boundaries of their particular facilities, and cannot include measures that involve third parties. See, e.g., State of West Virginia, et al. ("W.Va.") Mot. at 6-11; Utility Mot. 8-13. That contention lacks merit.

EPA has permissibly interpreted and applied the statutory text, and, in particular, the definition of "standard of performance." Movants cannot carry their heavy burden under Chevron, 467 U.S. at 842-43, to show that the Agency's interpretation is either completely foreclosed by the text or is an unreasonable reading of ambiguous statutory language. They instead posit limitations on EPA's discretion that are not grounded in actual statutory text and that would, in fact, frustrate Congress' fundamental objective to protect air quality in enacting the CAA.

**1.  The phrase "best system of emission reduction" encompasses a wide range of measures.**

Congress deliberately used the expansive phrase "best system of emission reduction" in defining the term "standard of performance" because it understood "that without regulatory flexibility, changing circumstances and scientific developments would soon render the [CAA] obsolete." Massachusetts v. EPA, 549

19

U.S. at 532.  As elsewhere in the Act, Congress' use of "[b]road language" in Section 111 "reflects an intentional effort to confer the flexibility necessary to forestall such obsolescence."  Id.  The Act thus exemplifies how Congress "usually does not legislate by specifying examples, but by identifying broad and general principles that must be applied to particular factual instances."  Pub. Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 475 (1989).

Contextual considerations confirm that Congress intended the broad phrase "system of emission reduction" to be given its plain meaning and construed flexibly. See King v. Burwell, 135 S. Ct. 2480, 2483-84 (2015) (reiterating the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (internal quotation marks and citation omitted)).  The phrase contrasts sharply with the narrower phrase "*technological* system of continuous emission reduction," which appears later in the same statutory subsection.  42 U.S.C. § 7411(a)(7) (emphasis added).  This contrast illustrates that Congress did not intend to limit a "system of emission reduction" to solely "technology-based" measures.  See Utility Mot. 9; see, e.g., Nat'l Fed'n of Indep. Businesses v. Sebelius, 132 S. Ct. 2566, 2583 (2012) ("NFIB") ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts

intentionally").[9]  Congress' decision to use broad language for purposes of Section 111(d) is logical, given the catch-all nature of this program, which addresses threats posed by a potentially wide range of pollutants not addressed elsewhere in the Act.  80 Fed. Reg. at 64,761 n.464.

Another significant contextual consideration is that Section 111(d) expressly instructs EPA to "establish a procedure similar to that provided by Section 7410," 42 U.S.C. § 7411(d)(1).  That section describes the National Ambient Air Quality Standards program, in which a cooperative-federalism approach affords states wide discretion in choosing methods of air pollution control.  In particular, section 7410 authorizes state plans to include a range of non-technological off-site measures for sources, including "marketable permits."  42 U.S.C. § 7410(a)(2)(A).  This explicit connection between the two programs suggests that Congress intended that states, in implementing Section 111 state plans, be able to use similarly flexible emission-reduction mechanisms, including trading programs that promote relatively greater use of low-emitting facilities.  See 80 Fed. Reg. at 64,733-75.

Indeed, many Movants in comments to EPA took the position that states and sources should be able to rely on generation-shifting measures in crafting and

---

[9] Likewise, the language at 42 U.S.C. § 7651f(b)(2), see Chamber of Commerce of the U.S., et al. ("Chamber") Mot. at 12, providing for limitation based on the "retrofit application of the best system of continuous emission reduction, taking into account available technology," reflects that Congress knew how to further cabin EPA's discretion when it wished to.

complying with the Section 111(d) emission standards set by states directly applicable to plants. See id. at 64,733 n.380; Declaration of Janet McCabe ¶ 37 (Ex. 1). Movants cannot have it both ways: the same cost-effective emission reduction measures that may be used in setting and complying with states' Section 111(d) "standards of performance" that are directly applicable to sources are necessarily also measures that may be incorporated into a "system of emission reduction" for purposes of EPA's Section 111(d) emission guidelines.

Movants also err, e.g., Utility Mot. 10, in placing weight on unenacted legislative proposals that would have amended the Act to further address climate change by imposing a different regulatory structure to replace the existing approach. The fact that subsequent Congresses have considered and rejected different approaches to combat climate change says nothing about what Congress meant when it drafted Section 111's operative language. See Massachusetts v. EPA, 549 U.S. at 529-30 (rejecting consideration of post-enactment legislative history in assessing whether CAA section 202, 42 U.S.C. § 7521, addresses climate change). See also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 187 (1994) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change.") (internal quotation marks and citation omitted).

## 2. The generation-shifting measures contemplated by the Rule can be effectuated through standards of performance for existing sources.

Movants assert that the Rule is defective because the application of generation-shifting measures by EPA in setting guidelines allegedly is inconsistent with the requirement in Section 111(d) that emission standards be implemented through "standards of *performance*" "for any existing *source*," see 42 U.S.C. § 7411(d) (emphasis added), with Movants focusing on the two emphasized words. E.g., W.Va. Mot. 8, 12. But neither of these words supports Movants' argument.

First, the promulgated guidelines are consistent with the statutory design under which EPA rulemaking informs the creation of standards of performance "for any existing source." Movants emphasize that the term "source" is defined in Section 111(a)(3) as "any building, structure, facility, or installation which emits or may emit any air pollutant." E.g., Utility Mot. 11; Chamber Mot. 7-8. This definition, however, simply specifies *what* entities are subject to Section 111 standards. Specifically, the definition makes clear that the entities to which Section 111 standards must apply are stationary sources, and not, for example, mobile sources that are regulated elsewhere in the Act.[10] But the definition of "source," and the description of "standards of

---

[10] As the Act itself recognizes, "[b]uildings" and "structures" cannot themselves, of course, act to comply with emission standards; it is their owners and operators that take compliance actions (e.g., their owners or operators purchase and install pollution control equipment, change fuels, reduce generation levels, purchase emission allowances or credits). See 42 U.S.C. § 7411(e) (requiring owners and operators of

*(Footnote continued . . . )*

performance" as applying to sources, does nothing to limit the scope of measures that can be considered as part of the "best system of emission reduction," which informs the *stringency* of standards for stationary sources, to only those measures that could be implemented even if the source were hermetically sealed off from the rest of the world.[11]  Certainly, it does not do so unambiguously, as would be required for Movants to prevail under <u>Chevron</u>.

Movants' assertions that EPA has "redefined" the source, Basin Electric Power Cooperative ("Basin") Mot. at 13, or is treating the electric grid as a single "source," National Mining Ass'n, et al. ("Coal") Mot. at 13, are wrong.  EPA has not redefined the source as the grid; rather, it has properly calculated the degree of emission limitation achievable for an individual source applying the "best system of emission

---

sources to comply with emission standards for sources).  To make clear that the emission performance levels are achievable by a source through generation-shifting, EPA made the unremarkable observation that it is the owner or operator of a source that will implement generation-shifting measures.  80 Fed. Reg. at 64,762.  Movants now argue that EPA erroneously redefined the "source" to include the owner.  <u>E.g.</u>, Chamber Mot. 9.  But Movants have misconstrued EPA's explanation, which is that the *source*, being controlled as it is by its owner or operator, can achieve an emission standard by implementing generation-shifting measures.

[11] There are a number of statutory constraints that *otherwise* cabin the scope of a permissible "system of emission reduction," including the need to consider "costs" and "energy requirements."  EPA also reasonably interprets the phrase "system of emission reduction" to call for considering only those systems that do not require any reduction in aggregate production levels within an industry, which precludes consideration of, <u>e.g.</u>, demand-side efficiency measures.  80 Fed. Reg. at 64,778-79.

reduction" in the context of the grid.[12]  Movants likewise err in suggesting, e.g., W.Va.

Mot. 7, that individual sources cannot apply or implement the measures in the best

system to achieve emission limits.  As discussed above, supra at 17, EPA extensively

described the measures that any individual source can take to shift generation to a

cleaner source or sources and thereby achieve its emission standard.[13]

---

[12] Movants' reliance on ASARCO, Inc. v. EPA, 578 F.2d 319 (D.C. Cir. 1978) is also misplaced.  See, e.g., Utility Mot. 11.  ASARCO has no relevance because that case did not address or interpret the scope of the controlling statutory term here: i.e., "best system of emission reduction."  That case instead rejected an EPA regulation which redefined the statutory term "stationary source" to include "any * * * combination of * * * facilities."  578 F.2d at 326 (internal quotation marks and citation omitted).  That regulation was intended to allow a plant operator who modifies a facility to increase emissions from some structures within the facility, to avoid complying with Section 111(b) new source standards, see 42 U.S.C. § 7411(a)(2), (4), if emission decreases from other units within the same facility canceled out the increases.  In rejecting the regulation, the Court emphasized that it would thwart the Act's air quality objectives. 578 F.2d at 327-28.  ASARCO was decided before the Supreme Court's decision in Chevron, which later upheld a similar EPA rule allowing states to treat all pollution-emitting devices within the same facility as though they were encased within a single "bubble."  467 U.S. at 857-66.  In any event, nothing in ASARCO supports Movants' proposition that EPA must adhere to a balkanized approach in interpreting the phrase "best system of emission reduction," an approach that would frustrate the Act's air quality objectives.

[13] Movant Basin Electric erroneously asserts that EPA is claiming authority to regulate *anything* that a particular owner of a source controls, so that EPA could hypothetically "treat jet engines and washing machines" manufactured by the same company as "the same source."  Basin Mot. 7.  This misunderstands EPA's explanation.  As EPA explained, "generation shifting" is available as an emission reduction system for power generators because of the uniquely integrated nature of the electric grid, where generators' operations are closely intertwined and dependent upon each other.  80 Fed. Reg. at 64,677; Legal Memorandum Accompanying Clean Power Plan for Certain Issues, Docket No. EPA-HQ-OAR-2013-0602-36872 ("Legal Mem.") at 117-27.  In the power sector, if a source adds clean generation to the grid, that addition

*(Footnote continued . . . )*

Second, with respect to Congress' use of the word "performance" in Section 111, that word is part of the fuller statutorily-defined term "standard of performance," and, as discussed above (supra at 13-18), the consideration of generation-shifting measures meets every element of that fuller term. Congress' contemplation that a "standard of performance" could be informed by how a source interacts with the world around it is further evident in Congress' instruction that such standards should "reflect[]" the degree of emission limitation achievable through the application of an overarching "system" that EPA determines to meet the statutory criteria. Congress' focus on the "system" as the central determination, with the particular degree of emission limitation calculated in light of that "system," reinforces the broad scope of potential pollution-curbing measures that may serve as the basis of the emission guidelines that EPA issues.

EPA's interpretation of its authority under Section 111 (i.e., its authority to consider generation-shifting as within the best system for reducing power plant $CO_2$ emissions), should, at a minimum, be upheld under <u>Chevron</u> step two. 467 U.S. at 843. Although Movants make no attempt to apply <u>Chevron</u>, it is clearly applicable to the Agency's interpretations of the Act, <u>see, e.g.</u>, <u>EPA v. EME Homer City</u>

---

necessarily decreases other generation, and, because the decreased generation is generally fossil-fuel-fired, generally decreases emissions. In Basin's hypothetical, emissions from the production of jet engines and washing machines under common ownership are not intertwined; the increased production of washing machines does not result in decreased emissions from jet engine manufacture.

Generation, L.P., 134 S. Ct. 1584, 1603 (2014), and EPA is well-qualified to fill the gap left open by any ambiguity in the CAA. Here, the Agency has exercised that interpretive authority, to the extent necessary, in a reasonable manner. The purpose of the statute is, after all, to protect public health and welfare, and EPA's interpretation fulfills that purpose by enabling EPA to truly apply the "best" emission reduction system to sources. Movants' proposed interpretation, in contrast, would thwart Congress' objectives.

As a matter of common sense, where the very same product (electricity) is manufactured by sources in an interconnected grid using processes that have vastly disparate air pollution impacts, it is reasonable for Section 111(d) guidelines to reflect that sources may reduce or offset their emissions by entering into arrangements that incorporate cleaner forms of power generation. This is particularly so where the regulated sources already engage in that practice on their own, and where increased utilization of clean energy production will be far less costly for high-polluting sources than requiring them to engage in fuel substitution or to apply end-of-the-stack technologies at their plants. Under Movants' position, EPA would be compelled to apply an obviously inferior emission reduction system: either one far more expensive, or one that would not meaningfully address the threats presented.[14]

---

[14] Contrary to Movants' assertion, Chamber Mot. 13, Section 111(d) standards of performance for existing sources do *not* set a regulatory floor for standards in the Act's separate pre-construction permitting program for individual new or modified

*(Footnote continued . . . )*

### 3. Cross-boundary measures have been used as the basis for other Section 111 rules, including Section 111(d).

Movants are mistaken in suggesting that EPA has never previously relied on measures extending beyond the boundaries of a plant in applying Section 111. Coal Mot. 5; Chamber Mot. 8. In one particularly relevant example, many of these same Movants *supported* EPA's reliance in the Clean Air Mercury Rule ("CAMR") on cross-boundary measures as a basis for Section 111(d) emission limitations for coal-fired plants. 70 Fed. Reg. 28,606 (May 18, 2005). In that rule, EPA set Section 111(d) guidelines that established a national cap-and-trade program for mercury emissions from coal-fired plants.[15] Under that program, states could allocate emission allowances to individual plants as they deemed appropriate as long as the total allocation did not exceed a state's emission budget. 80 Fed. Reg. at 64,697. EPA based the cap, in part, on the sources' ability to engage in the same kind of measures contemplated here. i.e., by shifting generation to relatively well-controlled units or

---

stationary sources (the Prevention of Significant Deterioration Program ("PSD") program). The Section 111(b) standards for new or modified sources will set the floor for PSD standards. See Response to Comments ("RTC"), Ch. 1, §§ 1.0-1.5, 170-72, EPA-HQ-OAR-2013-0602-36876. Thus, the 111(d) standards are unrelated to PSD standards. Similarly, Movant Basin Electric's citation to an EPA PSD guidance document also is misplaced, see Basin Mot. at 14, as the reasons for applying certain policies to the administration of the PSD program are inapplicable to this Section 111(d) Rule. RTC Ch. 1, § 1.2.

[15] The Court vacated CAMR, but on grounds immaterial to the statutory interpretation issue presented here. New Jersey v. EPA, 517 F.3d 574, 583-84 (D.C. Cir. 2008).

with cleaner forms of energy production, and through buying and selling allowance.[16]

On judicial review of CAMR, many of the same Movants here (including lead

Movants West Virginia, North Dakota, Utility Air Regulatory Group, and National

Mining Association) intervened in *support* of EPA's authority to establish a cap-and-

trade program under Section 111(d), advising the Court in their merits brief that:

> the regulation of air emissions using a cap-and-trade program has
> proven far more efficient than regulating each facility under a
> command-and-control approach.[17]

Indeed, owners and operators of power plants routinely depend on their ability

to enter into arrangements with entities that may or may not themselves be directly

regulated by the CAA, in relation to activities that are taking place far beyond the

boundaries of their plants, in complying with emission standards.  For example, they

routinely rely on third parties to pretreat coal or oil (i.e., fuel-cleaning) off-site for

purposes of meeting Section 111(b) sulfur emission standards, and for this reason,

EPA has based the "best system" for those standards on third-party fuel cleaning.

---

[16] Utility Movants are wrong, Mot. 9, in asserting that the emission cap in CAMR was
based solely on the application of control technology.  In CAMR, EPA identified the
"best system" as "the *combination* of the cap-and-trade mechanism and the technology
needed to achieve the chosen cap level."  70 Fed. Reg. at 28,620 (emphasis added).
Specifically, EPA set the cap at the level that would be cost-effective, based on the
ability of regulated sources to reduce their emissions in part through "*dispatch changes*"
(i.e., generation shifting). Id. at 28,619 (emphasis added).

[17] See New Jersey v. EPA, Case No. 05-1097, Joint Brief of State Respondent-
Intervenors, Industry Respondent-Intervenors, and State Amicus, 2007 WL 2155487
(D.C. Cir.) (July 23, 2007).

See 80 Fed. Reg. at 64,765-66.  Likewise, they routinely rely on emissions averaging and trading programs for purposes of meeting a wide range of CAA compliance obligations.  60 Fed. Reg. 65,402, 65,415 (Dec. 19, 1995); 80 Fed. Reg. at 64,770-73. By definition, such averaging and trading programs allow a particular source to rely in part on emission reductions that *other* facilities have actually achieved (as opposed to relying entirely on reductions that the source itself achieved within the boundaries of its plant).  Consequently, the balkanized construct that Movants assert as a textually-mandated limiting principle cannot be squared with real-world practice.

Movants are also mistaken in their argument that premising the "best system" on cost-effective arrangements involving cleaner forms of production is inappropriate because pollution regulation should not result in any "winners and losers" among generation sources.  W.Va. Mot. 9.  It is neither irrational nor unprecedented for the Agency to exercise its authority to incentivize production using the cleanest methods possible.  Many other air pollution standards previously promulgated by EPA for power plants have likewise had adverse competitive implications for dirtier plants that needed to do more to comply.  McCabe Decl. ¶ 44.[18]

_____

[18] Movant States raise, as a fictional strawman, the prospect that EPA would someday try to mandate under Section 111 that states direct all fossil-fuel power plants to close. W.Va. Mot. 8.  EPA has not asserted any such authority under Section 111.  Directing plants to shut down would be an action entirely different in nature from setting emission performance guidelines premised on an appropriate amount of generation-shifting that is cost-reasonable for the regulated industry.

Movants' reliance on certain language in <u>Util. Air Regulatory Grp. v. EPA</u>, 134 S. Ct. 2427 (2014) ("<u>UARG</u>") as purportedly undermining the reasonableness of EPA's approach is also misplaced. In <u>UARG</u>, EPA sought to expand two CAA permitting programs but to adjust, through regulations, the express statutory numerical thresholds for those programs to avoid sweeping in millions of small emission sources for the first time. <u>Id.</u> at 2448. Here, EPA is neither straining the interpretation of a clear statutory provision (e.g., rewriting a numerical threshold), nor expanding its regulatory authority so as to require such a strained interpretation to avoid an anomalous result (e.g., regulating a large number of new small sources). It is instead applying a sensible and straightforward interpretation of the "best system of emission reduction" to determine the stringency of emission standards, and it is doing so for polluters that have long been regulated under Section 111 and, in fact, are the *very biggest* polluters in the nation – large fossil-fuel-fired power plants. The Rule also builds upon existing industry trends and requires gradual and measured $CO_2$ reductions, thus, "moderately increasing the demands" it makes of these sources. <u>Id.</u> Movants mischaracterize the Rule in suggesting that it calls for some "massive industrial transformation." Coal Mot. 19.

### 4. The Rule does not intrude on areas of regulation reserved to the States or other federal agencies.

Movants also err in contending that EPA's interpretation impinges upon states' sovereign rights or is contrary to authority provided to the Federal Energy Regulatory

Commission ("FERC").  Congress provided authority specifically to EPA to regulate dangerous air pollution, including $CO_2$ from power plants, because this pollution poses urgent hazards that require a meaningful federal response.  The Act specifically entrusts EPA, as the "expert administrative agency," to determine the "appropriate amount of [$CO_2$] regulation" from power plants by engaging in "complex balancing" which weighs "the environmental benefit potentially achievable" against "our Nation's energy needs and the possibility of economic disruption."  <u>AEP</u>, 131 S. Ct. at 2539. Although Movants suggest that EPA lacks the necessary "expertise," <u>e.g.</u>, Chamber Mot. 14, for this Congressionally assigned task, the Supreme Court has recognized EPA as an "altogether fitting" "expert administrative agency" equipped to make suitable regulatory judgments about $CO_2$ pollution from power plants, <u>AEP</u>, 131 S. Ct. at 2539.  Neither FERC nor any other federal agency is entrusted with that particular mandate and responsibility.

EPA engaged in extensive consultation with FERC, grid operators, utilities and others prior to making any judgments relating to the Rule's impact; carefully considered their recommendations, and made reasonable judgments regarding "energy requirements."  80 Fed. Reg. at 64,671, 64,693-94, 64,706-07, 64,800, 64,874-81.[19]

---

[19] Movants err in contending that the Court remanded the rule at issue in <u>Del. Dep't of Natural Res. v. EPA</u>, 785 F.3d 1 (D.C. Cir. 2015) because EPA lacked authority to consider grid reliability issues.  <u>See, e.g.,</u> Coal Mot. 11 n.41.  The reason for the remand was the Court's view that EPA had failed to consider public comments raising grid reliability concerns or to consult with FERC, unlike in this case.

Contrary to Movants' argument, the Rule's emission guidelines do not diminish or alter the authorities and functions of state public utility commissions or other instruments of state energy policy. Movants' argument ignores the distinction between (1) specific pollution limitations authorized by the Act that have an indirect effect on energy markets, and (2) more general direct regulation of energy markets. The pollution limitations here are the former. As is the case with *any* pollution limitations for power plants (which are commonplace under the Act), the Rule will entail compliance costs for regulated power sources, and those costs will necessarily indirectly affect energy markets. That does not mean EPA lacks authority to establish pollution limitations or that establishing such limitations impermissibly interferes with states' traditional responsibilities in the field of electricity regulation.

Under the Rule, states retain the same authorities they have always had – for example, to regulate retail electricity sales in intrastate markets and to license new power generation facilities. While some power generators might need to spend more to comply with $CO_2$ standards applicable to their plants, costs for compliance with emission standards are regularly incorporated into power prices without usurping a state's authority over its energy market. As is the case with all air pollution standards, state regulators will continue to decide the rates that state ratepayers should bear, and could elect to reflect the costs of $CO_2$ controls in those rates, without suffering any usurpation of their authority. Similarly, states will continue to have the same authority over licensing decisions for new proposed power facilities. That emission

requirements might indirectly affect the types of projects that power generators

propose does not usurp state authority to determine whether to license those projects.

See 80 Fed. Reg. at 64,782-85.

It further bears emphasis that the Rule does *not* require states or sources to

employ the particular emission-limitation measures that EPA looked to in determining

the achievable degree of emission limitation.  EPA has provided states with extremely

broad flexibility to choose from a range of alternative approaches in crafting plans to

obtain the reductions in the guidelines.  A state can impose different obligations on its

sources, as long as the overall level of emission limitation is at least as stringent as the

guidelines.  Id. at 64,736.  For example, states may elect to require technological

controls at plants (e.g., gas co-firing or carbon sequestration) to meet the goals in

whole or in part.  If a state simply imposes emission limits on sources, the sources

may then also meet those limits in any way they wish, including using technological

controls.  States also have the flexibility to achieve the states' goals in whole or in part

through state-law-only programs that result in $CO_2$ emission reductions at sources.

For example, states may elect to use state law authority to rely largely upon existing or

planned programs for increasing energy-usage efficiency and reducing energy demand

to achieve $CO_2$ reductions from sources indirectly.

EPA is also not precluded from considering generation-shifting as a "system of

emission reduction" for purposes of guidelines on the ground that some high-emitting

facilities may reduce their overall output levels to meet state-established pollution

limitations.  <u>See</u> Basin Mot. 10-11.  Under the Act, particular fossil-fuel-fired power plants frequently choose to, or are required to, reduce their overall levels of generation to comply with pollution standards.  80 Fed. Reg. at 64,780-81.[20]  That said, it bears emphasis that the specific requirements and limitations placed on a source are for the states to decide, and if an individual facility were to be required by a state to simply comply with the uniform performance rate identified by EPA, it could potentially do so in a number of ways that would not require reducing the facility's energy output (e.g., by purchasing emission credits).  It should further be emphasized that EPA reasonably interprets the phrase "best system of emission reduction" in Section 111 as calling for consideration of only those systems that do not require any reduction in aggregate production levels within an industry, and the system identified by EPA does not require any such reduction.  <u>Id.</u> at 64,778-79.

### 5. EPA's emission guidelines for existing sources are not inconsistent with its regulation of new sources.

Movants challenge the reasonableness of the particular emission guidelines in the Rule by asserting that it is "nonsensical," Coal Mot. 14, that the Rule's performance-rate guidelines for existing sources are numerically lower than the standards promulgated by EPA under Section 111(b) for new sources.  But Movants'

---

[20] Examples include requirements that power plants implement to reduce emissions of air pollutants that cause or contribute to visibility impairment and enforceable limits on hours of operation that sources accept to avoid triggering CAA obligations that would otherwise apply to the source.  <u>Id.</u> at 64,781.

premise – that the existing source guidelines are more stringent than the new source standards – is not necessarily true, and in any event the comparative stringency of the two is ultimately irrelevant to the legal issues raised here.

Movants are making an apples-to-oranges comparison. 80 Fed. Reg. at 64,785. As EPA explained, the two rules become applicable at very different points in time and also have significantly different compliance periods, which, as this Court has recognized, factor importantly into the overall "stringency" of the respective standards. Id. at 64,785; Portland Cement Ass'n v. Ruckelshaus, 486 F.2d 375, 391-92 (D.C. Cir. 1973). The standards for new sources are immediately effective. 80 Fed. Reg. at 64,785; 42 U.S.C. § 7411(a)(2) & (b)(1)(B). In contrast, existing sources are not subject to $CO_2$ performance standards until 2022 at the earliest (and in fact, states may delay imposing requirements until 2024 in most cases) and the standards are then gradually phased in through 2030. 80 Fed. Reg. at 64,785-86.

Furthermore, EPA is required to review and, if appropriate, revise the stringency of new source standards no less frequently than every eight years – i.e., by 2023. 42 U.S.C. § 7411(b)(1)(B). Thus, the stringency of the limits that will apply to new sources when the existing source guidelines start to go into effect (2022 or later) and become fully effective (2030) is not yet known. 80 Fed. Reg. at 64,785. Finally, new-source standards are inherently more stringent than existing source guidelines because they apply directly and individually to each new source. 42 U.S.C. § 7411(a)(2) & (b)(1)(B). In contrast, states have great flexibility in fashioning requirements for

existing sources – for example, they may allow averaging among sources or emissions trading, rather than requiring sources to apply controls.  80 Fed. Reg. at 64,785-86.

In any event, even if the requirements for existing and new sources could be directly compared and the former were deemed more stringent, this would not, by itself, call into question the reasonableness of either standard.  As EPA noted, "[n]o provision in Section 111, nor any statement in the legislative history, nor any of its case law, indicates that the standards for new sources must be more stringent than the standards for existing sources." Id. at 64,787.  Rather, the relevant question is whether EPA reasonably identified the "best" emission reduction system for new sources and for existing sources.[21]  As discussed above, EPA has done so here.

## C.  Prior Regulation of Different Pollutants Emitted by Power Plants, Under a Different Provision, Does Not Bar $CO_2$ Regulation.

In 1990, Congress amended the Act in order to expand EPA's regulatory authority, compelling the Agency to regulate more pollutants more quickly.[22]  As part of those amendments, Congress enacted two different amendments to Section 111(d),

---

[21] Movants object to EPA's application of generation-shifting measures in determining the best system of emission reduction for existing, but not new, sources. Chamber Mot. 11-12.  But EPA explained why it reasonably chose not to require such measures for new sources; e.g., it noted that the robust trading market available to existing sources would not be available to new sources.  80 Fed. Reg. at 64,626-28.

[22] See S. Rep. No. 101-228 at 133, reprinted in 5 A Legislative History of the Clean Air Act Amendments of 1990 ("Legis. Hist.") 8338, 8473 (Comm. Print 1993).

one drafted by the House and one by the Senate.[23] Relying solely on the House-amendment, some Movants argue that Section 111(d) does not allow *any* regulation of existing power plants' $CO_2$ emissions.  E.g., W.Va. Mot. 11-15.  They claim that, once a source category's emissions of some *hazardous* pollutant have been regulated under section 112 of the Act, 42 U.S.C. § 7412, those sources' emissions of *any* pollutant – whether regulated as hazardous under section 7412 or not – cannot be addressed under Section 111(d).  E.g., W.Va. Mot 11-15.  They accordingly contend that, because power plants' emissions of certain hazardous pollutants were regulated by EPA in the 2012 Mercury and Air Toxics Standards ("MATS") Rule,[24] EPA can no longer address any emissions – hazardous or not – from power plants under Section 111(d).  E.g., W.Va. Mot 11-15.  That contention – which would strip Section 111(d) of nearly all practical effect – is misguided.

As EPA has explained, the House-amended text on which movants rely does not support that reading.  See 80 Fed. Reg. at 64,713.  That text states that EPA shall regulate any air pollutant "**[1]** for which air quality criteria have not been issued **or [2]** which is not included on a list published under section 7408(a) of this title or emitted from a source category which is regulated under section 7412."  42 U.S.C. § 7411(d)

---

[23] Pub. L. No. 101-549, §§ 108(g) & 302(a), 104 Stat. 2467 & 2574 (1990).

[24] 77 Fed. Reg. 9304 (Feb. 16, 2012).  As Movants note, W.Va. Mot 12 n.6, challenges to the MATS rule have been remanded by the Supreme Court.  Michigan v. EPA, 135 S. Ct. 2699 (2015).  Motions addressing whether that rule should be vacated are now pending before this Court in White Stallion Energy Ctr. v. EPA, No. 12-1100.

(emphasis and numbering added).  Because (at least) the first of the alternative conditions is satisfied – that is, because "air quality criteria have not been issued" for $CO_2$ – the literal reading supports EPA's authority to issue the Rule.  Movants' contrary interpretation – which would read the text to say "and which," rather than "or which" – is by no means plain, let alone the only permissible reading.

EPA's own interpretation is a reasonable reconciliation of the provision's ambiguity, in contrast to movants, whose interpretation would "give[] little or no meaning to the limitation covering [hazardous pollutants] that are regulated under [section 7412]."  80 Fed. Reg. at 64,713.  Rather, EPA reasonably interpreted 42 U.S.C. § 7411(d) as barring regulation thereunder only in regard to specific "hazardous" pollutants actually regulated under section 7412.  Id. at 64,714.  As EPA explained, when construing the phrase "regulated under section [7412]," one must consider *what* is being regulated.  Id. at 64,713-14.  Only hazardous pollutants are addressed by section 7412, and EPA regulates sources under that provision only in regard to hazardous emissions.  Id.  Thus, where EPA has regulated a source category's emissions of particular hazardous pollutants under section 7412, section 7411(d) is reasonably read as permitting regulation thereunder of other pollutants, such as $CO_2$.  Id. at 64,714-15.[25]

---

[25] Movants claim that EPA "abandoned its longstanding interpretation of the statutory text."  W.Va. Mot. 13; see Peabody Energy Corp. ("Peabody") Mot. at 11 (accusing EPA of "flip-flopping").  It did not.  Rather, while EPA's analysis of the

*(Footnote continued . . . )*

The reasonableness of EPA's reading of Section 111(d) is reinforced by the fact that the U.S. Code provision on which Movants base their atextual interpretation does not tell the whole story.  Both the House and Senate amendments were enacted into law when Congress amended the Act in 1990 to strengthen it by expanding, *inter alia*, the criteria and hazardous pollutant programs.  See H.R. Rep. No. 101-952, at 335 (1990) (summarizing 1990 amendments).  Because the two amendments cannot be simultaneously implemented, as they change the same text (a cross-reference to section 7412(b)(1)(A), repealed in 1990) in different ways, only the House amendment was included in the U.S. Code.  But both amendments were enacted and included in the Statutes at Large, which is controlling.  1 U.S.C. §§ 112 & 204(a); Five Flags Pipe Line Co. v. Dep't of Transp., 854 F.2d 1438, 1440 (D.C. Cir. 1988).

It is undisputed that the Senate's amendment to Section 111(d) would allow EPA to regulate power plants' $CO_2$ emissions, regardless of whether other pollutants are already regulated under section 7412.[26]  Movants try to avoid that result by arguing

---

provision has evolved in response to comments, EPA has consistently concluded that the section 7412 exclusion is best interpreted as hazardous-pollutant specific.  See 70 Fed. Reg. 15,994, 16,032 (Mar. 29, 2005) ("EPA has historically regulated non-[hazardous pollutants] under Section 111(d), even where those [pollutants] were emitted from a source category actually regulated under section [7412].").  In any event, EPA's interpretation is entitled to deference even if it differs from a prior interpretation.  See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981-82 (2005).

[26] The Senate amendment is straightforward.  Implemented alone, it authorizes regulation: "for any existing source for any air pollutant for which air quality criteria

*(Footnote continued . . . )*

that the Senate amendment should be ignored as a "clerical error," W.Va. Mot. 14-15,

or "scrivener's provision," Peabody Mot. 9.  But the House amendment is no more

substantive than the Senate amendment, given that both simply update an obsolete

cross-reference and thus are "conforming."  See 80 Fed. Reg. at 64,712 (citing Senate

Legislative Drafting Manual).  And regardless of the label applied, courts give full

effect to such amendments.  See Wash. Hosp. Ctr. v. Bowen, 795 F.2d 139, 149 (D.C.

Cir. 1986).  Any reasonable interpretation of Section 111(d) therefore must account

for the Senate amendment's clear intent to preserve EPA's ability to regulate

dangerous, but non-hazardous, pollutants under that provision.[27]  Unlike Movants'

proposal, which altogether disregards the enacted statutory text of the Senate

amendment, EPA has complied with the canon that "provisions in a statute should be

read to be consistent, rather than conflicting, if possible."  80 Fed. Reg. at 64,713

(citing Scialabba v. Cuellar De Osorio, 134 S. Ct. 2191, 2214, 2219-20 (2014)).

---

have not been issued or which is not included on a list published under . . . section
7412(b)."  Pub. L. No. 101-549, § 302(a), 104 Stat. 2399, 2574 (1990).

[27] Peabody attempts to avoid this obligation by arguing that the Senate "receded" to
the House.  Peabody Mot. 10 (citing 1 Legis. Hist. 885).  To begin with, the language
Peabody cites is not from a conference report as claimed, but only a "Statement of
Senate Managers" that was "not reviewed or approved by all of the conferees." 1
Legis. Hist. 880.  Moreover, the term "recedes" means simply that one chamber is
withdrawing its prior objection to a bill section, and it was used here only in regard to
Section 108 (containing the House amendment), and thus does not resolve Congress'
intent regarding Section 302 (containing the Senate amendment).  In any event, this
statement "cannot undermine the statute's language," Envtl. Def. Fund, Inc. v. EPA,
82 F.3d 451, 460 n.11 (D.C. Cir. 1996), which, as enacted, includes both amendments.

Finally, Movants' interpretation of Section 111(d) (under which sources regulated under section 7412 are thereafter immune from regulation, even in regard to different, non-hazardous pollutants) is also unreasonable because it would render that provision practically moot, since over 140 source categories are regulated under section 7412. 80 Fed. Reg. at 64,714. Not only are statutory interpretations having such an effect disfavored, there is no suggestion in the legislative history that either house of Congress intended to so dramatically reduce the scope of Section 111(d), one of three core programs intended to cover the full range of dangerous air emissions.[28] See King, 135 S. Ct. at 2492 ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (citations omitted)). In fact, the legislative history of the two amendments affirmatively suggests otherwise. See 80 Fed. Reg. at 64,711 n.289, 64,712-15. Movants' interpretation of Section 111(d) is thus at odds with the statutory scheme and legislative history.[29]

---

[28] See id. at 64,711 (citing S. Rep. No. 91-1196, at 20 (1970)). Section 111's Congressionally-designed role is to ensure that there are "no gaps" between the other two core programs, the criteria and hazardous pollutant programs. See id.

[29] Movants' interpretation has not been endorsed by the Supreme Court, as they claim. E.g., W.Va. Mot. 12. Rather, the holding in AEP, 131 S. Ct. at 2537 – that Section 111(d) "speaks directly to emissions of [$CO_2$] from defendants' [power] plants" – points in precisely the opposite direction.

### D.      Movants' Constitutional Arguments Lack Merit.

Certain Movants argue that the Rule violates the Tenth Amendment, the Fifth Amendment, and general principles of federalism.  See State of Oklahoma ("Ok.") Mot. at Mot. 9-17; Peabody Mot. 5-18.  Not only do these arguments lack support in the relevant jurisprudence, but accepting Movants' conclusion – that giving states a choice between federal regulation of emissions or controlling emissions themselves is unconstitutional – would have serious implications for other well-established regulatory programs.

### 1.  Movants' Tenth Amendment and federalism arguments lack merit.

The Rule is a constitutionally permissible exercise of well-settled federal authority.  It has long been recognized that "the power conferred by the Commerce Clause [is] broad enough to permit congressional regulation of activities causing air or water pollution . . . that may have effects in more than one State."  Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 282 (1981).  And the Supreme Court has "repeatedly affirm[ed] the constitutionality of federal statutes that allow States to administer federal programs but provide for direct federal administration if a State chooses not to administer it."  Miss. Comm'n on Envtl. Quality v. EPA, 790 F.3d 138, 175 (D.C. Cir. 2015) (quotation omitted).

For example, the Court upheld the Surface Mining Control and Reclamation Act, under which states were given a choice between federal regulation or implementing their own programs, reasoning that because "the States are not

compelled to . . . participate in the federal regulatory program . . .  [t]he most that can

be said is that the [ ] Act establishes a program of cooperative federalism that allows

the States . . . to enact and administer their own regulatory programs. . . ." Hodel, 452

U.S. at 288-89.  A decade later, the Court reiterated that "we have recognized

Congress' power to offer States the choice of regulating [ ] activity according to

federal standards or having state law pre-empted" and noted that such "cooperative

federalism" programs are "replicated in numerous federal statutory schemes." New

York v. United States, 505 U.S. 144, 167-68 (1992).

 The Rule is a textbook example of cooperative federalism.  States are given a

choice: they can take advantage of the Rule's flexibility to develop their own plans to

reduce power plants' $CO_2$ emissions, or they can decline to do so and EPA will

directly regulate those sources' $CO_2$ emissions instead.  See 80 Fed. Reg. at 64,986.

There is no constitutionally-significant distinction in this regard between the Rule and

the regulatory framework at issue in Hodel, or the framework of other well-

established CAA programs.[30]  Indeed, this Court recently rejected a very similar Tenth

---

[30] Oklahoma suggests that there is a "preemptive mismatch" here because EPA may
not regulate "the transmission, distribution, or consumption of energy."  Ok. Mot. 15.
But, as discussed earlier (see *supra* at 31-35), the Rule regulates emissions, not the
energy industry as such.  The fact that sources of emissions are subject to regulation
by other federal, state, and local authorities in regard to other aspects of their activities
is irrelevant.  See Hodel, 452 U.S. at 286 (noting that private persons and businesses
are "necessarily subject to [ ] dual sovereignty" (quotation omitted)).

Amendment challenge to the National Ambient Air Quality Standards program.  See

Miss. Comm'n, 790 F.3d at 174-80.

Movants' reliance on NFIB, 132 S. Ct. at 2604, to argue that the Rule

impermissibly coerces states is misplaced.  See Ok. Mot. 12-13; Peabody Mot. 14-15.

Unlike the Medicaid expansion at issue in NFIB – under which states stood to lose

preexisting funding representing significant portions of their budgets if they declined

to implement the program, 132 S. Ct. at 2604-05 – the Rule expressly *prohibits* EPA

from withholding "any existing federal funds" from states.  40 C.F.R. § 60.5736.

Indeed, a state that does not submit a Section 111(d) plan faces *no* sanctions or

penalties.  See 80 Fed. Reg. at 64,882, 64,968.  Thus, the Rule is no "gun to the head,"

Ok. Mot. 13; indeed, it cannot fairly be called a stick.  Rather, by allowing states to

design their own plans, it offers them a carrot that they are free to refuse.

Movants' suggestions that they have no choice but to submit a state plan are

unsubstantiated.  Oklahoma argues that it must do so because the implementation of

a federal plan would result in "disruption and dislocation."  Ok. Mot. 13.  But

Oklahoma's governor has issued an executive order stating that she "will not submit a

Section 111(d) [plan]" and forbidding state officials from working on such a plan, see

Executive Order 2015-22,[31] which belies the State's insistence that it has no real

choice in the matter.  Moreover, Oklahoma offers no support for its claims of

---

[31] Available at https://www.sos.ok.gov/documents/Executive/978.pdf.

impending chaos. EPA, in contrast, comprehensively addressed stakeholders' "disruption" concerns in the Rule,[32] and the proposed federal plan is highly flexible and also addresses those issues. See, e.g., 80 Fed. Reg. at 64,981-82. And of course, any final federal plan will be subject to judicial review for reasonableness and lawfulness. See 42 U.S.C. § 7607(d)(9). But perhaps most critically, a state's desire to avoid the effects (however perceived) of federal regulation does not render it unconstitutional for an agency to offer a state the option of regulating for itself.

Movants next claim that the Rule unlawfully "commandeers" state regulators. Ok. Mot. 9-12; Peabody Mot. 13. But "there can be no suggestion that the Act commandeers . . . the States by directly compelling them to enact and enforce a federal regulatory program" where states are given the option of doing nothing, and instead allowing the federal government to step in and regulate sources' $CO_2$ emissions. Hodel, 452 U.S. at 288. And if a state opts to do nothing, EPA will "not directly impose specific requirements on state and U.S. territory governments," but only "on affected [sources] located in states." 80 Fed. Reg. at 65,054. A federal plan that "regulate[s] individuals, not States" poses no Tenth Amendment issue. Printz v. United States, 521 U.S. 898, 920 (1997) (citation omitted).

---

[32] To give just one example of EPA's solicitude for these issues, the Rule made available a "reliability safety valve" for state plans, in the unlikely event that substantial reliability issues occur due to unanticipated emergency. 80 Fed. Reg. at 64,671.

Oklahoma argues that state regulators will nevertheless be forced to address changes made by power plants pursuant to any federal plan. Ok. Mot. 11-12. The possibility that states may react to federal regulation does not make that regulation, or an offer of state self-regulation, unlawful. In any event, as noted above, states that choose the federal-plan option will have no new regulatory obligations. If a state wishes to refuse, for example, to grant a permit required under state law for an action that a power plant wants to take to comply with a federal plan, it may do so. In that event, the full compliance burden rests with the power plant, which will have to pursue an alternative compliance method that is either agreeable to state regulators or does not require approval. The Rule is no different in this regard from other federal rules governing power plants.[33] There is no Tenth Amendment issue where states may "defend their prerogatives by adopting 'the simple expedient of not yielding' . . . when they do not want to embrace the federal policies as their own." NFIB, 132 S. Ct. at 2603 (quoting Massachusetts v. Mellon, 262 U.S. 447, 482 (1923)).

### 2.  Peabody's Fifth Amendment argument is meritless.

Peabody summarily argues that the Rule presents "serious questions under the Fifth Amendment." Peabody Mot. 15. Peabody does not explain precisely how the

---

[33] For example, under the Federal Power Act, FERC has authority to require "[a]ll users, owners and operators of the bulk-power system" to comply with federal electric reliability standards. 16 U.S.C. § 824o. Those standards are not unconstitutional merely because an entity may seek to comply through actions that require state public utility commission approval.

Rule effects a taking of coal companies' property interests so as to "trigger just compensation obligations." Id. at 15-18. In any event, the Rule does not do so.[34]

EPA undertook a thorough Fifth Amendment analysis, correctly concluding that the Rule is not an unlawful taking. See Legal Mem. at 57-62. The Rule plainly does not effect a physical or "per se" taking. See Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 321-24 (2002). To the extent Peabody is suggesting that the Rule is a regulatory taking, that analysis requires balancing factors including "[t]he economic impact of the regulation," "the extent to which the regulation has interfered with distinct investment-backed expectations," and the "character of the governmental action." Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978). The fact that power plants have long been subject to environmental regulation severely undercuts any suggestion that the Rule unfairly interferes with "investment-backed expectations," and the "character" of the Rule – a "program adjusting the benefits and burdens of economic life to promote the common good"– also makes it unlikely that a court will ever conclude that a taking has occurred. Id. Moreover, the regulatory takings issue is at best unripe, because the

---

[34] Peabody's suggestion that the Court should decline to apply Chevron to avoid takings issues is a misapplication of the constitutional avoidance doctrine. Courts are to construe Congressionally-mandated programs as *not* raising constitutional issues where possible, see NFIB, 132 S. Ct. at 2600, not decline to consider the reasonableness of an agency's interpretation of a statute based on claims of unconstitutionality.

economic impact of the Rule on coal producers cannot be known until states actually formulate their plans.  <u>See</u> Legal Mem. at 60-62.[35]  Finally, even if the Rule did effect a taking, the appropriate remedy is not to invalidate it, but to provide whatever "just compensation" is deemed requisite after the fact, through a suit under the Tucker Act.  <u>See</u> <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1016 (1984).

Neither of the two cases cited by Peabody supports its takings argument.  In <u>Eastern Enterprises v. Apfel</u>, 524 U.S. 498, 503-47, 550-56 (1998), a plurality of four justices concluded that there was an unconstitutional taking, but the other five did not agree.  Moreover, the plurality's takings conclusion was predicated on the retroactive nature of the provision at issue, which required companies to pay new benefits to miners who had retired decades earlier, interfering with "reasonable investment backed expectations."  <u>Id.</u> at 530, 534-36.  There is no similar retroactivity concern here, and the industry has no reasonable expectation of non-regulation.  And in <u>Pennsylvania Coal Co. v. Mahon</u>, 260 U.S. 393, 415 (1922), a <u>Lochner</u>-era "right to contract" case, the Court concluded that a legislature could not prohibit a coal company from mining under a home because the deed expressly allowed such mining.  Peabody's customers have no similar entitlement to pollute free from regulation.

---

[35] <u>See</u> <u>Hodel</u>, 452 U.S. at 294-95 (it is "particularly important" that courts not decide takings claims "except in an actual factual setting that makes such a decision necessary"; the analysis "must be conducted with respect to specific property, and the particular estimates of economic impact . . . relevant in the unique circumstances").

**E.     EPA Has Authority to Set Substantive Emission Guidelines.**

Movant North Dakota's contention that EPA cannot set any substantive emission guidelines at all for states is misplaced, and also constitutes an untimely challenge to regulations implementing Section 111(d) that were promulgated in 1975. <u>See</u> State of North Dakota ("N.D.") Mot. at 16; 40 Fed. Reg. 53,340 (Nov. 17, 1975); 40 C.F.R. §§ 60.21(e), 60.22(a); <u>see also</u> 42 U.S.C. § 7607(b) (requiring a petition for review of CAA regulations to be filed within 60 days of promulgation). As EPA explained when it promulgated the Section 111(d) implementing regulations, emission guidelines appropriately provide states with the substantive criteria that EPA will apply in its statutorily-required review of whether state plans are "satisfactory." 40 Fed. Reg. at 53,342; 42 U.S.C. § 7411(d)(2). In the absence of guidelines, "[s]tates could set extremely lenient standards – even standards permitting greatly increased emissions – so long as EPA's procedural requirements were met." 40 Fed. Reg. at 53,343.

Contrary to North Dakota and Basin Electric's argument, N.D. Mot. 16; Basin Mot. 12, the Rule also reasonably permits states to consider the remaining useful life of a source in a number of ways. 80 Fed. Reg. at 64,870-71. For example, by using the flexibilities provided, such as regional trading, states and sources can account for the remaining useful life of sources and avoid "stranded assets," that is, premature retirement of capital investments. <u>Id.</u>

50

**F.    Movants' Procedural Arguments Lack Merit and Are Not Properly Before the Court.**

Finally, Movant North Dakota's cursory argument that the Rule violates the CAA because portions of the Rule were purportedly promulgated without adequate notice and opportunity to comment also lacks merit.  N.D. Mot. 18-19.  This Court has explained that "an agency satisfies the notice requirement, and need not conduct a further round of public comment, as long as its final rule is a 'logical outgrowth' of the rule it originally proposed," a condition that is met when "interested parties should have anticipated that [a] change was possible."  Ne. Md. Waste Disposal Auth. v. EPA, 358 F.3d 936, 951-52 (D.C. Cir. 2004) (per curiam) (internal quotation marks and citation omitted).  The proposed rule and EPA's subsequent "notice of data availability" solicited broad and extensive public comment, including on alternative methods for determining the "best system" that would result in the more stringent state goals ultimately adopted for some states.  80 Fed. Reg. at 64,707; 64,736-38; see also McCabe Decl. ¶¶ 38-41.  North Dakota thus had ample notice of what was "on the table."  See Anne Arundel Cnty. v. EPA, 963 F.2d 412, 418 (D.C. Cir. 1992) (quotation omitted).  North Dakota's brief fails to identify any features of the Rule that it believes would fail the "logical outgrowth" test.

Moreover, North Dakota's procedural argument that it was not afforded sufficient opportunity for comment cannot be raised before the Court at this time.  N.D. Mot. 18-19.  Section 307(d) of the Act provides that new procedural objections

51

to a rule must be raised in a petition to the EPA for administrative reconsideration before they may be raised in judicial review.  42 U.S.C. § 7607(d)(7)(B), (d)(8)-(9); see Util. Air Regulatory Grp. v. EPA, 744 F.3d 741, 746-47 (D.C. Cir. 2014) (holding that section 307(d)(7)(B) "forecloses" judicial review of substantive *and* procedural challenges to a rule not raised during public comment until after EPA completes or denies reconsideration).  North Dakota's petition for administrative reconsideration is still under review at the Agency.  Cf. Mexichem Specialty Resins, Inc. v. EPA, 787 F.3d 544, 557 (D.C. Cir. 2015) (rejecting a stay even though EPA had already granted reconsideration because petitioners did not establish that "the Rule is likely to change after reconsideration").

## II.   MOVANTS WILL NOT SUFFER IRREPARABLE INJURY DURING THE PENDENCY OF THE LITIGATION.

To establish irreparable harm, Movants must demonstrate an injury that is "both certain and great; it must be actual and not theoretical." Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  Alleged economic losses do not constitute irreparable injury except in the most extreme circumstances, i.e., where the "very existence" of a company is threatened.  Id.  Furthermore, to justify a stay pending review, such harm must be imminent and substantial, and not reparable through the normal course of judicial review.  Id.  Movants have not met these requirements.

## A.      State Movants Have No Likelihood of Irreparable Injury.

State Movants have not shown they will suffer any irreparable injury during the period of this Court's review.  States have considerable flexibility in both the amount and timing of any effort required by the Rule, including the option of doing nothing.  Moreover, with a readily obtained extension, state plans are not due until 2018, and compliance obligations under the Rule do not begin until 2022 at the earliest.

### 1.   The Rule Does Not Intrude on States' Sovereign Interests.

State Movants cannot establish irreparable harm, either during the period of judicial review or thereafter, by invoking a purported sovereign interest in regulating the generation of electricity.  As a threshold matter, this argument is based on the false premise that the Rule dictates the required mix of generation facilities in each state.  It does not.  Consistent with the cooperative federalism principles of the Act, the Rule establishes emission performance levels or state goals for emissions of $CO_2$ and then leaves to states the responsibility, and flexibility, to determine how to meet them.  It thus has the same basic structure as numerous other CAA rules, such as new or revised National Ambient Air Quality Standards.  See McCabe Decl. ¶ 23.

State Movants do not identify a single case holding that it is irreparable harm for a state to exercise its regulatory authority subject to nationwide constraints in implementing a scheme of cooperative federalism.  To the contrary, the cited cases all involve situations where the stayed action prevented a state from exercising its regulatory authority at all.  For example, in the one cited case involving the action of a

federal agency, <u>Kansas v. United States</u>, 249 F.3d 1213 (10th Cir. 2001), the stayed action prevented the State from regulating casino construction on disputed property. The Rule here does not prevent states from regulating the generation of electricity, but simply establishes guidelines for state pollution-control measures under the Act. That is not an unconstitutional intrusion on state sovereignty, <u>Hodel</u>, 452 U.S. at 287-90, and accordingly cannot be considered irreparable harm.

### 2. Regulatory Activity by State Agencies Does Not Constitute Irreparable Harm.

State Movants also assert that they will be harmed because their environmental and public utility agencies will have to expend resources to comply with the Rule.[36] However, they cite no case in which a state's compliance with its statutory responsibilities was held to constitute irreparable harm, and such a holding would open the door to treating virtually any agency action requiring state implementation as causing irreparable harm. In any event, because the Rule gives the states considerable flexibility in determining the level and the timing of any effort required to implement the Rule, including the option of doing nothing, the resources states might have to

---

[36] States cannot claim injury from costs borne by power plants in the State; States have no standing to raise such *parens patriae* claims against the United States. <u>Ctr. for Biological Diversity v. DOI</u>, 563 F.3d 466, 476-77 (D.C. Cir. 2009). There is also no basis to North Dakota's claim of irreparable harm from lost tax revenue, ND Mot. 13-14, because there is no evidence that such loss would occur before judicial review is complete, and North Dakota has control over the types and rates of the taxes it levies.

devote to implementation during the period of judicial review cannot rise to the level of irreparable harm.

The fact that states may devote staff time towards development of a plan to implement CAA requirements pursuant to an EPA rule before judicial review is complete is neither exceptional nor extraordinary, but rather is an inherent and foreseeable consequence of cooperative federalism that Congress designed into the Act. As such, it cannot be deemed irreparable harm. Because judicial review will take place during the period required for plan preparation, 42 U.S.C. § 7607(b)(1), the Act clearly contemplates that states will work on plan development before judicial review is complete. If that fact alone constituted irreparable harm, it would not only subvert the principle that a stay of administrative agency action is an extraordinary remedy, but would also severely disrupt the entire statutory scheme for the promulgation, implementation, and achievement of air quality standards as well as other pollution-control programs that rely on state plans. Under the Act, states have been required to prepare within a few years many state plans of different types following action by EPA. McCabe Decl. ¶¶ 25-31; Declaration of Theresa Marks (Ex. 4) ¶¶ 3, 7. Some of these state plans were of comparable complexity to the state plans required by the Rule and had a shorter submission schedule. McCabe Decl. ¶¶ 25-31. Others, including state plans to achieve attainment of a National Ambient Air Quality Standard for an area with numerous stationary and mobile sources, had a similar, or even shorter, submission schedule but were more complex because they entailed

55

preparing source inventories for multiple source categories and complex air-quality modeling. Id. ¶¶ 27-31.

Moreover, under the particular Rule at issue here, states have considerable flexibility in both the timing and extent of their planning efforts, and do not need to submit a plan until 2018. The September 2016 initial submission is not burdensome and requires only that a state (i) generally identify the plan approaches under consideration, (ii) describe opportunities for public input during plan development, and (iii) explain why the state requires additional time. See 80 Fed. Reg. at 64,855-59; McCabe Decl. ¶ 13. State Movants make no substantial argument that this submission will require significant resources, let alone while judicial review is pending, and some overstate what is required. Marks Decl. ¶¶ 6-10. In fact, some states can likely meet at least one of the first two criteria based on their actions to date. McCabe Decl. ¶¶ 12-17.

Movants are wrong to claim that they necessarily must devote substantial efforts during the period of judicial review to develop plans they need not submit until 2018. States have considerable overall flexibility in designing their 2018 state plans, and those choices directly determine the level of resources the state must devote to them during the judicial review period. At the extreme, a state can elect not to prepare a plan at all, but instead have EPA develop and implement a federal plan for the sources in that state. Oklahoma (supra at 45) and at least two other state Movants have indicated that they will not or might not submit a plan. McCabe Decl.

¶ 34.  States can also join existing state trading programs, such as the Regional Greenhouse Gas Initiative, or simply adopt the Rule's emission performance standards without elaboration, leaving to the facilities the decisions about how to meet those limits.  Id. ¶¶ 19-22.  Similarly, states may also adopt one of the Model Plans that EPA intends to promulgate soon.[37]

Even if a state chooses to develop a more complex plan, State Movants' assertion that their environmental and public utility agencies must immediately undertake massive efforts to develop it in order for sources to have time to comply is without merit.  The Rule provides ample time for compliance, and Movants' claims to the contrary are based on unrealistic scenarios in which states would, for example, enter into memoranda of understanding with neighboring states to implement a trading program, rather than use the available option that allows trading without such agreements.  Id. ¶¶ 32-36.[38]

---

[37] EPA expects to finalize two Model Plans by the summer of 2016, allowing ample time for a state to adopt one before the 2018 deadline.  McCabe Decl. ¶ 21.  It is quite possible that a number of states will adopt the Model Plan (or a variant), because states have expressed interest in it, it closely tracks successful interstate trading programs for other power plant air pollutants, and virtually all states are considering an interstate trading program.  Id.

[38] For the same reason, there is no basis to claim that the Rule requires immediate legislative changes because state environmental agencies lack authority to regulate the generation of electricity.  E.g., Mississippi Dep't of Environmental Quality ("Miss.") Mot. at 12-13.  As with other rules, state environmental agencies can set emission limits for power plants, and, to the extent necessary, power plants will interact with other regulatory authorities as they normally do.  Furthermore, the assertion that the

*(Footnote continued . . . )*

Finally, even if state environmental or utility regulatory agencies must devote some resources to Rule implementation now, that does not constitute a great or extraordinary harm, but is rather just the "cost of doing business" for a state regulatory agency.  See Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 115 (2d Cir. 2005); A.O. Smith Corp. v. FTC, 530 F.2d 515, 527-28 (3d Cir. 1976); see also McCabe Decl. ¶¶ 24-32 (effort similar to other requirements of the Act).  No state has presented evidence that the effort required during the next year would preclude it from carrying out its other responsibilities.

### B.     Industry Movants Also Fail to Show Irreparable Injury Or That A Stay Would Address Such Injury.

Industry Movants likewise fail to show irreparable injury.  The already high "barrier to proving irreparable injury is higher still" for the types of economic harms asserted by Industry Movants, "for it is well-settled that economic loss does not, in and of itself, constitute irreparable harm."  Mexichem, 787 F.3d at 555 (internal quotations omitted).  Industry Movants have not cleared this high bar.

They have not shown, and for many reasons cannot reasonably claim, that their asserted economic "losses" – e.g., plant closures, immediate expenditures, or threatened bankruptcies – are "certain" to occur as a result of the Rule during the period of judicial review.  Wis. Gas, 758 F.2d at 674.  The Rule does not require that

---

sources must be in full compliance by 2022 is wrong. The Rule phases in gradually, see supra, with full compliance not until *2030*, and the states determine the phase-in period; they can begin obligations later than 2022 if they wish.  80 Fed. Reg. at 64,786.

any legal requirements be imposed on any sources until 2022 at the earliest, long after

judicial review will be complete, and Industry Movants likely will not know for several

years precisely what those requirements will be.  Even if certain events affecting

private parties do occur in the near term, they are neither "required" by nor a direct

result of the Rule; rather, they stem from economic trends that long pre-date the Rule

and therefore will not foreseeably change even if the Court enters a stay.[39]

> ### 1.  The Rule does not "require" any immediate action by power plants or non-regulated businesses.

Movants' central argument is that the Rule will force the power industry to

"immediately" retire high-emitting plants and focus on lower-emitting resources,

which allegedly will lead to various secondary economic effects, such as the

"immediate" closure of coal mines.  E.g., Utility Mot. 14-16; Coal Mot. 14-17.

---

[39] While some Movants note that certain companies announced bankruptcies around the time the Rule was finalized, no declarants have attested that they will in fact declare bankruptcy as a result of this Rule; they simply corroborate well-documented economic trends for the industry as a whole.  See generally Culligan Decl.  Under certain circumstances, economic losses that are "unrecoverable" *may* constitute irreparable harm even if they fall short of threatening the existence of a stay movant's business.  But "the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm."  Nat'l Mining Ass'n v. Jackson, 768 F. Supp. 2d 34, 53 (D.D.C. 2011).  And to the extent plant closures or infrastructure additions are "required" by the Rule, state laws provide mechanisms through which companies may recover emission management costs; thus, such "losses" are not necessarily unrecoverable.  See Legal Mem. at 147-48; see also Regulatory Assistance Project, Electricity Regulation in the US: A Guide 93 (2011), available at http://www.raponline.org/document/download/id/645.

Those claims are purely speculative, for several reasons: (1) plant owners cannot know what requirements will be imposed on specific plants, or what steps they will take in response to such requirements, until they see the content of state plans, which need not be submitted until 2018, well after judicial review is complete; (2) EPA's record for the Rule demonstrates that significant additions to infrastructure should not be necessary to meet Rule requirements; and (3) to the extent some plant owners nonetheless may choose to shut down plants in the near term for economic reasons, such choices are not "required" by the Rule and there is no evidence that such plant owners will make a different choice if the Court decides to enter a stay.

First, no state plans have been submitted thus far, and most are not expected until 2018, long after this litigation concludes. See McCabe Decl. ¶¶ 11, 17, 21. Compliance obligations under the Rule do not begin until 2022, at the earliest, and are phased in over eight years. Id. ¶ 34; Harvey Decl. ¶ 10. Moreover, as discussed supra, the states will enjoy broad flexibility in developing source-specific requirements (including deciding which sources to control, by how much, and when) and may allow their sources an equal degree of flexibility in meeting those requirements (such as by purchasing allowances or credits). Movants thus cannot reliably identify what their requirements will be, and they likely will not know them until 2018. Indeed, while some Declarants purport to identify such requirements, many acknowledge that they will not know what the Rule actually "requires" – and, hence, cannot determine what steps to take in response – until their states adopt finalized plans. E.g., Greene Decl.

¶¶ 12-13 (Utility Mot. Ex. E); Frenzel Decl. ¶¶ 41-42 (Utility Mot. Ex. Q); Brummett Decl.¶¶ 14, 18 (Utility Mot. Ex. G) (noting that plant has no plans to shut down and it is "far from clear" what the State will do).[40]  Accordingly, Movants cannot show with *certainty* that their compliance obligations will force them to take any particular action during the period of litigation.  See, e.g., Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 298 (D.C. Cir. 2006) (where injury is merely "possible," equitable relief is not "urgently necessary").

Second, not only is it premature to predict what requirements will be imposed on any *specific* source, but EPA's record also refutes as a general matter Movants' supposition that the Rule will require immediate action to build a significant amount of  infrastructure.  For example, the potential measure for shifting from coal-fired to gas-fired electric generation (which states need not adopt) "applies only to increases in generation at *existing* [natural gas combined cycle] facilities," "does not contemplate any connection of new capacity to the bulk power grid," and is premised on a gradual implementation schedule that accounts for "additional time to complete potential infrastructure improvements (e.g., natural gas pipeline expansion or transmission improvements) that might be needed to support more use of" such existing facilities.

---

[40]  See also Mark Chediak, Bloomberg, Why Coal Burners Don't Totally Hate Obama's Climate Plan (Nov. 13, 2015) (quoting Southern Co. CEO as saying, "'It is arguable that electricity will start to grow again as a response to the [Rule].' . . . Both Southern and AEP own regulated utilities that can recoup spending and make a profit on new investments [as part of Rule compliance] if it's approved by state regulators.")

80 Fed. Reg. at 64,798, 64,800-01.  Similarly, EPA determined that application of the potential measure for shifting from fossil-fuel fired generation to cleaner energy sources (which states likewise need not adopt) would not add significant transmission requirements in order to maintain grid reliability, as it too is phased in incrementally and capped at reasonable levels.  See GHG Mitigation Measures TSD, 4-23; see also 80 Fed. Reg. at 64,806-10.

Third, to the extent Movants elect to retire any coal-fired power plants during the period of litigation, Movants have not demonstrated that such retirements are required by the Rule or that a stay would prevent such retirements.  To obtain a stay, Movants "must show that the[ir] alleged harm will *directly result* from the [Rule]," and that entering a stay of the Rule will "prevent" the alleged harm.  Wis. Gas, 758 F.2d at 674 (emphasis added).  Their submissions to this Court fail to establish either proposition.  Contrary to the impression left by Movants, the Nation already is experiencing a significant and ongoing shift away from coal-fired power generation and towards greater generation from cleaner sources.  Supra at 18 (citing 80 Fed. Reg. at 64,678, 64,795, 64,803-04).  Movants cannot show that any particular plant retirements that may occur during judicial review will necessarily be a "direct result" of the Rule and not other causes.[41]  See Crete Carrier Corp. v. EPA, 363 F.3d 490, 493 (D.C. Cir. 2004) (because alleged economic injuries were equally likely to result from

---

[41] See, e.g., Culligan Decl. ¶¶ 7-19; Harvey Decl. ¶¶ 33-41 (Ex. 2).

causes other than the challenged rule, petitioners lacked standing); <u>Delta Constr. Co.</u>
<u>v. EPA</u>, 783 F.3d 1291, 1296-97 (D.C. Cir. 2015) (same).

Nor have Movants shown that ordering a stay would prevent any plants from
being retired.  A stay would not change the underlying economic conditions that have
spurred the nationwide shift, for more than fifteen years, away from coal-fired
generation, which continues to create uncertainty for owners of those plants.  80 Fed.
Reg. at 64,695.  Tellingly, not a single declarant appears to identify a specific power
plant or coal mine that plans to close in the near future but will reverse such plans if
the Court enters a stay.  Indeed, an analysis by Movants' own industry states that "it is
very unlikely that there are significant numbers of coal retirements scheduled for 2016
that have not yet been announced," which suggests that a stay would have little if any
impact on the number of retirements that occur during judicial review.  PA
Consulting Group, <u>American Coalition for Clean Coal Electricity, A Survey of Near-</u>
<u>Term Damages Associated with the EPA's Clean Power Plan</u>, 13 (Utility Mot. Ex. C).

Although the Rule therefore does not "require" near-term plant closures, it is
certainly possible, as Movant Chamber of Commerce posits, that some plant owners
may "*choose* to shut down their plants during the period of judicial review" rather than
invest further in older coal-fired plants that are "very expensive" to maintain.
Chamber Mot. 18 n.7 (emphasis added).  But the possibility that some plant owners
may make voluntary decisions to close costly plants does not demonstrate "irreparable
harm" that is traceable to "requirements" of the Rule.  See <u>Safari Club Int'l v. Salazar,</u>

852 F. Supp. 2d 102, 123 (D.D.C. 2012) ("It is well settled that a . . . movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.") (internal quotation omitted); cf. Grocery Mfrs. Ass'n v. EPA, 693 F.3d 169, 177 (D.C. Cir. 2012), cert. denied, 133 S. Ct. 2880 (2013) (where rule permitted but did not "force" or "require" use of new fuel type, petroleum refiners and importers failed to demonstrate Article III Standing – much less irreparable harm – based on alleged costs and liabilities associated with that fuel).

## 2. Movants err in relying on EPA's model to prove irreparable harm.

Having failed to provide direct evidence that specific plants "will" close in the near future due to the Rule, Movants and their Declarants instead rely on the forecast of "assumed" 2016 coal generation capacity reductions generated by EPA's Integrated Planning Model ("Model") as proof of actual plant closures.  See, e.g., Pemberton Decl. ¶ 2 (Utility Mot. Ex. B).  This reliance is misplaced for several reasons.

First, and most obviously, the Model's forecasts are not regulatory requirements of any kind. Second, the Model is not designed to predict the impacts of control requirements on individual sources, but instead to gauge the overall, power-sector-wide impacts of control requirements in terms of costs, emission reductions, and economic impacts, in this case primarily for the 2020-2030 period.  Harvey Decl. ¶ 18.  As a result, simplifying assumptions in the Model render its references to 2016 particularly susceptible to over-interpretation.  Id. ¶¶ 17-18, 22-23.  Among other assumptions designed to simplify the multitude of real-world variables that bear upon

the Rule's potential effect, the Model makes assumptions about the content of state plans, although in the real world such plans may differ and in any event will likely not be known until 2018 or later.  Id. ¶¶ 16-17, 25, 32.

Although such assumptions do not undermine the Model's usefulness for its intended purposes in this rulemaking, id. ¶ 30, the simplifications and constraints built into the Model mean that it is not designed to reliably forecast the Rule's impacts on specific power plants, particularly in the near-term period when judicial review of the Rule will occur.  Id. ¶ 18.  This is in part because the Model only forecasts impacts on "model plants," which are aggregates of actual electrical generating units and do not bear a direct relationship to them.  Id. ¶ 19.  Additionally, the Model cannot account for the informational constraints that actual power plant owners face, such as their inability to predict what their actual state plan requirements will be; nor can it simulate the business judgments that individual real-world plant owners will make in the near term, given such informational constraints.  Id. ¶¶ 31-32.

Indeed, several of Movants' Declarants demonstrate the fallacy of Movants' Model-based theory of "irreparable harm," as these Declarants do not assert that they have any plans to retire their plants (even though the Model purportedly projects that their plants will retire), and they state that any such decision will depend on the content of state plans and other variables.  See Harvey Decl. ¶¶ 34, 39; see also, e.g., Frenzel Decl. ¶¶ 41-42 (Utility Mot. Ex. Q); Greene Decl. ¶¶ 12-13 (Utility Mot. Ex. E); Brummett Decl. ¶ 14 (Utility Mot. Ex. G); Patton Decl. ¶ 18 (Utility Mot. Ex. D);

65

Jura Decl. ¶¶ 19-21 (Utility Mot. Ex. S).  Indeed, depending on the content of their States' plans (which are not yet known), these Declarants may *not* need to close their plants in order to comply with the Rule.  E.g., Frenzel Decl. ¶¶ 41-42 (Utility Mot. Ex. Q); see also Harvey Decl. ¶¶ 33-41.  Movants' own declarations therefore show that it is pure speculation to assume based on modelling results that any particular power plant "must retire" because of the Rule, and thus refute the notion that the Model supports a finding of irreparable harm.[42]

### 3.  Recent experience with the MATS Rule does not support a stay.

Movants also contend that the recent judicial review of the MATS Rule demonstrates the need for a stay of the current Rule pending review.  E.g., Utility Mot. 3; see supra at 38 (discussing MATS Rule).  This comparison is flawed.  The MATS Rule imposed specific requirements *directly on* covered sources.  77 Fed. Reg. at 9367-69.  The current Rule, in contrast, will be implemented through the state planning process, with significant flexibility in how any particular plant may be required to comply.  Thus, any prediction of how each state's plan might affect a particular source is speculative at this juncture.  The MATS Rule also was implemented over 3.5 to 4.5 years, whereas compliance with the current Rule is deferred for seven years and then phased in from 2022-2030, greatly lengthening the

---

[42] Movants' attacks on EPA's modeling methodology, e.g., Heidell & Repsher Decl. ¶ 10 (Utility Mot. Ex. C), are illogical. Harvey Decl. ¶¶ 42-58.

time sources have to respond to any requirements that may eventually be imposed. Id. at 9407-11; 80 Fed. Reg. at 64,923.[43]

## III.    A STAY OF THE RULE IS NOT IN THE PUBLIC INTEREST.

The public interest and balance of harms also weigh strongly in favor of denying Movants' stay request.  Climate change is the most significant environmental challenge of our day, and is already affecting national public health, welfare, and the environment.  See, e.g., 80 Fed. Reg. at 64,677, 64,686-88; see generally Declaration of Christopher Field (Ex. 5).  Greenhouse gas emissions must be significantly reduced to lessen colossal ongoing threats to public health and welfare, including the threat of more severe storms and droughts, rising sea levels, and decreased air and water quality both here and across the globe.  80 Fed. Reg. at 64,682-83; see Field ¶ 5, 9-29.

The emission reductions achieved by the Rule are extremely important, even if they represent only a part of a broader effort to address the accumulation of greenhouse gases.  The Rule achieves substantial reductions from what are by far the largest emitting stationary $CO_2$ generators (fossil fuel-fired power plants) in the United States.  Id. at 64,688-89.  The fact that these reductions will not by themselves reverse global warming does not undermine the Rule's role as an essential step towards mitigating climate change threats.  See Field ¶ 7-8, 16, 21, 29.  Agencies "do

---

[43] Movants' arguments that the MATS modeling under-estimated coal-fired power plant retirements, e.g., Schwartz Decl. ¶ 44 (Coal Mot. Ex. 1), likewise miss the mark. See Harvey Decl. ¶¶ 59-61.

not generally resolve massive problems [such as climate change] in one fell swoop."
Massachusetts v. EPA, 549 U.S. at 499-500, 526 (noting that reduction in domestic
greenhouse gas emissions can importantly slow the pace of global emissions increases
and mitigate the risk of "catastrophic harm," "no matter what happens elsewhere").
Moreover, the Rule's monetized climate benefits *alone* are projected to reach $10
billion in 2025 and to reach $20 billion by 2030. 80 Fed. Reg. at 64,681, 64,928-31.

A stay would adversely affect public health and welfare because it could
necessitate postponing the Rule's implementation deadlines, see, e.g., Basin Mot. 1,
and thereby result in a delay in securing important $CO_2$ reductions. Atmospheric $CO_2$
is cumulative and long-lived, so the additional amount of $CO_2$ emitted because of any
delay implementing the Rule would irretrievably accumulate in the atmosphere and
further contribute to, or even accelerate, the resulting public and environmental
harms. Field ¶ 5; 80 Fed. Reg. at 64,682. By demonstrating the United States'
commitment to reducing greenhouse gas emissions, the Rule has helped to establish
this country's leadership on the international stage. See Declaration of Todd Stern ¶
31 (Ex. 6). This leadership has facilitated new emission reduction commitments,
called Intentional Nationally Determined Contributions (INDCs), by countries
representing 98% of global emissions. Id. ¶ 26. The successful implementation of the
Clean Power Plan will enable our nation to continue leading by example.[44] Id. ¶ 31.

---

[44] Movants contend the Court should disregard the serious effects of climate change

*(Footnote continued . . . )*

Movants claim that because market trends and state programs are already leading to reduced $CO_2$ emissions even in the absence of the Rule, a stay would not harm the public interest.  See, e.g., Chamber Mot. 20.  While near-term $CO_2$ reductions are important and do reflect market trends and existing state programs – a fact that undercuts Movants' assertions of irreparable harm – the Rule will ultimately secure substantial additional reductions, particularly in the later compliance years.  Accordingly, although the Rule imposes very little near-term burden, a stay could easily delay more substantial, later-required reductions, and result in significant and irretrievable additional $CO_2$ emissions.

Movants also contend that the Rule should be stayed because coal unit retirements and new infrastructure investments will allegedly adversely affect the reliability of the electric grid and will increase electricity rates.  See, e.g., W.Va. Mot. 20.  As described in Section III, supra, Movants face no imminent compliance obligations and need not make any decisions to close existing generation sources or to

---

because EPA did not promulgate the Rule sooner.  See, e.g., Chamber Mot. 20.  The date on which this Rule was promulgated does not bear on the harms it seeks to address, the importance and severity of which are widely recognized.  Moreover, EPA's actions in recent years have demonstrated the urgency of the problem.  Since finding in 2009 that greenhouse gases may reasonably be anticipated to endanger public health or welfare, EPA has promulgated a number of significant regulations addressing greenhouse gas emissions, including regulations to address light-duty and heavy-duty vehicle emissions and to address greenhouse gases under EPA's New Source Review permitting program.  75 Fed. Reg. 25,324 (May 7, 2010); 75 Fed. Reg. 77,698 (Dec. 13, 2010) and 76 Fed. Reg. 57,106 (Sept. 15, 2011).

build new generation or transmission during the period of judicial review. Thus, there is no reason to conclude that a stay during that period is needed to protect grid reliability or ratepayers.

Furthermore, similar prior warnings by the industry that environmental regulation will cause blackouts and skyrocketing electric bills have not been borne out. McCabe Decl. ¶¶ 46-51. As with previous significant air-pollution regulations for the power industry, the Rule can be implemented cost-effectively, with limited impacts on rates, without disrupting the electrical grid, and with significant benefits to public health and the environment. 80 Fed. Reg. at 64,671, 64,679-81, 64,748-51.

The industry's past and current efforts to reduce $CO_2$ emissions, <u>see</u> Chamber Mot. 20; Utility Mot. 19; Basin Mot. 20, have not resulted in significant impacts to electricity prices.[45] Nor have retirements of old coal plants and the expansion of renewable generation, which are already the focus of electricity sector planning efforts nationwide, threatened the reliability of the electric grid. 80 Fed. Reg. at 64,694-96. Thus, the public interest does not favor a stay of the Rule pending judicial review.

## <u>CONCLUSION</u>

For the foregoing reasons, Movants' requests for a stay should be denied.

---

[45] <u>Compare</u> "Emissions from Energy Consumption at Conventional Power Plants and CHP Plants," Table 9-1, 2007-2012, <u>available at</u> http://www.eia.gov/electricity/ annual/html/epa_09_01.html ($CO_2$ emissions) <u>with</u> "Real Price Viewer" Residential Electricity Price series, EIA Short-term Energy Outlook, 2007-2012 <u>available at</u> http://www.eia.gov/forecasts/steo/realprices/ (electricity rates).

Respectfully submitted,

Dated: December 3, 2015          JOHN C. CRUDEN
                                Assistant Attorney General

                                /s/ Eric G. Hostetler
                                ERIC G. HOSTETLER
                                NORMAN L. RAVE, JR.
                                BRIAN H. LYNK
                                AMANDA SHAFER BERMAN
                                CHLOE H. KOLMAN
                                U.S. Department of Justice
                                Environmental Defense Section
                                P.O. Box 7611
                                Washington, D.C. 20044
                                Phone: (202) 305-2326
                                Email: eric.hostetler@usdoj.gov


                                Of Counsel:

                                Elliott Zenick
                                Howard J. Hoffman
                                Scott J. Jordan
                                Jonathan Skinner-Thompson
                                Abirami Vijayan
                                Daniel P. Schramm
                                Aileen D. Roder
                                Zach Pilchen
                                Steve Odendahl
                                United States Environmental
                                        Protection Agency
                                Office of General Counsel
                                1200 Pennsylvania Ave., N.W.
                                Washington, D.C. 20460

71

## Certificate of Service

I certify that RESPONDENT EPA'S OPPOSITION TO MOTIONS TO STAY FINAL RULE was electronically filed today with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system, and that, under Circuit Rule 21(d), five paper copies of the brief were delivered to the Court by hand.

I further certify that a copy of the foregoing document was today served electronically through the court's CM/ECF system on all registered counsel for Petitioners and Intervenors.

I further certify that a copy of the foregoing document was served by electronic mail or by U.S. Mail on the following non-CM/ECF counsel for Petitioners and Intervenors:

Janice M. Alward
Arizona Corporation
Commission

Kelvin Allen Brooks
Office of the Attorney General,
State of New Hampshire

Patrick Burchette
Holland & Knight LLP

William F. Cooper
State of Hawaii Department of
the Attorney General

David Finley Crabtree
Deseret Power

Tannis Fox
Office of the Attorney General,
State of New Mexico

Karen R. Harned
National Federation of
Independent Business

Jacob Larson
Environmental Law Division,
State of Iowa

Karl Roy Moor
Southern Company Services, Inc.

Patrick J. Morrisey
West Virginia Office of the
Attorney General

Carrie Noteboom
New York City Law Department

Steven J. Oberg
Lynn, Jackson, Shultz & Lebrun,
P.C.

Gary Vergil Perko
Hopping Green & Sams

Lee Philip Rudofsky
Office of the Attorney General,
State of Arkansas

Bill Spears
Segrest & Segrest, P.C.

Ben H. Stone
Balch & Bingham LLP

Luther J. Strange III
Office of the Attorney General,
State of Alabama

Laurence H. Tribe
Harvard Law School

Thiruvendran Vignarajah
Office of the Attorney General,
State of Maryland

Janet F. Wagner
Arizona Corporation
Commission

Philip Zoebisch


/s/ Eric G. Hostetler

ERIC G. HOSTETLER
Counsel for Respondent EPA


Dated: December 3, 2015

## <u>Certificate as to Parties, Rulings, and Related Cases</u>

Pursuant to Circuit Rules 28(a)(1) and 21(d), Respondents the United States

Environmental Protection Agency, et al., states as follows:

**Parties:**

The parties in these consolidated cases are:

<u>Petitioners</u>: No. 15-1363: the States of West Virginia, Texas, Alabama, Arkansas, Colorado, Florida, Georgia, Indiana, Kansas, Louisiana, Michigan, Missouri, Montana, Nebraska, New Jersey, Ohio, South Carolina, South Dakota, Utah, Wisconsin, Wyoming, and the Commonwealth of Kentucky, the Arizona Corporation Commission, the State of Louisiana Department of Environmental Quality, the State of North Carolina Department of Environmental Quality; No. 15-1364: the State of Oklahoma, ex rel. E. Scott Pruitt, in his official capacity as Attorney General of Oklahoma, and the Oklahoma Department of Environmental Quality; No. 15-1365: the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFLCIO; No. 15-1366: Murray Energy Corporation; No. 15-1367: the National Mining Association; No. 15-1368: the American Coalition for Clean Coal Electricity; No. 15-1370: the Utility Air Regulatory Group and the American Public Power Association; No. 15-1371: Alabama Power Company, Georgia Power Company, Gulf Power Company, and the Mississippi Power Company; No. 15-1372: the CO2 Task Force of the Florida Electric Power Coordinating Group, Inc.; No. 15-1373: Montana-Dakota Utilities Co., a Division of MDU Resources Group, Inc.; No. 15-1374: the Tri-State Generation and Transmission Association, Inc.; No. 15-1375: the United Mine Workers of America; No. 15-1376: the National Rural Electric Cooperative Association, Arizona Electric Power Cooperative, Inc., Associated Electric Cooperative, Inc., Big Rivers Electric Corporation, Brazos Electric Power Cooperative, Inc., Buckeye Power, Inc., Central Montana Electric Power Cooperative, Central Power Electric Cooperative, Inc., Corn Belt Power Cooperative, Dairyland Power Cooperative, Deseret Generation & Transmission Co-operative, Inc., East Kentucky Power Cooperative, Inc., East River Electric Power Cooperative, Inc., East Texas Electric Cooperative, Inc., Georgia Transmission Corporation, Golden Spread Electric Cooperative, Inc., Hoosier Energy Rural Electric Cooperative, Inc., Kansas Electric Power Cooperative, Inc., Minnkota Power Cooperative, Inc., North Carolina Electric Membership Corporation, Northeast Texas Electric Cooperative, Inc., Northwest Iowa Power Cooperative,

Oglethorpe Power Corporation, Powersouth Energy Cooperative, Prairie Power, Inc., Rushmore Electric Power Cooperative, Inc., Sam Rayburn G&T Electric Cooperative, Inc., San Miguel Electric Cooperative, Inc., Seminole Electric Cooperative, Inc., South Mississippi Electric Power Association, South Texas Electric Cooperative, Inc., Southern Illinois Power Cooperative, Sunflower Electric Power Corporation, Tex-La Electric Cooperative of Texas, Inc., Upper Missouri G. & T. Electric Cooperative, Inc., Wabash Valley Power Association, Inc., Western Farmers Electric Cooperative, and Wolverine Power Supply Cooperative, Inc.; No. 15-1377: Westar Energy, Inc.; No. 15-1378: NorthWestern Corporation, doing business as NorthWestern Energy; No. 15-1379: the National Association of Home Builders; No. 15-1380: the State of North Dakota; No. 15-1382: the Chamber of Commerce of the United States of America, National Association of Manufacturers, American Fuel & Petrochemical Manufacturers, National Federation of Independent Business, American Chemistry Council, American Coke and Coal Chemicals Institute, American Foundry Society, American Forest & Paper Association, American Iron and Steel Institute, American Wood Council, Brick Industry Association, Electricity Consumers Resource Council, Lignite Energy Council, National Lime Association, National Oilseed Processors Association, and the Portland Cement Association; No. 15-1383: the Association of American Railroads; No. 15-1386: Luminant Generation Company, LLC, Oak Grove Management Company, LLC, Big Brown Power Company, LLC, Sandow Power Company, LLC, Big Brown Lignite Company, LLC, Luminant Mining Company, LLC, and Luminant Big Brown Mining Company, LLC; No. 15-1393: Basin Electric Power Cooperative, Inc.; No. 15-1398: Energy & Environment Legal Institute; No. 15-1409: Mississippi Department of Environmental Quality; No. 15-1410: International Brotherhood of Electrical Workers, AFL-CIO; No. 15-1413: Entergy Corporation; No. 15-1418: LG&E and KU Energy LLC; No. 15-1422: West Virginia Coal Association; and No. 15-1432: Newmont Nevada Energy Investment, LLC, and Newmont USA Limited;

     <u>Movant-Intervenor for Petitioners</u>: Peabody Energy Corporation, Dixon Bros., Inc., Nelson Bros., Inc., Wesco International, Inc., Norfolk Southern Corporation, Joy Global Inc., Gulf Coast Lignite Coalition;

     <u>Respondents</u>: The United States Environmental Protection Agency and Regina A. McCarthy, Administrator, United States Environmental Protection Agency;

     <u>Movant-Intervenors for Respondent</u>: American Wind Energy Association, Advanced Energy Economy, American Lung Association, Center for Biological Diversity, Clean Air Council, Clean Wisconsin, Conservation Law Foundation, Environmental Defense Fund, Natural Resources Defense Council, Ohio Environmental Council, and Sierra Club, Solar Energy Industries Association; the

States of New York, California, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Minnesota, New Hampshire, New Mexico, Oregon, Rhode Island, Vermont, and Washington; the Commonwealths of Massachusetts and Virginia; the District of Columbia; the Cities of Boulder, Chicago, New York, Philadelphia, South Miami, and Broward County, Florida; Nextera Energy, Inc., Calpine Corporation, City of Austin, doing business as Austin Energy, City of Seattle, by and through its City Light Department, National Grid Generation, LLC, Pacific Gas and Electric Company, West Virginia Highlands Conservancy, Ohio Valley Environmental Coalition, Coal River Mountain Watch, Kanawha Forest Coalition, Mon Valley Clean Air Coalition, Keepers of the Mountains Foundation; and

<u>Movant-Amicus Curiae for Petitioner (in No. 15-1366)</u>: Philip Zoebisch.

**Rulings under Review**:

This final agency action under review is: <u>Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units; Final Rule</u>, 80 Fed. Reg. 64,662 (October 23, 2015).

**Related Cases**:

This following consolidated cases pending before the Court challenge a related agency action: <u>State of North Dakota v. EPA</u>, No. 15-1381; <u>Murray Energy Corporation v. EPA, et al.</u>, No. 15-1396; <u>Energy & Environment Legal Institute v. EPA</u>, No. 15-1397; and <u>State of West Virginia, et al., v. EPA, et al.</u>, No. 15-1399.