**ORAL ARGUMENT SCHEDULED ON JUNE 2, 2016**

No. 15-1363
(and consolidated cases)

———————————————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————————————

STATE OF WEST VIRGINIA, ET AL.,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

Respondents.

———————————————————————

On Petitions for Review of Final Action
by the United States Environmental Protection Agency

———————————————————————

**ADDENDUM TO BRIEF OF RESPONDENT EPA**

———————————————————————

JOHN C. CRUDEN
Assistant Attorney General

Of Counsel:

Lorie Schmidt
Elliott Zenick
Howard J. Hoffman
Scott J. Jordan
United States Environmental
    Protection Agency
Office of General Counsel
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

*Additional counsel listed
on following page*

ERIC G. HOSTETLER
NORMAN L. RAVE, JR.
BRIAN H. LYNK
AMANDA SHAFER BERMAN
CHLOE H. KOLMAN
JONATHAN SKINNER-THOMPSON
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Phone: (202) 305-2326
Email: eric.hostetler@usdoj.gov

March 28, 2016

Of Counsel:

Alexander Bond
Daniel Conrad
Nora Greenglass
Matthew Marks
Steven Odendahl
Zachary Pilchen
Aileen D. Roder
Daniel P. Schramm
Steven Silverman
Abirami Vijayan
United States Environmental
        Protection Agency
Office of General Counsel
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

# STATUTORY AND REGULATORY ADDENDUM

# TABLE OF CONTENTS

## STATUTES

16 U.S.C. § 824o ..............................................................................ADD1
16 U.S.C. § 1536 ..............................................................................ADD3
42 U.S.C. § 7401 ..............................................................................ADD4
42 U.S.C. § 7408-10 .........................................................................ADD6
42 U.S.C. § 7411 ............................................................................ ADD25
42 U.S.C. § 7412 ............................................................................ ADD33
42 U.S.C. § 7416 ............................................................................ ADD67
42 U.S.C. § 7491 ............................................................................ ADD68
42 U.S.C. § 7521(a) ....................................................................... ADD72
42 U.S.C. § 7602 ............................................................................ ADD76
42 U.S.C. § 7607 ............................................................................ ADD80
42 U.S.C. § 7651 ............................................................................ ADD87
42 U.S.C. § 7651b .......................................................................... ADD89
42 U.S.C. § 7651c .......................................................................... ADD93
Pub. L. No. 101-549, § 108(g) & § 302(a), 104 Stat. 2465-68 & 2574 (1990) ... ADD111

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 60.21 ......................................................................... ADD117
40 C.F.R. § 60.22 ......................................................................... ADD119
40 C.F.R. § 60.24 ......................................................................... ADD121
40 C.F.R. § 60.27 ......................................................................... ADD123
40 C.F.R. § 60.5736 ...................................................................... ADD125
40 C.F.R. § 60.5740 ...................................................................... ADD126
40 C.F.R. § 60.5745 ...................................................................... ADD130
40 C.F.R. § 60.5770 ...................................................................... ADD135
40 C.F.R. § 60.5790 ...................................................................... ADD137
40 C.F.R. § 60.5800 ...................................................................... ADD140
40 C.F.R. § 60.5825 ...................................................................... ADD143
40 C.F.R. § 60.5880 ...................................................................... ADD144
40 C.F.R. § 86.1865-12 .................................................................. ADD149
50 C.F.R. § 402.14 ........................................................................ ADD160

## LEGISLATIVE HISTORY

S. Rep. No. 91-1196 at 20 (1970), reprinted in 1 <u>Legislative History of the Clean Air Act Amendments of 1970</u>, at 420 (Comm. Print 1974).................................... ADD166

H.R. Rep. No. 95-294 at 81-89 (1977), reprinted in 4 <u>Legislative History of the Clean Air Act Amendments of 1977</u>, 2548-56 (Comm. Print 1979) ........................... ADD169

1 <u>A Legislative History of the Clean Air Act Amendments of 1990</u> at 46 n.1 (Comm. Print 1993) .............................................................................. ADD180

H.R. Rep. No. 101-952 at 336, 340, 345 & 347 (1989), reprinted in 1 <u>Legislative History of the Clean Air Act Amendments of 1990</u>, at 1786, 1790, 1795, 1797 (Comm. Print 1993) ............................................................................. ADD186

H.R. 3030, 101st Cong. § 301 (July 1989), reprinted in 2 <u>Legislative History of the Clean Air Act Amendments of 1990</u>, at 3937 (Comm. Print 1993).................. ADD191

S. Rep. No. 101-228 at 14, 133, 316 (1989), reprinted in 5 <u>Legislative History of the Clean Air Act Amendments of 1990</u>, at 8354, 8473, 8656 (Comm. Print 1993) ............................................................................. ADD210

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
    Title 16. Conservation
        Chapter 12. Federal Regulation and Development of Power (Refs & Annos)
            Subchapter II. Regulation of Electric Utility Companies Engaged in Interstate Commerce

16 U.S.C.A. § 824*o*

§ 824*o*. Electric reliability

Effective: August 8, 2005
Currentness

**(a)Definitions**

For purposes of this section:

   **(1)** The term "bulk-power system" means--

      **(A)** facilities and control systems necessary for operating an interconnected electric energy transmission network (or any portion thereof); and

      **(B)** electric energy from generation facilities needed to maintain transmission system reliability.

      The term does not include facilities used in the local distribution of electric energy.

   **(2)** The terms "Electric Reliability Organization" and "ERO" mean the organization certified by the Commission under subsection (c) of this section the purpose of which is to establish and enforce reliability standards for the bulk-power system, subject to Commission review.

   **(3)** The term "reliability standard" means a requirement, approved by the Commission under this section, to provide for reliable operation of the bulk-power system. The term includes requirements for the operation of existing bulk-power system facilities, including cybersecurity protection, and the design of planned additions or modifications to such facilities to the extent necessary to provide for reliable operation of the bulk-power system, but the term does not include any requirement to enlarge such facilities or to construct new transmission capacity or generation capacity.

   **(4)** The term "reliable operation" means operating the elements of the bulk-power system within equipment and electric system thermal, voltage, and stability limits so that instability, uncontrolled separation, or cascading failures of such system will not occur as a result of a sudden disturbance, including a cybersecurity incident, or unanticipated failure of system elements.

ADD1

USCA Case #15-1363    Document #1605913    Filed: 03/28/2016    Page 7 of 219

**(5)** The term "Interconnection" means a geographic area in which the operation of bulk-power system components is synchronized such that the failure of one or more of such components may adversely affect the ability of the operators of other components within the system to maintain reliable operation of the facilities within their control.

**(6)** The term "transmission organization" means a Regional Transmission Organization, Independent System Operator, independent transmission provider, or other transmission organization finally approved by the Commission for the operation of transmission facilities.

**(7)** The term "regional entity" means an entity having enforcement authority pursuant to subsection (e)(4) of this section.

**(8)** The term "cybersecurity incident" means a malicious act or suspicious event that disrupts, or was an attempt to disrupt, the operation of those programmable electronic devices and communication networks including hardware, software and data that are essential to the reliable operation of the bulk power system.

## (b) Jurisdiction and applicability

**(1)** The Commission shall have jurisdiction, within the United States, over the ERO certified by the Commission under subsection (c) of this section, any regional entities, and all users, owners and operators of the bulk-power system, including but not limited to the entities described in section 824(f) of this title, for purposes of approving reliability standards established under this section and enforcing compliance with this section. All users, owners and operators of the bulk-power system shall comply with reliability standards that take effect under this section.

**(2)** The Commission shall issue a final rule to implement the requirements of this section not later than 180 days after August 8, 2005.

## (c) Certification

Following the issuance of a Commission rule under subsection (b)(2) of this section, any person may submit an application to the Commission for certification as the Electric Reliability Organization. The Commission may certify one such ERO if the Commission determines that such ERO--

**(1)** has the ability to develop and enforce, subject to subsection (e)(2) of this section, reliability standards that provide for an adequate level of reliability of the bulk-power system; and

**(2)** has established rules that--

**(A)** assure its independence of the users and owners and operators of the bulk-power system, while assuring fair stakeholder representation in the selection of its directors and balanced decisionmaking in any ERO committee or subordinate organizational structure;

**(B)** allocate equitably reasonable dues, fees, and other charges among end users for all activities under this section;

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    2

🟨 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 16. Conservation
    Chapter 35. Endangered Species (Refs & Annos)

16 U.S.C.A. § 1536

§ 1536. Interagency cooperation

Currentness

**(a) Federal agency actions and consultations**

**(1)** The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title.

**(2)** Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

**(3)** Subject to such guidelines as the Secretary may establish, a Federal agency shall consult with the Secretary on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species.

**(4)** Each Federal agency shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under section 1533 of this title or result in the destruction or adverse modification of critical habitat proposed to be designated for such species. This paragraph does not require a limitation on the commitment of resources as described in subsection (d) of this section.

**(b) Opinion of Secretary**

**(1)(A)** Consultation under subsection (a) (2) of this section with respect to any agency action shall be concluded within the 90-day period beginning on the date on which initiated or, subject to subparagraph (B), within such other period of time as is mutually agreeable to the Secretary and the Federal agency.

United States Code Annotated
    Title 42. The Public Health and Welfare
        Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
            Subchapter I. Programs and Activities
                Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7401

§ 7401. Congressional findings and declaration of purpose

Currentness

(a) Findings

The Congress finds--

**(1)** that the predominant part of the Nation's population is located in its rapidly expanding metropolitan and other urban areas, which generally cross the boundary lines of local jurisdictions and often extend into two or more States;

**(2)** that the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare, including injury to agricultural crops and livestock, damage to and the deterioration of property, and hazards to air and ground transportation;

**(3)** that air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments; and

**(4)** that Federal financial assistance and leadership is essential for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution.

(b) Declaration

The purposes of this subchapter are--

**(1)** to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population;

**(2)** to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution;

**(3)** to provide technical and financial assistance to State and local governments in connection with the development and execution of their air pollution prevention and control programs; and

ADD4

USCA Case #15-1363      Document #1605913      Filed: 03/28/2016      Page 10 of 219

**(4)** to encourage and assist the development and operation of regional air pollution prevention and control programs.

(c) Pollution prevention

A primary goal of this chapter is to encourage or otherwise promote reasonable Federal, State, and local governmental actions, consistent with the provisions of this chapter, for pollution prevention.

**CREDIT(S)**

(July 14, 1955, c. 360, Title I, § 101, formerly § 1, as added Dec. 17, 1963, Pub.L. 88-206, § 1, 77 Stat. 392, and renumbered § 101 and amended Oct. 20, 1965, Pub.L. 89-272, Title I, § 101(2), (3), 79 Stat. 992; Nov. 21, 1967, Pub.L. 90-148, § 2, 81 Stat. 485; Nov. 15, 1990, Pub.L. 101-549, Title I, § 108(k), 104 Stat. 2468.)

Notes of Decisions (49)

42 U.S.C.A. § 7401, 42 USCA § 7401
Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

ADD5

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Programs and Activities
        Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7408

§ 7408. Air quality criteria and control techniques

Effective: November 10, 1998

Currentness

(a) Air pollutant list; publication and revision by Administrator; issuance of air quality criteria for air pollutants

**(1)** For the purpose of establishing national primary and secondary ambient air quality standards, the Administrator shall within 30 days after December 31, 1970, publish, and shall from time to time thereafter revise, a list which includes each air pollutant--

**(A)** emissions of which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare;

**(B)** the presence of which in the ambient air results from numerous or diverse mobile or stationary sources; and

**(C)** for which air quality criteria had not been issued before December 31, 1970 but for which he plans to issue air quality criteria under this section.

**(2)** The Administrator shall issue air quality criteria for an air pollutant within 12 months after he has included such pollutant in a list under paragraph (1). Air quality criteria for an air pollutant shall accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities. The criteria for an air pollutant, to the extent practicable, shall include information on--

**(A)** those variable factors (including atmospheric conditions) which of themselves or in combination with other factors may alter the effects on public health or welfare of such air pollutant;

**(B)** the types of air pollutants which, when present in the atmosphere, may interact with such pollutant to produce an adverse effect on public health or welfare; and

**(C)** any known or anticipated adverse effects on welfare.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

(b) Issuance by Administrator of information on air pollution control techniques; standing consulting committees for air pollutants; establishment; membership

**(1)** Simultaneously with the issuance of criteria under subsection (a) of this section, the Administrator shall, after consultation with appropriate advisory committees and Federal departments and agencies, issue to the States and appropriate air pollution control agencies information on air pollution control techniques, which information shall include data relating to the cost of installation and operation, energy requirements, emission reduction benefits, and environmental impact of the emission control technology. Such information shall include such data as are available on available technology and alternative methods of prevention and control of air pollution. Such information shall also include data on alternative fuels, processes, and operating methods which will result in elimination or significant reduction of emissions.

**(2)** In order to assist in the development of information on pollution control techniques, the Administrator may establish a standing consulting committee for each air pollutant included in a list published pursuant to subsection (a)(1) of this section, which shall be comprised of technically qualified individuals representative of State and local governments, industry, and the academic community. Each such committee shall submit, as appropriate, to the Administrator information related to that required by paragraph (1).

(c) Review, modification, and reissuance of criteria or information

The Administrator shall from time to time review, and, as appropriate, modify, and reissue any criteria or information on control techniques issued pursuant to this section. Not later than six months after August 7, 1977, the Administrator shall revise and reissue criteria relating to concentrations of $NO_2$ over such period (not more than three hours) as he deems appropriate. Such criteria shall include a discussion of nitric and nitrous acids, nitrites, nitrates, nitrosamines, and other carcinogenic and potentially carcinogenic derivatives of oxides of nitrogen.

(d) Publication in Federal Register; availability of copies for general public

The issuance of air quality criteria and information on air pollution control techniques shall be announced in the Federal Register and copies shall be made available to the general public.

(e) Transportation planning and guidelines

The Administrator shall, after consultation with the Secretary of Transportation, and after providing public notice and opportunity for comment, and with State and local officials, within nine months after November 15, 1990, and periodically thereafter as necessary to maintain a continuous transportation-air quality planning process, update the June 1978 Transportation-Air Quality Planning Guidelines and publish guidance on the development and implementation of transportation and other measures necessary to demonstrate and maintain attainment of national ambient air quality standards. Such guidelines shall include information on--

**(1)** methods to identify and evaluate alternative planning and control activities;

**(2)** methods of reviewing plans on a regular basis as conditions change or new information is presented;

ADD7

**(3)** identification of funds and other resources necessary to implement the plan, including interagency agreements on providing such funds and resources;

**(4)** methods to assure participation by the public in all phases of the planning process; and

**(5)** such other methods as the Administrator determines necessary to carry out a continuous planning process.

(f) Information regarding processes, procedures, and methods to reduce or control pollutants in transportation; reduction of mobile source related pollutants; reduction of impact on public health

**(1)** The Administrator shall publish and make available to appropriate Federal, State, and local environmental and transportation agencies not later than one year after November 15, 1990, and from time to time thereafter--

**(A)** information prepared, as appropriate, in consultation with the Secretary of Transportation, and after providing public notice and opportunity for comment, regarding the formulation and emission reduction potential of transportation control measures related to criteria pollutants and their precursors, including, but not limited to--

**(i)** programs for improved public transit;

**(ii)** restriction of certain roads or lanes to, or construction of such roads or lanes for use by, passenger buses or high occupancy vehicles;

**(iii)** employer-based transportation management plans, including incentives;

**(iv)** trip-reduction ordinances;

**(v)** traffic flow improvement programs that achieve emission reductions;

**(vi)** fringe and transportation corridor parking facilities serving multiple occupancy vehicle programs or transit service;

**(vii)** programs to limit or restrict vehicle use in downtown areas or other areas of emission concentration particularly during periods of peak use;

**(viii)** programs for the provision of all forms of high-occupancy, shared-ride services;

**(ix)** programs to limit portions of road surfaces or certain sections of the metropolitan area to the use of non-motorized vehicles or pedestrian use, both as to time and place;

ADD8

(**x**) programs for secure bicycle storage facilities and other facilities, including bicycle lanes, for the convenience and protection of bicyclists, in both public and private areas;

(**xi**) programs to control extended idling of vehicles;

(**xii**) programs to reduce motor vehicle emissions, consistent with subchapter II of this chapter, which are caused by extreme cold start conditions;

(**xiii**) employer-sponsored programs to permit flexible work schedules;

(**xiv**) programs and ordinances to facilitate non-automobile travel, provision and utilization of mass transit, and to generally reduce the need for single-occupant vehicle travel, as part of transportation planning and development efforts of a locality, including programs and ordinances applicable to new shopping centers, special events, and other centers of vehicle activity;

(**xv**) programs for new construction and major reconstructions of paths, tracks or areas solely for the use by pedestrian or other non-motorized means of transportation when economically feasible and in the public interest. For purposes of this clause, the Administrator shall also consult with the Secretary of the Interior; and

(**xvi**) program to encourage the voluntary removal from use and the marketplace of pre-1980 model year light duty vehicles and pre-1980 model light duty trucks. [1]

(**B**) information on additional methods or strategies that will contribute to the reduction of mobile source related pollutants during periods in which any primary ambient air quality standard will be exceeded and during episodes for which an air pollution alert, warning, or emergency has been declared;

(**C**) information on other measures which may be employed to reduce the impact on public health or protect the health of sensitive or susceptible individuals or groups; and

(**D**) information on the extent to which any process, procedure, or method to reduce or control such air pollutant may cause an increase in the emissions or formation of any other pollutant.

(**2**) In publishing such information the Administrator shall also include an assessment of--

(**A**) the relative effectiveness of such processes, procedures, and methods;

(**B**) the potential effect of such processes, procedures, and methods on transportation systems and the provision of transportation services; and

(**C**) the environmental, energy, and economic impact of such processes, procedures, and methods.

ADD9

(g) Assessment of risks to ecosystems

The Administrator may assess the risks to ecosystems from exposure to criteria air pollutants (as identified by the Administrator in the Administrator's sole discretion).

(h) RACT/BACT/LAER clearinghouse

The Administrator shall make information regarding emission control technology available to the States and to the general public through a central database. Such information shall include all control technology information received pursuant to State plan provisions requiring permits for sources, including operating permits for existing sources.

**CREDIT(S)**

  (July 14, 1955, c. 360, Title I, § 108, as added Dec. 31, 1970, Pub.L. 91-604, § 4(a), 84 Stat. 1678; amended Aug. 7, 1977, Pub.L. 95-95, Title I, §§ 104, 105, Title IV, § 401(a), 91 Stat. 689, 790; Nov. 15, 1990, Pub.L. 101-549, Title I, §§ 108(a) to (c), (o), 111, 104 Stat. 2465, 2466, 2469, 2470; Nov. 10, 1998, Pub.L. 105-362, Title XV, § 1501(b), 112 Stat. 3294.)

Notes of Decisions (15)

Footnotes

1        So in original. The period probably should be a semicolon.

42 U.S.C.A. § 7408, 42 USCA § 7408

Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

**End of Document**                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Programs and Activities
        Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7409

§ 7409. National primary and secondary ambient air quality standards

Currentness

(a) Promulgation

**(1)** The Administrator--

**(A)** within 30 days after December 31, 1970, shall publish proposed regulations prescribing a national primary ambient air quality standard and a national secondary ambient air quality standard for each air pollutant for which air quality criteria have been issued prior to such date; and

**(B)** after a reasonable time for interested persons to submit written comments thereon (but no later than 90 days after the initial publication of such proposed standards) shall by regulation promulgate such proposed national primary and secondary ambient air quality standards with such modifications as he deems appropriate.

**(2)** With respect to any air pollutant for which air quality criteria are issued after December 31, 1970, the Administrator shall publish, simultaneously with the issuance of such criteria and information, proposed national primary and secondary ambient air quality standards for any such pollutant. The procedure provided for in paragraph (1)(B) of this subsection shall apply to the promulgation of such standards.

(b) Protection of public health and welfare

**(1)** National primary ambient air quality standards, prescribed under subsection (a) of this section shall be ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health. Such primary standards may be revised in the same manner as promulgated.

**(2)** Any national secondary ambient air quality standard prescribed under subsection (a) of this section shall specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator, based on such criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air. Such secondary standards may be revised in the same manner as promulgated.

ADD11

(c) National primary ambient air quality standard for nitrogen dioxide

The Administrator shall, not later than one year after August 7, 1977, promulgate a national primary ambient air quality standard for $NO_2$ concentrations over a period of not more than 3 hours unless, based on the criteria issued under section 7408(c) of this title, he finds that there is no significant evidence that such a standard for such a period is requisite to protect public health.

(d) Review and revision of criteria and standards; independent scientific review committee; appointment; advisory functions

**(1)** Not later than December 31, 1980, and at five-year intervals thereafter, the Administrator shall complete a thorough review of the criteria published under section 7408 of this title and the national ambient air quality standards promulgated under this section and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate in accordance with section 7408 of this title and subsection (b) of this section. The Administrator may review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph.

**(2)(A)** The Administrator shall appoint an independent scientific review committee composed of seven members including at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies.

**(B)** Not later than January 1, 1980, and at five-year intervals thereafter, the committee referred to in subparagraph (A) shall complete a review of the criteria published under section 7408 of this title and the national primary and secondary ambient air quality standards promulgated under this section and shall recommend to the Administrator any new national ambient air quality standards and revisions of existing criteria and standards as may be appropriate under section 7408 of this title and subsection (b) of this section.

**(C)** Such committee shall also (i) advise the Administrator of areas in which additional knowledge is required to appraise the adequacy and basis of existing, new, or revised national ambient air quality standards, (ii) describe the research efforts necessary to provide the required information, (iii) advise the Administrator on the relative contribution to air pollution concentrations of natural as well as anthropogenic activity, and (iv) advise the Administrator of any adverse public health, welfare, social, economic, or energy effects which may result from various strategies for attainment and maintenance of such national ambient air quality standards.

**CREDIT(S)**
    (July 14, 1955, c. 360, Title I, § 109, as added Dec. 31, 1970, Pub.L. 91-604, § 4(a), 84 Stat. 1679; amended Aug. 7, 1977, Pub.L. 95-95, Title I, § 106, 91 Stat. 691.)

Notes of Decisions (82)

42 U.S.C.A. § 7409, 42 USCA § 7409
Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

**End of Document**                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Programs and Activities
        Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7410

§ 7410. State implementation plans for national primary and secondary ambient air quality standards

Currentness

(a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems

**(1)** Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

**(2)** Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall--

**(A)** include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

**(B)** provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to--

**(i)** monitor, compile, and analyze data on ambient air quality, and

**(ii)** upon request, make such data available to the Administrator;

ADD13

**(C)** include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D of this subchapter;

**(D)** contain adequate provisions--

    **(i)** prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will--

        **(I)** contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

        **(II)** interfere with measures required to be included in the applicable implementation plan for any other State under part C of this subchapter to prevent significant deterioration of air quality or to protect visibility,

    **(ii)** insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

**(E)** provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

**(F)** require, as may be prescribed by the Administrator--

    **(i)** the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

    **(ii)** periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

    **(iii)** correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

**(G)** provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

ADD14

**(H)** provide for revision of such plan--

**(i)** from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

**(ii)** except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to otherwise comply with any additional requirements established under this chapter;

**(I)** in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D of this subchapter (relating to nonattainment areas);

**(J)** meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C of this subchapter (relating to prevention of significant deterioration of air quality and visibility protection);

**(K)** provide for--

**(i)** the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

**(ii)** the submission, upon request, of data related to such air quality modeling to the Administrator;

**(L)** require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover--

**(i)** the reasonable costs of reviewing and acting upon any application for such a permit, and

**(ii)** if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action), until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V of this chapter; and

**(M)** provide for consultation and participation by local political subdivisions affected by the plan.

**(3)(A)** Repealed. Pub.L. 101-549, Title I, § 101(d)(1), Nov. 15, 1990, 104 Stat. 2409

ADD15

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**(B)** As soon as practicable, the Administrator shall, consistent with the purposes of this chapter and the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C.A. § 791 et seq.], review each State's applicable implementation plans and report to the State on whether such plans can be revised in relation to fuel burning stationary sources (or persons supplying fuel to such sources) without interfering with the attainment and maintenance of any national ambient air quality standard within the period permitted in this section. If the Administrator determines that any such plan can be revised, he shall notify the State that a plan revision may be submitted by the State. Any plan revision which is submitted by the State shall, after public notice and opportunity for public hearing, be approved by the Administrator if the revision relates only to fuel burning stationary sources (or persons supplying fuel to such sources), and the plan as revised complies with paragraph (2) of this subsection. The Administrator shall approve or disapprove any revision no later than three months after its submission.

**(C)** Neither the State, in the case of a plan (or portion thereof) approved under this subsection, nor the Administrator, in the case of a plan (or portion thereof) promulgated under subsection (c) of this section, shall be required to revise an applicable implementation plan because one or more exemptions under section 7418 of this title (relating to Federal facilities), enforcement orders under section 7413(d) of this title, suspensions under subsection (f) or (g) of this section (relating to temporary energy or economic authority), orders under section 7419 of this title (relating to primary nonferrous smelters), or extensions of compliance in decrees entered under section 7413(e) of this title (relating to iron- and steel-producing operations) have been granted, if such plan would have met the requirements of this section if no such exemptions, orders, or extensions had been granted.

**(4)** Repealed. Pub.L. 101-549, Title I, § 101(d)(2), Nov. 15, 1990, 104 Stat. 2409

**(5)(A)(i)** Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

**(ii)** Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

**(iii)** Any State may revise an applicable implementation plan approved under this subsection to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section.

**(B)** The Administrator shall have the authority to promulgate, implement and enforce regulations under subsection (c) of this section respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.

**(C)** For purposes of this paragraph, the term "indirect source" means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii)) of this section), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.

ADD16

USCA Case #15-1363     Document #1605913     Filed: 03/28/2016     Page 22 of 219

**(D)** For purposes of this paragraph the term "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations--

**(i)** exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

**(ii)** preventing maintenance of any such standard after such date.

**(E)** For purposes of this paragraph and paragraph (2)(B), the term "transportation control measure" does not include any measure which is an "indirect source review program".

**(6)** No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 7413(d) of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

(b) Extension of period for submission of plans

The Administrator may, wherever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation

**(1)** The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator--

**(A)** finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A) of this section, or

**(B)** disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

**(2)(A)** Repealed. Pub.L. 101-549, Title I, § 101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**(B)** No parking surcharge regulation may be required by the Administrator under paragraph (1) of this subsection as a part of an applicable implementation plan. All parking surcharge regulations previously required by the Administrator shall be void upon June 22, 1974. This subparagraph shall not prevent the Administrator from approving parking surcharges if they are adopted and submitted by a State as part of an applicable implementation plan. The Administrator may not condition approval of any implementation plan submitted by a State on such plan's including a parking surcharge regulation.

**(C)** Repealed. Pub.L. 101-549, Title I, § 101(d)(3)(B), Nov. 15, 1990, 104 Stat. 2409

**(D)** For purposes of this paragraph--

**(i)** The term "parking surcharge regulation" means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles.

**(ii)** The term "management of parking supply" shall include any requirement providing that any new facility containing a given number of parking spaces shall receive a permit or other prior approval, issuance of which is to be conditioned on air quality considerations.

**(iii)** The term "preferential bus/carpool lane" shall include any requirement for the setting aside of one or more lanes of a street or highway on a permanent or temporary basis for the exclusive use of buses or carpools, or both.

**(E)** No standard, plan, or requirement, relating to management of parking supply or preferential bus/carpool lanes shall be promulgated after June 22, 1974, by the Administrator pursuant to this section, unless such promulgation has been subjected to at least one public hearing which has been held in the area affected and for which reasonable notice has been given in such area. If substantial changes are made following public hearings, one or more additional hearings shall be held in such area after such notice.

**(3)** Upon application of the chief executive officer of any general purpose unit of local government, if the Administrator determines that such unit has adequate authority under State or local law, the Administrator may delegate to such unit the authority to implement and enforce within the jurisdiction of such unit any part of a plan promulgated under this subsection. Nothing in this paragraph shall prevent the Administrator from implementing or enforcing any applicable provision of a plan promulgated under this subsection.

**(4)** Repealed. Pub.L. 101-549, Title I, § 101(d)(3)(C), Nov. 15, 1990, 104 Stat. 2409

**(5)(A)** Any measure in an applicable implementation plan which requires a toll or other charge for the use of a bridge located entirely within one city shall be eliminated from such plan by the Administrator upon application by the Governor of the State, which application shall include a certification by the Governor that he will revise such plan in accordance with subparagraph (B).

**(B)** In the case of any applicable implementation plan with respect to which a measure has been eliminated under subparagraph (A), such plan shall, not later than one year after August 7, 1977, be revised to include comprehensive measures to:

ADD18

**(i)** establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and

**(ii)** implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds. Such measures shall, as a substitute for the tolls or charges eliminated under subparagraph (A), provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

**(C)** Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D of this subchapter.

(d), (e) Repealed. Pub.L. 101-549, Title I, § 101(d)(4), (5), Nov. 15, 1990, 104 Stat. 2409

(f) National or regional energy emergencies; determination by President

**(1)** Upon application by the owner or operator of a fuel burning stationary source, and after notice and opportunity for public hearing, the Governor of the State in which such source is located may petition the President to determine that a national or regional energy emergency exists of such severity that--

**(A)** a temporary suspension of any part of the applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) may be necessary, and

**(B)** other means of responding to the energy emergency may be inadequate.

Such determination shall not be delegable by the President to any other person. If the President determines that a national or regional energy emergency of such severity exists, a temporary emergency suspension of any part of an applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) adopted by the State may be issued by the Governor of any State covered by the President's determination under the condition specified in paragraph (2) and may take effect immediately.

**(2)** A temporary emergency suspension under this subsection shall be issued to a source only if the Governor of such State finds that--

**(A)** there exists in the vicinity of such source a temporary energy emergency involving high levels of unemployment or loss of necessary energy supplies for residential dwellings; and

**(B)** such unemployment or loss can be totally or partially alleviated by such emergency suspension.

ADD19

Not more than one such suspension may be issued for any source on the basis of the same set of circumstances or on the basis of the same emergency.

**(3)** A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator, if any. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of paragraph (2).

**(4)** This subsection shall not apply in the case of a plan provision or requirement promulgated by the Administrator under subsection (c) of this section, but in any such case the President may grant a temporary emergency suspension for a four month period of any such provision or requirement if he makes the determinations and findings specified in paragraphs (1) and (2).

**(5)** The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c-10 of this title, as in effect before August 7, 1977, or section 7413(d) of this title, upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

(g) Governor's authority to issue temporary emergency suspensions

**(1)** In the case of any State which has adopted and submitted to the Administrator a proposed plan revision which the State determines--

**(A)** meets the requirements of this section, and

**(B)** is necessary (i) to prevent the closing for one year or more of any source of air pollution, and (ii) to prevent substantial increases in unemployment which would result from such closing, and

which the Administrator has not approved or disapproved under this section within 12 months of submission of the proposed plan revision, the Governor may issue a temporary emergency suspension of the part of the applicable implementation plan for such State which is proposed to be revised with respect to such source. The determination under subparagraph (B) may not be made with respect to a source which would close without regard to whether or not the proposed plan revision is approved.

**(2)** A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of this subsection.

**(3)** The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c-10 of this title as in effect before August 7, 1977, or under section 7413(d) of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

ADD20

(h) Publication of comprehensive document for each State setting forth requirements of applicable implementation plan

**(1)** Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Administrator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

**(2)** The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

(i) Modification of requirements prohibited

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) of this section (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d) of this title (relating to compliance orders), a plan promulgation under subsection (c) of this section, or a plan revision under subsection (a)(3) of this section, no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

(j) Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

(k) Environmental Protection Agency action on plan submissions

(1) Completeness of plan submissions

(A) Completeness criteria

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission under this subsection. The criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

(B) Completeness finding

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria established pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator,

ADD21

and that has not been determined by the Administrator (by the date 6 months after receipt of the submission) to have failed to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

(C) Effect of finding of incompleteness

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

(2) Deadline for action

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

(3) Full and partial approval and disapproval

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

(4) Conditional approval

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

(5) Calls for plan revisions

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D of this subchapter, unless such date has elapsed).

(6) Corrections

ADD22

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

(l) Plan revisions

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

(m) Sanctions

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title in relation to any plan or plan item (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

(n) Savings clauses

(1) Existing plan provisions

Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

(2) Attainment dates

For any area not designated nonattainment, any plan or plan revision submitted or required to be submitted by a State--

(A) in response to the promulgation or revision of a national primary ambient air quality standard in effect on November 15, 1990, or

(B) in response to a finding of substantial inadequacy under subsection (a)(2) of this section (as in effect immediately before November 15, 1990),

ADD23

shall provide for attainment of the national primary ambient air quality standards within 3 years of November 15, 1990, or within 5 years of issuance of such finding of substantial inadequacy, whichever is later.

(3) Retention of construction moratorium in certain areas

In the case of an area to which, immediately before November 15, 1990, the prohibition on construction or modification of major stationary sources prescribed in subsection (a)(2)(I) of this section (as in effect immediately before November 15, 1990) applied by virtue of a finding of the Administrator that the State containing such area had not submitted an implementation plan meeting the requirements of section 7502(b)(6) of this title (relating to establishment of a permit program) (as in effect immediately before November 15, 1990) or 7502(a)(1) of this title (to the extent such requirements relate to provision for attainment of the primary national ambient air quality standard for sulfur oxides by December 31, 1982) as in effect immediately before November 15, 1990, no major stationary source of the relevant air pollutant or pollutants shall be constructed or modified in such area until the Administrator finds that the plan for such area meets the applicable requirements of section 7502(c)(5) of this title (relating to permit programs) or subpart 5 of part D of this subchapter (relating to attainment of the primary national ambient air quality standard for sulfur dioxide), respectively.

(o) Indian tribes

If an Indian tribe submits an implementation plan to the Administrator pursuant to section 7601(d) of this title, the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section 7601(d)(2) of this title. When such plan becomes effective in accordance with the regulations promulgated under section 7601(d) of this title, the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.

(p) Reports

Any State shall submit, according to such schedule as the Administrator may prescribe, such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development [1] effectiveness, need for revision, or implementation of any plan or plan revision required under this chapter.

**CREDIT(S)**

(July 14, 1955, c. 360, Title I, § 110, as added Dec. 31, 1970, Pub.L. 91-604, § 4(a), 84 Stat. 1680; amended June 22, 1974, Pub.L. 93-319, § 4, 88 Stat. 256; S.Res. 4, Feb. 4, 1977; Aug. 7, 1977, Pub.L. 95-95, Title I, §§ 107, 108, 91 Stat. 691, 693; Nov. 16, 1977, Pub.L. 95-190, § 14(a)(1)-(6), 91 Stat. 1399; July 17, 1981, Pub.L. 97-23, § 3, 95 Stat. 142; Nov. 15, 1990, Pub.L. 101-549, Title I, §§ 101(b)-(d), 102(h), 107(c), 108(d), Title IV, § 412, 104 Stat. 2404-2408, 2422, 2464, 2466, 2634.)

Notes of Decisions (358)

Footnotes

1       So in original. Probably should be followed by a comma.

42 U.S.C.A. § 7410, 42 USCA § 7410

Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
    Title 42. The Public Health and Welfare
        Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
            Subchapter I. Programs and Activities
            Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7411

§ 7411. Standards of performance for new stationary sources

Currentness

(a) Definitions

For purposes of this section:

(1) The term "standard of performance" means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

(2) The term "new source" means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

(3) The term "stationary source" means any building, structure, facility, or installation which emits or may emit any air pollutant. Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines.

(4) The term "modification" means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

(5) The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

(6) The term "existing source" means any stationary source other than a new source.

(7) The term "technological system of continuous emission reduction" means--

ADD25

**(A)** a technological process for production or operation by any source which is inherently low-polluting or nonpolluting, or

**(B)** a technological system for continuous reduction of the pollution generated by a source before such pollution is emitted into the ambient air, including precombustion cleaning or treatment of fuels.

**(8)** A conversion to coal (A) by reason of an order under section 2(a) of the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C.A. § 792(a) ] or any amendment thereto, or any subsequent enactment which supersedes such Act [15 U.S.C.A. § 791 et seq.], or (B) which qualifies under section 7413(d)(5)(A)(ii) of this title, shall not be deemed to be a modification for purposes of paragraphs (2) and (4) of this subsection.

(b) List of categories of stationary sources; standards of performance; information on pollution control techniques; sources owned or operated by United States; particular systems; revised standards

**(1)(A)** The Administrator shall, within 90 days after December 31, 1970, publish (and from time to time thereafter shall revise) a list of categories of stationary sources. He shall include a category of sources in such list if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.

**(B)** Within one year after the inclusion of a category of stationary sources in a list under subparagraph (A), the Administrator shall publish proposed regulations, establishing Federal standards of performance for new sources within such category. The Administrator shall afford interested persons an opportunity for written comment on such proposed regulations. After considering such comments, he shall promulgate, within one year after such publication, such standards with such modifications as he deems appropriate. The Administrator shall, at least every 8 years, review and, if appropriate, revise such standards following the procedure required by this subsection for promulgation of such standards. Notwithstanding the requirements of the previous sentence, the Administrator need not review any such standard if the Administrator determines that such review is not appropriate in light of readily available information on the efficacy of such standard. Standards of performance or revisions thereof shall become effective upon promulgation. When implementation and enforcement of any requirement of this chapter indicate that emission limitations and percent reductions beyond those required by the standards promulgated under this section are achieved in practice, the Administrator shall, when revising standards promulgated under this section, consider the emission limitations and percent reductions achieved in practice.

**(2)** The Administrator may distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing such standards.

**(3)** The Administrator shall, from time to time, issue information on pollution control techniques for categories of new sources and air pollutants subject to the provisions of this section.

**(4)** The provisions of this section shall apply to any new source owned or operated by the United States.

**(5)** Except as otherwise authorized under subsection (h) of this section, nothing in this section shall be construed to require, or to authorize the Administrator to require, any new or modified source to install and operate any particular technological system of continuous emission reduction to comply with any new source standard of performance.

ADD26

**(6)** The revised standards of performance required by enactment of subsection (a)(1)(A)(i) and (ii) of this section shall be promulgated not later than one year after August 7, 1977. Any new or modified fossil fuel fired stationary source which commences construction prior to the date of publication of the proposed revised standards shall not be required to comply with such revised standards.

(c) State implementation and enforcement of standards of performance

**(1)** Each State may develop and submit to the Administrator a procedure for implementing and enforcing standards of performance for new sources located in such State. If the Administrator finds the State procedure is adequate, he shall delegate to such State any authority he has under this chapter to implement and enforce such standards.

**(2)** Nothing in this subsection shall prohibit the Administrator from enforcing any applicable standard of performance under this section.

(d) Standards of performance for existing sources; remaining useful life of source

**(1)** The Administrator shall prescribe regulations which shall establish a procedure similar to that provided by section 7410 of this title under which each State shall submit to the Administrator a plan which (A) establishes standards of performance for any existing source for any air pollutant (i) for which air quality criteria have not been issued or which is not included on a list published under section 7408(a) of this title or emitted from a source category which is regulated under section 7412 of this title but (ii) to which a standard of performance under this section would apply if such existing source were a new source, and (B) provides for the implementation and enforcement of such standards of performance. Regulations of the Administrator under this paragraph shall permit the State in applying a standard of performance to any particular source under a plan submitted under this paragraph to take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies.

**(2)** The Administrator shall have the same authority--

**(A)** to prescribe a plan for a State in cases where the State fails to submit a satisfactory plan as he would have under section 7410(c) of this title in the case of failure to submit an implementation plan, and

**(B)** to enforce the provisions of such plan in cases where the State fails to enforce them as he would have under sections 7413 and 7414 of this title with respect to an implementation plan.

In promulgating a standard of performance under a plan prescribed under this paragraph, the Administrator shall take into consideration, among other factors, remaining useful lives of the sources in the category of sources to which such standard applies.

(e) Prohibited acts

After the effective date of standards of performance promulgated under this section, it shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source.

ADD27

(f) New source standards of performance

(1) For those categories of major stationary sources that the Administrator listed under subsection (b)(1)(A) of this section before November 15, 1990, and for which regulations had not been proposed by the Administrator by November 15, 1990, the Administrator shall--

   (A) propose regulations establishing standards of performance for at least 25 percent of such categories of sources within 2 years after November 15, 1990;

   (B) propose regulations establishing standards of performance for at least 50 percent of such categories of sources within 4 years after November 15, 1990; and

   (C) propose regulations for the remaining categories of sources within 6 years after November 15, 1990.

(2) In determining priorities for promulgating standards for categories of major stationary sources for the purpose of paragraph (1), the Administrator shall consider--

   (A) the quantity of air pollutant emissions which each such category will emit, or will be designed to emit;

   (B) the extent to which each such pollutant may reasonably be anticipated to endanger public health or welfare; and

   (C) the mobility and competitive nature of each such category of sources and the consequent need for nationally applicable new source standards of performance.

(3) Before promulgating any regulations under this subsection or listing any category of major stationary sources as required under this subsection, the Administrator shall consult with appropriate representatives of the Governors and of State air pollution control agencies.

(g) Revision of regulations

(1) Upon application by the Governor of a State showing that the Administrator has failed to specify in regulations under subsection (f)(1) of this section any category of major stationary sources required to be specified under such regulations, the Administrator shall revise such regulations to specify any such category.

(2) Upon application of the Governor of a State, showing that any category of stationary sources which is not included in the list under subsection (b)(1)(A) of this section contributes significantly to air pollution which may reasonably be anticipated to endanger public health or welfare (notwithstanding that such category is not a category of major stationary sources), the Administrator shall revise such regulations to specify such category of stationary sources.

ADD28

**(3)** Upon application of the Governor of a State showing that the Administrator has failed to apply properly the criteria required to be considered under subsection (f)(2) of this section, the Administrator shall revise the list under subsection (b)(1)(A) of this section to apply properly such criteria.

**(4)** Upon application of the Governor of a State showing that--

**(A)** a new, innovative, or improved technology or process which achieves greater continuous emission reduction has been adequately demonstrated for any category of stationary sources, and

**(B)** as a result of such technology or process, the new source standard of performance in effect under this section for such category no longer reflects the greatest degree of emission limitation achievable through application of the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impact and energy requirements) has been adequately demonstrated,

the Administrator shall revise such standard of performance for such category accordingly.

**(5)** Unless later deadlines for action of the Administrator are otherwise prescribed under this section, the Administrator shall, not later than three months following the date of receipt of any application by a Governor of a State, either--

**(A)** find that such application does not contain the requisite showing and deny such application, or

**(B)** grant such application and take the action required under this subsection.

**(6)** Before taking any action required by subsection (f) of this section or by this subsection, the Administrator shall provide notice and opportunity for public hearing.

(h) Design, equipment, work practice, or operational standard; alternative emission limitation

**(1)** For purposes of this section, if in the judgment of the Administrator, it is not feasible to prescribe or enforce a standard of performance, he may instead promulgate a design, equipment, work practice, or operational standard, or combination thereof, which reflects the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated. In the event the Administrator promulgates a design or equipment standard under this subsection, he shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

**(2)** For the purpose of this subsection, the phrase "not feasible to prescribe or enforce a standard of performance" means any situation in which the Administrator determines that (A) a pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State, or local law, or (B) the application of measurement methodology to a particular class of sources is not practicable due to technological or economic limitations.

ADD29

**(3)** If after notice and opportunity for public hearing, any person establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such air pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

**(4)** Any standard promulgated under paragraph (1) shall be promulgated in terms of standard of performance whenever it becomes feasible to promulgate and enforce such standard in such terms.

**(5)** Any design, equipment, work practice, or operational standard, or any combination thereof, described in this subsection shall be treated as a standard of performance for purposes of the provisions of this chapter (other than the provisions of subsection (a) of this section and this subsection).

(i) Country elevators

Any regulations promulgated by the Administrator under this section applicable to grain elevators shall not apply to country elevators (as defined by the Administrator) which have a storage capacity of less than two million five hundred thousand bushels.

(j) Innovative technological systems of continuous emission reduction

**(1)(A)** Any person proposing to own or operate a new source may request the Administrator for one or more waivers from the requirements of this section for such source or any portion thereof with respect to any air pollutant to encourage the use of an innovative technological system or systems of continuous emission reduction. The Administrator may, with the consent of the Governor of the State in which the source is to be located, grant a waiver under this paragraph, if the Administrator determines after notice and opportunity for public hearing, that--

**(i)** the proposed system or systems have not been adequately demonstrated,

**(ii)** the proposed system or systems will operate effectively and there is a substantial likelihood that such system or systems will achieve greater continuous emission reduction than that required to be achieved under the standards of performance which would otherwise apply, or achieve at least an equivalent reduction at lower cost in terms of energy, economic, or nonair quality environmental impact,

**(iii)** the owner or operator of the proposed source has demonstrated to the satisfaction of the Administrator that the proposed system will not cause or contribute to an unreasonable risk to public health, welfare, or safety in its operation, function, or malfunction, and

**(iv)** the granting of such waiver is consistent with the requirements of subparagraph (C).

In making any determination under clause (ii), the Administrator shall take into account any previous failure of such system or systems to operate effectively or to meet any requirement of the new source performance standards. In determining whether an unreasonable risk exists under clause (iii), the Administrator shall consider, among other factors, whether and to what extent

ADD30

the use of the proposed technological system will cause, increase, reduce, or eliminate emissions of any unregulated pollutants; available methods for reducing or eliminating any risk to public health, welfare, or safety which may be associated with the use of such system; and the availability of other technological systems which may be used to conform to standards under this section without causing or contributing to such unreasonable risk. The Administrator may conduct such tests and may require the owner or operator of the proposed source to conduct such tests and provide such information as is necessary to carry out clause (iii) of this subparagraph. Such requirements shall include a requirement for prompt reporting of the emission of any unregulated pollutant from a system if such pollutant was not emitted, or was emitted in significantly lesser amounts without use of such system.

**(B)** A waiver under this paragraph shall be granted on such terms and conditions as the Administrator determines to be necessary to assure--

    **(i)** emissions from the source will not prevent attainment and maintenance of any national ambient air quality standards, and

    **(ii)** proper functioning of the technological system or systems authorized.

Any such term or condition shall be treated as a standard of performance for the purposes of subsection (e) of this section and section 7413 of this title.

**(C)** The number of waivers granted under this paragraph with respect to a proposed technological system of continuous emission reduction shall not exceed such number as the Administrator finds necessary to ascertain whether or not such system will achieve the conditions specified in clauses (ii) and (iii) of subparagraph (A).

**(D)** A waiver under this paragraph shall extend to the sooner of--

    **(i)** the date determined by the Administrator, after consultation with the owner or operator of the source, taking into consideration the design, installation, and capital cost of the technological system or systems being used, or

    **(ii)** the date on which the Administrator determines that such system has failed to--

        **(I)** achieve at least an equivalent continuous emission reduction to that required to be achieved under the standards of performance which would otherwise apply, or

        **(II)** comply with the condition specified in paragraph (1)(A)(iii),

    and that such failure cannot be corrected.

**(E)** In carrying out subparagraph (D)(i), the Administrator shall not permit any waiver for a source or portion thereof to extend beyond the date--

    **(i)** seven years after the date on which any waiver is granted to such source or portion thereof, or

ADD31

**(ii)** four years after the date on which such source or portion thereof commences operation,

whichever is earlier.

**(F)** No waiver under this subsection shall apply to any portion of a source other than the portion on which the innovative technological system or systems of continuous emission reduction is used.

**(2)(A)** If a waiver under paragraph (1) is terminated under clause (ii) of paragraph (1)(D), the Administrator shall grant an extension of the requirements of this section for such source for such minimum period as may be necessary to comply with the applicable standard of performance under this section. Such period shall not extend beyond the date three years from the time such waiver is terminated.

**(B)** An extension granted under this paragraph shall set forth emission limits and a compliance schedule containing increments of progress which require compliance with the applicable standards of performance as expeditiously as practicable and include such measures as are necessary and practicable in the interim to minimize emissions. Such schedule shall be treated as a standard of performance for purposes of subsection (e) of this section and section 7413 of this title.

**CREDIT(S)**

   (July 14, 1955, c. 360, Title I, § 111, as added Dec. 31, 1970, Pub.L. 91-604, § 4(a), 84 Stat. 1683; amended Nov. 18, 1971, Pub.L. 92-157, Title III, § 302(f), 85 Stat. 464; Aug. 7, 1977, Pub.L. 95-95, Title I, § 109(a)-(d)(1), (e), (f), Title IV, § 401(b), 91 Stat. 697 to 703, 791; Nov. 16, 1977, Pub.L. 95-190, § 14(a)(7) to (9), 91 Stat. 1399; Nov. 9, 1978, Pub.L. 95-623, § 13(a), 92 Stat. 3457; Nov. 15, 1990, Pub.L. 101-549, Title I, § 108(e) to (g), Title III, § 302(a), (b), Title IV, § 403(a), 104 Stat. 2467, 2574, 2631.)

Notes of Decisions (120)

42 U.S.C.A. § 7411, 42 USCA § 7411
Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

> United States Code Annotated
>  Title 42. The Public Health and Welfare
>   Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
>    Subchapter I. Programs and Activities
>     Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7412

§ 7412. Hazardous air pollutants

Effective: August 5, 1999

Currentness

(a) Definitions

For purposes of this section, except subsection (r) of this section--

(1) Major source

The term "major source" means any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants. The Administrator may establish a lesser quantity, or in the case of radionuclides different criteria, for a major source than that specified in the previous sentence, on the basis of the potency of the air pollutant, persistence, potential for bioaccumulation, other characteristics of the air pollutant, or other relevant factors.

(2) Area source

The term "area source" means any stationary source of hazardous air pollutants that is not a major source. For purposes of this section, the term "area source" shall not include motor vehicles or nonroad vehicles subject to regulation under subchapter II of this chapter.

(3) Stationary source

The term "stationary source" shall have the same meaning as such term has under section 7411(a) of this title.

(4) New source

The term "new source" means a stationary source the construction or reconstruction of which is commenced after the Administrator first proposes regulations under this section establishing an emission standard applicable to such source.

(5) Modification

ADD33

The term "modification" means any physical change in, or change in the method of operation of, a major source which increases the actual emissions of any hazardous air pollutant emitted by such source by more than a de minimis amount or which results in the emission of any hazardous air pollutant not previously emitted by more than a de minimis amount.

(6) Hazardous air pollutant

The term "hazardous air pollutant" means any air pollutant listed pursuant to subsection (b) of this section.

(7) Adverse environmental effect

The term "adverse environmental effect" means any significant and widespread adverse effect, which may reasonably be anticipated, to wildlife, aquatic life, or other natural resources, including adverse impacts on populations of endangered or threatened species or significant degradation of environmental quality over broad areas.

(8) Electric utility steam generating unit

The term "electric utility steam generating unit" means any fossil fuel fired combustion unit of more than 25 megawatts that serves a generator that produces electricity for sale. A unit that cogenerates steam and electricity and supplies more than one-third of its potential electric output capacity and more than 25 megawatts electrical output to any utility power distribution system for sale shall be considered an electric utility steam generating unit.

(9) Owner or operator

The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

(10) Existing source

The term "existing source" means any stationary source other than a new source.

(11) Carcinogenic effect

Unless revised, the term "carcinogenic effect" shall have the meaning provided by the Administrator under Guidelines for Carcinogenic Risk Assessment as of the date of enactment. Any revisions in the existing Guidelines shall be subject to notice and opportunity for comment.

(b) List of pollutants

(1) Initial list

The Congress establishes for purposes of this section a list of hazardous air pollutants as follows:

| CAS | Chemical name |
| --- | --- |

ADD34

number

| | |
|---|---|
| 75070 | Acetaldehyde |
| 60355 | Acetamide |
| 75058 | Acetonitrile |
| 98862 | Acetophenone |
| 53963 | 2-Acetylaminofluorene |
| 107028 | Acrolein |
| 79061 | Acrylamide |
| 79107 | Acrylic acid |
| 107131 | Acrylonitrile |
| 107051 | Allyl chloride |
| 92671 | 4-Aminobiphenyl |
| 62533 | Aniline |
| 90040 | o-Anisidine |
| 1332214 | Asbestos |
| 71432 | Benzene (including benzene from gasoline) |
| 92875 | Benzidine |
| 98077 | Benzotrichloride |
| 100447 | Benzyl chloride |
| 92524 | Biphenyl |
| 117817 | Bis(2-ethylhexyl)phthalate (DEHP) |
| 542881 | Bis(chloromethyl)ether |
| 75252 | Bromoform |
| 106990 | 1,3-Butadiene |
| 156627 | Calcium cyanamide |
| 105602 | Caprolactam |
| 133062 | Captan |
| 63252 | Carbaryl |
| 75150 | Carbon disulfide |

ADD35

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

| | |
|---|---|
| 56235 | Carbon tetrachloride |
| 463581 | Carbonyl sulfide |
| 120809 | Catechol |
| 133904 | Chloramben |
| 57749 | Chlordane |
| 7782505 | Chlorine |
| 79118 | Chloroacetic acid |
| 532274 | 2-Chloroacetophenone |
| 108907 | Chlorobenzene |
| 510156 | Chlorobenzilate |
| 67663 | Chloroform |
| 107302 | Chloromethyl methyl ether |
| 126998 | Chloroprene |
| 1319773 | Cresols/Cresylic acid (isomers and mixture) |
| 95487 | o-Cresol |
| 108394 | m-Cresol |
| 106445 | p-Cresol |
| 98828 | Cumene |
| 94757 | 2,4-D, salts and esters |
| 3547044 | DDE |
| 334883 | Diazomethane |
| 132649 | Dibenzofurans |
| 96128 | 1,2-Dibromo-3-chloropropane |
| 84742 | Dibutylphthalate |
| 106467 | 1,4-Dichlorobenzene(p) |
| 91941 | 3,3-Dichlorobenzidene |
| 111444 | Dichloroethyl ether (Bis(2-chloroethyl)ether) |
| 542756 | 1,3-Dichloropropene |
| 62737 | Dichlorvos |

ADD36

USCA Case #15-1363    Document #1605913    Filed: 03/28/2016    Page 42 of 219

111422    Diethanolamine

121697    N,N-Diethyl aniline (N,N-Dimethylaniline)

 64675    Diethyl sulfate

119904    3,3-Dimethoxybenzidine

 60117    Dimethyl aminoazobenzene

119937    3,3′-Dimethyl benzidine

 79447    Dimethyl carbamoyl chloride

 68122    Dimethyl formamide

 57147    1,1-Dimethyl hydrazine

131113    Dimethyl phthalate

 77781    Dimethyl sulfate

534521    4,6-Dinitro-o-cresol, and salts

 51285    2,4-Dinitrophenol

121142    2,4-Dinitrotoluene

123911    1,4-Dioxane (1,4-Diethyleneoxide)

122667    1,2-Diphenylhydrazine

106898    Epichlorohydrin (1-Chloro-2,3-epoxypropane)

106887    1,2-Epoxybutane

140885    Ethyl acrylate

100414    Ethyl benzene

 51796    Ethyl carbamate (Urethane)

 75003    Ethyl chloride (Chloroethane)

106934    Ethylene dibromide (Dibromoethane)

107062    Ethylene dichloride (1,2-Dichloroethane)

107211    Ethylene glycol

151564    Ethylene imine (Aziridine)

 75218    Ethylene oxide

 96457    Ethylene thiourea

 75343    Ethylidene dichloride (1,1-Dichloroethane)

ADD37

USCA Case #15-1363      Document #1605913      Filed: 03/28/2016      Page 43 of 219

| | |
|---|---|
| 50000 | Formaldehyde |
| 76448 | Heptachlor |
| 118741 | Hexachlorobenzene |
| 87683 | Hexachlorobutadiene |
| 77474 | Hexachlorocyclopentadiene |
| 67721 | Hexachloroethane |
| 822060 | Hexamethylene-1,6-diisocyanate |
| 680319 | Hexamethylphosphoramide |
| 110543 | Hexane |
| 302012 | Hydrazine |
| 7647010 | Hydrochloric acid |
| 7664393 | Hydrogen fluoride (Hydrofluoric acid) |
| 123319 | Hydroquinone |
| 78591 | Isophorone |
| 58899 | Lindane (all isomers) |
| 108316 | Maleic anhydride |
| 67561 | Methanol |
| 72435 | Methoxychlor |
| 74839 | Methyl bromide (Bromomethane) |
| 74873 | Methyl chloride (Chloromethane) |
| 71556 | Methyl chloroform (1,1,1-Trichloroethane) |
| 78933 | Methyl ethyl ketone (2-Butanone) |
| 60344 | Methyl hydrazine |
| 74884 | Methyl iodide (Iodomethane) |
| 108101 | Methyl isobutyl ketone (Hexone) |
| 624839 | Methyl isocyanate |
| 80626 | Methyl methacrylate |
| 1634044 | Methyl tert butyl ether |
| 101144 | 4,4-Methylene bis(2-chloroaniline) |

ADD38

| | |
|---|---|
| 75092 | Methylene chloride (Dichloromethane) |
| 101688 | Methylene diphenyl diisocyanate (MDI) |
| 101779 | 4,4′–Methylenedianiline |
| 91203 | Naphthalene |
| 98953 | Nitrobenzene |
| 92933 | 4-Nitrobiphenyl |
| 100027 | 4-Nitrophenol |
| 79469 | 2-Nitropropane |
| 684935 | N-Nitroso-N-methylurea |
| 62759 | N-Nitrosodimethylamine |
| 59892 | N-Nitrosomorpholine |
| 56382 | Parathion |
| 82688 | Pentachloronitrobenzene (Quintobenzene) |
| 87865 | Pentachlorophenol |
| 108952 | Phenol |
| 106503 | p-Phenylenediamine |
| 75445 | Phosgene |
| 7803512 | Phosphine |
| 7723140 | Phosphorus |
| 85449 | Phthalic anhydride |
| 1336363 | Polychlorinated biphenyls (Aroclors) |
| 1120714 | 1,3-Propane sultone |
| 57578 | beta-Propiolactone |
| 123386 | Propionaldehyde |
| 114261 | Propoxur (Baygon) |
| 78875 | Propylene dichloride (1,2-Dichloropropane) |
| 75569 | Propylene oxide |
| 75558 | 1,2-Propylenimine (2-Methyl aziridine) |
| 91225 | Quinoline |

ADD39

| | |
|---|---|
| 106514 | Quinone |
| 100425 | Styrene |
| 96093 | Styrene oxide |
| 1746016 | 2,3,7,8-Tetrachlorodibenzo-p-dioxin |
| 79345 | 1,1,2,2-Tetrachloroethane |
| 127184 | Tetrachloroethylene (Perchloroethylene) |
| 7550450 | Titanium tetrachloride |
| 108883 | Toluene |
| 95807 | 2,4-Toluene diamine |
| 584849 | 2,4-Toluene diisocyanate |
| 95534 | o-Toluidine |
| 8001352 | Toxaphene (chlorinated camphene) |
| 120821 | 1,2,4-Trichlorobenzene |
| 79005 | 1,1,2-Trichloroethane |
| 79016 | Trichloroethylene |
| 95954 | 2,4,5-Trichlorophenol |
| 88062 | 2,4,6-Trichlorophenol |
| 121448 | Triethylamine |
| 1582098 | Trifluralin |
| 540841 | 2,2,4-Trimethylpentane |
| 108054 | Vinyl acetate |
| 593602 | Vinyl bromide |
| 75014 | Vinyl chloride |
| 75354 | Vinylidene chloride (1,1-Dichloroethylene) |
| 1330207 | Xylenes (isomers and mixture) |
| 95476 | o-Xylenes |
| 108383 | m-Xylenes |
| 106423 | p-Xylenes |
| 0 | Antimony Compounds |

ADD40

0   Arsenic Compounds (inorganic including arsine)

0   Beryllium Compounds

0   Cadmium Compounds

0   Chromium Compounds

0   Cobalt Compounds

0   Coke Oven Emissions

0   Cyanide Compounds [1]

0   Glycol ethers [2]

0   Lead Compounds

0   Manganese Compounds

0   Mercury Compounds

0   Fine mineral fibers [3]

0   Nickel Compounds

0   Polycylic Organic Matter [4]

0   Radionuclides (including radon) [5]

0   Selenium Compounds

NOTE: For all listings above which contain the word "compounds" and for glycol ethers, the following applies: Unless otherwise specified, these listings are defined as including any unique chemical substance that contains the named chemical (i.e., antimony, arsenic, etc.) as part of that chemical's infrastructure.

[1] X#CN where X = H′ or any other group where a formal dissociation may occur. For example KCN or Ca(CN) $_2$

[2] Includes mono- and di- ethers of ethylene glycol, diethylene glycol, and triethylene glycol R-(OCH$_2$CH$_2$) $_n$-OR′ where

n = 1, 2, or 3

R = alkyl or aryl groups

R′ = R, H, or groups which, when removed, yield glycol ethers with the structure: R-(OCH$_2$CH) $_n$-OH. Polymers are excluded from the glycol category.

[3] Includes mineral fiber emissions from facilities manufacturing or processing glass, rock, or slag fibers (or other mineral derived fibers) of average diameter 1 micrometer or less.

[4] Includes organic compounds with more than one benzene ring, and which have a boiling point greater than or equal to 100°C.

[5] A type of atom which spontaneously undergoes radioactive decay.

ADD41

(2) Revision of the list

The Administrator shall periodically review the list established by this subsection and publish the results thereof and, where appropriate, revise such list by rule, adding pollutants which present, or may present, through inhalation or other routes of exposure, a threat of adverse human health effects (including, but not limited to, substances which are known to be, or may reasonably be anticipated to be, carcinogenic, mutagenic, teratogenic, neurotoxic, which cause reproductive dysfunction, or which are acutely or chronically toxic) or adverse environmental effects whether through ambient concentrations, bioaccumulation, deposition, or otherwise, but not including releases subject to regulation under subsection (r) of this section as a result of emissions to the air. No air pollutant which is listed under section 7408(a) of this title may be added to the list under this section, except that the prohibition of this sentence shall not apply to any pollutant which independently meets the listing criteria of this paragraph and is a precursor to a pollutant which is listed under section 7408(a) of this title or to any pollutant which is in a class of pollutants listed under such section. No substance, practice, process or activity regulated under subchapter VI of this chapter shall be subject to regulation under this section solely due to its adverse effects on the environment.

(3) Petitions to modify the list

(A) Beginning at any time after 6 months after November 15, 1990, any person may petition the Administrator to modify the list of hazardous air pollutants under this subsection by adding or deleting a substance or, in case of listed pollutants without CAS numbers (other than coke oven emissions, mineral fibers, or polycyclic organic matter) removing certain unique substances. Within 18 months after receipt of a petition, the Administrator shall either grant or deny the petition by publishing a written explanation of the reasons for the Administrator's decision. Any such petition shall include a showing by the petitioner that there is adequate data on the health or environmental defects [1] of the pollutant or other evidence adequate to support the petition. The Administrator may not deny a petition solely on the basis of inadequate resources or time for review.

(B) The Administrator shall add a substance to the list upon a showing by the petitioner or on the Administrator's own determination that the substance is an air pollutant and that emissions, ambient concentrations, bioaccumulation or deposition of the substance are known to cause or may reasonably be anticipated to cause adverse effects to human health or adverse environmental effects.

(C) The Administrator shall delete a substance from the list upon a showing by the petitioner or on the Administrator's own determination that there is adequate data on the health and environmental effects of the substance to determine that emissions, ambient concentrations, bioaccumulation or deposition of the substance may not reasonably be anticipated to cause any adverse effects to the human health or adverse environmental effects.

(D) The Administrator shall delete one or more unique chemical substances that contain a listed hazardous air pollutant not having a CAS number (other than coke oven emissions, mineral fibers, or polycyclic organic matter) upon a showing by the petitioner or on the Administrator's own determination that such unique chemical substances that contain the named chemical of such listed hazardous air pollutant meet the deletion requirements of subparagraph (C). The Administrator must grant or deny a deletion petition prior to promulgating any emission standards pursuant to subsection (d) of this section applicable to any source category or subcategory of a listed hazardous air pollutant without a CAS number listed under subsection (b) of this section for which a deletion petition has been filed within 12 months of November 15, 1990.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.    10

(4) Further information

If the Administrator determines that information on the health or environmental effects of a substance is not sufficient to make a determination required by this subsection, the Administrator may use any authority available to the Administrator to acquire such information.

(5) Test methods

The Administrator may establish, by rule, test measures and other analytic procedures for monitoring and measuring emissions, ambient concentrations, deposition, and bioaccumulation of hazardous air pollutants.

(6) Prevention of significant deterioration

The provisions of part C of this subchapter (prevention of significant deterioration) shall not apply to pollutants listed under this section.

(7) Lead

The Administrator may not list elemental lead as a hazardous air pollutant under this subsection.

(c) List of source categories

(1) In general

Not later than 12 months after November 15, 1990, the Administrator shall publish, and shall from time to time, but no less often than every 8 years, revise, if appropriate, in response to public comment or new information, a list of all categories and subcategories of major sources and area sources (listed under paragraph (3)) of the air pollutants listed pursuant to subsection (b) of this section. To the extent practicable, the categories and subcategories listed under this subsection shall be consistent with the list of source categories established pursuant to section 7411 of this title and part C of this subchapter. Nothing in the preceding sentence limits the Administrator's authority to establish subcategories under this section, as appropriate.

(2) Requirement for emissions standards

For the categories and subcategories the Administrator lists, the Administrator shall establish emissions standards under subsection (d) of this section, according to the schedule in this subsection and subsection (e) of this section.

(3) Area sources

The Administrator shall list under this subsection each category or subcategory of area sources which the Administrator finds presents a threat of adverse effects to human health or the environment (by such sources individually or in the aggregate) warranting regulation under this section. The Administrator shall, not later than 5 years after November 15, 1990, and pursuant to subsection (k)(3)(B) of this section, list, based on actual or estimated aggregate emissions of a listed pollutant or pollutants, sufficient categories or subcategories of area sources to ensure that area sources representing 90 percent of the area source

emissions of the 30 hazardous air pollutants that present the greatest threat to public health in the largest number of urban areas are subject to regulation under this section. Such regulations shall be promulgated not later than 10 years after November 15, 1990.

(4) Previously regulated categories

The Administrator may, in the Administrator's discretion, list any category or subcategory of sources previously regulated under this section as in effect before November 15, 1990.

(5) Additional categories

In addition to those categories and subcategories of sources listed for regulation pursuant to paragraphs (1) and (3), the Administrator may at any time list additional categories and subcategories of sources of hazardous air pollutants according to the same criteria for listing applicable under such paragraphs. In the case of source categories and subcategories listed after publication of the initial list required under paragraph (1) or (3), emission standards under subsection (d) of this section for the category or subcategory shall be promulgated within 10 years after November 15, 1990, or within 2 years after the date on which such category or subcategory is listed, whichever is later.

(6) Specific pollutants

With respect to alkylated lead compounds, polycyclic organic matter, hexachlorobenzene, mercury, polychlorinated biphenyls, 2,3,7,8-tetrachlorodibenzofurans and 2,3,7,8-tetrachlorodibenzo-p-dioxin, the Administrator shall, not later than 5 years after November 15, 1990, list categories and subcategories of sources assuring that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsection (d)(2) or (d)(4) of this section. Such standards shall be promulgated not later than 10 years after November 15, 1990. This paragraph shall not be construed to require the Administrator to promulgate standards for such pollutants emitted by electric utility steam generating units.

(7) Research facilities

The Administrator shall establish a separate category covering research or laboratory facilities, as necessary to assure the equitable treatment of such facilities. For purposes of this section, "research or laboratory facility" means any stationary source whose primary purpose is to conduct research and development into new processes and products, where such source is operated under the close supervision of technically trained personnel and is not engaged in the manufacture of products for commercial sale in commerce, except in a de minimis manner.

(8) Boat manufacturing

When establishing emissions standards for styrene, the Administrator shall list boat manufacturing as a separate subcategory unless the Administrator finds that such listing would be inconsistent with the goals and requirements of this chapter.

(9) Deletions from the list

ADD44

**(A)** Where the sole reason for the inclusion of a source category on the list required under this subsection is the emission of a unique chemical substance, the Administrator shall delete the source category from the list if it is appropriate because of action taken under either subparagraphs (C) or (D) of subsection (b)(3) of this section.

**(B)** The Administrator may delete any source category from the list under this subsection, on petition of any person or on the Administrator's own motion, whenever the Administrator makes the following determination or determinations, as applicable:

**(i)** In the case of hazardous air pollutants emitted by sources in the category that may result in cancer in humans, a determination that no source in the category (or group of sources in the case of area sources) emits such hazardous air pollutants in quantities which may cause a lifetime risk of cancer greater than one in one million to the individual in the population who is most exposed to emissions of such pollutants from the source (or group of sources in the case of area sources).

**(ii)** In the case of hazardous air pollutants that may result in adverse health effects in humans other than cancer or adverse environmental effects, a determination that emissions from no source in the category or subcategory concerned (or group of sources in the case of area sources) exceed a level which is adequate to protect public health with an ample margin of safety and no adverse environmental effect will result from emissions from any source (or from a group of sources in the case of area sources).

The Administrator shall grant or deny a petition under this paragraph within 1 year after the petition is filed.

(d) Emission standards

(1) In general

The Administrator shall promulgate regulations establishing emission standards for each category or subcategory of major sources and area sources of hazardous air pollutants listed for regulation pursuant to subsection (c) of this section in accordance with the schedules provided in subsections (c) and (e) of this section. The Administrator may distinguish among classes, types, and sizes of sources within a category or subcategory in establishing such standards except that, there shall be no delay in the compliance date for any standard applicable to any source under subsection (i) of this section as the result of the authority provided by this sentence.

(2) Standards and methods

Emissions standards promulgated under this subsection and applicable to new or existing sources of hazardous air pollutants shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies, through application of measures, processes, methods, systems or techniques including, but not limited to, measures which--

**(A)** reduce the volume of, or eliminate emissions of, such pollutants through process changes, substitution of materials or other modifications,

ADD45

**(B)** enclose systems or processes to eliminate emissions,

**(C)** collect, capture or treat such pollutants when released from a process, stack, storage or fugitive emissions point,

**(D)** are design, equipment, work practice, or operational standards (including requirements for operator training or certification) as provided in subsection (h) of this section, or

**(E)** are a combination of the above.

None of the measures described in subparagraphs (A) through (D) shall, consistent with the provisions of section 7414(c) of this title, in any way compromise any United States patent or United States trademark right, or any confidential business information, or any trade secret or any other intellectual property right.

(3) New and existing sources

The maximum degree of reduction in emissions that is deemed achievable for new sources in a category or subcategory shall not be less stringent than the emission control that is achieved in practice by the best controlled similar source, as determined by the Administrator. Emission standards promulgated under this subsection for existing sources in a category or subcategory may be less stringent than standards for new sources in the same category or subcategory but shall not be less stringent, and may be more stringent than--

**(A)** the average emission limitation achieved by the best performing 12 percent of the existing sources (for which the Administrator has emissions information), excluding those sources that have, within 18 months before the emission standard is proposed or within 30 months before such standard is promulgated, whichever is later, first achieved a level of emission rate or emission reduction which complies, or would comply if the source is not subject to such standard, with the lowest achievable emission rate (as defined by section 7501 of this title) applicable to the source category and prevailing at the time, in the category or subcategory for categories and subcategories with 30 or more sources, or

**(B)** the average emission limitation achieved by the best performing 5 sources (for which the Administrator has or could reasonably obtain emissions information) in the category or subcategory for categories or subcategories with fewer than 30 sources.

(4) Health threshold

With respect to pollutants for which a health threshold has been established, the Administrator may consider such threshold level, with an ample margin of safety, when establishing emission standards under this subsection.

(5) Alternative standard for area sources

With respect only to categories and subcategories of area sources listed pursuant to subsection (c) of this section, the Administrator may, in lieu of the authorities provided in paragraph (2) and subsection (f) of this section, elect to promulgate

ADD46

standards or requirements applicable to sources in such categories or subcategories which provide for the use of generally available control technologies or management practices by such sources to reduce emissions of hazardous air pollutants.

(6) Review and revision

The Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years.

(7) Other requirements preserved

No emission standard or other requirement promulgated under this section shall be interpreted, construed or applied to diminish or replace the requirements of a more stringent emission limitation or other applicable requirement established pursuant to section 7411 of this title, part C or D of this subchapter, or other authority of this chapter or a standard issued under State authority.

(8) Coke ovens

**(A)** Not later than December 31, 1992, the Administrator shall promulgate regulations establishing emission standards under paragraphs (2) and (3) of this subsection for coke oven batteries. In establishing such standards, the Administrator shall evaluate--

**(i)** the use of sodium silicate (or equivalent) luting compounds to prevent door leaks, and other operating practices and technologies for their effectiveness in reducing coke oven emissions, and their suitability for use on new and existing coke oven batteries, taking into account costs and reasonable commercial door warranties; and

**(ii)** as a basis for emission standards under this subsection for new coke oven batteries that begin construction after the date of proposal of such standards, the Jewell design Thompson non-recovery coke oven batteries and other non-recovery coke oven technologies, and other appropriate emission control and coke production technologies, as to their effectiveness in reducing coke oven emissions and their capability for production of steel quality coke.

Such regulations shall require at a minimum that coke oven batteries will not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing oven doors. Notwithstanding subsection (i) of this section, the compliance date for such emission standards for existing coke oven batteries shall be December 31, 1995.

**(B)** The Administrator shall promulgate work practice regulations under this subsection for coke oven batteries requiring, as appropriate--

**(i)** the use of sodium silicate (or equivalent) luting compounds, if the Administrator determines that use of sodium silicate is an effective means of emissions control and is achievable, taking into account costs and reasonable commercial warranties for doors and related equipment; and

**(ii)** door and jam cleaning practices.

ADD47

Notwithstanding subsection (i) of this section, the compliance date for such work practice regulations for coke oven batteries shall be not later than the date 3 years after November 15, 1990.

**(C)** For coke oven batteries electing to qualify for an extension of the compliance date for standards promulgated under subsection (f) of this section in accordance with subsection (i)(8) of this section, the emission standards under this subsection for coke oven batteries shall require that coke oven batteries not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing doors. Notwithstanding subsection (i) of this section, the compliance date for such emission standards for existing coke oven batteries seeking an extension shall be not later than the date 3 years after November 15, 1990.

(9) Sources licensed by the Nuclear Regulatory Commission

No standard for radionuclide emissions from any category or subcategory of facilities licensed by the Nuclear Regulatory Commission (or an Agreement State) is required to be promulgated under this section if the Administrator determines, by rule, and after consultation with the Nuclear Regulatory Commission, that the regulatory program established by the Nuclear Regulatory Commission pursuant to the Atomic Energy Act [42 U.S.C.A. § 2011 et seq.] for such category or subcategory provides an ample margin of safety to protect the public health. Nothing in this subsection shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce any standard or limitation respecting emissions of radionuclides which is more stringent than the standard or limitation in effect under section 7411 of this title or this section.

(10) Effective date

Emission standards or other regulations promulgated under this subsection shall be effective upon promulgation.

(e) Schedule for standards and review

(1) In general

The Administrator shall promulgate regulations establishing emission standards for categories and subcategories of sources initially listed for regulation pursuant to subsection (c)(1) of this section as expeditiously as practicable, assuring that--

**(A)** emission standards for not less than 40 categories and subcategories (not counting coke oven batteries) shall be promulgated not later than 2 years after November 15, 1990;

**(B)** emission standards for coke oven batteries shall be promulgated not later than December 31, 1992;

**(C)** emission standards for 25 per centum of the listed categories and subcategories shall be promulgated not later than 4 years after November 15, 1990;

**(D)** emission standards for an additional 25 per centum of the listed categories and subcategories shall be promulgated not later than 7 years after November 15, 1990; and

ADD48

**(E)** emission standards for all categories and subcategories shall be promulgated not later than 10 years after November 15, 1990.

(2) Priorities

In determining priorities for promulgating standards under subsection (d) of this section, the Administrator shall consider--

**(A)** the known or anticipated adverse effects of such pollutants on public health and the environment;

**(B)** the quantity and location of emissions or reasonably anticipated emissions of hazardous air pollutants that each category or subcategory will emit; and

**(C)** the efficiency of grouping categories or subcategories according to the pollutants emitted, or the processes or technologies used.

(3) Published schedule

Not later than 24 months after November 15, 1990, and after opportunity for comment, the Administrator shall publish a schedule establishing a date for the promulgation of emission standards for each category and subcategory of sources listed pursuant to subsection (c)(1) and (3) of this section which shall be consistent with the requirements of paragraphs (1) and (2). The determination of priorities for the promulgation of standards pursuant to this paragraph is not a rulemaking and shall not be subject to judicial review, except that, failure to promulgate any standard pursuant to the schedule established by this paragraph shall be subject to review under section 7604 of this title.

(4) Judicial review

Notwithstanding section 7607 of this title, no action of the Administrator adding a pollutant to the list under subsection (b) of this section or listing a source category or subcategory under subsection (c) of this section shall be a final agency action subject to judicial review, except that any such action may be reviewed under such section 7607 of this title when the Administrator issues emission standards for such pollutant or category.

(5) Publicly owned treatment works

The Administrator shall promulgate standards pursuant to subsection (d) of this section applicable to publicly owned treatment works (as defined in title II of the Federal Water Pollution Control Act [33 U.S.C.A. § 1281 et seq.] ) not later than 5 years after November 15, 1990.

(f) Standard to protect health and environment

(1) Report

Not later than 6 years after November 15, 1990, the Administrator shall investigate and report, after consultation with the Surgeon General and after opportunity for public comment, to Congress on--

**(A)** methods of calculating the risk to public health remaining, or likely to remain, from sources subject to regulation under this section after the application of standards under subsection (d) of this section;

**(B)** the public health significance of such estimated remaining risk and the technologically and commercially available methods and costs of reducing such risks;

**(C)** the actual health effects with respect to persons living in the vicinity of sources, any available epidemiological or other health studies, risks presented by background concentrations of hazardous air pollutants, any uncertainties in risk assessment methodology or other health assessment technique, and any negative health or environmental consequences to the community of efforts to reduce such risks; and

**(D)** recommendations as to legislation regarding such remaining risk.

(2) Emission standards

**(A)** If Congress does not act on any recommendation submitted under paragraph (1), the Administrator shall, within 8 years after promulgation of standards for each category or subcategory of sources pursuant to subsection (d) of this section, promulgate standards for such category or subcategory if promulgation of such standards is required in order to provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990) or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. Emission standards promulgated under this subsection shall provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990), unless the Administrator determines that a more stringent standard is necessary to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. If standards promulgated pursuant to subsection (d) of this section and applicable to a category or subcategory of sources emitting a pollutant (or pollutants) classified as a known, probable or possible human carcinogen do not reduce lifetime excess cancer risks to the individual most exposed to emissions from a source in the category or subcategory to less than one in one million, the Administrator shall promulgate standards under this subsection for such source category.

**(B)** Nothing in subparagraph (A) or in any other provision of this section shall be construed as affecting, or applying to the Administrator's interpretation of this section, as in effect before November 15, 1990, and set forth in the Federal Register of September 14, 1989 (54 Federal Register 38044).

**(C)** The Administrator shall determine whether or not to promulgate such standards and, if the Administrator decides to promulgate such standards, shall promulgate the standards 8 years after promulgation of the standards under subsection (d) of this section for each source category or subcategory concerned. In the case of categories or subcategories for which standards under subsection (d) of this section are required to be promulgated within 2 years after November 15, 1990, the Administrator shall have 9 years after promulgation of the standards under subsection (d) of this section to make the determination under the preceding sentence and, if required, to promulgate the standards under this paragraph.

(3) Effective date

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    18

Any emission standard established pursuant to this subsection shall become effective upon promulgation.


(4) Prohibition

No air pollutant to which a standard under this subsection applies may be emitted from any stationary source in violation of such standard, except that in the case of an existing source--


(A) such standard shall not apply until 90 days after its effective date, and


(B) the Administrator may grant a waiver permitting such source a period of up to 2 years after the effective date of a standard to comply with the standard if the Administrator finds that such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment.


(5) Area sources

The Administrator shall not be required to conduct any review under this subsection or promulgate emission limitations under this subsection for any category or subcategory of area sources that is listed pursuant to subsection (c)(3) of this section and for which an emission standard is promulgated pursuant to subsection (d)(5) of this section.


(6) Unique chemical substances

In establishing standards for the control of unique chemical substances of listed pollutants without CAS numbers under this subsection, the Administrator shall establish such standards with respect to the health and environmental effects of the substances actually emitted by sources and direct transformation byproducts of such emissions in the categories and subcategories.


(g) Modifications


(1) Offsets


(A) A physical change in, or change in the method of operation of, a major source which results in a greater than de minimis increase in actual emissions of a hazardous air pollutant shall not be considered a modification, if such increase in the quantity of actual emissions of any hazardous air pollutant from such source will be offset by an equal or greater decrease in the quantity of emissions of another hazardous air pollutant (or pollutants) from such source which is deemed more hazardous, pursuant to guidance issued by the Administrator under subparagraph (B). The owner or operator of such source shall submit a showing to the Administrator (or the State) that such increase has been offset under the preceding sentence.


(B) The Administrator shall, after notice and opportunity for comment and not later than 18 months after November 15, 1990, publish guidance with respect to implementation of this subsection. Such guidance shall include an identification, to the extent practicable, of the relative hazard to human health resulting from emissions to the ambient air of each of the pollutants listed under subsection (b) of this section sufficient to facilitate the offset showing authorized by subparagraph (A). Such

ADD51

USCA Case #15-1363      Document #1605913      Filed: 03/28/2016      Page 57 of 219

guidance shall not authorize offsets between pollutants where the increased pollutant (or more than one pollutant in a stream of pollutants) causes adverse effects to human health for which no safety threshold for exposure can be determined unless there are corresponding decreases in such types of pollutant(s).

(2) Construction, reconstruction and modifications

**(A)** After the effective date of a permit program under subchapter V of this chapter in any State, no person may modify a major source of hazardous air pollutants in such State, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for existing sources will be met. Such determination shall be made on a case-by-case basis where no applicable emissions limitations have been established by the Administrator.

**(B)** After the effective date of a permit program under subchapter V of this chapter in any State, no person may construct or reconstruct any major source of hazardous air pollutants, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for new sources will be met. Such determination shall be made on a case-by-case basis where no applicable emission limitations have been established by the Administrator.

(3) Procedures for modifications

The Administrator (or the State) shall establish reasonable procedures for assuring that the requirements applying to modifications under this section are reflected in the permit.

(h) Work practice standards and other requirements

(1) In general

For purposes of this section, if it is not feasible in the judgment of the Administrator to prescribe or enforce an emission standard for control of a hazardous air pollutant or pollutants, the Administrator may, in lieu thereof, promulgate a design, equipment, work practice, or operational standard, or combination thereof, which in the Administrator's judgment is consistent with the provisions of subsection (d) or (f) of this section. In the event the Administrator promulgates a design or equipment standard under this subsection, the Administrator shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

(2) Definition

For the purpose of this subsection, the phrase "not feasible to prescribe or enforce an emission standard" means any situation in which the Administrator determines that--

**(A)** a hazardous air pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State or local law, or

**(B)** the application of measurement methodology to a particular class of sources is not practicable due to technological and economic limitations.

ADD52

(3) Alternative standard

If after notice and opportunity for comment, the owner or operator of any source establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

(4) Numerical standard required

Any standard promulgated under paragraph (1) shall be promulgated in terms of an emission standard whenever it is feasible to promulgate and enforce a standard in such terms.

(i) Schedule for compliance

(1) Preconstruction and operating requirements

After the effective date of any emission standard, limitation, or regulation under subsection (d), (f) or (h) of this section, no person may construct any new major source or reconstruct any existing major source subject to such emission standard, regulation or limitation unless the Administrator (or a State with a permit program approved under subchapter V of this chapter) determines that such source, if properly constructed, reconstructed and operated, will comply with the standard, regulation or limitation.

(2) Special rule

Notwithstanding the requirements of paragraph (1), a new source which commences construction or reconstruction after a standard, limitation or regulation applicable to such source is proposed and before such standard, limitation or regulation is promulgated shall not be required to comply with such promulgated standard until the date 3 years after the date of promulgation if--

(A) the promulgated standard, limitation or regulation is more stringent than the standard, limitation or regulation proposed; and

(B) the source complies with the standard, limitation, or regulation as proposed during the 3-year period immediately after promulgation.

(3) Compliance schedule for existing sources

(A) After the effective date of any emissions standard, limitation or regulation promulgated under this section and applicable to a source, no person may operate such source in violation of such standard, limitation or regulation except, in the case of an existing source, the Administrator shall establish a compliance date or dates for each category or subcategory of existing

ADD53

sources, which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard, except as provided in subparagraph (B) and paragraphs (4) through (8).

**(B)** The Administrator (or a State with a program approved under subchapter V of this chapter) may issue a permit that grants an extension permitting an existing source up to 1 additional year to comply with standards under subsection (d) of this section if such additional period is necessary for the installation of controls. An additional extension of up to 3 years may be added for mining waste operations, if the 4-year compliance time is insufficient to dry and cover mining waste in order to reduce emissions of any pollutant listed under subsection (b) of this section.

(4) Presidential exemption

The President may exempt any stationary source from compliance with any standard or limitation under this section for a period of not more than 2 years if the President determines that the technology to implement such standard is not available and that it is in the national security interests of the United States to do so. An exemption under this paragraph may be extended for 1 or more additional periods, each period not to exceed 2 years. The President shall report to Congress with respect to each exemption (or extension thereof) made under this paragraph.

(5) Early reduction

**(A)** The Administrator (or a State acting pursuant to a permit program approved under subchapter V of this chapter) shall issue a permit allowing an existing source, for which the owner or operator demonstrates that the source has achieved a reduction of 90 per centum or more in emissions of hazardous air pollutants (95 per centum in the case of hazardous air pollutants which are particulates) from the source, to meet an alternative emission limitation reflecting such reduction in lieu of an emission limitation promulgated under subsection (d) of this section for a period of 6 years from the compliance date for the otherwise applicable standard, provided that such reduction is achieved before the otherwise applicable standard under subsection (d) of this section is first proposed. Nothing in this paragraph shall preclude a State from requiring reductions in excess of those specified in this subparagraph as a condition of granting the extension authorized by the previous sentence.

**(B)** An existing source which achieves the reduction referred to in subparagraph (A) after the proposal of an applicable standard but before January 1, 1994, may qualify under subparagraph (A), if the source makes an enforceable commitment to achieve such reduction before the proposal of the standard. Such commitment shall be enforceable to the same extent as a regulation under this section.

**(C)** The reduction shall be determined with respect to verifiable and actual emissions in a base year not earlier than calendar year 1987, provided that, there is no evidence that emissions in the base year are artificially or substantially greater than emissions in other years prior to implementation of emissions reduction measures. The Administrator may allow a source to use a baseline year of 1985 or 1986 provided that the source can demonstrate to the satisfaction of the Administrator that emissions data for the source reflects verifiable data based on information for such source, received by the Administrator prior to November 15, 1990, pursuant to an information request issued under section 7414 of this title.

**(D)** For each source granted an alternative emission limitation under this paragraph there shall be established by a permit issued pursuant to subchapter V of this chapter an enforceable emission limitation for hazardous air pollutants reflecting the reduction which qualifies the source for an alternative emission limitation under this paragraph. An alternative emission limitation under this paragraph shall not be available with respect to standards or requirements promulgated pursuant to

subsection (f) of this section and the Administrator shall, for the purpose of determining whether a standard under subsection (f) of this section is necessary, review emissions from sources granted an alternative emission limitation under this paragraph at the same time that other sources in the category or subcategory are reviewed.

**(E)** With respect to pollutants for which high risks of adverse public health effects may be associated with exposure to small quantities including, but not limited to, chlorinated dioxins and furans, the Administrator shall by regulation limit the use of offsetting reductions in emissions of other hazardous air pollutants from the source as counting toward the 90 per centum reduction in such high-risk pollutants qualifying for an alternative emissions limitation under this paragraph.

(6) Other reductions

Notwithstanding the requirements of this section, no existing source that has installed--

**(A)** best available control technology (as defined in section 7479(3) of this title), or

**(B)** technology required to meet a lowest achievable emission rate (as defined in section 7501 of this title),

prior to the promulgation of a standard under this section applicable to such source and the same pollutant (or stream of pollutants) controlled pursuant to an action described in subparagraph (A) or (B) shall be required to comply with such standard under this section until the date 5 years after the date on which such installation or reduction has been achieved, as determined by the Administrator. The Administrator may issue such rules and guidance as are necessary to implement this paragraph.

(7) Extension for new sources

A source for which construction or reconstruction is commenced after the date an emission standard applicable to such source is proposed pursuant to subsection (d) of this section but before the date an emission standard applicable to such source is proposed pursuant to subsection (f) of this section shall not be required to comply with the emission standard under subsection (f) of this section until the date 10 years after the date construction or reconstruction is commenced.

(8) Coke ovens

**(A)** Any coke oven battery that complies with the emission limitations established under subsection (d)(8)(C) of this section, subparagraph (B), and subparagraph (C), and complies with the provisions of subparagraph (E), shall not be required to achieve emission limitations promulgated under subsection (f) of this section until January 1, 2020.

**(B)(i)** Not later than December 31, 1992, the Administrator shall promulgate emission limitations for coke oven emissions from coke oven batteries. Notwithstanding paragraph (3) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 1998. Such emission limitations shall reflect the lowest achievable emission rate as defined in section 7501 of this title for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than--

**(I)** 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

**(II)** 1 per centum leaking lids;

**(III)** 4 per centum leaking offtakes; and

**(IV)** 16 seconds visible emissions per charge,

with an exclusion for emissions during the period after the closing of self-sealing oven doors (or the total mass emissions equivalent). The rulemaking in which such emission limitations are promulgated shall also establish an appropriate measurement methodology for determining compliance with such emission limitations, and shall establish such emission limitations in terms of an equivalent level of mass emissions reduction from a coke oven battery, unless the Administrator finds that such a mass emissions standard would not be practicable or enforceable. Such measurement methodology, to the extent it measures leaking doors, shall take into consideration alternative test methods that reflect the best technology and practices actually applied in the affected industries, and shall assure that the final test methods are consistent with the performance of such best technology and practices.

**(ii)** If the Administrator fails to promulgate such emission limitations under this subparagraph prior to the effective date of such emission limitations, the emission limitations applicable to coke oven batteries under this subparagraph shall be--

**(I)** 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

**(II)** 1 per centum leaking lids;

**(III)** 4 per centum leaking offtakes; and

**(IV)** 16 seconds visible emissions per charge,

or the total mass emissions equivalent (if the total mass emissions equivalent is determined to be practicable and enforceable), with no exclusion for emissions during the period after the closing of self-sealing oven doors.

**(C)** Not later than January 1, 2007, the Administrator shall review the emission limitations promulgated under subparagraph (B) and revise, as necessary, such emission limitations to reflect the lowest achievable emission rate as defined in section 7501 of this title at the time for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than the emission limitation promulgated under subparagraph (B). Notwithstanding paragraph (2) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 2010.

**(D)** At any time prior to January 1, 1998, the owner or operator of any coke oven battery may elect to comply with emission limitations promulgated under subsection (f) of this section by the date such emission limitations would otherwise apply to such coke oven battery, in lieu of the emission limitations and the compliance dates provided under subparagraphs (B) and (C) of this paragraph. Any such owner or operator shall be legally bound to comply with such emission limitations promulgated under subsection (f) of this section with respect to such coke oven battery as of January 1, 2003. If no such

emission limitations have been promulgated for such coke oven battery, the Administrator shall promulgate such emission limitations in accordance with subsection (f) of this section for such coke oven battery.

**(E)** Coke oven batteries qualifying for an extension under subparagraph (A) shall make available not later than January 1, 2000, to the surrounding communities the results of any risk assessment performed by the Administrator to determine the appropriate level of any emission standard established by the Administrator pursuant to subsection (f) of this section.

**(F)** Notwithstanding the provisions of this section, reconstruction of any source of coke oven emissions qualifying for an extension under this paragraph shall not subject such source to emission limitations under subsection (f) of this section more stringent than those established under subparagraphs (B) and (C) until January 1, 2020. For the purposes of this subparagraph, the term "reconstruction" includes the replacement of existing coke oven battery capacity with new coke oven batteries of comparable or lower capacity and lower potential emissions.

(j) Equivalent emission limitation by permit

(1) Effective date

The requirements of this subsection shall apply in each State beginning on the effective date of a permit program established pursuant to subchapter V of this chapter in such State, but not prior to the date 42 months after November 15, 1990.

(2) Failure to promulgate a standard

In the event that the Administrator fails to promulgate a standard for a category or subcategory of major sources by the date established pursuant to subsection (e)(1) and (3) of this section, and beginning 18 months after such date (but not prior to the effective date of a permit program under subchapter V of this chapter), the owner or operator of any major source in such category or subcategory shall submit a permit application under paragraph (3) and such owner or operator shall also comply with paragraphs (5) and (6).

(3) Applications

By the date established by paragraph (2), the owner or operator of a major source subject to this subsection shall file an application for a permit. If the owner or operator of a source has submitted a timely and complete application for a permit required by this subsection, any failure to have a permit shall not be a violation of paragraph (2), unless the delay in final action is due to the failure of the applicant to timely submit information required or requested to process the application. The Administrator shall not later than 18 months after November 15, 1990, and after notice and opportunity for comment, establish requirements for applications under this subsection including a standard application form and criteria for determining in a timely manner the completeness of applications.

(4) Review and approval

Permit applications submitted under this subsection shall be reviewed and approved or disapproved according to the provisions of section 7661d of this title. In the event that the Administrator (or the State) disapproves a permit application submitted under this subsection or determines that the application is incomplete, the applicant shall have up to 6 months to revise the application to meet the objections of the Administrator (or the State).

ADD57

(5) Emission limitation

The permit shall be issued pursuant to subchapter V of this chapter and shall contain emission limitations for the hazardous air pollutants subject to regulation under this section and emitted by the source that the Administrator (or the State) determines, on a case-by-case basis, to be equivalent to the limitation that would apply to such source if an emission standard had been promulgated in a timely manner under subsection (d) of this section. In the alternative, if the applicable criteria are met, the permit may contain an emissions limitation established according to the provisions of subsection (i)(5) of this section. For purposes of the preceding sentence, the reduction required by subsection (i)(5)(A) of this section shall be achieved by the date on which the relevant standard should have been promulgated under subsection (d) of this section. No such pollutant may be emitted in amounts exceeding an emission limitation contained in a permit immediately for new sources and, as expeditiously as practicable, but not later than the date 3 years after the permit is issued for existing sources or such other compliance date as would apply under subsection (i) of this section.

(6) Applicability of subsequent standards

If the Administrator promulgates an emission standard that is applicable to the major source prior to the date on which a permit application is approved, the emission limitation in the permit shall reflect the promulgated standard rather than the emission limitation determined pursuant to paragraph (5), provided that the source shall have the compliance period provided under subsection (i) of this section. If the Administrator promulgates a standard under subsection (d) of this section that would be applicable to the source in lieu of the emission limitation established by permit under this subsection after the date on which the permit has been issued, the Administrator (or the State) shall revise such permit upon the next renewal to reflect the standard promulgated by the Administrator providing such source a reasonable time to comply, but no longer than 8 years after such standard is promulgated or 8 years after the date on which the source is first required to comply with the emissions limitation established by paragraph (5), whichever is earlier.

(k) Area source program

(1) Findings and purpose

The Congress finds that emissions of hazardous air pollutants from area sources may individually, or in the aggregate, present significant risks to public health in urban areas. Considering the large number of persons exposed and the risks of carcinogenic and other adverse health effects from hazardous air pollutants, ambient concentrations characteristic of large urban areas should be reduced to levels substantially below those currently experienced. It is the purpose of this subsection to achieve a substantial reduction in emissions of hazardous air pollutants from area sources and an equivalent reduction in the public health risks associated with such sources including a reduction of not less than 75 per centum in the incidence of cancer attributable to emissions from such sources.

(2) Research program

The Administrator shall, after consultation with State and local air pollution control officials, conduct a program of research with respect to sources of hazardous air pollutants in urban areas and shall include within such program--

(A) ambient monitoring for a broad range of hazardous air pollutants (including, but not limited to, volatile organic compounds, metals, pesticides and products of incomplete combustion) in a representative number of urban locations;

ADD58

**(B)** analysis to characterize the sources of such pollution with a focus on area sources and the contribution that such sources make to public health risks from hazardous air pollutants; and

**(C)** consideration of atmospheric transformation and other factors which can elevate public health risks from such pollutants.

Health effects considered under this program shall include, but not be limited to, carcinogenicity, mutagenicity, teratogenicity, neurotoxicity, reproductive dysfunction and other acute and chronic effects including the role of such pollutants as precursors of ozone or acid aerosol formation. The Administrator shall report the preliminary results of such research not later than 3 years after November 15, 1990.

(3) National strategy

**(A)** Considering information collected pursuant to the monitoring program authorized by paragraph (2), the Administrator shall, not later than 5 years after November 15, 1990, and after notice and opportunity for public comment, prepare and transmit to the Congress a comprehensive strategy to control emissions of hazardous air pollutants from area sources in urban areas.

**(B)** The strategy shall--

**(i)** identify not less than 30 hazardous air pollutants which, as the result of emissions from area sources, present the greatest threat to public health in the largest number of urban areas and that are or will be listed pursuant to subsection (b) of this section, and

**(ii)** identify the source categories or subcategories emitting such pollutants that are or will be listed pursuant to subsection (c) of this section. When identifying categories and subcategories of sources under this subparagraph, the Administrator shall assure that sources accounting for 90 per centum or more of the aggregate emissions of each of the 30 identified hazardous air pollutants are subject to standards pursuant to subsection (d) of this section.

**(C)** The strategy shall include a schedule of specific actions to substantially reduce the public health risks posed by the release of hazardous air pollutants from area sources that will be implemented by the Administrator under the authority of this or other laws (including, but not limited to, the Toxic Substances Control Act [15 U.S.C.A. § 2601 et seq.], the Federal Insecticide, Fungicide and Rodenticide Act [7 U.S.C.A. § 136 et seq.] and the Resource Conservation and Recovery Act [42 U.S.C.A. § 6901 et seq.] ) or by the States. The strategy shall achieve a reduction in the incidence of cancer attributable to exposure to hazardous air pollutants emitted by stationary sources of not less than 75 per centum, considering control of emissions of hazardous air pollutants from all stationary sources and resulting from measures implemented by the Administrator or by the States under this or other laws.

**(D)** The strategy may also identify research needs in monitoring, analytical methodology, modeling or pollution control techniques and recommendations for changes in law that would further the goals and objectives of this subsection.

ADD59

**(E)** Nothing in this subsection shall be interpreted to preclude or delay implementation of actions with respect to area sources of hazardous air pollutants under consideration pursuant to this or any other law and that may be promulgated before the strategy is prepared.

**(F)** The Administrator shall implement the strategy as expeditiously as practicable assuring that all sources are in compliance with all requirements not later than 9 years after November 15, 1990.

**(G)** As part of such strategy the Administrator shall provide for ambient monitoring and emissions modeling in urban areas as appropriate to demonstrate that the goals and objectives of the strategy are being met.

(4) Areawide activities

In addition to the national urban air toxics strategy authorized by paragraph (3), the Administrator shall also encourage and support areawide strategies developed by State or local air pollution control agencies that are intended to reduce risks from emissions by area sources within a particular urban area. From the funds available for grants under this section, the Administrator shall set aside not less than 10 per centum to support areawide strategies addressing hazardous air pollutants emitted by area sources and shall award such funds on a demonstration basis to those States with innovative and effective strategies. At the request of State or local air pollution control officials, the Administrator shall prepare guidelines for control technologies or management practices which may be applicable to various categories or subcategories of area sources.

(5) Report

The Administrator shall report to the Congress at intervals not later than 8 and 12 years after November 15, 1990, on actions taken under this subsection and other parts of this chapter to reduce the risk to public health posed by the release of hazardous air pollutants from area sources. The reports shall also identify specific metropolitan areas that continue to experience high risks to public health as the result of emissions from area sources.

(l) State programs

(1) In general

Each State may develop and submit to the Administrator for approval a program for the implementation and enforcement (including a review of enforcement delegations previously granted) of emission standards and other requirements for air pollutants subject to this section or requirements for the prevention and mitigation of accidental releases pursuant to subsection (r) of this section. A program submitted by a State under this subsection may provide for partial or complete delegation of the Administrator's authorities and responsibilities to implement and enforce emissions standards and prevention requirements but shall not include authority to set standards less stringent than those promulgated by the Administrator under this chapter.

(2) Guidance

Not later than 12 months after November 15, 1990, the Administrator shall publish guidance that would be useful to the States in developing programs for submittal under this subsection. The guidance shall also provide for the registration of all

ADD60

facilities producing, processing, handling or storing any substance listed pursuant to subsection (r) of this section in amounts greater than the threshold quantity. The Administrator shall include as an element in such guidance an optional program begun in 1986 for the review of high-risk point sources of air pollutants including, but not limited to, hazardous air pollutants listed pursuant to subsection (b) of this section.

(3) Technical assistance

The Administrator shall establish and maintain an air toxics clearinghouse and center to provide technical information and assistance to State and local agencies and, on a cost recovery basis, to others on control technology, health and ecological risk assessment, risk analysis, ambient monitoring and modeling, and emissions measurement and monitoring. The Administrator shall use the authority of section 7403 of this title to examine methods for preventing, measuring, and controlling emissions and evaluating associated health and ecological risks. Where appropriate, such activity shall be conducted with not-for-profit organizations. The Administrator may conduct research on methods for preventing, measuring and controlling emissions and evaluating associated health and environment risks. All information collected under this paragraph shall be available to the public.

(4) Grants

Upon application of a State, the Administrator may make grants, subject to such terms and conditions as the Administrator deems appropriate, to such State for the purpose of assisting the State in developing and implementing a program for submittal and approval under this subsection. Programs assisted under this paragraph may include program elements addressing air pollutants or extremely hazardous substances other than those specifically subject to this section. Grants under this paragraph may include support for high-risk point source review as provided in paragraph (2) and support for the development and implementation of areawide area source programs pursuant to subsection (k) of this section.

(5) Approval or disapproval

Not later than 180 days after receiving a program submitted by a State, and after notice and opportunity for public comment, the Administrator shall either approve or disapprove such program. The Administrator shall disapprove any program submitted by a State, if the Administrator determines that--

(A) the authorities contained in the program are not adequate to assure compliance by all sources within the State with each applicable standard, regulation or requirement established by the Administrator under this section;

(B) adequate authority does not exist, or adequate resources are not available, to implement the program;

(C) the schedule for implementing the program and assuring compliance by affected sources is not sufficiently expeditious; or

(D) the program is otherwise not in compliance with the guidance issued by the Administrator under paragraph (2) or is not likely to satisfy, in whole or in part, the objectives of this chapter.

ADD61

USCA Case #15-1363     Document #1605913     Filed: 03/28/2016     Page 67 of 219

If the Administrator disapproves a State program, the Administrator shall notify the State of any revisions or modifications necessary to obtain approval. The State may revise and resubmit the proposed program for review and approval pursuant to the provisions of this subsection.

(6) Withdrawal

Whenever the Administrator determines, after public hearing, that a State is not administering and enforcing a program approved pursuant to this subsection in accordance with the guidance published pursuant to paragraph (2) or the requirements of paragraph (5), the Administrator shall so notify the State and, if action which will assure prompt compliance is not taken within 90 days, the Administrator shall withdraw approval of the program. The Administrator shall not withdraw approval of any program unless the State shall have been notified and the reasons for withdrawal shall have been stated in writing and made public.

(7) Authority to enforce

Nothing in this subsection shall prohibit the Administrator from enforcing any applicable emission standard or requirement under this section.

(8) Local program

The Administrator may, after notice and opportunity for public comment, approve a program developed and submitted by a local air pollution control agency (after consultation with the State) pursuant to this subsection and any such agency implementing an approved program may take any action authorized to be taken by a State under this section.

(9) Permit authority

Nothing in this subsection shall affect the authorities and obligations of the Administrator or the State under subchapter V of this chapter.

(m) Atmospheric deposition to Great Lakes and coastal waters

(1) Deposition assessment

The Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall conduct a program to identify and assess the extent of atmospheric deposition of hazardous air pollutants (and in the discretion of the Administrator, other air pollutants) to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters. As part of such program, the Administrator shall--

(A) monitor the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters, including monitoring of the Great Lakes through the monitoring network established pursuant to paragraph (2) of this subsection and designing and deploying an atmospheric monitoring network for coastal waters pursuant to paragraph (4);

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**(B)** investigate the sources and deposition rates of atmospheric deposition of air pollutants (and their atmospheric transformation precursors);

**(C)** conduct research to develop and improve monitoring methods and to determine the relative contribution of atmospheric pollutants to total pollution loadings to the Great Lakes, the Chesapeake Bay, Lake Champlain, and coastal waters;

**(D)** evaluate any adverse effects to public health or the environment caused by such deposition (including effects resulting from indirect exposure pathways) and assess the contribution of such deposition to violations of water quality standards established pursuant to the Federal Water Pollution Control Act [33 U.S.C.A. § 1251 et seq.] and drinking water standards established pursuant to the Safe Drinking Water Act [42 U.S.C.A. § 300f et seq.]; and

**(E)** sample for such pollutants in biota, fish, and wildlife of the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters and characterize the sources of such pollutants.

(2) Great Lakes monitoring network

The Administrator shall oversee, in accordance with Annex 15 of the Great Lakes Water Quality Agreement, the establishment and operation of a Great Lakes atmospheric deposition network to monitor atmospheric deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) to the Great Lakes.

**(A)** As part of the network provided for in this paragraph, and not later than December 31, 1991, the Administrator shall establish in each of the 5 Great Lakes at least 1 facility capable of monitoring the atmospheric deposition of hazardous air pollutants in both dry and wet conditions.

**(B)** The Administrator shall use the data provided by the network to identify and track the movement of hazardous air pollutants through the Great Lakes, to determine the portion of water pollution loadings attributable to atmospheric deposition of such pollutants, and to support development of remedial action plans and other management plans as required by the Great Lakes Water Quality Agreement.

**(C)** The Administrator shall assure that the data collected by the Great Lakes atmospheric deposition monitoring network is in a format compatible with databases sponsored by the International Joint Commission, Canada, and the several States of the Great Lakes region.

(3) Monitoring for the Chesapeake Bay and Lake Champlain

The Administrator shall establish at the Chesapeake Bay and Lake Champlain atmospheric deposition stations to monitor deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) within the Chesapeake Bay and Lake Champlain watersheds. The Administrator shall determine the role of air deposition in the pollutant loadings of the Chesapeake Bay and Lake Champlain, investigate the sources of air pollutants deposited in the watersheds, evaluate the health and environmental effects of such pollutant loadings, and shall sample such pollutants in biota, fish and wildlife within the watersheds, as necessary to characterize such effects.

ADD63

(4) Monitoring for coastal waters

The Administrator shall design and deploy atmospheric deposition monitoring networks for coastal waters and their watersheds and shall make any information collected through such networks available to the public. As part of this effort, the Administrator shall conduct research to develop and improve deposition monitoring methods, and to determine the relative contribution of atmospheric pollutants to pollutant loadings. For purposes of this subsection, "coastal waters" shall mean estuaries selected pursuant to section 320(a)(2)(A) of the Federal Water Pollution Control Act [33 U.S.C.A. § 1330(a)(2)(A)] or listed pursuant to section 320(a)(2)(B) of such Act [33 U.S.C.A. § 1330(a)(2)(B)] or estuarine research reserves designated pursuant to section 1461 of Title 16.

(5) Report

Within 3 years of November 15, 1990, and biennially thereafter, the Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall submit to the Congress a report on the results of any monitoring, studies, and investigations conducted pursuant to this subsection. Such report shall include, at a minimum, an assessment of--

   **(A)** the contribution of atmospheric deposition to pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

   **(B)** the environmental and public health effects of any pollution which is attributable to atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

   **(C)** the source or sources of any pollution to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters which is attributable to atmospheric deposition;

   **(D)** whether pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain or coastal waters cause or contribute to exceedances of drinking water standards pursuant to the Safe Drinking Water Act [42 U.S.C.A. § 300f et seq.] or water quality standards pursuant to the Federal Water Pollution Control Act [33 U.S.C.A. § 1251 et seq.] or, with respect to the Great Lakes, exceedances of the specific objectives of the Great Lakes Water Quality Agreement; and

   **(E)** a description of any revisions of the requirements, standards, and limitations pursuant to this chapter and other applicable Federal laws as are necessary to assure protection of human health and the environment.

(6) Additional regulation

As part of the report to Congress, the Administrator shall determine whether the other provisions of this section are adequate to prevent serious adverse effects to public health and serious or widespread environmental effects, including such effects resulting from indirect exposure pathways, associated with atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters of hazardous air pollutants (and their atmospheric transformation products). The Administrator shall take into consideration the tendency of such pollutants to bioaccumulate. Within 5 years after November 15, 1990, the Administrator shall, based on such report and determination, promulgate, in accordance with this section, such further emission standards or control measures as may be necessary and appropriate to prevent such effects, including effects

ADD64

due to bioaccumulation and indirect exposure pathways. Any requirements promulgated pursuant to this paragraph with respect to coastal waters shall only apply to the coastal waters of the States which are subject to section 7627(a) of this title.

(n) Other provisions

(1) Electric utility steam generating units

(A) The Administrator shall perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions by electric utility steam generating units of pollutants listed under subsection (b) of this section after imposition of the requirements of this chapter. The Administrator shall report the results of this study to the Congress within 3 years after November 15, 1990. The Administrator shall develop and describe in the Administrator's report to Congress alternative control strategies for emissions which may warrant regulation under this section. The Administrator shall regulate electric utility steam generating units under this section, if the Administrator finds such regulation is appropriate and necessary after considering the results of the study required by this subparagraph.

(B) The Administrator shall conduct, and transmit to the Congress not later than 4 years after November 15, 1990, a study of mercury emissions from electric utility steam generating units, municipal waste combustion units, and other sources, including area sources. Such study shall consider the rate and mass of such emissions, the health and environmental effects of such emissions, technologies which are available to control such emissions, and the costs of such technologies.

(C) The National Institute of Environmental Health Sciences shall conduct, and transmit to the Congress not later than 3 years after November 15, 1990, a study to determine the threshold level of mercury exposure below which adverse human health effects are not expected to occur. Such study shall include a threshold for mercury concentrations in the tissue of fish which may be consumed (including consumption by sensitive populations) without adverse effects to public health.

(2) Coke oven production technology study

(A) The Secretary of the Department of Energy and the Administrator shall jointly undertake a 6-year study to assess coke oven production emission control technologies and to assist in the development and commercialization of technically practicable and economically viable control technologies which have the potential to significantly reduce emissions of hazardous air pollutants from coke oven production facilities. In identifying control technologies, the Secretary and the Administrator shall consider the range of existing coke oven operations and battery design and the availability of sources of materials for such coke ovens as well as alternatives to existing coke oven production design.

(B) The Secretary and the Administrator are authorized to enter into agreements with persons who propose to develop, install and operate coke production emission control technologies which have the potential for significant emissions reductions of hazardous air pollutants provided that Federal funds shall not exceed 50 per centum of the cost of any project assisted pursuant to this paragraph.

(C) On completion of the study, the Secretary shall submit to Congress a report on the results of the study and shall make recommendations to the Administrator identifying practicable and economically viable control technologies for coke oven production facilities to reduce residual risks remaining after implementation of the standard under subsection (d) of this section.

ADD65

**(D)** There are authorized to be appropriated $5,000,000 for each of the fiscal years 1992 through 1997 to carry out the program authorized by this paragraph.

(3) Publicly owned treatment works

The Administrator may conduct, in cooperation with the owners and operators of publicly owned treatment works, studies to characterize emissions of hazardous air pollutants emitted by such facilities, to identify industrial, commercial and residential discharges that contribute to such emissions and to demonstrate control measures for such emissions. When promulgating any standard under this section applicable to publicly owned treatment works, the Administrator may provide for control measures that include pretreatment of discharges causing emissions of hazardous air pollutants and process or product substitutions or limitations that may be effective in reducing such emissions. The Administrator may prescribe uniform sampling, modeling and risk assessment methods for use in implementing this subsection.

(4) Oil and gas wells; pipeline facilities

**(A)** Notwithstanding the provisions of subsection (a) of this section, emissions from any oil or gas exploration or production well (with its associated equipment) and emissions from any pipeline compressor or pump station shall not be aggregated with emissions from other similar units, whether or not such units are in a contiguous area or under common control, to determine whether such units or stations are major sources, and in the case of any oil or gas exploration or production well (with its associated equipment), such emissions shall not be aggregated for any purpose under this section.

**(B)** The Administrator shall not list oil and gas production wells (with its associated equipment) as an area source category under subsection (c) of this section, except that the Administrator may establish an area source category for oil and gas production wells located in any metropolitan statistical area or consolidated metropolitan statistical area with a population in excess of 1 million, if the Administrator determines that emissions of hazardous air pollutants from such wells present more than a negligible risk of adverse effects to public health.

(5) Hydrogen sulfide

The Administrator is directed to assess the hazards to public health and the environment resulting from the emission of hydrogen sulfide associated with the extraction of oil and natural gas resources. To the extent practicable, the assessment shall build upon and not duplicate work conducted for an assessment pursuant to section 8002(m) of the Solid Waste Disposal Act [42 U.S.C.A. § 6982(m) ] and shall reflect consultation with the States. The assessment shall include a review of existing State and industry control standards, techniques and enforcement. The Administrator shall report to the Congress within 24 months after November 15, 1990, with the findings of such assessment, together with any recommendations, and shall, as appropriate, develop and implement a control strategy for emissions of hydrogen sulfide to protect human health and the environment, based on the findings of such assessment, using authorities under this chapter including sections [3] 7411 of this title and this section.

(6) Hydrofluoric acid

Not later than 2 years after November 15, 1990, the Administrator shall, for those regions of the country which do not have comprehensive health and safety regulations with respect to hydrofluoric acid, complete a study of the potential hazards

United States Code Annotated
    Title 42. The Public Health and Welfare
        Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
            Subchapter I. Programs and Activities
                Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7416

§ 7416. Retention of State authority

Currentness

Except as otherwise provided in sections 1857c-10(c), (e), and (f) (as in effect before August 7, 1977), 7543, 7545(c)(4), and 7573 of this title (preempting certain State regulation of moving sources) nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if an emission standard or limitation is in effect under an applicable implementation plan or under section 7411 or section 7412 of this title, such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section.

**CREDIT(S)**

    (July 14, 1955, c. 360, Title I, § 116, formerly § 109, as added Nov. 21, 1967, Pub.L. 90-148, § 2, 81 Stat. 497, renumbered and amended Dec. 31, 1970, Pub.L. 91-604, § 4(a), (c), 84 Stat. 1678, 1689; June 22, 1974, Pub.L. 93-319, § 6(b), 88 Stat. 259; Nov. 16, 1977, Pub.L. 95-190, § 14(a)(24), 91 Stat. 1400.)

Notes of Decisions (8)

42 U.S.C.A. § 7416, 42 USCA § 7416
Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

ADD67

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Programs and Activities
        Part C. Prevention of Significant Deterioration of Air Quality
          Subpart II. Visibility Protection (Refs & Annos)

42 U.S.C.A. § 7491

§ 7491. Visibility protection for Federal class I areas

Currentness

(a) Impairment of visibility; list of areas; study and report

**(1)** Congress hereby declares as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution.

**(2)** Not later than six months after August 7, 1977, the Secretary of the Interior in consultation with other Federal land managers shall review all mandatory class I Federal areas and identify those where visibility is an important value of the area. From time to time the Secretary of the Interior may revise such identifications. Not later than one year after August 7, 1977, the Administrator shall, after consultation with the Secretary of the Interior, promulgate a list of mandatory class I Federal areas in which he determines visibility is an important value.

**(3)** Not later than eighteen months after August 7, 1977, the Administrator shall complete a study and report to Congress on available methods for implementing the national goal set forth in paragraph (1). Such report shall include recommendations for--

**(A)** methods for identifying, characterizing, determining, quantifying, and measuring visibility impairment in Federal areas referred to in paragraph (1), and

**(B)** modeling techniques (or other methods) for determining the extent to which manmade air pollution may reasonably be anticipated to cause or contribute to such impairment, and

**(C)** methods for preventing and remedying such manmade air pollution and resulting visibility impairment.

Such report shall also identify the classes or categories of sources and the types of air pollutants which, alone or in conjunction with other sources or pollutants, may reasonably be anticipated to cause or contribute significantly to impairment of visibility.

**(4)** Not later than twenty-four months after August 7, 1977, and after notice and public hearing, the Administrator shall promulgate regulations to assure (A) reasonable progress toward meeting the national goal specified in paragraph (1), and (B) compliance with the requirements of this section.

ADD68

(b) Regulations

Regulations under subsection (a)(4) of this section shall--

**(1)** provide guidelines to the States, taking into account the recommendations under subsection (a)(3) of this section on appropriate techniques and methods for implementing this section (as provided in subparagraphs (A) through (C) of such subsection (a)(3) ), and

**(2)** require each applicable implementation plan for a State in which any area listed by the Administrator under subsection (a)(2) of this section is located (or for a State the emissions from which may reasonably be anticipated to cause or contribute to any impairment of visibility in any such area) to contain such emission limits, schedules of compliance and other measures as may be necessary to make reasonable progress toward meeting the national goal specified in subsection (a) of this section, including--

**(A)** except as otherwise provided pursuant to subsection (c) of this section, a requirement that each major stationary source which is in existence on August 7, 1977, but which has not been in operation for more than fifteen years as of such date, and which, as determined by the State (or the Administrator in the case of a plan promulgated under section 7410(c) of this title) emits any air pollutant which may reasonably be anticipated to cause or contribute to any impairment of visibility in any such area, shall procure, install, and operate, as expeditiously as practicable (and maintain thereafter) the best available retrofit technology, as determined by the State (or the Administrator in the case of a plan promulgated under section 7410(c) of this title) for controlling emissions from such source for the purpose of eliminating or reducing any such impairment, and

**(B)** a long-term (ten to fifteen years) strategy for making reasonable progress toward meeting the national goal specified in subsection (a) of this section.

In the case of a fossil-fuel fired generating powerplant having a total generating capacity in excess of 750 megawatts, the emission limitations required under this paragraph shall be determined pursuant to guidelines, promulgated by the Administrator under paragraph (1).

(c) Exemptions

**(1)** The Administrator may, by rule, after notice and opportunity for public hearing, exempt any major stationary source from the requirement of subsection (b)(2)(A) of this section, upon his determination that such source does not or will not, by itself or in combination with other sources, emit any air pollutant which may reasonably be anticipated to cause or contribute to a significant impairment of visibility in any mandatory class I Federal area.

**(2)** Paragraph (1) of this subsection shall not be applicable to any fossil-fuel fired powerplant with total design capacity of 750 megawatts or more, unless the owner or operator of any such plant demonstrates to the satisfaction of the Administrator that such powerplant is located at such distance from all areas listed by the Administrator under subsection (a)(2) of this section that such powerplant does not or will not, by itself or in combination with other sources, emit any air pollutant which may reasonably be anticipated to cause or contribute to significant impairment of visibility in any such area.

ADD69

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**(3)** An exemption under this subsection shall be effective only upon concurrence by the appropriate Federal land manager or managers with the Administrator's determination under this subsection.

(d) Consultations with appropriate Federal land managers

Before holding the public hearing on the proposed revision of an applicable implementation plan to meet the requirements of this section, the State (or the Administrator, in the case of a plan promulgated under section 7410(c) of this title) shall consult in person with the appropriate Federal land manager or managers and shall include a summary of the conclusions and recommendations of the Federal land managers in the notice to the public.

(e) Buffer zones

In promulgating regulations under this section, the Administrator shall not require the use of any automatic or uniform buffer zone or zones.

(f) Nondiscretionary duty

For purposes of section 7604(a)(2) of this title, the meeting of the national goal specified in subsection (a)(1) of this section by any specific date or dates shall not be considered a "nondiscretionary duty" of the Administrator.

(g) Definitions

For the purpose of this section--

**(1)** in determining reasonable progress there shall be taken into consideration the costs of compliance, the time necessary for compliance, and the energy and nonair quality environmental impacts of compliance, and the remaining useful life of any existing source subject to such requirements;

**(2)** in determining best available retrofit technology the State (or the Administrator in determining emission limitations which reflect such technology) shall take into consideration the costs of compliance, the energy and nonair quality environmental impacts of compliance, any existing pollution control technology in use at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology;

**(3)** the term "manmade air pollution" means air pollution which results directly or indirectly from human activities;

**(4)** the term "as expeditiously as practicable" means as expeditiously as practicable but in no event later than five years after the date of approval of a plan revision under this section (or the date of promulgation of such a plan revision in the case of action by the Administrator under section 7410(c) of this title for purposes of this section);

**(5)** the term "mandatory class I Federal areas" means Federal areas which may not be designated as other than class I under this part;

ADD70

**(6)** the terms "visibility impairment" and "impairment of visibility" shall include reduction in visual range and atmospheric discoloration; and

**(7)** the term "major stationary source" means the following types of stationary sources with the potential to emit 250 tons or more of any pollutant: fossil-fuel fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (thermal dryers), kraft pulp mills, Portland Cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production facilities, chemical process plants, fossil-fuel boilers of more than 250 million British thermal units per hour heat input, petroleum storage and transfer facilities with a capacity exceeding 300,000 barrels, taconite ore processing facilities, glass fiber processing plants, charcoal production facilities.

**CREDIT(S)**
(July 14, 1955, c. 360, Title I, § 169A, as added Aug. 7, 1977, Pub.L. 95-95, Title I, § 128, 91 Stat. 742.)

Notes of Decisions (16)

42 U.S.C.A. § 7491, 42 USCA § 7491
Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter II. Emission Standards for Moving Sources
        Part A. Motor Vehicle Emission and Fuel Standards (Refs & Annos)

42 U.S.C.A. § 7521

§ 7521. Emission standards for new motor vehicles or new motor vehicle engines

Currentness

(a) Authority of Administrator to prescribe by regulation

Except as otherwise provided in subsection (b) of this section--

**(1)** The Administrator shall by regulation prescribe (and from time to time revise) in accordance with the provisions of this section, standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare. Such standards shall be applicable to such vehicles and engines for their useful life (as determined under subsection (d) of this section, relating to useful life of vehicles for purposes of certification), whether such vehicles and engines are designed as complete systems or incorporate devices to prevent or control such pollution.

**(2)** Any regulation prescribed under paragraph (1) of this subsection (and any revision thereof) shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period.

**(3)(A) In general**

**(i)** Unless the standard is changed as provided in subparagraph (B), regulations under paragraph (1) of this subsection applicable to emissions of hydrocarbons, carbon monoxide, oxides of nitrogen, and particulate matter from classes or categories of heavy-duty vehicles or engines manufactured during or after model year 1983 shall contain standards which reflect the greatest degree of emission reduction achievable through the application of technology which the Administrator determines will be available for the model year to which such standards apply, giving appropriate consideration to cost, energy, and safety factors associated with the application of such technology.

**(ii)** In establishing classes or categories of vehicles or engines for purposes of regulations under this paragraph, the Administrator may base such classes or categories on gross vehicle weight, horsepower, type of fuel used, or other appropriate factors.

**(B) Revised standards for heavy duty trucks**

**(i)** On the basis of information available to the Administrator concerning the effects of air pollutants emitted from heavy-duty vehicles or engines and from other sources of mobile source related pollutants on the public health and welfare, and taking costs into account, the Administrator may promulgate regulations under paragraph (1) of this subsection revising any standard promulgated under, or before the date of, the enactment of the Clean Air Act Amendments of 1990 (or previously revised under this subparagraph) and applicable to classes or categories of heavy-duty vehicles or engines.

**(ii)** Effective for the model year 1998 and thereafter, the regulations under paragraph (1) of this subsection applicable to emissions of oxides of nitrogen ($NO_x$) from gasoline and diesel-fueled heavy duty trucks shall contain standards which provide that such emissions may not exceed 4.0 grams per brake horsepower hour (gbh).

**(C) Lead time and stability**

Any standard promulgated or revised under this paragraph and applicable to classes or categories of heavy-duty vehicles or engines shall apply for a period of no less than 3 model years beginning no earlier than the model year commencing 4 years after such revised standard is promulgated.

**(D) Rebuilding practices**

The Administrator shall study the practice of rebuilding heavy-duty engines and the impact rebuilding has on engine emissions. On the basis of that study and other information available to the Administrator, the Administrator may prescribe requirements to control rebuilding practices, including standards applicable to emissions from any rebuilt heavy-duty engines (whether or not the engine is past its statutory useful life), which in the Administrator's judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare taking costs into account. Any regulation shall take effect after a period the Administrator finds necessary to permit the development and application of the requisite control measures, giving appropriate consideration to the cost of compliance within the period and energy and safety factors.

**(E) Motorcycles**

For purposes of this paragraph, motorcycles and motorcycle engines shall be treated in the same manner as heavy-duty vehicles and engines (except as otherwise permitted under section 7525(f)(1) of this title) unless the Administrator promulgates a rule reclassifying motorcycles as light-duty vehicles within the meaning of this section or unless the Administrator promulgates regulations under subsection (a) of this section applying standards applicable to the emission of air pollutants from motorcycles as a separate class or category. In any case in which such standards are promulgated for such emissions from motorcycles as a separate class or category, the Administrator, in promulgating such standards, shall consider the need to achieve equivalency of emission reductions between motorcycles and other motor vehicles to the maximum extent practicable.

**(4)(A)** Effective with respect to vehicles and engines manufactured after model year 1978, no emission control device, system, or element of design shall be used in a new motor vehicle or new motor vehicle engine for purposes of complying with requirements prescribed under this subchapter if such device, system, or element of design will cause or contribute to an unreasonable risk to public health, welfare, or safety in its operation or function.

**(B)** In determining whether an unreasonable risk exists under subparagraph (A), the Administrator shall consider, among other factors, (i) whether and to what extent the use of any device, system, or element of design causes, increases, reduces,

or eliminates emissions of any unregulated pollutants; (ii) available methods for reducing or eliminating any risk to public health, welfare, or safety which may be associated with the use of such device, system, or element of design, and (iii) the availability of other devices, systems, or elements of design which may be used to conform to requirements prescribed under this subchapter without causing or contributing to such unreasonable risk. The Administrator shall include in the consideration required by this paragraph all relevant information developed pursuant to section 7548 of this title.

**(5)(A)** If the Administrator promulgates final regulations which define the degree of control required and the test procedures by which compliance could be determined for gasoline vapor recovery of uncontrolled emissions from the fueling of motor vehicles, the Administrator shall, after consultation with the Secretary of Transportation with respect to motor vehicle safety, prescribe, by regulation, fill pipe standards for new motor vehicles in order to insure effective connection between such fill pipe and any vapor recovery system which the Administrator determines may be required to comply with such vapor recovery regulations. In promulgating such standards the Administrator shall take into consideration limits on fill pipe diameter, minimum design criteria for nozzle retainer lips, limits on the location of the unleaded fuel restrictors, a minimum access zone surrounding a fill pipe, a minimum pipe or nozzle insertion angle, and such other factors as he deems pertinent.

**(B)** Regulations prescribing standards under subparagraph (A) shall not become effective until the introduction of the model year for which it would be feasible to implement such standards, taking into consideration the restraints of an adequate leadtime for design and production.

**(C)** Nothing in subparagraph (A) shall (i) prevent the Administrator from specifying different nozzle and fill neck sizes for gasoline with additives and gasoline without additives or (ii) permit the Administrator to require a specific location, configuration, modeling, or styling of the motor vehicle body with respect to the fuel tank fill neck or fill nozzle clearance envelope.

**(D)** For the purpose of this paragraph, the term "fill pipe" shall include the fuel tank fill pipe, fill neck, fill inlet, and closure.

**(6) Onboard vapor recovery**

Within 1 year after November 15, 1990, the Administrator shall, after consultation with the Secretary of Transportation regarding the safety of vehicle-based ("onboard") systems for the control of vehicle refueling emissions, promulgate standards under this section requiring that new light-duty vehicles manufactured beginning in the fourth model year after the model year in which the standards are promulgated and thereafter shall be equipped with such systems. The standards required under this paragraph shall apply to a percentage of each manufacturer's fleet of new light-duty vehicles beginning with the fourth model year after the model year in which the standards are promulgated. The percentage shall be as specified in the following table:

**IMPLEMENTATION SCHEDULE FOR ONBOARD VAPOR RECOVERY REQUIREMENTS**

| Model year commencing after standards promulgated | Percentage* |
| --- | --- |
| Fourth............................................................................................................................. | 40 |
| Fifth................................................................................................................................ | 80 |
| After Fifth....................................................................................................................... | 100 |

ADD74

*Percentages in the table refer to a percentage of the manufacturer's sales volume.

The standards shall require that such systems provide a minimum evaporative emission capture efficiency of 95 percent. The requirements of section 7511a(b)(3) of this title (relating to stage II gasoline vapor recovery) for areas classified under section 7511 of this title as moderate for ozone shall not apply after promulgation of such standards and the Administrator may, by rule, revise or waive the application of the requirements of such section 7511a(b)(3) of this title for areas classified under section 7511 of this title as Serious, Severe, or Extreme for ozone, as appropriate, after such time as the Administrator determines that onboard emissions control systems required under this paragraph are in widespread use throughout the motor vehicle fleet.

(b) Emissions of carbon monoxide, hydrocarbons, and oxides of nitrogen; annual report to Congress; waiver of emission standards; research objectives

(1)(A) The regulations under subsection (a) of this section applicable to emissions of carbon monoxide and hydrocarbons from light-duty vehicles and engines manufactured during model years 1977 through 1979 shall contain standards which provide that such emissions from such vehicles and engines may not exceed 1.5 grams per vehicle mile of hydrocarbons and 15.0 grams per vehicle mile of carbon monoxide. The regulations under subsection (a) of this section applicable to emissions of carbon monoxide from light-duty vehicles and engines manufactured during the model year 1980 shall contain standards which provide that such emissions may not exceed 7.0 grams per vehicle mile. The regulations under subsection (a) of this section applicable to emissions of hydrocarbons from light-duty vehicles and engines manufactured during or after model year 1980 shall contain standards which require a reduction of at least 90 percent from emissions of such pollutant allowable under the standards under this section applicable to light-duty vehicles and engines manufactured in model year 1970. Unless waived as provided in paragraph (5), regulations under subsection (a) of this section applicable to emissions of carbon monoxide from light-duty vehicles and engines manufactured during or after the model year 1981 shall contain standards which require a reduction of at least 90 percent from emissions of such pollutant allowable under the standards under this section applicable to light-duty vehicles and engines manufactured in model year 1970.

(B) The regulations under subsection (a) of this section applicable to emissions of oxides of nitrogen from light-duty vehicles and engines manufactured during model years 1977 through 1980 shall contain standards which provide that such emissions from such vehicles and engines may not exceed 2.0 grams per vehicle mile. The regulations under subsection (a) of this section applicable to emissions of oxides of nitrogen from light-duty vehicles and engines manufactured during the model year 1981 and thereafter shall contain standards which provide that such emissions from such vehicles and engines may not exceed 1.0 gram per vehicle mile. The Administrator shall prescribe standards in lieu of those required by the preceding sentence, which provide that emissions of oxides of nitrogen may not exceed 2.0 grams per vehicle mile for any light-duty vehicle manufactured during model years 1981 and 1982 by any manufacturer whose production, by corporate identity, for calendar year 1976 was less than three hundred thousand light-duty motor vehicles worldwide if the Administrator determines that--

(i) the ability of such manufacturer to meet emission standards in the 1975 and subsequent model years was, and is, primarily dependent upon technology developed by other manufacturers and purchased from such manufacturers; and

(ii) such manufacturer lacks the financial resources and technological ability to develop such technology.

(C) The Administrator may promulgate regulations under subsection (a)(1) of this section revising any standard prescribed or previously revised under this subsection, as needed to protect public health or welfare, taking costs, energy, and safety into account. Any revised standard shall require a reduction of emissions from the standard that was previously applicable. Any such

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                    4

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
   Title 42. The Public Health and Welfare
      Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
         Subchapter III. General Provisions

42 U.S.C.A. § 7602

§ 7602. Definitions

Currentness

When used in this chapter--

**(a)** The term "Administrator" means the Administrator of the Environmental Protection Agency.

**(b)** The term "air pollution control agency" means any of the following:

**(1)** A single State agency designated by the Governor of that State as the official State air pollution control agency for purposes of this chapter.

**(2)** An agency established by two or more States and having substantial powers or duties pertaining to the prevention and control of air pollution.

**(3)** A city, county, or other local government health authority, or, in the case of any city, county, or other local government in which there is an agency other than the health authority charged with responsibility for enforcing ordinances or laws relating to the prevention and control of air pollution, such other agency.

**(4)** An agency of two or more municipalities located in the same State or in different States and having substantial powers or duties pertaining to the prevention and control of air pollution.

**(5)** An agency of an Indian tribe.

**(c)** The term "interstate air pollution control agency" means--

**(1)** an air pollution control agency established by two or more States, or

**(2)** an air pollution control agency of two or more municipalities located in different States.

ADD76

**(d)** The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa and includes the Commonwealth of the Northern Mariana Islands.

**(e)** The term "person" includes an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof.

**(f)** The term "municipality" means a city, town, borough, county, parish, district, or other public body created by or pursuant to State law.

**(g)** The term "air pollutant" means any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive (including source material, special nuclear material, and byproduct material) substance or matter which is emitted into or otherwise enters the ambient air. Such term includes any precursors to the formation of any air pollutant, to the extent the Administrator has identified such precursor or precursors for the particular purpose for which the term "air pollutant" is used.

**(h)** All language referring to effects on welfare includes, but is not limited to, effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being, whether caused by transformation, conversion, or combination with other air pollutants.

**(i)** The term "Federal land manager" means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

**(j)** Except as otherwise expressly provided, the terms "major stationary source" and "major emitting facility" mean any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator).

**(k)** The terms "emission limitation" and "emission standard" mean a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter.. [1]

**(l)** The term "standard of performance" means a requirement of continuous emission reduction, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction.

**(m)** The term "means of emission limitation" means a system of continuous emission reduction (including the use of specific technology or fuels with specified pollution characteristics).

**(n)** The term "primary standard attainment date" means the date specified in the applicable implementation plan for the attainment of a national primary ambient air quality standard for any air pollutant.

**(o)** The term "delayed compliance order" means an order issued by the State or by the Administrator to an existing stationary source, postponing the date required under an applicable implementation plan for compliance by such source with any requirement of such plan.

**(p)** The term "schedule and timetable of compliance" means a schedule of required measures including an enforceable sequence of actions or operations leading to compliance with an emission limitation, other limitation, prohibition, or standard.

**(q)** For purposes of this chapter, the term "applicable implementation plan" means the portion (or portions) of the implementation plan, or most recent revision thereof, which has been approved under section 7410 of this title, or promulgated under section 7410(c) of this title, or promulgated or approved pursuant to regulations promulgated under section 7601(d) of this title and which implements the relevant requirements of this chapter.

**(r) Indian tribe.--**The term "Indian tribe" means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

**(s) VOC.--**The term "VOC" means volatile organic compound, as defined by the Administrator.

**(t) PM-10.--**The term "PM-10" means particulate matter with an aerodynamic diameter less than or equal to a nominal ten micrometers, as measured by such method as the Administrator may determine.

**(u) NAAQS and CTG.--**The term "NAAQS" means national ambient air quality standard. The term "CTG" means a Control Technique Guideline published by the Administrator under section 7408 of this title.

**(v) NO$_x$.--**The term "NO$_x$" means oxides of nitrogen.

**(w) CO.--**The term "CO" means carbon monoxide.

**(x) Small source.--**The term "small source" means a source that emits less than 100 tons of regulated pollutants per year, or any class of persons that the Administrator determines, through regulation, generally lack technical ability or knowledge regarding control of air pollution.

**(y) Federal implementation plan.--**The term "Federal implementation plan" means a plan (or portion thereof) promulgated by the Administrator to fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a State implementation plan, and which includes enforceable emission limitations or other control measures, means or techniques (including economic incentives, such as marketable permits or auctions of emissions allowances), and provides for attainment of the relevant national ambient air quality standard.

ADD78

**(z) Stationary source.**--The term "stationary source" means generally any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle as defined in section 7550 of this title.

**CREDIT(S)**

(July 14, 1955, c. 360, Title III, § 302, formerly § 9, as added Dec. 17, 1963, Pub.L. 88-206, § 1, 77 Stat. 400, renumbered Oct. 20, 1965, Pub.L. 89-272, Title I, § 101(4), 79 Stat. 992; amended Nov. 21, 1967, Pub.L. 90-148, § 2, 81 Stat. 504; Dec. 31, 1970, Pub.L. 91-604, § 15(a)(1), (c)(1), 84 Stat. 1710, 1713; Aug. 7, 1977, Pub.L. 95-95, Title II, § 218(c), Title III, § 301, 91 Stat. 761, 769; Nov. 16, 1977, Pub.L. 95-190, § 14(a)(76), 91 Stat. 1404; Nov. 15, 1990, Pub.L. 101-549, Title I, §§ 101(d)(4), 107(a), (b), 108(j), 109(b), Title III, § 302(e), Title VII, § 709, 104 Stat. 2409, 2464, 2468, 2470, 2574, 2684.)

Notes of Decisions (11)

Footnotes

1      So in original.

42 U.S.C.A. § 7602, 42 USCA § 7602

Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

---

**End of Document**                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter III. General Provisions

42 U.S.C.A. § 7607

§ 7607. Administrative proceedings and judicial review

Currentness

(a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4) or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the [1] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),, [2] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of Title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph [3], the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

(b) Judicial review

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,, [2] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5) of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c-10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or

ADD80

disapproval by the Administrator under subchapter I of this chapter) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

**(2)** Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

(c) Additional evidence

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to [4] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

(d) Rulemaking

**(1)** This subsection applies to--

**(A)** the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

**(B)** the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

**(C)** the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

**(D)** the promulgation of any requirement for solid waste combustion under section 7429 of this title,

**(E)** the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

**(F)** the promulgation or revision of any aircraft emission standard under section 7571 of this title,

**(G)** the promulgation or revision of any regulation under subchapter IV-A of this chapter (relating to control of acid deposition),

**(H)** promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

**(I)** promulgation or revision of regulations under subchapter VI of this chapter (relating to stratosphere and ozone protection),

**(J)** promulgation or revision of regulations under part C of subchapter I of this chapter (relating to prevention of significant deterioration of air quality and protection of visibility),

**(K)** promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

**(L)** promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

**(M)** promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

**(N)** action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

**(O)** the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

**(P)** the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

**(Q)** the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II of this chapter,

**(R)** the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

**(S)** the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

ADD82

**(T)** the promulgation or revision of any regulation under subchapter IV-A of this chapter (relating to acid deposition),

**(U)** the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

**(V)** such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of Title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of Title 5.

**(2)** Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a "rule"). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

**(3)** In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of Title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the "comment period"). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of--

**(A)** the factual data on which the proposed rule is based;

**(B)** the methodology used in obtaining the data and in analyzing the data; and

**(C)** the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

**(4)(A)** The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

**(B)(i)** Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed

ADD83

such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

**(ii)** The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

**(5)** In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

**(6)(A)** The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

**(B)** The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

**(C)** The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

**(7)(A)** The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

**(B)** Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

**(8)** The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In

ADD84

reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

**(9)** In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be--

    **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    **(B)** contrary to constitutional right, power, privilege, or immunity;

    **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

    **(D)** without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

**(10)** Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

**(11)** The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

(e) Other methods of judicial review not authorized

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

(f) Costs

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

(h) Public participation

ADD85

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of Title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section [5] 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

**CREDIT(S)**

(July 14, 1955, c. 360, Title III, § 307, as added Dec. 31, 1970, Pub.L. 91-604, § 12(a), 84 Stat. 1707; amended Nov. 18, 1971, Pub.L. 92-157, Title III, § 302(a), 85 Stat. 464; June 22, 1974, Pub.L. 93-319, § 6(c), 88 Stat. 259; Aug. 7, 1977, Pub.L. 95-95, Title III, §§ 303(d), 305(a), (c), (f)-(h), 91 Stat. 772, 776, 777; Nov. 16, 1977, Pub.L. 95-190, § 14(a)(79), (80), 91 Stat. 1404; Nov. 15, 1990, Pub.L. 101-549, Title I, §§ 108(p), 110(5), Title III, § 302(g), (h), Title VII, §§ 702(c), 703, 706, 707(h), 710(b), 104 Stat. 2469, 2470, 2574, 2681-2684.)

Notes of Decisions (330)

Footnotes

1       So in original. Probably should be "this".
2       So in original.
3       So in original. Probably should be "subsection,".
4       So in original. The word "to" probably should not appear.
5       So in original. Probably should be "sections".

42 U.S.C.A. § 7607, 42 USCA § 7607

Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

**End of Document**                                     © 2016 Thomson Reuters. No claim to original U.S. Government Works.

ADD86

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                    7

🟨 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter IV-A. Acid Deposition Control (Refs & Annos)

42 U.S.C.A. § 7651

§ 7651. Findings and purposes

Currentness

(a) Findings

The Congress finds that--

**(1)** the presence of acidic compounds and their precursors in the atmosphere and in deposition from the atmosphere represents a threat to natural resources, ecosystems, materials, visibility, and public health;

**(2)** the principal sources of the acidic compounds and their precursors in the atmosphere are emissions of sulfur and nitrogen oxides from the combustion of fossil fuels;

**(3)** the problem of acid deposition is of national and international significance;

**(4)** strategies and technologies for the control of precursors to acid deposition exist now that are economically feasible, and improved methods are expected to become increasingly available over the next decade;

**(5)** current and future generations of Americans will be adversely affected by delaying measures to remedy the problem;

**(6)** reduction of total atmospheric loading of sulfur dioxide and nitrogen oxides will enhance protection of the public health and welfare and the environment; and

**(7)** control measures to reduce precursor emissions from steam-electric generating units should be initiated without delay.

(b) Purposes

The purpose of this subchapter is to reduce the adverse effects of acid deposition through reductions in annual emissions of sulfur dioxide of ten million tons from 1980 emission levels, and, in combination with other provisions of this chapter, of nitrogen oxides emissions of approximately two million tons from 1980 emission levels, in the forty-eight contiguous States and the District of Columbia. It is the intent of this subchapter to effectuate such reductions by requiring compliance by affected

USCA Case #15-1363      Document #1605913      Filed: 03/28/2016      Page 93 of 219

sources with prescribed emission limitations by specified deadlines, which limitations may be met through alternative methods of compliance provided by an emission allocation and transfer system. It is also the purpose of this subchapter to encourage energy conservation, use of renewable and clean alternative technologies, and pollution prevention as a long-range strategy, consistent with the provisions of this subchapter, for reducing air pollution and other adverse impacts of energy production and use.

**CREDIT(S)**

   (July 14, 1955, c. 360, Title IV, § 401, as added Nov. 15, 1990, Pub.L. 101-549, Title IV, § 401, 104 Stat. 2584.)

42 U.S.C.A. § 7651, 42 USCA § 7651
Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

**End of Document**                                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter IV-A. Acid Deposition Control (Refs & Annos)

42 U.S.C.A. § 7651b

§ 7651b. Sulfur dioxide allowance program for existing and new units

Currentness

(a) Allocations of annual allowances for existing and new units

**(1)** For the emission limitation programs under this subchapter, the Administrator shall allocate annual allowances for the unit, to be held or distributed by the designated representative of the owner or operator of each affected unit at an affected source in accordance with this subchapter, in an amount equal to the annual tonnage emission limitation calculated under section 7651c, 7651d, 7651e, 7651h, or 7651i of this title except as otherwise specifically provided elsewhere in this subchapter. Except as provided in sections 7651d(a)(2), 7651d(a)(3), 7651h and 7651i of this title, beginning January 1, 2000, the Administrator shall not allocate annual allowances to emit sulfur dioxide pursuant to section 7651d of this title in such an amount as would result in total annual emissions of sulfur dioxide from utility units in excess of 8.90 million tons except that the Administrator shall not take into account unused allowances carried forward by owners and operators of affected units or by other persons holding such allowances, following the year for which they were allocated. If necessary to meeting the restrictions imposed in the preceding sentence, the Administrator shall reduce, pro rata, the basic Phase II allowance allocations for each unit subject to the requirements of section 7651d of this title. Subject to the provisions of section 7651o of this title, the Administrator shall allocate allowances for each affected unit at an affected source annually, as provided in paragraphs (2) and (3) [1] and section 7651g of this title. Except as provided in sections 7651h and 7651i of this title, the removal of an existing affected unit or source from commercial operation at any time after November 15, 1990 (whether before or after January 1, 1995, or January 1, 2000) shall not terminate or otherwise affect the allocation of allowances pursuant to section 7651c or 7651d of this title to which the unit is entitled. Allowances shall be allocated by the Administrator without cost to the recipient, except for allowances sold by the Administrator pursuant to section 7651o of this title. Not later than December 31, 1991, the Administrator shall publish a proposed list of the basic Phase II allowance allocations, the Phase II bonus allowance allocations and, if applicable, allocations pursuant to section 7651d(a)(3) of this title for each unit subject to the emissions limitation requirements of section 7651d of this title for the year 2000 and the year 2010. After notice and opportunity for public comment, but not later than December 31, 1992, the Administrator shall publish a final list of such allocations, subject to the provisions of section 7651d(a)(2) of this title. Any owner or operator of an existing unit subject to the requirements of section 7651d(b) or (c) of this title who is considering applying for an extension of the emission limitation requirement compliance deadline for that unit from January 1, 2000, until not later than December 31, 2000, pursuant to section 7651h of this title, shall notify the Administrator no later than March 31, 1991. Such notification shall be used as the basis for estimating the basic Phase II allowances under this subsection. Prior to June 1, 1998, the Administrator shall publish a revised final statement of allowance allocations, subject to the provisions of section 7651d(a)(2) of this title and taking into account the effect of any compliance date extensions granted pursuant to section 7651h of this title on such allocations. Any person who may make an election concerning the amount of allowances to be allocated to a unit or units shall make such election and so inform the Administrator not later than March 31, 1991, in the case of an election under section 7651d of this title (or June 30, 1991, in the case of an election under section 7651e of this title). If such person fails to make such election, the Administrator shall set forth for each unit owned or operated by such person, the amount of allowances reflecting the election that would, in the judgment of the Administrator, provide the greatest benefit for the owner or operator of the unit. If such person is a Governor who may make an election under section 7651e of this title and the Governor fails to make an election, the Administrator shall set forth for each unit in the State the amount of allowances reflecting the election that would, in the judgment of the Administrator, provide the greatest benefit for units in the State.

ADD89

(b) Allowance transfer system

Allowances allocated under this subchapter may be transferred among designated representatives of the owners or operators of affected sources under this subchapter and any other person who holds such allowances, as provided by the allowance system regulations to be promulgated by the Administrator not later than eighteen months after November 15, 1990. Such regulations shall establish the allowance system prescribed under this section, including, but not limited to, requirements for the allocation, transfer, and use of allowances under this subchapter. Such regulations shall prohibit the use of any allowance prior to the calendar year for which the allowance was allocated, and shall provide, consistent with the purposes of this subchapter, for the identification of unused allowances, and for such unused allowances to be carried forward and added to allowances allocated in subsequent years, including allowances allocated to units subject to Phase I requirements (as described in section 7651c of this title) which are applied to emissions limitations requirements in Phase II (as described in section 7651d of this title). Transfers of allowances shall not be effective until written certification of the transfer, signed by a responsible official of each party to the transfer, is received and recorded by the Administrator. Such regulations shall permit the transfer of allowances prior to the issuance of such allowances. Recorded pre-allocation transfers shall be deducted by the Administrator from the number of allowances which would otherwise be allocated to the transferor, and added to those allowances allocated to the transferee. Pre-allocation transfers shall not affect the prohibition contained in this subsection against the use of allowances prior to the year for which they are allocated.

(c) Interpollutant trading

Not later than January 1, 1994, the Administrator shall furnish to the Congress a study evaluating the environmental and economic consequences of amending this subchapter to permit trading sulfur dioxide allowances for nitrogen oxides allowances.

(d) Allowance tracking system

(1) The Administrator shall promulgate, not later than 18 months after November 15, 1990, a system for issuing, recording, and tracking allowances, which shall specify all necessary procedures and requirements for an orderly and competitive functioning of the allowance system. All allowance allocations and transfers shall, upon recordation by the Administrator, be deemed a part of each unit's permit requirements pursuant to section 7651g of this title, without any further permit review and revision.

(2) In order to insure electric reliability, such regulations shall not prohibit or affect temporary increases and decreases in emissions within utility systems, power pools, or utilities entering into allowance pool agreements, that result from their operations, including emergencies and central dispatch, and such temporary emissions increases and decreases shall not require transfer of allowances among units nor shall it require recordation. The owners or operators of such units shall act through a designated representative. Notwithstanding the preceding sentence, the total tonnage of emissions in any calendar year (calculated at the end thereof) from all units in such a utility system, power pool, or allowance pool agreements shall not exceed the total allowances for such units for the calendar year concerned.

(e) New utility units

After January 1, 2000, it shall be unlawful for a new utility unit to emit an annual tonnage of sulfur dioxide in excess of the number of allowances to emit held for the unit by the unit's owner or operator. Such new utility units shall not be eligible for an allocation of sulfur dioxide allowances under subsection (a)(1) of this section, unless the unit is subject to the provisions of subsection (g)(2) or (3) of section 7651d of this title. New utility units may obtain allowances from any person, in accordance

ADD90

with this subchapter. The owner or operator of any new utility unit in violation of this subsection shall be liable for fulfilling the obligations specified in section 7651j of this title.

(f) Nature of allowances

An allowance allocated under this subchapter is a limited authorization to emit sulfur dioxide in accordance with the provisions of this subchapter. Such allowance does not constitute a property right. Nothing in this subchapter or in any other provision of law shall be construed to limit the authority of the United States to terminate or limit such authorization. Nothing in this section relating to allowances shall be construed as affecting the application of, or compliance with, any other provision of this chapter to an affected unit or source, including the provisions related to applicable National Ambient Air Quality Standards and State implementation plans. Nothing in this section shall be construed as requiring a change of any kind in any State law regulating electric utility rates and charges or affecting any State law regarding such State regulation or as limiting State regulation (including any prudency review) under such a State law. Nothing in this section shall be construed as modifying the Federal Power Act [16 U.S.C.A. § 791a et seq.] or as affecting the authority of the Federal Energy Regulatory Commission under that Act. Nothing in this subchapter shall be construed to interfere with or impair any program for competitive bidding for power supply in a State in which such program is established. Allowances, once allocated to a person by the Administrator, may be received, held, and temporarily or permanently transferred in accordance with this subchapter and the regulations of the Administrator without regard to whether or not a permit is in effect under subchapter V of this chapter or section 7651g of this title with respect to the unit for which such allowance was originally allocated and recorded. Each permit under this subchapter and each permit issued under subchapter V of this chapter for any affected unit shall provide that the affected unit may not emit an annual tonnage of sulfur dioxide in excess of the allowances held for that unit.

(g) Prohibition

It shall be unlawful for any person to hold, use, or transfer any allowance allocated under this subchapter, except in accordance with regulations promulgated by the Administrator. It shall be unlawful for any affected unit to emit sulfur dioxide in excess of the number of allowances held for that unit for that year by the owner or operator of the unit. Upon the allocation of allowances under this subchapter, the prohibition contained in the preceding sentence shall supersede any other emission limitation applicable under this subchapter to the units for which such allowances are allocated. Allowances may not be used prior to the calendar year for which they are allocated. Nothing in this section or in the allowance system regulations shall relieve the Administrator of the Administrator's permitting, monitoring and enforcement obligations under this chapter, nor relieve affected sources of their requirements and liabilities under this chapter.

(h) Competitive bidding for power supply

Nothing in this subchapter shall be construed to interfere with or impair any program for competitive bidding for power supply in a State in which such program is established.

(i) Applicability of antitrust laws

(1) Nothing in this section affects--

   (A) the applicability of the antitrust laws to the transfer, use, or sale of allowances, or

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.   3

**(B)** the authority of the Federal Energy Regulatory Commission under any provision of law respecting unfair methods of competition or anticompetitive acts or practices.

**(2)** As used in this section, "antitrust laws" means those Acts set forth in section 12 of Title 15.

(j) Public Utility Holding Company Act

The acquisition or disposition of allowances pursuant to this subchapter including the issuance of securities or the undertaking of any other financing transaction in connection with such allowances shall not be subject to the provisions of the Public Utility Holding Company Act of 1935 [15 U.S.C.A. § 79 et seq.].

**CREDIT(S)**

(July 14, 1955, c. 360, Title IV, § 403, as added Nov. 15, 1990, Pub.L. 101-549, Title IV, § 401, 104 Stat. 2589.)

Notes of Decisions (1)

Footnotes

1        So in original. No pars. (2) and (3) have been enacted.

42 U.S.C.A. § 7651b, 42 USCA § 7651b

Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 42. The Public Health and Welfare
        Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
            Subchapter IV-A. Acid Deposition Control (Refs & Annos)

42 U.S.C.A. § 7651c

§ 7651c. Phase I sulfur dioxide requirements

Currentness

(a) Emission limitations

(1) After January 1, 1995, each source that includes one or more affected units listed in table A is an affected source under this section. After January 1, 1995, it shall be unlawful for any affected unit (other than an eligible phase I unit under subsection (d) (2) of this section) to emit sulfur dioxide in excess of the tonnage limitation stated as a total number of allowances in table A for phase I, unless (A) the emissions reduction requirements applicable to such unit have been achieved pursuant to subsection (b) or (d) of this section, or (B) the owner or operator of such unit holds allowances to emit not less than the unit's total annual emissions, except that, after January 1, 2000, the emissions limitations established in this section shall be superseded by those established in section 7651d of this title. The owner or operator of any unit in violation of this section shall be fully liable for such violation including, but not limited to, liability for fulfilling the obligations specified in section 7651j of this title.

(2) Not later than December 31, 1991, the Administrator shall determine the total tonnage of reductions in the emissions of sulfur dioxide from all utility units in calendar year 1995 that will occur as a result of compliance with the emissions limitation requirements of this section, and shall establish a reserve of allowances equal in amount to the number of tons determined thereby not to exceed a total of 3.50 million tons. In making such a determination, the Administrator shall compute for each unit subject to the emissions limitation requirements of this section the difference between:

(A) the product of its baseline multiplied by the lesser of each unit's allowable 1985 emissions rate and its actual 1985 emissions rate, divided by 2,000, and

(B) the product of each unit's baseline multiplied by 2.50 lbs/mmBtu divided by 2,000,

and sum the computations. The Administrator shall adjust the foregoing calculation to reflect projected calendar year 1995 utilization of the units subject to the emissions limitations of this subchapter that the Administrator finds would have occurred in the absence of the imposition of such requirements. Pursuant to subsection (d) of this section, the Administrator shall allocate allowances from the reserve established hereinunder until the earlier of such time as all such allowances in the reserve are allocated or December 31, 1999.

(3) In addition to allowances allocated pursuant to paragraph (1), in each calendar year beginning in 1995 and ending in 1999, inclusive, the Administrator shall allocate for each unit on Table A that is located in the States of Illinois, Indiana, or Ohio (other than units at Kyger Creek, Clifty Creek and Joppa Steam), allowances in an amount equal to 200,000 multiplied by the unit's pro rata share of the total number of allowances allocated for all units on Table A in the 3 States (other than units at Kyger

ADD93

Creek, Clifty Creek, and Joppa Steam) pursuant to paragraph (1). Such allowances shall be excluded from the calculation of the reserve under paragraph (2).

(b) Substitutions

The owner or operator of an affected unit under subsection (a) of this section may include in its section 7651g of this title permit application and proposed compliance plan a proposal to reassign, in whole or in part, the affected unit's sulfur dioxide reduction requirements to any other unit(s) under the control of such owner or operator. Such proposal shall specify--

**(1)** the designation of the substitute unit or units to which any part of the reduction obligations of subsection (a) of this section shall be required, in addition to, or in lieu of, any original affected units designated under such subsection;

**(2)** the original affected unit's baseline, the actual and allowable 1985 emissions rate for sulfur dioxide, and the authorized annual allowance allocation stated in table A;

**(3)** calculation of the annual average tonnage for calendar years 1985, 1986, and 1987, emitted by the substitute unit or units, based on the baseline for each unit, as defined in section 7651a(d) [1] of this title, multiplied by the lesser of the unit's actual or allowable 1985 emissions rate;

**(4)** the emissions rates and tonnage limitations that would be applicable to the original and substitute affected units under the substitution proposal;

**(5)** documentation, to the satisfaction of the Administrator, that the reassigned tonnage limits will, in total, achieve the same or greater emissions reduction than would have been achieved by the original affected unit and the substitute unit or units without such substitution; and

**(6)** such other information as the Administrator may require.

(c) Administrator's action on substitution proposals

**(1)** The Administrator shall take final action on such substitution proposal in accordance with section 7651g(c) of this title if the substitution proposal fulfills the requirements of this subsection. The Administrator may approve a substitution proposal in whole or in part and with such modifications or conditions as may be consistent with the orderly functioning of the allowance system and which will ensure the emissions reductions contemplated by this subchapter. If a proposal does not meet the requirements of subsection (b) of this section, the Administrator shall disapprove it. The owner or operator of a unit listed in table A shall not substitute another unit or units without the prior approval of the Administrator.

**(2)** Upon approval of a substitution proposal, each substitute unit, and each source with such unit, shall be deemed affected under this subchapter, and the Administrator shall issue a permit to the original and substitute affected source and unit in accordance with the approved substitution plan and section 7651g of this title. The Administrator shall allocate allowances for the original and substitute affected units in accordance with the approved substitution proposal pursuant to section 7651b of this title. It shall be unlawful for any source or unit that is allocated allowances pursuant to this section to emit sulfur dioxide in excess

ADD94

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    2

of the emissions limitation provided for in the approved substitution permit and plan unless the owner or operator of each unit governed by the permit and approved substitution plan holds allowances to emit not less than the units[2] total annual emissions. The owner or operator of any original or substitute affected unit operated in violation of this subsection shall be fully liable for such violation, including liability for fulfilling the obligations specified in section 7651j of this title. If a substitution proposal is disapproved, the Administrator shall allocate allowances to the original affected unit or units in accordance with subsection (a) of this section.


(d) Eligible phase I extension units


**(1)** The owner or operator of any affected unit subject to an emissions limitation requirement under this section may petition the Administrator in its permit application under section 7651g of this title for an extension of 2 years of the deadline for meeting such requirement, provided that the owner or operator of any such unit holds allowances to emit not less than the unit's total annual emissions for each of the 2 years of the period of extension. To qualify for such an extension, the affected unit must either employ a qualifying phase I technology, or transfer its phase I emissions reduction obligation to a unit employing a qualifying phase I technology. Such transfer shall be accomplished in accordance with a compliance plan, submitted and approved under section 7651g of this title, that shall govern operations at all units included in the transfer, and that specifies the emissions reduction requirements imposed pursuant to this subchapter.


**(2)** Such extension proposal shall--


**(A)** specify the unit or units proposed for designation as an eligible phase I extension unit;


**(B)** provide a copy of an executed contract, which may be contingent upon the Administrator approving the proposal, for the design engineering, and construction of the qualifying phase I technology for the extension unit, or for the unit or units to which the extension unit's emission reduction obligation is to be transferred;


**(C)** specify the unit's or units' baseline, actual 1985 emissions rate, allowable 1985 emissions rate, and projected utilization for calendar years 1995 through 1999;


**(D)** require CEMS on both the eligible phase I extension unit or units and the transfer unit or units beginning no later than January 1, 1995; and


**(E)** specify the emission limitation and number of allowances expected to be necessary for annual operation after the qualifying phase I technology has been installed.


**(3)** The Administrator shall review and take final action on each extension proposal in order of receipt, consistent with section 7651g of this title, and for an approved proposal shall designate the unit or units as an eligible phase I extension unit. The Administrator may approve an extension proposal in whole or in part, and with such modifications or conditions as may be necessary, consistent with the orderly functioning of the allowance system, and to ensure the emissions reductions contemplated by the[3] subchapter.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**(4)** In order to determine the number of proposals eligible for allocations from the reserve under subsection (a)(2) of this section and the number of allowances remaining available after each proposal is acted upon, the Administrator shall reduce the total number of allowances remaining available in the reserve by the number of allowances calculated according to subparagraphs (A), (B) and (C) until either no allowances remain available in the reserve for further allocation or all approved proposals have been acted upon. If no allowances remain available in the reserve for further allocation before all proposals have been acted upon by the Administrator, any pending proposals shall be disapproved. The Administrator shall calculate allowances equal to--

**(A)** the difference between the lesser of the average annual emissions in calendar years 1988 and 1989 or the projected emissions tonnage for calendar year 1995 of each eligible phase I extension unit, as designated under paragraph (3), and the product of the unit's baseline multiplied by an emission rate of 2.50 lbs/mmBtu, divided by 2,000;

**(B)** the difference between the lesser of the average annual emissions in calendar years 1988 and 1989 or the projected emissions tonnage for calendar year 1996 of each eligible phase I extension unit, as designated under paragraph (3), and the product of the unit's baseline multiplied by an emission rate of 2.50 lbs/mmBtu, divided by 2,000; and

**(C)** the amount by which (i) the product of each unit's baseline multiplied by an emission rate of 1.20 lbs/mmBtu, divided by 2,000, exceeds (ii) the tonnage level specified under subparagraph (E) of paragraph (2) of this subsection multiplied by a factor of 3.

**(5)** Each eligible Phase I extension unit shall receive allowances determined under subsection (a)(1) or (c) of this section. In addition, for calendar year 1995, the Administrator shall allocate to each eligible Phase I extension unit, from the allowance reserve created pursuant to subsection (a)(2) of this section, allowances equal to the difference between the lesser of the average annual emissions in calendar years 1988 and 1989 or its projected emissions tonnage for calendar year 1995 and the product of the unit's baseline multiplied by an emission rate of 2.50 lbs/mmBtu, divided by 2,000. In calendar year 1996, the Administrator shall allocate for each eligible unit, from the allowance reserve created pursuant to subsection (a)(2) of this section, allowances equal to the difference between the lesser of the average annual emissions in calendar years 1988 and 1989 or its projected emissions tonnage for calendar year 1996 and the product of the unit's baseline multiplied by an emission rate of 2.50 lbs/mmBtu, divided by 2,000. It shall be unlawful for any source or unit subject to an approved extension plan under this subsection to emit sulfur dioxide in excess of the emissions limitations provided for in the permit and approved extension plan, unless the owner or operator of each unit governed by the permit and approved plan holds allowances to emit not less than the unit's total annual emissions.

**(6)** In addition to allowances specified in paragraph (5), the Administrator shall allocate for each eligible Phase I extension unit employing qualifying Phase I technology, for calendar years 1997, 1998, and 1999, additional allowances, from any remaining allowances in the reserve created pursuant to subsection (a)(2) of this section, following the reduction in the reserve provided for in paragraph (4), not to exceed the amount by which (A) the product of each eligible unit's baseline times an emission rate of 1.20 lbs/mmBtu, divided by 2,000, exceeds (B) the tonnage level specified under subparagraph (E) of paragraph (2) of this subsection.

**(7)** After January 1, 1997, in addition to any liability under this chapter, including under section 7651j of this title, if any eligible phase I extension unit employing qualifying phase I technology or any transfer unit under this subsection emits sulfur dioxide in excess of the annual tonnage limitation specified in the extension plan, as approved in paragraph (3) of this subsection, the Administrator shall, in the calendar year following such excess, deduct allowances equal to the amount of such excess from such unit's annual allowance allocation.

ADD96

(e) Allocation of allowances

**(1)** In the case of a unit that receives authorization from the Governor of the State in which such unit is located to make reductions in the emissions of sulfur dioxide prior to calendar year 1995 and that is part of a utility system that meets the following requirements: (A) the total coal-fired generation within the utility system as a percentage of total system generation decreased by more than 20 percent between January 1, 1980, and December 31, 1985; and (B) the weighted capacity factor of all coal-fired units within the utility system averaged over the period from January 1, 1985, through December 31, 1987, was below 50 percent, the Administrator shall allocate allowances under this paragraph for the unit pursuant to this subsection. The Administrator shall allocate allowances for a unit that is an affected unit pursuant to section 7651d of this title (but is not also an affected unit under this section) and part of a utility system that includes 1 or more affected units under section 7651d of this title for reductions in the emissions of sulfur dioxide made during the period 1995-1999 if the unit meets the requirements of this subsection and the requirements of the preceding sentence, except that for the purposes of applying this subsection to any such unit, the prior year concerned as specified below, shall be any year after January 1, 1995 but prior to January 1, 2000.

**(2)** In the case of an affected unit under this section described in subparagraph (A),[4] the allowances allocated under this subsection for early reductions in any prior year may not exceed the amount which (A) the product of the unit's baseline multiplied by the unit's 1985 actual sulfur dioxide emission rate (in lbs. per mmBtu), divided by 2,000, exceeds (B) the allowances specified for such unit in Table A. In the case of an affected unit under section 7651d of this title described in subparagraph (A),[4] the allowances awarded under this subsection for early reductions in any prior year may not exceed the amount by which (i) the product of the quantity of fossil fuel consumed by the unit (in mmBtu) in the prior year multiplied by the lesser of 2.50 or the most stringent emission rate (in lbs. per mmBtu) applicable to the unit under the applicable implementation plan, divided by 2,000, exceeds (ii) the unit's actual tonnage of sulfur dioxide emission for the prior year concerned. Allowances allocated under this subsection for units referred to in subparagraph (A)[4] may be allocated only for emission reductions achieved as a result of physical changes or changes in the method of operation made after November 15, 1990, including changes in the type or quality of fossil fuel consumed.

**(3)** In no event shall the provisions of this paragraph[5] be interpreted as an event of force majeur[6] or a commercial impractibility[7] or in any other way as a basis for excused nonperformance by a utility system under a coal sales contract in effect before November 15, 1990.

### TABLE A. AFFECTED SOURCES AND UNITS IN PHASE I AND THEIR SULFUR DIOXIDE ALLOWANCES (TONS)

| State | Plant Name | Generator | Phase I Allowances |
|---|---|---|---|
| Alabama....................................................Colbert........................................................... | | 1 | 13,570 |
| | | 2 | 15,310 |
| | | 3 | 15,400 |
| | | 4 | 15,410 |
| | | 5 | 37,180 |

ADD97

|  |  |  |  |
|---|---|---|---|
|  | E.C. Gaston | 1 | 18,100 |
|  |  | 2 | 18,540 |
|  |  | 3 | 18,310 |
|  |  | 4 | 19,280 |
|  |  | 5 | 59,840 |
| Florida | Big Bend | 1 | 28,410 |
|  |  | 2 | 27,100 |
|  |  | 3 | 26,740 |
|  | Crist | 6 | 19,200 |
|  |  | 7 | 31,680 |
| Georgia | Bowen | 1 | 56,320 |
|  |  | 2 | 54,770 |
|  |  | 3 | 71,750 |
|  |  | 4 | 71,740 |
|  | Hammond | 1 | 8,780 |
|  |  | 2 | 9,220 |
|  |  | 3 | 8,910 |
|  |  | 4 | 37,640 |
|  | J. McDonough | 1 | 19,910 |
|  |  | 2 | 20,600 |
|  | Wansley | 1 | 70,770 |
|  |  | 2 | 65,430 |
|  | Yates | 1 | 7,210 |
|  |  | 2 | 7,040 |
|  |  | 3 | 6,950 |
|  |  | 4 | 8,910 |
|  |  | 5 | 9,410 |
|  |  | 6 | 24,760 |
|  |  | 7 | 21,480 |

ADD98

| | | | |
|---|---|---|---|
| Illinois | Baldwin | 1 | 42,010 |
| | | 2 | 44,420 |
| | | 3 | 42,550 |
| | Coffeen | 1 | 11,790 |
| | | 2 | 35,670 |
| | Grand Tower | 4 | 5,910 |
| | Hennepin | 2 | 18,410 |
| | Joppa Steam | 1 | 12,590 |
| | | 2 | 10,770 |
| | | 3 | 12,270 |
| | | 4 | 11,360 |
| | | 5 | 11,420 |
| | | 6 | 10,620 |
| | Kincaid | 1 | 31,530 |
| | | 2 | 33,810 |
| | Meredosia | 3 | 13,890 |
| | Vermilion | 2 | 8,880 |
| Indiana | Bailly | 7 | 11,180 |
| | | 8 | 15,630 |
| | Breed | 1 | 18,500 |
| | Cayuga | 1 | 33,370 |
| | | 2 | 34,130 |
| | Clifty Creek | 1 | 20,150 |
| | | 2 | 19,810 |
| | | 3 | 20,410 |
| | | 4 | 20,080 |
| | | 5 | 19,360 |
| | | 6 | 20,380 |
| | E.W. Stout | 5 | 3,880 |

ADD99

|  |  |  |
|---|---|---|
|  | 6 | 4,770 |
|  | 7 | 23,610 |
| F.B. Culley............................................... | 2 | 4,290 |
|  | 3 | 16,970 |
| F.E. Ratts............................................... | 1 | 8,330 |
|  | 2 | 8,480 |
| Gibson............................................... | 1 | 40,400 |
|  | 2 | 41,010 |
|  | 3 | 41,080 |
|  | 4 | 40,320 |
| H.T. Pritchard............................................... | 6 | 5,770 |
| Michigan City............................................... | 12 | 23,310 |
| Petersburg............................................... | 1 | 16,430 |
|  | 2 | 32,380 |
| R. Gallagher............................................... | 1 | 6,490 |
|  | 2 | 7,280 |
|  | 3 | 6,530 |
|  | 4 | 7,650 |
| Tanners Creek............................................... | 4 | 24,820 |
| Wabash River............................................... | 1 | 4,000 |
|  | 2 | 2,860 |
|  | 3 | 3,750 |
|  | 5 | 3,670 |
|  | 6 | 12,280 |
| Warrick............................................... | 4 | 26,980 |
| Iowa...............................................Burlington............................................... | 1 | 10,710 |
| Des Moines............................................... | 7 | 2,320 |
| George Neal............................................... | 1 | 1,290 |
| M.L. Kapp............................................... | 2 | 13,800 |

ADD100

|  |  |  |  |
|---|---|---|---|
|  | Prairie Creek | 4 | 8,180 |
|  | Riverside | 5 | 3,990 |
| Kansas | Quindaro | 2 | 4,220 |
| Kentucky | Coleman | 1 | 11,250 |
|  |  | 2 | 12,840 |
|  |  | 3 | 12,340 |
|  | Cooper | 1 | 7,450 |
|  |  | 2 | 15,320 |
|  | E.W. Brown | 1 | 7,110 |
|  |  | 2 | 10,910 |
|  |  | 3 | 26,100 |
|  | Elmer Smith | 1 | 6,520 |
|  |  | 2 | 14,410 |
|  | Ghent | 1 | 28,410 |
|  | Green River | 4 | 7,820 |
|  | H.L. Spurlock | 1 | 22,780 |
|  | Henderson II | 1 | 13,340 |
|  |  | 2 | 12,310 |
|  | Paradise | 3 | 59,170 |
|  | Shawnee | 10 | 10,170 |
| Maryland | Chalk Point | 1 | 21,910 |
|  |  | 2 | 24,330 |
|  | C.P. Crane | 1 | 10,330 |
|  |  | 2 | 9,230 |
|  | Morgantown | 1 | 35,260 |
|  |  | 2 | 38,480 |
| Michigan | J.H. Campbell | 1 | 19,280 |
|  |  | 2 | 23,060 |
| Minnesota | High Bridge | 6 | 4,270 |

ADD101

| | | | |
|---|---|---|---|
| Mississippi | Jack Watson | 4 | 17,910 |
| | | 5 | 36,700 |
| Missouri | Asbury | 1 | 16,190 |
| | James River | 5 | 4,850 |
| | Labadie | 1 | 40,110 |
| | | 2 | 37,710 |
| | | 3 | 40,310 |
| | | 4 | 35,940 |
| | Montrose | 1 | 7,390 |
| | | 2 | 8,200 |
| | | 3 | 10,090 |
| | New Madrid | 1 | 28,240 |
| | | 2 | 32,480 |
| | Sibley | 3 | 15,580 |
| | Sioux | 1 | 22,570 |
| | | 2 | 23,690 |
| | Thomas Hill | 1 | 10,250 |
| | | 2 | 19,390 |
| New Hampshire | Merrimack | 1 | 10,190 |
| | | 2 | 22,000 |
| New Jersey | B.L. England | 1 | 9,060 |
| | | 2 | 11,720 |
| New York | Dunkirk | 3 | 12,600 |
| | | 4 | 14,060 |
| | Greenidge | 4 | 7,540 |
| | Milliken | 1 | 11,170 |
| | | 2 | 12,410 |
| | Northport | 1 | 19,810 |
| | | 2 | 24,110 |

ADD102

|  |  |  |  |
|---|---|---|---|
|  |  | 3 | 26,480 |
|  | Port Jefferson...............................................| 3 | 10,470 |
|  |  | 4 | 12,330 |
| Ohio........................................................... | Ashtabula........................................ | 5 | 16,740 |
|  | Avon Lake...................................... | 8 | 11,650 |
|  |  | 9 | 30,480 |
|  | Cardinal......................................... | 1 | 34,270 |
|  |  | 2 | 38,320 |
|  | Conesville..................................... | 1 | 4,210 |
|  |  | 2 | 4,890 |
|  |  | 3 | 5,500 |
|  |  | 4 | 48,770 |
|  | Eastlake......................................... | 1 | 7,800 |
|  |  | 2 | 8,640 |
|  |  | 3 | 10,020 |
|  |  | 4 | 14,510 |
|  |  | 5 | 34,070 |
|  | Edgewater..................................... | 4 | 5,050 |
|  | Gen. J.M. Gavin........................................ | 1 | 79,080 |
|  |  | 2 | 80,560 |
|  | Kyger Creek................................... | 1 | 19,280 |
|  |  | 2 | 18,560 |
|  |  | 3 | 17,910 |
|  |  | 4 | 18,710 |
|  |  | 5 | 18,740 |
|  | Miami Fort..................................... | 5 | 760 |
|  |  | 6 | 11,380 |
|  |  | 7 | 38,510 |
|  | Muskingum River........................................ | 1 | 14,880 |

ADD103

| | | | |
|---|---|---|---|
| | | 2 | 14,170 |
| | | 3 | 13,950 |
| | | 4 | 11,780 |
| | | 5 | 40,470 |
| | Niles............................................................ | 1 | 6,940 |
| | | 2 | 9,100 |
| | Picway........................................................ | 5 | 4,930 |
| | R.E. Burger................................................ | 3 | 6,150 |
| | | 4 | 10,780 |
| | | 5 | 12,430 |
| | W.H. Sammis............................................. | 5 | 24,170 |
| | | 6 | 39,930 |
| | | 7 | 43,220 |
| | W.C. Beckjord........................................... | 5 | 8,950 |
| | | 6 | 23,020 |
| Pennsylvania...................................... | Armstrong.................................................. | 1 | 14,410 |
| | | 2 | 15,430 |
| | Brunner Island.......................................... | 1 | 27,760 |
| | | 2 | 31,100 |
| | | 3 | 53,820 |
| | Cheswick.................................................... | 1 | 39,170 |
| | Conemaugh................................................. | 1 | 59,790 |
| | | 2 | 66,450 |
| | Hatfield's Ferry......................................... | 1 | 37,830 |
| | | 2 | 37,320 |
| | | 3 | 40,270 |
| | Martins Creek............................................ | 1 | 12,660 |
| | | 2 | 12,820 |
| | Portland..................................................... | 1 | 5,940 |

ADD104

| | | | |
|---|---|---|---|
| | | 2 | 10,230 |
| | Shawville..................................................... | 1 | 10,320 |
| | | 2 | 10,320 |
| | | 3 | 14,220 |
| | | 4 | 14,070 |
| | Sunbury...................................................... | 3 | 8,760 |
| | | 4 | 11,450 |
| Tennessee....................................................... | Allen............................................................... | 1 | 15,320 |
| | | 2 | 16,770 |
| | | 3 | 15,670 |
| | Cumberland................................................. | 1 | 86,700 |
| | | 2 | 94,840 |
| | Gallatin....................................................... | 1 | 17,870 |
| | | 2 | 17,310 |
| | | 3 | 20,020 |
| | | 4 | 21,260 |
| | Johnsonville................................................ | 1 | 7,790 |
| | | 2 | 8,040 |
| | | 3 | 8,410 |
| | | 4 | 7,990 |
| | | 5 | 8,240 |
| | | 6 | 7,890 |
| | | 7 | 8,980 |
| | | 8 | 8,700 |
| | | 9 | 7,080 |
| | | 10 | 7,550 |
| West Virginia..............................................Albright.............................................. | | 3 | 12,000 |
| | Fort Martin................................................. | 1 | 41,590 |
| | | 2 | 41,200 |

ADD105

|  |  |  |  |
|---|---|---|---|
|  | Harrison.............................................. | 1 | 48,620 |
|  |  | 2 | 46,150 |
|  |  | 3 | 41,500 |
|  | Kammer.............................................. | 1 | 18,740 |
|  |  | 2 | 19,460 |
|  |  | 3 | 17,390 |
|  | Mitchell.............................................. | 1 | 43,980 |
|  |  | 2 | 45,510 |
|  | Mount Storm....................................... | 1 | 43,720 |
|  |  | 2 | 35,580 |
|  |  | 3 | 42,430 |
| Wisconsin.............................................. | Edgewater.......................................... | 4 | 24,750 |
|  | La Crosse/Genoa................................. | 3 | 22,700 |
|  | Nelson Dewey..................................... | 1 | 6,010 |
|  |  | 2 | 6,680 |
|  | N. Oak Creek...................................... | 1 | 5,220 |
|  |  | 2 | 5,140 |
|  |  | 3 | 5,370 |
|  |  | 4 | 6,320 |
|  | Pulliam.............................................. | 8 | 7,510 |
|  | S. Oak Creek....................................... | 5 | 9,670 |
|  |  | 6 | 12,040 |
|  |  | 7 | 16,180 |
|  |  | 8 | 15,790 |

(f) Energy conservation and renewable energy

(1) Definitions

As used in this subsection:

ADD106

(A) Qualified energy conservation measure

The term "qualified energy conservation measure" means a cost effective measure, as identified by the Administrator in consultation with the Secretary of Energy, that increases the efficiency of the use of electricity provided by an electric utility to its customers.

(B) Qualified renewable energy

The term "qualified renewable energy" means energy derived from biomass, solar, geothermal, or wind as identified by the Administrator in consultation with the Secretary of Energy.

(C) Electric utility

The term "electric utility" means any person, State agency, or Federal agency, which sells electric energy.

(2) Allowances for emissions avoided through energy conservation and renewable energy

(A) In general

The regulations under paragraph (4) of this subsection shall provide that for each ton of sulfur dioxide emissions avoided by an electric utility, during the applicable period, through the use of qualified energy conservation measures or qualified renewable energy, the Administrator shall allocate a single allowance to such electric utility, on a first-come-first-served basis from the Conservation and Renewable Energy Reserve established under subsection (g) of this section, up to a total of 300,000 allowances for allocation from such Reserve.

(B) Requirements for issuance

The Administrator shall allocate allowances to an electric utility under this subsection only if all of the following requirements are met:

(i) Such electric utility is paying for the qualified energy conservation measures or qualified renewable energy directly or through purchase from another person.

(ii) The emissions of sulfur dioxide avoided through the use of qualified energy conservation measures or qualified renewable energy are quantified in accordance with regulations promulgated by the Administrator under this subsection.

(iii)(I) Such electric utility has adopted and is implementing a least cost energy conservation and electric power plan which evaluates a range of resources, including new power supplies, energy conservation, and renewable energy resources, in order to meet expected future demand at the lowest system cost.

(II) The qualified energy conservation measures or qualified renewable energy, or both, are consistent with that plan.

ADD107

**(III)** Electric utilities subject to the jurisdiction of a State regulatory authority must have such plan approved by such authority. For electric utilities not subject to the jurisdiction of a State regulatory authority such plan shall be approved by the entity with rate-making authority for such utility.

**(iv)** In the case of qualified energy conservation measures undertaken by a State regulated electric utility, the Secretary of Energy certifies that the State regulatory authority with jurisdiction over the electric rates of such electric utility has established rates and charges which ensure that the net income of such electric utility after implementation of specific cost effective energy conservation measures is at least as high as such net income would have been if the energy conservation measures had not been implemented. Upon the date of any such certification by the Secretary of Energy, all allowances which, but for this paragraph, would have been allocated under subparagraph (A) before such date, shall be allocated to the electric utility. This clause is not a requirement for qualified renewable energy.

**(v)** Such utility or any subsidiary of the utility's holding company owns or operates at least one affected unit.

(C) Period of applicability

Allowances under this subsection shall be allocated only with respect to kilowatt hours of electric energy saved by qualified energy conservation measures or generated by qualified renewable energy after January 1, 1992 and before the earlier of (i) December 31, 2000, or (ii) the date on which any electric utility steam generating unit owned or operated by the electric utility to which the allowances are allocated becomes subject to this subchapter (including those sources that elect to become affected by this subchapter, pursuant to section 7651i of this title).

(D) Determination of avoided emissions

(i) [8] Application

In order to receive allowances under this subsection, an electric utility shall make an application which--

**(I)** designates the qualified energy conservation measures implemented and the qualified renewable energy sources used for purposes of avoiding emissions, [9]

**(II)** calculates, in accordance with subparagraphs (F) and (G), the number of tons of emissions avoided by reason of the implementation of such measures or the use of such renewable energy sources; and

**(III)** demonstrates that the requirements of subparagraph (B) have been met.

Such application for allowances by a State-regulated electric utility shall require approval by the State regulatory authority with jurisdiction over such electric utility. The authority shall review the application for accuracy and compliance with this subsection and the rules under this subsection. Electric utilities whose retail rates are not subject to the jurisdiction of a State regulatory authority shall apply directly to the Administrator for such approval.

ADD108

(E) Avoided emissions from qualified energy conservation measures

For the purposes of this subsection, the emission tonnage deemed avoided by reason of the implementation of qualified energy conservation measures for any calendar year shall be a tonnage equal to the product of multiplying--

    **(i)** the kilowatt hours that would otherwise have been supplied by the utility during such year in the absence of such qualified energy conservation measures, by

    **(ii)** 0.004,

    and dividing by 2,000.

(F) Avoided emissions from the use of qualified renewable energy

The emissions tonnage deemed avoided by reason of the use of qualified renewable energy by an electric utility for any calendar year shall be a tonnage equal to the product of multiplying--

    **(i)** the actual kilowatt hours generated by, or purchased from, qualified renewable energy, by

    **(ii)** 0.004,

    and dividing by 2,000.

(G) Prohibitions

    **(i)** No allowances shall be allocated under this subsection for the implementation of programs that are exclusively informational or educational in nature.

    **(ii)** No allowances shall be allocated for energy conservation measures or renewable energy that were operational before January 1, 1992.

(3) Savings provision

Nothing in this subsection precludes a State or State regulatory authority from providing additional incentives to utilities to encourage investment in demand-side resources.

(4) Regulations

Not later than 18 months after November 15, 1990, and in conjunction with the regulations required to be promulgated under subsections (b) and (c) of this section, the Administrator shall, in consultation with the Secretary of Energy, promulgate regulations under this subsection. Such regulations shall list energy conservation measures and renewable energy sources

ADD109

which may be treated as qualified energy conservation measures and qualified renewable energy for purposes of this subsection. Allowances shall only be allocated if all requirements of this subsection and the rules promulgated to implement this subsection are complied with. The Administrator shall review the determinations of each State regulatory authority under this subsection to encourage consistency from electric utility to electric utility and from State to State in accordance with the Administrator's rules. The Administrator shall publish the findings of this review no less than annually.

(g) Conservation and Renewable Energy Reserve

The Administrator shall establish a Conservation and Renewable Energy Reserve under this subsection. Beginning on January 1, 1995, the Administrator may allocate from the Conservation and Renewable Energy Reserve an amount equal to a total of 300,000 allowances for emissions of sulfur dioxide pursuant to section 7651b of this title. In order to provide 300,000 allowances for such reserve, in each year beginning in calendar year 2000 and until calendar year 2009, inclusive, the Administrator shall reduce each unit's basic Phase II allowance allocation on the basis of its pro rata share of 30,000 allowances. If allowances remain in the reserve after January 2, 2010, the Administrator shall allocate such allowances for affected units under section 7651d of this title on a pro rata basis. For purposes of this subsection, for any unit subject to the emissions limitation requirements of section 7651d of this title, the term "pro rata basis" refers to the ratio which the reductions made in such unit's allowances in order to establish the reserve under this subsection bears to the total of such reductions for all such units.

(h) Alternative allowance allocation for units in certain utility systems with optional baseline

(1) Optional baseline for units in certain systems

In the case of a unit subject to the emissions limitation requirements of this section which (as of November 15, 1990)--

**(A)** has an emission rate below 1.0 lbs/mmBtu,

**(B)** has decreased its sulfur dioxide emissions rate by 60 percent or greater since 1980, and

**(C)** is part of a utility system which has a weighted average sulfur dioxide emissions rate for all fossil fueled-fired units below 1.0 lbs/mmBtu,

at the election of the owner or operator of such unit, the unit's baseline may be calculated (i) as provided under section 7651a(d) [10] of this title, or (ii) by utilizing the unit's average annual fuel consumption at a 60 percent capacity factor. Such election shall be made no later than March 1, 1991.

(2) Allowance allocation

Whenever a unit referred to in paragraph (1) elects to calculate its baseline as provided in clause (ii) of paragraph (1), the Administrator shall allocate allowances for the unit pursuant to section 7651b(a)(1) of this title, this section, and section 7651d of this title (as basic Phase II allowance allocations) in an amount equal to the baseline selected multiplied by the lower of the average annual emission rate for such unit in 1989, or 1.0 lbs./mmBtu. Such allowance allocation shall be in lieu of any allocation of allowances under this section and section 7651d of this title.

**CREDIT(S)**

CA Case #15-1363    Document #1605913      Filed: 03/28/2016    Page 116 of 2

Public Law 101–549
101st Congress

## An Act

To amend the Clean Air Act to provide for attainment and maintenance of health protective national ambient air quality standards, and for other purposes.

Nov. 15, 1990
[S. 1630]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Air pollution control.

# TITLE I—PROVISIONS FOR ATTAINMENT AND MAINTENANCE OF NATIONAL AMBIENT AIR QUALITY STANDARDS

Sec. 101. General planning requirements.
Sec. 102. General provisions for nonattainment areas.
Sec. 103. Additional provisions for ozone nonattainment areas.
Sec. 104. Additional provisions for carbon monoxide nonattainment areas.
Sec. 105. Additional provisions for particulate matter (PM-10) nonattainment areas.
Sec. 106. Additional provisions for areas designated nonattainment for sulfur oxides, nitrogen dioxide, and lead.
Sec. 107. Provisions related to Indian tribes.
Sec. 108. Miscellaneous provisions.
Sec. 109. Interstate pollution.
Sec. 110. Conforming amendments.
Sec. 111. Transportation system impacts on clean air.

**SEC. 101. GENERAL PLANNING REQUIREMENTS.**

(a) AREA DESIGNATIONS.—Section 107(d) of the Clean Air Act (42 U.S.C. 7407(d)) is amended to read as follows:

Intergovernmental relations.

"(d) DESIGNATIONS.—
    "(1) DESIGNATIONS GENERALLY.—
        "(A) SUBMISSION BY GOVERNORS OF INITIAL DESIGNATIONS FOLLOWING PROMULGATION OF NEW OR REVISED STANDARDS.—By such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised national ambient air quality standard for any pollutant under section 109, the Governor of each State shall (and at any other time the Governor of a State deems appropriate the Governor may) submit to the Administrator a list of all areas (or portions thereof) in the State, designating as—
            "(i) nonattainment, any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant,
            "(ii) attainment, any area (other than an area identified in clause (i)) that meets the national primary or secondary ambient air quality standard for the pollutant, or
            "(iii) unclassifiable, any area that cannot be classified on the basis of available information as meeting or not

SCA Case #15-1363    Document #1605913    Filed: 03/28/2016    Page 117 of 21

exterior boundaries of the reservation or other areas within the tribe's jurisdiction; and

"(C) the Indian tribe is reasonably expected to be capable, in the judgment of the Administrator, of carrying out the functions to be exercised in a manner consistent with the terms and purposes of this Act and all applicable regulations.

"(3) The Administrator may promulgate regulations which establish the elements of tribal implementation plans and procedures for approval or disapproval of tribal implementation plans and portions thereof.

"(4) In any case in which the Administrator determines that the treatment of Indian tribes as identical to States is inappropriate or administratively infeasible, the Administrator may provide, by regulation, other means by which the Administrator will directly administer such provisions so as to achieve the appropriate purpose.

"(5) Until such time as the Administrator promulgates regulations pursuant to this subsection, the Administrator may continue to provide financial assistance to eligible Indian tribes under section 105.".

### SEC. 108. MISCELLANEOUS GUIDANCE.

(a) TRANSPORTATION PLANNING GUIDANCE.—Section 108(e) of the Clean Air Act is amended by deleting the first sentence and inserting in lieu thereof the following: "The Administrator shall, after consultation with the Secretary of Transportation, and after providing public notice and opportunity for comment, and with State and local officials, within nine months after enactment of the Clean Air Act Amendments of 1989 and periodically thereafter as necessary to maintain a continuous transportation-air quality planning process, update the June 1978 Transportation-Air Quality Planning Guidelines and publish guidance on the development and implementation of transportation and other measures necessary to demonstrate and maintain attainment of national ambient air quality standards.". *42 USC 7408.*

(b) TRANSPORTATION CONTROL MEASURES.—Section 108(f)(1) of the Clean Air Act is amended by deleting all after "(f)" through the end of subparagraph (A) and inserting in lieu thereof the following:

"(1) The Administrator shall publish and make available to appropriate Federal, State, and local environmental and transportation agencies not later than one year after enactment of the Clean Air Act Amendments of 1990, and from time to time thereafter— *Public information.*

"(A) information prepared, as appropriate, in consultation with the Secretary of Transportation, and after providing public notice and opportunity for comment, regarding the formulation and emission reduction potential of transportation control measures related to criteria pollutants and their precursors, including, but not limited to—

"(i) programs for improved public transit;

"(ii) restriction of certain roads or lanes to, or construction of such roads or lanes for use by, passenger buses or high occupancy vehicles;

"(iii) employer-based transportation management plans, including incentives;

"(iv) trip-reduction ordinances;

"(v) traffic flow improvement programs that achieve emission reductions;

"(vi) fringe and transportation corridor parking facilities serving multiple occupancy vehicle programs or transit service;

"(vii) programs to limit or restrict vehicle use in downtown areas or other areas of emission concentration particularly during periods of peak use;

"(viii) programs for the provision of all forms of high-occupancy, shared-ride services;

"(ix) programs to limit portions of road surfaces or certain sections of the metropolitan area to the use of non-motorized vehicles or pedestrian use, both as to time and place;

"(x) programs for secure bicycle storage facilities and other facilities, including bicycle lanes, for the convenience and protection of bicyclists, in both public and private areas;

"(xi) programs to control extended idling of vehicles;

"(xii) programs to reduce motor vehicle emissions, consistent with title II, which are caused by extreme cold start conditions;

"(xiii) employer-sponsored programs to permit flexible work schedules;

"(xiv) programs and ordinances to facilitate non-automobile travel, provision and utilization of mass transit, and to generally reduce the need for single-occupant vehicle travel, as part of transportation planning and development efforts of a locality, including programs and ordinances applicable to new shopping centers, special events, and other centers of vehicle activity;

"(xv) programs for new construction and major reconstructions of paths, tracks or areas solely for the use by pedestrian or other non-motorized means of transportation when economically feasible and in the public interest. For purposes of this clause, the Administrator shall also consult with the Secretary of the Interior; and

"(xvi) program to encourage the voluntary removal from use and the marketplace of pre-1980 model year light duty vehicles and pre-1980 model light duty trucks.".

(c) RACT/BACT/LAER CLEARINGHOUSE.—Section 108 of the Clean Air Act (42 U.S.C. 7408) is amended by adding the following at the end thereof:

"(h) RACT/BACT/LAER CLEARINGHOUSE.—The Administrator shall make information regarding emission control technology available to the States and to the general public through a central database. Such information shall include all control technology information received pursuant to State plan provisions requiring permits for sources, including operating permits for existing sources.".

(d) STATE REPORTS ON EMISSIONS-RELATED DATA.—Section 110 of the Clean Air Act (42 U.S.C. 7410) is amended by adding the following new subsection after subsection (o):

"(p) REPORTS.—Any State shall submit, according to such schedule as the Administrator may prescribe, such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development effectiveness,

need for revision, or implementation of any plan or plan revision required under this Act.".

(e) NEW SOURCE STANDARDS OF PERFORMANCE.—(1) Section 111(b)(1)(B) of the Clean Air Act (42 U.S.C. 7411(b)(1)(B)) is amended as follows:

(A) Strike "120 days" and insert "one year".

(B) Strike "90 days" and insert "one year".

(C) Strike "four years" and insert "8 years".

(D) Immediately before the sentence beginning "Standards of performance or revisions thereof" insert "Notwithstanding the requirements of the previous sentence, the Administrator need not review any such standard if the Administrator determines that such review is not appropriate in light of readily available information on the efficacy of such standard.".

(E) Add the following at the end: "When implementation and enforcement of any requirement of this Act indicate that emission limitations and percent reductions beyond those required by the standards promulgated under this section are achieved in practice, the Administrator shall, when revising standards promulgated under this section, consider the emission limitations and percent reductions achieved in practice.".

(2) Section 111(f)(1) of the Clean Air Act (42 U.S.C. 7411(f)(1)) is amended to read as follows:

"(1) For those categories of major stationary sources that the Administrator listed under subsection (b)(1)(A) before the date of the enactment of the Clean Air Act Amendments of 1990 and for which regulations had not been proposed by the Administrator by such date, the Administrator shall—    *Regulations.*

"(A) propose regulations establishing standards of performance for at least 25 percent of such categories of sources within 2 years after the date of the enactment of the Clean Air Act Amendments of 1990;

"(B) propose regulations establishing standards of performance for at least 50 percent of such categories of sources within 4 years after the date of the enactment of the Clean Air Act Amendments of 1990; and

"(C) propose regulations for the remaining categories of sources within 6 years after the date of the enactment of the Clean Air Act Amendments of 1990.".

(f) SAVINGS CLAUSE.—Section 111(a)(3) of the Clean Air Act (42 U.S.C. 7411(f)(1)) is amended by adding at the end: "Nothing in title II of this Act relating to nonroad engines shall be construed to apply to stationary internal combustion engines.".

(g) REGULATION OF EXISTING SOURCES.—Section 111(d)(1)(A)(i) of the Clean Air Act (42 U.S.C. 7411(d)(1)(A)(i)) is amended by striking "or 112(b)(1)(A)" and inserting "or emitted from a source category which is regulated under section 112".

(h) CONSULTATION.—The penultimate sentence of section 121 of the Clean Air Act (42 U.S.C. 7421) is amended to read as follows: "The Administrator shall update as necessary the original regulations required and promulgated under this section (as in effect    *Regulations.* immediately before the date of the enactment of the Clean Air Act Amendments of 1990) to ensure adequate consultation.".

(i) DELEGATION.—The second sentence of section 301(a)(1) of the Clean Air Act (42 U.S.C. 7601(a)(1)) is amended by inserting "subject to section 307(d)" immediately following "regulations".

(j) DEFINITIONS.—Section 302 of the Clean Air Act (42 U.S.C. 7602) is amended as follows:

(1) Insert the following new subsections after subsection (r):

"(s) VOC.—The term 'VOC' means volatile organic compound, as defined by the Administrator.

"(t) PM-10.—The term 'PM-10' means particulate matter with an aerodynamic diameter less than or equal to a nominal ten micrometers, as measured by such method as the Administrator may determine.

"(u) NAAQS AND CTG.—The term 'NAAQS' means national ambient air quality standard. The term 'CTG' means a Control Technique Guideline published by the Administrator under section 108.

"(v) NO$_x$.—The term 'NO$_x$' means oxides of nitrogen.

"(w) CO.—The term 'CO' means carbon monoxide.

"(x) SMALL SOURCE.—The term 'small source' means a source that emits less than 100 tons of regulated pollutants per year, or any class of persons that the Administrator determines, through regulation, generally lack technical ability or knowledge regarding control of air pollution.

"(y) FEDERAL IMPLEMENTATION PLAN.—The term 'Federal implementation plan' means a plan (or portion thereof) promulgated by the Administrator to fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a State implementation plan, and which includes enforceable emission limitations or other control measures, means or techniques (including economic incentives, such as marketable permits or auctions of emissions allowances), and provides for attainment of the relevant national ambient air quality standard.".

(2) Section 302(g) of the Clean Air Act (42 U.S.C. 7602(g)) is amended by adding the following at the end: "Such term includes any precursors to the formation of any air pollutant, to the extent the Administrator has identified such precursor or precursors for the particular purpose for which the term 'air pollutant' is used.".

(k) POLLUTION PREVENTION.—Section 101 of the Clean Air Act (42 U.S.C. 7401) is amended as follows:

(1) Amend subsection (a)(3) to read as follows:

"(3) that air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments; and".

(2) Amend subsection (b)(4) by inserting "prevention and" immediately after "pollution".

(3) Add a new subsection (c) to read as follows:

"(c) POLLUTION PREVENTION.—A primary goal of this Act is to encourage or otherwise promote reasonable Federal, State, and local governmental actions, consistent with the provisions of this Act, for pollution prevention.".

(l) Part D of title I of the Clean Air Act is amended by adding a new subpart after subpart 5 as follows:

## "Subpart 6—Savings Provisions

"Sec. 193. General savings clause.

and sources subject to the provisions of this section and shall include aggregate information from the database in each annual report. The report shall include, but not be limited to—

"(1) a status report on standard-setting under subsections (d) and (f);

"(2) information with respect to compliance with such standards including the costs of compliance experienced by sources in various categories and subcategories;

"(3) development and implementation of the national urban air toxics program; and

"(4) recommendations of the Chemical Safety and Hazard Investigation Board with respect to the prevention and mitigation of accidental releases.".

## SEC. 302. CONFORMING AMENDMENTS.

42 USC 7411.

(a) Section 111(d)(1) of the Clean Air Act is amended by striking "112(b)(1)(A)" and inserting in lieu thereof "112(b)".

(b) Section 111 of the Clean Air Act is amended by striking paragraphs (g)(5) and (g)(6) and redesignating the succeeding paragraphs accordingly. Such section is further amended by striking "or section 112" in paragraph (g)(5) as redesignated in the preceding sentence.

42 USC 7414.

(c) Section 114(a) of the Clean Air Act is amended by striking "or" after "section 111," and by inserting ", or any regulation of solid waste combustion under section 129," after "section 112".

42 USC 7418.

(d) Section 118(b) of the Clean Air Act is amended by striking "112(c)" and inserting in lieu thereof "112(i)(4)".

42 USC 7602.

(e) Section 302(k) of the Clean Air Act is amended by adding before the period at the end thereof ", and any design, equipment, work practice or operational standard promulgated under this Act.".

42 USC 7604.

(f) Section 304(b) of the Clean Air Act is amended by striking "112(c)(1)(B)" and inserting in lieu thereof "112(i)(3)(A) or (f)(4)".

42 USC 7607.

(g) Section 307(b)(1) is amended by striking "112(c)" and inserting in lieu thereof "112".

(h) Section 307(d)(1) is amended by inserting—

"(D) the promulgation of any requirement for solid waste combustion under section 129,"

after subparagraph (C) and redesignating the succeeding subparagraphs accordingly.

42 USC 7412 note.

## SEC. 303. RISK ASSESSMENT AND MANAGEMENT COMMISSION.

(a) ESTABLISHMENT.—There is hereby established a Risk Assessment and Management Commission (hereafter referred to in this section as the "Commission"), which shall commence proceedings not later than 18 months after the date of enactment of the Clean Air Act Amendments of 1990 and which shall make a full investigation of the policy implications and appropriate uses of risk assessment and risk management in regulatory programs under various Federal laws to prevent cancer and other chronic human health effects which may result from exposure to hazardous substances.

(b) CHARGE.—The Commission shall consider—

(1) the report of the National Academy of Sciences authorized by section 112(o) of the Clean Air Act, the use and limitations of risk assessment in establishing emission or effluent standards, ambient standards, exposure standards, acceptable concentration levels, tolerances or other environmental criteria for hazardous substances that present a risk of carcinogenic effects

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter C. Air Programs
                Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
                    Subpart B. Adoption and Submittal of State Plans for Designated Facilities (Refs & Annos)

40 C.F.R. § 60.21

§ 60.21 Definitions.

Effective: April 16, 2012
Currentness

Terms used but not defined in this subpart shall have the meaning given them in the Act and in subpart A:

(a) Designated pollutant means any air pollutant, the emissions of which are subject to a standard of performance for new stationary sources, but for which air quality criteria have not been issued and that is not included on a list published under section 108(a) or section 112(b)(1)(A) of the Act.

(b) Designated facility means any existing facility (see § 60.2(aa)) which emits a designated pollutant and which would be subject to a standard of performance for that pollutant if the existing facility were an affected facility (see § 60.2(e)).

(c) Plan means a plan under section 111(d) of the Act which establishes emission standards for designated pollutants from designated facilities and provides for the implementation and enforcement of such emission standards.

(d) Applicable plan means the plan, or most recent revision thereof, which has been approved under § 60.27(b) or promulgated under § 60.27(d).

(e) Emission guideline means a guideline set forth in subpart C of this part, or in a final guideline document published under § 60.22(a), which reflects the degree of emission reduction achievable through the application of the best system of emission reduction which (taking into account the cost of such reduction) the Administrator has determined has been adequately demonstrated for designated facilities.

(f) Emission standard means a legally enforceable regulation setting forth an allowable rate of emissions into the atmosphere, establishing an allowance system, or prescribing equipment specifications for control of air pollution emissions.

(g) Compliance schedule means a legally enforceable schedule specifying a date or dates by which a source or category of sources must comply with specific emission standards contained in a plan or with any increments of progress to achieve such compliance.

ADD117

(h) Increments of progress means steps to achieve compliance which must be taken by an owner or operator of a designated facility, including:

    (1) Submittal of a final control plan for the designated facility to the appropriate air pollution control agency;

    (2) Awarding of contracts for emission control systems or for process modifications, or issuance of orders for the purchase of component parts to accomplish emission control or process modification;

    (3) Initiation of on-site construction or installation of emission control equipment or process change;

    (4) Completion of on-site construction or installation of emission control equipment or process change; and

    (5) Final compliance.

(i) Region means an air quality control region designated under section 107 of the Act and described in part 81 of this chapter.

(j) Local agency means any local governmental agency.

(k) [Reserved by 77 FR 9447].

**Credits**

[70 FR 28649, May 18, 2005; 77 FR 9447, Feb. 16, 2012]

SOURCE: 36 FR 24877, Dec. 23, 1971; 40 FR 53346, Nov. 17, 1975; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through March 17, 2016; 81 FR 14401.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

<div style="border:1px solid black">

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter C. Air Programs
                Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
                    Subpart B. Adoption and Submittal of State Plans for Designated Facilities (Refs & Annos)

</div>

40 C.F.R. § 60.22

§ 60.22 Publication of guideline documents, emission guidelines, and final compliance times.

Currentness

(a) Concurrently upon or after proposal of standards of performance for the control of a designated pollutant from affected facilities, the Administrator will publish a draft guideline document containing information pertinent to control of the designated pollutant form designated facilities. Notice of the availability of the draft guideline document will be published in the Federal Register and public comments on its contents will be invited. After consideration of public comments and upon or after promulgation of standards of performance for control of a designated pollutant from affected facilities, a final guideline document will be published and notice of its availability will be published in the Federal Register.

(b) Guideline documents published under this section will provide information for the development of State plans, such as:

(1) Information concerning known or suspected endangerment of public health or welfare caused, or contributed to, by the designated pollutant.

(2) A description of systems of emission reduction which, in the judgment of the Administrator, have been adequately demonstrated.

(3) Information on the degree of emission reduction which is achievable with each system, together with information on the costs and environmental effects of applying each system to designated facilities.

(4) Incremental periods of time normally expected to be necessary for the design, installation, and startup of identified control systems.

(5) An emission guideline that reflects the application of the best system of emission reduction (considering the cost of such reduction) that has been adequately demonstrated for designated facilities, and the time within which compliance with emission standards of equivalent stringency can be achieved. The Administrator will specify different emission guidelines or compliance times or both for different sizes, types, and classes of designated facilities when costs of control, physical limitations, geographical location, or similar factors make subcategorization appropriate.

(6) Such other available information as the Administrator determines may contribute to the formulation of State plans.

ADD119

USCA Case #15-1363      Document #1605913      Filed: 03/28/2016      Page 125 of 219

(c) Except as provided in paragraph (d)(1) of this section, the emission guidelines and compliance times referred to in paragraph (b)(5) of this section will be proposed for comment upon publication of the draft guideline document, and after consideration of comments will be promulgated in subpart C of this part with such modifications as may be appropriate.

(d)(1) If the Administrator determines that a designated pollutant may cause or contribute to endangerment of public welfare, but that adverse effects on public health have not been demonstrated, he will include the determination in the draft guideline document and in the Federal Register notice of its availability. Except as provided in paragraph (d)(2) of this section, paragraph (c) of this section shall be inapplicable in such cases.

(2) If the Administrator determines at any time on the basis of new information that a prior determination under paragraph (d)(1) of this section is incorrect or no longer correct, he will publish notice of the determination in the Federal Register, revise the guideline document as necessary under paragraph (a) of this section, and propose and promulgate emission guidelines and compliance times under paragraph (c) of this section.

**Credits**

[54 FR 52189, Dec. 20, 1989]

SOURCE: 36 FR 24877, Dec. 23, 1971; 40 FR 53346, Nov. 17, 1975; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through March 17, 2016; 81 FR 14401.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
   Title 40. Protection of Environment
      Chapter I. Environmental Protection Agency (Refs & Annos)
         Subchapter C. Air Programs
            Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
               Subpart B. Adoption and Submittal of State Plans for Designated Facilities (Refs & Annos)

40 C.F.R. § 60.24

§ 60.24 Emission standards and compliance schedules.

Effective: April 16, 2012

Currentness

(a) Each plan shall include emission standards and compliance schedules.

(b)(1) Emission standards shall either be based on an allowance system or prescribe allowable rates of emissions except when it is clearly impracticable. Such cases will be identified in the guideline documents issued under § 60.22. Where emission standards prescribing equipment specifications are established, the plan shall, to the degree possible, set forth the emission reductions achievable by implementation of such specifications, and may permit compliance by the use of equipment determined by the State to be equivalent to that prescribed.

(2) Test methods and procedures for determining compliance with the emission standards shall be specified in the plan. Methods other than those specified in appendix A to this part may be specified in the plan if shown to be equivalent or alternative methods as defined in § 60.2 (t) and (u).

(3) Emission standards shall apply to all designated facilities within the State. A plan may contain emission standards adopted by local jurisdictions provided that the standards are enforceable by the State.

(c) Except as provided in paragraph (f) of this section, where the Administrator has determined that a designated pollutant may cause or contribute to endangerment of public health, emission standards shall be no less stringent than the corresponding emission guideline(s) specified in subpart C of this part, and final compliance shall be required as expeditiously as practicable but no later than the compliance times specified in subpart C of this part.

(d) Where the Administrator has determined that a designated pollutant may cause or contribute to endangerment of public welfare but that adverse effects on public health have not been demonstrated, States may balance the emission guidelines, compliance times, and other information provided in the applicable guideline document against other factors of public concern in establishing emission standards, compliance schedules, and variances. Appropriate consideration shall be given to the factors specified in § 60.22(b) and to information presented at the public hearing(s) conducted under § 60.23(c).

(e)(1) Any compliance schedule extending more than 12 months from the date required for submittal of the plan must include legally enforceable increments of progress to achieve compliance for each designated facility or category of facilities. Unless otherwise specified in the applicable subpart, increments of progress must include, where practicable, each increment of progress

ADD121

specified in § 60.21(h) and must include such additional increments of progress as may be necessary to permit close and effective supervision of progress toward final compliance.

(2) A plan may provide that compliance schedules for individual sources or categories of sources will be formulated after plan submittal. Any such schedule shall be the subject of a public hearing held according to § 60.23 and shall be submitted to the Administrator within 60 days after the date of adoption of the schedule but in no case later than the date prescribed for submittal of the first semiannual report required by § 60.25(e).

(f) Unless otherwise specified in the applicable subpart on a case-by-case basis for particular designated facilities or classes of facilities, States may provide for the application of less stringent emissions standards or longer compliance schedules than those otherwise required by paragraph (c) of this section, provided that the State demonstrates with respect to each such facility (or class of facilities):

(1) Unreasonable cost of control resulting from plant age, location, or basic process design;

(2) Physical impossibility of installing necessary control equipment; or

(3) Other factors specific to the facility (or class of facilities) that make application of a less stringent standard or final compliance time significantly more reasonable.

(g) Nothing in this subpart shall be construed to preclude any State or political subdivision thereof from adopting or enforcing (1) emission standards more stringent than emission guidelines specified in subpart C of this part or in applicable guideline documents or (2) compliance schedules requiring final compliance at earlier times than those specified in subpart C or in applicable guideline documents.

(h) [Reserved by 77 FR 9447]

**Credits**

[40 FR 53346, Nov. 17, 1975, as amended at 43 FR 8800, March 3, 1978; 60 FR 65414, Dec. 19, 1995; 62 FR 45124, Aug. 25, 1997; 65 FR 76384, Dec. 6, 2000; 70 FR 28649, May 18, 2005; 71 FR 33398, June 9, 2006; 72 FR 59204, Oct. 19, 2007; 77 FR 9447, Feb. 16, 2012]

SOURCE: 36 FR 24877, Dec. 23, 1971; 40 FR 53346, Nov. 17, 1975; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through March 17, 2016; 81 FR 14401.

---

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
   Title 40. Protection of Environment
      Chapter I. Environmental Protection Agency (Refs & Annos)
         Subchapter C. Air Programs
            Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
               Subpart B. Adoption and Submittal of State Plans for Designated Facilities (Refs & Annos)

40 C.F.R. § 60.27

§ 60.27 Actions by the Administrator.

Currentness

(a) The Administrator may, whenever he determines necessary, extend the period for submission of any plan or plan revision or portion thereof.

(b) After receipt of a plan or plan revision, the Administrator will propose the plan or revision for approval or disapproval. The Administrator will, within four months after the date required for submission of a plan or plan revision, approve or disapprove such plan or revision or each portion thereof.

(c) The Administrator will, after consideration of any State hearing record, promptly prepare and publish proposed regulations setting forth a plan, or portion thereof, for a State if:

   (1) The State fails to submit a plan within the time prescribed;

   (2) The State fails to submit a plan revision required by § 60.23(a)(2) within the time prescribed; or

   (3) The Administrator disapproves the State plan or plan revision or any portion thereof, as unsatisfactory because the requirements of this subpart have not been met.

(d) The Administrator will, within six months after the date required for submission of a plan or plan revision, promulgate the regulations proposed under paragraph (c) of this section with such modifications as may be appropriate unless, prior to such promulgation, the State has adopted and submitted a plan or plan revision which the Administrator determines to be approvable.

(e)(1) Except as provided in paragraph (e)(2) of this section, regulations proposed and promulgated by the Administrator under this section will prescribe emission standards of the same stringency as the corresponding emission guideline(s) specified in the final guideline document published under § 60.22(a) and will require final compliance with such standards as expeditiously as practicable but no later than the times specified in the guideline document.

ADD123

(2) Upon application by the owner or operator of a designated facility to which regulations proposed and promulgated under this section will apply, the Administrator may provide for the application of less stringent emission standards or longer compliance schedules than those otherwise required by this section in accordance with the criteria specified in § 60.24(f).

(f) Prior to promulgation of a plan under paragraph (d) of this section, the Administrator will provide the opportunity for at least one public hearing in either:

(1) Each State that failed to hold a public hearing as required by § 60.23(c); or

(2) Washington, DC or an alternate location specified in the Federal Register.

**Credits**

[65 FR 76384, Dec. 6, 2000]

SOURCE: 36 FR 24877, Dec. 23, 1971; 40 FR 53346, Nov. 17, 1975; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through March 17, 2016; 81 FR 14401.

**End of Document**                                © 2016 Thomson Reuters. No claim to original U.S. Government Works.

ADD124

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter C. Air Programs
                Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
                    Subpart Uuuu. Emission Guidelines for Greenhouse Gas Emissions and Compliance Times for
                    Electric Utility Generating Units (Refs & Annos)
                        Introduction

40 C.F.R. § 60.5736

§ 60.5736 Will the EPA impose any sanctions?

Effective: December 22, 2015

Currentness

<On Feb. 9, 2016, the Supreme Court of the United States ordered in West Virginia, et al. v. EPA, et al.,--- S.Ct. ----, 2016 WL 502947 (Mem), 2016 WL 502947, that the "Environmental Protection Agency's 'Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units,' 80 Fed. Reg. 64,662 (October 23, 2015), is stayed pending disposition of the applicants' petitions for review in the United States Court of Appeals for the District of Columbia Circuit and disposition of the applicants' petition for a writ of certiorari, if such writ is sought.">

No. The EPA will not withhold any existing federal funds from a State on account of a State's failure to submit, implement, or enforce an approvable plan or plan revision, or to meet any other requirements under this subpart or subpart B of this part.

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 80 FR 64941, Oct. 23, 2015, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through March 17, 2016; 81 FR 14401.

---

**End of Document**                                         © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter C. Air Programs
                Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
                    Subpart Uuuu. Emission Guidelines for Greenhouse Gas Emissions and Compliance Times for
                    Electric Utility Generating Units (Refs & Annos)
                        State and Multi–State Plan Requirements

40 C.F.R. § 60.5740

§ 60.5740 What must I include in my federally enforceable State or multi State plan?

Effective: December 22, 2015

Currentness

<On Feb. 9, 2016, the Supreme Court of the United States ordered in West Virginia, et al. v. EPA, et al.,--- S.Ct. ----, 2016 WL 502947 (Mem), 2016 WL 502947, that the "Environmental Protection Agency's 'Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units,' 80 Fed. Reg. 64,662 (October 23, 2015), is stayed pending disposition of the applicants' petitions for review in the United States Court of Appeals for the District of Columbia Circuit and disposition of the applicants' petition for a writ of certiorari, if such writ is sought.">

(a) You must include the components described in paragraphs (a)(1) through (5) of this section in your plan submittal. The final plan must meet the requirements and include the information required under § 60.5745.

(1) Identification of affected EGUs. Consistent with § 60.25(a), you must identify the affected EGUs covered by your plan and all affected EGUs in your State that meet the applicability criteria in § 60.5845. In addition, you must include an inventory of $CO_2$ emissions from the affected EGUs during the most recent calendar year for which data is available prior to the submission of the plan.

(2) Emission standards. You must include an identification of all emission standards for each affected EGU according to § 60.5775, compliance periods for each emission standard according to § 60.5770, and a demonstration that the emission standards, when taken together, achieve the applicable $CO_2$ emission performance rates or $CO_2$ emission goals described in § 60.5855. Allowance systems are an acceptable form of emission standards under this subpart.

(i) Your plan does not need to include corrective measures specified in paragraph (a)(2)(ii) of this section if your plan:

(A) Imposes emission standards on all affected EGUs that, assuming full compliance by all affected EGUs, mathematically assure achievement of the $CO_2$ emission performance rates in the plan for each plan period;

(B) Imposes emission standards on all affected EGUS that, assuming full compliance by all affected EGUs, mathematically assure achievement of the $CO_2$ emission goals; or

ADD126

(C) Imposes emission standards on all affected EGUs that, assuming full compliance by all affected EGUs, in conjunction with applicable requirements under state law for EGUs subject to subpart TTTT of this subpart, assuming the applicable requirements under state law are met by all EGUs subject to subpart TTTT of this subpart, achieve the applicable mass-based $CO_2$ emission goals plus new source $CO_2$ emission complement allowed for in § 60.5790(b)(5).

(ii) If your plan does not meet the requirements of (a)(2)(i) or (iii) of this section, your plan must include the requirement for corrective measures to be implemented if triggered. Upon triggering corrective measures, if you do not already have them included in your approved State plan, you must submit corrective measures to EPA for approval as a plan revision per the requirements of § 60.5785(c). These corrective measures must ensure that the interim period and final period $CO_2$ emission performance rates or $CO_2$ emission goals are achieved by your affected EGUs, as applicable, and must achieve additional emission reductions to offset any emission performance shortfall. Your plan must include the requirement that corrective measures be triggered and implemented according to paragraphs (a)(2)(ii)(A) through (H) of this section.

(A) Your plan must include a trigger for an exceedance of an interim step 1 or interim step 2 $CO_2$ emission performance rate or $CO_2$ emission goal by 10 percent or greater, either on average or cumulatively (if applicable).

(B) Your plan must include a trigger for an exceedance of an interim step 1 goal or interim step 2 goal of 10 percent or greater based on either reported $CO_2$ emissions with applied plus or minus net allowance export or import adjustments (if applicable), or based on the adjusted $CO_2$ emission rate (if applicable).

(C) Your plan must include a trigger for a failure to meet an interim period goal based on reported $CO_2$ emissions with applied plus or minus net allowance export or import adjustments (if applicable), or based on the adjusted $CO_2$ emission rate (if applicable).

(D) Your plan must include a trigger for a failure to meet the interim period or any final reporting period $CO_2$ emission performance rate or $CO_2$ emission goal, either on average or cumulatively (as applicable).

(E) Your plan must include a trigger for a failure to meet any final reporting period goal based on reported $CO_2$ emissions with applied plus or minus net allowance export or import adjustments (if applicable).

(F) Your plan must include a trigger for a failure to meet the interim period $CO_2$ emission performance rate or $CO_2$ emission goal based on the adjusted $CO_2$ emission rate (if applicable).

(G) Your plan must include a trigger for a failure to meet any final reporting period $CO_2$ emission performance rate or $CO_2$ emission goal based on the adjusted $CO_2$ emission rate (if applicable).

(H) A net allowance import adjustment represents the $CO_2$ emissions (in tons) equal to the number of net imported $CO_2$ allowances. This adjustment is subtracted from reported $CO_2$ emissions. Under this adjustment, such allowances must be issued by a state with an emission budget trading program that only applies to affected EGUs (or affected

ADD127

EGUs plus EGUs covered by subpart TTTT of this part as applicable). A net allowance export adjustment represents the $CO_2$ emissions (in tons) equal to the number of net exported $CO_2$ allowances. This adjustment is added to reported $CO_2$ emissions.

(iii) If your plan relies upon State measures, in addition to or in lieu of emission standards on your affected EGUs, then the final State plan must include the requirements in paragraph (a)(3) of this section and the submittal must include the information listed in § 60.5745(a)(6).

(iv) If your plan requires emission standards in addition to relying upon State measures, then you must demonstrate that the emission standards and State measures, when taken together, result in the achievement of the applicable mass-based $CO_2$ emission goal described in § 60.5855 by your State's affected EGUs.

(3) State measures backstop. If your plan relies upon State measures, you must submit, as part of the plan in lieu of the requirements in paragraph (a)(2)(i) and (ii) of this section, a federally enforceable backstop that includes emission standards for affected EGUs that will be put into place, if there is a triggering event listed in paragraph (a)(3)(i) of this section, within 18 months of the due date of the report required in § 60.5870(b). The emission standards on the affected EGUs as part of the backstop must be able to meet either the $CO_2$ emission performance rates or mass-based or rate-based $CO_2$ emission goal for your State during the interim and final periods. You must either submit, along with the backstop emission standards, provisions to adjust the emission standards to make up for the prior emission performance shortfall, such that no later plan revision to modify the emission standards is necessary in order to address the emission performance shortfall, or you must submit, as part of the final plan, backstop emission standards that assure affected EGUs would achieve your State's $CO_2$ emission performance rates or emission goals during the interim and final periods, and then later submit appropriate revisions to the backstop emission standards adjusting for the shortfall through the State plan revision process described in § 60.5785. The backstop must also include the requirements in paragraphs (a)(3)(i) through (iii) of this section, as applicable.

(i) You must include a trigger for the backstop to go into effect upon:

(A) A failure to meet a programmatic milestone;

(B) An exceedance of 10 percent or greater of an interim step 1 goal or interim step 2 goal based on reported $CO_2$ emissions, with applied plus or minus net allowance export or import adjustments (if applicable);

(C) A failure to meet the interim period goal based on reported $CO_2$ emissions, with applied plus or minus net allowance export or import adjustments (if applicable); or

(D) A failure to meet any final reporting period goal based on reported $CO_2$ emissions, with applied plus or minus net allowance export or import adjustments (if applicable).

(ii) You may include in your plan any additional triggers so long as they do not reduce the stringency of the triggers required under paragraph (a)(3)(i) of this section.

ADD128

(iii) You must include a schedule for implementation of the backstop once triggered, and you must identify all necessary State administrative and technical procedures for implementing the backstop.

(4) Identification of applicable monitoring, reporting, and recordkeeping requirements for each affected EGU. You must include in your plan all applicable monitoring, reporting and recordkeeping requirements for each affected EGU and the requirements must be consistent with or no less stringent than the requirements specified in § 60.5860.

(5) State reporting. You must include in your plan a description of the process, contents, and schedule for State reporting to the EPA about plan implementation and progress, including information required under § 60.5870.

(i) You must include in your plan a requirement for a report to be submitted by July 1, 2021, that demonstrates that the State has met, or is on track to meet, the programmatic milestone steps indicated in the timeline required in § 60.5770.

(b) You must follow the requirements of subpart B of this part and demonstrate that they were met in your State plan. However, the provisions of § 60.24(f) shall not apply.

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 80 FR 64941, Oct. 23, 2015, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through March 17, 2016; 81 FR 14401.

---

**End of Document**                          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

ADD129

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   4

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
          Subpart Uuuu. Emission Guidelines for Greenhouse Gas Emissions and Compliance Times for Electric Utility Generating Units (Refs & Annos)
            State and Multi–State Plan Requirements

40 C.F.R. § 60.5745

§ 60.5745 What must I include in my final plan submittal?

Effective: December 22, 2015

Currentness

<On Feb. 9, 2016, the Supreme Court of the United States ordered in West Virginia, et al. v. EPA, et al.,--- S.Ct. ----, 2016 WL 502947 (Mem), 2016 WL 502947, that the "Environmental Protection Agency's 'Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units,' 80 Fed. Reg. 64,662 (October 23, 2015), is stayed pending disposition of the applicants' petitions for review in the United States Court of Appeals for the District of Columbia Circuit and disposition of the applicants' petition for a writ of certiorari, if such writ is sought.">

(a) In addition to the components of the plan listed in § 60.5740, a final plan submittal to the EPA must include the information in paragraphs (a)(1) through (13) of this section. This information must be submitted to the EPA as part of your final plan submittal but will not be codified as part of the federally enforceable plan upon approval by EPA.

(1) You must include a description of your plan approach and the geographic scope of the plan (i.e., State or multi–State, geographic boundaries related to the plan elements), including, if applicable, identification of multi–State plan participants.

(2) You must identify $CO_2$ emission performance rates or equivalent statewide $CO_2$ emission goals that your affected EGUs will achieve. If the geographic scope of your plan is a single State, then you must identify $CO_2$ emission performance rates or emission goals according to § 60.5855. If your plan includes multiple States and you elect to set $CO_2$ emission goals, you must identify $CO_2$ emission goals calculated according to § 60.5750.

(i) You must specify in the plan submittal the $CO_2$ emission performance rates or emission goals that affected EGUs will meet for the interim period, each interim step, and the final period (including each final reporting period) pursuant to § 60.5770.

(ii) [Reserved]

(3) You must include a demonstration that the affected EGUs covered by the plan are projected to achieve the $CO_2$ emission performance rates or $CO_2$ emission goals described in § 60.5855.

ADD130

(4) You must include a demonstration that each affected EGU's emission standard is quantifiable, non-duplicative, permanent, verifiable, and enforceable according to § 60.5775.

(5) If your plan includes emission standards on your affected EGUs sufficient to meet either the $CO_2$ emission performance rates or $CO_2$ emission goals, you must include in your plan submittal the information in paragraphs (a)(5)(i) through (v) of this section as applicable.

(i) If your plan applies separate rate-based $CO_2$ emission standards for affected EGUs (in lbs $CO_2$/MWh) that are equal to or lower than the $CO_2$ emission performance rates listed in Table 1 of this subpart or uniform rate-based $CO_2$ emission standards equal to or lower than the rate-based $CO_2$ emission goals listed in Table 2 of this subpart, then no additional demonstration is required beyond inclusion of the emission standards in the plan.

(ii) If a plan applies rate-based emission standards to individual affected EGUs at a lbs $CO_2$/MWh rate that differs from the $CO_2$ emission performance rates in Table 1 of this subpart or the State's rate-based $CO_2$ emission goal in Table 2 of this subpart, then a further demonstration is required that the application of the $CO_2$ emission standards will achieve the $CO_2$ emission performance rates or State rate-based $CO_2$ emission goal. You must demonstrate through a projection that the adjusted weighted average $CO_2$ emission rate of affected EGUs, when weighted by generation (in MWh), will be equal to or less than the $CO_2$ emission performance rates or the rate-based $CO_2$ emission goal. This projection must address the interim period and the final period. The projection in the plan submittal must include the information listed in paragraph (a)(5)(v) of this section and in addition the following:

(A) An analysis of the change in generation of affected EGUs given the compliance costs and incentives under the application of different emission rate standards across affected EGUs in a State;

(B) A projection showing how generation is expected to shift between affected EGUs and across affected EGUs and non-affected EGUs over time;

(C) Assumptions regarding the availability and anticipated use of the MWh of electricity generation or electricity savings from eligible resources that can be issued ERCs;

(D) The specific calculation (or assumption) of how eligible resource MWh of electricity generation or savings are being used in the projection to adjust the reported $CO_2$ emission rate of affected EGUs;

(E) If a state plan provides for the ability of renewable energy resources located in states with mass-based plans to be issued ERCs, consideration in the projection that such resources must meet geographic eligibility requirements, consistent with § 60.5800(a); and

(F) Any other applicable assumptions used in the projection.

ADD131

(iii) If a plan establishes mass-based emission standards for affected EGUs that cumulatively do not exceed the State's EPA–specified mass $CO_2$ emission goal, then no additional demonstration is required beyond inclusion of the emission standards in the plan.

(iv) If a plan applies mass-based emission standards to individual affected EGUs that cumulatively exceed the State's EPA–specified mass $CO_2$ emission goal, then you must include a demonstration that your mass-based emission program will be designed such that compliance by affected EGUs would achieve the State mass-based $CO_2$ emission goals. This demonstration includes the information listed in paragraph (a)(5)(v) of this section.

(v) Your plan demonstration to be included in your plan submittal, if applicable, must include the information listed in paragraphs (a)(5)(v)(A) through (L) of this section.

   (A) A summary of each affected EGU's anticipated future operation characteristics, including:

      (1) Annual generation;

      (2) $CO_2$ emissions;

      (3) Fuel use, fuel prices (when applicable), fuel carbon content;

      (4) Fixed and variable operations and maintenance costs (when applicable);

      (5) Heat rates; and

      (6) Electric generation capacity and capacity factors.

   (B) An identification of any planned new electric generating capacity.

   (C) Analytic treatment of the potential for building unplanned new electric generating capacity.

   (D) A timeline for implementation of EGU–specific actions (if applicable).

   (E) All wholesale electricity prices.

   (F) A geographic representation appropriate for capturing impacts and/or changes in the electric system.

   (G) A time period of analysis, which must extend through at least 2031.

ADD132

(H) An anticipated electricity demand forecast (MWh load and MW peak demand) at the State and regional level, including the source and basis for these estimates, and, if appropriate, justification and documentation of underlying assumptions that inform the development of the demand forecast (e.g., annual economic and demand growth rate or population growth rate).

(I) A demonstration that each emission standard included in your plan meets the requirements of § 60.5775.

(J) Any ERC or emission allowance prices, when applicable.

(K) An identification of planning reserve margins.

(L) Any other applicable assumptions used in the projection.

(6) If your plan relies upon State measures, in addition to or in lieu of the emission standards required by paragraph § 60.5740(a)(2), the final State plan submittal must include the information under paragraphs (a)(5)(v) and (a)(6)(i) through (v) of this section.

(i) You must include a description of all the State measures the State will rely upon to achieve the applicable $CO_2$ emission goals required under § 60.5855(e), the projected impacts of the State measures over time, the applicable State laws or regulations related to such measures, and identification of parties or entities subject to or implementing such State measures.

(ii) You must include the schedule and milestones for the implementation of the State measures. If the State measures in your plan submittal rely upon measures that do not have a direct effect on the $CO_2$ emissions measured at an affected EGU's stack, you must also demonstrate how the minimum emission, monitoring and verification (EM & V) requirements listed under § 60.5795 that apply to those programs and projects will be met.

(iii) You must demonstrate that federally enforceable emission standards for affected EGUs in conjunction with any State measures relied upon for your plan, are sufficient to achieve the mass-based $CO_2$ emission goal for the interim period, each interim step in that interim period, the final period, and each final reporting period. In addition, you must demonstrate that each emission standard included in your plan meets the requirements of § 60.5775 and each State measure included in your plan submittal meets the requirements of § 60.5780.

(iv) You must include a $CO_2$ performance projection of your State measures that shows how the measures, whether alone or in conjunction with any federally enforceable $CO_2$ emission standards for affected EGUs, will result in the achievement of the future $CO_2$ performance at affected EGUs. Elements of this projection must include those specified in paragraph (a)(5)(v) of this section, as applicable, and the following for the interim period and the final period:

(A) A baseline demand and supply forecast as well as the underlying assumptions and data sources of each forecast;

ADD133

(B) The magnitude of energy and emission impacts from all measures included in the plan and applicable assumptions;

(C) An identification of State-enforceable measures with electricity savings and RE generation, in MWh, expected for individual and collective measures and any assumptions related to the quantification of the MWh, as applicable.

(7) Your plan submittal must include a demonstration that the reliability of the electrical grid has been considered in the development of your plan.

(8) Your plan submittal must include a timeline with all the programmatic milestone steps the State intends to take between the time of the State plan submittal and January 1, 2022 to ensure the plan is effective as of January 1, 2022.

(9) Your plan submittal must adequately demonstrate that your State has the legal authority (e.g., through regulations or legislation) and funding to implement and enforce each component of the State plan submittal, including federally enforceable emission standards for affected EGUs, and State measures as applicable.

(10) Your State plan submittal must demonstrate that each interim step goal required under § 60.5855(c), will be met and include in its supporting documentation, if applicable, a description of the analytic process, tools, methods, and assumptions used to make this demonstration.

(11) Your plan submittal must include certification that a hearing required under § 60.23(c)(1) on the State plan was held, a list of witnesses and their organizational affiliations, if any, appearing at the hearing, and a brief written summary of each presentation or written submission, pursuant to the requirements of § 60.23(d) and (f).

(12) Your plan submittal must include documentation of any conducted community outreach and community involvement, including engagement with vulnerable communities.

(13) Your plan submittal must include supporting material for your plan including:

(i) Materials demonstrating the State's legal authority and funding to implement and enforce each component of its plan, including emissions standards and/or State measures that the plan relies upon;

(ii) Materials supporting that the $CO_2$ emission performance rates or $CO_2$ emission goals will be achieved by affected EGUs identified under the plan, according to paragraph (a)(3) of this section;

(iii) Materials supporting any calculations for $CO_2$ emission goals calculated according to § 60.5855, if applicable; and

(iv) Any other materials necessary to support evaluation of the plan by the EPA.

(b) You must submit your final plan to the EPA electronically according to § 60.5875.

ADD134

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
          Subpart Uuuu. Emission Guidelines for Greenhouse Gas Emissions and Compliance Times for
          Electric Utility Generating Units (Refs & Annos)
            State and Multi–State Plan Requirements

40 C.F.R. § 60.5770

§ 60.5770 What schedules, performance periods, and compliance periods must I include in my plan?

Effective: December 22, 2015

Currentness

<On Feb. 9, 2016, the Supreme Court of the United States ordered in West Virginia, et al. v. EPA, et al.,--- S.Ct. ----, 2016 WL 502947 (Mem), 2016 WL 502947, that the "Environmental Protection Agency's 'Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units,' 80 Fed. Reg. 64,662 (October 23, 2015), is stayed pending disposition of the applicants' petitions for review in the United States Court of Appeals for the District of Columbia Circuit and disposition of the applicants' petition for a writ of certiorari, if such writ is sought.">

(a) The affected EGUs covered by your plan must meet the $CO_2$ emission requirements required under § 60.5855 for the interim period, interim steps, and the final reporting periods according to paragraph (b) of this section. You must also include in your plan compliance periods for each affected EGU regulated under the plan according to paragraphs (c) and (d) of this section.

(b) Your plan must require your affected EGUs to achieve each $CO_2$ emission performance rate or $CO_2$ emission goal, as applicable, required under § 60.5855 over the periods according to paragraphs (b)(1) through (3) of this section.

  (1) The interim period.

  (2) Each interim step.

  (3) Each final reporting period.

(c) The emission standards for affected EGUs regulated under the plan must include the following compliance periods:

  (1) For the interim period, affected EGUs must have emission standards that have compliance periods that are no longer than each interim step and are imposed for the entirety of the interim step either alone or in combination.

  (2) For the final period, affected EGUs must have emission standards that have compliance periods that are no longer than each final reporting period and are imposed for the entirety of the final reporting period either alone or in combination.

ADD135

USCA Case #15-1363    Document #1605913    Filed: 03/28/2016    Page 141 of 219

(3) Compliance periods for each interim step and each final reporting period may take forms shorter than specified in this regulation, provided the schedules of compliance collectively end on the same schedule as each interim step and final reporting period.

(d) If your plan relies upon State measures in lieu of or in addition to emission standards for affected EGUs regulated under the plan, then the performance periods must be identical to the compliance periods for affected EGUs listed in paragraphs (c) (1) through (3) of this section.

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 80 FR 64941, Oct. 23, 2015, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through March 17, 2016; 81 FR 14401.

**End of Document**                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

ADD136

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
          Subpart Uuuu. Emission Guidelines for Greenhouse Gas Emissions and Compliance Times for
          Electric Utility Generating Units (Refs & Annos)
            State and Multi–State Plan Requirements

40 C.F.R. § 60.5790

§ 60.5790 What must I do to meet my plan obligations?

Effective: December 22, 2015

Currentness

<On Feb. 9, 2016, the Supreme Court of the United States ordered in West Virginia, et al. v. EPA, et al.,--- S.Ct. ----, 2016 WL 502947 (Mem), 2016 WL 502947, that the "Environmental Protection Agency's 'Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units,' 80 Fed. Reg. 64,662 (October 23, 2015), is stayed pending disposition of the applicants' petitions for review in the United States Court of Appeals for the District of Columbia Circuit and disposition of the applicants' petition for a writ of certiorari, if such writ is sought.">

(a) To meet your plan obligations, you must demonstrate that your affected EGUs are complying with their emission standards as specified in § 60.5740, and you must demonstrate that the emission standards on affected EGUs, alone or in conjunction with any State measures, are resulting in achievement of the $CO_2$ emission performance rates or statewide $CO_2$ emission goals by affected EGUs using the procedures in paragraphs (b) through (d) of this section. If your plan requires the use of allowances for your affected EGUs to comply with their mass-based emission standards, you must follow the requirements under paragraph (b) of this section and § 60.5830. If your plan requires the use of ERCs for your affected EGUs to comply with their rate-based emission standards, you must follow the requirements under paragraphs (c) and (d) of this section and §§ 60.5795 through 60.5805.

(b) If you submit a plan that sets a mass-based emission trading program for your affected EGUs, the State plan must include emission standards and requirements that specify the allowance system, related compliance requirements and mechanisms, and the emission budget as appropriate. These requirements must include those listed in paragraphs (b)(1) through (5) of this section.

(1) $CO_2$ emission monitoring, reporting, and recordkeeping requirements for affected EGUs.

(2) Requirements for State allocation of allowances consistent with § 60.5815.

(3) Requirements for tracking of allowances, from issuance through submission for compliance, consistent with § 60.5820.

(4) The process for affected EGUs to demonstrate compliance (allowance "true-up" with reported $CO_2$ emissions) consistent with § 60.5825.

ADD137

(5) Requirements that address potential increased $CO_2$ emissions from new sources, beyond the emissions expected from new sources if affected EGUs were given emission standards in the form of the subcategory-specific $CO_2$ emission performance rates. You may meet this requirement by requiring one of the options under paragraphs (b)(5)(i) through (iii) of this section.

(i) You may include, as part of your plan's supporting documentation, requirements enforceable as a matter of State law regulating $CO_2$ emissions from EGUs covered by subpart TTTT of this part under the mass-based $CO_2$ goal plus new source $CO_2$ emission complement applicable to your State in Table 4 of this subpart. If you choose this option, the term "mass-based $CO_2$ goal plus new source $CO_2$ emission complement" shall apply rather than "$CO_2$ mass-based goal" and the term "$CO_2$ emission goal" shall include "mass-based $CO_2$ goal plus new source $CO_2$ emission complement" in these emission guidelines.

(ii) You may include requirements in your State plan for emission budget allowance allocation methods that align incentives to generate to affected EGUs or EGUs covered by subpart TTTT of this part that result in the affected EGUs meeting the mass-based $CO_2$ emission goal;

(iii) You may submit for the EPA's approval, an equivalent method which requires affected EGUs to meet the mass-based $CO_2$ emission goal. The EPA will evaluate the approvability of such an alternative method on a case by case basis.

(c) If you submit a plan that sets rate-based emission standards on your affected EGUs, to meet the requirements of § 60.5775, you must follow the requirements in paragraphs (c)(1) through (4) of this section.

(1) You must require the owner or operator of each affected EGU covered by your plan to calculate an adjusted $CO_2$ emission rate to demonstrate compliance with its emission standard by factoring stack emissions and any ERCs into the following equation:

$$CO_2 \, emission \, rate = \frac{\sum M_{CO2}}{\sum MWh_{op} + \sum MWh_{ERC}}$$

Where:

$CO_2$ emission rate = An affected EGU's adjusted $CO_2$ emission rate that will be used to determine compliance with the applicable $CO_2$ emission standard.

$M_{CO2}$ = Measured $CO_2$ mass in units of pounds (lbs) summed over the compliance period for an affected EGU.

$MWh_{op}$ = Total net energy output over the compliance period for an affected EGU in units of MWh.

$MWh_{ERC}$ = ERC replacement generation for an affected EGU in units of MWh (ERCs are denominated in whole integers as specified in paragraph (d) of this section).

ADD138

(2) Your plan must specify that an ERC qualifies for the compliance demonstration specified in paragraph (c)(1) of this section if the ERC meets the requirements of paragraphs (c)(2)(i) through (iv) of this section.

(i) An ERC must have a unique serial number.

(ii) An ERC must represent one MWh of actual energy generated or saved with zero associated $CO_2$ emissions.

(iii) An ERC must only be issued to an eligible resource that meets the requirements of § 60.5800 or to an affected EGU that meets the requirements of § 60.5795 and must only be issued by a State or its State agent through an EPA–approved ERC tracking system that meets the requirements of § 60.5810, or by the EPA through an EPA–administered tracking system.

(iv) An ERC must be surrendered and retired only once for purpose of compliance with this regulation through an EPA–approved ERC tracking system that meets the requirements of § 60.5810, or by the EPA through an EPA–administered tracking system.

(3) Your plan must specify that an ERC does not qualify for the compliance demonstration specified in paragraph (c)(1) of this section if it does not meet the requirements of paragraph (c)(2) of this section or if any State has used that same ERC for purposes of demonstrating achievement of a $CO_2$ emission performance rate or $CO_2$ emission goal. The plan must additionally include provisions that address requirements for revocation or adjustment that apply if an ERC issued by the State is subsequently found to have been improperly issued.

(4) Your plan must include provisions either allowing for or restricting banking of ERCs between compliance periods for affected EGUs, and provisions not allowing any borrowing of any ERCs from future compliance periods by affected EGUs or eligible resources.

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 80 FR 64941, Oct. 23, 2015, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through March 17, 2016; 81 FR 14401.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

ADD139

---

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter C. Air Programs
                Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
                    Subpart Uuuu. Emission Guidelines for Greenhouse Gas Emissions and Compliance Times for
                    Electric Utility Generating Units (Refs & Annos)
                        Emission Rate Credit Requirements

---

40 C.F.R. § 60.5800

§ 60.5800 What other resources qualify for issuance of ERCs?

Effective: December 22, 2015

Currentness

<On Feb. 9, 2016, the Supreme Court of the United States ordered in West Virginia, et al. v. EPA, et al.,--- S.Ct. ----,
2016 WL 502947 (Mem), 2016 WL 502947, that the "Environmental Protection Agency's 'Carbon Pollution Emission
Guidelines for Existing Stationary Sources: Electric Utility Generating Units,' 80 Fed. Reg. 64,662 (October 23,
2015), is stayed pending disposition of the applicants' petitions for review in the United States Court of Appeals for the
District of Columbia Circuit and disposition of the applicants' petition for a writ of certiorari, if such writ is sought.">

(a) ERCs may only be issued for generation or savings produced on or after January 1, 2022, to a resource that qualifies as an
eligible resource because it meets each of the requirements in paragraphs (a)(1) through (4) of this section.

(1) Resources qualifying for eligibility only include resources that increased installed electrical generation nameplate
capacity, or implemented new electrical savings measures, on or after January 1, 2013. If a resource had a nameplate
capacity uprate, ERCs may be issued only for the difference in generation between its uprated nameplate capacity and its
nameplate capacity prior to the uprate. ERCs must not be issued for generation for an uprate that followed a derate that
occurred on or after January 1, 2013. A resource that is relicensed or receives a license extension is considered existing
capacity and is not an eligible resource, unless it receives a capacity uprate as a result of the relicensing process that is
reflected in its relicensed permit. In such a case, only the difference in nameplate capacity between its relicensed permit
and its prior permit is eligible to be issued ERCs.

(2) The resource must be connected to, and deliver energy to or save electricity on, the electric grid in the contiguous
United States.

(3) The resource must be located in either:

(i) A State whose affected EGUs are subject to rate-based emission standards pursuant to this regulation; or

(ii) A State with a mass-based $CO_2$ emission goal, and the resource can demonstrate (e.g., through a power purchase
agreement or contract for delivery) that the electricity generated is delivered with the intention to meet load in a State
with affected EGUs which are subject to rate-based emission standards pursuant to this regulation, and was treated as

ADD140

a generation resource used to serve regional load that included the State whose affected EGUs are subject to rate-based emission standards. Notwithstanding any other provision of paragraph (a)(4) of this section, the only type of eligible resource in the State with mass-based emission standards is renewable generating technologies listed in (a)(4)(i) of this section.

(4) The resource falls into one of the following categories of resources:

(i) Renewable electric generating technologies using one of the following renewable energy resources: Wind, solar, geothermal, hydro, wave, tidal;

(ii) Qualified biomass;

(iii) Waste-to-energy (biogenic portion only);

(iv) Nuclear power;

(v) A non-affected combined heat and power (CHP) unit, including waste heat power;

(vi) A demand-side EE or demand-side management measure that saves electricity and is calculated on the basis of quantified ex post savings, not "projected" or "claimed" savings; or

(vii) A category identified in a State plan and approved by the EPA to generate ERCs.

(b) Any resource that does not meet the requirements of this subpart or an approved State plan cannot be issued ERCs for use by an affected EGU with its compliance demonstration required under § 60.5790(c).

(c) ERCs may not be issued to or for any of the following:

(1) New, modified, or reconstructed EGUs that are subject to subpart TTTT of this part, except CHP units that meet the requirements of a CHP unit under paragraph (a);

(2) EGUs that do not meet the applicability requirements of §§ 60.5845 and 60.5850, except CHP units that meet the requirements of a CHP unit under paragraph (a);

(3) Measures that reduce $CO_2$ emissions outside the electric power sector, including, for example, GHG offset projects representing emission reductions that occur in the forestry and agriculture sectors, direct air capture, and crediting of $CO_2$ emission reductions that occur in the transportation sector as a result of vehicle electrification; and

(4) Any measure not approved by the EPA for issuance of ERCs in connection with a specific State plan.

ADD141

(d) You must include the appropriate requirements in paragraphs (d)(1) through (3) of this section for an applicable eligible resource in your plan.

(1) If qualified biomass is an eligible resource, the plan must include a description of why the proposed feedstocks or feedstock categories should qualify as an approach for controlling increases of $CO_2$ levels in the atmosphere as well as the proposed valuation of biogenic $CO_2$ emissions. In addition, for sustainably-derived agricultural and forest biomass feedstocks, the state plan must adequately demonstrate that such feedstocks appropriately control increases of $CO_2$ levels in the atmosphere and methods for adequately monitoring and verifying these feedstock sources and related sustainability practices. For all qualified biomass feedstocks, plans must specify how biogenic $CO_2$ emissions will be monitored and reported, and identify specific EM & V, tracking and auditing approaches.

(2) If waste-to-energy is an eligible resource, the plan must assess both the capacity to strengthen existing or implement new waste reduction, reuse, recycling and composting programs, and measures to minimize any potential negative impacts of waste-to-energy operations on such programs. Additionally the plan must include a method for determining the proportion of total MWh generation from a waste-to-energy facility that is eligible for use in adjusting a $CO_2$ emission rate (i.e., that which is generated from biogenic materials).

(3) If carbon capture and utilization (CCU) is an eligible resource in a plan, the plan must include analysis supporting how the proposed qualifying CCU technology results in $CO_2$ emission mitigation from affected EGUs and provide monitoring, reporting, and verification requirements to demonstrate the reductions.

(e) States and areas of Indian country that do not have any affected EGUs, and other countries, may provide ERCs to adjust $CO_2$ emissions provided they are connected to the contiguous U.S. grid and meet the other requirements for eligibility and eligible resources and the issuance of ERCs included in these emission guidelines, except that such States and other countries may not provide ERCs from resources described in § 60.5800(a)(4)(vi).

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 80 FR 64941, Oct. 23, 2015, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through March 17, 2016; 81 FR 14401.

---

**End of Document**                                          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
Subpart Uuuu. Emission Guidelines for Greenhouse Gas Emissions and Compliance Times for
Electric Utility Generating Units (Refs & Annos)
Mass Allocation Requirements

40 C.F.R. § 60.5825

§ 60.5825 What is the process for affected EGUs to demonstrate compliance in a mass-based program?

Effective: December 22, 2015

Currentness

<On Feb. 9, 2016, the Supreme Court of the United States ordered in West Virginia, et al. v. EPA, et al.,--- S.Ct. ----, 2016 WL 502947 (Mem), 2016 WL 502947, that the "Environmental Protection Agency's 'Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units,' 80 Fed. Reg. 64,662 (October 23, 2015), is stayed pending disposition of the applicants' petitions for review in the United States Court of Appeals for the District of Columbia Circuit and disposition of the applicants' petition for a writ of certiorari, if such writ is sought.">

(a) A plan must require an affected EGU's owners or operators to demonstrate compliance with emission standards in a mass based program by holding an amount of allowances not less than the tons of total $CO_2$ emissions for such compliance period from the affected EGUs in the account for the affected EGU's emissions in the allowance tracking system required under § 60.5820 during the applicable compliance period.

(b) In a mass-based trading program a plan may allow multiple affected EGUs co-located at the same facility to demonstrate that they are meeting the applicable emission standards on a facility-wide basis by the owner or operator holding enough allowances to cover the $CO_2$ emissions of all the affected EGUs at the facility.

(1) If there are not enough allowances to cover the facility's affected EGUs' $CO_2$ emissions then there must be provisions for determining the compliance status of each affected EGU located at that facility.

(2) [Reserved]

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 80 FR 64941, Oct. 23, 2015, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

ADD143

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter C. Air Programs
                Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
                    Subpart Uuuu. Emission Guidelines for Greenhouse Gas Emissions and Compliance Times for Electric Utility Generating Units (Refs & Annos)
                        Definitions

40 C.F.R. § 60.5880

§ 60.5880 What definitions apply to this subpart?

Effective: December 22, 2015

Currentness

<On Feb. 9, 2016, the Supreme Court of the United States ordered in West Virginia, et al. v. EPA, et al.,--- S.Ct. ----, 2016 WL 502947 (Mem), 2016 WL 502947, that the "Environmental Protection Agency's 'Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units,' 80 Fed. Reg. 64,662 (October 23, 2015), is stayed pending disposition of the applicants' petitions for review in the United States Court of Appeals for the District of Columbia Circuit and disposition of the applicants' petition for a writ of certiorari, if such writ is sought.">

As used in this subpart, all terms not defined herein will have the meaning given them in the Clean Air Act and in subparts A, B, and TTTT, of this part.

Adjusted $CO_2$ Emission Rate Means

(1) For an affected EGU, the reported $CO_2$ emission rate of an affected EGU, adjusted as described in § 60.5790(c)(1) to reflect any ERCs used by an affected EGU to demonstrate compliance with its $CO_2$ emission standards; or

(2) For a State (or states in a multi-state plan) calculating a collective $CO_2$ emission rate achieved under the plan, the actual $CO_2$ emission rate during a plan reporting period of the affected EGUs subject to the rate specified in the plan, adjusted by the ERCs used for compliance by those EGUs (total $CO_2$ mass divided by the sum of the total MWh and ERCs).

Affected electric generating unit or Affected EGU means a steam generating unit, integrated gasification combined cycle (IGCC), or stationary combustion turbine that meets the relevant applicability conditions in section § 60.5845.

Allowance means an authorization for each specified unit of actual $CO_2$ emitted from an affected EGU or a facility during a specified period.

Allowance system means a control program under which the owner or operator of each affected EGU is required to hold an allowance for each specified unit of $CO_2$ emitted from that affected EGU or facility during a specified period and which limits the total amount of such allowances for a specified period and allows the transfer of such allowances.

Annual capacity factor means the ratio between the actual heat input to an EGU during a calendar year and the potential heat input to the EGU had it been operated for 8,760 hours during a calendar year at the base load rating.

ADD144

Base load rating means the maximum amount of heat input (fuel) that an EGU can combust on a steady-state basis, as determined by the physical design and characteristics of the EGU at ISO conditions. For a stationary combustion turbine, base load rating includes the heat input from duct burners.

Biomass means biologically based material that is living or dead (e.g., trees, crops, grasses, tree litter, roots) above and below ground, and available on a renewable or recurring basis. Materials that are biologically based include non-fossilized, biodegradable organic material originating from modern or contemporarily grown plants, animals, or microorganisms (including plants, products, byproducts and residues from agriculture, forestry, and related activities and industries, as well as the non-fossilized and biodegradable organic fractions of industrial and municipal wastes, including gases and liquids recovered from the decomposition of non-fossilized and biodegradable organic material).

$CO_2$ emission goal means a statewide rate-based $CO_2$ emission goal or mass-based $CO_2$ emission goal specified in § 60.5855.

Combined cycle unit means an electric generating unit that uses a stationary combustion turbine from which the heat from the turbine exhaust gases is recovered by a heat recovery steam generating unit to generate additional electricity.

Combined heat and power unit or CHP unit, (also known as "cogeneration") means an electric generating unit that uses a steam-generating unit or stationary combustion turbine to simultaneously produce both electric (or mechanical) and useful thermal output from the same primary energy source.

Compliance period means a discrete time period for an affected EGU to comply with either an emission standard or State measure.

Demand-side energy efficiency project means an installed piece of equipment or system, a modification of an existing piece of equipment or system, or a strategy intended to affect consumer electricity-use behavior, that results in a reduction in electricity use (in MWh) at an end-use facility, premises, or equipment connected to the electricity grid.

Derate means a decrease in the available capacity of an electric generating unit, due to a system or equipment modification or to discounting a portion of a generating unit's capacity for planning purposes.

Eligible resource means a resource that meets the requirements of § 60.5800(a).

Emission Rate Credit or ERC means a tradable compliance instrument that meets the requirements of § 60.5790(c).

EM & V plan means a plan that meets the requirements of § 60.5830.

ERC tracking system means a system for the issuance, surrender and retirement of ERCs that meets the requirements of § 60.5810.

Final period means the period that begins on January 1, 2030, and continues thereafter. The final period is comprised of final reporting periods, each of which may be no longer than two calendar years (with a calendar year beginning on January 1 and ending on December 31).

Final reporting period means an increment of plan performance within the final period, with each final reporting period being no longer than two calendar years (with a calendar year beginning on January 1 and ending on December 31), with the first final reporting period in the final period beginning on January 1, 2030, and ending no later than December 31, 2031.

Fossil fuel means natural gas, petroleum, coal, and any form of solid fuel, liquid fuel, or gaseous fuel derived from such material for the purpose of creating useful heat.

ADD145

Heat recovery steam generating unit (HRSG) means a unit in which hot exhaust gases from the combustion turbine engine are routed in order to extract heat from the gases and generate useful output. Heat recovery steam generating units can be used with or without duct burners.

Independent verifier means a person (including any individual, corporation, partnership, or association) who has the appropriate technical and other qualifications to provide verification reports. The independent verifier must not have, or have had, any direct or indirect financial or other interest in the subject of its verification report or ERCs that could impact their impartiality in performing verification services.

Integrated gasification combined cycle facility or IGCC means a combined cycle facility that is designed to burn fuels containing 50 percent (by heat input) or more solid-derived fuel not meeting the definition of natural gas plus any integrated equipment that provides electricity or useful thermal output to either the affected facility or auxiliary equipment. The Administrator may waive the 50 percent solid-derived fuel requirement during periods of the gasification system construction, startup and commissioning, shutdown, or repair. No solid fuel is directly burned in the unit during operation.

Interim period means the period of eight calendar years from January 1, 2022, to December 31, 2029. The interim period is composed three interim steps, interim step 1, interim step 2, and interim step 3.

Interim step means an increment of plan performance within the interim period.

Interim step 1 means the period of three calendar years from January 1, 2022, to December 31, 2024.

Interim step 2 means the period of three calendar years from January 1, 2025, to December 31, 2027.

Interim step 3 means the period of two calendar years from January 1, 2028, to December 31, 2029.

ISO conditions means 288 Kelvin (15 °C), 60 percent relative humidity and 101.3 kilopascals pressure.

M & V report means a report that meets the requirements of § 60.5835.

Mechanical output means the useful mechanical energy that is not used to operate the affected facility, generate electricity and/or thermal output, or to enhance the performance of the affected facility. Mechanical energy measured in horsepower hour must be converted into MWh by multiplying it by 745.7 then dividing by 1,000,000.

Nameplate capacity means, starting from the initial installation, the maximum electrical generating output that a generator, prime mover, or other electric power production equipment under specific conditions designated by the manufacturer is capable of producing (in MWe, rounded to the nearest tenth) on a steady-state basis and during continuous operation (when not restricted by seasonal or other deratings) as of such installation as specified by the manufacturer of the equipment, or starting from the completion of any subsequent physical change resulting in an increase in the maximum electrical generating output that the equipment is capable of producing on a steady-state basis and during continuous operation (when not restricted by seasonal or other deratings), such increased maximum amount (in MWe, rounded to the nearest tenth) as of such completion as specified by the person conducting the physical change.

Natural gas means a fluid mixture of hydrocarbons (e.g., methane, ethane, or propane), composed of at least 70 percent methane by volume or that has a gross calorific value between 35 and 41 megajoules (MJ) per dry standard cubic meter (950 and 1,100 Btu per dry standard cubic foot), that maintains a gaseous State under ISO conditions. In addition, natural gas contains 20.0 grains or less of total sulfur per 100 standard cubic feet. Finally, natural gas does not include the following gaseous fuels:

ADD146

Landfill gas, digester gas, refinery gas, sour gas, blast furnace gas, coal-derived gas, producer gas, coke oven gas, or any gaseous fuel produced in a process which might result in highly variable sulfur content or heating value.

Net allowance export/import means a net transfer of $CO_2$ allowances during an interim step, the interim period, or a final reporting period which represents the net number of $CO_2$ allowances (issued by a State) that are transferred from the compliance accounts of affected EGUs in that state to the compliance accounts of affected EGUs in another State. This net transfer is determined based on compliance account holdings at the end of the plan performance period. Compliance account holdings, as used here, refer to the number of $CO_2$ allowances surrendered for compliance during a plan performance period, as well as any remaining $CO_2$ allowances held in a compliance account as of the end of a plan performance period.

Net electric output means the amount of gross generation the generator(s) produce (including, but not limited to, output from steam turbine(s), combustion turbine(s), and gas expander(s)), as measured at the generator terminals, less the electricity used to operate the plant (i.e., auxiliary loads); such uses include fuel handling equipment, pumps, fans, pollution control equipment, other electricity needs, and transformer losses as measured at the transmission side of the step up transformer (e.g., the point of sale).

Net energy output means:

(1) The net electric or mechanical output from the affected facility, plus 100 percent of the useful thermal output measured relative to SATP conditions that is not used to generate additional electric or mechanical output or to enhance the performance of the unit (e.g., steam delivered to an industrial process for a heating application).

(2) For combined heat and power facilities where at least 20.0 percent of the total gross or net energy output consists of electric or direct mechanical output and at least 20.0 percent of the total gross or net energy output consists of useful thermal output on a 12–operating month rolling average basis, the net electric or mechanical output from the affected EGU divided by 0.95, plus 100 percent of the useful thermal output; (e.g., steam delivered to an industrial process for a heating application).

Programmatic milestone means the implementation of measures necessary for plan progress, including specific dates associated with such implementation. Prior to January 1, 2022, programmatic milestones are applicable to all state plan approaches and measures. Subsequent to January 1, 2022, programmatic milestones are applicable to state measures.

Qualified biomass means a biomass feedstock that is demonstrated as a method to control increases of $CO_2$ levels in the atmosphere.

Standard ambient temperature and pressure (SATP) conditions means 298.15 Kelvin (25 °C, 77 °F)) and 100.0 kilopascals (14.504 psi, 0.987 atm) pressure. The enthalpy of water at SATP conditions is 50 Btu/lb.

State agent means an entity acting on behalf of the State, with the legal authority of the State.

State measures means measures that are adopted, implemented, and enforced as a matter of State law. Such measures are enforceable only per State law, and are not included in and codified as part of the federally enforceable State plan.

Stationary combustion turbine means all equipment, including but not limited to the turbine engine, the fuel, air, lubrication and exhaust gas systems, control systems (except emissions control equipment), heat recovery system, fuel compressor, heater, and/or pump, post-combustion emissions control technology, and any ancillary components and sub-components comprising any simple cycle stationary combustion turbine, any combined cycle combustion turbine, and any combined heat and power combustion turbine based system plus any integrated equipment that provides electricity or useful thermal output to the combustion turbine engine, heat recovery system or auxiliary equipment. Stationary means that the combustion turbine is not

ADD147

self-propelled or intended to be propelled while performing its function. It may, however, be mounted on a vehicle for portability. If a stationary combustion turbine burns any solid fuel directly it is considered a steam generating unit.

Steam generating unit means any furnace, boiler, or other device used for combusting fuel and producing steam (nuclear steam generators are not included) plus any integrated equipment that provides electricity or useful thermal output to the affected facility or auxiliary equipment.

Uprate means an increase in available electric generating unit power capacity due to a system or equipment modification.

Useful thermal output means the thermal energy made available for use in any heating application (e.g., steam delivered to an industrial process for a heating application, including thermal cooling applications) that is not used for electric generation, mechanical output at the affected EGU, to directly enhance the performance of the affected EGU (e.g., economizer output is not useful thermal output, but thermal energy used to reduce fuel moisture is considered useful thermal output), or to supply energy to a pollution control device at the affected EGU. Useful thermal output for affected EGU(s) with no condensate return (or other thermal energy input to the affected EGU(s)) or where measuring the energy in the condensate (or other thermal energy input to the affected EGU(s)) would not meaningfully impact the emission rate calculation is measured against the energy in the thermal output at SATP conditions. Affected EGU(s) with meaningful energy in the condensate return (or other thermal energy input to the affected EGU) must measure the energy in the condensate and subtract that energy relative to SATP conditions from the measured thermal output.

Valid data means quality-assured data generated by continuous monitoring systems that are installed, operated, and maintained according to part 75 of this chapter. For CEMS, the initial certification requirements in § 75.20 of this chapter and appendix A to part 75 of this chapter must be met before quality-assured data are reported under this subpart; for on-going quality assurance, the daily, quarterly, and semiannual/annual test requirements in sections 2.1, 2.2, and 2.3 of appendix B to part 75 of this chapter must be met and the data validation criteria in sections 2.1.5, 2.2.3, and 2.3.2 of appendix B to part 75 of this chapter apply. For fuel flow meters, the initial certification requirements in section 2.1.5 of appendix D to part 75 of this chapter must be met before quality-assured data are reported under this subpart (except for qualifying commercial billing meters under section 2.1.4.2 of appendix D), and for on-going quality assurance, the provisions in section 2.1.6 of appendix D to part 75 of this chapter apply (except for qualifying commercial billing meters).

Waste-to–Energy means a process or unit (e.g., solid waste incineration unit) that recovers energy from the conversion or combustion of waste stream materials, such as municipal solid waste, to generate electricity and/or heat.

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 80 FR 64941, Oct. 23, 2015, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through March 17, 2016; 81 FR 14401.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 86. Control of Emissions from New and in–Use Highway Vehicles and Engines (Refs & Annos)
Subpart S. General Compliance Provisions for Control of Air Pollution from New and in–Use Light–Duty Vehicles, Light–Duty Trucks, and Heavy–Duty Vehicles (Refs & Annos)

40 C.F.R. § 86.1865–12

§ 86.1865–12 How to comply with the fleet average $CO_2$ standards.

Effective: August 16, 2013

Currentness

(a) Applicability.

(1) Unless otherwise exempted under the provisions of § 86.1801–12(j) or (k), $CO_2$ fleet average exhaust emission standards of this subpart apply to:

(i) 2012 and later model year passenger automobiles and light trucks.

(ii) Heavy-duty vehicles subject to standards under 40 CFR 1037.104.

(iii) Vehicles imported by ICIs as defined in 40 CFR 85.1502.

(2) The terms "passenger automobile" and "light truck" as used in this section have the meanings as defined in § 86.1818–12.

(b) Useful life requirements. Full useful life requirements for $CO_2$ standards are defined in § 86.1818–12. There is not an intermediate useful life standard for $CO_2$ emissions.

(c) Altitude. Altitude requirements for $CO_2$ standards are provided in § 86.1810–09(f).

(d) Small volume manufacturer certification procedures. Certification procedures for small volume manufacturers are provided in § 86.1838. Small businesses meeting certain criteria may be exempted from the greenhouse gas emission standards in § 86.1818 according to the provisions of § 86.1801–12(j) or (k).

(e) $CO_2$ fleet average exhaust emission standards. The fleet average standards referred to in this section are the corporate fleet average $CO_2$ standards for passenger automobiles and light trucks set forth in § 86.1818–12(c) and (e). The fleet average $CO_2$ standards applicable in a given model year are calculated separately for passenger automobiles and light trucks for each

ADD149

manufacturer and each model year according to the provisions in § 86.1818–12. Each manufacturer must comply with the applicable $CO_2$ fleet average standard on a production-weighted average basis, for each separate averaging set, at the end of each model year, using the procedure described in paragraph (j) of this section.

(f) In-use $CO_2$ standards. In-use $CO_2$ exhaust emission standards applicable to each model type are provided in § 86.1818–12(d).

(g) Durability procedures and method of determining deterioration factors (DFs). Deterioration factors for $CO_2$ exhaust emission standards are provided in § 86.1823–08(m).

(h) Vehicle test procedures.

(1) The test procedures for demonstrating compliance with $CO_2$ exhaust emission standards are contained in subpart B of this part and subpart B of part 600 of this chapter.

(2) Testing of all passenger automobiles and light trucks to determine compliance with $CO_2$ exhaust emission standards set forth in this section must be on a loaded vehicle weight (LVW) basis, as defined in § 86.1803–01.

(3) Testing for the purpose of providing certification data is required only at low altitude conditions. If hardware and software emission control strategies used during low altitude condition testing are not used similarly across all altitudes for in-use operation, the manufacturer must include a statement in the application for certification, in accordance with § 86.1844–01(d)(11) and § 86.1810–09(f), stating what the different strategies are and why they are used.

(i) Calculating the fleet average carbon-related exhaust emissions.

(1) Manufacturers must compute separate production-weighted fleet average carbon-related exhaust emissions at the end of the model year for passenger automobiles and light trucks, using actual production, where production means vehicles produced and delivered for sale, and certifying model types to standards as defined in § 86.1818–12. The model type carbon-related exhaust emission results determined according to 40 CFR part 600 subpart F (in units of grams per mile rounded to the nearest whole number) become the certification standard for each model type.

(2) Manufacturers must separately calculate production-weighted fleet average carbon-related exhaust emissions levels for the following averaging sets according to the provisions of part 600 subpart F of this chapter:

(i) Passenger automobiles subject to the fleet average $CO_2$ standards specified in § 86.1818–12(c)(2);

(ii) Light trucks subject to the fleet average $CO_2$ standards specified in § 86.1818–12(c)(3);

(iii) Passenger automobiles subject to the Temporary Leadtime Allowance Alternative Standards specified in § 86.1818–12(e), if applicable; and

ADD150

(iv) Light trucks subject to the Temporary Leadtime Allowance Alternative Standards specified in § 86.1818–12(e), if applicable.

(j) Certification compliance and enforcement requirements for $CO_2$ exhaust emission standards.

(1) Compliance and enforcement requirements are provided in this section and § 86.1848–10(c)(9).

(2) The certificate issued for each test group requires all model types within that test group to meet the in-use emission standards to which each model type is certified as outlined in § 86.1818–12(d).

(3) Each manufacturer must comply with the applicable $CO_2$ fleet average standard on a production-weighted average basis, at the end of each model year, using the procedure described in paragraph (i) of this section.

(4) Each manufacturer must comply on an annual basis with the fleet average standards as follows:

(i) Manufacturers must report in their annual reports to the Agency that they met the relevant corporate average standard by showing that their production-weighted average $CO_2$ emission levels of passenger automobiles, light trucks, and heavy-duty vehicles, as applicable, are at or below the applicable fleet average standards; or

(ii) If the production-weighted average is above the applicable fleet average standard, manufacturers must obtain and apply sufficient $CO_2$ credits as authorized under paragraph (k)(8) of this section. A manufacturer must show that they have offset any exceedence of the corporate average standard via the use of credits. Manufacturers must also include their credit balances or deficits in their annual report to the Agency.

(iii) If a manufacturer fails to meet the corporate average $CO_2$ standard for four consecutive years, the vehicles causing the corporate average exceedence will be considered not covered by the certificate of conformity (see paragraph (k)(8) of this section). A manufacturer will be subject to penalties on an individual-vehicle basis for sale of vehicles not covered by a certificate.

(iv) EPA will review each manufacturer's production to designate the vehicles that caused the exceedence of the corporate average standard. EPA will designate as nonconforming those vehicles in test groups with the highest certification emission values first, continuing until reaching a number of vehicles equal to the calculated number of noncomplying vehicles as determined in paragraph (k)(8) of this section. In a group where only a portion of vehicles would be deemed nonconforming, EPA will determine the actual nonconforming vehicles by counting backwards from the last vehicle produced in that test group. Manufacturers will be liable for penalties for each vehicle sold that is not covered by a certificate.

(k) Requirements for the $CO_2$ averaging, banking and trading (ABT) program.

(1) A manufacturer whose $CO_2$ fleet average emissions exceed the applicable standard must complete the calculation in paragraph (k)(4) of this section to determine the size of its $CO_2$ deficit. A manufacturer whose $CO_2$ fleet average emissions

ADD151

are less than the applicable standard must complete the calculation in paragraph (k)(4) of this section to generate $CO_2$ credits. In either case, the number of credits or debits must be rounded to the nearest whole number.

(2) There are no property rights associated with $CO_2$ credits generated under this subpart. Credits are a limited authorization to emit the designated amount of emissions. Nothing in this part or any other provision of law should be construed to limit EPA's authority to terminate or limit this authorization through a rulemaking.

(3) Each manufacturer must comply with the reporting and recordkeeping requirements of paragraph (l) of this section for $CO_2$ credits, including early credits. The averaging, banking and trading program is enforceable through the certificate of conformity that allows the manufacturer to introduce any regulated vehicles into commerce.

(4) Credits are earned on the last day of the model year. Manufacturers must calculate, for a given model year and separately for passenger automobiles, light trucks, and heavy-duty vehicles (as specified in 40 CFR 1037.104), the number of credits or debits it has generated according to the following equation rounded to the nearest megagram:

$CO_2$ Credits or Debits (Mg) = [($CO_2$ Standard—Manufacturer's Production–Weighted Fleet Average $CO_2$ Emissions) x (Total Number of Vehicles Produced) x (Vehicle Lifetime Miles)] ÷ 1,000,000

Where:

$CO_2$ Standard = the applicable standard for the model year as determined by § 86.1818–12;

Manufacturer's Production–Weighted Fleet Average $CO_2$ Emissions = average calculated according to paragraph (i) of this section;

Total Number of Vehicles Produced = The number of vehicles domestically produced plus those imported as defined in § 600.511–80 of this chapter; and

Vehicle Lifetime Miles is 195,264 for passenger automobiles and 225,865 for light trucks.

(5) Total credits or debits generated in a model year, maintained and reported separately for passenger automobiles and light trucks, shall be the sum of the credits or debits calculated in paragraph (k)(4) of this section and any of the following credits, if applicable, minus any $N_2O$ and/or $CH_4$ $CO_2$-equivalent debits calculated according to the provisions of § 86.1818–12(f)(4):

(i) Air conditioning leakage credits earned according to the provisions of § 86.1867–12(b);

(ii) Air conditioning efficiency credits earned according to the provisions of § 86.1868–12(c);

(iii) Off-cycle technology credits earned according to the provisions of § 86.1869–12(d).

(iv) Full size pickup truck credits earned according to the provisions of § 86.1870–12(c).

ADD152

(v) $N_2O$ and/or $CH_4$ $CO_2$-equivalent debits accumulated according to the provisions of § 86.1818–12(f)(4).

(6) The expiration date of unused $CO_2$ credits is based on the model year in which the credits are earned, as follows:

(i) Unused $CO_2$ credits from the 2009 model year shall retain their full value through the 2014 model year. Credits from the 2009 model year that remain at the end of the 2014 model year shall expire.

(ii) Unused $CO_2$ credits from the 2010 through 2015 model years shall retain their full value through the 2021 model year. Credits remaining from these model years at the end of the 2021 model year shall expire.

(iii) Unused $CO_2$ credits from the 2016 and later model years shall retain their full value through the five subsequent model years after the model year in which they were generated. Credits remaining at the end of the fifth model year after the model year in which they were generated shall expire.

(7) Credits may be used as follows:

(i) Credits generated and calculated according to the method in paragraphs (k)(4) and (5) of this section may not be used to offset deficits other than those deficits accrued with respect to the standard in § 86.1818. Credits may be banked and used in a future model year in which a manufacturer's average $CO_2$ level exceeds the applicable standard. Credits may be transferred between the passenger automobile and light truck fleets of a given manufacturer. Credits may also be traded to another manufacturer according to the provisions in paragraph (k)(8) of this section. Before trading or carrying over credits to the next model year, a manufacturer must apply available credits to offset any deficit, where the deadline to offset that credit deficit has not yet passed.

(ii) The use of credits shall not change Selective Enforcement Auditing or in-use testing failures from a failure to a non-failure. The enforcement of the averaging standard occurs through the vehicle's certificate of conformity. A manufacturer's certificate of conformity is conditioned upon compliance with the averaging provisions. The certificate will be void ab initio if a manufacturer fails to meet the corporate average standard and does not obtain appropriate credits to cover its shortfalls in that model year or subsequent model years (see deficit carry-forward provisions in paragraph (k)(8) of this section).

(iii) Special provisions for manufacturers using the Temporary Leadtime Allowance Alternative Standards.

(A) Credits generated by vehicles subject to the fleet average $CO_2$ standards specified in § 86.1818–12(c) may only be used to offset a deficit generated by vehicles subject to the Temporary Leadtime Allowance Alternative Standards specified in § 86.1818–12(e).

(B) Credits generated by a passenger automobile or light truck averaging set subject to the Temporary Leadtime Allowance Alternative Standards specified in § 86.1818–12(e)(4)(i) or (ii) of this section may be used to offset a deficit generated by an averaging set subject to the Temporary Leadtime Allowance Alternative Standards through

ADD153

the 2015 model year, except that manufacturers qualifying under the provisions of § 86.1818–12(e)(3) may use such credits to offset a deficit generated by an averaging set subject to the Temporary Leadtime Allowance Alternative Standards through the 2016 model year.

(C) Credits generated by an averaging set subject to the Temporary Leadtime Allowance Alternative Standards specified in § 86.1818–12(e)(4)(i) or (ii) of this section may not be used to offset a deficit generated by an averaging set subject to the fleet average $CO_2$ standards specified in § 86.1818–12(c)(2) or (3) or otherwise transferred to an averaging set subject to the fleet average $CO_2$ standards specified in § 86.1818–12(c)(2) or (3).

(D) Credits generated by vehicles subject to the Temporary Leadtime Allowance Alternative Standards specified in § 86.1818–12(e)(4)(i) or (ii) may be banked for use in a future model year (to offset a deficit generated by an averaging set subject to the Temporary Leadtime Allowance Alternative Standards). All such credits shall expire at the end of the 2015 model year, except that manufacturers qualifying under the provisions of § 86.1818–12(e)(3) may use such credits to offset a deficit generated by an averaging set subject to the Temporary Leadtime Allowance Alternative Standards through the 2016 model year.

(E) A manufacturer with any vehicles subject to the Temporary Leadtime Allowance Alternative Standards specified in § 86.1818–12(e)(4)(i) or (ii) of this section in a model year in which that manufacturer also generates credits with vehicles subject to the fleet average $CO_2$ standards specified in § 86.1818–12(c) may not trade or bank credits earned against the fleet average standards in § 86.1818–12(c) for use in a future model year.

(iv) Credits generated in the 2017 through 2020 model years under the provisions of § 86.1818(e)(3)(ii) may not be traded or otherwise provided to another manufacturer.

(v) Credits generated under any alternative fleet average standards approved under § 86.1818(g) may not be traded or otherwise provided to another manufacturer.

(8) The following provisions apply if debits are accrued:

(i) If a manufacturer calculates that it has negative credits (also called "debits" or a "credit deficit") for a given model year, it may carry that deficit forward into the next three model years. Such a carry-forward may only occur after the manufacturer exhausts any supply of banked credits. At the end of the third model year, the deficit must be covered with an appropriate number of credits that the manufacturer generates or purchases. Any remaining deficit is subject to a voiding of the certificate ab initio, as described in this paragraph (k)(8). Manufacturers are not permitted to have a credit deficit for four consecutive years.

(ii) If debits are not offset within the specified time period, the number of vehicles not meeting the fleet average $CO_2$ standards (and therefore not covered by the certificate) must be calculated.

(A) Determine the gram per mile quantity of debits for the noncompliant vehicle category by multiplying the total megagram deficit by 1,000,000 and then dividing by the vehicle lifetime miles for the vehicle category (passenger automobile or light truck) specified in paragraph (k)(4) of this section.

ADD154

(B) Divide the result by the fleet average standard applicable to the model year in which the debits were first incurred and round to the nearest whole number to determine the number of vehicles not meeting the fleet average $CO_2$ standards.

(iii) EPA will determine the vehicles not covered by a certificate because the condition on the certificate was not satisfied by designating vehicles in those test groups with the highest carbon-related exhaust emission values first and continuing until reaching a number of vehicles equal to the calculated number of non-complying vehicles as determined in this paragraph (k)(8). If this calculation determines that only a portion of vehicles in a test group contribute to the debit situation, then EPA will designate actual vehicles in that test group as not covered by the certificate, starting with the last vehicle produced and counting backwards.

(iv)(A) If a manufacturer ceases production of passenger automobiles, light trucks, or heavy-duty vehicles subject to the standards of 40 CFR 1037.104, the manufacturer continues to be responsible for offsetting any debits outstanding within the required time period. Any failure to offset the debits will be considered a violation of paragraph (k)(8)(i) of this section and may subject the manufacturer to an enforcement action for sale of vehicles not covered by a certificate, pursuant to paragraphs (k)(8)(ii) and (iii) of this section.

(B) If a manufacturer is purchased by, merges with, or otherwise combines with another manufacturer, the controlling entity is responsible for offsetting any debits outstanding within the required time period. Any failure to offset the debits will be considered a violation of paragraph (k)(8)(i) of this section and may subject the manufacturer to an enforcement action for sale of vehicles not covered by a certificate, pursuant to paragraphs (k)(8)(ii) and (iii) of this section.

(v) For purposes of calculating the statute of limitations, a violation of the requirements of paragraph (k)(8)(i) of this section, a failure to satisfy the conditions upon which a certificate(s) was issued and hence a sale of vehicles not covered by the certificate, all occur upon the expiration of the deadline for offsetting debits specified in paragraph (k)(8)(i) of this section.

(9) The following provisions apply to $CO_2$ credit trading:

(i) EPA may reject $CO_2$ credit trades if the involved manufacturers fail to submit the credit trade notification in the annual report.

(ii) A manufacturer may not sell credits that are not available for sale pursuant to the provisions in paragraph (k)(6) of this section.

(iii) In the event of a negative credit balance resulting from a transaction, both the buyer and seller are liable. EPA may void ab initio the certificates of conformity of all test groups participating in such a trade.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    7

(iv)(A) If a manufacturer trades a credit that it has not generated pursuant to paragraph (k) of this section or acquired from another party, the manufacturer will be considered to have generated a debit in the model year that the manufacturer traded the credit. The manufacturer must offset such debits by the deadline for the annual report for that same model year.

(B) Failure to offset the debits within the required time period will be considered a failure to satisfy the conditions upon which the certificate(s) was issued and will be addressed pursuant to paragraph (k)(8) of this section.

(v) A manufacturer may only trade credits that it has generated pursuant to paragraphs (k)(4) and (5) of this section or acquired from another party.

(l) Maintenance of records and submittal of information relevant to compliance with fleet average $CO_2$ standards—

(1) Maintenance of records.

(i) Manufacturers producing any light-duty vehicles, light-duty trucks, or medium-duty passenger vehicles subject to the provisions in this subpart or any heavy-duty vehicles subject to the standards of 40 CFR 1037.104 must establish, maintain, and retain all the following information in adequately organized records for each model year:

(A) Model year.

(B) Applicable fleet average $CO_2$ standards for each averaging set as defined in paragraph (i) of this section.

(C) The calculated fleet average $CO_2$ value for each averaging set as defined in paragraph (i) of this section.

(D) All values used in calculating the fleet average $CO_2$ values.

(ii) Manufacturers producing any passenger automobiles or light trucks subject to the provisions in this subpart and vehicles subject to the standards of 40 CFR 1037.104 must establish, maintain, and retain all the following information in adequately organized records for each passenger automobile or light truck subject to this subpart:

(A) Model year.

(B) Applicable fleet average $CO_2$ standard.

(C) EPA test group.

(D) Assembly plant.

ADD156

(E) Vehicle identification number.

(F) Carbon-related exhaust emission standard, $N_2O$ emission standard, and $CH_4$ emission standard to which the passenger automobile or light truck is certified.

(G) In-use carbon-related exhaust emission standard.

(H) Information on the point of first sale, including the purchaser, city, and state.

(iii) Manufacturers must retain all required records for a period of eight years from the due date for the annual report. Records may be stored in any format and on any media, as long as manufacturers can promptly send EPA organized written records in English if requested by the Administrator. Manufacturers must keep records readily available as EPA may review them at any time.

(iv) The Administrator may require the manufacturer to retain additional records or submit information not specifically required by this section.

(v) Pursuant to a request made by the Administrator, the manufacturer must submit to the Administrator the information that the manufacturer is required to retain.

(vi) EPA may void ab initio a certificate of conformity for vehicles certified to emission standards as set forth or otherwise referenced in this subpart for which the manufacturer fails to retain the records required in this section or to provide such information to the Administrator upon request, or to submit the reports required in this section in the specified time period.

(2) Reporting.

(i) Each manufacturer must submit an annual report. The annual report must contain for each applicable $CO_2$ standard, the calculated fleet average $CO_2$ value, all values required to calculate the $CO_2$ emissions value, the number of credits generated or debits incurred, all the values required to calculate the credits or debits, and the resulting balance of credits or debits. For each applicable alternative $N_2O$ and/or $CH_4$ standard selected under the provisions of § 86.1818–12(f)(3), the report must contain the $N_2O$ and/or $CH_4$ $CO_2$-equivalent debits calculated according to § 86.1818–12(f)(4) for each test group and all values required to calculate the number of debits incurred.

(ii) For each applicable fleet average $CO_2$ standard, the annual report must also include documentation on all credit transactions the manufacturer has engaged in since those included in the last report. Information for each transaction must include all of the following:

(A) Name of credit provider.

(B) Name of credit recipient.

(C) Date the trade occurred.

(D) Quantity of credits traded in megagrams.

(E) Model year in which the credits were earned.

(iii) Manufacturers calculating air conditioning leakage and/or efficiency credits under paragraph § 86.1871–12(b) shall include the following information for each model year and separately for passenger automobiles and light trucks and for each air conditioning system used to generate credits:

(A) A description of the air conditioning system.

(B) The leakage credit value and all the information required to determine this value.

(C) The total credits earned for each averaging set, model year, and region, as applicable.

(iv) Manufacturers calculating advanced technology vehicle credits under paragraph § 86.1871–12(c) shall include the following information for each model year and separately for passenger automobiles and light trucks:

(A) The number of each model type of eligible vehicle sold.

(B) The cumulative model year production of eligible vehicles starting with the 2009 model year.

(C) The carbon-related exhaust emission value by model type and model year.

(v) Manufacturers calculating off-cycle technology credits under paragraph § 86.1871–12(d) shall include, for each model year and separately for passenger automobiles and light trucks, all test results and data required for calculating such credits.

(vi) Unless a manufacturer reports the data required by this section in the annual production report required under § 86.1844–01(e) or the annual report required under § 600.512–12 of this chapter, a manufacturer must submit an annual report for each model year after production ends for all affected vehicles produced by the manufacturer subject to the provisions of this subpart and no later than May 1 of the calendar year following the given model year. Annual reports must be submitted to: Director, Compliance and Innovative Strategies Division, U.S. Environmental Protection Agency, 2000 Traverwood, Ann Arbor, Michigan 48105.

ADD158

(vii) Failure by a manufacturer to submit the annual report in the specified time period for all vehicles subject to the provisions in this section is a violation of section 203(a)(1) of the Clean Air Act (42 U.S.C. 7522 (a)(1)) for each applicable vehicle produced by that manufacturer.

(viii) If EPA or the manufacturer determines that a reporting error occurred on an annual report previously submitted to EPA, the manufacturer's credit or debit calculations will be recalculated. EPA may void erroneous credits, unless traded, and will adjust erroneous debits. In the case of traded erroneous credits, EPA must adjust the selling manufacturer's credit balance to reflect the sale of such credits and any resulting credit deficit.

(3) Notice of opportunity for hearing. Any voiding of the certificate under paragraph (l)(1)(vi) of this section will be made only after EPA has offered the affected manufacturer an opportunity for a hearing conducted in accordance with § 86.614 and, if a manufacturer requests such a hearing, will be made only after an initial decision by the Presiding Officer.

**Credits**

[75 FR 25691, May 7, 2010; 76 FR 19874, April 8, 2011; 76 FR 39522, July 6, 2011; 76 FR 57379, Sept. 15, 2011; 77 FR 63163, Oct. 15, 2012; 78 FR 36388, June 17, 2013]

SOURCE: 50 FR 35386, Aug. 30, 1985; 53 FR 19134, May 26, 1988; 53 FR 43875, Oct. 31, 1988; 54 FR 14455, April 11, 1989; 56 FR 64711, Dec. 12, 1991; 57 FR 30055, July 7, 1992; 58 FR 4002, Jan. 12, 1993; 58 FR 16019, March 24, 1993; 62 FR 31232, June 6, 1997; 62 FR 44875, Aug. 22, 1997; 62 FR 47119, Sept. 5, 1997; 63 FR 7719, Feb. 17, 1998; 64 FR 23925, May 4, 1999; 65 FR 59963, Oct. 6, 2000; 66 FR 17273, March 29, 2001; 67 FR 72825, Dec. 6, 2002; 80 FR 9104, Feb. 19, 2015, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401–7671q.

Current through March 17, 2016; 81 FR 14401.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

ADD159

Code of Federal Regulations
    Title 50. Wildlife and Fisheries
        Chapter IV. Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and
        National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of
        Commerce); Endangered Species Committee Regulations
            Subchapter A
                Part 402. Interagency Cooperation—Endangered Species Act of 1973, as Amended (Refs & Annos)
                    Subpart B. Consultation Procedures

50 C.F.R. § 402.14

§ 402.14 Formal consultation.

Effective: June 10, 2015
Currentness

(a) Requirement for formal consultation. Each Federal agency shall review its actions at the earliest possible time to determine
whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required,
except as noted in paragraph (b) of this section. The Director may request a Federal agency to enter into consultation if he
identifies any action of that agency that may affect listed species or critical habitat and for which there has been no consultation.
When such a request is made, the Director shall forward to the Federal agency a written explanation of the basis for the request.

(b) Exceptions.

(1) A Federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment
under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines,
with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species
or critical habitat.

(2) A Federal agency need not initiate formal consultation if a preliminary biological opinion, issued after early consultation
under § 402.11, is confirmed as the final biological opinion.

(c) Initiation of formal consultation. A written request to initiate formal consultation shall be submitted to the Director and
shall include:

(1) A description of the action to be considered;

(2) A description of the specific area that may be affected by the action;

(3) A description of any listed species or critical habitat that may be affected by the action;

ADD160

(4) A description of the manner in which the action may affect any listed species or critical habitat and an analysis of any cumulative effects;

(5) Relevant reports, including any environmental impact statement, environmental assessment, or biological assessment prepared; and

(6) Any other relevant available information on the action, the affected listed species, or critical habitat.

Formal consultation shall not be initiated by the Federal agency until any required biological assessment has been completed and submitted to the Director in accordance with § 402.12. Any request for formal consultation may encompass, subject to the approval of the Director, a number of similar individual actions within a given geographical area or a segment of a comprehensive plan. This does not relieve the Federal agency of the requirements for considering the effects of the action as a whole.

(d) Responsibility to provide best scientific and commercial data available. The Federal agency requesting formal consultation shall provide the Service with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat. This information may include the results of studies or surveys conducted by the Federal agency or the designated non-Federal representative. The Federal agency shall provide any applicant with the opportunity to submit information for consideration during the consultation.

(e) Duration and extension of formal consultation. Formal consultation concludes within 90 days after its initiation unless extended as provided below. If an applicant is not involved, the Service and the Federal agency may mutually agree to extend the consultation for a specific time period. If an applicant is involved, the Service and the Federal agency may mutually agree to extend the consultation provided that the Service submits to the applicant, before the close of the 90 days, a written statement setting forth:

(1) The reasons why a longer period is required,

(2) The information that is required to complete the consultation, and

(3) The estimated date on which the consultation will be completed.

A consultation involving an applicant cannot be extended for more than 60 days without the consent of the applicant. Within 45 days after concluding formal consultation, the Service shall deliver a biological opinion to the Federal agency and any applicant.

(f) Additional data. When the Service determines that additional data would provide a better information base from which to formulate a biological opinion, the Director may request an extension of formal consultation and request that the Federal agency obtain additional data to determine how or to what extent the action may affect listed species or critical habitat. If formal consultation is extended by mutual agreement according to § 402.14(e), the Federal agency shall obtain, to the extent practicable, that data which can be developed within the scope of the extension. The responsibility for conducting and funding any studies belongs to the Federal agency and the applicant, not the Service. The Service's request for additional data is not to be construed as the Service's opinion that the Federal agency has failed to satisfy the information standard of section 7(a)

ADD161

(2) of the Act. If no extension of formal consultation is agreed to, the Director will issue a biological opinion using the best scientific and commercial data available.

(g) *Service responsibilities.* Service responsibilities during formal consultation are as follows:

(1) Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

(2) Evaluate the current status of the listed species or critical habitat.

(3) Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4) Formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

(5) Discuss with the Federal agency and any applicant the Service's review and evaluation conducted under paragraphs (g) (1)–(3) of this section, the basis for any finding in the biological opinion, and the availability of reasonable and prudent alternatives (if a jeopardy opinion is to be issued) that the agency and the applicant can take to avoid violation of section 7(a)(2). The Service will utilize the expertise of the Federal agency and any applicant in identifying these alternatives. If requested, the Service shall make available to the Federal agency the draft biological opinion for the purpose of analyzing the reasonable and prudent alternatives. The 45–day period in which the biological opinion must be delivered will not be suspended unless the Federal agency secures the written consent of the applicant to an extension to a specific date. The applicant may request a copy of the draft opinion from the Federal agency. All comments on the draft biological opinion must be submitted to the Service through the Federal agency, although the applicant may send a copy of its comments directly to the Service. The Service will not issue its biological opinion prior to the 45–day or extended deadline while the draft is under review by the Federal agency. However, if the Federal agency submits comments to the Service regarding the draft biological opinion within 10 days of the deadline for issuing the opinion, the Service is entitled to an automatic 10–day extension on the deadline.

(6) Formulate discretionary conservation recommendations, if any, which will assist the Federal agency in reducing or eliminating the impacts that its proposed action may have on listed species or critical habitat.

(7) Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

(8) In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation.

(h) *Biological opinions.* The biological opinion shall include:

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

(1) A summary of the information on which the opinion is based;

(2) A detailed discussion of the effects of the action on listed species or critical habitat; and

(3) The Service's opinion on whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "jeopardy biological opinion"); or, the action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "no jeopardy" biological opinion). A "jeopardy" biological opinion shall include reasonable and prudent alternatives, if any. If the Service is unable to develop such alternatives, it will indicate that to the best of its knowledge there are no reasonable and prudent alternatives.

(i) Incidental take.

(1) In those cases where the Service concludes that an action (or the implementation of any reasonable and prudent alternatives) and the resultant incidental take of listed species will not violate section 7(a)(2), and, in the case of marine mammals, where the taking is authorized pursuant to section 101(a)(5) of the Marine Mammal Protection Act of 1972, the Service will provide with the biological opinion a statement concerning incidental take that:

(i) Specifies the impact, i.e., the amount or extent, of such incidental taking on the species (A surrogate (e.g., similarly affected species or habitat or ecological conditions) may be used to express the amount or extent of anticipated take provided that the biological opinion or incidental take statement: Describes the causal link between the surrogate and take of the listed species, explains why it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals of the listed species, and sets a clear standard for determining when the level of anticipated take has been exceeded.);

(ii) Specifies those reasonable and prudent measures that the Director considers necessary or appropriate to minimize such impact;

(iii) In the case of marine mammals, specifies those measures that are necessary to comply with section 101(a)(5) of the Marine Mammal Protection Act of 1972 and applicable regulations with regard to such taking;

(iv) Sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or any applicant to implement the measures specified under paragraphs (i)(1)(ii) and (i)(1)(iii) of this section; and

(v) Specifies the procedures to be used to handle or dispose of any individuals of a species actually taken.

(2) Reasonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes.

ADD163

(3) In order to monitor the impacts of incidental take, the Federal agency or any applicant must report the progress of the action and its impact on the species to the Service as specified in the incidental take statement. The reporting requirements will be established in accordance with 50 CFR 13.45 and 18.27 for FWS and 50 CFR 216.105 and 222.301(h) for NMFS.

(4) If during the course of the action the amount or extent of incidental taking, as specified under paragraph (i)(1)(i) of this Section, is exceeded, the Federal agency must reinitiate consultation immediately.

(5) Any taking which is subject to a statement as specified in paragraph (i)(1) of this section and which is in compliance with the terms and conditions of that statement is not a prohibited taking under the Act, and no other authorization or permit under the Act is required.

(6) For a framework programmatic action, an incidental take statement is not required at the programmatic level; any incidental take resulting from any action subsequently authorized, funded, or carried out under the program will be addressed in subsequent section 7 consultation, as appropriate. For a mixed programmatic action, an incidental take statement is required at the programmatic level only for those program actions that are reasonably certain to cause take and are not subject to further section 7 consultation.

(j) Conservation recommendations. The Service may provide with the biological opinion a statement containing discretionary conservation recommendations. Conservation recommendations are advisory and are not intended to carry any binding legal force.

(k) Incremental steps. When the action is authorized by a statute that allows the agency to take incremental steps toward the completion of the action, the Service shall, if requested by the Federal agency, issue a biological opinion on the incremental step being considered, including its views on the entire action. Upon the issuance of such a biological opinion, the Federal agency may proceed with or authorize the incremental steps of the action if:

(1) The biological opinion does not conclude that the incremental step would violate section 7(a)(2);

(2) The Federal agency continues consultation with respect to the entire action and obtains biological opinions, as required, for each incremental step;

(3) The Federal agency fulfills its continuing obligation to obtain sufficient data upon which to base the final biological opinion on the entire action;

(4) The incremental step does not violate section 7(d) of the Act concerning irreversible or irretrievable commitment of resources; and

(5) There is a reasonable likelihood that the entire action will not violate section 7(a)(2) of the Act.

(l) Termination of consultation.

ADD164

(1) Formal consultation is terminated with the issuance of the biological opinion.

(2) If during any stage of consultation a Federal agency determines that its proposed action is not likely to occur, the consultation may be terminated by written notice to the Service.

(3) If during any stage of consultation a Federal agency determines, with the concurrence of the Director, that its proposed action is not likely to adversely affect any listed species or critical habitat, the consultation is terminated.

**Credits**

[54 FR 40350, Sept. 29, 1989; 73 FR 76287, Dec. 16, 2008; 74 FR 20423, May 4, 2009; 80 FR 26844, May 11, 2015]

SOURCE: 51 FR 19957, June 3, 1986, unless otherwise noted.

AUTHORITY: 16 U.S.C. 1531 et seq.

Notes of Decisions (183)

Current through March 24, 2016; 81 FR 16051.

---

End of Document                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

ADD165

93d Congress }
2d Session }        COMMITTEE PRINT

# A LEGISLATIVE HISTORY OF THE CLEAN AIR AMENDMENTS OF 1970

TOGETHER WITH

## A SECTION-BY-SECTION INDEX

PREPARED BY THE

### ENVIRONMENTAL POLICY DIVISION

OF THE

### CONGRESSIONAL RESEARCH SERVICE

OF THE

### LIBRARY OF CONGRESS

FOR THE

### COMMITTEE ON PUBLIC WORKS
### U.S. SENATE

VOLUME 1



JANUARY 1974

SERIAL NO. 93–18

Printed for the use of the Committee on Public Works

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1974

26-274 O

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C., 20402 - Price $5.30

ADD166

Calendar No. 1214

| 91st Congress<br>2d Session | SENATE | Report<br>No. 91–1196 |
|---|---|---|

# NATIONAL AIR QUALITY STANDARDS ACT OF 1970

---

# R E P O R T

OF THE

## COMMITTEE ON PUBLIC WORKS
## UNITED STATES SENATE

TOGETHER WITH

## INDIVIDUAL VIEWS

TO ACCOMPANY

## S. 4358



SEPTEMBER 17, 1970.—Ordered to be printed

---

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1970

(397)

ADD167

## SECTION 115. EMISSION STANDARDS FOR HAZARDOUS AGENTS

The proposed new section 115 would authorize the Secretary to prohibit emissions or to establish standards applicable to emissions of air pollutants "whose presence, chronically or intermittently, in trace concentrations in the ambient air, either alone or in combination with other agents, causes or will cause, or contribute to, an increase in mortality or an increase in serious irreversible or incapacitating reversible damage to health."

On the basis of information presented to the Committee, it is clear that the above definition will encompass a limited number of pollutants. Asbestos, cadmium, mercury, and beryllium have been identified as pollution agents which could be subject to emission prohibitions or standards to be established under section 115. It would be the Secretary's responsibility to determine whether there are additional pollutants (including any of those expected to be subject to section 114) which also should be covered under section 115.

In writing a relatively restrictive definition of hazardous agents, the Committee recognized that a total prohibition on emissions is a step that ought to be taken only where a danger to health, as defined, exists. It should be noted that emission standards for pollutants which cannot be considered hazardous (as defined in section 115) could be established under section 114. Thus, there should be no gaps in control activities pertaining to stationary source emissions that pose any significant danger to public health or welfare.

This section would establish an administrative procedure to regulate and control the emission of such hazardous materials. Under this procedure, the Secretary would be authorized to designate from time to time those air pollution agents or combinations of agents which present a hazard to the health of persons as indicated by available material evidence. Following designation the Secretary would be required to publish a proposed prohibition of emissions of such agents or combination of such agents from any stationary source.

The Committee recognizes that some of these hazardous pollutants, such as cadmium and beryllium, are present in nearly all raw materials. Thus, beryllium and cadmium appear as trace impurities in steel making and other raw material processes, in addition to the processing at beryllium and cadmium plants. Recognizing that complete control of beryllium from steel plants, for example, may not be necessary or practicable, the Committee has provided the Secretary with authority to differentiate among categories of sources in establishing prohibitions under section 115.

After public hearings and within six months of the publication of such proposed prohibition, the Secretary would be required to promulgate such prohibition, unless he found on the basis of a preponderance of the evidence, that the air pollution agent was not, in fact, hazardous to the health of persons—or that a greater than zero emission could be permitted without presenting a hazard to health.

The bill would provide that any prohibition should become effective upon promulgation and that any emission standard for a hazardous substance established under this section should become effective no later than 180 days after such promulgation.

The Committee recognizes that the violation of a prohibition or emission standard for any substance which is hazardous to the health of persons requires an expeditious enforcement procedure. Conse-

quently, the bill would p
Secretary should bring s
manent or temporary in
States District Court in

### SECTION

The Clean Air Act as
sibility for control of ei
ment. While Section 116
available to the Secretar
either the authority or
ments. As is clear in sec
expected to have or to c
provisions of the act are

The Committee recog
under existing law has
violations of standards.
visions of existing law,
used to the fullest exten
section 116 would provid
swiftly to abate violatio
should not interfere wit
consideration any reco
have resulted from existi

If the Secretary shoul
agency is not acting to a
enforce certification requ
full force of Federal law.
provisions of this section
write the strong public
to enforce compliance wi

If the Secretary and
responsibility, the publi
vigorous enforcement a
section 304.

Because attainment of
the enforcement of preci
mittee bill would delete
ment of violations of the a
emission controls "subjec
limited to emission requ
performance, prohibition
compliance and other req
tion of monitoring equip

The bill would also de
procedures in the existin
appropriate when criteria
devices were needed to
new formula proposed w
requiring the abatement
emission standard or, in
emission requirements a
would be authorized to is

KF
3812
.A15
91-604
v. 4

| 95th Congress } | COMMITTEE PRINT |
| 2d Session } | |

# A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1977
## A CONTINUATION OF THE CLEAN AIR ACT AMENDMENTS OF 1970

TOGETHER WITH

## A SECTION-BY-SECTION INDEX

PREPARED BY THE

### ENVIRONMENTAL POLICY DIVISION

OF THE

### CONGRESSIONAL RESEARCH SERVICE

OF THE

### LIBRARY OF CONGRESS

FOR THE

### COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS
### U.S. SENATE

VOLUME 4



AUGUST 1978

SERIAL NO. 95-16

Printed for the use of the Committee on Environment and Public Works

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1979

35-357 O

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402

ADD169

*ordance with the Clean Air*

*se expressly provided, the*

*hall be effective on date of*

*ressly provided, each State*

*e implementation plan by*

*by this Act shall adopt and*

*plan revision no later than*

*? of this Act.*

2465

| 95TH CONGRESS<br>1st Session | HOUSE OF REPRESENTATIVES | REPORT<br>No. 95–294 |

# CLEAN AIR ACT AMENDMENTS OF 1977

## REPORT

### BY THE

## COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE

[To accompany H.R. 6161]

together with

## ADDITIONAL, SEPARATE, AND SUPPLEMENTAL VIEWS

And Including Cost Estimate of the Congressional Budget Office



MAY 12, 1977.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1977

88–734 O

ADD170

81

These amendments were intended, when adopted by the committee last year, to be responsive to the Ford administration's concern for a workable procedure to facilitate coal conversions. In adopting these provisions this year, the committee intends to create a sufficiently flexible mechanism to accommodate the Carter administration's coal conversion initiatives. At the same time, the committee retains its commitment to assuring that extensions granted under section 119 not endanger public health.

Furthermore, if the Administrator of EPA finds that the granting of a CDE under section 119 may cause or contribute to a significant endangerment to the public welfare (such as in the case mentioned in the background section with respect to Colorado and Georgia), the Administrator would be authorized, but not required, to refuse to issue such a CDE.

*Background—Intermittent controls and tall stacks*

Section 110(a)(2)(B) of the present Clean Air Act requires that the State implementation plans must include

(B) * * * emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary [ambient air quality] standard * * *.

Many industrial sources have argued that, under this language, it should be permissible for sources to use tall stacks and intermittent (or supplemental [4] control measures to achieve and maintain the desired air quality concentration for sulfur oxides. Intermittent controls and other dispersion enhancement techniques are techniques which seek to reduce concentrations of pollutants not by reducing the amounts of pollutants emitted into the air, but rather by relying on the dispersion of pollutants throughout the atmosphere. Thus, pollutants are dispersed away from high-concentration areas and toward lower concentration areas.

When meteorological conditions favor dispersion of air pollutants from heavily impacted areas to cleaner areas, greater emissions would be permitted. When meteorologic conditions adversely affect dispersion, emissions from the affected source would be temporarily reduced or deferred, although in some cases emissions elsewhere might be increased. An example of the latter situation is load switching from one powerplant where dispersion is poor to another where dispersion is more favorable. Tall stacks are used to elevate the releases of emissions so that they will be dispersed more widely before reaching ground level and thus will result in lower ambient concentrations at ground level near the source. Both intermittent controls and tall stacks are referred to as dispersion dependent or enhancement techniques, although there are other dispersion dependent techniques than these two.

Three courts of appeals have considered and rejected these arguments by industry. In *NRDC* v. *EPA*, 489 F. 2d 390 (5th Cir. 1974), the Court held that EPA could permit the use of dispersion depend-

---

[4] A supplemental control system refers to use of an intermittent control system in addition to achieving some degree of continuous emission reduction.

81

ded, when adopted by the committee
e Ford administration's concern for
e coal conversions. In adopting these
ee intends to create a sufficiently flex-
e the Carter administration's coal
ime time, the committee retains its
ctensions granted under section 119

ator of EPA finds that the granting
' cause or contribute to a significant
fare (such as in the case mentioned
spect to Colorado and Georgia), the
zed, but not required, to refuse to

*ls and tall stacks*

present Clean Air Act requires that
ist include

ions, schedules, and timetables
:ations, and such other measures
attainment and maintenance of
ambient air quality] standard

rgued that, under this language, it
to use tall stacks and intermittent
es to achieve and maintain the de-
sulfur oxides. Intermittent controls
t techniques are techniques which
' pollutants not by reducing the
o the air, but rather by relying on
rhout the atmosphere. Thus, pollu-
;h-concentration areas and toward

favor dispersion of air pollutants
iner areas, greater emissions would
conditions adversely affect disper-
urce would be temporarily reduced
s emissions elsewhere might be in-
tuation is load switching from one
or to another where dispersion is
to elevate the releases of emissions
e widely before reaching ground
ambient concentrations at ground
ttent controls and tall stacks are
it or enhancement techniques, al-
pendent techniques than these two.
asidered and rejected these argu-
'4, 489 F. 2d 390 (5th Cir. 1974),
mit the use of dispersion depend-

* of an intermittent control system in addi-
ision reduction.

---

82

ent techniques as a means of attaining and maintaining national
ambient air quality standards

> [o]nly (1) if it is demonstrated that emission limitations
> regulations included in the plan are sufficient standing alone;
> or (2) if it is demonstrated that emission limitation sufficient
> to meet the standard is unachievable or infeasible, and that
> the state has adopted regulations which will attain the maxi-
> mum degree of emission limitation achievable. 489 F. 2d at
> 410.

Similar results were reached by the Sixth Circuit (*Big Rivers Elec-
tric Corp.* v. *EPA*, 523 F.2d 16, 6th Cir. 1975)) and the Ninth Circuit
(*Kennecott Copper Corp.* v. *EPA*, 526 F.2d 1149 (9th Cir. 1975)). In
each of these cases, the U.S. Supreme Court has denied petitioners'
application for writ of certiorari.

The fundamental policy objections which have been raised to the
use of tall stacks, intermittent or supplemental controls, and other
dispersion techniques are as follows:

*1. Even for the purpose of attaining and maintaining the national
ambient air quality standards, these methods are of dubious relia-
bility and enforceability.*[5]

This point has been made repeatedly by many persons and groups.
One of the groups which have expressed these doubts is the National
Academy of Sciences. The NAS points out that the effectiveness of
intermittent control systems depends on accurate meteorological fore-
casting; quick response to adverse air quality readings; proper place-
ment, maintenance, and calibration of monitors, among other factors.
In looking at presently operating intermittent control systems, the
NAS found:

> All relevant ambient air standards are still not met in the
> vicinity of several of the sources which have implemented
> ICS technology, particularly the short-term * * * stand-
> ards * * *
> This review has documented that a need exists for a fully
> documented analysis of an operating ICS system * * *
> The time required to effect a fuel switch to low sulfur coal
> can prevent the attainment of the Federal 3-hour [national
> ambient air quality standard].[6]

The problems of enforceability of intermittent control systems were
also pointed out in 1973 by EPA's then Director of the Division of
Stationary Source Enforcement.

> Although the concept of ICS is simple, enforcement of ICS
> is not.
> [W]e have determined that ICS is unacceptable from an
> enforcement standpoint * * *
> ICS was attempted in Washington and Montana with suffi-
> cient lack of success to encourage the Puget Sound Agency in

---

[5] This is what the Court held in *Kennecott Copper Corp.* v. *EPA*, 526 F. 2d 1149 (9th Cir.
1975) ; see material cited at n. 23 ; see also Ayres, "Enforcement of Air Pollution Controls
on Stationary Sources Under the Clean Air Amendments of 1960," 4 Ecology Law Quality
441, 454 (1975), see at n. 38.
[6] NAS, "Air Quality and Stationary Source Emission Control" (March 1975), pp. 510–514.

ADD172

Washington and the State of Montana to adopt direct emission standards. * * * The failures were attributable chiefly to (1) insufficient curtailment of operations due to inability to forecast adverse meteorological conditions, and (2) information to prove a violation was completely dependent on self-monitoring by the source without an effective means of policing the monitoring stations. Similar experiences have been recorded in New Jersey, Kentucky, and Pennsylvania.[7]

On April 9, 1976, EPA Administrator Train testified before a joint hearing of subcommittees of the Interstate and Foreign Commerce Committee and the Science and Technology Committee that, "In the area of ICS [intermittent control systems], we have determined that such methods are inherently unreliable and difficult to enforce." (p. 187)

Testimony by the Director of the Montana Air Pollution Control Program has indicated that industry has itself attacked the enforceability of intermittent control systems and been sustained by the courts in enforcement proceedings.[8]

*2. Intermittent control systems do not help to reduce the derivative pollutants of sulfur oxides (sulfates, sulfites, sulfuric acid) or oxides of nitrogen (nitrates, nitrites, nitric acid, nitrosamines); in conjunction with tall stacks, ICS may thus increase the health risks associated with $SO_2$ and $NO_x$ emissions.*

The Environmental Protection Agency has found—and the National Academy of Sciences has confirmed—that sulfates, sulfites, and sulfuric acid appear to be "more toxic than the parent compound [sulfur dioxide] and appear likely to be responsible for a substantial portion of adverse effects on health associated with stationary source combustion of fossil fuels".[9] NAS has also found,

> * * * The application of tall stacks and/or intermittent control systems will not reduce total emissions of sulfur oxides to any significant degree; thus this strategy does not decrease the total amount of sulfate in the regional atmosphere.[10]

Similarly, one of the papers contained in the HEW–NIEHS Rall Report, conducted at the request of the Office of Management and Budget concluded,

> In view of the possible toxicity of suspended sulfates, it should be noted that emission control measures designed to disperse sulfur dioxide from point sources, that is, tall stacks, will not have a major effect on suspended sulfate levels despite producing a decrease in local ambient sulfur dioxide concentration.[11]

---

[7] See 1973 hearings, p. 976, citing memorandum from William H. Megonnell to Bernard J. Steigerwald, "Intermittent Control Systems," Mar. 9, 1973.
[8] Testimony of Frank Partee, technical director, Kentucky Air Pollution Control Commission, before the U.S. Senate Committee on Public Works, Subcommittee on Air and Water Pollution, oversight hearings, "Implementation of the Clean Air Act of 1970," at 205 (Feb. 17, 1972).
[9] 1975 NAS report, op. cit., p. xxii.
[10] Id. at p. xxxv.
[11] Rall, National Institute of Environmental Health Sciences, "A Review of the Health Effects of Sulfur Oxides" (Oct. 9, 1973), p. 23.

In fact, the same report expressed dence that local control of $SO_2$ (by hi; ing to a wider dissemination of partic

The National Academy of Science cern about the effects of tall stacks a ing with oxides of nitrogen than for

> * * * Nitric oxide converts faster than sulfur dioxide conv fates; and since the reaction p greater potential for local impac

At least in part because of the ac pollutants, the National Academy compromise.

> The tall stack-ICS technolog manent control technique on the risks associated with increased compounds. At the same time, cepted for carefully defined sit technique.[14]

The Ford administration essenti and recommendations. The Ford 2633) would have authorized use o interim basis; constant controls wo nent or final compliance strategy. ( the State of Illinois agreed that i mitted only on an interim basis. (I tive of that taken by the State and Administrators.

*3. Use of tall stacks spreads the po were not previously exposed, and and States, where it is too late to*

This point was made by the N Health Sciences' Rall Report.[15] Th also expressed concern about the lo which is encouraged by use of tal

Even in 1907, it was apparent its source if injury were to be av preme Court in that year held tha sue a smelter in Tennessee which which then traveled across the St Georgia.

> It is a fair and reasonable eign that the air over its terri great scale by sulfurous acid tains, be they better or worse, tion they have suffered, sho

---
[12] Id., p. 6.
[13] 1975 NAS report, op. cit.
[14] Id. at 521–2.
[15] See supra at note 11.
[16] 1975 NAS report, op. cit., pp. 259–262,

33

84

Montana to adopt direct emis-
ires were attributable chiefly to
f operations due to inability to
il conditions, and (2) informa-
completely dependent on self-
out an effective means of polic-
Similar experiences have been
ucky, and Pennsylvania.[7]

trator Train testified before a joint
Interstate and Foreign Commerce
echnology Committee that, "In the
systems], we have determined that
reliable and difficult to enforce."

ie Montana Air Pollution Control
ry has itself attacked the enforce-
ms and been sustained by the courts

*not help to reduce the derivative
tes, sulfites, sulfuric acid) or oxides
itric acid, nitrosamines); in con-
way thus increase the health risks
ssions.*

gency has found—and the National
l—that sulfates, sulfites, and sul-
than the parent compound [sulfur
sponsible for a substantial portion
ed with stationary source combus-
ound,

ll stacks and/or intermittent
ce total emissions of sulfur
:: thus this strategy does not
of sulfate in the regional

iined in the HEW–NIEHS Rall
f the Office of Management and

ity of suspended sulfates, it
ontrol measures designed to
it sources, that is, tall stacks,
spended sulfate levels despite
il ambient sulfur dioxide

from William H. Megonnell to Bernard J.
c. 9, 1973.
or, Kentucky Air Pollution Control Com-
Public Works, Subcommittee on Air and
tation of the Clean Air Act of 1970," at

[ealth Sciences, "A Review of the Health

In fact, the same report expressed concern that "there is some evi-
dence that local control of $SO_2$ (by higher stacks, and so forth) is lead-
ing to a wider dissemination of particulate sulfates." [12]

The National Academy of Sciences has expressed even greater con-
cern about the effects of tall stacks and intermittent controls for deal-
ing with oxides of nitrogen than for $SO_2$. As the NAS explained,

> * * * Nitric oxide converts to nitric acid and nitrates
> faster than sulfur dioxide converts to sulfuric acid and sul-
> fates; and since the reaction products precipitate, there is
> greater potential for local impact.[13]

At least in part because of the adverse impact of these derivative
pollutants, the National Academy of Sciences has recommended a
compromise.

> The tall stack-ICS technology could be rejected as a per-
> manent control technique on the basis of substantial potential
> risks associated with increased atmospheric loading of sulfur
> compounds. At the same time, the technology could be ac-
> cepted for carefully defined situations as an interim control
> technique.[14]

The Ford administration essentially agreed with these conclusions
and recommendations. The Ford administration bill in 1975 (H.R.
2633) would have authorized use of intermittent controls only on an
interim basis; constant controls would have been required as a perma-
nent or final compliance strategy. (H. 40, 156, 1181). Testimony from
the State of Illinois agreed that intermittent controls should be per-
mitted only on an interim basis. (H. 1308) Illinois' position is reflec-
tive of that taken by the State and Territorial Air Pollution Program
Administrators.

*3. Use of tall stacks spreads the pollution, subjects areas to risk which
were not previously exposed, and exports the problem to other areas
and States, where it is too late to control the pollution.*

This point was made by the National Institute of Environmental
Health Sciences' Rall Report.[15] The National Academy of Sciences has
also expressed concern about the long-distance transport phenomenon,
which is encouraged by use of tall stacks and intermittent controls.[16]

Even in 1907, it was apparent that pollution must be reduced at
its source if injury were to be avoided downwind. For the U.S. Su-
preme Court in that year held that the State of Georgia had a right to
sue a smelter in Tennessee which was emanating sulfur dioxide fumes
which then traveled across the States' shared border causing harm in
Georgia.

> It is a fair and reasonable demand on the part of a sover-
> eign that the air over its territory should not be polluted on a
> great scale by sulfurous acid gas, that the forests on its moun-
> tains, be they better or worse, and whatever domestic destruc-
> tion they have suffered, should not be further destroyed or

[12] Id., p. 6.
[13] 1975 NAS report, op. cit.
[14] Id. at 521–2.
[15] See supra at note 11.
[16] 1975 NAS report, op. cit., pp. 259–260, 302–303, 517–520.

ADD174

85

threatened by the act of persons beyond its control, that the crops and orchards on its hills should not be endangered from the same source. * * *

The proof requires but a few words. It is not denied that the defendants generate in their works near the Georgia line large quantities of sulfur dioxide which becomes sulfurous acid by its mixture with the air. It is hardly denied and cannot be denied with success that this gas often is carried by the wind great distances and over tracts of Georgia land. On the evidence the pollution of the air and the magnitude of that pollution are not open to dispute * * * we are satisfied by a preponderance of the evidence that the sulfurous fumes cause and threaten damage on so considerable a scale to the forests and vegetable life, if not to health, within the plaintiff State as to make out a case within the requirements of *Missouri* v. *Illinois*, 200 U.S. 496. * * *

* * * the plaintiff now finds * * * that the tall chimneys in present use [since the complaint was filed] cause the poisonous gases to be carried greater distances than ever before and that the evil has not been helped.[17]

In the committee's view, what Justice Holmes and the Supreme Court knew and explained in 1907 cannot be ignored nearly 70 years later. This is particularly so in light of the fact that the NAS and NIEHS reports of the most current scientific evidence confirm the knowledge of seven decades ago.

4. *If $SO_x$ and $NO_x$ emissions are merely dispersed by tall stacks and intermittent controls and are not reduced, these emissions will be converted to acid rain in significant amounts. Acid rain reduces soil productivity, harms vegetation, crops, buildings, and materials, and may jeopardize segments of the whole economy of certain areas,*

The increasing acidity of rainfall has been noted in many areas— England, Scotland, Norway, Sweden, Brazil, and the States of the Northeastern United States. Cornell, Yale, and Dartmouth scientists have documented this trend.[18]

As the acidity of rainfall increases, the productivity of forest and agricultural lands are threatened. The 1972 report of the Swedish Government to the United Nations Conference on the Human Environment concluded that continued sulfur oxide emissions from England and Germany could reduce Swedish forest yields by 3–15 percent in the next 30 years.[19]

Similar concerns have been expressed by the National Academy of Sciences. The concentration of both sulfates and nitrates in precipitation have increased in the past 20 years, and these increases appear to

[17] *Georgia* v. *Tennessee Cooper Corp.*, 206 U.S. 230, 239 (1907) (J. Holmes).
[18] Likens, Borman, and Johnson, "Acid Rain," Environment (March 1972), pp. 33–40. See also 1975 NAS report, op. cit., pp. 302–303.
[19] Swedish Royal Ministry for Foreign Affairs, Royal Ministry of Agriculture, "Air Pollution Across National Boundaries: The Impact on the Environment of Sulfur in Air and Precipitation," report to the U.N. Conference on the Human Environment (1972), pp. 85–90.

86

be associated with the increases in h[...] sions from tall stacks).[20]

Furthermore, the NAS has predic[...] are allowed to double between 1970[...] in the Northeast is likely to increase[...]

Effects of acid rain on natu[...] greater consequence than effects [...] if emissions are permitted to inc[...]

Identifiable effects of acid rai[...] reduction in forest productivity,[...] fish populations. The full impac[...] layed for years or even decades.[...]

The possibility of large additi[...] injury to valuable ornamental p[...] tural productivity, cannot be dis[...] ity of precipitation is permitted[...]

The possibility of effects on [...] be dismissed.[22]

The NAS also concluded that aci[...] damage materials, and reduce pro[...] cluded, "These effects point to the[...] amount of man-produced sulfur co[...] phere."[23]

*5. Use of tall stacks and intermitten[...] effects: it tends to reduce pro[...] bility, and limit the potential [...]*

When the National Academy of [...] of intermittent controls, it found th[...] ductivity were necessitated. In one[...] cut 15–27 percent; in another, 27–3[...]

In the electric power generating [...] system provides for load reduction [...] pollution concentrations. This appr[...] ularly during summer inversions wh[...] demand coincide. Thus, the NAS n[...]

The practicality of impleme[...] mand load reductions can be q[...] meet ambient air quality stan[...] desire of utilities to maintain [...]

Furthermore, the use of tall sta[...] inherently inconsistent with the go[...] This is so even without respect to [...] of this bill. Current law, by requirin[...] national ambient air quality standa[...] United States, sets a ceiling for a[...] resources are thus finite and limite[...]

[20] 1975 NAS report, op. cit., p. 302.
[21] Id., p. 303.
[22] Id., pp. 181–2.
[23] Id., p. xxxii. See also infra at discussion of [...]
[24] 1975 NAS report, op. cit., p. 511.
[25] Id., p. 514.

2553

86

be associated with the increases in high level emissions (that is, emissions from tall stacks).[20]

Furthermore, the NAS has predicted that if sulfur oxide emissions are allowed to double between 1970–80, the average acidity of rain in the Northeast is likely to increase as much as 300 percent.[21]

> Effects of acid rain on natural systems are probably of greater consequence than effects of sulfur dioxide, especially if emissions are permitted to increase * * *.
>
> Identifiable effects of acid rain include acidificationof soil, reduction in forest productivity, and depletion of freshwater fish populations. The full impact of these effects may be delayed for years or even decades. * * *.
>
> The possibility of large additional effects, such as extensive injury to valuable ornamental plants or reduction in agricultural productivity, cannot be dismissed, especially if the acidity of precipitation is permitted to increase * * *.
>
> The possibility of effects on weather and climate cannot be dismissed.[22]

The NAS also concluded that acid rain could increase corrosion, damage materials, and reduce property values. Therefore it concluded, "These effects point to the desirability of controlling the amount of man-produced sulfur compounds emitted into the atmosphere." [23]

*5. Use of tall stacks and intermittent controls has harmful economic effects: it tends to reduce productivity, threaten electric reliability, and limit the potential for future economic growth.*

When the National Academy of Sciences studied the effects of use of intermittent controls, it found that substantial reductions in productivity were necessitated. In one smelter, plant output had to be cut 15–27 percent; in another, 27–35 percent.[24]

In the electric power generating industry, one intermittent control system provides for load reduction during periods of predicted peak pollution concentrations. This approach is of doubtful value, particularly during summer inversions when peak pollution and peak power demand coincide. Thus, the NAS noted,

> The practicality of implementing ICS actions which demand load reductions can be questioned, since the desire to meet ambient air quality standards may conflict with the desire of utilities to maintain an adequate power supply.[25]

Furthermore, the use of tall stacks and intermittent controls is inherently inconsistent with the goal of long-term economic growth. This is so even without respect to the requirements of section 108 of this bill. Current law, by requiring attainment and maintenance of national ambient air quality standards at all points throughout the United States, sets a ceiling for allowable pollution increases. Air resources are thus finite and limited; any pollution of currently un-

beyond its control, that the
...uld not be endangered from

...rds. It is not denied that the
...s near the Georgia line large
...h becomes sulfurous acid by
...rdly denied and cannot be
...often is carried by the wind
...f Georgia land. On the evi-
...l the magnitude of that pol-
... * we are satisfied by a pre-
...the sulfurous fumes cause
...lerable a scale to the forests
...h, within the plaintiff State
...requirements of *Missouri* v.

... * that the tall chimneys in
...as filed] cause the poisonous
...es than ever before and that

...stice Holmes and the Supreme
...nnot be ignored nearly 70 years
... of the fact that the NAS and
... scientific evidence confirm the

...ely dispersed by tall stacks and
...reduced, these emissions will be
...cant amounts. Acid rain reduces
...on, crops, buildings, and mater-
...ts of the whole economy of cer-

...has been noted in many areas—
..., Brazil, and the States of the
...Yale, and Dartmouth scientists

..., the productivity of forest and
...he 1972 report of the Swedish
...nference on the Human Environ-
...r oxide emissions from England
...orest yields by 3–15 percent in the

...sed by the National Academy of
...ulfates and nitrates in precipita-
...rs, and these increases appear to

...30, 259 (1907) (J. Holmes).
...Environment (March 1972), pp. 33–40.

...Royal Ministry of Agriculture, "Air Pollu-
...on the Environment of Sulfur in Air and
...he Human Environment (1972), pp. 85–90.

[20] 1975 NAS report, op. cit., p. 302.
[21] Id., p. 303.
[22] Id., pp. 181–2.
[23] Id., p. xxxii. See also infra at discussion of sec. 108.
[24] 1975 NAS report, op. cit., p. 511.
[25] Id., p. 514.

87

polluted areas would limit the availability of these scarce air resources for future economic growth. The electric utility industry has recognized and admitted the growth limiting nature of intermittent control methods. This is evident from the testimony by a representative of that industry that "if another industry wants to locate near one of our powerplants [using ICS], our permit should be reexamined." (H. 747).

But as the Court in *NRDC* v. *EPA* pointed out,

> Dispersion enhancement techniques operate by keeping pollutants out of areas of high pollutant concentrations, and dispersing them to lower concentration areas. * * * Inevitably, however, the pollutants emitted into the atmosphere must end up somewhere; and the atmosphere at their destination, whatever that may be, will be degraded * * * 489 F. 2d at 408–9.

The only way to minimize pollution and to maximize the potential for long-term economic growth is to achieve continuous reduction of the amount of pollutant emitted from any source.

*6. Intermittent control systems place a heavy burden on State air pollution control budgets and personnel and drain scarce resources at the State level.*

According to the Puget Sound Air Pollution Control Authority, monitoring the intermittent control system in operation at the ASARCO smelter cost the taxpayers between \$160,000 and \$200,000 per year.[26] That amount is clearly an exorbitant one for any local or even regional agency to devote to a single source. EPA's estimates for the price of policing ICS also provide basis for concern. EPA indicates that the additional costs associated with surveillance of an intermittent system "may run as high as \$130,000 the first year and \$50,000 a year thereafter".[27]

These costs are not merely costs of doing business which are internalized in the cost of doing business and passed along to the ultimate consumer in the price of the product. These costs are instead imposed on the taxpayer. For these reasons, the pollution source has no incentive to develop and implement less costly surveillance systems. Moreover, these costs of pollution control are externalized for that source and thus are not reflected in the marketplace. As the NAS has indicated

> [r]egulatory agency expenses for monitoring and enforcement of ICS programs represents hidden costs of control. . . . Defraying these costs by licensing and imposition of fees appears equitable.[28]

Finally, since State and local pollution control agencies have many sources to monitor and to check for possible violations and limited personnel and monetary resources to do that job, ICS approaches tend to distort State and local enforcement priorities and leave some sources unchecked or, at least, subject to inadequate surveillance.

*7. Allowing permanent use of tall stacks and intermittent controls would stifle research and development efforts by utilities, emis-*

---

[26] Ayres, op. cit., p. 454 at note 40.
[27] See 119 Congressional Record S10958 (daily edition, June 12, 1973).
[28] 1975 NAS report, op. cit., p. 532.

---

88

*sion control equipment vendors, the clean burning or pretreatmen[t]*

As pointed out in the discussion of pose of the Clean Air Act is to encour[a] efficient, less costly pollution control manent use of intermittent controls sion techniques would reduce, if not for development of systems potentia coal—such as fluidized bed combustio[n]

If anything, the record shows that nificantly increased and strengthene[d] Hearing Panel concluded, "some [ pear to have spent more in defendi[ng] tempting to have the emission requi in controlling their sulfur oxide emi panies were reported to have spent o year over the period 1969–1973 on derivatives in an environmentally sou[nd]

Requiring continuous emission re dispersion enhancement as an inte means of emission control are not av necessary incentives for upgraded res

*8. Prudence and the primacy o requires limitation on the use o[f]*

Perhaps, most important of all, t has reviewed the question in terms risk assessment. In recommending measures such as tall stacks and in cluded,

> The committee places import dence; the consequences of an e substantial damage to human than an error which led to econo[mic]

In the same vein, the National I Sciences has written,

> When the research data base quate and the margins of error conservative approach. Standa levels to insure that the public [

When asked about the advisabil Dr. Goldstein testified that, "[f]r[o] would be my judgment that the m[o] complete removal of sulfur dioxi[de] mony was regarded as particularl[y] physician on the faculty of N.Y.U tive of the American Public Heal both NAS and HEW-NIEHS.

---

[29] EPA, "Report of the Hearing Panel, Nat[ional] ance With Sulfur Oxide Air Pollution Regula[tions]" op. cit., at p. 452, note 28.
[30] Ayres, op. cit., p. 445.
[31] 1975 NAS report, op. cit., p. xxxvi.
[32] Rall report, op. cit., p. 8.

54

2555

88

ability of these scarce air resources
lectric utility industry has recog-
niting nature of intermittent con-
e testimony by a representative of
try wants to locate near one of our
t should be reexamined." (H. 747).
*PA* pointed out,

niques operate by keeping pol-
utant concentrations, and dis-
ation areas. * * * Inevitably,
into the atmosphere must end
ere at their destination, what-
ded * * * 489 F. 2d at 408–9.

ion and to maximize the potential
o achieve continuous reduction of
on any source.

*e a heavy burden on State air pol-*
*sonnel and drain scarce resources*

Air Pollution Control Authority,
rol system in operation at the
rs between $160,000 and $200,000
in exorbitant one for any local or
a single source. EPA's estimates
rovide basis for concern. EPA in-
ociated with surveillance of an in-
h as $130,000 the first year and

of doing business which are inter-
s and passed along to the ultimate
t. These costs are instead imposed
the pollution source has no incen-
costly surveillance systems. More-
l are externalized for that source
marketplace. As the NAS has

s for monitoring and enforce-
ts hidden costs of control. . . .
ising and imposition of fees

lution control agencies have many
r possible violations and limited
do that job, ICS approaches tend
it priorities and leave some sources
equate surveillance.

*stacks and intermittent controls*
*lopment efforts by utilities, emis-*

edition, June 12, 1973).

sion control equipment vendors, and others to find methods for the clean burning or pretreatment of coal.

As pointed out in the discussion of section 103, a fundamental purpose of the Clean Air Act is to encourage the development of new, more efficient, less costly pollution control systems. Ratification of the permanent use of intermittent controls and tall stacks or other dispersion techniques would reduce, if not wholly eliminate, the incentive for development of systems potentially capable of clean burning of coal—such as fluidized bed combustion.

If anything, the record shows that these incentives need to be significantly increased and strengthened, not relaxed. As a 1974 EPA Hearing Panel concluded, "some [electric utility] companies appear to have spent more in defending their lack of progress or in attempting to have the emission requirements changed than they have in controlling their sulfur oxide emission".[29] Moreover, the coal companies were reported to have spent only an average of $17 million per year over the period 1969–1973 on all research to burn coal or its derivatives in an environmentally sound manner.[30]

Requiring continuous emission reduction and limiting the use of dispersion enhancement as an interim technique where continuous means of emission control are not available will assist in creating the necessary incentives for upgraded research and development.

8. *Prudence and the primacy of the goal of health protection requires limitation on the use of dispersion dependent measures.*

Perhaps, most important of all, the National Academy of Sciences has reviewed the question in terms of relative health and economic risk assessment. In recommending only limited and interim use of measures such as tall stacks and intermittent controls, the NAS concluded,

The committee places importance on consideration of prudence; the consequences of an error in judgment which led to substantial damage to human health would be more serious than an error which led to economic misallocation.[31]

In the same vein, the National Institute of Environmental Health Sciences has written,

When the research data base for standard setting is inadequate and the margins of error are large, prudence dictates a conservative approach. Standards will be set at more stringent levels to insure that the public health is protected.[32]

When asked about the advisability of use of intermittent controls, Dr. Goldstein testified that, "[f]rom the health point of view * * * it would be my judgment that the more prudent course would be to have complete removal of sulfur dioxide emissions." (H. 328) This testimony was regarded as particularly noteworthy since it came from a physician on the faculty of N.Y.U. School of Medicine, a representative of the American Public Health Association and a consultant to both NAS and HEW–NIEHS.

[29] EPA, "Report of the Hearing Panel, National Public Hearings on Power Plant Compliance With Sulfur Oxide Air Pollution Regulations" (January 1974), p. 28. See also Ayres, op. cit., at p. 452, note 28.
[30] Ayers, op. cit., p. 445.
[31] 1975 NAS report, op. cit., p. xxxvi.
[32] Rall report, op. cit., p. 8.

ADD178

89

While the committee has considered these eight objections to the use of tall stacks, intermittent controls, and other dispers on enhancement methods, it has also considered two other questions: (1) If continuous emission reduction controls are required, does this mean each utility plant will have to use a flue gas desulfurization system? and (2) How effective and reliable are such systems?

*Availability of low sulfur coal as a means of continuous emission reduction.*—First, it is clear that use of low sulfur coal alone in any existing source would constitute a continuous emission reduction system for the purpose of meeting emission limits required to be included in State implementation plans under section 110 of the Clean Air Act.

Second, vast amounts of low sulfur coal could be made available if new mines were opened. According to the Interior Department, demonstrated coal reserves of less than 1 percent sulfur coal equal 11 billion tons in West Virginia alone. Nationwide there are demonstrated reserves of 30 billion tons of less than 1 percent sulfur coal. Much of this is very high Btu coal and can be burned to meet applicable emission limitations without any washing or flue-gas desulfurization.[33]

Third, with coal washing, even more of this coal could be burned in compliance with emission limitations without use of scrubbers. Up to a 40-percent reduction in sulfur content of eastern coal is achievable through coal washing.[34] Solvent refining of coal and other chemical treatment processes may achieve greater reductions in the sulfur content of coal.

*Effectiveness and reliability of flue gas desulfurization.*—Although there are many different types of continuous emission reduction technologies or systems which apply to control of various pollutants from various industrial sources, most of the controversy has focused on the flue gas desulfurization techniques (that is scrubbers) for fuel-burning industrial sources. Most of the controversy as to the reliability and effectiveness of these systems has largely been eliminated as experience with these systems has increased and as second generation systems have appeared.

This is the view of the Environmental Protection Agency. (1973 hearings, p. 998.) But the committee's view is not based primarily upon EPA's view. Rather, it was the information supplied by independent agencies and by the historic opponents of flue gas desulfurization that proved most persuasive to the committee. In 1973, representatives of the utility industry had testified that scrubber technology was unproven, unreliable, and ineffective. Yet only 2 years later, Mr. William G. Lawlor, representing Edison Electric Institute, testified,

I have heard the comment that electric companies are totally opposed to scrubbers. That is not so * * * At some plants scrubbers just might be the best means available to insure that the air around the plant meets ambient air quality standards * * * On those plants, scrubbers could be installed and we think they could be made to work. (H. 745–6)

Furthermore, testimony of the the use of scrubbers as one appro mary ambient air quality standar

Where primary air standa fore where human health wo installation either of scrubbe ment technologies such as lo of low sulfur coals. There is because there can be no com 827)

Similarly, the Federal Energy mental impact statement on t ESECA, concluded,

This impact statement ta spect to the effectiveness and * * * Lime or limestone scr the most effective and relial moval of sulfur dioxide. R are achieved by these system

The Commerce Department's with this assessment.[36]

The reasons for this change critics of the scrubber technol Academy of Sciences:

For powerplants that bu lime or limestone scrubbing available for reducing em gases. Emissions of sulfur reduced by at least 90 perce operation has been demonst of 115Mw for lime scrub scrubbing.

For powerplants that bu lime scrubbing is the mos reducing emissions of sulfu of at least 90 percent have Successful operation of a plant burning medium-su demonstrated on a comme

The committee is well a been experienced in early ir tion processes * * * The c has been rapid advance in of scrubbing technology es those who are skeptical to r There is a reasonable exp scrubbers will be availabl

[33] Department of Interior, Bureau of Mines, Survey of Estimated Coal Reserves/Resources (1975).
[34] 1975 NAS report, op. cit., p. xxxiii.

[35] FEA, Final Environmental Statement
[36] U.S. Department of Commerce, Tec
Control Technology" (Sept. 10, 1975), p.

ADD179

| 103d Congress 1st Session | COMMITTEE PRINT | S. PRT. 103–38 Vol. I |
|---|---|---|

# A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990

TOGETHER WITH

## A SECTION-BY-SECTION INDEX

PREPARED BY THE

### ENVIRONMENT AND NATURAL RESOURCES POLICY DIVISION

OF THE

### CONGRESSIONAL RESEARCH SERVICE

OF THE

### LIBRARY OF CONGRESS

FOR THE

## COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS U.S. SENATE

**VOLUME I**



NOVEMBER 1993

Printed for the use of the Senate Committee on Environment and Public Works

U.S. GOVERNMENT PRINTING OFFICE

48–657    WASHINGTON : 1993

ADD180

# The Clean Air Act, As Amended
## (42 U.S.C. 7401-7626)

TABLE OF CONTENTS FOR THE CLEAN AIR ACT[1]

TITLE I—AIR POLLUTION PREVENTION AND CONTROL

PART A—AIR QUALITY AND EMISSION LIMITATIONS

Sec. 101. Findings and purposes.
Sec. 102. Cooperative activities and uniform laws.
Sec. 103. Research, investigation, training, and other activities.
Sec. 104. Research relating to fuels and vehicles.
Sec. 105. Grants for support of air pollution planning and control programs.
Sec. 106. Interstate air quality agencies or commissions.
Sec. 107. Air quality control regions.
Sec. 108. Air quality criteria and control techniques.
Sec. 109. National ambient air quality standards.
Sec. 110. Implementation plans.
Sec. 111. Standards of performance for new stationary sources.
Sec. 112. Hazardous air pollutants.
Sec. 113. Federal Enforcement.
Sec. 114. Inspections, monitoring, and entry.
Sec. 115. International air pollution.
Sec. 116. Retention of state authority.
Sec. 117. President's air quality advisory board and advisory committees.
Sec. 118. Control of pollution from federal facilities.
Sec. 119. Primary nonferrous smelter orders.
Sec. 120. Noncompliance penalty.
Sec. 121. Consultation.
Sec. 122. Listing of certain unregulated pollutants.
Sec. 123. Stack heights.
Sec. 124. Assurance of adequacy of state plans.
Sec. 125. Measures to prevent economic disruption or unemployment.
Sec. 126. Interstate pollution abatement.
Sec. 127. Public notification.
Sec. 128. State boards.
Sec. 129. Solid waste combustion.
Sec. 130. Emission factors.
Sec. 131. Land use authority.

PART B—OZONE PROTECTION

[Secs. 150 through 159 Repealed]

PART C—PREVENTION OF SIGNIFICANT DETERIORATION OF AIR QUALITY

SUBPART 1

Sec. 160. Purposes.
Sec. 161. Plan requirements.
Sec. 162. Initial classifications.
Sec. 163. Increments and ceilings.
Sec. 164. Area redesignation.
Sec. 165. Preconstruction requirements.
Sec. 166. Other pollutants.
Sec. 167. Enforcement.
Sec. 168. Period before plan approval.
Sec. 169. Definitions.

[1] This table of contents is not part of the Clean Air Act but is included herein for the convenience of the users of this publication.

3

## CLEAN AIR ACT                                    4

SUBPART 2

Sec. 169A. Visibility protection for Federal class I areas.
Sec. 169B. Visibility.

PART D—PLAN REQUIREMENTS FOR NONATTAINMENT AREAS

SUBPART 1—NONATTAINMENT AREAS IN GENERAL

Sec. 171. Definitions.
Sec. 172. Nonattainment plan provisions in general.
Sec. 173. Permit requirements.
Sec. 174. Planning procedures.
Sec. 175. Environmental Protection Agency grants.
Sec. 175A. Maintenance plans.
Sec. 176. Limitation on certain Federal assistance.
Sec. 176A. Interstate transport commissions.
Sec. 177. New motor vehicle emission standards in nonattainment areas.
Sec. 178. Guidance documents.
Sec. 179. Sanctions and consequences of failure to attain.
Sec. 179B. International border areas.

SUBPART 2—ADDITIONAL PROVISIONS FOR OZONE NONATTAINMENT AREAS

Sec. 181. Classifications and attainment dates.
Sec. 182. Plan submissions and requirements.
Sec. 183. Federal ozone measures.
Sec. 184. Control of interstate ozone air pollution.
Sec. 185. Enforcement for Severe and Extreme ozone nonattainment areas for fail-
         ure to attain.
Sec. 185A. Transitional areas.
Sec. 185B. NO$_x$ and VOC study.

SUBPART 3—ADDITIONAL PROVISIONS FOR CARBON MONOXIDE NONATTAINMENT AREAS

Sec. 186. Classifications and attainment dates.
Sec. 187. Plan submissions and requirements.

SUBPART 4—ADDITIONAL PROVISIONS FOR PARTICULATE MATTER NONATTAINMENT
AREAS

Sec. 188. Classifications and attainment dates.
Sec. 189. Plan provisions and schedules for plan submissions.
Sec. 190. Issuance of RACM and BACM guidance.

SUBPART 5—ADDITIONAL PROVISIONS FOR AREAS DESIGNATED NONATTAINMENT FOR
SULFUR OXIDES, NITROGEN DIOXIDE, OR LEAD

Sec. 191. Plan submission deadlines.
Sec. 192. Attainment dates.

SUBPART 6—SAVINGS PROVISIONS

Sec. 193. General savings clause.

TITLE II—EMISSION STANDARDS FOR MOVING SOURCES

Sec. 201. Short title.

PART A—MOTOR VEHICLE EMISSION AND FUEL STANDARDS

Sec. 202. Establishment of standards.
Sec. 203. Prohibited acts.
Sec. 204. Injunction proceedings.
Sec. 205. Civil penalties.
Sec. 206. Motor vehicle and motor vehicle engine compliance testing and certifi-
         cation.
Sec. 207. Compliance by vehicles and engines in actual use.
Sec. 208. Information collection.
Sec. 209. State standards.
Sec. 210. State grants.
Sec. 211. Regulation of fuels.
[Sec. 212. Repealed]
Sec. 213. Fuel economy improvement from new motor vehicles.

**5**                                      **CLEAN AIR ACT**

Sec. 214. Study of particulate emissions from motor vehicles.
Sec. 215. High altitude performance adjustments.
Sec. 216. Definitions for part A.
Sec. 217. Motor vehicle compliance program fees.
Sec. 218. Prohibition on production of engines requiring leaded gasoline.
Sec. 219. Urban bus standards.

PART B—AIRCRAFT EMISSION STANDARDS

Sec. 231. Establishment of standards.
Sec. 232. Enforcement of standards.
Sec. 233. State standards and controls.
Sec. 234. Definitions.

PART C—CLEAN FUEL VEHICLES

Sec. 241. Definitions.
Sec. 242. Requirements applicable to clean fuel vehicles.
Sec. 243. Standards for light-duty clean fuel vehicles.
Sec. 244. Administration and enforcement as per California standards.
Sec. 245. Standards for heavy-duty clean-fuel vehicles (gvwr above 8,500 up to 26,000 lbs).
Sec. 246. Centrally fueled fleets.
Sec. 247. Vehicle conversions.
Sec. 248. Federal agency fleets.
Sec. 249. California pilot test program.
Sec. 250. General provisions.

TITLE III—GENERAL

Sec. 301. Administration.
Sec. 302. Definitions.
Sec. 303. Emergency powers.
Sec. 304. Citizen suits.
Sec. 305. Representation in litigation.
Sec. 306. Federal procurement.
Sec. 307. General provisions relating to administrative proceedings and judicial review.
Sec. 308. Mandatory licensing.
Sec. 309. Policy review.
Sec. 310. Other authority not affected.
Sec. 311. Records and audit.
Sec. 312. Economic impact analyses.
[Sec. 313. Repealed]
Sec. 314. Labor standards.
Sec. 315. Separability.
Sec. 316. Sewage treatment grants.
Sec. 317. Short title.
Sec. 317.[1] Economic impact assessment.
[Sec. 318. Repealed]
Sec. 319. Air quality monitoring.
Sec. 320. Standardized air quality modeling.
Sec. 321. Employment effects.
Sec. 322. Employee protection.
Sec. 323. Cost of emission control for certain vapor recovery to be borne by owner of retail outlet.
Sec. 324. Vapor recovery for small business marketers of petroleum products.
Sec. 325. Exemptions for certain territories.
Sec. 326. Construction of certain clauses.
Sec. 327. Authorization of appropriations.
Sec. 328. Air pollution from outer continental shelf activities.

[1] There are two sections numbered 317. This section should be numbered 318.

## CLEAN AIR ACT                                    6

### TITLE IV—NOISE POLLUTION

### TITLE IV—ACID DEPOSITION CONTROL[1]

Sec. 401. Findings and purpose.
Sec. 402. Definitions.
Sec. 403. Sulfur dioxide allowance program for existing and new units.
Sec. 404. Phase I sulfur dioxide requirements.
Sec. 405. Phase II sulfur dioxide requirements.
Sec. 406. Allowances for States with emissions rates at or below 0.80, lbs/mmBtu.
Sec. 407. Nitrogen oxides emission reduction program.
Sec. 408. Permits and compliance plans.
Sec. 409. Repowered sources.
Sec. 410. Election for additional sources.
Sec. 411. Excess emissions penalty.
Sec. 412. Monitoring, reporting, and recordkeeping requirements.
Sec. 413. General compliance with other provisions.
Sec. 414. Enforcement.
Sec. 415. Clean coal technology regulatory incentives.
Sec. 416. Contingency guarantee; auctions, reserve.

### TITLE V—PERMITS

Sec. 501. Definitions.
Sec. 502. Permit programs.
Sec. 503. Permit applications.
Sec. 504. Permit requirements and conditions.
Sec. 505. Notification to Administrator and contiguous States.
Sec. 506. Other authorities.
Sec. 507. Small business stationary source technical and environmental compliance assistance program.

### TITLE VI—STRATOSPHERIC OZONE PROTECTION

Sec. 601. Definitions.
Sec. 602. Listing of class I and class II substances.
Sec. 603. Monitoring and reporting requirements.
Sec. 604. Phase-out of production and consumption of class I substances.
Sec. 605. Phase-out of production and consumption of class II substances.
Sec. 606. Accelerated schedule.
Sec. 607. Exchange authority.
Sec. 608. National recycling and emission reduction program.
Sec. 609. Servicing of motor vehicle air conditioners.
Sec. 610. Nonessential products containing chlorofluorocarbons.
Sec. 611. Labeling.
Sec. 612. Safe alternatives policy.
Sec. 613. Federal procurement.
Sec. 614. Relationship to other laws.
Sec. 615. Authority of Administrator.
Sec. 616. Transfers among Parties to Montreal Protocol.
Sec. 617. International cooperation.
Sec. 618. Miscellaneous provisions.

[1] Title IV, relating to acid deposition control, was added by P.L. 101–549, sec. 401, 104 Stat. 2584, without repealing the existing title IV, relating to noise pollution.

any air pollutant (i) for which air quality criteria have not been issued or which is not included on a list published under section 108(a) ⟦or emitted from a source category which is regulated under section 112⟧ ⟦or 112(b)⟧ [1] but (ii) to which a standard of performance under this section would apply if such existing source were a new source, and (B) provides for the implementation and enforcement of such standards of performance. Regulations of the Administrator under this paragraph shall permit the State in applying a standard of performance to any particular source under a plan submitted under this paragraph to take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies.

(2) The Administrator shall have the same authority—

    (A) to prescribe a plan for a State in cases where the State fails to submit a satisfactory plan as he would have under section 110(c) in the case of failure to submit an implementation plan, and

    (B) to enforce the provisions of such plan in cases where the State fails to enforce them as he would have under sections 113 and 114 with respect to an implementation plan. In promulgating a standard of performance under a plan prescribed under this paragraph, the Administrator shall take into consideration, among other factors, remaining useful lives of the sources in the category of sources to which such standard applies.

(e) After the effective date of standards of performance promulgated under this section, it shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source.

(f)(1) For those categories of major stationary sources that the Administrator listed under subsection (b)(1)(A) before the date of the enactment of the Clean Air Act Amendments of 1990 and for which regulations had not been proposed by the Administrator by such date, the Administrator shall—

    (A) propose regulations establishing standards of performance for at least 25 percent of such categories of sources within 2 years after the date of the enactment of the Clean Air Act Amendments of 1990;

    (B) propose regulations establishing standards of performance for at least 50 percent of such categories of sources within 4 years after the date of the enactment of the Clean Air Act Amendments of 1990; and

    (C) propose regulations for the remaining categories of sources within 6 years after the date of the enactment of the Clean Air Act Amendments of 1990.

(2) In determining priorities for promulgating standards for categories of major stationary sources for the purpose of paragraph (1), the Administrator shall consider—

    (A) the quantity of air pollutant emissions which each such category will emit, or will be designed to emit;

---

[1] The amendments, made by section 108(g) and 302(a) of P.L. 101-549, appear to be duplicative; both, in different language, change the reference to section 112.

| 101ST CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPORT 101–952 |
|---|---|---|

# CLEAN AIR ACT AMENDMENTS OF 1990

## CONFERENCE REPORT

### TO ACCOMPANY

## S. 1630



OCTOBER 26, 1990.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1990

35-412

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, DC 20402

ADD186

336

pare or implement a plan to attain an air quality standard: limited use of Federal highway funds or a requirement that new industry offset emissions at a 2-to 1 ratio.

Under the safety exemption to highway sanctions, the principal purpose of the project must be to improve highway safety, but the project may also have other important benefits.

The definition of major sources in current law is modified so that smaller sources of VOCs are required to control emissions (50 tons in moderate and serious areas; 25 tons in severe areas; 10 tons in extreme areas).

When a State fails to develop a plan that meets the requirements of the law, the EPA is required to promulgate a Federal Implementation Plan.

The EPA is required to issue control requirements for a number of sources of pollution, including commercial and consumer products.

A new program is established to address the interstate transport of ozone air pollution.

The conferees adopt the House language on rocket testing with the agreement that the appropriate Federal agency may find that testing required for a civilian or commercial launch program is essential to the national security.

### Title II—Motor Vehicle-Related Provisions

Title II is based on the House bill with a number of significant modifications.

#### Reformulated gasoline

Cleaner, reformulated gasoline would be mandated in the nine cities with the most severe ozone pollution beginning in 1995. States could elect to have the requirements apply in other cities with ozone pollution problems. In comparison with conventional gasoline, reformulated gasoline would be required to have 15 percent lower emissions of VOCs and toxic chemicals by 1995, and greater reductions by 2000. The agreement also contains additional standards for oxygen, benzene, and aromatics.

Under section 211(k)(4), a petition for the certification of a fuel formulation or slate of fuel formulations is deemed certified if the Administrator fails to act on the petition within 180 days of its receipt. Such a petition is deemed certified until the Administrator completes action on the petition. In the event that the Administrator subsequently denies such a petition, the conferees intend that the Administrator will take appropriate steps to ensure orderly and prompt compliance.

Section 219 of the bill includes a credit program to provide flexibility in meeting the bill's requirements on the oxygen, aromatic hydrocarbon, and benzene content of reformulated gasoline. A credit program is the mechanism by which persons subject to these requirements will be allowed to pool gasoline sold in a given covered area for purposes of determining compliance with these requirements.

Under this credit program, a person may earn credit for gasoline with a higher oxygen content, lower aromatic hydrocarbon content,

ADD187

340

*Permits*

It is the conferees' intent that EPA not use the permit hammer approach (case-by-case) to avoid or delay meeting MACT requirements.

### Routine Emissions From "Area" Sources

Based on the list of pollutants mentioned above, EPA can also list an area source category just as the agency would list a major source category, and can require MACT. EPA must list sufficient source categories to assure that 90% of the emissions of the 30 most serious area source pollutants are regulated.

Five years after enactment, EPA is to propose a national urban air toxics strategy to reduce cancer risks associated with urban air toxics by 75%. EPA is to report on reductions achieved in 8 and 12 years intervals.

### Accidental Releases

The agreement contains provisions that are designed to prevent chemical accidents.

EPA is to publish a list of at least 100 regulated substances, of which 16 are listed in the agreement.

EPA is authorized to promulgate accident prevention regulations.

The conferees do not intend the term "stationary source" to apply to transportation, including the storage incident to such transportation, of any regulated substance or other extremely hazardous substance under the provisions of this subsection.

The prohibition on listing substances for the accident prevention program which have been listed under this section 108(a) does not preclude the listing of anhydrous sulfur dioxide which is on the initial list.

The conference agreement establishes a Chemical Safety and Hazard Investigation Board, similar to the National Transportation Safety board, to investigate chemical accidents.

The Board is authorized to investigate accidental releases which cause substantial property damage. Substantial damage would include fires, explosions, and other events which cause damages that are very costly to repair or correct, and would not include incidental damage to equipment or controls.

Hazard assessments required under this section shall include:

(1) basic data on the source, units at the source facility which contain or process regulated substances (including the longitude and latitude of such units), operating procedures, population of nearby communities, and the meteorology of the area where the source is located;

(2) an identification of the potential points of accidental releases from the source of regulated substances;

(3) an identification of any previous accidental releases from the source including the amounts released, frequencies, and durations;

(4) an identification of a range (including worst case events) of potential releases from the source, including an estimate of

ADD188

345

The conferees intend that termination of the seasonal or tempo-
rary use of a cleaner fuel shall not be considered a modification for
purposes of section 111 or part C of Title I.

### TITLE V—PERMIT PROVISIONS

The conference agreement includes provisions that require vari-
ous sources of air pollution to obtain operating permits which
would ensure compliance with all applicable requirements of the
Clean Air Act.

#### Permit programs

EPA is required to issue permit program regulations within one
year. States are required to develop programs consistent with those
regulations. The programs would be in effect within four years, and
the requirement to have a permit would be phased-in over the en-
suing three years.

Consistent with the general provisions of section 116 of the Clean
Air Act, the conferees understand that a State may establish addi-
tional, more stringent permitting requirements, but a State may
not establish permit requirements that are inconsistent with the
national permitting requirements of this Act, including this title.

#### EPA Oversight of Permit Programs

The conference agreement provides EPA with the authority to
review permits proposed to be issued by a State and to object to
permits that violate the Clean Air Act. EPA would also have the
opportunity to waive review of permits for small sources.

#### State response to EPA objections

Under the conference agreement, States would be granted 90
days to revise permits to meet any EPA objection. If the State fails
to revise the permit, EPA will issue or deny the permit.

#### Permit shield

The agreement provides that compliance with a permit is
deemed compliance with the requirements of the permit program.
Permit compliance also may be deemed compliance with other ap-
plicable provisions of the Clean Air Act if the permit has been
issued in accordance with Title V and includes those provisions, or
if the permitting authority includes in the permit a specific deter-
mination that such provisions are not applicable.

#### Operational flexibility

Facilities will be authorized to make changes in operations with-
out the necessity for a permit revision so long as: (i) the changes
are not "modifications" under Title I of the Act, (ii) the changes
will not result in emissions that exceed emissions allowable under
the permit, and (iii) the facility provides EPA and the permitting
authority with seven days written notice in advance of the changes.

#### Processing permit applications

Except for applications submitted within the first year of the
permit program (for which a 3-year phased review is allowed),

347

are subsequently destroyed is too broad and does not include adequate safeguards to preclude abuse. In the course of implementing this Act, however, EPA shall consider whether an exclusion will be allowed on a case-by-case basis for the manufacture of controlled substances that are (1) coincidental, unavoidable byproducts of a manufacturing process and (2) immediately contained and destroyed by the producer using maximum available control technologies.

### TITLE VII—FEDERAL ENFORCEMENT

The conference agreement includes a number of provisions that enhance the enforcement authority of the Federal government under the Clean Air Act while at the same time providing substantive procedural safeguards. In general terms, the agreement increases the range of civil and criminal penalties for violations of the Clean Air Act.

*SIP and permit violations*

The conference agreement revises and strengthens EPA enforcement authority regarding violations of State Implementation Plans and permits, including authority to bring civil actions for injunctive relief and penalties, as well as new authority to issue administrative penalty orders in response to violations. These authorities can also be used by EPA when States fail to enforce SIPs or permit requirements.

*Violations of other requirements*

EPA is authorized to initiate a range of enforcement actions for a number of violations of specified sections and titles of the Act. Included is authority to issue administrative penalty orders, file civil actions, and initiate criminal proceedings via the Attorney General.

It is the conferees' intention to provide the Administrator with prosecutorial discretion to decide not to seek sanctions under Section 113 for de minimis or technical violations in civil and criminal matters.

*Criminal penalties*

Criminal fines and penalties are included for a range of violations of the Act, including negligent or knowing violations that result in the endangerment of others, knowing violations of SIPs that occur after the violator is on notice of the violation, knowing violations of certain sections in the permit title, and knowing violations of the acid rain title or the stratospheric ozone protection title. In addition, the agreement provides criminal fines and penalties for the knowing filing of false statements and other similar recordkeeping, monitoring, and reporting violations. Consistent with other recent environmental statutes, criminal violations of the Clean Air Act are upgraded from misdemeanors to felonies.

The amendments add new criminal sanctions for recordkeeping, filing and other omissions. These provisions are not meant to penalize inadvertent errors. For criminal sanctions to apply, a source

| 103d Congress 1st Session | **COMMITTEE PRINT** | S. Prt. 103–38 Vol. II |
|---|---|---|

# A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990

TOGETHER WITH

## A SECTION-BY-SECTION INDEX

PREPARED BY THE

### ENVIRONMENT AND NATURAL RESOURCES POLICY DIVISION

OF THE

### CONGRESSIONAL RESEARCH SERVICE

OF THE

### LIBRARY OF CONGRESS

FOR THE

## COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS U.S. SENATE

———

### VOLUME II



NOVEMBER 1993

———

Printed for the use of the Senate Committee on Environment and Public Works

———

U.S. GOVERNMENT PRINTING OFFICE

U.S. GOVERNMENT PRINTING OFFICE

69–532                    WASHINGTON : 1993

ADD191

[NOTE:  Same as S. 1490, as introduced.]

I

101ST CONGRESS
1ST SESSION
# H. R. 3030

To amend the Clean Air Act to provide for the attainment and maintenance of the national ambient air quality standards, the control of toxic air pollutants, the prevention of acid deposition, and other improvements in the quality of the Nation's air.

---

## IN THE HOUSE OF REPRESENTATIVES

JULY 27, 1989

Mr. DINGELL (for himself, Mr. LENT, Mr. BLILEY, Mr. BROOKS, Mr. MOOR-HEAD, Mr. FLIPPO, Mr. DELAY, Mr. BONIOR, Mr. WHITTAKER, Mr. AN-NUNZIO, Mr. FRENZEL, Mr. DREIER of California, Mr. BROWN of Colorado, Mr. VANDER JAGT, Mr. ESPY, Mr. ANTHONY, Mr. GRANDY, Mr. BROOM-FIELD, Mr. COOPER, Mr. GIBBONS, Mr. GINGRICH, Mr. FIELDS, Mr. FORD of Michigan, Mr. TAUKE, Mr. HANSEN, Mr. THOMAS A. LUKEN, Mr. BAKER, Mr. ROWLAND of Georgia, Mr. QUILLEN, Mr. NIELSON OF UTAH, Mr. HALL of Texas, Mr. MURTHA, Mr. PURSELL, Mr. RAY, Mr. WALGREN, Mr. MANTON, Mr. FISH, Mr. ANDERSON, Mr. HORTON, Mrs. LLOYD, Mr. BOSCO, Mr. LEATH of Texas, Mr. HOUGHTON, Mr. GOSS, Mr. BOUCHER, Mr. DANNEMEYER, Mr. MONTGOMERY, Mr. SCHAEFER, Ms. SNOWE, Mr. COBLE, Mr. HENRY, Mr. BARTON of Texas, Mr. SISISKY, Mr. IRELAND, Mrs. JOHNSON of Connecticut, Mr. CALLAHAN, Mr. WILSON, Mr. WYLIE, Mr. BOEHLERT, Mr. MARTIN of New York, Mr. McCOLLUM, Mr. McGRATH, Mr. WALKER, Mr. McNULTY, Ms. KAPTUR, Mr. McMILLEN of Maryland, Mr. GUNDERSON, Mr. BALLENGER, Mr. KILDEE, Mr. SMITH of New Hampshire, Mr. BILIRAKIS, Mr. WOLPE, Mr. HERTEL, Mr. HAMMER-SCHMIDT, Mr. TOWNS, Mr. McCREERY, Mr. HUCKABY, Mr. LIGHTFOOT, Mr. MILLER of Washington, Mr. PALLONE, Mr. PARRIS, Mr. MORRISON of Washington, Mr. CLEMENT, Mr. TALLON, Mr. GILMAN, Mr. WEBER, Mr. GALLEGLY, Mr. McMILLAN of North Carolina, Mr. GALLO, Mr. UPTON, Mr. PAYNE OF Virginia, Mrs. SMITH of Nebraska, Mr. BUSTAMANTE, Mr. YOUNG of Alaska, Mr. HUNTER, Mr. STENHOLM, Mr. ROBERT F. SMITH, Mr. WALSH, Mr. SUNDQUIST, Mr. HAYES of Illinois, Mr. DAVIS, Mr. SMITH of Mississippi, Mr. SOLOMON, Mr. PARKER, Mr. DARDEN, Mr. SMITH of Texas, Mr. SAWYER, Mr. WELDON, Mr. ROTH, Mr. TRAXLER, Mr. RHODES, Mr. LEVIN of Michigan, Mrs. SAIKI, Mr. SCHUETTE, Mr. GOODLING, Mr. DYSON, Ms. SLAUGHTER of Virginia, Mr. ARMEY, Mr. BATEMAN, Mr. COUGHLIN, Mr. ROBINSON, Mr. CROCKETT, Mr. JONES of North Carolina, Mr. EDWARDS of Oklahoma, Mr. DOUGLAS, Mr. STANGE-LAND, Mr. CARR, Mr. HAYES of Louisiana, Mr. BARTLETT, Mr. CHAN-

ADD192

3738

2

DLER, Mr. YATRON, Mr. DENNY SMITH, Mr. SAXTON, Mr. SKEEN, Mr. SARPALIUS, Mr. RAVENEL, Mr. HOLLOWAY, Mr. HARRIS, Mr. CRAIG, Mr. CHAPMAN, Mr. KOLBE, Mr. INHOFE, Mr. LIPINSKI, Mr. LIVINGSTON, Mr. LEWIS of Florida, Mr. LOWERY of California, and Mr. ROWLAND of Connecticut) introduced the following bill; which was referred to the Committee on Energy and Commerce

--------------------

# A BILL

To amend the Clean Air Act to provide for the attainment and maintenance of the national ambient air quality standards, the control of toxic air pollutants, the prevention of acid deposition, and other improvements in the quality of the Nation's air.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    **SECTION 1. SHORT TITLE AND TABLE OF CONTENTS.**

4        This Act may be cited as the "Clean Air Act Amend-

5    ments of 1989".

TABLE OF CONTENTS

TITLE I—PROVISIONS FOR ATTAINMENT AND MAINTENANCE OF AMBIENT AIR QUALITY STANDARDS

Sec. 101. General planning requirements.
Sec. 102. General provisions for nonattainment areas.
Sec. 103. Additional provisions for ozone nonattainment areas.
Sec. 104. Additional provisions for carbon monoxide nonattainment areas.
Sec. 105. Additional provisions for particulate matter (PM-10) nonattainment areas.
Sec. 106. Additional provisions for areas designated nonattainment for sulfur oxides, nitrogen dioxide, or lead.
Sec. 107. Provisions related to Indian tribes.
Sec. 108. Miscellaneous provisions.
Sec. 109. Conforming amendments.

TITLE II—PROVISIONS RELATING TO MOBILE SOURCES

Sec. 201. Clean fuel requirements.
Sec. 202. Emissions of hydrocarbons, carbon monoxide and oxides of nitrogen from passenger cars.
Sec. 203. Emissions of hydrocarbons and carbon monoxide from light-duty trucks.

ADD193

3

Sec. 204. Carbon monoxide emissions at cold temperatures.
Sec. 205. Evaporative emissions.
Sec. 206. Mobile source-related air toxics.
Sec. 207. Emission control diagnostics systems.
Sec. 208. Heavy-duty trucks.
Sec. 209. Nonroad engines and vehicles.
Sec. 210. Vehicle certification.
Sec. 211. In-use compliance—recall.
Sec. 212. Compliance program fees.
Sec. 213. Information collection.
Sec. 214. Fuel volatility.
Sec. 215. Diesel fuel sulfur content.
Sec. 216. Nonroad fuels.
Sec. 217. Fuel waivers.
Sec. 218. Market-based alternative controls.
Sec. 219. Preemption of State fuels regulations.
Sec. 220. Enforcement.
Sec. 221. Technical amendments.

### TITLE III—HAZARDOUS AIR POLLUTANTS

Sec. 301. Technology-based standards for hazardous air pollutants.

### TITLE IV—PERMITS

Sec. 401. Permits.

### TITLE V—ACID DEPOSITION CONTROL

Sec. 501. Acid deposition control.

### TITLE VI—PROVISIONS RELATING TO ENFORCEMENT

Sec. 601. Section 113 enforcement.
Sec. 602. Reviewability of administrative orders.
Sec. 603. Compliance certification.
Sec. 604. Contractor inspections.
Sec. 605. Administrative enforcement subpoenas.
Sec. 606. Enforcement of administrative orders.
Sec. 607. Scope of emergency orders.
Sec. 608. Contractor listings.
Sec. 609. Judicial review pending reconsideration of regulation.
Sec. 610. Citizen suits.
Sec. 611. Enhanced implementation and enforcement of new source review require-
         ments.
Sec. 612. Moveable stationary sources.
Sec. 613. Enforcement of new titles of the Act.

### TITLE VII—MISCELLANEOUS PROVISIONS

Sec. 701. Grants for support of air pollution planning and control programs.
Sec. 702. Annual report repeal.
Sec. 703. NOx and VOC study.
Sec. 704. Review and revision of criteria and standards.
Sec. 705. Air Pollutant Release Investigation Board.

1    TITLE III—HAZARDOUS AIR POLLUTANTS

2    SEC. 301. TECHNOLOGY-BASED STANDARDS FOR HAZARDOUS

3         AIR POLLUTANTS.

4        Section 112 of the Clean Air Act is amended to read as

5    follows:

6              "HAZARDOUS AIR POLLUTANTS

7        "SEC. 112. (a) DEFINITIONS.—For the purposes of this

8    section—

9            "(1) The term 'major source' for pollutants other

10           than radionuclides, means any stationary source or

11           group of stationary sources located within a contiguous

12           area and under common control that emits or has the

13           potential to emit considering controls, in the aggregate,

14           ten metric tons per year or more of any hazardous air

15           pollutant or twenty-five metric tons per year or more

16           of any combination of hazardous air pollutants which

17           have been listed pursuant to subsection (b). The Ad-

18           ministrator may establish a lesser quantity for major

19           source other than specified in the previous sentence, on

20           the basis of the potency, characteristics of the air pol-

21           lutant, or other relevant factors. For radionuclides,

22           such term shall have the meaning specified by the Ad-

23           ministrator by rule, considering radiation dose.

24           "(2) The term 'area source' means any source

25           that is not a major source but that is a member of a

26           source category listed under this section based on ag-

1     gregate emissions, or potential aggregate emissions, of

2     a listed pollutant or pollutants in an area.

3        "(3) The term 'new source' means a stationary

4     source the construction or reconstruction of which is

5     commenced after the Administrator proposes regula-

6     tions under this section establishing an emission stand-

7     ard applicable to such source category or subcategory

8     pursuant to subsection (d) or (f).

9        "(4) The terms 'stationary source', 'owner or op-

10    erator', and 'existing' source shall have the same

11    meaning as such terms have under section 111(a).

12       "(5) The term 'electric utility steam generating

13    unit' means any fossil fuel fired steam electric generat-

14    ing unit that is constructed for the purpose of supply-

15    ing more than one-third of its potential electric output

16    capacity and more than twenty-five megawatts electri-

17    cal output to any utility power distribution system for

18    sale. Any steam supplied to a steam distribution

19    system for the purpose of providing steam to a steam-

20    electric generator that would produce electrical energy

21    for sale is also considered in determining the electrical

22    energy output capacity of the facility.

23    "(b) HAZARDOUS AIR POLLUTANT LIST.—

24       "(1) The Congress establishes for purposes of this

25    section a list of hazardous air pollutants as follows:

ADD196

191

| CAS number | Chemical name |
|---|---|
| 75070 | Acetaldehyde |
| 60355 | Acetamide |
| 75058 | Acetonitrile |
| 98862 | Acetophenone |
| 53963 | 2-Acetylaminofluorene |
| 107028 | Acrolein |
| 79061 | Acrylamide |
| 79107 | Acrylic acid |
| 107131 | Acrylonitrile |
| 107051 | Allyl chloride |
| 92671 | 4-Aminobiphenyl |
| 7664417 | Ammonia |
| 62533 | Aniline |
| 90040 | o-Anisidine |
| 1332214 | Asbestos |
| 71432 | Benzene (including benzene from gasoline) |
| 92875 | Benzidine |
| 98077 | Benzotrichloride |
| 100447 | Benzyl chloride |
| 92524 | Biphenyl |
| 117817 | Bis(2-ethylhexyl)phthalate (DEHP) |
| 542881 | Bis(chloromethyl)ether |
| 75252 | Bromoform |
| 106990 | 1,3-Butadiene |
| 156627 | Calcium cyanamide |
| 105602 | Caprolactam |
| 133062 | Captan |
| 63252 | Carbaryl |
| 75150 | Carbon disulfide |
| 56235 | Carbon tetrachloride |
| 463581 | Carbonyl sulfide |
| 120809 | Catechol |
| 133904 | Chloramben |
| 57749 | Chlordane |
| 7782505 | Chlorine |
| 79118 | Chloroacetic acid |
| 532274 | 2-Chloroacetophenone |
| 108907 | Chlorobenzene |
| 510156 | Chlorobenzilate |
| 67663 | Chloroform |
| 107302 | Chloromethyl methyl ether |
| 126998 | Chloroprene |
| 1319773 | Cresols/Cresylic acid (isomers and mixture) |
| 95487 | Cresols/Cresylic acid (isomers and mixture) |
| 108394 | Cresols/Cresylic acid (isomers and mixture) |
| 106445 | Cresols/Cresylic acid (isomers and mixture) |
| 98828 | Cumene |
| 94757 | 2,4-D, salts and esters |
| 3547044 | DDE |
| 334883 | Diazomethane |
| 132649 | Dibenzofurans |
| 96128 | 1,2-Dibromo-3-chloropropane |

192

| CAS number | Chemical name |
|---|---|
| 84742 | Dibutylphthalate |
| 106467 | 1,4-Dichlorobenzene(p) |
| 91941 | 3,3-Dichlorobenzidene |
| 111444 | Dichloroethyl ether (Bis(2-chloroethyl)ether) |
| 542756 | 1,3-Dichloropropene |
| 62737 | Dichlorvos |
| 111422 | Diethanolamine |
| 121697 | N,N-Diethyl aniline (N,N-Dimethylaniline) |
| 64675 | Diethyl sulfate |
| 119904 | 3,3-Dimethoxybenzidine |
| 60117 | Dimethyl aminoazobenzene |
| 119937 | 3,3'-Dimethyl benzidine |
| 79447 | Dimethyl carbamoyl chloride |
| 68122 | Dimethyl formamide |
| 57147 | 1,1-Dimethyl hydrazine |
| 131113 | Dimethyl phthalate |
| 77781 | Dimethyl sulfate |
| 534521 | 4,6-Dinitro-o-cresol, and salts |
| 51285 | 2,4-Dinitrophenol |
| 121142 | 2,4-Dinitrotoluene |
| 123911 | 1,4-Dioxane (1,4-Diethyleneoxide) |
| 122667 | 1,2-Diphenylhydrazine |
| 106898 | Epichlorohydrin (1-Chloro-2,3-epoxypropane) |
| 106887 | 1,2-Epoxybutane |
| 140885 | Ethyl acrylate |
| 100414 | Ethyl benzene |
| 51796 | Ethyl carbamate (Urethane) |
| 75003 | Ethyl chloride (Chloroethane) |
| 106934 | Ethylene dibromide (Dibromoethane) |
| 107062 | Ethylene dichloride (1,2-Dichloroethane) |
| 107211 | Ethylene glycol |
| 151564 | Ethylene imine (Aziridine) |
| 75218 | Ethylene oxide |
| 96457 | Ethylene thiourea |
| 75343 | Ethylidene dichloride (1,1-Dichloroethane) |
| 50000 | Formaldehyde |
| 76448 | Heptachlor |
| 118741 | Hexachlorobenzene |
| 87683 | Hexachlorobutadiene |
| 77474 | Hexachlorocyclopentadiene |
| 67721 | Hexachloroethane |
| 822060 | Hexamethylene-1,6-diisocyanate |
| 680319 | Hexamethylphosphoramide |
| 110543 | Hexane |
| 302012 | Hydrazine |
| 7647010 | Hydrochloric acid |
| 7664393 | Hydrogen fluoride (Hydrofluoric acid) |
| 7783064 | Hydrogen sulfide |
| 123319 | Hydroquinone |
| 78591 | Isophorone |
| 58899 | Lindane (all isomers) |
| 108316 | Maleic anhydride |

ADD198

193

| CAS number | Chemical name |
|---|---|
| 67561 | Methanol |
| 72435 | Methoxychlor |
| 74839 | Methyl bromide (Bromomethane) |
| 74873 | Methyl chloride (Chloromethane) |
| 71556 | Methyl chloroform (1,1,1-Trichloroethane) |
| 78933 | Methyl ethyl ketone (2-Butanone) |
| 60344 | Methyl hydrazine |
| 74884 | Methyl iodide (Iodomethane) |
| 108101 | Methyl isobutyl ketone (Hexone) |
| 624839 | Methyl isocyanate |
| 80626 | Methyl methacrylate |
| 1634044 | Methyl tert butyl ether |
| 101144 | 4,4-Methylene bis(2-chloroaniline) |
| 75092 | Methylene chloride (Dichloromethane) |
| 101688 | Methylene diphenyl diisocyanate (MDI) |
| 101779 | 4,4'-Methylenedianiline |
| 91203 | Naphthalene |
| 98953 | Nitrobenzene |
| 92933 | 4-Nitrobiphenyl |
| 100027 | 4-Nitrophenol |
| 79469 | 2-Nitropropane |
| 684935 | N-Nitroso-N-methylurea |
| 62759 | N-Nitrosodimethylamine |
| 59892 | N-Nitrosomorpholine |
| 56382 | Parathion |
| 82688 | Pentachloronitrobenzene (Quintobenzene) |
| 87865 | Pentachlorophenol |
| 108952 | Phenol |
| 106503 | p-Phenylenediamine |
| 75445 | Phosgene |
| 7803512 | Phosphine |
| 7723140 | Phosphorus |

| CAS Number | Chemical Name |
|---|---|
| 85449 | Phthalic anhydride |
| 1336363 | Polychlorinated biphenyls (Aroclors) |
| 1120714 | 1,3-Propane sultone |
| 57578 | beta-Propiolactone |
| 123386 | Propionaldehyde |
| 114261 | Propoxur (Baygon) |
| 78875 | Propylene dichloride (1,2-Dichloropropane) |
| 75569 | Propylene oxide |
| 75558 | 1,2-Propylenimine (2-Methyl aziridine) |
| 91255 | Quinoline |
| 106514 | Quinone |
| 100425 | Styrene |
| 96093 | Styrene oxide |
| 1746016 | 2,3,7,8-Tetrachlorodibenzo-p-dioxin |
| 79345 | 1,1,2,2-Tetrachloroethane |
| 127184 | Tetrachloroethylene (Perchloroethylene) |

ADD199

194

| CAS Number | Chemical Name |
|---|---|
| 7550450 | Titanium tetrachloride |
| 108883 | Toluene |
| 95807 | 2,4-Toluene diamine |
| 584849 | 2,4-Toluene diisocyanate |
| 95534 | o-Toluidine |
| 8001352 | Toxaphene (chlorinated camphene) |
| 120821 | 1,2,4-Trichlorobenzene |
| 79005 | 1,1,2-Trichloroethane |
| 79016 | Trichloroethylene |
| 95954 | 2,4,5-Trichlorophenol |
| 88062 | 2,4,6-Trichlorophenol |
| 121448 | Triethylamine |
| 1582098 | Trifluralin |
| 540841 | 2,2,4-Trimethylpentane |
| 108054 | Vinyl acetate |
| 593602 | Vinyl bromide |
| 75014 | Vinyl chloride |
| 75354 | Vinylidene chloride (1,1-Dichloroethylene) |
| 1330207 | Xylenes (isomers and mixture) |
| 95476 | Xylenes (isomers and mixture) |
| 108383 | Xylenes (isomers and mixture) |
| 106423 | Xylenes (isomers and mixture) |
| 0 | Antimony Compounds |
| 0 | Arsenic Compounds (inorganic including arsine) |
| 0 | Beryllium Compounds |
| 0 | Cadmium Compounds |
| 0 | Chromium Compounds |
| 0 | Cobalt Compounds |
| 0 | Coke Oven Emissions |
| 0 | Cyanide Compounds [1] |
| 0 | Glycol ethers [2] |
| 0 | Lead Compounds |
| 0 | Manganese Compounds |
| 0 | Mercury Compounds |
| 0 | Mineral fibers [3] |
| 0 | Nickel Compounds |
| 0 | Polycyclic Organic Matter [4] |
| 0 | Radionuclides (including radon) [5] |
| 0 | Selenium Compounds |

NOTE: For all listings above which contain the word "compounds" and for glycol ethers, the following applies: Unless otherwise specified, these listings are defined as including any unique chemical substance that contains the named chemical (i.e., antimony, arsenic, etc.) as part of that chemical's infrastructure.

[1] X'CN where X = H' or any other group where a formal dissociation may occur. For example KCN or Ca(CN)₂

[2] includes mono- and di- ethers of ethylene glycol, diethylene glycol, and triethylene glycol R-(OCH2CH2)ₙ-OR' where
    n = 1, 2, or 3
    R = alkyl or aryl groups
    R' = R, H, or groups which, when removed, yield glycol ethers with the structure: R-(OCH2CH2)ₙ-OH
    Polymers are excluded from the glycol category

[3] includes glass microfibers, glass wool fibers, rock wool fibers, and slag wool fibers, each characterized as "respirable" (fiber diameter less than 3.5 micrometers) and possessing an aspect ratio (fiber length divided by fiber diameter) greater than 3.

[4] includes organic compounds with more than one benzene ring, and which have a boiling point greater than or equal to 100°C

[5] a type of atom which spontaneously undergoes radioactive decay

195

1        "(2) IN GENERAL.—The Administrator may add

2    or delete a substance from the list under this subsec-

3    tion.

4            "(A) ADDITIONS.—A substance may be

5        added if the Administrator determines in his judg-

6        ment that the substance is an air pollutant and

7        that there is sufficient evidence to establish that

8        the pollutant is known to cause or can reasonably

9        be anticipated to cause in humans any one of the

10       following:

11               "(i) cancer or developmental effects, or

12               "(ii) serious or irreversible—

13                   "(I) reproductive dysfunctions, or

14                   "(II) neurological disorders, or

15                   "(III) heritable gene mutations, or

16                   "(IV) other chronic health effects,

17               or

18                   "(V) adverse acute human health

19               effects.

20           "(B) DELETIONS.—The Administrator may

21       delete a pollutant if he determines there is not

22       sufficient evidence to establish any of the criteria

23       described in paragraph (A).

24           "(C) FURTHER INFORMATION.—If the Ad-

25       ministrator determines that information on the

196

1        health effects of a substance is not sufficient to

2        make a determination required by this paragraph

3        the Administrator may use any authority available

4        to him to acquire such information.

5        "(3) PETITIONS.—Any person may petition the

6    Administrator to modify the list by adding or deleting a

7    substance. Within eighteen months after receipt of a

8    petition the Administrator shall either grant or deny

9    the petition by publishing a written explanation of the

10   reasons for his decision. Any air pollutant which is

11   listed under section 108(a) may not be added to the list

12   under this section.

13       "(c) SOURCE CATEGORY LIST.—(1) Not later than

14   twelve months after the date of enactment, the Administrator

15   shall publish, and may from time to time revise in response to

16   public comment or new information, a list of all categories

17   and subcategories of major sources and area sources desig-

18   nated under paragraph (4) of the air pollutants listed pursu-

19   ant to subsection (b).

20       "(2) For the categories and subcategories he designates,

21   he shall establish emission standards under subsection (d), ac-

22   cording to the schedule in subsection (e).

23       "(3) The Administrator may decide not to list a source

24   category or subcategory because its emissions into the air

197

1 are, in his judgment, already adequately controlled under this

2 Act or any other Federal statute or regulation.

3      "(4) The Administrator may designate a category or

4 subcategory of area sources that he finds, based on actual or

5 estimated aggregate emissions of a listed pollutant or pollut-

6 ants in an area, warrants regulation under this section.

7      "(5) The Administrator may, in his discretion, list any

8 category or subcategory previously regulated under this sec-

9 tion as in effect prior to the date of enactment.

10      "(6) The Administrator may withdraw a source catego-

11 ry or subcate   gory from the list published under this subsec-

12 tion if he finds, in his discretion, that the sources in the cate-

13 gory present a negligible risk to public health.

14      "(d) MAXIMUM ACHIEVABLE CONTROL TECHNOLOGY

15 EMISSION STANDARDS.—(1) The Administrator shall pro-

16 mulgate regulations establishing emission standards for each

17 category or subcategory of major sources and area sources in

18 accordance with the schedule provided in subsection (e). The

19 Administrator may distinguish among classes, types and sizes

20 of sources within a category or subcategory in establishing

21 such standards. The Administrator may set standards for

22 emissions of radionuclides from a category or subcategory

23 separately from regulating other listed pollutants emitted by

24 that category or subcategory.

198

1     "(2) Emisson standards promulgated under this subsec-
2     tion shall be applicable to new and existing major sources
3     and area sources in each category or subcategory, and shall
4     require the maximum degree of reduction in emissions of the
5     air pollutants subject to this section (including a prohibition of
6     such emissions, if achievable) that the Administrator, taking
7     into consideration the cost of achieving such emission reduc-
8     tion, and any nonair quality and other air quality-related
9     health and environmental impacts, and energy requirements,
10    determines is achievable through application of measures,
11    processes, methods, systems or techniques including, but not
12    limited to, measures which—

13          "(A) reduce the volume of, or eliminate emissions
14    of such pollutants through process changes, substitution
15    of materials or other modifications such as reuse or re-
16    cycling; or

17          "(B) enclose systems or processes to eliminate
18    emissions; or

19          "(C) collect, capture or treat such pollutants when
20    released from a process, stack, storage or fugitive
21    emissions point; or

22          "(D) are design, equipment, work practice or
23    operational methods, or radiation dose standards; or

24          "(E) requirements for operator training or certifi-
25    cation; or

1       "(F) are a combination of the above.

2   If the Administrator finds that it is not feasible to prescribe

3   or enforce an emission standard, he may instead issue regula-

4   lations requiring any of the measures identified in subpara-

5   graphs (D) through (E) of this paragraph, or any combination

6   of such measures.

7       "(3) The maximum degree of reduction in emissions that

8   is deemed achievable for new sources in a category or sub-

9   category shall not be less stringent than the emission control

10  that is achieved in practice by the best controlled similar

11  source, as determined by the Administrator. Emissions stand-

12  ards promulgated under this subsection for existing sources of

13  a category or subcategory may be less stringent than stand-

14  ards for new sources in the same category or subcategory but

15  shall be at least as stringent as the emissions controls

16  achieved in practice by the best controlled similar sources.

17  These determinations, for new and existing sources, shall

18  take into account energy, environmental, economic impacts

19  and other costs, as well as any other factors the Administra-

20  tor deems appropriate. If the Administrator finds that no

21  similar source employs controls reflecting the maximum

22  available control technolgy, he may establish emissions

23  standards or regulations meeting the requirements of this sec-

24  tion without regard to the performance of similar sources.

200

1 Emission standards under this section for radionuclides shall
2 be set based upon radiation dose.

3    "(4) Emission standards promulgated under this subsec-
4 tion shall be effective upon promulgation.

5    "(5) In promulgating emission standards for a source
6 category under this subsection, the Administrator shall pre-
7 scribe a date for compliance with the standards for existing
8 sources. In no event shall such date be later than three years
9 after promulgation of the standards.

10    "(6) With respect only to categories and subcategories
11 of area sources listed pursuant to subsection (c), the Adminis-
12 trator may, in lieu of the authorities provided in paragraph
13 (2) and subsection (f), elect to promulgate standards or re-
14 quirements applicable to sources in such categories or subca-
15 tegories which provide for the use of generally available con-
16 trol technologies or management practices by such sources to
17 reduce emissions of listed air pollutants.

18    "(7) The Administrator shall from time to time review,
19 and, if appropriate, revise emissions standards promulgated
20 under this subsection.

21    "(e) SCHEDULE FOR STANDARDS.—(1) The Adminis-
22 trator shall promulgate standards for categories and subcate-
23 gories listed under subsection (c) of this section according to
24 the following schedule:

201

1     "(A) Emission standards for not less than ten cat-

2   egories or subcategories shall be promulgated not later

3   than two years after the date of enactment of the

4   Clean Air Act Amendments of 1989.

5     "(B) Emission standards for 25 per centum of the

6   listed categories or subcategories shall be promulgated

7   not later than four years after the date of enactment of

8   the Clean Air Act Amendments of 1989.

9     "(C) Emission standards for an additional 25 per

10   centum of the listed categories and subcategories shall

11   be promulgated not later than seven years after such

12   date.

13     "(D) For the remaining categories or subcategor-

14   ies listed under subsection (c) for which regulatory

15   action has not been initiated, the Administrator shall,

16   within seven years after enactment, review and desig-

17   nate the additional categories and subcategories he

18   finds, in his discretion, warrant regulation under this

19   section. Emission standards for the designated catego-

20   ries and subcategories shall be promulgated not later

21   than ten years after enactment of the Clean Air Act

22   Amendments of 1989.

23   "(2) In determining priorities for promulgating stand-

24 ards under subsection (d), the Administrator shall consider—

1     "(A) the quantity and location of emissions or rea-
2     sonably anticipated emissions of air pollutants subject
3     to this section that each category or subcategory will
4     emit;

5     "(B) the known or anticipated adverse effects of
6     such pollutants on public health; and

7     "(C) the efficiency of grouping categories or sub-
8     categories according to the pollutants emitted, or the
9     processes or technologies used.

10     "(f) UNREASONABLE RISK EVALUATION.—(1) Within
11     seven years after promulgation of emission standards for a
12     category of sources pursuant to subsection (d), the Adminis-
13     trator shall evaluate the risks to the public health remaining
14     after application of such standards.

15     "(2) If the Administrator finds after such evaluation,
16     that the category or subcategory, or portion thereof, after
17     application of the prescribed standards, presents an unreason-
18     able risk to public health taking into account the cost and
19     technical feasibility as well as the health risks of such stand-
20     ards, he shall, within two years after completion of such eval-
21     uation, promulgate standards to protect adequately against
22     such risk.

23     "(3) Any standards promulgated under this subsection
24     shall be effective upon the date of promulgation.

203

1    "(4) In promulgating emission standards for a source
2  category under this subsection, the Administrator shall pre-
3  scribe a date for compliance with the standards by existing
4  sources. In no event shall such date be later than six years
5  after promulgation of the standards.

6    "(g) ALTERNATIVE EMISSIONS LIMITATIONS.—(1)
7  Notwithstanding the requirements of subsection (d), a State
8  with a program approved under title IV, may issue a permit
9  that authorizes—

10      "(A) a major source to comply with alternative
11      emission limitations in lieu of standards under this sec-
12      tion, if the owner or operator presents evidence suffi-
13      cient to demonstrate that emissions from the source in
14      compliance with such limitations present a negligible
15      risk to public health under criteria issued by the Ad-
16      ministrator under subparagraph (F);

17      "(B)(i) any existing source, for which the owner
18      or operator demonstrates that it has achieved a volun-
19      tary reduction of 90 per centum or more in emissions
20      of listed pollutants (95 per centum or more in the case
21      of listed particulate pollutants) from the source within
22      five years prior to proposal of an applicable standard
23      promulgated pursuant to subsection (d), to meet emis-
24      sion limitations based on such voluntary reduction in
25      lieu of such standard; the reduction shall be determined

A Case #15-1363    Document #1605913    Filed: 03/28/2016    Page 215 of

| 103d Congress<br>1st Session } | COMMITTEE PRINT | { S. Prt. 103–38<br>Vol. V |
| --- | --- | --- |

# A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990

TOGETHER WITH

## A SECTION-BY-SECTION INDEX

PREPARED BY THE

### ENVIRONMENT AND NATURAL RESOURCES POLICY DIVISION

OF THE

### CONGRESSIONAL RESEARCH SERVICE

OF THE

### LIBRARY OF CONGRESS

FOR THE

## COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS U.S. SENATE

---

### VOLUME V



NOVEMBER 1993

Printed for the use of the Senate Committee
on Environment and Public Works

---

U.S. GOVERNMENT PRINTING OFFICE
71-912                    WASHINGTON : 1993

ADD210

**Calendar No. 427**

| 101st Congress<br>*1st Session* | SENATE | Report<br>101–228 |
|---|---|---|

# CLEAN AIR ACT AMENDMENTS OF 1989

## REPORT

OF THE

## COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS UNITED STATES SENATE

together with

ADDITIONAL AND MINORITY VIEWS

TO ACCOMPANY

## S. 1630



DECEMBER 20, 1989.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
24–525                WASHINGTON : 1989

ADD211

14

that does not meet the standard is to be designated nonattainment. An area that meets the standard and does not contribute to another area that exceeds the standard is to be designated attainment. An area that cannot be classified on the basis of available information as meeting the standard is to be designated unclassifiable.

Revised section 107(f)(3) of the Act designated any area that did not meet the primary ambient air quality standard for ozone or carbon monoxide as of the last calendar year before the date of enactment of the bill as nonattainment. Revised section 107(f)(4) designates each area that was identified by EPA as a Group I area in the August 7, 1987, promulgation of the revised particulate standard (PM-10) or which contains a site for which monitoring data shows a violation of the air quality standard for PM-10 before the date of enactment as nonattainment.

Revised section 107(d)(5) of the Act provides that areas may be redesignated by the Administrator upon the request of the Governor of a State or on the Administrator's own motion. The Administrator must act to redesignate an area not currently designated as nonattainment as a nonattainment area within one hundred eighty days of receiving evidence that the area exceeds the national ambient air quality standard for any pollutant. In order to redesignate an area from nonattainment to attainment, the Administrator must promulgate the redesignation by rule, must determine that the area has attained the air quality standard and that attainment is due to permanent reductions in emissions, must have approved a maintenance plan, and determine that the State containing the area has met requirements of the Act applicable to the area. The Administrator may not redesignate an area from nonattainment to unclassified.

New paragraphs (2) and (3) of section 107(d) of the Act provide that the boundaries of an area that is designated nonattainment for ozone and that is located within a metropolitan statistical area (MSA) or a consolidated metropolitan statistical area (CMSA) are the boundaries of the MSA or CMSA, unless the State demonstrates that some portion of the MSA or CMSA does not contribute to violations of the air quality standard and that there is a geographical basis for excluding the portion. With respect to a serious carbon monoxide area, the Administrator may, by rule, include the entire MSA or CMSA in the nonattainment area.

### DISCUSSION

This section of the bill restructures and clarifies the process for designating and redesignating areas of the country depending on their emissions and ambient air quality. The bill gives significant authority to the Administrator in order to overcome the deficiencies in current law that have failed to allow the Administrator to respond to new information about pollution levels and control needs.

Existing law, as interpreted by EPA, precludes the Administrator from issuing new designations or revising existing ones when an ambient standard is revised, as occurred with the promulgation in 1987 of the ambient standard for PM-10. Current law is also

ADD212

133

currently recognized within the structure of section 112 and
have no other statutory authorization.

There is now a broad consensus that the program to regulate
hazardous air pollutants under section 112 of the Clean Air Act
should be restructured to provide EPA with authority to regulate
industrial and area source categories of air pollution (rather than
the pollutants) with technology-based standards in the near term.

In light of these conclusions, the reported legislation makes fun-
damental changes in the basic provisions of section 112 of the
Clean Air Act. The bill establishes a list of 191 air pollutants and a
mandatory schedule for issuing emissions standards for the major
sources of these pollutants. The standards are to be based on the
maximum reduction in emissions which can be achieved by applica-
tion of best available control technology. These new, technology-
based standards will become the principal focus of activity under
section 112. Authority to issue health-based standards is preserved
in modified form to be used for especially serious pollution prob-
lems.

This approach to regulation of toxic pollutants is not without
precedent. It follows the general model which has been employed
since the mid-1970's to control toxic effluents discharged to surface
waters by major industrial point sources.

Under the 1972 amendments to the Clean Water Act, industrial
dischargers were given two deadlines to control *conventional* pol-
lutants (biological oxygen demand, suspended solids, and acidity): 1)
by July 1, 1977 each facility was required to meet emissions limita-
tions reflecting "best practicable control technology currently
available" (so-called BPT limits); and 2) by July 1, 1983 each facili-
ty was to meet emissions limitations set according to "best avail-
able technology economically achievable" (BAT).

Toxic pollutants under the 1972 Act were to be treated different-
ly. The Administrator was to publish a list of toxic pollutants
within 90 days and within a year promulgate effluent standards
that would provide an "ample margin of safety" to protect the
most affected (aquatic) organisms. Thus, the structure of this au-
thority to regulate toxic discharges to surface waters was very
similar to the current structure of section 112 of the Clean Air Act.

During the five-year period following passage of the 1972 Clean
Water Act, EPA promulgated standards for only six toxic pollut-
ants. In 1975 the Environmental Defense Fund and the Natural Re-
sources Defense Council brought suit against the Agency for failure
to list more toxics and to promulgate standards as mandated by the
Act. In June 1976, EPA and the plantiffs entered into a consent
decree that established a new formula for the development of efflu-
ent standards for toxic water pollutants. This agreement created a
list of 120 priority pollutants and required EPA to promulgate ef-
fluent guidelines based on best available control technology for
each pollutant and each industrial category not later than Decem-
ber 31, 1980. Industrial dischargers were to be in compliance with
these standards by July 1, 1983, the same deadline as established
by the Act for BAT control of conventional pollutants. There were
14,000 dischargers divided into 21 industrial categories and 399 sub-
categories potentially subject to these new toxics standards.

316

Allowances are transferrable both between units and from a current year to a future year. Any unit that reduces its emissions more than is required will be required to surrender to the Administrator fewer allowances than have been allocated to it. The remaining allowances can be transferred to another unit for its use in meeting its compliance requirements. Alternatively, the remaining allowances can also be applied to meet emissions requirements in a future year.

The transferrability of allowances between units and to future years is the key both to the strong environmental policy sought in new title IV of the Act and to the flexibility the title creates for sources in choosing the means for complying with their emissions obligations. Since units can gain cash revenues from the sale of allowances they do not use, they will have a financial incentive both to make greater-than-required reductions and/or reductions earlier than required. In practice, economies of scale will amplify these incentives for the highest emitting units located in areas like the Midwest whose emissions are of the greatest concern to areas in the Northeast and Canada adversely affected by acid deposition. EPA projects that additional and/or early emissions reductions will be made by units in states like Pennsylvania, Illinois and Ohio whose emissions play a significant role in the ecological degradation associated with acid deposition.

Since selling unused allowances is tantamount to selling emissions reductions, the incentives created by the allowance market should stimulate innovations in the technologies and strategies used to reduce emissions. Coupled with the overall flexibility in compliance that the title affords sources, the allowance market should encourage sources to exploit energy efficiency; enhanced emissions reduction or control technologies—like sorbent injection, cofiring coal with natural gas, integrated gasification combined cycles; fuel-switching and least-emissions dispatching in order to maximize emissions reductions.

At the same time, the flexibility created by the allowance-trading system alone has been estimated by the EPA to produce a nationwide cost-savings of 50 percent in Phase I of the program, 14 percent to 20 percent when the program is first fully implemented at the beginning of Phase II and a 20 percent cost-savings in 2010.

On a regional basis, allowance transfers also yield significant cost-reductions. In testimony before the Committee, the Environmental Defense Fund applied EPA's cost analysis to different geographic regions to reveal the following regional impacts: