**ORAL ARGUMENT SCHEDULED FOR JUNE 2, 2016**

No. 15-1363 (and consolidated cases)

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF WEST VIRGINIA, *et al.*,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents.*

**On Petitions for Review of Final Agency Action of the
United States Environmental Protection Agency
80 Fed. Reg. 64,662 (Oct. 23, 2015)**

**OPENING BRIEF OF PETITIONERS ON CORE LEGAL ISSUES**

Ken Paxton
   ATTORNEY GENERAL OF TEXAS
Jeffrey C. Mateer
   First Assistant Attorney General
Scott A. Keller
   Solicitor General
   *Counsel of Record*
P.O. Box 12548
Austin, TX  78711-2548
Tel:  (512) 936-1700
scott.keller@texasattorneygeneral.gov

*Counsel for Petitioner State of Texas*

Patrick Morrisey
   ATTORNEY GENERAL OF WEST
   VIRGINIA
Elbert Lin
   Solicitor General
   *Counsel of Record*
J. Zak Ritchie
   Assistant Attorney General
State Capitol Building 1, Room 26-E
Charleston, WV  25305
Tel:  (304) 558-2021
Fax:  (304) 558-0140
elbert.lin@wvago.gov

**DATED:  February 19, 2016
FINAL FORM:  April 22, 2016**

*Counsel for Petitioner State of West Virginia*

*Additional counsel listed on following pages*

F. William Brownell
Allison D. Wood
Henry V. Nickel
Tauna M. Szymanski
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Tel: (202) 955-1500
bbrownell@hunton.com

*Counsel for Petitioners Utility Air Regulatory
Group and American Public Power Association*

Peter S. Glaser
Carroll W. McGuffey III
Justin T. Wong
TROUTMAN SANDERS LLP
401 Ninth Street N.W., Suite 1000
Washington, D.C. 20004
Tel: (202) 274-2998
peter.glaser@troutmansanders.com

*Counsel for Petitioner National Mining
Association*

Peter D. Keisler
Roger R. Martella, Jr.
C. Frederick Beckner III
Ryan C. Morris
Paul J. Ray
SIDLEY AUSTIN, LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel: (202) 736-8027
pkeisler@sidley.com

*Counsel for Petitioners Chamber of Commerce of
the United States of America; National
Association of Manufacturers; American Fuel
& Petrochemical Manufacturers; and National
Federation of Independent Business*

Luther Strange
  ATTORNEY GENERAL OF ALABAMA
Andrew Brasher
  Solicitor General
  *Counsel of Record*
501 Washington Avenue
Montgomery, AL 36130
Tel: (334) 590-1029
abrasher@ago.state.al.us

*Counsel for Petitioner State of Alabama*

Mark Brnovich
  ATTORNEY GENERAL OF ARIZONA
John R. Lopez IV
  *Counsel of Record*
Dominic E. Draye
Keith Miller
  Assistant Attorneys General
Maureen Scott
Janet Wagner
Janice Alward
  Arizona Corp. Commission,
  Staff Attorneys
1275 West Washington
Phoenix, AZ 85007
Tel: (602) 542-5025
john.lopez@azag.gov
dominic.draye@azag.gov
keith.miller@azag.gov

*Counsel for Petitioner Arizona Corporation
Commission*

Thomas A. Lorenzen
Sherrie A. Armstrong
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel:  (202) 624-2500
tlorenzen@crowell.com
sarmstrong@crowell.com

*Counsel for Petitioners National Rural Electric
Cooperative Association; Big Rivers Electric
Corporation; Brazos Electric Power Cooperative,
Inc.; Buckeye Power, Inc.; Central Montana
Electric Power Cooperative; Central Power
Electric Cooperative, Inc., Corn Belt Power
Cooperative; Dairyland Power Cooperative; East
River Electric Power Cooperative, Inc.; Georgia
Transmission Corporation; Kansas Electric
Power Cooperative, Inc.; North Carolina Electric
Membership Corporation; Northwest Iowa Power
Cooperative; Oglethorpe Power Corporation;
PowerSouth Energy Cooperative; Prairie Power,
Inc.; Rushmore Electric Power Cooperative, Inc.;
Seminole Electric Cooperative, Inc.; Southern
Illinois Power Cooperative; Sunflower Electric
Power Corporation; and Upper Missouri G. &
T. Electric Cooperative, Inc.*

Leslie Rutledge
   ATTORNEY GENERAL OF ARKANSAS
Lee Rudofsky
   Solicitor General
Jamie L. Ewing
   Assistant Attorney General
   *Counsel of Record*
323 Center Street, Suite 400
Little Rock, AR  72201
Tel:  (501) 682-5310
jamie.ewing@arkansasag.gov

*Counsel for Petitioner State of Arkansas*

Cynthia H. Coffman
   ATTORNEY GENERAL OF COLORADO
Frederick Yarger
   Solicitor General
   *Counsel of Record*
1300 Broadway, 10th Floor
Denver, CO  80203
Tel:  (720) 508-6168
fred.yarger@state.co.us

*Counsel for Petitioner State of Colorado*

*Of Counsel*

Rae Cronmiller
Environmental Counsel
NATIONAL ASSOCIATION OF RURAL
ELECTRIC COOPERATIVES
4301 Wilson Blvd.
Arlington, VA 22203
Tel: (703) 907-5500
rae.cronmiller@nreca.coop

*Counsel for Petitioner National Rural Electric
Cooperative Association*

Eric L. Hiser
JORDEN BISCHOFF & HISER, PLC
7272 E. Indian School Road, Suite 360
Scottsdale, AZ 85251
Tel: (480) 505-3927
ehiser@jordenbischoff.com

*Counsel for Petitioner Arizona Electric Power
Cooperative, Inc.*

Brian A. Prestwood
Senior Corporate and Compliance
Counsel
ASSOCIATED ELECTRIC COOPERATIVE,
INC.
2814 S. Golden, P.O. Box 754
Springfield, MO 65801
Tel: (417) 885-9273
bprestwood@aeci.org

*Counsel for Petitioner Associated Electric
Cooperative, Inc.*

Pamela Jo Bondi
   ATTORNEY GENERAL OF FLORIDA
Allen Winsor
   Solicitor General of Florida
   *Counsel of Record*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel: (850) 414-3681
Fax: (850) 410-2672
allen.winsor@myfloridalegal.com

*Counsel for Petitioner State of Florida*

Samuel S. Olens
   ATTORNEY GENERAL OF GEORGIA
Britt C. Grant
   Solicitor General
   *Counsel of Record*
40 Capitol Square S.W.
Atlanta, GA 30334
Tel: (404) 656-3300
Fax: (404) 463-9453
bgrant@law.ga.gov

*Counsel for Petitioner State of Georgia*

David Crabtree
Vice President, General Counsel
DESERET GENERATION & TRANSMISSION
CO-OPERATIVE
10714 South Jordan Gateway
South Jordan, UT 84095
Tel: (801) 619-9500
Crabtree@deseretpower.com

*Counsel for Petitioner Deseret Generation &
Transmission Co-operative*

John M. Holloway III
SUTHERLAND ASBILL & BRENNAN LLP
700 Sixth Street, N.W., Suite 700
Washington, D.C. 20001
Tel: (202) 383-0100
Fax: (202) 383-3593
jay.holloway@sutherland.com

*Counsel for Petitioners East Kentucky Power
Cooperative, Inc.; Hoosier Energy Rural Electric
Cooperative, Inc.; Minnkota Power Cooperative,
Inc.; and South Mississippi Electric Power
Association*

Gregory F. Zoeller
  ATTORNEY GENERAL OF INDIANA
Timothy Junk
  Deputy Attorney General
  *Counsel of Record*
Indiana Government Ctr. South
Fifth Floor
302 West Washington Street
Indianapolis, IN 46205
Tel: (317) 232-6247
tim.junk@atg.in.gov

*Counsel for Petitioner State of Indiana*

Derek Schmidt
  ATTORNEY GENERAL OF KANSAS
Jeffrey A. Chanay
  Chief Deputy Attorney General
  *Counsel of Record*
Bryan C. Clark
  Assistant Solicitor General
120 S.W. 10th Avenue, 3rd Floor
Topeka, KS 66612
Tel: (785) 368-8435
Fax: (785) 291-3767
jeff.chanay@ag.ks.gov

*Counsel for Petitioner State of Kansas*

Patrick Burchette
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Tel: (202) 469-5102
Patrick.Burchette@hklaw.com

*Counsel for Petitioners East Texas Electric
Cooperative, Inc.; Northeast Texas Electric
Cooperative, Inc.; Sam Rayburn G&T Electric
Cooperative, Inc.; and Tex-La Electric
Cooperative of Texas, Inc.*

Christopher L. Bell
GREENBERG TRAURIG LLP
1000 Louisiana Street, Suite 1700
Houston, TX 77002
Tel: (713) 374-3556
bellc@gtlaw.com

*Counsel for Petitioner Golden Spread Electrical
Cooperative, Inc.*

Andy Beshear
ATTORNEY GENERAL OF KENTUCKY
Gregory T. Dutton
  Assistant Attorney General
   *Counsel of Record*
700 Capitol Avenue
Suite 118
Frankfort, KY 40601
Tel: (502) 696-5453
gregory.dutton@ky.gov

*Counsel for Petitioner Commonwealth of
Kentucky*

Jeff Landry
  ATTORNEY GENERAL OF LOUISIANA
Steven B. "Beaux" Jones
  *Counsel of Record*
Duncan S. Kemp, IV
  Assistant Attorneys General
Environmental Section – Civil Division
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6085
Fax: (225) 326-6099
jonesst@ag.state.la.us

*Counsel for Petitioner State of Louisiana*

Mark Walters
Michael J. Nasi
JACKSON WALKER L.L.P.
100 Congress Avenue, Suite 1100
Austin, TX 78701
Tel: (512) 236-2000
Fax: (512) 236-2002
mwalters@jw.com
mnasi@jw.com

*Counsel for Petitioners San Miguel Electric*
*Cooperative, Inc. and South Texas Electric*
*Cooperative, Inc.*

Randolph G. Holt
Jeremy L. Fetty
PARR RICHEY OBREMSKEY FRANDSEN &
PATTERSON LLP
Wabash Valley Power Association, Inc.
722 N. High School Road
P.O. Box 24700
Indianapolis, IN 46224
Tel: (317) 481-2815
R_holt@wvpa.com
jfetty@parrlaw.com

*Counsel for Petitioner Wabash Valley Power*
*Association, Inc.*

Herman Robinson
    Executive Counsel
Donald Trahan
    *Counsel of Record*
Elliott Vega
LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY
Legal Division
P.O. Box 4302
Baton Rouge, LA 70821-4302
Tel: (225) 219-3985
Fax: (225) 219-4068
donald.trahan@la.gov

*Counsel for Petitioner State of Louisiana*
*Department of Environmental Quality*

Monica Derbes Gibson
Lesley Foxhall Pietras
LISKOW & LEWIS, P.L.C.
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Tel: (504) 556-4010
Fax: (504) 556-4108
mdgibson@liskow.com
lfpietras@liskow.com

*Counsel for Petitioner Louisiana Public Service*
*Commission*

Megan H. Berge
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 639-7700
megan.berge@bakerbotts.com

*Counsel for Petitioner Western Farmers Electric Cooperative*

Steven C. Kohl
Gaetan Gerville-Reache
WARNER NORCROSS & JUDD LLP
2000 Town Center, Suite 2700
Southfield, MI  48075-1318
Tel:  (248) 784-5000
skohl@wnj.com

*Counsel for Petitioner Wolverine Power Supply Cooperative, Inc.*

Bill Schuette
   ATTORNEY GENERAL FOR THE PEOPLE
   OF MICHIGAN
Aaron D. Lindstrom
   Michigan Solicitor General
   *Counsel of Record*
P.O. Box 30212
Lansing, MI  48909
Tel:  (515) 373-1124
Fax:  (517) 373-3042
lindstroma@michigan.gov

*Counsel for Petitioner People of the State of Michigan*

Jim Hood
   ATTORNEY GENERAL OF THE STATE OF
   MISSISSIPPI
Harold E. Pizzetta
   Assistant Attorney General
Civil Litigation Division
Office of the Attorney General
Post Office Box 220
Jackson, MS  39205
Tel:  (601) 359-3816
Fax:  (601) 359-2003
hpizz@ago.state.ms.us

*Counsel for Petitioner State of Mississippi*

Christina F. Gomez
Lawrence E. Volmert
Garrison W. Kaufman
Jill H. Van Noord
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Tel: (303) 295-8000
Fax: (303) 295-8261
cgomez@hollandhart.com
lvolmert@hollandhart.com
gwkaufman@hollandhart.com
jhvannoord@hollandhart.com

Patrick R. Day
HOLLAND & HART LLP
2515 Warren Avenue, Suite 450
Cheyenne, WY 82001
Tel: (307) 778-4200
Fax: (307) 778-8175
pday@hollandhart.com

Emily C. Schilling
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
Tel: (801) 799-5800
Fax: (801) 799-5700
ecschilling@hollandhart.com

*Counsel for Petitioner Basin Electric Power
Cooperative*

Donna J. Hodges
   Senior Counsel
MISSISSIPPI DEPARTMENT OF
ENVIRONMENTAL QUALITY
P.O. Box 2261
Jackson, MS 39225-2261
Tel: (601) 961-5369
Fax: (601) 961-5349
donna_hodges@deq.state.ms.us

*Counsel for Petitioner Mississippi Department of
Environmental Quality*

Todd E. Palmer
Valerie L. Green
MICHAEL, BEST & FRIEDRICH LLP
601 Pennsylvania Ave., N.W., Suite 700
Washington, D.C. 20004-2601
Tel: (202) 747-9560
Fax: (202) 347-1819
tepalmer@michaelbest.com
vlgreen@michaelbest.com

*Counsel for Petitioner Mississippi Public Service
Commission*

Stacey Turner
SOUTHERN COMPANY SERVICES, INC.
600 18th Street North
BIN 14N-8195
Birmingham, AL  35203
Tel:  (205) 257-2823
staturne@southernco.com

*Counsel for Petitioners Alabama Power
Company, Georgia Power Company, Gulf Power
Company, and Mississippi Power Company*

C. Grady Moore, III
Steven G. McKinney
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL  35303-4642
Tel:  (205) 251-8100
Fax:  (205) 488-5704
gmoore@balch.com
smckinney@balch.com

*Counsel for Petitioner Alabama Power Company*

Margaret Claiborne Campbell
Angela J. Levin
TROUTMAN SANDERS LLP
600 Peachtree Street, NE, Suite 5200
Atlanta, GA  30308-2216
Tel:  (404) 885-3000
margaret.campbell@troutmansanders.com
angela.levin@troutmansanders.com

*Counsel for Petitioner Georgia Power Company*

Chris Koster
ATTORNEY GENERAL OF MISSOURI
James R. Layton
    Solicitor General
    *Counsel of Record*
P.O. Box 899
207 W. High Street
Jefferson City, MO  65102
Tel:  (573) 751-1800
Fax:  (573) 751-0774
james.layton@ago.mo.gov

*Counsel for Petitioner State of Missouri*

Timothy C. Fox
ATTORNEY GENERAL OF MONTANA
Alan Joscelyn
    Chief Deputy Attorney General
Dale Schowengerdt
    Solicitor General
    *Counsel of Record*
215 North Sanders
Helena, MT  59620-1401
Tel:  (406) 444-7008
dales@mt.gov

*Counsel for Petitioner State of Montana*

Terese T. Wyly
Ben H. Stone
BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS  39501-1931
Tel:  (228) 214-0413
twyly@balch.com
bstone@balch.com

*Counsel for Petitioner Mississippi Power
Company*

Jeffrey A. Stone
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL  32502
Tel:  (850) 432-2451
JAS@beggslane.com

James S. Alves
2110 Trescott Drive
Tallahassee, FL 32308
Tel:  (850) 566-7607
jim.s.alves@outlook.com

*Counsel for Petitioner Gulf Power Company*

Doug Peterson
  ATTORNEY GENERAL OF NEBRASKA
Dave Bydlaek
  Chief Deputy Attorney General
Justin D. Lavene
  Assistant Attorney General
  *Counsel of Record*
2115 State Capitol
Lincoln, NE  68509
Tel:  (402) 471-2834
justin.lavene@nebraska.gov

*Counsel for Petitioner State of Nebraska*

John J. Hoffman
  ACTING ATTORNEY GENERAL OF NEW
  JERSEY
David C. Apy
  Assistant Attorney General
Robert J. Kinney
  Deputy Attorney General
  *Counsel of Record*
Division of Law
R.J. Hughes Justice Complex
P.O. Box 093
25 Market Street
Trenton, NJ  08625-0093
Tel:  (609) 292-6945
Fax: (609) 341-5030
robert.kinney@dol.lps.state.nj.us

*Counsel for Petitioner State of New Jersey*

James S. Alves
2110 Trescott Drive
Tallahassee, FL  32308
Tel:  (850) 566-7607
jim.s.alves@outlook.com

*Counsel for Petitioner CO₂ Task Force of the
Florida Electric Power Coordinating Group, Inc.*

John J. McMackin
WILLIAMS & JENSEN
701 8th Street, N.W., Suite 500
Washington, D.C.  20001
Tel:  (202) 659-8201
jjmcmackin@wms-jen.com

*Counsel for Petitioner Energy-Intensive
Manufacturers Working Group on Greenhouse
Gas Regulation*

William M. Bumpers
Megan H. Berge
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 639-7700
william.bumpers@bakerbotts.com
megan.berge@bakerbotts.com

Kelly McQueen
ENTERGY SERVICES, INC.
425 W. Capitol Avenue, 27th Floor
Little Rock, AR  72201
Tel:  (501) 377-5760
kmcque1@entergy.com

*Counsel for Petitioner Entergy Corporation*

Wayne Stenehjem
   ATTORNEY GENERAL OF NORTH
   DAKOTA
Margaret Olson
   Assistant Attorney General
North Dakota Attorney General's Office
600 E. Boulevard Avenue #125
Bismarck, ND  58505
Tel:  (701) 328-3640
maiolson@nd.gov

Paul M. Seby
   Special Assistant Attorney General
   State of North Dakota
GREENBERG TRAURIG, LLP
1200 17th Street, Suite 2400
Denver, CO  80202
Tel:  (303) 572-6500
Fax:  (303) 572-6540
sebyp@gtlaw.com

*Counsel for Petitioner State of North Dakota*

Michael DeWine
   ATTORNEY GENERAL OF OHIO
Eric E. Murphy
   State Solicitor
   *Counsel of Record*
30 E. Broad Street, 17th Floor
Columbus, OH  43215
Tel:  (614) 466-8980
eric.murphy@ohioattorneygeneral.gov

*Counsel for Petitioner State of Ohio*

Paul J. Zidlicky
SIDLEY AUSTIN, LLP
1501 K Street, N.W.
Washington, D.C.  20005
Tel:  (202) 736-8000
pzidlicky@sidley.com

*Counsel for Petitioners GenOn Mid-Atlantic, LLC; Indian River Power LLC; Louisiana Generating LLC; Midwest Generation, LLC; NRG Chalk Point LLC; NRG Power Midwest LP; NRG Rema LLC; NRG Texas Power LLC; NRG Wholesale Generation LP; and Vienna Power LLC*

David M. Flannery
Kathy G. Beckett
Edward L. Kropp
STEPTOE & JOHNSON, PLLC
707 Virginia Street East
Charleston, WV  25326
Tel:  (304) 353-8000
dave.flannery@steptoe-johnson.com
kathy.beckett@steptoe-johnson.com
skipp.kropp@steptoe-johnson.com

Stephen L. Miller
STEPTOE & JOHNSON, PLLC
700 N. Hurstbourne Parkway, Suite 115
Louisville, KY  40222
Tel:  (502) 423-2000
steve.miller@steptoe-johnson.com

*Counsel for Petitioner Indiana Utility Group*

E. Scott Pruitt
    ATTORNEY GENERAL OF OKLAHOMA
Patrick R. Wyrick
    Solicitor General of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK  73105
Tel:  (405) 521-4396
Fax:  (405) 522-0669
fc.docket@oag.state.ok.us
scott.pruitt@oag.ok.gov

David B. Rivkin, Jr.
    *Counsel of Record*
Mark W. DeLaquil
Andrew M. Grossman
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
Tel:  (202) 861-1731
Fax:  (202) 861-1783
drivkin@bakerlaw.com

*Counsel for Petitioners State of Oklahoma and Oklahoma Department of Environmental Quality*

F. William Brownell
Eric J. Murdock
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Tel: (202) 955-1500
bbrownell@hunton.com
emurdock@hunton.com

Nash E. Long III
HUNTON & WILLIAMS LLP
Bank of America Plaza, Suite 3500
101 South Tryon Street
Charlotte, NC 28280
Tel: (704) 378-4700
nlong@hunton.com

*Counsel for Petitioner LG&E and
KU Energy LLC*

Alan Wilson
    ATTORNEY GENERAL OF SOUTH
    CAROLINA
Robert D. Cook
    Solicitor General
James Emory Smith, Jr.
    Deputy Solicitor General
    *Counsel of Record*
P.O. Box 11549
Columbia, SC 29211
Tel: (803) 734-3680
Fax: (803) 734-3677
esmith@scag.gov

*Counsel for Petitioner State of South Carolina*

Marty J. Jackley
    ATTORNEY GENERAL OF SOUTH
    DAKOTA
Steven R. Blair
    Assistant Attorney General
    *Counsel of Record*
1302 E. Highway 14, Suite 1
Pierre, SD 57501
Tel: (605) 773-3215
steven.blair@state.sd.us

*Counsel for Petitioner State of South Dakota*

P. Stephen Gidiere III
Thomas L. Casey III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N., Suite 1500
Birmingham, AL 35203
Tel: (205) 251-8100
sgidiere@balch.com

Stephanie Z. Moore
Vice President and General Counsel
LUMINANT GENERATION COMPANY LLC
1601 Bryan Street, 22nd Floor
Dallas, TX 75201

Daniel J. Kelly
Vice President and Associate General
   Counsel
ENERGY FUTURE HOLDINGS CORP.
1601 Bryan Street, 43rd Floor
Dallas, TX 75201

*Counsel for Petitioners Luminant Generation Company LLC; Oak Grove Management Company LLC; Big Brown Power Company LLC; Sandow Power Company LLC; Big Brown Lignite Company LLC; Luminant Mining Company LLC; and Luminant Big Brown Mining Company LLC*

Sean Reyes
   ATTORNEY GENERAL OF UTAH
Tyler R. Green
   Solicitor General
   *Counsel of Record*
Parker Douglas
   Federal Solicitor
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, UT 84114-2320
pdouglas@utah.gov

*Counsel for Petitioner State of Utah*

Brad Schimel
   ATTORNEY GENERAL OF WISCONSIN
Misha Tseytlin
   Solicitor General
   *Counsel of Record*
Andrew Cook
   Deputy Attorney General
Delanie M. Breuer
   Assistant Deputy Attorney General
Wisconsin Department of Justice
17 West Main Street
Madison, WI 53707
Tel: (608) 267-9323
tseytlinm@doj.state.wi.us

*Counsel for Petitioner State of Wisconsin*

Ronald J. Tenpas
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 739-3000
rtenpas@morganlewis.com

*Counsel for Petitioner Minnesota Power (an
operating division of ALLETE, Inc.)*

Allison D. Wood
Tauna M. Szymanski
Andrew D. Knudsen
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
Tel:  (202) 955-1500
awood@hunton.com
tszymanski@hunton.com
aknudsen@hunton.com

*Counsel for Petitioner Montana-Dakota Utilities
Co., a Division of MDU Resources Group, Inc.*

Peter K. Michael
   ATTORNEY GENERAL OF WYOMING
James Kaste
   Deputy Attorney General
   *Counsel of Record*
Michael J. McGrady
Erik Petersen
   Senior Assistant Attorneys General
Elizabeth Morrisseau
   Assistant Attorney General
2320 Capitol Avenue
Cheyenne, WY  82002
Tel:  (307) 777-6946
Fax: (307) 777-3542
james.kaste@wyo.gov

*Counsel for Petitioner State of Wyoming*

Sam M. Hayes
   General Counsel
   *Counsel of Record*
Craig Bromby
   Deputy General Counsel
Andrew Norton
   Deputy General Counsel
NORTH CAROLINA DEPARTMENT OF
ENVIRONMENTAL QUALITY
1601 Mail Service Center
Raleigh, NC  27699-1601
Tel:  (919) 707-8616
sam.hayes@ncdenr.gov

*Counsel for Petitioner North Carolina
Department of Environmental Quality*

William M. Bumpers
Megan H. Berge
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 639-7700
william.bumpers@bakerbotts.com
megan.berge@bakerbotts.com

*Counsel for Petitioner NorthWestern
Corporation d/b/a NorthWestern Energy*

Joshua R. More
Jane E. Montgomery
Amy Antoniolli
SCHIFF HARDIN LLP
233 South Wacker Drive
Suite 6600
Chicago, IL  60606
Tel:  (312) 258-5500
jmore@schiffhardin.com
jmontgomery@schiffhardin.com
aantoniolli@schiffhardin.com

*Counsel for Petitioner Prairie State Generating
Company, LLC*

Dennis Lane
STINSON LEONARD STREET LLP
1775 Pennsylvania Ave., N.W., Suite 800
Washington, D.C.  20006
Tel:  (202) 785-9100
Fax:  (202) 785-9163
dennis.lane@stinson.com

Parthenia B. Evans
STINSON LEONARD STREET LLP
1201 Walnut Street, Suite 2900
Kansas City, MO  64106
Tel:  (816) 842-8600
Fax:  (816) 691-3495
parthy.evans@stinson.com

*Counsel for Petitioner Kansas City Board of
Public Utilities – Unified Government of
Wyandotte County/Kansas City, Kansas*

Allison D. Wood
Tauna M. Szymanski
Andrew D. Knudsen
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Tel: (202) 955-1500
awood@hunton.com
tszymanski@hunton.com
aknudsen@hunton.com

*Counsel for Petitioner Tri-State Generation and
Transmission Association, Inc.*

William M. Bumpers
Megan H. Berge
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 639-7700
william.bumpers@bakerbotts.com
megan.berge@bakerbotts.com

*Counsel for Petitioner Westar Energy, Inc.*

Peter D. Keisler
Roger R. Martella, Jr.
C. Frederick Beckner III
Ryan C. Morris
Paul J. Ray
SIDLEY AUSTIN, LLP
1501 K Street, N.W.
Washington, D.C.  20005
Tel:  (202) 736-8027
pkeisler@sidley.com

*Counsel for Petitioners American Chemistry
Council; American Coke and Coal Chemicals
Institute; American Foundry Society; American
Forest & Paper Association; American Iron &
Steel Institute; American Wood Council; Brick
Industry Association; Electricity Consumers
Resource Council; Lignite Energy Council;
National Lime Association; National Oilseed
Processors Association; and Portland Cement
Association*

Jeffrey R. Holmstead
Sandra Y. Snyder
BRACEWELL LLP
2001 M Street, N.W., Suite 900
Washington, D.C.  20036
Tel:  (202) 828-5852
Fax:  (202) 857-4812
jeff.holmstead@bracewelllaw.com

*Counsel for Petitioner American Coalition for
Clean Coal Electricity*

Geoffrey K. Barnes
J. Van Carson
Wendlene M. Lavey
John D. Lazzaretti
Robert D. Cheren
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH  44114
Tel:  (216) 479-8646
geoffrey.barnes@squirepb.com

*Counsel for Petitioner Murray Energy
Corporation*

Andrew C. Emrich
HOLLAND & HART LLP
6380 South Fiddlers Green Circle
Suite 500
Greenwood Village, CO  80111
Tel:  (303) 290-1621
Fax:  (866) 711-8046
acemrich@hollandhart.com

Emily C. Schilling
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT  84101
Tel:  (801) 799-5753
Fax:  (202) 747-6574
ecschilling@hollandhart.com

*Counsel for Petitioners Newmont Nevada
Energy Investment, LLC and Newmont USA
Limited*

Charles T. Wehland
    *Counsel of Record*
Brian J. Murray
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, IL 60601-1692
Tel: (312) 782-3939
Fax: (312) 782-8585
ctwehland@jonesday.com
bjmurray@jonesday.com

*Counsel for Petitioners The North American Coal Corporation; The Coteau Properties Company; Coyote Creek Mining Company, LLC; The Falkirk Mining Company; Mississippi Lignite Mining Company; North American Coal Royalty Company; NODAK Energy Services, LLC; Otter Creek Mining Company, LLC; and The Sabine Mining Company*

Robert G. McLusky
JACKSON KELLY, PLLC
1600 Laidley Tower
P.O. Box 553
Charleston, WV 25322
Tel: (304) 340-1000
rmclusky@jacksonkelly.com

*Counsel for Petitioner West Virginia Coal Association*

Eugene M. Trisko
LAW OFFICES OF EUGENE M. TRISKO
P.O. Box 596
Berkeley Springs, WV  25411
Tel:  (304) 258-1977
Tel:  (301) 639-5238 (cell)
emtrisko7@gmail.com

*Counsel for Petitioner International Brotherhood
of Boilermakers, Iron Ship Builders,
Blacksmiths, Forgers & Helpers*

Eugene M. Trisko
LAW OFFICES OF EUGENE M. TRISKO
P.O. Box 596
Berkeley Springs, WV  25411
Tel:  (304) 258-1977
Tel:  (301) 639-5238 (cell)
emtrisko7@gmail.com

*Counsel for Petitioner International Brotherhood
of Electrical Workers, AFL-CIO*

Grant F. Crandall
General Counsel
UNITED MINE WORKERS OF AMERICA
18354 Quantico Gateway Drive
Triangle, VA  22172
Tel:  (703) 291-2429
gcrandall@umwa.org

Arthur Traynor, III
Staff Counsel
UNITED MINE WORKERS OF AMERICA
18354 Quantico Gateway Drive
Triangle, VA  22172
Tel:  (703) 291-2457
atraynor@umwa.org

Eugene M. Trisko
LAW OFFICES OF EUGENE M. TRISKO
P.O. Box 596
Berkeley Springs, WV  25411
Tel:  (304) 258-1977
emtrisko7@gmail.com

*Counsel for Petitioner United Mine Workers of America*

Steven P. Lehotsky
Sheldon B. Gilbert
U.S. CHAMBER LITIGATION CENTER, INC.
1615 H Street, N.W.
Washington, D.C.  20062
Tel:  (202) 463-5337
slehotsky@uschamber.com

*Counsel for Petitioner Chamber of Commerce of the United States of America*

Linda E. Kelly
Quentin Riegel
Leland P. Frost
MANUFACTURERS' CENTER FOR LEGAL
ACTION
733 10th Street, N.W., Suite 700
Washington, D.C.  20001
Tel:  (202) 637-3000
qriegel@nam.org

*Counsel for Petitioner National Association of
Manufacturers*

Richard S. Moskowitz
AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS
1667 K Street, N.W., Suite 700
Washington, D.C.  20006
Tel:  (202) 457-0480
rmoskowitz@afpm.org

*Counsel for Petitioner American Fuel &
Petrochemical Manufacturers*

Karen R. Harned
Executive Director
Elizabeth A. Gaudio
Senior Executive Counsel
NATIONAL FEDERATION OF
INDEPENDENT BUSINESS
SMALL BUSINESS LEGAL CENTER
1201 F Street, N.W., Suite 200
Washington, D.C.  20004
Tel:  (202) 314-2061
karen.harned@nfib.org
elizabeth.milito@nfib.org

*Counsel for Petitioner National Federation of
Independent Business*

Megan H. Berge
William M. Bumpers
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 639-7700
megan.berge@bakerbotts.com
william.bumpers@bakerbotts.com

*Counsel for Petitioner National Association of
Home Builders*

Kathryn D. Kirmayer
General Counsel
Evelyn R. Nackman
Associate General Counsel
ASSOCIATION OF AMERICAN RAILROADS
425 3rd Street, S.W.
Washington, D.C.  20024
Tel:  (202) 639-2100
kkirmayer@aar.org

*Counsel for Petitioner Association of American
Railroads*

Chaim Mandelbaum
Litigation Manager
FREE MARKET ENVIRONMENTAL LAW
CLINIC
726 N. Nelson Street, Suite 9
Arlington, VA  22203
Tel:  (703) 577-9973
chaim12@gmail.com

*Counsel for Petitioner Energy and Environment
Legal Institute*

Catherine E. Stetson
Eugene A. Sokoloff
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
Tel:  (202) 637-5600
Fax:  (202) 637-5910
cate.stetson@hoganlovells.com
eugene.sokoloff@hoganlovells.com

*Counsel for Petitioner Denbury Onshore, LLC*

C. Boyden Gray
Adam R.F. Gustafson
    *Counsel of Record*
Derek S. Lyons
James R. Conde
BOYDEN GRAY & ASSOCIATES, PLLC
1627 I Street, N.W., Suite 950
Washington, D.C.  20006
Tel:  (202) 955-0620
gustafson@boydengrayassociates.com

*Counsel for Petitioners Competitive Enterprise
Institute; Buckeye Institute for Public Policy
Solutions; Independence Institute; Rio Grande
Foundation; Sutherland Institute; Klaus J.
Christoph; Samuel R. Damewood; Catherine C.
Dellin; Joseph W. Luquire; Lisa R. Markham;
Patrick T. Peterson; and Kristi Rosenquist*

Sam Kazman
Hans Bader
COMPETITIVE ENTERPRISE INSTITUTE
1899 L Street, N.W., 12th Floor
Washington, D.C.  20036
Tel:  (202) 331-1010

*Counsel for Petitioner Competitive Enterprise
Institute*

Robert Alt
BUCKEYE INSTITUTE FOR PUBLIC POLICY
SOLUTIONS
88 E. Broad Street, Suite 1120
Columbus, OH  43215
Tel:  (614) 224-4422
robert@buckeyeinstitute.org

*Counsel for Petitioner Buckeye Institute for
Public Policy Solutions*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioners state as follows:

### A.      Parties, Intervenors, and Amici Curiae

These cases involve the following parties:

**Petitioners:**

No. 15-1363:      State of West Virginia; State of Texas; State of Alabama; State of Arizona Corporation Commission; State of Arkansas; State of Colorado; State of Florida; State of Georgia; State of Indiana; State of Kansas; Commonwealth of Kentucky; State of Louisiana; State of Louisiana Department of Environmental Quality; Attorney General Bill Schuette, People of Michigan; State of Missouri; State of Montana; State of Nebraska; State of New Jersey; State of North Carolina Department of Environmental Quality; State of Ohio; State of South Carolina; State of South Dakota; State of Utah; State of Wisconsin; and State of Wyoming.

No. 15-1364:      State of Oklahoma *ex rel.* E. Scott Pruitt, in his official capacity as Attorney General of Oklahoma and Oklahoma Department of Environmental Quality.

No. 15-1365:      International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers.

No. 15-1366:      Murray Energy Corporation.

No. 15-1367:      National Mining Association.

No. 15-1368:      American Coalition for Clean Coal Electricity.

i

No. 15-1370:          Utility Air Regulatory Group and American Public Power Association.

No. 15-1371:          Alabama Power Company; Georgia Power Company; Gulf Power Company; and Mississippi Power Company.

No. 15-1372:          $CO_2$ Task Force of the Florida Electric Power Coordinating Group, Inc.

No. 15-1373:          Montana-Dakota Utilities Co., a Division of MDU Resources Group, Inc.

No. 15-1374:          Tri-State Generation and Transmission Association, Inc.

No. 15-1375:          United Mine Workers of America.

No. 15-1376:          National Rural Electric Cooperative Association; Arizona Electric Power Cooperative, Inc.; Associated Electric Cooperative, Inc.; Big Rivers Electric Corporation; Brazos Electric Power Cooperative, Inc.; Buckeye Power, Inc.; Central Montana Electric Power Cooperative; Central Power Electric Cooperative, Inc.; Corn Belt Power Cooperative; Dairyland Power Cooperative; Deseret Generation & Transmission Co-operative; East Kentucky Power Cooperative, Inc.; East River Electric Power Cooperative, Inc.; East Texas Electric Cooperative, Inc.; Georgia Transmission Corporation; Golden Spread Electrical Cooperative, Inc.; Hoosier Energy Rural Electric Cooperative, Inc.; Kansas Electric Power Cooperative, Inc.; Minnkota Power Cooperative, Inc.; North Carolina Electric Membership Corporation; Northeast Texas Electric Cooperative, Inc.; Northwest Iowa Power

Cooperative; Oglethorpe Power Corporation; PowerSouth Energy Cooperative;

Prairie Power, Inc.; Rushmore Electric Power Cooperative, Inc.; Sam Rayburn G&T

Electric Cooperative, Inc.; San Miguel Electric Cooperative, Inc.; Seminole Electric

Cooperative, Inc.; South Mississippi Electric Power Association; South Texas Electric

Cooperative, Inc.; Southern Illinois Power Cooperative; Sunflower Electric Power

Corporation; Tex-La Electric Cooperative of Texas, Inc.; Upper Missouri G. & T.

Electric Cooperative, Inc.; Wabash Valley Power Association, Inc.; Western Farmers

Electric Cooperative; and Wolverine Power Supply Cooperative, Inc.

No. 15-1377:     Westar Energy, Inc.

No. 15-1378:     NorthWestern Corporation d/b/a NorthWestern Energy.

No. 15-1379:     National Association of Home Builders.

No. 15-1380:     State of North Dakota.

No. 15-1382:     Chamber of Commerce of the United States of America;

National Association of Manufacturers; American Fuel & Petrochemical

Manufacturers; National Federation of Independent Business; American Chemistry

Council; American Coke and Coal Chemicals Institute; American Foundry Society;

American Forest & Paper Association; American Iron & Steel Institute; American

Wood Council; Brick Industry Association; Electricity Consumers Resource Council;

Lignite Energy Council; National Lime Association; National Oilseed Processors

Association; and Portland Cement Association.

No. 15-1383:     Association of American Railroads.

No. 15-1386:        Luminant Generation Company LLC; Oak Grove Management Company LLC; Big Brown Power Company LLC; Sandow Power Company LLC; Big Brown Lignite Company LLC; Luminant Mining Company LLC; and Luminant Big Brown Mining Company LLC.

No. 15-1393:        Basin Electric Power Cooperative.

No. 15-1398:        Energy & Environment Legal Institute.

No. 15-1409:        Mississippi Department of Environmental Quality; State of Mississippi; and Mississippi Public Service Commission.

No. 15-1410:        International Brotherhood of Electrical Workers, AFL-CIO.

No. 15-1413:        Entergy Corporation.

No. 15-1418:        LG&E and KU Energy LLC.

No. 15-1422:        West Virginia Coal Association.

No. 15-1432:        Newmont Nevada Energy Investment, LLC, and Newmont USA Limited.

No. 15-1442:        The Kansas City Board of Public Utilities – Unified Government of Wyandotte County/Kansas City, Kansas.

No. 15-1451:        The North American Coal Corporation; The Coteau Properties Company; Coyote Creek Mining Company, LLC; The Falkirk Mining Company; Mississippi Lignite Mining Company; North American Coal Royalty

Company; NODAK Energy Services, LLC; Otter Creek Mining Company, LLC; and The Sabine Mining Company.

No. 15-1459:        Indiana Utility Group.

No. 15-1464:        Louisiana Public Service Commission.

No. 15-1470:        GenOn Mid-Atlantic, LLC; Indian River Power LLC; Louisiana Generating LLC; Midwest Generation, LLC; NRG Chalk Point LLC; NRG Power Midwest LP; NRG Rema LLC; NRG Texas Power LLC; NRG Wholesale Generation LP; and Vienna Power LLC.

No. 15-1472:        Prairie State Generating Company, LLC.

No. 15-1474:        Minnesota Power (an operating division of ALLETE, Inc.).

No. 15-1475:        Denbury Onshore, LLC.

No. 15-1477:        Energy-Intensive Manufacturers Working Group on Greenhouse Gas Regulation.

No. 15-1483:        Local Government Coalition for Renewable Energy.

No. 15-1488:        Competitive Enterprise Institute; Buckeye Institute for Public Policy Solutions; Independence Institute; Rio Grande Foundation; Sutherland Institute; Klaus J. Christoph; Samuel R. Damewood; Catherine C. Dellin; Joseph W. Luquire; Lisa R. Markham; Patrick T. Peterson; and Kristi Rosenquist.

**Respondents:**

Respondents are the United States Environmental Protection Agency (in Nos. 15-1364, 15-1365, 15-1367, 15-1368, 15-1370, 15-1373, 15-1374, 15-1375, 15-1376,

15-1380, 15-1383, 15-1398, 15-1410, 15-1418, 15-1442, 15-1472, 15-1474, 15-1475, 15-1483) and the United States Environmental Protection Agency and Gina McCarthy, Administrator (in Nos. 15-1363, 15-1366, 15-1371, 15-1372, 15-1377, 15-1378, 15-1379, 15-1382, 15-1386, 15-1393, 15-1409, 15-1413, 15-1422, 15-1432, 15-1451, 15-1459, 15-1464, 15-1470, 15-1477, 15-1488).

**Intervenors and *Amici Curiae*:**

Dixon Bros., Inc.; Gulf Coast Lignite Coalition; Joy Global Inc.; Nelson Brothers, Inc.; Norfolk Southern Corp.; Peabody Energy Corp.; and Western Explosive Systems Company are Petitioner-Intervenors.

Advanced Energy Economy; American Lung Association; American Wind Energy Association; Broward County, Florida; Calpine Corporation; Center for Biological Diversity; City of Austin d/b/a Austin Energy; City of Boulder; City of Chicago; City of Los Angeles, by and through its Department of Water and Power; City of New York; City of Philadelphia; City of Seattle, by and through its City Light Department; City of South Miami; Clean Air Council; Clean Wisconsin; Coal River Mountain Watch; Commonwealth of Massachusetts; Commonwealth of Virginia; Conservation Law Foundation; District of Columbia; Environmental Defense Fund; Kanawha Forest Coalition; Keepers of the Mountains Foundation; Mon Valley Clean Air Coalition; National Grid Generation, LLC; Natural Resources Defense Council; New York Power Authority; NextEra Energy, Inc.; Ohio Environmental Council; Ohio Valley Environmental Coalition; Pacific Gas and Electric Company; Sacramento

Municipal Utility District; Sierra Club; Solar Energy Industries Association; Southern

California Edison Company; State of California by and through Governor Edmund

G. Brown, Jr., and the California Air Resources Board, and Attorney General Kamala

D. Harris; State of Connecticut; State of Delaware; State of Hawaii; State of Illinois;

State of Iowa; State of Maine; State of Maryland; State of Minnesota by and through

the Minnesota Pollution Control Agency; State of New Hampshire; State of New

Mexico; State of New York; State of Oregon; State of Rhode Island; State of

Vermont; State of Washington; and West Virginia Highlands Conservancy are

Respondent-Intervenors.

Philip Zoebisch; Pedernales Electric Cooperative, Inc.; Municipal Electric

Authority of Georgia; Pacific Legal Foundation; Texas Public Policy Foundation;

Morning Star Packing Company; Merit Oil Company; Loggers Association of

Northern California; Norman R. "Skip" Brown; Southeastern Legal Foundation;

National Black Chamber of Commerce; Hispanic Leadership Fund; 60Plus

Association; Joseph S. D'Aleo; Dr. Harold H. Doiron; Dr. Don J. Easterbrook; Dr.

Theodore R. Eck; Dr. Gordon J. Fulks; Dr. William M. Gray; Dr. Craig D. Idso; Dr.

Richard A. Keen; Dr. Anthony R. Lupo; Dr. Thomas P. Sheahen; Dr. S. Fred Singer;

Dr. James P. Wallace III; Dr. George T. Wolff; Senator Mitch McConnell of

Kentucky; Senator James M. Inhofe of Oklahoma; Senator Lamar Alexander of

Tennessee; Senator John Barrasso of Wyoming; Senator Roy Blunt of Missouri;

Senator John Boozman of Arkansas; Senator Shelly Moore Capito of West Virginia;

Senator Bill Cassidy of Louisiana; Senator Dan Coats of Indiana; Senator John

Cornyn of Texas; Senator Michael D. Crapo of Idaho; Senator Ted Cruz of Texas;

Senator Steve Daines of Montana; Senator Michael B. Enzi of Wyoming; Senator Deb

Fischer of Nebraska; Senator Orrin G. Hatch of Utah; Senator John Hoeven of

North Dakota; Senator Ron Johnson of Wisconsin; Senator James Lankford of

Oklahoma; Senator Joe Manchin of West Virginia; Senator John McCain of Arizona;

Senator Lisa Murkowski of Alaska; Senator Rand Paul of Kentucky; Senator James E.

Risch of Idaho; Senator Pat Roberts of Kansas; Senator M. Michael Rounds of South

Dakota; Senator Marco Rubio of Florida; Senator Tim Scott of South Carolina;

Senator Richard C. Shelby of Alabama; Senator Dan Sullivan of Alaska; Senator John

Thune of South Dakota; Senator Patrick J. Toomey of Pennsylvania; Senator David

Vitter of Louisiana; Senator Roger Wicker of Mississippi; Speaker Paul Ryan of

Wisconsin, 1st Congressional District; Majority Leader Kevin McCarthy of California,

23rd Congressional District; Majority Whip Steve Scalise of Louisiana, 1st

Congressional District; Representative Cathy McMorris Rodgers of Washington, 5th

Congressional District; Representative Brian Babin of Texas, 36th Congressional

District; Representative Lou Barletta of Pennsylvania, 11th Congressional District;

Representative Andy Barr of Kentucky, 6th Congressional District; Representative Joe

Barton of Texas, 6th Congressional District; Representative Gus Bilirakis of Florida,

12th Congressional District; Representative Mike Bishop of Michigan, 8th

Congressional District; Representative Rob Bishop of Utah, 1st Congressional

District; Representative Diane Black of Tennessee, 6th Congressional District;

Representative Marsha Blackburn of Tennessee, 7th Congressional District;

Representative Mike Bost of Illinois, 12th Congressional District; Representative

Charles W. Boustany, Jr. of Louisiana, 3rd Congressional District; Representative

Kevin Brady of Texas, 8th Congressional District; Representative Jim Bridenstine of

Oklahoma, 1st Congressional District; Representative Mo Brooks of Alabama, 5th

Congressional District; Representative Susan W. Brooks of Indiana, 5th Congressional

District; Representative Ken Buck of Colorado, 4th Congressional District;

Representative Larry Bucshon of Indiana, 8th Congressional District; Representative

Michael C. Burgess of Texas, 26th Congressional District; Representative Bradley

Byrne of Alabama, 1st Congressional District; Representative Ken Calvert of

California, 42nd Congressional District; Representative Earl L. "Buddy" Carter of

Georgia, 1st Congressional District; Representative John R. Carter of Texas, 31st

Congressional District; Representative Steve Chabot of Ohio, 1st Congressional

District; Representative Jason Chaffetz of Utah, 3rd Congressional District;

Representative Mike Coffman of Colorado, 6th Congressional District; Representative

Tom Cole of Oklahoma, 4th Congressional District; Representative Chris Collins of

New York, 27th Congressional District; Representative Doug Collins of Georgia, 9th

Congressional District; Representative K. Michael Conaway of Texas, 11th

Congressional District; Representative Kevin Cramer of North Dakota, At-Large

Congressional District; Representative Ander Crenshaw of Florida, 4th Congressional

District; Representative John Abney Culberson of Texas, 7th Congressional District; Representative Rodney Davis of Illinois, 13th Congressional District; Representative Jeff Denham of California, 10th Congressional District; Representative Ron DeSantis of Florida, 6th Congressional District; Representative Scott DesJarlais of Tennessee, 4th Congressional District; Representative Sean P. Duffy of Wisconsin, 7th Congressional District; Representative Jeff Duncan of South Carolina, 3rd Congressional District; Representative John J. Duncan, Jr. of Tennessee, 2nd Congressional District; Representative Renee Ellmers of North Carolina, 2nd Congressional District; Representative Blake Farenthold of Texas, 27th Congressional District; Representative Chuck Fleischmann of Tennessee, 3rd Congressional District; Representative John Fleming of Louisiana, 4th Congressional District; Representative Bill Flores of Texas, 17th Congressional District; Representative J. Randy Forbes of Virginia, 4th Congressional District; Representative Virginia Foxx of North Carolina, 5th Congressional District; Representative Trent Franks of Arizona, 8th Congressional District; Representative Scott Garrett of New Jersey, 5th Congressional District; Representative Bob Gibbs of Ohio, 7th Congressional District; Representative Louie Gohmert of Texas, 1st Congressional District; Representative Bob Goodlatte of Virginia, 6th Congressional District; Representative Paul A. Gosar of Arizona, 4th Congressional District; Representative Kay Granger of Texas, 12th Congressional District; Representative Garret Graves of Louisiana, 6th Congressional District; Representative Sam Graves of Missouri, 6th Congressional District;

Representative Tom Graves of Georgia, 14th Congressional District; Representative
H. Morgan Griffith of Virginia, 9th Congressional District; Representative Glenn
Grothman of Wisconsin, 6th Congressional District; Representative Frank C. Guinta
of New Hampshire, 1st Congressional District; Representative Brett Guthrie of
Kentucky, 2nd Congressional District; Representative Gregg Harper of Mississippi,
3rd Congressional District; Representative Vicky Hartzler of Missouri, 4th
Congressional District; Representative Jeb Hensarling of Texas, 5th Congressional
District; Representative Jody B. Hice of Georgia, 10th Congressional District;
Representative J. French Hill of Arkansas, 2nd Congressional District; Representative
Richard Hudson of North Carolina, 8th Congressional District; Representative Tim
Huelskamp of Kansas, 1st Congressional District; Representative Bill Huizenga of
Michigan, 2nd Congressional District; Representative Will Hurd of Texas, 23rd
Congressional District; Representative Robert Hurt of Virginia, 5th Congressional
District; Representative Evan H. Jenkins of West Virginia, 3rd Congressional District;
Representative Lynn Jenkins of Kansas, 2nd Congressional District; Representative
Bill Johnson of Ohio, 6th Congressional District; Representative Sam Johnson of
Texas, 3rd Congressional District; Representative Walter B. Jones of North Carolina,
3rd Congressional District; Representative Jim Jordan of Ohio, 4th Congressional
District; Representative Mike Kelly of Pennsylvania, 3rd Congressional District;
Representative Trent Kelly of Mississippi, 1st Congressional District; Representative
Steve King of Iowa, 4th Congressional District; Representative Adam Kinzinger of

Illinois, 16th Congressional District; Representative John Kline of Minnesota, 2nd

Congressional District; Representative Doug LaMalfa of California, 1st Congressional

District; Representative Doug Lamborn of Colorado, 5th Congressional District;

Representative Robert E. Latta of Ohio, 5th Congressional District; Representative

Billy Long of Missouri, 7th Congressional District; Representative Barry Loudermilk

of Georgia, 11th Congressional District; Representative Frank D. Lucas of Oklahoma,

3rd Congressional District; Representative Blaine Luetkemeyer of Missouri, 3rd

Congressional District; Representative Cynthia M. Lummis of Wyoming, At-Large

Congressional District; Representative Kenny Marchant of Texas, 24th Congressional

District; Representative Tom Marino of Pennsylvania, 10th Congressional District;

Representative Thomas Massie of Kentucky, 4th Congressional District;

Representative Michael T. McCaul of Texas, 10th Congressional District;

Representative Tom McClintock of California, 4th Congressional District;

Representative David B. McKinley of West Virginia, 1st Congressional District;

Representative Martha McSally of Arizona, 2nd Congressional District; Representative

Mark Meadows of North Carolina, 11th Congressional District; Representative Luke

Messer of Indiana, 6th Congressional District; Representative John L. Mica of Florida,

7th Congressional District; Representative Jeff Miller of Florida, 1st Congressional

District; Representative John Moolenaar of Michigan, 4th Congressional District;

Representative Alex X. Mooney of West Virginia, 2nd Congressional District;

Representative Markwayne Mullin of Oklahoma, 2nd Congressional District;

Representative Tim Murphy of Pennsylvania, 18th Congressional District;

Representative Randy Neugebauer of Texas, 19th Congressional District;

Representative Dan Newhouse of Washington, 4th Congressional District;

Representative Richard B. Nugent of Florida, 11th Congressional District;

Representative Devin Nunes of California, 22nd Congressional District;

Representative Pete Olson of Texas, 22nd Congressional District; Representative

Steven M. Palazzo of Mississippi, 4th Congressional District; Representative Stevan

Pearce of New Mexico, 2nd Congressional District; Representative Scott Perry of

Pennsylvania, 4th Congressional District; Representative Robert Pittenger of North

Carolina, 9th Congressional District; Representative Joseph R. Pitts of Pennsylvania,

16th Congressional District; Representative Ted Poe of Texas, 2nd Congressional

District; Representative Mike Pompeo of Kansas, 4th Congressional District;

Representative John Ratcliffe of Texas, 4th Congressional District; Representative Jim

Renacci of Ohio, 16th Congressional District; Representative Reid Ribble of

Wisconsin, 8th Congressional District; Representative Scott Rigell of Virginia, 2nd

Congressional District; Representative David P. Roe of Tennessee, 1st Congressional

District; Representative Harold Rogers of Kentucky, 5th Congressional District;

Representative Mike Rogers of Alabama, 3rd Congressional District; Representative

Dana Rohrabacher of California, 48th Congressional District; Representative Todd

Rokita of Indiana, 4th Congressional District; Representative Peter J. Roskam of

Illinois, 6th Congressional District; Representative Keith J. Rothfus of Pennsylvania,

12th Congressional District; Representative David Rouzer of North Carolina, 7th

Congressional District; Representative Steve Russell of Oklahoma, 5th Congressional

District; Representative Pete Sessions of Texas, 32nd Congressional District;

Representative John Shimkus of Illinois, 15th Congressional District; Representative

Bill Shuster of Pennsylvania, 9th Congressional District; Representative Michael K.

Simpson of Idaho, 2nd Congressional District; Representative Adrian Smith of

Nebraska, 3rd Congressional District; Representative Jason Smith of Missouri, 8th

Congressional District; Representative Lamar Smith of Texas, 21st Congressional

District; Representative Chris Stewart of Utah, 2nd Congressional District;

Representative Steve Stivers of Ohio, 15th Congressional District; Representative

Marlin A. Stutzman of Indiana, 3rd Congressional District; Representative Glenn

"GT" Thompson of Pennsylvania, 5th Congressional District; Representative Mac

Thornberry of Texas, 13th Congressional District; Representative Patrick J. Tiberi of

Ohio, 12th Congressional District; Representative Scott R. Tipton of Colorado, 3rd

Congressional District; Representative David A. Trott of Michigan, 11th

Congressional District; Representative Michael R. Turner of Ohio, 10th

Congressional District; Representative Fred Upton of Michigan, 4th Congressional

District;  Representative Ann Wagner of Missouri, 2nd Congressional District;

Representative Tim Walberg of Michigan, 7th Congressional District; Representative

Greg Walden of Oregon, 2nd Congressional District; Representative Jackie Walorski

of Indiana, 2nd Congressional District; Representative Mimi Walters of California,

45th Congressional District; Representative Randy K. Weber of Texas, 14th

Congressional District; Representative Daniel Webster of Florida, 10th Congressional

District; Representative Brad R. Wenstrup of Ohio, 2nd Congressional District;

Representative Bruce Westerman of Arkansas, 4th Congressional District;

Representative Lynn A. Westmoreland of Georgia, 3rd Congressional District;

Representative Ed Whitfield of Kentucky, 1st Congressional District; Representative

Roger Williams of Texas, 25th Congressional District; Representative Joe Wilson of

South Carolina, 2nd Congressional District; Representative Robert J. Wittman of

Virginia, 1st Congressional District; Representative Steve Womak of Arkansas, 3rd

Congressional District; Representative  Rob Woodall of Georgia, 7th Congressional

District; Representative Kevin Yoder of Kansas, 3rd Congressional District;

Representative Ted S. Yoho of Florida, 3rd Congressional District; Representative

Don Young of Alaska, At-Large Congressional District; Representative Todd C.

Young of Indiana, 9th Congressional District; Representative Ryan Zinke of Montana,

At-Large Congressional District; Former State Public Utility Commissioners

Congressman Kevin Cramer, David Armstrong, Randall Bynum, Charles Davidson,

Jeff Davis, Mark David Goss, Robert Hix, Terry Jarrett, Larry Landis, Jon McKinney,

Carol Miller, Polly Page, Anthony Rachal III, Dr. Edward Salmon, Joan Smith, Jim

Sullivan, David Wright, and Tom Wright; Landmark Legal Foundation; Texas

Association of Business; Pennsylvania Chamber of Business and Industry; Ohio

Chamber of Commerce; Alaska Chamber of Commerce; Arizona Chamber of

Commerce and Industry; Arkansas State Chamber of Commerce/Associated Industries of Arkansas; Associated Industries of Missouri; Association of Commerce and Industry; Bakersfield Chamber of Commerce; Beaver Dam Chamber of Commerce; Billings Chamber of Commerce; Birmingham Business Alliance; Bismarck Mandan Chamber of Commerce; Blair County Chamber of Commerce; Bowling Green Area Chamber of Commerce; Bullitt County Chamber of Commerce; Business Council of Alabama; Campbell County Chamber of Commerce; Canton Regional Chamber of Commerce; Carbon County Chamber of Commerce; Carroll County Chamber of Commerce; Catawba Chamber of Commerce; Central Chamber of Commerce; Central Louisiana Chamber of Commerce; Chamber Southwest Louisiana; Chamber630; Chandler Chamber of Commerce; Colorado Association of Commerce and Industry; Colorado Business Roundtable; Columbus Area Chamber of Commerce; Dallas Regional Chamber; Davis Chamber of Commerce; Detroit Regional Chamber of Commerce; Eau Claire Area Chamber of Commerce; Erie Regional Chamber & Growth Partnership; Fall River Area Chamber of Commerce & Industry; Fremont Area Chamber of Commerce; Georgia Association of Manufacturers; Georgia Chamber of Commerce; Gibson County Chamber of Commerce; Gilbert Chamber of Commerce; Grand Junction Area Chamber; Grand Rapids Area Chamber of Commerce; Great Lakes Metro Chambers Coalition; Greater Flagstaff Chamber of Commerce; Greater Green Bay Chamber of Commerce; Greater Irving-Las Colinas Chamber of Commerce; Greater Lehigh Valley Chamber

of Commerce; Greater Muhlenberg Chamber of Commerce; Greater North Dakota
Chamber of Commerce; Greater Orange Area Chamber of Commerce; Greater
Phoenix Chamber of Commerce; Greater Shreveport Chamber of Commerce;
Greater Summerville/Dorchester County Chamber of Commerce; Greater Tulsa
Hispanic Chamber of Commerce; Greater West Plains Area Chamber of Commerce;
Hartford Area Chamber of Commerce; Hastings Area Chamber of Commerce;
Hazard Perry County Chamber of Commerce; Illinois Manufacturers Association;
Indiana Chamber of Commerce; Indiana County Chamber of Commerce; Iowa
Association of Business and Industry; Jackson County Chamber; Jax Chamber of
Commerce; Jeff Davis Chamber of Commerce; Johnson City Chamber of Commerce;
Joplin Area Chamber of Commerce; Kalispell Chamber of Commerce; Kansas
Chamber of Commerce; Kentucky Association of Manufacturers; Kentucky Chamber
of Commerce; Kingsport Chamber of Commerce; Kyndle, Kentucky Network for
Development, Leadership and Engagement; Latino Coalition; Lima-Allen County
Chamber of Commerce; Lincoln Chamber of Commerce; Longview Chamber of
Commerce; Loudoun Chamber of Commerce; Lubbock Chamber of Commerce;
Madisonville-Hopkins County Chamber of Commerce; Maine State Chamber of
Commerce; Manhattan Chamber of Commerce; McLean County Chamber of
Commerce; Mercer Chamber of Commerce; Mesa Chamber of Commerce; Metro
Atlanta Chamber of Commerce; Metropolitan Milwaukee Association of Commerce;
Michigan Chamber of Commerce; Michigan Manufacturers Association; Midland

Chamber of Commerce; Milbank Area Chamber of Commerce; Minot Area Chamber of Commerce; Mississippi Economic Council – The State Chamber of Commerce; Mississippi Manufacturers Association, Missouri Chamber of Commerce; Mobile Area Chamber of Commerce; Montana Chamber of Commerce; Montgomery Area Chamber of Commerce; Morganfield Chamber of Commerce; Mount Pleasant/Titus County Chamber of Commerce; Myrtle Beach Chamber of Commerce; Naperville Area Chamber of Commerce; Nashville Area Chamber of Commerce; National Black Chamber of Commerce; Nebraska Chamber of Commerce and Industry; Nevada Manufacturers Association; New Jersey Business & Industry Association; New Jersey State Chamber of Commerce; New Mexico Business Coalition; Newcastle Area Chamber of Commerce; North Carolina Chamber of Commerce; North Country Chamber of Commerce; Northern Kentucky Chamber of Commerce; Ohio Manufacturers Association; Orrville Area Chamber of Commerce; Oshkosh Chamber of Commerce; Paducah Area Chamber of Commerce; Paintsville/Johnson County Chamber of Commerce; Pennsylvania Manufacturers Association; Port Aransas Chamber of Commerce/Tourist Bureau; Powell Valley Chamber of Commerce; Putnam Chamber of Commerce; Rapid City Area Chamber of Commerce; Rapid City Economic Development Partnership; Redondo Beach Chamber of Commerce; Roanoke Valley Chamber of Commerce; Rock Springs Chamber of Commerce; Salt Lake Chamber of Commerce; San Diego East County Chamber of Commerce; San Gabriel Valley Economic Partnership; Savannah Area Chamber of Commerce;

Schuylkill Chamber of Commerce; Shoals Chamber of Commerce; Silver City Grant County Chamber of Commerce; Somerset County Chamber of Commerce; South Bay Association of Chambers of Commerce; South Carolina Chamber of Commerce; South Dakota Chamber of Commerce; Southeast Kentucky Chamber of Commerce; Southwest Indiana Chamber; Springerville-Eagar Chamber of Commerce; Springfield Area Chamber of Commerce; St. Louis Regional Chamber; State Chamber of Oklahoma; Superior Arizona Chamber of Commerce; Tempe Chamber of Commerce; Tennessee Chamber of Commerce and Industry; Tucson Metro Chamber of Commerce; Tulsa Chamber of Commerce; Tyler Area Chamber of Commerce; Upper Sandusky Area Chamber of Commerce; Utah Valley Chamber; Victoria Chamber of Commerce; Virginia Chamber of Commerce; Wabash County Chamber of Commerce; West Virginia Chamber of Commerce; West Virginia Manufacturers Association; Westmoreland County Chamber of Commerce; White Pine Chamber of Commerce; Wichita Metro Chamber of Commerce; Williamsport/Lycoming Chamber of Commerce; Wisconsin Manufacturers & Commerce; Wyoming Business Alliance; Wyoming State Chamber of Commerce; Youngstown Warren Regional Chamber; State of Nevada; and Consumers' Research are *amici curiae* in support of Petitioners.

Former EPA Administrators William D. Ruckelshaus and William K. Reilly; Institute for Policy Integrity at New York University School of Law; National League of Cities; U.S. Conference of Mayors; Baltimore, MD; Boulder County, CO; Coral

Gables, FL; Grand Rapids, MI; Houston, TX; Jersey City, NJ; Los Angeles, CA; Minneapolis, MN; Pinecrest, FL; Portland, OR; Providence, RI; Salt Lake City, UT; San Francisco, CA; West Palm Beach, FL; American Thoracic Society; American Medical Association; American College of Preventive Medicine; American College of Occupational and Environmental Medicine; Service Employees International Union; American Sustainable Business Council; and South Carolina Small Business Chamber of Commerce are *amici curiae* in support of Respondents.

Ann Arbor, MI; Arlington County, VA; Aurora, IL; Bellingham, WA; Berkeley, CA; Bloomington, IN; Boise, ID; Boston, MA; Carmel, IN; Chapel Hill, NC; Clarkston, GA; Cutler Bay, FL; Elgin, IL; Eugene, OR; Evanston, IL; Fort Collins, CO; Henderson, NV; Highland Park, IL; Hoboken, NJ; Holyoke, MA; King County, WA; Madison, WI; Miami, FL; Miami Beach, FL; Milwaukie, OR; Newburgh Heights, OH; Oakland, CA; Pittsburgh, PA; Portland, ME; Reno, NV; Rochester, NY; Syracuse, NY; Tucson, AZ; Washburn, WI; West Chester, PA; West Hollywood, CA; Mayor of Dallas, TX; Mayor of Knoxville, TN; Mayor of Missoula, MT; Mayor of Orlando, FL; American Academy of Pediatrics; National Medical Association; National Association for Medical Direction of Respiratory Care; American Public Health Association; Former State Energy and Environmental Officials Matt Baker, Janet Gail Besser, Ron Binz, Garry Brown, Michael H. Dworkin, Jeanne Fox, Dian Grueneich, Paul Hibbard, Karl Rábago, Cheryl Roberto, Barbara Roberts, Jim Roth, Larry R. Soward, Kelly Speakes-Backman, Sue Tierney, Kathy Watson; Union of

Concerned Scientists; Grid Experts Benjamin F. Hobbs, Brendan Kirby, Kenneth J. Lutz, James D. McCalley, Brian Parsons; Frank Pallone, Jr., Representative of New Jersey; Jared Huffman, Representative of California; Nancy Pelosi, Representative of California; Steny H. Hoyer, Representative of Maryland; James E. Clyburn, Representative of South Carolina; Xavier Becerra, Representative of California; Joseph Crowley, Representative of New York; John Conyers, Jr., Representative of Michigan; Elijah E. Cummings, Representative of Maryland; Peter A. DeFazio, Representative of Oregon; Eliot L. Engel, Representative of New York; Raúl M. Grijalva, Representative of Arizona; Eddie Bernice Johnson, Representative of Texas; Sander Levin, Representative of Michigan; John Lewis, Representative of Georgia; Nita M. Lowey, Representative of New York; Jim McDermott, Representative of Washington; Richard E. Neal, Representative of Massachusetts; David Price, Representative of North Carolina; Charles B. Rangel, Representative of New York; Bobby L. Rush, Representative of Illinois; José E. Serrano, Representative of New York; Louise M. Slaughter, Representative of New York; Alma S. Adams, Representative of North Carolina; Pete Aguilar, Representative of California; Karen Bass, Representative of California; Ami Bera, Representative of California; Donald S. Beyer, Jr., Representative of Virginia; Earl Blumenauer, Representative of Oregon; Suzanne Bonamici, Representative of Oregon; Brendan F. Boyle, Representative of Pennsylvania; Robert A. Brady, Representative of Pennsylvania; Corrine Brown, Representative of Florida; Julia Brownley, Representative of California; Cheri Bustos,

Representative of Illinois; G.K. Butterfield, Representative of North Carolina; Lois

Capps, Representative of California; Tony Cárdenas, Representative of California;

John C. Carney, Jr., Representative of Delaware; André Carson, Representative of

Indiana; Matt Cartwright, Representative of Pennsylvania; Kathy Castor,

Representative of Florida; Joaquin Castro, Representative of Texas; Judy Chu,

Representative of California; David N. Cicilline, Representative of Rhode Island;

Katherine M. Clark, Representative of Massachusetts; Emanuel Cleaver, II,

Representative of Missouri; Steve Cohen, Representative of Tennessee; Gerald E.

Connolly, Representative of Virginia; Joe Courtney, Representative of Connecticut;

Danny K. Davis, Representative of Illinois; Susan A. Davis, Representative of

California; Diana L. DeGette, Representative of Colorado; John K. Delaney,

Representative of Maryland; Rosa L. DeLauro, Representative of Connecticut; Suzan

K. DelBene, Representative of Washington; Mark DeSaulnier, Representative of

California; Theodore E. Deutch, Representative of Florida; Debbie Dingell,

Representative of Michigan; Michael F. Doyle, Representative of Pennsylvania;

Tammy Duckworth, Representative of Illinois; Donna F. Edwards, Representative of

Maryland; Keith Ellison, Representative of Minnesota; Anna G. Eshoo,

Representative of California; Elizabeth H. Esty, Representative of Connecticut; Sam

Farr, Representative of California; Chaka Fattah, Representative of Pennsylvania; Bill

Foster, Representative of Illinois; Lois Frankel, Representative of Florida; Ruben

Gallego, Representative of Arizona; John Garamendi, Representative of California;

Alan Grayson, Representative of Florida; Luis V. Gutierrez, Representative of Illinois;

Janice Hahn, Representative of California; Alcee L. Hastings; Representative of

Florida; Denny Heck, Representative of Washington; Brian Higgins, Representative of

New York; Jim Himes, Representative of Connecticut; Michael M. Honda,

Representative of California; Steve Israel, Representative of New York; Shelia Jackson

Lee, Representative of Texas; Hakeem Jeffries, Representative of New York; Henry

C. "Hank" Johnson, Representative of Georgia; William R. Keating, Representative of

Massachusetts; Robin L. Kelly, Representative of Illinois; Joseph P. Kennedy, III,

Representative of Massachusetts; Daniel T. Kildee, Representative of Michigan; Derek

Kilmer, Representative of Washington; Ann McLane Kuster, Representative of New

Hampshire; James R. Langevin, Representative of Rhode Island; John B. Larson,

Representative of Connecticut; Brenda L. Lawrence, Representative of Michigan;

Barbara Lee, Representative of California; Ted W. Lieu, Representative of California;

Daniel Lipinski, Representative of Illinois; Dave Loebsack, Representative of Iowa;

Zoe Lofgren, Representative of California; Alan Lowenthal, Representative of

California; Ben Ray Luján, Representative of New Mexico; Michelle Lujan Grisham,

Representative of New Mexico; Stephen F. Lynch, Representative of Massachusetts;

Carolyn B. Maloney, Representative of New York; Sean Patrick Maloney,

Representative of New York; Doris Matsui, Representative of California; Betty

McCollum, Representative of Minnesota; James P. McGovern, Representative of

Massachusetts; Jerry McNerney, Representative of California; Gregory W. Meeks,

Representative of New York; Grace Meng, Representative of New York; Gwen

Moore, Representative of Wisconsin; Seth Moulton, Representative of Massachusetts;

Patrick E. Murphy, Representative of Florida; Jerrold Nadler, Representative of New

York; Grace F. Napolitano, Representative of California; Donald Norcross,

Representative of New Jersey; Eleanor Holmes Norton, Representative of District of

Columbia; Beto O'Rourke, Representative of Texas; Bill Pascrell, Jr., Representative

of New Jersey; Donald M. Payne, Jr., Representative of New Jersey; Ed Perlmutter,

Representative of Colorado; Scott H. Peters, Representative of California; Chellie

Pingree, Representative of Maine; Mark Pocan, Representative of Wisconsin; Jared

Polis, Representative of Colorado; Mike Quigley, Representative of Illinois; Kathleen

M. Rice, Representative of New York; Cedric L. Richmond, Representative of

Louisiana; Lucille Roybal-Allard, Representative of California; Raul Ruiz,

Representative of California; C.A. Dutch Ruppersberger, Representative of Maryland;

Gregorio Kilili Camacho Sablan, Representative of Northern Mariana Islands; Linda

T. Sánchez, Representative of California; Loretta Sanchez, Representative of

California; John P. Sarbanes, Representative of Maryland; Jan Schakowsky,

Representative of Illinois; Adam B. Schiff, Representative of California; Kurt

Schrader, Representative of Oregon; Robert C. "Bobby" Scott, Representative of

Virginia; Brad Sherman, Representative of California; Albio Sires, Representative of

New Jersey; Adam Smith, Representative of Washington; Jackie Speier,

Representative of California; Eric Swalwell, Representative of California; Mark Takai,

Representative of Hawaii; Mark Takano, Representative of California; Mike

Thompson, Representative of California; Dina Titus, Representative of Nevada; Paul

D. Tonko, Representative of New York; Niki Tsongas, Representative of

Massachusetts; Chris Van Hollen, Representative of Maryland; Juan Vargas,

Representative of California; Debbie Wasserman Schultz, Representative of Florida;

Maxine Waters, Representative of California; Bonnie Watson Coleman,

Representative of New Jersey; Peter Welch, Representative of Vermont; Frederica S.

Wilson, Representative of Florida; John Yarmuth, Representative of Kentucky;

Tammy Baldwin, Senator of Wisconsin; Michael F. Bennet, Senator of Colorado;

Richard Blumenthal, Senator of Connecticut; Cory A. Booker, Senator of New Jersey;

Barbara Boxer, Senator of California; Sherrod Brown, Senator of Ohio; Maria

Cantwell, Senator of Washington; Benjamin L. Cardin, Senator of Maryland; Thomas

R. Carper, Senator of Delaware; Robert P. Casey, Jr., Senator of Pennsylvania;

Christopher A. Coons, Senator of Delaware; Richard J. Durbin, Senator of Illinois;

Dianne Feinstein, Senator of California; Al Franken, Senator of Minnesota; Kirsten E.

Gillibrand, Senator of New York; Martin Heinrich, Senator of New Mexico; Mazie K.

Hirono, Senator of Hawaii; Tim Kaine, Senator of Virginia; Angus S. King, Jr.,

Senator of Maine; Amy Klobuchar, Senator of Minnesota; Patrick J. Leahy, Senator of

Vermont; Edward J. Markey; Senator of Massachusetts; Robert Menendez, Senator of

New Jersey; Jeff Merkley, Senator of Oregon; Patty Murray, Senator of Washington;

Gary C. Peters, Senator of Michigan; Jack Reed, Senator of Rhode Island; Harry Reid,

Senator of Nevada; Bernard Sanders, Senator of Vermont; Brian Schatz, Senator of Hawaii; Charles E. Schumer, Senator of New York; Jeanne Shaheen, Senator of New Hampshire; Debbie Stabenow, Senator of Michigan; Mark R. Warner, Senator of Virginia; Sheldon Whitehouse, Senator of Rhode Island; Ron Wyden, Senator of Oregon; Sherwood Boehlert, Representative of New York (retired); Milton "Bob" Carr, Representative of Michigan (retired); Thomas A. Daschle, Senator and Representative of South Dakota (retired); Thomas Downey, Representative of New York (retired); David Durenberger, Senator of Minnesota (retired); Tom Harkin, Senator and Representative of Iowa (retired); Bill Hughes, Representative of New Jersey (retired); J. Robert Kerrey, Senator of Nebraska (retired); Carl Levin, Senator of Michigan (retired); Joseph I. Lieberman, Senator of Connecticut (retired); George Miller, Representative of California (retired); George J. Mitchell, Senator of Maine (retired); Jim Moran, Representative of Virginia (retired); Henry Waxman, Representative of California (retired); Timothy E. Wirth, Senator and Representative of Colorado (retired); Amazon.com, Inc.; Apple Inc.; Google Inc.; Microsoft Corp.; Leon G. Billings; Thomas C. Jorling; Citizens Utility Board; Consumers Union; Public Citizen, Inc.; Climate Scientists David Battisti, Marshall Burke, Ken Caldeira, Noah Diffenbaugh, William E. Easterling III, Christopher Field, John Harte, Jessica Hellman, Daniel Kirk-Davidoff, David Lobell, Katherine Mach, Pamela Matson, James C. Mcwilliams, Mario J. Molina, Michael Oppenheimer, Jonathan Overpeck, Scott R. Saleska, Noelle Eckley Selin, Drew Shindell, and Steven Wofsy; Dominion

Resources, Inc.; U.S. Black Chambers, Inc.; CABA (Climate Action Business Association, New England); Pioneer Valley Local First; Local First Ithaca; Green America; Kentucky Sustainable Business Council; West Virginia Sustainable Business Council; Ohio Sustainable Business Council; Idaho Clean Energy Association; Integrative Healthcare Policy Consortium; Sustainable Furnishings Council; National Small Business Network; New York State Sustainable Business Council; P3Utah; Business and Labor Coalition of New York; Small Business Minnesota; Metro Independent Business Council (Minneapolis); Lowcountry Local First (South Carolina); Local First Arizona; Sustainable Business Network of Massachusetts; Sustainable Business Network of Greater Philadelphia; Hampton Roads Hispanic Chamber of Commerce; Heartland Black Chamber of Commerce (Kansas); Madeleine K. Albright; Leon E. Panetta; William J. Burns; Catholic Climate Covenant; Catholic Rural Life; Evangelical Environmental Network; National Council of Churches USA; Coalition on the Environment and Jewish Life; Church World Service; Union of Reform Judaism; Women of Reform Judaism; National Baptist Convention of America; Progressive National Baptist Convention; Hazon; Sisters of Mercy of the Americas, Institute Leadership Team; Maryknoll Sisters; Sisters of the Divine Compassion; The Columban Center for Advocacy and Outreach; Cabrini College; Fordham University; University of San Diego; Center for Sustainability at Saint Louis University; Center for Human Rights and International Justice, Boston College; The Boisi Center of Boston College; Conference for Mercy Higher Education; University

of San Francisco; Le Moyne College; The Center for Peace and Justice Education; Loyola University Maryland; The College of the Holy Cross; Florida Council of Churches; Wisconsin Council of Churches; The Diocese of Stockton, California; The Diocese of Des Moines, Iowa; The Diocese of Davenport, Iowa; Catholic Committee of Appalachia; Sisters of Charity of New York; Dominican Sisters of Springfield, IL; Sisters of St. Joseph Earth Center: SSJ Earth Center; Sisters of St. Joseph Peace Leadership Team; Sisters of Charity of Saint Elizabeth Office of Peace, Justice and Ecological Integrity; School Sisters of Notre Dame Atlantic Midwest Province Department of Justice, Peace and Integrity of Creation; Buffalo Diocese Care for Creation Committee; Dominican Sisters of Grand Rapids; Adobe, Inc.; Mars, Incorporated; IKEA North America Services LLC; and Blue Cross and Blue Shield of Massachusetts, Inc. filed motions and *amici curiae* briefs in support of Respondents that remain pending as of the time of filing of this final form brief.

### B. <u>Rulings Under Review</u>

These consolidated cases involve final agency action of the United States Environmental Protection Agency titled, "Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units," and published on October 23, 2015, at 80 Fed. Reg. 64,662.

## C.    Related Cases

These consolidated cases have not previously been before this Court or any other court. Counsel is aware of five related cases that, as of the time of filing, have appeared before this Court:

(1)    *In re Murray Energy Corporation*, No. 14-1112,

(2)    *Murray Energy Corporation v. EPA*, No. 14-1151 (consolidated with No. 14-1112),

(3)    *State of West Virginia v. EPA*, No. 14-1146,

(4)    *In re State of West Virginia*, No. 15-1277, and

(5)    *In re Peabody Energy Corporation*, No. 15-1284 (consolidated with No. 15-1277).

Counsel is aware of five related proceedings that, as of the time of filing, have appeared before the United States Supreme Court:

(1)    *West Virginia v. EPA*, 136 S. Ct. 1000 (2016),

(2)    *Basin Electric Power Coop. v. EPA*, 136 S. Ct. 998 (2016),

(3)    *Murray Energy Corp. v. EPA*, 136 S. Ct. 999 (2016),

(4)    *Chamber of Commerce v. EPA*, 136 S. Ct. 999 (2016), and

(5)    *North Dakota v. EPA*, 136 S. Ct. 999 (2016).

Per the Court's order of January 21, 2016, the following cases are consolidated and being held in abeyance pending potential administrative resolution of biogenic carbon dioxide emissions issues in the Final Rule: *National Alliance of Forest Owners v.*

*EPA*, No. 15-1478; *Biogenic CO2 Coalition v. EPA*, No. 15-1479; and *American Forest &*

*Paper Association, Inc. and American Wood Council v. EPA*, No. 15-1485.

## CORPORATE DISCLOSURE STATEMENTS

Non-governmental Petitioners submit the following statements pursuant to

Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1:

**Alabama Power Company** is a wholly-owned subsidiary of Southern Company, which is a publicly held corporation. Other than Southern Company, no publicly-held company owns 10% or more of Alabama Power Company's stock. Southern Company is traded publicly on the New York Stock Exchange under the symbol "SO."

**American Chemistry Council** ("ACC") states that it represents the leading companies engaged in the business of chemistry. ACC members apply the science of chemistry to make innovative products and services that make people's lives better, healthier, and safer. ACC is committed to improved environmental, health, and safety performance through Responsible Care®, common sense advocacy designed to address major public policy issues, and health and environmental research and product testing. The business of chemistry is an $801 billion enterprise and a key element of the nation's economy. ACC has no parent corporation, and no publicly held company has 10% or greater ownership in ACC.

**American Coalition for Clean Coal Electricity** ("ACCCE") is a partnership of companies that are involved in the production of electricity from coal. ACCCE recognizes the inextricable linkage between energy, the economy and our environment. Toward that end, ACCCE supports policies that promote the wise use of coal, one of America's largest domestically produced energy resources, to ensure a reliable and affordable supply of electricity to meet our nation's demand for energy. The ACCCE is a "trade association" within the meaning of Circuit Rule 26.1(b). It has no parent corporation, and no publicly held company owns a 10% or greater interest in the ACCCE.

**American Coke and Coal Chemicals Institute** ("ACCCI"), founded in 1944, is the international trade association that represents 100% of the U.S. producers of metallurgical coke used for iron and steelmaking, and 100% of the nation's producers of coal chemicals, who combined have operations in 12 states. ACCCI also represents chemical processors, metallurgical coal producers, coal and coke sales agents, and suppliers of equipment, goods, and services to the industry. ACCCI has no parent corporation, and no publicly held company has 10% or greater ownership in ACCCI.

**American Forest & Paper Association** ("AF&PA") is the national trade association of the paper and wood products industry, which accounts for approximately 4 percent

of the total U.S. manufacturing gross domestic product. The industry makes products essential for everyday life from renewable and recyclable resources, producing about $210 billion in products annually and employing nearly 900,000 men and women with an annual payroll of approximately $50 billion. AF&PA has no parent corporation, and no publicly held company has 10% or greater ownership in AF&PA.

**American Foundry Society** ("AFS"), founded in 1896, is the leading U.S. based metalcasting society, assisting member companies and individuals to effectively manage their production operations, profitably market their products and services, and equitably manage their employees. AFS is comprised of more than 7,500 individual members representing over 3,000 metalcasting firms, including foundries, suppliers, and customers. AFS has no parent corporation, and no publicly held company has 10% or greater ownership in AFS.

**American Fuel & Petrochemical Manufacturers** ("AFPM") states that it is a national trade association whose members comprise more than 400 companies, including virtually all United States refiners and petrochemical manufacturers. AFPM's members supply consumers with a wide variety of products that are used daily in homes and businesses. AFPM has no parent corporation, and no publicly held company has 10% or greater ownership in AFPM.

**American Iron and Steel Institute** ("AISI") states that it serves as the voice of the North American steel industry and represents 19 member companies, including integrated and electric furnace steelmakers, accounting for the majority of U.S. steelmaking capacity with facilities located in 41 states, Canada, and Mexico, and approximately 125 associate members who are suppliers to or customers of the steel industry. AISI has no parent corporation, and no publicly held company has 10% or greater ownership in AISI.

**American Public Power Association** ("APPA") is the national association of publicly-owned electric utilities. APPA has no outstanding shares or debt securities in the hands of the public. APPA has no parent company. No publicly held company has a 10% or greater ownership in APPA.

**American Wood Council** ("AWC") is the voice of North American traditional and engineered wood products, representing over 75% of the industry that provides approximately 400,000 men and women with family-wage jobs. AWC members make products that are essential to everyday life from a renewable resource that absorbs and sequesters carbon. AWC has no parent corporation, and no publicly held company has a 10% or greater ownership interest in AWC.

**Arizona Electric Power Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of Arizona Electric Power Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Associated Electric Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of Associated Electric Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Association of American Railroads** ("AAR") is a nonprofit trade association whose members include all of the Class I freight railroads (the largest freight railroads), as well as some smaller freight railroads and Amtrak. AAR represents its member railroads in proceedings before Congress, the courts, and administrative agencies in matters of common interest, such as the issues that are the subject matter of this litigation. AAR has no parent corporation, and no publicly held company owns a 10% or greater interest in AAR.

**Basin Electric Power Cooperative** ("Basin Electric") is a not-for-profit regional wholesale electric generation and transmission cooperative owned by over 100 member cooperatives. Basin Electric provides wholesale power to member rural electric systems in nine states, with electric generation facilities in North Dakota, South Dakota, Wyoming, Montana, and Iowa serving approximately 2.9 million customers. Basin Electric has no parent companies. There are no publicly held corporations that have a 10% or greater ownership interest in Basin Electric.

**Big Brown Lignite Company, LLC** is a wholly owned subsidiary of Luminant Holding Company LLC, which is a Delaware limited liability company and is a wholly owned subsidiary of Texas Competitive Electric Holdings Company LLC ("TCEH"). TCEH is a Delaware limited liability company and is a wholly owned subsidiary of Energy Future Competitive Holdings Company ("EFCH"), which is a Texas corporation and a wholly owned subsidiary of Energy Future Holdings Corp. ("EFH Corp."). Substantially all of the common stock of EFH Corp., a Texas corporation, is owned by Texas Energy Future Holdings Limited Partnership, which is a privately held limited partnership. No publicly held entities have a 10% or greater equity ownership interest in EFH Corp.

**Big Brown Power Company, LLC** is a wholly owned subsidiary of Luminant Holding Company LLC, which is a Delaware limited liability company and is a wholly owned subsidiary of Texas Competitive Electric Holdings Company LLC ("TCEH"). TCEH is a Delaware limited liability company and is a wholly owned subsidiary of Energy Future Competitive Holdings Company ("EFCH"), which is a Texas corporation and a wholly owned subsidiary of Energy Future Holdings Corp. ("EFH Corp."). Substantially all of the common stock of EFH Corp., a Texas corporation, is

owned by Texas Energy Future Holdings Limited Partnership, which is a privately held limited partnership. No publicly held entities have a 10% or greater equity ownership interest in EFH Corp.

**Big Rivers Electric Corporation** has no parent corporation. No publicly held corporation owns any portion of Big Rivers Electric Corporation, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Brazos Electric Power Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of Brazos Electric Power Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Brick Industry Association** ("BIA"), founded in 1934, is the recognized national authority on clay brick manufacturing and construction, representing approximately 250 manufacturers, distributors, and suppliers that historically provide jobs for 200,000 Americans in 45 states. BIA has no parent corporation, and no publicly held company has 10% or greater ownership in BIA.

**Buckeye Institute for Public Policy Solutions** ("Buckeye Institute") is a nonprofit organization incorporated in Ohio under Section 501(c)(3) of the Internal Revenue Code. The Buckeye Institute seeks to improve Ohio policies by performing research and promoting market-oriented policy solutions. No parent company or publicly-held company has a 10% or greater ownership interest in the Buckeye Institute.

**Buckeye Power, Inc.** has no parent corporation. No publicly held corporation owns any portion of Buckeye Power, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Central Montana Electric Power Cooperative** has no parent corporation. No publicly held corporation owns any portion of Central Montana Electric Power Cooperative, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Central Power Electric Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of Central Power Electric Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Chamber of Commerce of the United States of America** (the "Chamber") is the world's largest business federation. The Chamber represents 300,000 direct members and indirectly represents the interests of more than 3 million companies, state and local chambers, and trade associations of every size, in every industry sector, and from every region of the country. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

**CO$_2$ Task Force of the Florida Electric Power Coordinating Group, Inc.** ("FCG") is a non-profit, non-governmental corporate entity organized under the laws of Florida. The FCG does not have a parent corporation. No publicly held corporation owns 10% or more of the FCG's stock.

**Competitive Enterprise Institute** ("CEI") is a nonprofit organization incorporated in Washington D.C. under Section 501(c)(3) of the Internal Revenue Code. CEI focuses on advancing market approaches to regulatory issues. No parent company or publicly-held company has a 10% or greater ownership interest in CEI.

**Corn Belt Power Cooperative** has no parent corporation. No publicly held corporation owns any portion of Corn Belt Power Cooperative, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Coteau Properties Company** ("Coteau Properties") is a wholly-owned subsidiary of The North American Coal Corporation ("NACoal"). No publicly held entity has a 10% or greater ownership interest in Coteau Properties. The general nature and purpose of Coteau Properties, insofar as relevant to this litigation, is the mining and marketing of lignite coal as fuel for power generation in North Dakota.

**Coyote Creek Mining Company, LLC** ("Coyote Creek Mining") is a wholly-owned subsidiary of NACoal. No publicly held entity has a 10% or greater ownership interest in Coyote Creek Mining. The general nature and purpose of Coyote Creek Mining, insofar as relevant to this litigation, is the mining and marketing of lignite coal as fuel for power generation in North Dakota.

**Dairyland Power Cooperative** has no parent corporation. No publicly held corporation owns any portion of Dairyland Power Cooperative, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Denbury Onshore, LLC** is a wholly owned subsidiary of Denbury Resources Inc., a publicly held corporation whose shares are listed on the New York Stock Exchange. Other than Denbury Resources Inc., no publicly-held company owns 10% or more of any of Petitioner's stock and no publicly-held company holds 10% or more of Denbury Resources, Inc., stock. The stock of Denbury Resources, Inc. is traded publicly on the New York Stock Exchange under the symbol "DNR." Denbury is an oil and gas production company. As a part of its oil recovery operations (generally termed "tertiary" or "enhanced" recovery) that are performed in several states, Denbury, with its affiliated companies, produces, purchases, transports, and injects carbon dioxide for the purpose of the recovery of hydrocarbon resources.

**Deseret Generation & Transmission Co-operative** has no parent corporation. No publicly held corporation owns any portion of Deseret Generation & Transmission Co-operative, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**East Kentucky Power Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of East Kentucky Power Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**East River Electric Power Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of East River Electric Power Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**East Texas Electric Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of East Texas Electric Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Electricity Consumers Resource Council** ("ELCON") is the national association representing large industrial consumers of electricity. ELCON member companies produce a wide range of industrial commodities and consumer goods from virtually every segment of the manufacturing community. ELCON members operate hundreds of major facilities in all regions of the United States. Many ELCON members also cogenerate electricity as a by-product to serving a manufacturing steam requirement. ELCON has no parent corporation, and no publicly held company has 10% or greater ownership in ELCON.

**Energy & Environment Legal Institute** ("EELI") is a non-profit, non-governmental corporate entity organized under the laws of the Commonwealth of Virginia. EELI does not have a parent corporation. No publicly held corporation owns 10% or more of EELI's stock.

**Energy-Intensive Manufacturers Working Group on Greenhouse Gas Regulation** ("EIM") is a coalition of individual companies. EIM has no outstanding shares or debt securities in the hands of the public. EIM has no parent corporation, and no publicly held company has 10% or greater ownership in EIM.

**Entergy Corporation** ("Entergy") is a publicly traded company incorporated in the State of Delaware, with its principal place of business in the city of New Orleans, Louisiana. Entergy does not have any parent companies that have a 10% or greater ownership interest in Entergy. Further, there is no publicly-held company that has a 10% or greater ownership interest in Entergy. Entergy is an integrated energy company engaged primarily in electric power production and electric retail

distribution operations. Entergy delivers electricity to approximately 2.8 million customers in Arkansas, Louisiana, Mississippi, and Texas.

**Falkirk Mining Company** ("Falkirk Mining") is a wholly-owned subsidiary of NACoal. No publicly held entity has a 10% or greater ownership interest in Falkirk Mining. The general nature and purpose of Falkirk Mining, insofar as relevant to this litigation, is the mining and marketing of lignite coal as fuel for power generation in North Dakota.

**GenOn Mid-Atlantic, LLC** exists to provide safe, reliable, and affordable electric power to consumers. It is a limited liability corporation wholly owned by NRG North America LLC, a limited liability corporation wholly owned by GenOn Americas Generation, LLC. GenOn Americas Generation, LLC is a limited liability corporation wholly owned by NRG Americas, Inc. NRG Americas, Inc. is a corporation wholly owned by GenOn Energy Holdings, Inc., a corporation wholly owned by GenOn Energy, Inc. GenOn Energy, Inc. is a corporation wholly owned by NRG Energy, Inc. a Delaware publicly-traded corporation. NRG Energy, Inc. has no parent corporation. As of the last reporting period, T. Rowe Price Associates, Inc. held a 10% or greater ownership in NRG Energy, Inc. As of the last reporting period, T. Rowe Price Associates, Inc. was a subsidiary of T. Rowe Price Group, Inc., a publicly-traded company.

**Georgia Power Company** is a wholly-owned subsidiary of Southern Company, which is a publicly held corporation. Other than Southern Company, no publicly-held company owns 10% or more of Georgia Power Company's stock. Southern Company is traded publicly on the New York Stock Exchange under the symbol "SO."

**Georgia Transmission Corporation** has no parent corporation. No publicly held corporation owns any portion of Georgia Transmission Corporation, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Golden Spread Electrical Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of Golden Spread Electrical Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Gulf Power Company** is a wholly-owned subsidiary of Southern Company, which is a publicly held corporation. Other than Southern Company, no publicly-held company owns 10% or more of Gulf Power Company's stock. Southern Company is traded publicly on the New York Stock Exchange under the symbol "SO."

**Hoosier Energy Rural Electric Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of Hoosier Energy Rural Electric

Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Independence Institute** is a nonprofit organization incorporated in Colorado under Section 501(c)(3) of the Internal Revenue Code. The Independence Institute is a public policy think tank whose purpose is to educate citizens, legislators, and opinion makers in Colorado about policies that enhance personal and economic freedom. No parent company or publicly-held company has a 10% or greater ownership interest in the Independence Institute.

**Indian River Power LLC** exists to provide safe, reliable, and affordable electric power to consumers. It is a limited liability corporation wholly owned by NRG Energy, Inc., a Delaware publicly-traded corporation. NRG Energy, Inc. has no parent corporation. As of the last reporting period, T. Rowe Price Associates, Inc. held a 10% or greater ownership in NRG Energy, Inc. As of the last reporting period, T. Rowe Price Associates, Inc. was a subsidiary of T. Rowe Price Group, Inc. a publicly-traded company.

**Indiana Utility Group** ("IUG") is a continuing association of individual electric generating companies operated for the purpose of promoting the general interests of the membership of electric generators. IUG has no outstanding shares or debt securities in the hand of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in IUG.

**International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers** ("IBB") is a non-profit national labor organization with headquarters in Kansas City, Kansas. IBB's members are active and retired members engaged in various skilled trades of welding and fabrication of boilers, ships, pipelines, and other industrial facilities and equipment in the United States and Canada, and workers in other industries in the United States organized by the IBB. IBB provides collective bargaining representation and other membership services on behalf of its members. IBB is affiliated with the American Federation of Labor-Congress of Industrial Organizations. IBB and its affiliated lodges own approximately 60 percent of the outstanding stock of Brotherhood Bancshares, Inc., the holding company of the Bank of Labor. Bank of Labor's mission is to serve the banking and other financial needs of the North American labor movement. No entity owns 10% or more of IBB.

**International Brotherhood of Electrical Workers, AFL-CIO** ("IBEW") is a non-profit national labor organization with headquarters located at 900 7th Street, N.W., Washington, D.C. 20001. IBEW's members are active and retired skilled electricians and related professionals engaged in a broad array of U.S. industries, including the

electrical utility, coal mining, and railroad transportation sectors that stand to be impacted adversely by implementation of EPA's final agency action. IBEW provides collective bargaining representation and other membership services and benefits on behalf of its members. IBEW is affiliated with the American Federation of Labor-Congress of Industrial Organizations. IBEW has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

**Kansas Electric Power Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of Kansas Electric Power Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**LG&E and KU Energy LLC** is the holding company for Louisville Gas and Electric Company ("LG&E") and Kentucky Utilities Company ("KU"), regulated utilities that serve a total of 1.2 million customers. LG&E serves 321,000 natural gas and 400,000 electric customers in Louisville, Kentucky and 16 surrounding counties, whereas KU serves 543,000 customers in 77 Kentucky counties and five counties in Virginia. LG&E and KU Energy LLC is a wholly-owned subsidiary of PPL Corporation. Other than PPL Corporation, no publicly-held company owns 10% or more of any of LG&E and KU Energy LLC's membership interests. No publicly held company has a 10% or greater ownership interest in PPL Corporation.

**Lignite Energy Council** ("LEC") is a regional, non-profit organization whose primary mission is to promote the continued development and use of lignite coal as an energy resource. LEC's membership includes: (1) producers of lignite coal who have an ownership interest in and who mine lignite; (2) users of lignite who operate lignite-fired electric generating plants and the nation's only commercial scale "synfuels" plant that converts lignite into pipeline-quality natural gas; and (3) suppliers of goods and services to the lignite coal industry. LEC has no parent corporation, and no publicly held company has 10% or greater ownership in LEC.

**Louisiana Generating LLC** exists to provide safe, reliable, and affordable electric power to consumers. It is a limited liability corporation wholly owned by NRG South Central Generating LLC, a limited liability corporation which in turn is wholly owned by NRG Energy, Inc., a Delaware publicly-traded corporation. NRG Energy, Inc. has no parent corporation. As of the last reporting period, T. Rowe Price Associates, Inc. held a 10% or greater ownership in NRG Energy, Inc. As of the last reporting period, T. Rowe Price Associates, Inc. was a subsidiary of T. Rowe Price Group, Inc. a publicly-traded company.

**Luminant Big Brown Mining Company, LLC** is a wholly owned subsidiary of Luminant Holding Company LLC, which is a Delaware limited liability company and is a wholly owned subsidiary of Texas Competitive Electric Holdings Company LLC

("TCEH"). TCEH is a Delaware limited liability company and is a wholly owned subsidiary of Energy Future Competitive Holdings Company ("EFCH"), which is a Texas corporation and a wholly owned subsidiary of Energy Future Holdings Corp. ("EFH Corp."). Substantially all of the common stock of EFH Corp., a Texas corporation, is owned by Texas Energy Future Holdings Limited Partnership, which is a privately held limited partnership. No publicly held entities have a 10% or greater equity ownership interest in EFH Corp.

**Luminant Generation Company, LLC** is a wholly owned subsidiary of Luminant Holding Company LLC, which is a Delaware limited liability company and is a wholly owned subsidiary of Texas Competitive Electric Holdings Company LLC ("TCEH"). TCEH is a Delaware limited liability company and is a wholly owned subsidiary of Energy Future Competitive Holdings Company ("EFCH"), which is a Texas corporation and a wholly owned subsidiary of Energy Future Holdings Corp. ("EFH Corp."). Substantially all of the common stock of EFH Corp., a Texas corporation, is owned by Texas Energy Future Holdings Limited Partnership, which is a privately held limited partnership. No publicly held entities have a 10% or greater equity ownership interest in EFH Corp.

**Luminant Mining Company, LLC** is a wholly owned subsidiary of Luminant Holding Company LLC, which is a Delaware limited liability company and is a wholly owned subsidiary of Texas Competitive Electric Holdings Company LLC ("TCEH"). TCEH is a Delaware limited liability company and is a wholly owned subsidiary of Energy Future Competitive Holdings Company ("EFCH"), which is a Texas corporation and a wholly owned subsidiary of Energy Future Holdings Corp. ("EFH Corp."). Substantially all of the common stock of EFH Corp., a Texas corporation, is owned by Texas Energy Future Holdings Limited Partnership, which is a privately held limited partnership. No publicly held entities have a 10% or greater equity ownership interest in EFH Corp.

**Midwest Generation LLC** exists to provide safe, reliable, and affordable electric power to consumers. It is a limited liability corporation wholly owned by Midwest Generation Holdings II, LLC. Midwest Generation Holdings II, LLC is a limited liability corporation wholly owned by Midwest Generation Holdings I, LLC. Midwest Generation Holdings I, LLC is a limited liability corporation 95% of which is owned by Mission Midwest Coal, LLC and 5% of which is owned by Midwest Generation Holdings Limited, which in turn is wholly owned by Mission Midwest Coal, LLC. Mission Midwest Coal, LLC is a limited liability corporation wholly owned by NRG Midwest Holdings LLC, which in turn is a limited liability corporation wholly owned by Midwest Generation EME, LLC. Midwest Generation EME, LLC is a limited liability corporation wholly owned by NRG Energy Holdings Inc. which is a

corporation wholly owned by NRG Acquisition Holdings Inc. NRG Acquisition Holdings, Inc. is a corporation wholly owned by NRG Energy, Inc., a Delaware publicly-traded corporation. NRG Energy, Inc. has no parent corporation. As of the last reporting period, T. Rowe Price Associates, Inc. held a 10% or greater ownership in NRG Energy, Inc. As of the last reporting period, T. Rowe Price Associates, Inc. was a subsidiary of T. Rowe Price Group, Inc. a publicly-traded company.

**Minnesota Power** is an operating division of ALLETE, Inc. No publicly-held company has a 10% or greater ownership interest in ALLETE, Inc.

**Minnkota Power Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of Minnkota Power Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Mississippi Lignite Mining Company** ("Mississippi Lignite Mining") is a wholly-owned subsidiary of NACoal. No publicly held entity has a 10% or greater ownership interest in Mississippi Lignite Mining. The general nature and purpose of Mississippi Lignite Mining, insofar as relevant to this litigation, is the mining and marketing of lignite coal as fuel for power generation in Mississippi.

**Mississippi Power Company** is a wholly-owned subsidiary of Southern Company, which is a publicly held corporation. Other than Southern Company, no publicly-held company owns 10% or more of Mississippi Power Company's stock. Southern Company is traded publicly on the New York Stock Exchange under the symbol "SO."

**Montana-Dakota Utilities Co.** is engaged in the distribution of natural gas and the generation, transmission, and distribution of electricity in the states of North Dakota, South Dakota, Montana, and Wyoming. Montana-Dakota Utilities Co. is a division of MDU Resources Group, Inc. No publicly held company has a 10% or greater ownership interest in MDU Resources Group, Inc.

**Murray Energy Corporation** has no parent corporation and no publicly held corporation owns 10% or more of its stock. Murray Energy Corporation is the largest privately-held coal company and largest underground coal mine operator in the United States.

**National Association of Home Builders** ("NAHB") is a not-for-profit trade association organized under the laws of Nevada. NAHB does not have any parent companies that have a 10% or greater ownership interest in NAHB. Further, there is no publicly-held company that has a 10% or greater ownership interest in NAHB. NAHB has issued no shares of stock to the public. NAHB is comprised of

approximately 800 state and local home builders associations with whom it is affiliated, but all of those associations are, to the best of NAHB's knowledge, nonprofit corporations that have not issued stock to the public. NAHB's purpose is to promote the general commercial, professional, and legislative interests of its approximately 140,000 builder and associate members throughout the United States. NAHB's membership includes entities that construct and supply single-family homes, as well as apartment, condominium, multi-family, commercial, and industrial builders, land developers, and remodelers.

**National Association of Manufacturers** ("NAM") states that it is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs nearly 12 million men and women, contributes roughly $2.17 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for three-quarters of private-sector research and development. The NAM is the powerful voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States. The NAM has no parent corporation, and no publicly held company has 10% or greater ownership in the NAM.

**National Federation of Independent Business** ("NFIB") is a nonprofit mutual benefit corporation that promotes and protects the rights of its members to own, operate, and grow their businesses across the fifty States and the District of Columbia. NFIB has no parent corporation, and no publicly held company has 10% or greater ownership in NFIB.

**National Lime Association** ("NLA") is the national trade association of the lime industry and is comprised of U.S. and Canadian commercial lime manufacturing companies, suppliers to lime companies, and foreign lime companies and trade associations. NLA's members produce more than 99% of all lime in the U.S., and 100% of the lime manufactured in Canada. NLA provides a forum to enhance and encourage the exchange of ideas and technical information common to the industry and to promote the use of lime and the business interests of the lime industry. NLA is a non-profit organization. It has no parent corporation, and no publicly held company has 10% or greater ownership in NLA.

**National Mining Association** ("NMA") is a non-profit, incorporated national trade association whose members include the producers of most of America's coal, metals, and industrial and agricultural minerals; manufacturers of mining and mineral processing machinery, equipment, and supplies; and engineering and consulting firms that serve the mining industry. NMA has no parent companies, subsidiaries, or

affiliates that have issued shares or debt securities to the public, although NMA's individual members have done so.

**National Oilseed Processors Association** ("NOPA") is a national trade association that represents 12 companies engaged in the production of vegetable meals and vegetable oils from oilseeds, including soybeans. NOPA's member companies process more than 1.6 billion bushels of oilseeds annually at 63 plants in 19 states, including 57 plants which process soybeans. NOPA has no parent corporation, and no publicly held company has 10% or greater ownership in NOPA.

**National Rural Electric Cooperative Association** has no parent corporation. No publicly held corporation owns any portion of National Rural Electric Cooperative Association, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Newmont Nevada Energy Investment, LLC** is a wholly-owned subsidiary of Newmont USA Limited and is the owner and operator of the TS Power Plant, a 242 MW coal-fired power plant located in Eureka County, Nevada, which provides power to Newmont USA Limited's mining operations. No other publicly held corporation owns 10% or more of the stock of Newmont Nevada Energy Investment, LLC.

**Newmont USA Limited** owns and operates 11 surface gold and copper mines, eight underground mines, and 13 processing facilities in Nevada that are served by the TS Power Plant. Newmont USA Limited is a wholly owned subsidiary of Newmont Mining Corporation and no other publicly held corporation owns 10% or more of its stock.

**NODAK Energy Services, LLC** ("NODAK") is a wholly-owned subsidiary of NACoal. No publicly held entity has a 10% or greater ownership interest in NODAK. The general nature and purpose of NODAK, insofar as relevant to this litigation, is the operation of a lignite beneficiation facility within Great River Energy's Coal Creek Station, a lignite-fired power generating station in North Dakota.

**The North American Coal Corporation** ("NACoal") is a wholly-owned subsidiary of NACCO Industries, Inc. NACoal is not publicly held, but NACCO Industries, Inc., its parent, is a publicly traded corporation that owns more than 10% of the stock of NACoal. No other publicly-held corporation owns more than 10% of the stock of NACoal. The general nature and purpose of NACoal, insofar as relevant to this litigation, is the mining and marketing of lignite coal as fuel for power generation and the provision of mining services to natural resources companies.

**North American Coal Royalty Company** ("North American Coal Royalty") is a wholly-owned subsidiary of NACoal. No publicly held entity has a 10% or greater ownership interest in North American Coal Royalty. The general nature and purpose of North American Coal Royalty, insofar as relevant to this litigation, is the acquisition and disposition of mineral and surface interests in support of NACoal's mining of lignite coal as fuel for power generation, and the provision of mining services to natural resources companies.

**North Carolina Electric Membership Corporation** has no parent corporation. No publicly held corporation owns any portion of North Carolina Electric Membership Corporation, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Northeast Texas Electric Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of Northeast Texas Electric Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Northwest Iowa Power Cooperative** has no parent corporation. No publicly held corporation owns any portion of Northwest Iowa Power Cooperative, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**NorthWestern Corporation** is a publicly traded company (NYSE: NWE) incorporated in the State of Delaware with corporate offices in Butte, Montana and Sioux Falls, South Dakota. NorthWestern Corporation has no parent corporation. As of February 17, 2016, based on a review of statements filed with the Securities and Exchange Commission pursuant to Sections 13(d), 13(f), and 13(g) of the Securities and Exchange Act of 1934, as amended, BlackRock Fund Advisors is the only shareholder owning more than 10% or more of NorthWestern Corporation's stock. In addition to publicly traded stock, NorthWestern Corporation has issued debt and bonds to the public.

**NRG Chalk Point LLC** exists to provide safe, reliable, and affordable electric power to consumers. It is wholly owned by GenOn Mid-Atlantic, LLC. GenOn Mid-Atlantic, LLC is a limited liability corporation wholly owned by NRG North America LLC, a limited liability corporation wholly owned by GenOn Americas Generation, LLC. GenOn Americas Generation, LLC is a limited liability corporation wholly owned by NRG Americas, Inc. NRG Americas, Inc. is a corporation wholly owned by GenOn Energy Holdings, Inc., a corporation wholly owned by GenOn Energy, Inc. GenOn Energy, Inc. is a corporation wholly owned by NRG Energy, Inc., a Delaware publicly-traded corporation. NRG Energy, Inc. has no parent corporation. As of the last reporting period, T. Rowe Price Associates, Inc. held a 10% or greater ownership in NRG Energy, Inc. As of the last reporting period, T. Rowe Price

Associates, Inc. was a subsidiary of T. Rowe Price Group, Inc. a publicly-traded company.

**NRG Power Midwest LP** exists to provide safe, reliable, and affordable electric power to consumers. It is a limited partnership 99% of which is owned by NRG Power Generation Assets LLC and 1% of which is owned by NRG Power Midwest GP LLC, a limited liability corporation wholly owned by NRG Power Generation Assets LLC. NRG Power Generation Assets LLC is a limited liability corporation wholly owned by NRG Power Generation LLC, which is a limited liability corporation wholly owned by NRG Americas, Inc. NRG Americas, Inc. is a corporation wholly owned by GenOn Energy Holdings, Inc., a corporation wholly owned by GenOn Energy, Inc. GenOn Energy, Inc. is a corporation wholly owned by NRG Energy, Inc., a Delaware publicly-traded corporation. NRG Energy, Inc. has no parent corporation. As of the last reporting period, T. Rowe Price Associates, Inc. held a 10% or greater ownership in NRG Energy, Inc. As of the last reporting period, T. Rowe Price Associates, Inc. was a subsidiary of T. Rowe Price Group, Inc. a publicly-traded company.

**NRG Rema LLC** exists to provide safe, reliable, and affordable electric power to consumers. It is a limited liability corporation wholly owned by NRG Northeast Generation, Inc., a corporation wholly owned by NRG Northeast Holdings Inc. NRG Northeast Holdings Inc. is a corporation wholly owned by NRG Power Generation LLC, a limited liability corporation wholly owned by NRG Americas, Inc. NRG Americas, Inc. is a corporation wholly owned by GenOn Energy Holdings, Inc., a corporation wholly owned by GenOn Energy, Inc. GenOn Energy, Inc. is a corporation wholly owned by NRG Energy, Inc., a Delaware publicly-traded corporation. NRG Energy, Inc. has no parent corporation. As of the last reporting period, T. Rowe Price Associates, Inc. held a 10% or greater ownership in NRG Energy, Inc. As of the last reporting period, T. Rowe Price Associates, Inc. was a subsidiary of T. Rowe Price Group, Inc. a publicly-traded company.

**NRG Texas Power LLC** exists to provide safe, reliable, and affordable electric power to consumers. It is a limited liability corporation wholly owned by NRG Texas LLC, which in turn is a limited liability corporation wholly owned by NRG Energy, Inc., a Delaware publicly-traded corporation. NRG Energy, Inc. has no parent corporation. As of the last reporting period, T. Rowe Price Associates, Inc. held a 10% or greater ownership in NRG Energy, Inc. As of the last reporting period, T. Rowe Price Associates, Inc. was a subsidiary of T. Rowe Price Group, Inc. a publicly-traded company.

**NRG Wholesale Generation LP** exists to provide safe, reliable, and affordable electric power to consumers. It is a limited partnership 99% owned by NRG Power

Generation Assets LLC and 1% owned by NRG Wholesale Generation GP LLC, both of which are wholly owned by NRG Power Generation LLC. NRG Power Generation LLC is a limited liability corporation wholly owned by NRG Americas, Inc. NRG Americas, Inc. is a corporation wholly owned by GenOn Energy Holdings, Inc., a corporation wholly owned by GenOn Energy, Inc. GenOn Energy, Inc. is a corporation wholly owned by NRG Energy, Inc., a Delaware publicly-traded corporation. NRG Energy, Inc. has no parent corporation. As of the last reporting period, T. Rowe Price Associates, Inc. held a 10% or greater ownership in NRG Energy, Inc. As of the last reporting period, T. Rowe Price Associates, Inc. was a subsidiary of T. Rowe Price Group, Inc. a publicly-traded company.

**Oak Grove Management Company, LLC** is a wholly owned subsidiary of Luminant Holding Company LLC, which is a Delaware limited liability company and is a wholly owned subsidiary of Texas Competitive Electric Holdings Company LLC ("TCEH"). TCEH is a Delaware limited liability company and is a wholly owned subsidiary of Energy Future Competitive Holdings Company ("EFCH"), which is a Texas corporation and a wholly owned subsidiary of Energy Future Holdings Corp. ("EFH Corp."). Substantially all of the common stock of EFH Corp., a Texas corporation, is owned by Texas Energy Future Holdings Limited Partnership, which is a privately held limited partnership. No publicly held entities have a 10% or greater equity ownership interest in EFH Corp.

**Oglethorpe Power Corporation** has no parent corporation. No publicly held corporation owns any portion of Oglethorpe Power Corporation, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Otter Creek Mining Company, LLC** ("Otter Creek") is a wholly-owned subsidiary of NACoal. No publicly held entity has a 10% or greater ownership interest in Otter Creek. The general nature and purpose of Otter Creek, insofar as relevant to this litigation, is the development of a mine to deliver lignite coal as fuel for power generation in North Dakota.

**Portland Cement Association** ("PCA") is a not-for-profit "trade association" within the meaning of Circuit Rule 26.1(b). It represents companies responsible for more than 80 percent of cement-making capacity in the United States. PCA members operate manufacturing plants in 35 states, with distribution centers in all 50 states. PCA conducts market development, engineering, research, education, technical assistance, and public affairs programs on behalf of its members. Its mission focuses on improving and expanding the quality and uses of cement and concrete, raising the quality of construction, and contributing to a better environment. PCA has no parent corporation, and no publicly held company owns a 10% or greater interest in PCA.

**PowerSouth Energy Cooperative** has no parent corporation. No publicly held corporation owns any portion of PowerSouth Energy Cooperative, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Prairie Power, Inc.** has no parent corporation. No publicly held corporation owns any portion of Prairie Power, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Prairie State Generating Company, LLC** ("PSGC") is a private non-governmental corporation that is principally engaged in the business of generating electricity for cooperatives and public power companies. PSGC does not have a parent corporation and no publicly-held corporation owns ten percent or more of its stock.

**Rio Grande Foundation** is a nonprofit organization incorporated in New Mexico under Section 501(c)(3) of the Internal Revenue Code. The Rio Grande Foundation is a research institute dedicated to increasing liberty and prosperity for New Mexico's citizens. No parent company or publicly-held company has a 10% or greater ownership interest in the Rio Grande Foundation.

**Rushmore Electric Power Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of Rushmore Electric Power Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**The Sabine Mining Company** ("Sabine Mining") is a wholly-owned subsidiary of NACoal. No publicly held entity has a 10% or greater ownership interest in Sabine Mining. The general nature and purpose of Sabine Mining, insofar as relevant to this litigation, is the mining of lignite coal as fuel for power generation in Texas.

**Sam Rayburn G&T Electric Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of Sam Rayburn G&T Electric Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**San Miguel Electric Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of San Miguel Electric Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Sandow Power Company, LLC** is a wholly owned subsidiary of Luminant Holding Company LLC, which is a Delaware limited liability company and is a wholly owned subsidiary of Texas Competitive Electric Holdings Company LLC ("TCEH"). TCEH is a Delaware limited liability company and is a wholly owned subsidiary of Energy Future Competitive Holdings Company ("EFCH"), which is a Texas corporation and a wholly owned subsidiary of Energy Future Holdings Corp. ("EFH Corp.").

Substantially all of the common stock of EFH Corp., a Texas corporation, is owned by Texas Energy Future Holdings Limited Partnership, which is a privately held limited partnership. No publicly held entities have a 10% or greater equity ownership interest in EFH Corp.

**Seminole Electric Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of Seminole Electric Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**South Mississippi Electric Power Association** has no parent corporation. No publicly held corporation owns any portion of South Mississippi Electric Power Association, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**South Texas Electric Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of South Texas Electric Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Southern Illinois Power Cooperative** has no parent corporation. No publicly held corporation owns any portion of Southern Illinois Power Cooperative, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Sunflower Electric Power Corporation** has no parent corporation. No publicly held corporation owns any portion of Sunflower Electric Power Corporation, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Sutherland Institute** is a nonprofit organization incorporated in Utah under Section 501(c)(3) of the Internal Revenue Code. The Sutherland Institute is a public policy think tank committed to influencing Utah law and policy based on the core principles of limited government, personal responsibility, and charity. No parent company or publicly-held company has a 10% or greater ownership interest in the Sutherland Institute.

**Tex-La Electric Cooperative of Texas, Inc.** has no parent corporation. No publicly held corporation owns any portion of Tex-La Electric Cooperative of Texas, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Tri-State Generation and Transmission Association, Inc.** ("Tri-State") is a wholesale electric power supply cooperative which operates on a not-for-profit basis and is owned by 1.5 million member-owners and 44 distribution cooperatives. Tri-State issues no stock and has no parent corporation. Accordingly, no publicly held corporation owns 10% or more of its stock.

**United Mine Workers of America** ("UMWA") is a non-profit national labor organization with headquarters in Triangle, Virginia. UMWA's members are active and retired miners engaged in the extraction of coal and other minerals in the United States and Canada, and workers in other industries in the United States organized by the UMWA. UMWA provides collective bargaining representation and other membership services on behalf of its members. UMWA is affiliated with the America Federation of Labor-Congress of Industrial Organizations. UMWA has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

**Upper Missouri G. & T. Electric Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of Upper Missouri G. & T. Electric Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Utility Air Regulatory Group** ("UARG") is a not-for-profit association of individual generating companies and national trade associations that participates on behalf of its members collectively in administrative proceedings under the Clean Air Act, and in litigation arising from those proceedings, that affect electric generators. UARG has no outstanding shares or debt securities in the hands of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in UARG.

**Vienna Power LLC** exists to provide safe, reliable, and affordable electric power to consumers. It is a limited liability corporation wholly owned by NRG Energy, Inc., a Delaware publicly-traded corporation. NRG Energy, Inc. has no parent corporation. As of the last reporting period, T. Rowe Price Associates, Inc. held a 10% or greater ownership in NRG Energy, Inc. As of the last reporting period, T. Rowe Price Associates, Inc. was a subsidiary of T. Rowe Price Group, Inc. a publicly-traded company.

**Wabash Valley Power Association, Inc.** has no parent corporation. No publicly held corporation owns any portion of Wabash Valley Power Association, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

**West Virginia Coal Association** ("WVCA") is a trade association representing more than 90% of West Virginia's underground and surface coal mine production. No publicly-held company has 10% or greater ownership of the WVCA.

**Western Farmers Electric Cooperative** has no parent corporation. No publicly held corporation owns any portion of Western Farmers Electric Cooperative, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Westar Energy, Inc.** ("Westar") is a publicly traded company (symbol: WR) incorporated in the State of Kansas, with its principal place of business in the city of Topeka, Kansas. Westar is the parent corporation of Kansas Gas and Electric Company ("KGE"), a Kansas corporation with its principal place of business in Topeka, Kansas. Westar owns all of the stock of KGE. In addition to Westar's publicly traded stock, both Westar and KGE have issued debt and bonds to the public. Westar does not have any parent companies that have a 10% or greater ownership interest in Westar. Further, there is no publicly-held company that has a 10% or greater ownership interest in Westar.

**Wolverine Power Supply Cooperative, Inc.** has no parent corporation. No publicly held corporation owns any portion of Wolverine Power Supply Cooperative, Inc., and it is not a subsidiary or an affiliate of any publicly owned corporation.

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................. i

CORPORATE DISCLOSURE STATEMENTS ....................................... xxxi

TABLE OF CONTENTS ........................................................... li

TABLE OF AUTHORITIES ...................................................... liv

GLOSSARY OF TERMS .......................................................... lxviii

JURISDICTIONAL STATEMENT ................................................. 1

STATEMENT OF ISSUES ........................................................ 1

STATUTES AND REGULATIONS .................................................. 2

INTRODUCTION ................................................................ 2

STATEMENT OF THE CASE ...................................................... 6

I.      Section 111 of the Clean Air Act ................................... 6

    A.    The Definition of "Standard of Performance" ................... 7

    B.    Standards of Performance for Existing Sources ................ 8

II.     The President's Climate Action Plan ............................... 11

    A.    The Section 111(b) New Source Rule ........................... 11

    B.    The Section 111(d) Existing Source Rule: "The Clean Power
        Plan" ........................................................ 12

        1.   EPA's "Performance Rates" and Compliance
            Requirements ............................................ 13

            a.   EPA's "Building Blocks" and "Performance
               Rates" ............................................ 13

            b.   EPA's Rationale ................................... 16

        2.   State Plans ............................................. 18

        3.   The Proposed Federal Plan .............................. 19

        4.   The Rule's Effects ..................................... 21

        5.   The Supreme Court Stay ................................. 22

SUMMARY OF ARGUMENT ........................................................ 23

STANDING ................................................................... 27

STANDARD OF REVIEW...................................................................28

ARGUMENT .......................................................................................29

I.    The Rule Transgresses Section 111. ...........................................29

    A.    Congress Did Not Authorize EPA To Restructure the Power Sector. .......................................................................31

        1.    The Rule Asserts Novel and Vast Authority Over the States' Energy Grids Without Clear Congressional Authorization..........................................................32

        2.    EPA Seeks To Invade a Traditional State Regulatory Domain Without a Clear Statement From Congress. ...................36

    B.    Section 111 Unambiguously Forecloses EPA's Requirements Based on "Generation Shifting."..............................................41

        1.    Section 111 Does Not Authorize EPA To Mandate Emission Reductions That Cannot Be Implemented at Individual Regulated "Stationary Sources."....................41

            a.    Section 111(d) provides that standards apply to the "source," not to owners and operators........................43

            b.    This Court's precedents foreclose EPA's reading of section 111(d)................................................46

            c.    The Rule's reading of section 111(d) is contrary to EPA's regulations and consistent agency practice....................................................48

        2.    Setting Rates Based on "Generation Shifting" Is Inconsistent With the Definition of "Standard of Performance."................................................50

            a.    The Rule does not comport with the statutory terms........................................................51

            b.    EPA's Rule confuses "standards of performance" with other programs..........................................54

        3.    EPA's Attempt To Use Section 111(d) To Reengineer the Grid Is Inconsistent With Section 111 as a Whole.................56

II.    The Section 112 Exclusion Unambiguously Prohibits the Rule. ........................61

    A.    EPA May Not Employ Section 111(d) To Regulate a Source Category That It Has Chosen To "Regulate[] Under Section [1]12."..........................................62

B.    EPA's Attempts To Escape the Literal Reading of the
Exclusion Are Unavailing........................................................... 64

1.    EPA's New Assertions of Ambiguity Lack Merit......................... 65

2.    The Failed Clerical Amendment Is Entirely Irrelevant................. 68

III.    The Rule Unlawfully Abrogates Authority Granted to the States by
the Clean Air Act. ..................................................................... 74

IV.    The Rule Unconstitutionally Commandeers and Coerces States and
Their Officials into Carrying Out Federal Energy Policy. ................... 78

A.    The Rule Unlawfully Commandeers the States and Their
Officials.................................................................................. 80

B.    The Rule Unlawfully Coerces the States.................................... 84

CONCLUSION ....................................................................................... 86

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM PURSUANT TO FEDERAL RULE OF APPELLATE
PROCEDURE 32.1 AND CIRCUIT RULE 32.1(B)(3)

# TABLE OF AUTHORITIES

## FEDERAL CASES

<u>Page</u>

*Alden v. Maine*, 527 U.S. 706 (1999) ................................................................. 80

*\*Am. Bar Ass'n v. FTC*, 430 F.3d 457 (D.C. Cir. 2005) .......................... 23, 28, 29, 37, 38

*Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527 (2011) ............................ 9, 62

*Am. Petroleum Inst. v. SEC*, 714 F.3d 1329 (D.C. Cir. 2013) ............................ 73

*Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375 (1983) ..................... 24, 37

*\*ASARCO Inc. v. EPA*, 578 F.2d 319 (D.C. Cir. 1978) .............................. 24, 46, 53, 54

*Bond v. United States*, 134 S. Ct. 2077 (2014) ................................................ 3, 36

*Brown v. Gardner*, 513 U.S. 115 (1994) ............................................................ 58

*Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) ......................................... 18

*Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009) ....................... 37

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1 (D.C. Cir. 2015) ........................................................................... 36

*District of Columbia v. Train*, 521 F.2d 971 (D.C. Cir. 1975), *vacated on other grounds*, *EPA v. Brown*, 431 U.S. 99 (1977) ............................................. 84

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988) ....................................................................... 79

*Envtl. Def., Inc. v. EPA*, 509 F.3d 553 (D.C. Cir. 2007) .................................... 58

*\*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ....................... 32, 33, 35

---

* Authorities upon which we chiefly rely are marked with asterisks.

*Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205 (1964) ............................................. 38

*FERC v. Mississippi*, 456 U.S. 742 (1982) ........................................................................ 86

*\*Gregory v. Ashcroft*, 501 U.S. 452 (1991) .............................................................31, 36, 41

*Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981) ............................ 83

*\*King v. Burwell*, 135 S. Ct. 2480 (2015) ............................................ 3, 23, 28, 32, 35

*Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50 (2004) ........................................ 69, 70

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................... 28

*Meghrig v. KFC Western, Inc.*, 516 U.S. 479 (1996) .................................................. 47, 56

*Michigan v. EPA*, 268 F.3d 1075 (D.C. Cir. 2001) .................................................... 29

*Michigan v. EPA*, 135 S. Ct. 2699 (2015) ........................................................... 56

*Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138 (D.C. Cir. 2015) .......................... 84

*\*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012) .................. 27, 79, 84, 85, 86

*Nat'l-Southwire Aluminum Co. v. EPA*, 838 F.2d 835 (6th Cir. 1988) ......................... 29, 55

*New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008) ................................................. 68

*New York v. FERC*, 535 U.S. 1 (2002) ............................................................... 39

*\*New York v. United States*, 505 U.S. 144 (1992) ...................................... 26, 81, 82, 83, 84

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................... 23

*North Dakota v. EPA*, No. 15-1381 (and consolidated cases) (D.C. Cir. filed Oct. 23, 2015) ...................................................................... 12

*NRDC v. EPA*, 777 F.3d 456 (D.C. Cir. 2014) ..................................................... 29

*\*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983) ........................................................ 3, 24, 37, 38, 83

*Printz v. United States*, 521 U.S. 898 (1997) ............................................................. 81, 82, 86

*Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533 (2002) .......................................... 36

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ........................................................... 74

*Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191 (2014) ............................................. 74

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ..................................................... 28

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ....................................................................................................... 51

*South Dakota v. Dole*, 483 U.S. 203 (1987) ............................................................ 85, 86

*Stephan v. United States*, 319 U.S. 423 (1943) ........................................................... 69

*Transbrasil S.A. Linhas Aereas v. Dep't of Transp.*, 791 F.2d 202 (D.C. Cir. 1986) ..................................................................................................................... 44

*United States v. O'Brien*, 560 U.S. 218 (2010) ........................................................... 70

*\*Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427 (2014) ........................... 3, 4, 23, 25, 28, ............................................................................................ 31, 32, 34, 57, 58, 66

*W. Minn. Mun. Power Agency v. FERC*, 806 F.3d 588 (D.C. Cir. 2015) ................... 65, 66

*West Virginia v. EPA*, 362 F.3d 861 (D.C. Cir. 2004) ................................................. 28

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ...................................... 52

## STATE CASES

*Ariz. Corp. Comm'n v. State ex rel. Woods*, 830 P.2d 807 (Ariz. 1992) ..................... 38

*La. Power & Light Co. v. La. Pub. Serv. Comm'n*, 609 So. 2d 797 (La. 1992) .................... 38

## FEDERAL CONSTITUTION

U.S. CONST. amend. X ...................................................................................................... 80

# STATE CONSTITUTIONS

ARIZ. CONST. art. XV, § 1 ............................................................. 38

GA. CONST. art. IV, § 1 ............................................................... 38

LA. CONST. art. IV, § 21(A)(1) ...................................................... 38

# FEDERAL STATUTES

1 U.S.C. § 204(a) ..................................................................... 69

2 U.S.C. §§ 285a-285g ............................................................... 69

7 U.S.C. § 2018, Revisor's Note ................................................... 70

10 U.S.C. § 869, Revisor's Note ................................................... 70

10 U.S.C. § 1407, Revisor's Note .................................................. 70

10 U.S.C. § 2306a, Revisor's Note ................................................. 70

10 U.S.C. § 2533b, Revisor's Note ................................................. 70

11 U.S.C. § 101, Revisor's Note ................................................... 70

12 U.S.C. § 1787, Revisor's Note .................................................. 70

12 U.S.C. § 4520, Revisor's Note .................................................. 70

14 U.S.C. ch. 17 Front Matter, Revisor's Note ................................... 70

15 U.S.C. § 2064, Revisor's Note .................................................. 70

15 U.S.C. § 2081, Revisor's Note .................................................. 70

16 U.S.C. § 230f, Revisor's Note .................................................. 70

16 U.S.C. §§ 791a, *et seq.* ....................................................... 38

16 U.S.C. § 824(a) ................................................................... 38

16 U.S.C. § 824(b)(1) ............................................................... 38

16 U.S.C. § 824*o*(i)(2) ............................................................. 38

18 U.S.C. § 2327, Revisor's Note ............................................ 70

20 U.S.C. § 1226c, Revisor's Note .......................................... 70

20 U.S.C. § 1232, Revisor's Note ............................................ 70

20 U.S.C. § 4014, Revisor's Note ............................................ 70

21 U.S.C. § 355, Revisor's Note .............................................. 70

22 U.S.C. § 3651, Revisor's Note ............................................ 70

22 U.S.C. § 3723, Revisor's Note ............................................ 70

23 U.S.C. § 104, Revisor's Note .............................................. 70

26 U.S.C. § 105, Revisor's Note .............................................. 70

26 U.S.C. § 219, Revisor's Note .............................................. 70

26 U.S.C. § 1201, Revisor's Note ............................................ 70

26 U.S.C. § 4973, Revisor's Note ............................................ 70

29 U.S.C. § 1053, Revisor's Note ............................................ 70

33 U.S.C. § 1316 ...................................................................... 54

33 U.S.C. § 2736, Revisor's Note ............................................ 70

37 U.S.C. § 414, Revisor's Note .............................................. 70

38 U.S.C. § 3015, Revisor's Note ............................................ 70

40 U.S.C. § 11501, Revisor's Note .......................................... 70

42 U.S.C. § 218, Revisor's Note..................................................... 70

42 U.S.C. § 290bb-25, Revisor's Note ........................................... 70

42 U.S.C. § 300ff-28, Revisor's Note ............................................ 70

42 U.S.C. § 1395u, Revisor's Note ................................................ 70

42 U.S.C. § 1395ww, Revisor's Note ............................................. 70

42 U.S.C. § 1395x, Revisor's Note ................................................ 70

42 U.S.C. § 1396a, Revisor's Note ................................................ 70

42 U.S.C. § 1396b, Revisor's Note ................................................ 70

42 U.S.C. § 1396r, Revisor's Note ................................................ 70

42 U.S.C. § 3025, Revisor's Note .................................................. 70

42 U.S.C. § 5776, Revisor's Note .................................................. 70

Clean Air Act, CAA § 111(d), 42 U.S.C. § 7411(d) (1989) ....................... 70, 71

Clean Air Act, 42 U.S.C. §§ 7401, *et seq.* (2014)

    CAA § 108, 42 U.S.C. § 7408 ....................................... 55

    CAA § 109, 42 U.S.C. § 7409 ....................................... 55

    CAA § 110, 42 U.S.C. § 7410 ....................................... 55

    CAA § 110(a)(2)(A), 42 U.S.C. § 7410(a)(2)(A)................ 55, 56

    CAA § 111, 42 U.S.C. § 7411 ....................................... 47, 54

    CAA § 111, 42 U.S.C. § 7411, Revisor's Note ................... 72

    *CAA § 111(a)(1), 42 U.S.C. § 7411(a)(1) ..........4, 7, 10, 24, 30, 51, 55

    CAA § 111(a)(2), 42 U.S.C. § 7411(a)(2) ................7, 12, 41, 44

CAA § 111(a)(3), 42 U.S.C. § 7411(a)(3) ........................................... 4, 7, 14, 29, 44

CAA § 111(a)(5), 42 U.S.C. § 7411(a)(5) ........................................................ 44

CAA § 111(b)(1)(A), 42 U.S.C. § 7411(b)(1)(A) ....................................... 7, 44

CAA § 111(b)(1)(B), 42 U.S.C. § 7411(b)(1)(B) ....................................... 7, 44

*CAA § 111(d), 42 U.S.C. § 7411(d) ........................................................ 7, 76

CAA § 111(d)(1), 42 U.S.C. § 7411(d)(1) ................................... 4, 7, 9, 26, 29, 41,
.................................................................................... 43, 45, 74, 75, 76

CAA § 111(d)(1)(A), 42 U.S.C. § 7411(d)(1)(A) ........................... 5, 9, 26

CAA § 111(d)(1)(B), 42 U.S.C. § 7411(d)(1)(B) ...................................... 7

CAA § 111(d)(2), 42 U.S.C. § 7411(d)(2) ....................................... 43, 75

CAA § 111(d)(2)(A), 42 U.S.C. § 7411(d)(2)(A) ................................. 10

CAA § 111(e), 42 U.S.C. § 7411(e) ........................................... 44, 45

CAA § 112(b)(2), 42 U.S.C. § 7412(b)(2) ......................................... 63

CAA § 112(d), 42 U.S.C. § 7412(d) ................................................. 54

CAA § 165(a)(4), 42 U.S.C. § 7475(a)(4) ........................................ 54

*CAA § 302(k), 42 U.S.C. § 7602(k) ..................................... 7, 30, 52, 53

CAA § 307(b)(1), 42 U.S.C. § 7607(b)(1) ............................................ 1

CAA § 307(d)(9), 42 U.S.C. § 7607(d)(9) ..................................... 28

CAA §§ 401, *et seq.*, 42 U.S.C. §§ 7651, *et seq.* ........................... 55

CAA § 403(a), 42 U.S.C. § 7651b(a) ............................................ 56

CAA § 403(b), 42 U.S.C. § 7651b(b) ............................................ 56

CAA § 403(d), 42 U.S.C. § 7651b(d) ........................................................ 56

CAA § 404, 42 U.S.C. § 7651c..................................................................... 56

CAA § 405, 42 U.S.C. § 7651d...................................................................... 56

CAA § 406, 42 U.S.C. § 7651e...................................................................... 56

42 U.S.C. § 9601, Revisor's Note ................................................................ 70

42 U.S.C. § 9875, Revisor's Note ................................................................ 70

## LEGISLATIVE HISTORY

136 CONG. REC. 36,067 (Oct. 27, 1990)......................................................... 74

Clean Air Act, as amended 1990, *reprinted in* 1 A LEGISLATIVE HISTORY
    OF THE CLEAN AIR ACT AMENDMENTS OF 1990, at 1 (Comm.
    Print 1993) ....................................................................................... 68, 69

Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 104 Stat.
    2399 (1990) ......................................................................................... 9, 71

Clean Air Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676
    (1970)........................................................................................................ 9

Clean Energy Jobs & Am. Power Act, S. 1733, 111th Cong. (2009)............................ 11

Climate Prot. Act of 2013, S. 332, 113th Cong. (2013) .................................... 11

H.R. Rep. No. 95-294 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1077 ................. 30, 52, 76

S. Con. Res. 8, S. Amdt. 646, 113th Cong. (2013) ........................................ 11

S. Rep. No. 91-1196 (1970), *reprinted in* 1 CLEAN AIR ACT AMENDMENTS
    OF 1970, at i (Comm. Print 1970) ....................................................... 63

# EXECUTIVE MATERIALS

Executive Office of the President, *The President's Climate Action Plan* (June 2013), https://www.whitehouse.gov/sites/default/files/image/president27sclimateactionplan.pdf .......................................................................... 11

The President, *Power Sector Carbon Pollution Standards: Memorandum for the Administrator of the Environmental Protection Agency* (June 25, 2013), 78 Fed. Reg. 39,535 (July 1, 2013) .......................................................................... 11

White House Fact Sheet, Ex. B to State Pet'rs' Mot. for Stay & for Expedited Consideration of Pet. for Review, *West Virginia v. EPA*, No. 15-1363 (D.C. Cir. Oct. 23, 2015), ECF 1579999 .................................... 2, 23

# FEDERAL REGULATIONS

40 C.F.R. § 60.15 .................................................................................................. 12

*40 C.F.R. Part 60, Subpart B ........................................................................10, 49, 75

    40 C.F.R. § 60.21(b) ...................................................................................... 49

    40 C.F.R. § 60.21(e) ...................................................................................... 49

    40 C.F.R. § 60.22(a) ................................................................................. 10, 75

    40 C.F.R. § 60.22(b) ...................................................................................... 10

    40 C.F.R. § 60.22(b)(3) .................................................................................. 49

    40 C.F.R. § 60.22(b)(5) .................................................................................. 75

    40 C.F.R. § 60.24(b)(3) .................................................................................. 49

    40 C.F.R. § 60.24(d) ...................................................................................... 77

    40 C.F.R. § 60.24(f) ...............................................................................10, 75, 77

40 C.F.R. Part 60, Subparts Cb-OOOO ........................................................ 8, 48

    40 C.F.R. § 60.32c(a) ..................................................................................... 49

40 C.F.R. Part 60, Subpart UUUU ................................................................ 2, 15

    40 C.F.R. § 60.5720 ........................................................................................ 85

    40 C.F.R. § 60.5740(a)(2)(i) .......................................................................... 17

    40 C.F.R. § 60.5745(a)(7) ............................................................................. 81

    40 C.F.R. § 60.5780(a)(5)(iii) ....................................................................... 82

    40 C.F.R. § 60.5790(c) .................................................................................. 17

    40 C.F.R. § 60.5790(c)(1) ................................................................. 18, 19, 46

    40 C.F.R. § 60.5790(c)(2)(ii) ....................................................................... 18

    40 C.F.R. § 60.5855(a) ................................................................................. 18

    40 C.F.R. § 60.5855(b) ................................................................................. 19

    40 C.F.R. § 60.5880 ..................................................................................... 18

    40 C.F.R. Part 60, Subpart UUUU, Table 1 ............................................ 75, 76

## FEDERAL REGISTER

36 Fed. Reg. 24,876 (Dec. 23, 1971) ............................................................. 59

*40 Fed. Reg. 53,340 (Nov. 17, 1975) ......................... 10, 49, 58, 60, 61, 75, 77

41 Fed. Reg. 19,585 (May 12, 1976) .............................................................. 50

41 Fed. Reg. 48,706 (Nov. 4, 1976) ............................................................... 50

42 Fed. Reg. 55,796 (Oct. 18, 1977) .............................................................. 59

44 Fed. Reg. 29,828 (May 22, 1979) ....................................................... 49, 50, 59

45 Fed. Reg. 26,294 (Apr. 17, 1980) ......................................................... 49, 59

47 Fed. Reg. 28,099 (June 29, 1982) .............................................................. 75

47 Fed. Reg. 50,868 (Nov. 10, 1982) .................................................................... 75

49 Fed. Reg. 35,771 (Sept. 12, 1984) ................................................................... 75

61 Fed. Reg. 9905 (Mar. 12, 1996) ..........................................................34, 49, 59

69 Fed. Reg. 4652 (Jan. 30, 2004) ................................................................. 63, 69

70 Fed. Reg. 15,994 (Mar. 29, 2005) ........................................................63, 64, 68

70 Fed. Reg. 28,606 (May 18, 2005) ................................................................... 68

73 Fed. Reg. 44,354 (July 30, 2008) .................................................................... 67

75 Fed. Reg. 31,514 (June 3, 2010) ..................................................................... 66

77 Fed. Reg. 9304 (Feb. 16, 2012) ........................................................5, 11, 61, 62

78 Fed. Reg. 39,535 (July 1, 2013) ...................................................................... 11

79 Fed. Reg. 34,830 (June 18, 2014) .................................................................... 16

79 Fed. Reg. 34,960 (June 18, 2014) ............................................................... 16, 51

79 Fed. Reg. 36,880 (June 30, 2014) .................................................................... 48

80 Fed. Reg. 64,510 (Oct. 23, 2015) ................................................... 11, 12, 49, 59

*80 Fed. Reg. 64,662 (Oct. 23, 2015) ............. 1, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 34,
.............................................................. 35, 41, 42, 45, 47, 48, 52, 53, 55, 56, 57, 58,
.............................................................. 59, 60, 65, 66, 67, 72, 76, 78, 81, 83, 84, 85

80 Fed. Reg. 64,966 (Oct. 23, 2015) ............................................................... 19, 20

# MISCELLANEOUS

EPA, Air Emissions from Municipal Solid Waste Landfills –
Background Information for Final Standards and Guidelines,
EPA-453/R-94-021 (Dec. 1995),
http://www3.epa.gov/ttn/atw/landfill/bidfl.pdf..........................................63, 72

EPA, $CO_2$ Emission Performance Rate and Goal Computation
Technical Support Document for CPP Final Rule (Aug. 2015),
EPA-HQ-OAR-2013-0602-36850..........................................................15

    Appendix 5 – State Goals, EPA-HQ-OAR-2013-0602-36849...........................78

EPA, Demand-Side Energy Efficiency Technical Support Document
(Aug. 2015), EPA-HQ-OAR-2013-0602-36842 ....................................15

EPA, Final Guideline Document: Control of Fluoride Emissions from
Existing Phosphate Fertilizer Plants, EPA-450/2-77-005 (Mar.
1977), http://nepis.epa.gov/Exe/ZyPURL.cgi?Docket=
2000UNFK.TXT .....................................................................................59

EPA, Greenhouse Gas Mitigation Measures Technical Support
Document (Aug. 3, 2015), EPA-HQ-OAR-2013-0602-37114....................16, 51

EPA, Kraft Pulping: Control of TRS Emissions from Existing Mills,
EPA-450/2-78-003b (Mar. 1979), http://nepis.epa.gov/Exe/
ZyPURL.cgi?Dockey=2000ZF3I.TXT...................................................59

EPA, Legal Memorandum Accompanying Clean Power Plan for Certain
Issues (undated), EPA-HQ-OAR-2013-0602-36872 ...........................77

EPA, Legal Memorandum for Proposed Carbon Pollution Emission
Guidelines for Existing Electric Utility Generating Units
(undated), EPA-HQ-OAR-2013-0602-0419 ....................................17, 63

EPA, Primary Aluminum: Guidelines for Control of Fluoride Emissions
From Existing Primary Aluminum Plants, EPA-450/2-78-049b
(Dec. 1979), http://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=
2000M9Hs.pdf ...................................................................................50, 59

EPA, Regulatory Impact Analysis for the Clean Power Plan Final Rule,
    EPA-452/R-15-003 (Aug. 2015), EPA-HQ-OAR-2013-0602-
    37105 ........................................................................................... 15, 22

FERC, *Energy Primer: A Handbook of Energy Market Basics* (Nov. 2015),
    www.ferc.gov/market-oversight/guide/energy-primer.pdf .............................. 21

Final Br. of Resp't EPA, *New Jersey v. EPA*, No. 05-1097, 2007 WL
    2155494 (D.C. Cir. July 23, 2007) ..................................................... 63, 71

King, Melanie, Energy Strategies Group, Memorandum to EPA Docket
    EPA-HQ-OAR-2008-0708, Response to Public Comments on
    Proposed Amendments to National Emission Standards for
    Hazardous Air Pollutants for Existing Stationary Reciprocating
    Internal Combustion Engines and New Source Performance
    Standards for Stationary Internal Combustion Engines (Jan. 14,
    2013), EPA-HQ-OAR-2008-0708-1491 .............................................. 36

Martineau, Robert J., Jr. & Michael K. Stagg, *New Source Performance
    Standards*, in THE CLEAN AIR ACT HANDBOOK (Julie R. Domike
    & Alec C. Zacaroli eds., 3d ed. 2011) ................................................... 59

McCarthy, Gina, *In 2016, We're Hitting the Ground Running*, THE EPA
    BLOG (Jan. 4, 2016), https://blog.epa.gov/blog/tag/clean-power-
    plan/ ............................................................................................... 33

Office of the Legislative Counsel, U.S. House of Representatives, House
    Legislative Counsel's Manual on Drafting Style § 332(b) (Nov.
    1995), http://legcounsel.house.gov/HOLC/Drafting_Legislation
    /Drafting_Guide.html ................................................................69, 71, 73

Office of the Legislative Counsel, U.S. Senate, Legislative Drafting
    Manual § 126(b) (1997), https://www.law.yale.edu/system/files/
    documents/pdf/Faculty/SenateOfficeoftheLegislativeCounsel_L
    egislativeDraftingManual(1997).pdf ...............................................69, 71, 73

OXFORD ENGLISH DICTIONARY (J.A. Simpson & E.S.C. Weiner eds., 2d
    ed. 1989) .................................................................................... 30, 62

Petition for Writ of Certiorari, *FERC v. Elec. Power Supply Ass'n*, No. 14-
    840 (U.S. Jan. 15, 2015) ................................................................... 39

*President Obama's Clean Power Plan is a Strong Signal of International Leadership*
(Aug. 5, 2015), https://climate.america.gov/clean-power-plan-
strong-signal-international-leadership ...................................................................... 3

Schwartz, Seth, Evaluation of the Immediate Impact of the Clean Power
Plan Rule on the Coal Industry (Oct. 2015), Att. to Ex. 1, Decl. of
Seth Schwartz (Oct. 14, 2015) to Coal Indus. Mot. for Stay (Oct.
23, 2015), *West Virginia v. EPA*, No. 15-1363 (D.C. Cir. Oct. 23,
2015), ECF 1580004 ..................................................................................... 22

U.S. Energy Information Administration, Today In Energy, Most states
have Renewable Portfolio Standards (Feb. 3, 2012),
https://www.eia.gov/todayinenergy/detail.cfm?id=4850 .................................. 39

*West Virginia v. EPA*, No. 15A773 (and related cases) (U.S. Feb. 9, 2016)

Mem. for the Fed. Resp'ts in Opp'n (Feb. 4, 2016) ............................................ 31

Order in Pending Case (Feb. 9, 2016)......................................................22, 23, 35

# GLOSSARY OF TERMS

| | |
|---|---|
| Act (or CAA) | Clean Air Act |
| $CO_2$ | Carbon Dioxide |
| EPA | United States Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| JA | Joint Appendix |
| MWh | Megawatt-Hour |
| Rule | U.S. Environmental Protection Agency, Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, Final Rule, 80 Fed. Reg. 64,662 (Oct. 23, 2015) |

## JURISDICTIONAL STATEMENT

Petitioners seek review of a U.S. Environmental Protection Agency ("EPA") final rule entitled "Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units," 80 Fed. Reg. 64,662 (Oct. 23, 2015) ("Rule"), Joint Appendix ("JA") 143-445. Petitions for review were timely filed in this Court under section 307(b)(1) of the Clean Air Act ("Act" or "CAA").[1]

## STATEMENT OF ISSUES

1.    Whether the Rule violates section 111 of the Clean Air Act by:

   a.    Requiring that States adopt standards of performance that are not "for," and cannot be "applied" to, individual existing fossil fuel-fired electric generating units, but that instead require the owners and operators of these facilities to subsidize EPA-preferred facilities;

   b.    Requiring that States adopt standards of performance that are not based on technological or operational processes that continuously limit the rate at which the regulated pollutant is emitted by regulated sources, but instead require non-performance by sources; and/or

   c.    Requiring that States adopt standards for *existing* units that are more stringent even than those EPA contemporaneously established under section 111(b) for the best state-of-the-art *new* units.

---

[1] All citations are to the CAA; the Table of Authorities provides parallel citations to the U.S. Code.

2.      Whether the Rule exceeds EPA's authority under CAA section 111(d) by requiring States to adopt standards of performance for sources in source categories that are already regulated under section 112.

3.      Whether the Rule abrogates authority granted to the States under section 111(d) by forbidding States from setting performance standards less stringent than the Rule's national performance rates, and failing to authorize States "to take into consideration, among other factors, the remaining useful life" of an existing source.

4.      Whether the Rule violates rights reserved to the States by the United States Constitution by reordering the mix of energy generation in such a way that States will have no choice but to carry out EPA's preferred energy policy, regardless of whether the Rule is implemented through a state or federal plan.

## STATUTES AND REGULATIONS

The Rule is codified in 40 C.F.R. Part 60, Subpart UUUU. The Statutory and Regulatory Addendum reproduces pertinent portions of cited statutes and regulations.

## INTRODUCTION

Relying on an obscure provision of the Clean Air Act, EPA's Rule seeks to effect an "aggressive transformation"[2] of the mix of electricity generation in nearly every State by systematically "decarboniz[ing]" power generation and ushering in a

---

[2] State Pet'rs' Mot. for Stay (Oct. 23, 2015), Ex. B, White House Fact Sheet, ECF 1579999 ("White House Fact Sheet"), JA5711.

new "clean energy" economy.[3] Although Congress has debated a number of bills designed to achieve that very result, it has not adopted any such legislation. Frustrated with Congress, EPA now purports to have discovered sweeping authority in section 111(d) of the Clean Air Act—a provision that has been used only five times in 45 years—to issue a "Power Plan" that forces States to fundamentally alter electricity generation throughout the country.

But as the Supreme Court recently said, courts should "greet … with a measure of skepticism" claims by EPA to have "discover[ed] in a long-extant statute an unheralded power to regulate a significant portion of the American economy" and make "decisions of vast economic and political significance," *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014) ("*UARG*") (internal quotation marks omitted), especially in areas outside an agency's "expertise," *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). That skepticism is doubly warranted here where EPA's Rule intrudes on an "area[] of traditional state responsibility," *Bond v. United States*, 134 S. Ct. 2077, 2089 (2014)—namely, the States' "traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like," *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212 (1983) ("*PG&E*").

---

[3] *President Obama's Clean Power Plan is a Strong Signal of International Leadership* (Aug. 5, 2015), https://climate.america.gov/clean-power-plan-strong-signal-international-leadership/.

EPA's audacious assertion of authority in this Rule is more far-reaching than any previous effort by the agency. According to EPA, section 111(d) authorizes it to use the States to impose on fossil fuel-fired power plants emission reduction requirements that are premised not just on pollution control measures at the regulated plants, but also (and predominantly) on reducing or eliminating operations at those plants and shifting their electricity generation to competitors, including those not regulated by the Rule. Those reduction requirements far exceed what EPA has found may be achieved individually by even a new plant with the agency's state-of-the-art "best system of emission reduction." Rather, the reduction requirements can be met *only* by shutting down hundreds of coal-fired plants, limiting the use of others, and requiring the construction and operation of other types of facilities preferred by EPA—a directive EPA euphemistically calls "generation shifting."

EPA's legal theory is at odds with the plain language of section 111 and certainly is not "clearly" authorized by that provision. *UARG*, 134 S. Ct. at 2444. Section 111(d) authorizes EPA to establish "procedure[s]" under which States set "standards of performance for any existing source," i.e., standards that are "appl[icable] … to a[] particular source" within a regulated "source category." CAA § 111(a)(1), (d)(1). Those standards must reflect the "application of the best system of emission reduction" to that "source," i.e., to a "building, structure, facility, or installation." *Id.* § 111(a)(1), (3). In other words, EPA may seek to reduce emissions only through measures that can be implemented by individual facilities. Indeed, for 45

years, EPA has consistently interpreted section 111 standards of performance in this way—not only in the five instances in which it has addressed existing sources, but also in the more than one hundred rulemakings in which it has adopted standards for new sources.

The Rule is further barred by the fact that coal-fired electric generating units are already regulated under section 112 of the Clean Air Act. *See* 77 Fed. Reg. 9304 (Feb. 16, 2012). Section 111(d) expressly prohibits EPA's use of that section to require States to regulate "any air pollutant … emitted from a source category which is regulated under section [1]12." CAA § 111(d)(1)(A).

Additionally, even if EPA were permitted to regulate in this instance, the Rule is unlawful because it prevents States from exercising the authority granted to them under section 111 to establish standards of performance and to take into consideration the remaining useful life of an existing source when applying a standard to that source.

Finally, the Rule violates the Constitution. In order to pass constitutional muster, cooperative federalism programs must provide States with a meaningful opportunity to decline implementation. But the Rule does not do so; States that decline to take legislative or regulatory action to ensure increased generation by EPA's preferred power sources face the threat of insufficient electricity to meet demand. The Rule is thus an act of commandeering that leaves States no choice but to alter their

laws and programs governing electricity generation and delivery to accord with federal policy.

If upheld, the Rule would lead to a breathtaking expansion of the agency's authority. The Rule's restructuring of nearly every State's electric grid would exceed even the authority that Congress gave to the Federal Energy Regulatory Commission ("FERC"), the federal agency responsible for electricity regulation. But EPA's theory of "generation shifting"—which is not about making regulated sources reduce their emissions while operating but rather about preventing many sources from operating at all—does not stop with the power sector. EPA's newly-discovered authority threatens to enable the agency to mandate that any existing source's owners in *any* industry reduce their source's production, shutter the existing source entirely, and even subsidize their non-regulated competitors. Section 111(d) would be transformed from a limited provision into the most powerful part of the Clean Air Act, making the agency a central planner for every single industry that emits carbon dioxide. Congress did not intend and could not have imagined such a result when it passed the provision more than 45 years ago.

The Rule must be vacated.

## STATEMENT OF THE CASE

### I.     Section 111 of the Clean Air Act

Enacted in 1970, section 111 authorizes the regulation of air pollutants emitted by stationary sources. Under section 111, EPA is directed to "list" categories of

"stationary sources"—defined as "any building, structure, facility, or installation which emits or may emit any air pollutant," CAA § 111(a)(3)—whose pollutants endanger public health or welfare, *id.* § 111(b)(1)(A). EPA must establish nationally-applicable "standards of performance" for new stationary sources within that category. *Id.* § 111(b)(1)(B). EPA also may, in limited circumstances, call upon States to submit plans containing State-established standards of performance for the same pollutant from *existing* sources within the same source category. *Id.* § 111(d)(1).

## A.    The Definition of "Standard of Performance"

Under section 111(d), a "standard of performance" must be "for" and "appl[icable] … to a[] particular source" within a regulated source category. *Id.* § 111(d), (d)(1)(B); *accord id.* § 111(b)(1)(B) (discussing standards of performance "which will be applicable to" individual new sources); *id.* § 111(a)(2). Section 111(a)(1) defines the phrase to mean, for both new and existing sources:

> a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

The term "emission limitation" means a "requirement … which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis …." *Id.* § 302(k). Thus, a "standard of performance" must reflect the emission limitation that can be achieved by "the application of the best system of emission reduction" that has

7

been "demonstrated" to limit emissions from an individual source in the listed source category on a "continuous basis," after considering cost and other factors.

Since 1970, every performance standard has adhered to the requirement of this plain text. Each has been based upon a best system of emission reduction involving technological controls or low-polluting production processes that: (i) are capable of being implemented at the source, (ii) limit the individual source's emissions while it operates, and (iii) do not limit the individual source's level of production. *See generally* 40 C.F.R. pt. 60, subpts. Cb-OOOO.

## B.    Standards of Performance for Existing Sources

Though section 111's primary focus—as reflected in its title, "Standards of performance for new stationary sources"—is the regulation of new sources, EPA has on a few occasions called upon States to establish standards of performance for *existing* sources under section 111(d) in a category for which EPA has issued a national new source standard. Compared to the roughly one hundred new source performance standards under section 111(b), EPA has promulgated only five rules under section 111(d).

Section 111(d)'s infrequent use stems partly from an important limitation on EPA's authority contained in that provision itself: the Section 112 Exclusion. In the 1990 CAA Amendments, Congress broadly expanded the stringency and reach of

8

section 112,[4] and at the same time limited the reach of section 111(d) for the purpose of prohibiting double regulation of sources also regulated under section 112. Since the 1990 Amendments, section 111(d) has expressly prohibited EPA from requiring States to regulate "any air pollutant … emitted from a source category which is regulated under section [1]12." CAA § 111(d)(1)(A). This means "EPA may not employ § [1]11(d) if existing stationary sources of the pollutant in question are regulated under … § [1]12." *Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527, 2537 n.7 (2011) ("*AEP*").

In contrast to the standard-setting authority granted *to EPA* for new sources under section 111(b), section 111(d) grants *to the States* the authority to set performance standards for existing sources. Section 111(d) permits EPA only to prescribe regulations "establish[ing] a procedure" under which "each State shall submit" to EPA "a plan which … establishes standards of performance for any existing source" meeting the statutory criteria. CAA § 111(d)(1). It further directs that EPA's regulations "shall permit the State in applying a standard of performance to any particular source" to "take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies." *Id.* "[I]n cases where

---

[4] *Compare* Clean Air Act Amendments of 1990, Pub. L. No. 101-549, § 301, 104 Stat. 2399, 2531-74 (1990) (amending CAA § 312), JA4191-234, *with* Clean Air Amendments of 1970, Pub. L. No. 91-604, § 112, 84 Stat. 1676, 1685-86 (1970), JA4059-60.

the State fails to submit a satisfactory plan," EPA has the authority to "prescribe a plan for a State." *Id.* § 111(d)(2)(A).

EPA's 1975 regulations reflect these statutory directives. Establishing the procedure for section 111(d) state plans, 40 C.F.R. pt. 60, subpt. B, those regulations provide that EPA will issue under section 111(d) only a "guideline document" containing an "emission guideline" "for the development of State plans." 40 C.F.R. § 60.22(a), (b). Each individual State then submits a plan establishing standards of performance, *id.* § 60.22(b), which may be less stringent than the EPA emission guidelines if the State makes certain demonstrations, including infeasibility or unreasonable cost given a plant's age, *id.* § 60.24(f).

No previous section 111(d) regulation has identified emission guidelines for existing sources that are more stringent than the corresponding section 111(b) standards for new sources in that category. *See infra* pp. 58-59 & n.30. This is consistent with the Act's directive that EPA must take cost and feasibility into account in setting the best system of emission reduction, CAA § 111(a)(1), because retrofitting an existing source with pollution controls will be more expensive and technologically challenging than incorporating controls into a new plant's design, 40 Fed. Reg. 53,340, 53,344 (Nov. 17, 1975), JA4090.

## II.     The President's Climate Action Plan

After Congress declined to pass legislation authorizing $CO_2$ reduction programs,[5] President Obama issued his "Climate Action Plan" in June 2013.[6] The President ordered EPA to mandate steep reductions in $CO_2$ emissions from power plants under section 111.[7] EPA subsequently adopted separate rules under section 111(b) and section 111(d) for new and existing fossil fuel-fired electric generating units, including the Rule at issue here. *See* 80 Fed. Reg. 64,510 (Oct. 23, 2015); 80 Fed. Reg. 64,662. It did so even though existing coal-fired units had recently been regulated under section 112. *See* 77 Fed. Reg. 9304.

### A.     The Section 111(b) New Source Rule

In October 2015, EPA promulgated standards limiting $CO_2$ emissions from new facilities within two source categories—coal- and natural gas-fired electric generating units. 80 Fed. Reg. 64,510. EPA determined that the best system of emission reduction for newly constructed coal-fired facilities is partial carbon capture and sequestration technology, based on which EPA set a performance standard of

---

[5] *See, e.g.*, S. Con. Res. 8, S. Amdt. 646, 113th Cong. (2013) (rejecting carbon tax); Climate Prot. Act of 2013, S. 332, 113th Cong. (2013) (rejecting fees on greenhouse gas emissions); Clean Energy Jobs & Am. Power Act, S. 1733, 111th Cong. (2009) (rejecting greenhouse gas cap-and-trade program).

[6] Executive Office of the President, *The President's Climate Action Plan* (June 2013), https://www.whitehouse.gov/sites/default/files/image/president27sclimateactionplan.pdf.

[7] *Power Sector Carbon Pollution Standards: Memorandum for the Administrator of the Environmental Protection Agency* (June 25, 2013), 78 Fed. Reg. 39,535, 39,535-36 (July 1, 2013).

1,400 lbs $CO_2$/megawatt-hour ("MWh"). *Id.* at 64,512-13, Tbl. 1. For modified and reconstructed coal-fired facilities,[8] EPA rejected carbon capture technology and concluded that improved operational efficiency was the best system of emission reduction. Applying this system, EPA established standards for modified coal-fired facilities of no less than 1,800 to 2,000 lbs $CO_2$/MWh, to be determined on a case-by-case basis. *Id.* For new and reconstructed gas-fired facilities, the standard is 1,000 lbs $CO_2$/MWh, based on natural gas combined cycle technology. *Id.*[9]

## B.    The Section 111(d) Existing Source Rule: "The Clean Power Plan"

Notwithstanding the express prohibition of the Section 112 Exclusion, the same day EPA issued the section 111(b) rule, it separately issued under section 111(d) the Rule at issue to address $CO_2$ emissions from existing facilities within the coal and gas plant categories. Because EPA concluded that emission controls implementable at individual existing coal plants cannot yield sufficient $CO_2$ emission reductions to meet the Administration's policy goals, EPA abandoned the approach it took in every other performance standard rulemaking, including the contemporaneous section 111(b) rule. As EPA recognized, the carbon capture technology that formed the basis for its new source performance standard for new coal units is not feasible for existing coal

---

[8] The statute defines modified and reconstructed sources as new sources. CAA § 111(a)(2); *see also* 40 C.F.R. § 60.15.

[9] EPA's section 111(b) rule is being challenged in a separate proceeding before this Court. *See North Dakota v. EPA*, No. 15-1381 (and consolidated cases) (D.C. Cir. filed Oct. 23, 2015).

units. 80 Fed. Reg. at 64,756, JA237. And though EPA believed existing coal plants could feasibly make the combustion efficiency improvements that form the basis for the section 111(b) standards for modified coal facilities, those improvements would not achieve sufficient reductions to meet the Administration's goals. *Id.* at 64,748, JA229. The only way to obtain the desired reductions, EPA decided, was to restructure the entire power sector—by reducing the use of existing coal-fired power plants altogether and replacing their generation through increased use of existing natural gas-fired power plants and yet-to-be-built renewable resources. *See generally id.* at 64,717-811, JA198-292.

### 1.   EPA's "Performance Rates" and Compliance Requirements

To achieve this policy outcome, EPA devised national "emission performance rates" for coal and gas power plants based on a best system of emission reduction consisting of three so-called "Building Blocks." *Id.* at 64,719-20, 64,752, JA200-01, JA233.

### a.   EPA's "Building Blocks" and "Performance Rates"

Building Block 1 (the only element of EPA's rule that resembles its historic practice) is based on improved combustion efficiency at individual coal-fired generating facilities, which can result in lower $CO_2$ emissions per unit of electric output. *Id.* at 64,745, JA226. As EPA explained, however, Building Block 1 would "yield only a small amount of emission reductions," nowhere near enough to satisfy EPA's policy goals. *Id.* at 64,769, JA250.

13

Building Block 2 is based on displacing large quantities of existing coal-fired generation with additional generation from existing natural gas generating facilities. *Id.* at 64,745-46, JA226-27. Put another way, existing natural gas generating facilities would be called on to produce much more power than they currently do and coal units much less. *Id.* at 64,795, 64,800, JA276, JA281.[10]

Building Block 3 is based on displacing both existing coal- and gas-fired generation with large increases in generation from new renewable energy resources like wind and solar. *Id.* at 64,747-48, JA228-29. Together, Blocks 2 and 3 represent "[t]he amount of reduced generation" from coal- and gas-fired plants by which EPA plans to achieve the bulk of its desired emission reductions. *Id.* at 64,782, JA263; *see also id.* at 64,728 ("[M]ost of the $CO_2$ controls need to come in the form of those other measures … that involve, in one form or another, replacement of higher emitting generation with lower- or zero-emitting generation."), JA209. The fundamental restructuring of the current mix of power generation among regulated and non-regulated entities[11] reflected in Building Blocks 2 and 3 is what EPA refers to as "generation shifting."

---

[10] To ensure that gas-fired generation is replaced by renewable generation in the long term, the Rule actually forbids the use of *new* natural gas plants to calculate rate reductions. *See* 80 Fed. Reg. at 64,729-30, 64,903, JA210-11, JA384.

[11] Non-emitting renewable energy facilities are not regulated "sources" under section 111 because they do not "emit any air pollutant." CAA § 111(a)(3) (definition of "stationary source").

14

Based on these "Building Blocks," and an assumed decline in demand for electricity,[12] EPA set uniform "emission performance rates" for existing fossil fuel-fired generating facilities nationwide. To do so, EPA determined the theoretical $CO_2$ emission rates at which existing coal- and gas-fired plants would have to operate to obtain the emission reductions assumed to be achievable through implementation of the three sector-wide Building Blocks. *See generally* $CO_2$ Emission Performance Rate and Goal Computation Technical Support Document (Aug. 2015) ("Goal Computation TSD"), JA3027-76. The resulting rate for existing coal-fired plants is 1,305 lbs $CO_2$/MWh, and for existing gas-fired plants is 771 lbs $CO_2$/MWh. 40 C.F.R. pt. 60, subpt. UUUU, Tbl. 1. These emission rates are the "chief regulatory requirement of th[e] rulemaking"; plants may not emit $CO_2$ in excess of these rates. 80 Fed. Reg. at 64,823, 64,667, JA304, JA148.

But, as EPA concedes, no existing facility can actually meet these rates. They are not achievable by pollution controls or operational improvements at any individual source, and simply reducing generation at the source does not reduce (and

---

[12] Despite population and economic growth and the fact that electric demand has *never* fallen over a multi-year period absent a significant economic downturn, EPA assumed that demand for electricity will *fall* between 2020 and 2030. Regulatory Impact Analysis at 3-14, Tbl. 3-2, 3-25, 3-27, Tbl. 3-11 (Aug. 2015) ("RIA"), JA3646, JA3657, JA3659; Demand-Side Energy Efficiency Technical Support Document at 62-64, Tbl. 25 (Aug. 2015), JA2943-45.

may actually increase) the source's emissions rate. *Id.* at 64,754, JA235.[13] They are even stricter than the emission rates established by EPA for *new* plants using what EPA considers to be the "best" available technology.

**Summary of Emission Rates (lbs $CO_2$/MWh)**

|  | New | Reconstructed | Modified | Existing | 2012 Average |
|---|---|---|---|---|---|
| **Coal** | 1,400 | 1,800 - 2,000 | 1,800-2,000[14] | 1,305 | 2,217[15] |
| **Natural Gas** | 1,000 | 1,000 | N/A | 771 | 905[16] |

### b.     EPA's Rationale

EPA's legal justification for its "Building Blocks" shifted substantially during the rulemaking. Because pollution controls that could be implemented by fossil fuel-fired generating units "yield only a small amount of emission reductions," *id.* at 64,769, JA250, EPA's proposed rationale for the rule was not based on what fossil fuel-fired sources themselves could achieve. Instead, attributing a capacious meaning to the word "system," 79 Fed. Reg. 34,830, 34,885 (June 18, 2014), JA57, EPA claimed that it could "include [within its best system of emission reduction] *anything*

---

[13] As EPA acknowledges, coal plants that reduce operations actually are generally *less* efficient, and have *higher* emission rates. Greenhouse Gas Mitigation Measures Technical Support Document at 2-34 (Aug. 3, 2015) ("Mitigation TSD"), JA3942. Conversely, gas plants can have higher emission rates when they *increase* operations. *See* 79 Fed. Reg. 34,960, 34,980 (June 18, 2014) (EPA noting some gas plants "are designed to be highly efficient when operated as load-following units" but are less efficient at baseload), JA5260.

[14] Modified coal-fired units are subject to case-by-case standards that may not be more stringent than these levels.

[15] Mitigation TSD at 3-4, JA3978.

[16] *Id.*

that reduces emissions," including obligations imposed on entities beyond the regulated sources themselves, Legal Memorandum for Proposed Carbon Pollution Emission Guidelines at 51-52, EPA-HQ-OAR-2013-0602-0419 ("EPA Legal Memo"), JA2790-91 (emphasis added).

But in the final Rule, EPA took a different approach. Retreating from its sweeping assertions in the proposed rule, EPA conceded that a best system of emission reduction must be "*limited to measures that can be implemented—'appl[ied]'—by the sources themselves.*" 80 Fed. Reg. at 64,720 (emphasis added), JA201. It then provided a new legal theory for nevertheless setting performance rates that are demonstrably not achievable by regulated sources and for including in the best system "actions that may occur off-site and actions that a third party takes." *Id.* at 64,761, JA242. Specifically, EPA equated a source with its owner or operator: "[a]s a practical matter, the 'source' includes the '*owner or operator'* of any building, structure, facility, or installation for which a standard of performance is applicable." *Id.* at 64,762 (emphasis added), JA243; *see also id.* at 64,720, JA201. An *owner or operator* of a regulated source, EPA said, can "invest in actions at facilities owned by others," *id.* at 64,733, JA214, including generation from other sources or facilities, in order to generate "emission rate credits," *id.* at 64,669, JA150, to offset the regulated source's emission rate, 40 C.F.R. § 60.5740(a)(2)(i); *see also id.* § 60.5790(c). Alternatively, the *owner or operator* of a regulated unit can comply with the performance rate by simply shutting the unit down. 80 Fed. Reg. at 64,750, 64,780 n.590, JA231, JA261. EPA claimed deference

17

for its interpretation under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). 80 Fed. Reg. at 64,719 n.301, JA200.

The Rule's performance rates thus are based on the availability of tradable "emission rate credits" that implement EPA's "Building Blocks." Because the Rule's performance rates cannot be met by any single regulated source, a source's owner or operator must comply by "calculat[ing] an adjusted $CO_2$ emission rate" of 1,305 or 771 lbs/MWh using (i) actual stack emissions data, and (ii) proof (in the form of tradable "emission rate credits") that actual lower- or zero-emitting generation elsewhere has occurred. 40 C.F.R. § 60.5790(c)(1). An "emission rate credit" is a "tradable compliance instrument[ ]" that "represent[s] one MWh of actual energy generated or saved…." *Id.* §§ 60.5880, 60.5790(c)(2)(ii). Implementing the Building Blocks through emissions trading, EPA admits, is "an *integral* part of [the] … analysis" used to justify the Rule's "performance rates." 80 Fed. Reg. at 64,734, JA215 (emphasis added). According to EPA, "trading allows each affected [unit] to access … all the building blocks as well as other measures," *id.* at 64,733, JA214, and to do so using "a virtually nationwide emissions trading market for compliance," *id.* at 64,732, JA213. No such nationwide trading market exists at present.

### 2.    State Plans

Under the Rule, States must submit plans establishing $CO_2$ emission standards for existing coal-fired and gas-fired generating units that will meet EPA's emissions performance rates. 40 C.F.R. § 60.5855(a). Alternatively, the Rule allows States to

impose emission standards that will "collectively meet" EPA-assigned state-wide

"goals" derived from an average of the rates for all regulated generating units within a

State. *Id.* § 60.5855(b). These goals are expressed either in "rate-based" terms (pounds

of $CO_2$ per megawatt-hour that all regulated sources in a State can emit on average) or

"mass-based" terms (total tons of $CO_2$ that all regulated sources in a State can emit in

aggregate). *Id.*

Both types of plans require owners and operators of regulated plants to

subsidize alternative generation. In a plan implementing a rate-based State goal, the

State must require an owner or operator to "calculate an adjusted $CO_2$ emission rate"

based on stack emissions and any "emission rate credits" from other facilities. 40

C.F.R. § 60.5790(c)(1). Under a mass-based plan, achieving the state-wide $CO_2$

emissions cap "involve[s], in one form or another, replacement of higher emitting

[coal or gas-fired] generation with lower-or zero-emitting generation," 80 Fed. Reg. at

64,728, JA209. New, more efficient gas-fired plants are restricted from participating in

both types of state plans. *See, e.g., id.* at 64,887-91, 64,903, JA368-72, JA384.

### 3.    The Proposed Federal Plan

Because EPA has the authority "to prescribe a plan for a State in cases where

the State fails to submit a satisfactory plan," CAA § 111(d), the agency has separately

proposed (but not yet finalized) two approaches to a federal plan. *See* 80 Fed. Reg.

64,966 (Oct. 23, 2015). Both approaches are trading programs. The plants in a rate-

based trading program would be required to meet the emission rates established under

19

the Rule through the use of emission rate credits that could be bought, sold, transferred, or banked for future use under an EPA-administered program. *Id.* at 64,970-71. Under the mass-based approach, EPA would distribute transferrable emissions allowances up to the mass-based goal established for the State under the Rule. *Id.* at 64,971.

Because no regulated unit can achieve the Rule's uniform performance rates, States will be required even under federal plans to facilitate the reordering of each State's mix of electricity generation in order to "ensure that electric system reliability will be maintained" as coal generation is forced to retire and alternative generation must be constructed to take its place. *Id.* at 64,981; *see* 80 Fed. Reg. at 64,678, 64,874, JA159, JA355. As commenters warned, the "emission performance requirements set by EPA necessarily require compliance and enforcement activities that include changing dispatch methodology, efficiency measures, the type of generation to be constructed, and renewable energy considerations, all of which are matters within the [States'] exclusive jurisdiction."[17]

---

[17] Comments of Fla. Pub. Serv. Comm'n, at 8 (Dec. 1, 2014), EPA-HQ-OAR-2013-0602-23650, JA2027; *see also* Comments of Pub. Util. Comm'n of Texas, at 9 (Dec. 1, 2014), EPA-HQ-OAR-2013-0602-23305, JA1610; Comments of North Dakota Pub. Serv. Comm'n, at 14-16 (Nov. 25, 2014), EPA-HQ-OAR-2013-0602-25944, JA2263-65; Comments of Thomas Jefferson Inst. for Public Policy, at 5, 8 (Dec. 1, 2014), EPA-HQ-OAR-2013-0602-23286, JA1576, JA1579; Comments of La. Pub. Serv. Comm'n, at 5-6 (undated), EPA-HQ-OAR-2013-0602-23175, JA1413-14.

### 4.    The Rule's Effects

In the Administration's own words, the Rule is intended to effect through the States an "aggressive transformation" of the electric sector by "decarboniz[ing]" power generation. *Supra* nn. 2, 3. Today, "[g]rid operators dispatch plants—or, call them into service—with the simultaneous goals of providing reliable power at the lowest reasonable cost." FERC, *Energy Primer: A Handbook of Energy Market Basics* at 48 (Nov. 2015), http://www.ferc.gov/market-oversight/guide/energy-primer.pdf. But the Rule subordinates the energy diversity, consumer protection, reliability, and other policies in current state dispatch law to the single overarching goal of shifting the generation of electricity to zero- or low-emitting resources. In fact, by setting emission rates that can be met only by a substantial shift in generation to new, renewable facilities, *see supra* pp. 12-19, the Rule *constrains* industry's ability to keep consumer prices low and to guarantee grid reliability through dispatch decisions.[18] In this regard, the Rule also forbids sources from complying by investing in new gas generation facilities. 80 Fed. Reg. at 64,903, JA384.

---

[18] As EPA recognizes, the nation's fleet of fossil fuel-fired units cannot keep operating at existing levels and meet the Rule's requirements simply by subsidizing additional renewable generation. There is not enough demand for electricity to allow that result. *See* 80 Fed. Reg. at 64,928 (EPA "assumes that overall electric demand will decrease."), JA409; *id.* at 64,677 (Electricity "supply and demand [must] constantly be[] balanced."), JA158. That is why EPA describes the Rule as requiring "generation shifting." *Id.* at 64,729, JA210. Fossil generators must reduce generation while subsidizing renewable replacement generation. *Id.* at 64,749 (Under the Rule, "the volume of coal-fired generation will decrease."), JA230.

21

The Rule thus would reverse countless decisions made by States and industry throughout the country as to the optimal mix of power generation to reliably satisfy electricity demand. EPA's own data show that coal-fired generating capacity will be cut nearly in half, from over 336,000 MW in 2012, to 183,000 MW in 2030. RIA at 2-3, 3-31, JA3623, JA3663. Conversely, EPA forecasts that the Rule will expand non-hydroelectric renewable generating capacity to a level in 2030—174,000 MW—almost equal to the forecast for coal capacity. *Id.* To achieve this remarkable result, EPA projects that the amount of electricity from wind and solar generation, the principal types of non-hydroelectric renewable generation, will need to triple. Coal Indus. Mot. for Stay (Oct. 23, 2015), Ex. 1, Decl. of Seth Schwartz (Oct. 14, 2015), Attach., Seth Schwartz, Evaluation of the Immediate Impact of the Clean Power Plan Rule on the Coal Industry at 29 (Oct. 2015), ECF 1580004, JA5804. But even these data understate the Rule's transformative effect on the power sector. Had EPA accounted for increases in electric demand forecasted by the Energy Information Administration, the U.S. Department of Energy agency created by Congress to collect energy data and project energy trends, even greater levels of renewable generation will be necessary to satisfy the Rule's emission rates. *Id.* at 21-29, JA5796-804.

## 5.     The Supreme Court Stay

On February 9, 2016, the Supreme Court stayed the Rule, halting its enforceability and its deadlines pending disposition of the petitions for review in this Court and any petitions for a writ of certiorari or merits determination. Order in

Pending Case, *West Virginia v. EPA*, No. 15A773 (U.S. Feb. 9, 2016) (*see also* Nos. 15A776, 15A778, 15A787, 15A793), JA6220-24; *see Nken v. Holder*, 556 U.S. 418, 428 (2009).

## SUMMARY OF ARGUMENT

**I.A.** For the Clean Air Act to authorize the Rule's wholesale transformation of the U.S. energy system, EPA must show that the Act contains a clear statement *compelling* the agency's reading of section 111(d). Because the Act includes no such congressional authorization (and EPA does not even attempt to argue that it does), the Rule fails two separate clear-statement rules.

*First*, the Rule's reliance on section 111(d) to "aggressively transform[] … the domestic energy industry," White House Fact Sheet, JA5711, is precisely the kind of "transformative expansion in EPA's regulatory authority" based on a "long-extant statute" that requires "clear congressional authorization," *UARG*, 134 S. Ct. at 2444; *see also King*, 135 S. Ct. at 2489. EPA is making "decisions of vast 'economic and political significance'" based on a rarely used provision of the Clean Air Act without a "clear[]" statement from Congress, *UARG*, 134 S. Ct. at 2444, and in an area where the agency has no claim of expertise, *King*, 135 S. Ct. at 2489. *See infra* Section I.A.1.

*Second*, "[f]ederal law may not be interpreted to reach" areas traditionally subject to State regulation "unless the language of the federal law compels the intrusion" with "unmistakably clear … language." *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 471-72 (D.C. Cir. 2005) (internal quotation marks omitted). The States' authority over the intrastate

generation and consumption of energy is "one of the most important of the functions traditionally associated with the police power of the States." *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983). By arrogating to itself the authority to control each State's energy mix, EPA undermines the States' authority to govern the intrastate "[n]eed for new power facilities, their economic feasibility, and rates and services," *PG&E*, 461 U.S. at 205, with no clear statement of authority. *See infra* Section I.A.2.

    **I.B.**  The Rule is unlawful because section 111(d) unambiguously forecloses it.

    *First*, section 111(d) forbids EPA to mandate emission reductions by requiring the owners or operators of existing sources to subsidize lower-emitting generation, including generation entirely outside section 111's reach. Section 111's performance standards "appl[y]" to sources themselves, not to the owners and operators of those sources. CAA § 111(a)(1). This is not only EPA's longstanding interpretation of the statute, it is compelled by the statutory text and by *ASARCO Inc. v. EPA*, 578 F.2d 319 (D.C. Cir. 1978), which bars the Rule's approach of setting emission performance rates that can be achieved only by the electricity sector in aggregate, rather than by individual sources. *See infra* Section I.B.1.

    *Second*, EPA cannot require States to adopt as a "standard of performance" reduction obligations that can be met only through *non*-performance by regulated sources. A "standard of performance" requires *better* emission performance from an individual regulated source, not *less* (or no) performance. The Rule's "generation-

shifting" mandate does not involve a source improving its emissions performance when it generates, but instead consists of plants *reducing* or *ceasing* work, or *non-performance*, as their production is "shifted" to EPA-preferred facilities. Congress specifically amended the CAA in 1977 to preclude standards of performance set on this basis. *See infra* Section I.B.2.

*Third*, the Rule contravenes the purpose and design of section 111 by requiring that States adopt existing source standards that are more stringent than the corresponding new source standards. The point of section 111's division of authority between new and existing sources was to require the most stringent emission reductions when it was most economically sensible to require those stringent reductions—at the time of new construction or modification. The Rule's disregard for this fundamental aspect of Congress's statutory design is unlawful and results in a statute that would be "unrecognizable to the Congress that designed" it. *UARG*, 134 S. Ct. at 2437 (internal quotation marks omitted). Indeed, under EPA's inconsistent reading of section 111, the Rule's emission reduction requirements cannot be met even if every coal- and natural gas-fired plant is closed and replaced with brand new plants using what EPA has determined to be state-of-the-art technology. *See infra* Section I.B.3.

**II.** The Rule is categorically foreclosed by the Section 112 Exclusion. Since the 1990 CAA Amendments, section 111(d) has expressly prohibited EPA from using section 111(d) to regulate "a source category which is regulated under [CAA section

25

112].” CAA § 111(d)(1)(A). Congress enacted this language to prevent the costly

double regulation that coal-fired power plants are facing with this Rule, having already

sunk billions of dollars to comply with section 112 regulations. Much of this

investment will now become stranded as the units are forced to retire. *See infra* Section

II.

      **III.**  The Clean Air Act is a program of cooperative federalism, which expressly

provides States—not EPA—with the right under section 111(d) to “establish” and

“apply” performance standards and to “take into consideration, among other factors,

the remaining useful life of the existing source to which [a] standard [of performance]

applies.” CAA § 111(d)(1). But with this Rule, EPA, not the States, effectively

established standards of performance and prohibited States from establishing and

applying standards to sources reflecting the statutory considerations, even when

applying EPA’s emission rates would force a source to shut down before the end of

its useful life. *See infra* Section III.

      **IV.**  The U.S. Constitution preserves the sovereignty of the States by barring

the federal government from compelling them to implement federal policies. The

federal government may not “use the States as implements of regulation”—in other

words, to commandeer them to carry out federal law. *New York v. United States*, 505

U.S. 144, 161 (1992). The Rule violates this sovereignty by commandeering and

coercing the States to enable EPA’s decarbonization of the U.S. power system. But

achieving the Rule’s emissions targets requires States to fundamentally revamp their

regulation of their utility sectors and to undertake a series of regulatory actions, all to satisfy EPA's dictates. *See infra* Section IV.A.

Moreover, States have no "legitimate choice" but to take action to carry out EPA's federal decarbonization policy. *Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2602 (2012) (Roberts, C.J.) (plurality opinion) ("*NFIB*"); *see also id.* at 2659 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). Because EPA lacks the authority to take all of the regulatory actions necessary to ensure a sufficient supply of power to accommodate the Rule's changes, States face the threat of blackouts and consequent threats to their public safety and economies unless they help implement federal policy. The federal government cannot legitimately put States to that non-choice. *See infra* Section IV.B.

## STANDING

Petitioners include States and state agencies that are required by the Rule to implement federal policy, electric utilities that own or operate units regulated by the Rule, coal companies that will have to reduce operations or close mines as a result of the Rule's shift away from coal-fired generation, industries and other consumers affected by higher rates and less reliable electricity produced by the Rule's closure of some of the most affordable and reliable power sources, and labor unions representing workers who will lose jobs as a result of the Rule.[19] Individual Petitioners

---

[19] Petitioners in Case No. 15-1488, *Competitive Enterprise Institute et al. v. EPA*, are filing pursuant to Circuit Rule 28(a)(7) a separate addendum to support their standing.

have standing because they have suffered an injury-in-fact caused by the Rule that is redressable by the relief they seek. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see, e.g.*, *West Virginia v. EPA*, 362 F.3d 861, 868 (D.C. Cir. 2004). Trade association Petitioners have standing on behalf of their members. *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

## STANDARD OF REVIEW

This Court must set aside final EPA action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right …." CAA § 307(d)(9). Where "decisions of vast economic and political significance" are concerned, the statute must "speak clearly" to authorize the agency's action, *UARG*, 134 S. Ct. at 2444 (internal quotation marks omitted), "especially" where the agency "has no expertise" in the matter, *King*, 135 S. Ct. at 2489. Likewise, "[f]ederal law may not be interpreted to reach" areas traditionally subject to State regulation absent "unmistakably clear … language." *Am. Bar Ass'n*, 430 F.3d at 471-72. Moreover, "the existence of ambiguity is not enough per se to warrant deference to the agency's interpretation"; *Chevron* deference is warranted only if "[t]he ambiguity [is] such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity." *Id.* at 469.

# ARGUMENT

## I.    The Rule Transgresses Section 111.

As an executive agency, EPA has "only those authorities conferred upon it by Congress." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001). Where "there is no statute conferring authority, [EPA] has none." *Id.*; *see also NRDC v. EPA*, 777 F.3d 456, 468 (D.C. Cir. 2014) ("[N]o statutory provision giv[es] [EPA] free-form discretion to set [requirements] based on its own policy assessment ...."). In some circumstances, that delegation of authority not only must be apparent in the law, it must be stated with "unmistakably clear ... language." *Am. Bar Ass'n*, 430 F.3d at 471-72.

EPA's requirement that States adopt standards of performance based on what EPA calls "generation shifting" is foreclosed by section 111's unambiguous language and structure. *See infra* Section I.B. Under section 111(d), EPA's role is to establish a "procedure" for States to submit plans "establish[ing] standards of performance *for any existing source*." CAA § 111(d)(1) (emphasis added). State plans in turn must "apply[] a standard of performance to any *particular source*." *Id.* (emphasis added). The CAA defines a "stationary source" as "any building, structure, facility, or installation which emits or may emit any air pollutant." *Id.* § 111(a)(3). Thus, section 111(d) permits EPA to call upon States to establish performance standards only for the building, structure, facility, or installation whose emissions are being controlled. *See also Nat'l-Southwire Aluminum Co. v. EPA*, 838 F.2d 835, 837 n.3 (6th Cir. 1988)

29

(section 111 performance standards "specif[y] the maximum rate at which an *individual source* may emit pollution") (emphasis added). Requiring an owner or operator of a fossil fuel-fired source to construct, or to subsidize generation at, other facilities, as the Rule does, is not a standard "for" that source at all.

The Rule violates section 111 in another fundamental respect: it mandates that regulated sources *cease producing* electricity, rather than addressing *how* they produce electricity with fewer emissions. "Performance" is "[t]he accomplishment, execution, carrying out, … [or] doing of any action or work." 11 OXFORD ENGLISH DICTIONARY 544 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. 1989). A "standard of performance" is thus a principle to judge the execution of work by the source, not an order to stop working. Furthermore, a "standard of performance" must reflect reductions from an "emission limitation," which in turn must "limit[] the quantity, rate, or concentration of emissions of air pollutants *on a continuous* basis." CAA § 302(k) (emphasis added); *see also id.* § 111(a)(1). As Congress made clear, the terms "standard of performance" and "emission limitation" are defined to *preclude* performance rates based on "intermittent controls," such as cutting or shifting production to other facilities. *Id.* §§ 111(a)(1), 302(k); H.R. Rep. No. 95-294, at 92 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1077, 1170, JA4110; *see id.* at 81, 86-87, *reprinted in* 1977 U.S.C.C.A.N. 1159-60, 1164-65, JA4102-03, JA4106-07. Yet EPA's Rule requires exactly that. Most emission reductions that occur result from shifting production to new renewable facilities that do not emit a

30

regulated pollutant and are not regulated under section 111(d). EPA's Rule is the antithesis of a "standard of performance" for a source.

But as explained immediately below, there is an even simpler reason why the Rule should be vacated. EPA must show that Congress *clearly authorized* the agency to restructure power markets under section 111(d), and nowhere has EPA even attempted to shoulder that burden. *See infra* Section I.A. The Rule's attempt to reorder the power grid is precisely the sort of significant and transformative assertion of authority that, under the Supreme Court's decisions, requires "clear congressional authorization." *UARG*, 134 S. Ct. at 2444. A clear statement of congressional intent is also necessary under cases like *Bond* and *Gregory v. Ashcroft*, 501 U.S. 452 (1991), because the Rule intrudes on the States' authority over the intrastate generation of energy. Section 111 cannot be read to "clearly" confer such authority on EPA. In fact, EPA has never attempted to argue as much and effectively conceded the point in stay briefing before the Supreme Court. Mem. for the Fed. Resp'ts in Opp'n at 41, *West Virginia v. EPA*, No. 15A773 (and related cases) (U.S. Feb. 4, 2016) ("EPA Opp'n in 15A773") (section 111 "does not expressly address such measures"), JA6214.

## A.     Congress Did Not Authorize EPA To Restructure the Power Sector.

Under controlling Supreme Court precedent, the Rule's attempt to radically transform the electric sector and assert EPA authority over traditional State functions

requires a clear statement from Congress. Because there is no such clear statement, the Rule must fail.

### 1. The Rule Asserts Novel and Vast Authority Over the States' Energy Grids Without Clear Congressional Authorization.

The Supreme Court's recent cases have made clear that an agency cannot exercise transformative power over matters of economic and political significance unless it has clear congressional authorization. Two years ago, in *UARG*, EPA attempted to expand two CAA programs to cover stationary sources based solely on their greenhouse gas emissions. 134 S. Ct. at 2437-38. The Supreme Court rejected that effort, explaining that when an agency seeks to make "decisions of vast 'economic and political significance'" or "bring about an enormous and transformative expansion" in its authority under a "long-extant statute," it must point to a "clear[]" statement from Congress. *Id.* at 2444 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)). Last term, the Court built on *UARG*, holding in *King v. Burwell* that courts are not to presume that Congress would implicitly delegate to agencies "question[s] of deep 'economic and political significance'" because, if "Congress wished to assign [such] question[s] to an agency, it surely would have done so expressly." *King*, 135 S. Ct. at 2489 (citation omitted).

There is no question that the Rule, which garnered 4.3 million comments,[20] is of great economic and political significance. As explained above, the Administration has admitted that the Rule is an attempt to "aggressive[ly] transform[]… the domestic energy industry." *See supra* n.2. EPA claims authority to mandate that States reorder their mixes of electricity generation, to force the closure of coal-fired plants that generate some of America's most affordable and reliable electricity, to govern how much electricity each source may produce, to require the owners of regulated sources to subsidize and invest in their non-regulated competitors, and to develop a carbon dioxide emissions trading system of the sort Congress has rejected. Under EPA's logic, the agency could eventually require emission reductions premised on a complete shift of electric generation away from fossil fuel-fired power plants to other resources preferred by EPA. In short, EPA claims the authority to become a central planning authority for the power sector, with unilateral authority to end the use in this country of certain kinds of energy generation. *See Brown & Williamson*, 529 U.S. at 160 (stating that clear statement rule applies to "whether an industry will be entirely, or even substantially," subjected to a new regulatory regime) (internal quotation marks omitted).

Nor would EPA be confined to the power sector. If the Rule is upheld, EPA could use section 111(d) to force the States to undertake a restructuring of almost any

---

[20] Gina McCarthy, *In 2016, We're Hitting the Ground Running*, THE EPA BLOG (Jan. 4, 2016), https://blog.epa.gov/blog/tag/clean-power-plan/.

industry by claiming that shifting production to other plants (including plants not yet built) will reduce emissions. While EPA claims the power sector is uniquely suitable for such measures due to the interconnected electric grid, 80 Fed. Reg. at 64,677, JA158, many industries likewise involve both sales of interchangeable products or services and the potential to achieve lower emissions if production were shifted to "cleaner" plants. For instance, EPA could require States to reduce pollutant emissions from municipal landfills (the last source category regulated under section 111(d)) by switching to recycling plants.

EPA's assertion of authority is also an "enormous and transformative expansion" of the agency's power. *UARG*, 134 S. Ct. at 2444. Section 111 was enacted more than 45 years ago and assumed its current form in 1990. The focus of that provision has always been regulation of new sources. Until the Rule, EPA used section 111(d) to require state regulation of just "four pollutants from five source categories," 80 Fed. Reg. at 64,703, JA184, with only one of these rulemakings in the last three decades, *see* 61 Fed. Reg. 9905 (Mar. 12, 1996); *see also supra* p. 8. Not once in the history of section 111 has EPA asserted the authority to mandate emission reductions premised on the notion that EPA may force a source to subsidize "cleaner" alternatives that would increase production at the source's expense. Rather, EPA has consistently promulgated emission limitations achievable only by improved performance of *the individual facilities* in a regulated source category. But under the Rule, section 111(d) now overshadows every other provision of the CAA, for no

34

other environmental regulation has purported to give EPA such enormous power over the American economy.

The clear-statement requirement is fatal to the Rule. EPA has made no attempt to show clear congressional authorization for the market restructuring required by the Rule, relying instead exclusively on a *Chevron* deference argument to defend its interpretation of section 111. 80 Fed. Reg. at 64,719 n.301, 64,783-85, JA200, JA264-66. The Court can vacate the Rule on this basis alone.

In any event, there is no plausible claim that Congress in section 111(d) authorized EPA—clearly or otherwise—to set emission performance rates on the basis that the owners of fossil fuel-fired sources could subsidize lower-emitting generation that would displace their own generation. If it did, Congress would have had no reason to debate heatedly and then reject legislation enacting a $CO_2$ "cap-and-trade" program similar to the program the Rule authorizes and encourages. *See supra* pp. 10-11 & n.5; *see also Brown & Williamson*, 529 U.S. at 144. Indeed, EPA has acknowledged in recent filings before the Supreme Court that section 111(d) "does not expressly address" its concept of "generation shifting." EPA Opp'n in 15A773, at 41, JA6214.

The clear statement rule applies with particular force here, where EPA has "no expertise" in the subject matter. *King*, 135 S. Ct. at 2489. As EPA has acknowledged, "[t]he issues related [to] management of energy markets and competition between various forms of electric generation are far afield from EPA's responsibilities for

setting standards under the CAA."[21] This Court has agreed: "[G]rid reliability is not a subject of the Clean Air Act and is not the province of EPA." *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 18 (D.C. Cir. 2015). For this reason, it is "especially unlikely" that Congress implicitly delegated to EPA the myriad technical and policy judgments needed to reconfigure the entire grid to lower overall emissions while maintaining reliable and low-cost operation. Absent a clear statement, Congress should not be presumed to have entrusted to EPA any more than the authority over pollution control equipment and processes as to which EPA is presumed to have expertise.

### 2. EPA Seeks To Invade a Traditional State Regulatory Domain Without a Clear Statement From Congress.

Clear congressional authorization is further required here because the Rule raises serious federalism concerns. It is a "well-established principle that it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Bond*, 134 S. Ct. at 2089 (internal quotation marks omitted). "This principle applies when Congress 'intends to pre-empt the historic powers of the States' or when it legislates in 'traditionally sensitive areas' that 'affec[t] the federal balance.'" *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 543 (2002); *see also Gregory*, 501 U.S. at 460-61.

---

[21] Response to Comments on Amendments to Standards for Stationary Internal Combustion Engines, at 50 (Jan. 14, 2013), EPA-HQ-OAR-2008-0708-1491, JA4897.

As this Court has said, "[f]ederal law may not be interpreted to reach" areas traditionally subject to State regulation "unless the language of the federal law compels the intrusion" with "unmistakably clear … language." *Am. Bar Ass'n*, 430 F.3d at 471-72 (internal quotation marks omitted). This "plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Id.* at 472 (citation omitted). Where "[t]he states have regulated [a sector] throughout the history of the country … it is not reasonable for an agency to decide that Congress has chosen" to entrust regulation of that sector to a federal agency. *Id.*

"[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States," *Ark. Elec. Coop. Corp.*, 461 U.S. at 377, which the Supreme Court has specifically recognized should not be "superseded" "unless that was the clear and manifest purpose of Congress." *PG&E*, 461 U.S. at 206 (internal quotation marks omitted). Particularly relevant here, the "[n]eed for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States"—indeed, the "franchise to operate a public utility … is a special privilege which … may be granted or withheld at the pleasure of the State." *Id.* at 205 (internal quotation marks omitted); *see also Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009). Certain States' constitutions vest these powers in independent commissions whose

members are elected,[22] while other States have exercised sovereign power to deregulate the electric sector.[23]

Far from granting EPA authority over power generation with "'unmistakably clear … language,'" *Am. Bar Ass'n*, 430 F.3d at 471-72, Congress has clearly *confirmed* the States' plenary authority in this area and granted to a different agency—FERC— the limited federal jurisdiction in this sphere. In the Federal Power Act, 16 U.S.C. §§ 791a, *et seq.*, Congress drew "a bright line easily ascertained, between state and federal jurisdiction," *Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 215 (1964). Under the Federal Power Act, "the States retain their traditional responsibility in the field of regulating electrical utilities for determining questions of need, reliability, cost, and other related state concerns." *PG&E*, 461 U.S. at 205. Congress cabined the power of FERC "to those matters which are not subject to regulation by the States," 16 U.S.C. § 824(a), and disclaimed federal authority "over facilities used for the generation of electric energy," *id.* § 824(b)(1); *see also id.* § 824*o*(i)(2) ("This section

----

[22] For example, the Louisiana Constitution grants its Public Service Commission "broad and independent power and authority to regulate … public utilities." *La. Power & Light Co. v. La. Pub. Serv. Comm'n*, 609 So. 2d 797, 800 (La. 1992). The Arizona Constitution provides its Corporation Commission with "'full power' to regulate, set rates, and make reasonable rules for public service companies." *Ariz. Corp. Comm'n v. State ex rel. Woods*, 830 P.2d 807, 811 (Ariz. 1992). Commissioners in both States are elected. LA. CONST. art. IV, § 21(A)(1); ARIZ. CONST. art. XV, § 1. *See also* GA. CONST. art. IV, § 1 (providing for elected Public Service Commission in Georgia).

[23] *See* Opening Br. of Pet'rs on Procedural and Record-Based Issues at Section V.E (Feb. 19, 2016) (noting New Jersey's deregulation of energy markets).

does not authorize … [FERC] to order the construction of additional generation or transmission capacity ….”). Even FERC lacks power to interfere with “state authority in such traditional areas as the … administration of integrated resource planning and … utility generation and resource portfolios.” *New York v. FERC*, 535 U.S. 1, 24 (2002). Indeed, the United States recently acknowledged to the Supreme Court that “promot[ion of] new generation facilities” is “an area expressly reserved to state authority.” Pet. for Writ of Cert. at 26, *FERC v. Elec. Power Supply Ass’n*, No. 14-840 (U.S. Jan. 15, 2015).

Nevertheless, EPA seeks to usurp these important traditional State police powers. Until now, the States have determined for themselves the extent to which they should (or should not) mandate particular levels of renewable generation, balancing such generation’s benefits against other considerations, including the risks that energy dependent on weather events (such as wind speed, cloudiness, and snow cover) often pose to the grid’s reliability.[24] But as explained *supra*, pp. 12-22, to achieve the Rule’s emission reduction demands, States will be forced to shift vast amounts of generation from fossil fuel-fired plants to new renewable resources. The Rule thus mandates changes to the power generation mix in individual States,

---

[24] U.S. Energy Information Administration, Today In Energy, Most states have Renewable Portfolio Standards (Feb. 3, 2012), https://www.eia.gov/todayinenergy/detail.cfm?id=4850 (while Congress has rejected federal renewable portfolio standards, “30 States and the District of Columbia had enforceable [renewable portfolio standards] or other mandated renewable capacity policies,” and seven had adopted voluntary renewable energy goals).

supplanting the States' traditional authority in this area. Indeed, the very reason EPA issued the Rule is that to date States have not sought to "decarboniz[e]" their economies to the extent favored by EPA. The Rule thus amounts to a takeover of power generation decisions in the States, despite longstanding exclusive State jurisdiction—reaffirmed by Congress—over this field.

Moreover, to meet EPA's emission reduction demands, States will be forced to undertake many legislative and regulatory actions they would not have otherwise chosen. States will have to enact legislation and regulations restructuring their power systems, decommissioning coal-fired plants, and granting regulatory and siting approval to new renewable energy projects. Okla.'s Mot. for Stay at 18-19, No. 15-1364 (Oct. 28, 2015), ECF 1580577; State Pet'rs' Mot. for Stay at 15-18, No. 15-1363 (Oct. 23, 2015), ECF 1579999 ("State Pet'rs' Mot. for Stay"). In many States, regulatory proceedings will be needed to determine how the costs of prematurely-retired plants must be recovered from ratepayers. State Pet'rs' Mot. for Stay at 20; States' Joint Reply at 14-15, No. 15-1363 (and consolidated cases), ECF 1590286 (Dec. 23, 2015). States may have to incentivize development of renewable resources previously found cost-prohibitive, State Pet'rs' Mot. for Stay at 15-16, while ensuring that the Rule's change in power generation does not adversely impact the grid's reliability, *id.* at 16. Even if the Rule's demand that States take these actions were constitutional (which, as explained below, it is not), EPA may not make these

"decision[s] of the most fundamental sort" for the States without clear authorization from Congress. *Gregory*, 501 U.S. at 460.

**B.    Section 111 Unambiguously Forecloses EPA's Requirements Based on "Generation Shifting."**

The text and structure of section 111 unambiguously bar the "generation shifting" the Rule imposes.

**1.    Section 111 Does Not Authorize EPA To Mandate Emission Reductions That Cannot Be Implemented at Individual Regulated "Stationary Sources."**

The unambiguous requirement that standards of performance must be set "*for*" and be "*applicable … to*" individual *sources* within a regulated source category forecloses EPA's claim to authority to reorder grid operations. CAA §§ 111(d)(1), 111(a)(2) (emphases added). What EPA calls "generation shifting" does not entail setting standards that are "for" or "applicable" to regulated sources. Rather, it involves something else entirely—replacing or reducing the operation of the source category with that of entirely different kinds of facilities, selected by EPA based on $CO_2$ emissions. *See supra* pp. 12-19. That is plainly beyond what the statutory text permits.

Confronted with this plain text, EPA claimed it faced a "dilemma." 80 Fed. Reg. at 64,769, JA250. EPA conceded that the phrase "best system of emission reduction" may only include "measures that can be implemented—'*appl[ied]*'—*by the sources themselves.*" *Id.* at 64,720 (emphasis added), JA201. And while EPA sought large reductions in $CO_2$, it also recognized that emission control measures that can be

41

applied at coal- and natural gas-fired units either are not commercially or technologically feasible (in the case of carbon capture and sequestration systems) or will not achieve the desired emission reductions (in the case of efficiency improvements). *See supra* pp. 12-13; 80 Fed. Reg. at 64,751, 64,787-90, JA232, JA268-71.

To resolve this purported "dilemma," EPA redefined "source" to "*include[] the 'owner or operator'* of any building … for which a standard of performance is applicable." *Id.* at 64,762 (emphasis added), JA243. On this basis, EPA set stringent standards that cannot be met by *any* individual coal or gas-fired generating unit, even if it installs the type of state-of-the-art equipment EPA has required for brand new units. *See supra* pp. 14-16. Instead, to comply with the standard, the owner or operator must invest in lower- or zero-emitting generation, either directly or by purchasing emission allowances or credits, 80 Fed. Reg. at 64,720, 64,725-26, 64,728, 64,731, JA201, JA206-07, JA209, JA212; *see also supra* pp. 18-20, and shift generation to this new lower- or zero-emitting generation, 80 Fed. Reg. at 64,911, JA392; *see also id.* at 64,745-47 ("generation shifts"), JA226-28.

This reading of section 111(d) to permit standards based on "generation shifting" is unambiguously foreclosed by the language of the statute, established case law, and nearly a half century of consistent administrative practice.

a.     **Section 111(d) provides that standards apply to the "source," not to owners and operators.**

Section 111 could not be clearer: performance standards apply to sources, not owners and operators of sources that might take actions beyond the source itself. Under section 111(d), a State-established performance standard may be set for an existing source that would be regulated under section 111(b) "if such existing *source* were a new *source*." CAA § 111(d)(1) (emphases added). State plans must "apply[] a standard of performance to any *particular source*." *Id.* (emphasis added). And EPA's role is to establish a "procedure" for States to submit plans "establish[ing] standards of performance *for any existing source.*" *Id.* (emphasis added).

The statute also expressly contemplates adjustments to a standard of performance as it applies to individual sources in varying conditions. States must be permitted to take into consideration "the remaining useful life of the existing *source*" when "applying a standard of performance" to "any particular *source*." *Id.* (emphases added). If EPA promulgates a federal plan in lieu of an unsatisfactory state plan, EPA "shall take into consideration … [the] remaining useful lives of the *sources* in the category of *sources* to which [the] standard applies." *Id.* § 111(d)(2) (emphases added).

Finally, EPA cannot regulate existing sources under section 111(d) unless the agency first regulates under section 111(b), and Congress likewise made individual "sources" the focus of new source regulation under that section. To commence section 111(b) regulation, Congress requires EPA first to list categories of "stationary

*sources*" to be regulated. *Id.* § 111(b)(1)(A) (emphasis added). EPA then sets federal standards for new "*sources* within such [listed] category." *Id.* § 111(b)(1)(B) (emphasis added); *see also id.* § 111(a)(2) (defining the term "new source" and discussing standards of performance "which will be applicable to such source").

For all of these section 111 provisions, "source" is defined as an individual physical "building, structure, facility, or installation." *Id.* § 111(a)(3). It is not defined to include the "owner or operator" of the "building, structure, facility, or installation."

Indeed, section 111 makes this distinction explicit. Congress differentiated the term "owner or operator" from the term "source" by giving the former a distinct definition: "any person who owns, leases, operates, controls, or supervises a stationary source." *Id.* § 111(a)(5). If Congress had intended to include a facility's owner or operator *within* the term "source," it would not have separately defined those terms. Section 111 further states that it is unlawful "for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source." *Id.* § 111(e).

In sum, Congress adopted distinct definitions of "source" and "owner or operator" as well as a specific provision to hold an "owner or operator" of a new source liable precisely because, contrary to the Rule's central assumption, the owner or operator of a source is legally distinct from the "source" itself. *See Transbrasil S.A. Linhas Aereas v. Dep't of Transp.*, 791 F.2d 202, 205 (D.C. Cir. 1986) ("[W]here different terms are used in a single piece of legislation, the court must presume that Congress

44

intended the terms to have different meanings.") (internal quotation marks and citation omitted).

Given the lack of textual support for its position, EPA falls back on what it calls the "commonsense" proposition that, because sources are inanimate objects, it is the owner or operator of the source that must take action to comply with any standards, so the Rule is not unusual by requiring action from owners or operators. 80 Fed. Reg. at 64,767, JA248. But EPA overlooks that a standard of performance must be "for" a particular "source." CAA § 111(d)(1). It is one thing to recognize that the owner or operator must take steps at its source—e.g., installing new equipment or ordering more efficient operations—to implement a standard of performance that was set "for" the source. It is quite another to say that EPA may require a standard that forces owners or operators to construct, or subsidize generation at, other facilities. A rule that requires construction of or generation at a second facility is not a standard "for" the first source at all, even if the first source's owner or operator can somehow bring about the generation at the second facility. Indeed, section 111(e) makes clear that the "owner or operator of any … source" may only be held liable for "violation of any standard of performance applicable to *such source*" (emphasis added), not for violating standards that apply to any other facilities (including non-sources) the owner or operator may control or invest in.

45

###### b.    This Court's precedents foreclose EPA's reading of section 111(d).

This Court's decision in *ASARCO* also squarely forecloses EPA's reading of section 111(d). As interpreted by EPA, the Rule's performance rates force the owner or operator of a source to invest in lower-emitting generation—whether by building a plant, investing in someone else's plant, or buying credits from another plant. This is because the only way a source can comply with the performance rate is to average its actual emissions rate with the rate of the lower-emitting plant. 40 C.F.R. § 60.5790(c)(1) (providing formula "to calculate an adjusted $CO_2$ emission rate to demonstrate compliance"). Thus, the Rule's "generation shifting" mandate demands that two or more facilities *together* achieve the required rate—effectively treating distant and unrelated facilities, some of which may not even be regulated sources at all, as a single "stationary source" for purposes of setting EPA's emission performance rates.

*ASARCO*, however, holds that EPA may not "embellish[]" the statutory definition of "stationary source" by "rewrit[ing] the definition of a stationary source." 578 F.2d at 324, 326 n.24. According to the Court, the statute "limit[s] the definition of 'stationary source' to one 'facility'" and not a "'combination of' facilities." *Id.* at 324. As a result, EPA cannot "change the basic unit to which the [standards] apply from a *single* building, structure, facility, or installation—the unit prescribed in the statute—to a *combination* of such units." *Id.* at 327 (emphasis in original). Certainly, EPA cannot treat as a single source separate generating units that may be hundreds of

miles apart, may be owned by different parties, and may not even be section 111

sources at all.

Indeed, EPA concedes that the Rule goes beyond setting reduction

requirements on a source-by-source basis; the agency states that it is setting reduction

requirements at the level of the entire *source category*. According to EPA, the Rule

"focus[es] on the … overall source category," 80 Fed. Reg. at 64,725-26, JA206-07; its

best system of emission reduction is "for the source category as a whole," *id.* at

64,727, JA208; *see also id.* at 64,723, JA204; and its "emission limits [are] for the source

category as a whole," *id.* at 64,732, JA213. The Rule is thus indifferent to how

much—and even whether—any particular source reduces its emissions; in EPA's

words, "it is the total amount of emissions from the source category that matters, not

the specific emissions from any one" source. *Id.* at 64,734, JA215.

EPA, however, lacks authority to address "standards of performance" at the

level of an entire source category. Section 111 plainly provides for EPA to "list"

source categories and then, where section 111(d) applies, to call on States to set

"standards of performance *for any existing source*" within that category. Had Congress

wished to base section 111(d) reduction requirements on systems of emission

reduction for an entire source category, rather than "for" any sources within the listed

category, it would have said so. *See, e.g.*, *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485

(1996). In fact, the Rule strays even further afield from what Congress specified in

section 111: by basing its emission performance rates on shifting generation from

47

existing fossil-fuel fired sources to renewable facilities, EPA goes well-beyond even the "source category," which does not include the renewable generation EPA prefers.

### c.    The Rule's reading of section 111(d) is contrary to EPA's regulations and consistent agency practice.

The Rule departs from 45 years of consistent agency practice, further confirming that EPA's current interpretation of its section 111(d) authority does not follow that provision's "plain meaning." 80 Fed. Reg. at 64,761, JA242. Each of the approximately one hundred new source performance standards that EPA has set in more than 60 source categories has been based on a system of emission reduction that can be achieved with technological or operational measures that the regulated source itself can implement. *See generally* 40 C.F.R. pt. 60, subpts. Cb-OOOO. In promulgating standards of performance for refineries, EPA reiterated its long-standing view that "[t]he standard that the EPA develops [is] based on the [best system of emission reduction] *achievable at that source.*" 79 Fed. Reg. 36,880, 36,885 (June 30, 2014) (emphasis added).

EPA took the same settled approach in promulgating its $CO_2$ standards of performance for *new* coal and gas plants under section 111(b). EPA based the standards on its examination of the level of emissions performance these plants could achieve by using control technologies and operating practices at the plants themselves, not on the level that could be achieved on some combined basis if their owners also

48

built or paid for new lower- or zero-emitting resources. 80 Fed. Reg. at 64,512-13, Tbl. 1.

The same focus on setting standards for the source, rather than the source's owner or operator, is central to EPA's 40-year-old Subpart B regulations establishing the section 111(d) "procedure." 40 C.F.R. pt. 60, subpt. B (promulgated by 40 Fed. Reg. 53,340 (Nov. 17, 1975), JA4086). In those regulations, EPA determined that section 111(d) "emissions guideline[s]" must "reflect[] … the application of the best system of emission reduction … [that] has been adequately demonstrated *for designated facilities*," 40 C.F.R. § 60.21(e) (emphasis added), defined as the facility within the regulated source category for which the standard is developed, *id.* § 60.21(b).[25] And, thus, every other section 111(d) guideline EPA has promulgated has defined the "designated facility"[26] and is based on emission reduction systems that the "designated facility" can implement.[27] As EPA stated in one of its earliest guidelines,

---

[25] *See also* 40 C.F.R. § 60.22(b)(3) (guideline document to include "[i]nformation on the … costs and environmental effects of *applying each system to designated facilities*") (emphasis added); *id.* § 60.24(b)(3) ("[e]missions standards *shall apply to all designated facilities* within the State") (emphasis added).

[26] *See, e.g.*, 40 C.F.R. § 60.32c(a) (setting forth "each [municipal solid waste] landfill" constructed before May 30, 1991, as the "designated facility to which the guidelines apply"); 44 Fed. Reg. 29,828, 29,829 (May 22, 1979) ("[T]he guideline document for kraft pulp mills is written in terms of standards of performance for each designated facility.").

[27] 61 Fed. Reg. at 9914 (landfill guideline based on "[p]roperly operated gas collection and control systems achieving 98 percent emission reduction"); 45 Fed. Reg. 26,294, 26,294 (Apr. 17, 1980) (aluminum plant guideline based on "effective collection of emissions, followed by efficient fluoride removal by dry scrubbers or by

49

"[t]he emission guidelines will reflect the degrees of emission reduction attainable with the best adequately demonstrated systems of emission reduction, considering costs[,] *as applied to existing facilities.*"[28]

### 2. Setting Rates Based on "Generation Shifting" Is Inconsistent With the Definition of "Standard of Performance."

The Rule's attempt to rearrange the grid also transgresses EPA's authority under section 111(d) by contravening the term "standard of performance," which calls for standards based on controls or operating practices that provide emission reductions from regulated sources "on a continuous basis"—and which reflect the inherent capabilities of those controls or operating practices—not "intermittent controls" such as temporarily reducing operations or shifting production to other facilities. Thus, even if a standard of performance were not unambiguously required to be applicable to an individual source, the Rule still would be unlawful.

---

wet scrubbers"); 44 Fed. Reg. at 29,829 (pulp mill guideline based on digester systems, multiple-effect evaporator systems, and straight kraft recovery furnace systems); 41 Fed. Reg. 48,706, 48,706 (Nov. 4, 1976) (proposed guideline for sulfuric acid production units based on "fiber mist eliminators"); 41 Fed. Reg. 19,585, 19,585 (May 12, 1976) (draft guideline for fertilizer plants based on "spray cross-flow packed scrubbers").

[28] EPA, Primary Aluminum: Guidelines for Control of Fluoride Emissions From Existing Primary Aluminum Plants, at 1-2 (Dec. 1979), http://nepis.epa.gov/Exe/ZyPDF.cgi? Dockey=2000M9HS.pdf ("Primary Aluminum Guidelines") (emphasis added).

###### a.    The Rule does not comport with the statutory terms.

As a threshold matter, the Rule gives no meaning to Congress's use of the word "performance" in the phrase "standard of performance." As noted previously, "performance" means "[t]he accomplishment, execution, carrying out, … [or] working out of anything ordered or undertaken; the doing of any action or work." *See supra* p. 30. "Generation shifting" as used by EPA does not involve a source improving the emission rate at which it performs work, but instead consists of plants *reducing* or *ceasing* work, or *non*-performance. As the Supreme Court held in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001), courts must give statutory terms meaning, even where they are part of a larger statutorily defined phrase, *id.* at 172 (requiring that the word "navigable" in the Clean Water Act's statutorily defined term "navigable waters" be given "effect").

More specifically, a section 111 "standard of performance" is defined as a "standard for emissions," which reflects the "degree of emission limitation" that a source may "achiev[e]" using the "best system of emission reduction." CAA § 111(a)(1). The Rule, however, does not reflect a "degree of emission limitation" achievable by any source. *See supra* pp. 14-16. In fact, increasing generation at existing gas plants (e.g., under Building Block 2) and reducing generation at existing coal plants (e.g., under Building Blocks 2 and 3) both typically *increase* those plants' $CO_2$ emission rates, as EPA has acknowledged. 79 Fed. Reg. at 34,980, JA5260; Mitigation TSD at 2-34, JA3942.

Furthermore, the phrase "emission limitation" is defined as a "requirement …
which limits the quantity, rate, or concentration of emissions of air pollutants *on a
continuous basis*." CAA § 302(k) (emphasis added). Congress's intent is clear: the term
"continuous" was added to this definition in 1977 to signify that technological or low-
polluting processes to achieve pollutant reductions during production are "to be the
basis of the standard." H.R. Rep. No. 95-294, at 11 (1977), *reprinted in* 1977
U.S.C.C.A.N. 1077, 1088, JA4100. As Congress explained, it used this term to *preclude*
"intermittent controls" such as temporarily reducing operations or "shifting"
production to other sources. *Id.* at 92, *reprinted in* 1977 U.S.C.C.A.N. 1170, JA4110; *see
id.* at 81, 86-87, *reprinted in* 1977 U.S.C.C.A.N. 1159-60, 1164-65, JA4102-03, JA4106-
07.[29] In this way, Congress required that performance standards reflect new control
technology or operational innovations, rather than "load switching from one
powerplant … to another." *Id.* at 81, 89, 92, *reprinted in* 1977 U.S.C.C.A.N. 1159, 1167,
1170, JA4102, JA4108, JA4110. Thus, a "standard of performance" must be derived
from *better* emission performance from an individual regulated source, not *non-*
performance.

---

[29] The word "technological" was inserted in the definition of "standard of
performance" in 1977 to require certain sources to comply by installing technological
controls (e.g., scrubbers) rather than burning low-sulfur fuel without controls. *See, e.g.,
Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 918-19 (7th Cir. 1990). Congress removed
"technological" from section 111(a)(1)'s definition in 1990 to allow sources to comply
by using either technological *or* low-polluting operational processes (e.g., low-sulfur
fuel). 80 Fed. Reg. at 64,702, JA183.

The Rule's generation-shifting mandate is the antithesis of the definition of "standard of performance" and mandates the very "load switching" that Congress sought to prevent in the development of standards. The Rule's emission rates are based on regulated units collectively reducing operations and producing collective emission reductions; they do not flow from an assessment that "any particular source … [can] reduce its emissions …." 80 Fed. Reg. at 64,779, JA260. The very standards that the Rule defines contemplate that emission reductions vary for each unit in timing, amount, and duration. Units able to purchase enough emission credits to meet the rate can continue operating (and emitting) at past or even higher levels. Other units will have to reduce or cease operations altogether. *See supra* pp. 18-22. As a result, the Rule is not based on "a requirement … which limits … emissions [from any individual regulated unit] … on a continuous basis," as Congress used that term. CAA § 302(k).

As this Court explained in *ASARCO*, the purpose of the section 111 performance standard program is to "enhance air quality by forcing all … [regulated] buildings, structures, facilities, or installations *to employ pollution control systems* that will limit emissions to the level 'achievable'" by the "'best technological system of continuous emission reduction'" that is "'adequately demonstrated.'" 578 F.2d at 327 (quoting the 1977 CAA) (emphasis added). In defining "standard of performance," Congress never contemplated that such standards could be based on reductions that are impossible to achieve without shifting generation from one type of plant to

53

another, including to non-emitting facilities, when one source operates while another cuts production. *Id.* at 328. The plain language of the statute and *ASARCO* preclude an approach in which standards of performance are based on achieving emission reductions from groups of multiple sources rather than from application of demonstrated controls on individual regulated sources to achieve continuous emission reductions.

> **b.    EPA's Rule confuses "standards of performance" with other programs.**

Section 111(d) reflects a broader programmatic distinction Congress drew between control programs focused on a source's performance and air quality programs focused on the health and welfare impact of a source category's aggregate emissions. For control programs, including section 111(d), Congress required sources to incorporate available, low-emitting production processes or control technologies into their design and operations. *See, e.g.*, CAA § 111 (new source performance standards); *id.* § 112(d) (maximum achievable control technology standards); *id.* § 165(a)(4) (best achievable control technology standards); Clean Water Act § 306, 33 U.S.C. § 1316 (standards of performance for source pollutant discharge). These programs do not limit a source's ability to operate but do require that the source limit emissions during operations.

In air quality-based programs, Congress gave EPA authority to pursue a particular air quality objective by capping overall levels of emissions and by using

mechanisms such as trading that result in aggregate reductions from a category of sources. *See, e.g.*, CAA §§ 108-110 (national ambient air quality standards); *id.* §§ 401 *et seq.* (acid rain cap-and-trade program); *see also Nat'l-Southwire Aluminum Co.*, 838 F.2d at 837 n.3 ("An ambient air quality standard differs from an emission or performance standard …. An ambient air quality standard specifies a maximum pollutant concentration in the ambient air, while a performance standard specifies the maximum rate at which an individual source may emit pollution."). Under section 110, for example, state plans implementing ambient air quality standards may include, in addition to "emission limitations" for individual sources, "other control measures," "means," or "techniques," like "marketable permits" to assure attainment and maintenance of ambient air quality standards. CAA § 110(a)(2)(A).

As explained above, the Rule expressly relies upon trading to establish its emission performance rates. *See supra* pp. 17-20. As justification, the Rule points to several trading programs that were adopted as a "control measure[], means or technique[]" under section 110 to meet an air quality goal. 80 Fed. Reg. at 64,696-97, 64,734 n.381, 64,735, JA177-78, JA215, JA216. EPA's analogy overlooks Congress's decades-long distinction between those programs and programs limiting emissions from individual sources. Section 110 itself highlights that distinction: It provides for "emission limitations" (like section 111), but also (unlike section 111) "other control measures" including "marketable permits[] and auctions of emissions rights." CAA §§ 110(a)(2)(A), 111(a)(1). The Rule elides the distinction between "emission

limitations" and "other control measures" by adopting an emission limitation in which "marketable permits" and "auctions of emissions rights," *id.* § 110(a)(2)(A), are "integral," 80 Fed. Reg. at 64,734, JA215.

EPA's reliance on the statutory Title IV cap-and-trade program is similarly misplaced. *Id.* at 64,770, JA251. In Title IV, Congress created a detailed statutory cap-and-trade program after more than a decade of debate. The statute specifically spells out how emission allowances are to be allocated, CAA §§ 403(a), 404-406, restricts how they may be traded, *id.* § 403(b), and sets parameters for the allowance tracking system, *id.* § 403(d), among other features. Title IV underscores that Congress knew how to design a grid-wide cap-and-trade program, and it did not do so when it called for EPA to provide for "standards of performance" under section 111. *See Meghrig*, 516 U.S. at 485.

While EPA may wish that Congress took the same approach in section 111 as it did in authorizing "other measures, means, or techniques" in section 110, or in spelling out a cap-and-trade program under Title IV, EPA's "preference for symmetry cannot trump an asymmetrical statute." *Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015) (internal quotation marks omitted).

### 3. EPA's Attempt To Use Section 111(d) To Reengineer the Grid Is Inconsistent With Section 111 as a Whole.

The Rule also contravenes the requirement that "reasonable statutory interpretation must account for both the specific context in which … language is used

and the broader context of the statute as a whole." *UARG*, 134 S. Ct. at 2442 (internal quotation marks omitted). EPA undermines this basic principle by mandating performance rates for existing sources that are far more stringent than the standards EPA contemporaneously set for existing sources that are "modified" or "reconstructed." *See supra* pp. 11-12, 15-16. Indeed, the Rule's performance rates cannot be met even if every coal- and natural gas-fired unit were closed and replaced with brand new units using what EPA has determined to be state-of-the-art technology. *Id.*

Congress could not have intended this bizarre outcome, which stems from a fundamental flaw in statutory construction: EPA's adoption of a definition of "standard of performance" for section 111(d) that is fundamentally inconsistent with EPA's understanding of the same statutory term in section 111(b). For both sections, the term "standard of performance" is defined by a *single* sub-section—section 111(a)(1). As noted above, in EPA's parallel rulemaking to establish standards of performance for *new* units under section 111(b), EPA determined that it could not read the term "best system of emission reduction" in section 111(a)(1) to set standards of performance based on shifts in generation from new plants to other sources with lower emissions but would consider only reductions that those plants could themselves achieve. 80 Fed. Reg. at 64,627. In the Rule, however, EPA gives a radically different reading to "best system of emission reduction" on the grounds that considering only those efficiency reductions that existing sources can achieve would

not produce "enough" reductions to meet EPA's objectives. 80 Fed. Reg. at 64,729,

JA210. As a basic textual matter, EPA cannot reasonably adopt two conflicting

interpretations of the very same term. *See Brown v. Gardner*, 513 U.S. 115, 118-20

(1994); *see also Envtl. Def., Inc. v. EPA*, 509 F.3d 553, 560-61 (D.C. Cir. 2007).

That is particularly true here because EPA's contrived and inconsistent reading

of the phrase "best system of emission reduction" stands section 111 on its head:

EPA has unlawfully required States to establish performance standards that are more

stringent for *existing* coal and gas plants (which must retrofit controls) than the

standards EPA itself established for *new* coal and gas plants (which can incorporate

controls into their design). It makes no sense that the "best system of emission

reduction," after consideration of cost and other relevant factors, would lead to a

scheme in which existing plants face more stringent regulation than new plants. "[A]n

agency interpretation that is inconsisten[t] with the design and structure of the statute

as a whole" must be struck down. *UARG*, 134 S. Ct. at 2442 (alteration in original).

EPA recognized as much when it first published its section 111(d)

implementing regulations in 1975, explaining that "the degree of control [for existing

sources] … will ordinarily be less stringent than … required by standards of

performance for new sources" based on the fact that "controls cannot be included in

the design of an existing facility and … physical limitations may make installation of

particular control systems [at an existing facility] impossible or unreasonably

expensive in some cases." 40 Fed. Reg. at 53,341, 53,344, JA4087, JA4090; *see also*

Robert J. Martineau, Jr. & Michael K. Stagg, *New Source Performance Standards*, in THE CLEAN AIR ACT HANDBOOK 321 (Julie R. Domike & Alec C. Zacaroli eds., 3d ed. 2011) (Section 111 "reflects the basic notion that it is cheaper and easier to design emissions control equipment into production equipment at the time of initial construction than it is to engage in costly retrofits."), JA4663. Precisely because new plants can be designed to accommodate new controls while existing plants cannot, EPA determined that carbon capture and storage technology is not the best system of emission reduction for existing coal plants, 80 Fed. Reg. at 64,751, JA232, while at the same time determining that this technology is the best system for new plants, *see* 80 Fed. Reg. at 64,558. Reflecting the structure and purpose of section 111, EPA has never before adopted new source standards that were *less* stringent than the standards its existing source guidelines required States to adopt.[30]

---

[30] *See* 61 Fed. Reg. at 9907 (same standards for new and existing landfills); 45 Fed. Reg. at 26,294 & Primary Aluminum Guidelines at 8-1 (recommended range of control technologies for existing primary aluminum plants and a maximum emissions rate of fluoride for new plants); 44 Fed. Reg. at 29,828 & EPA, Kraft Pulping: Control of TRS Emissions from Existing Mills, at 1-6 (Mar. 1979), http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000ZF3I.TXT ("the application of the best adequately demonstrated technology for new sources could result in excessive control costs at existing sources"); 42 Fed. Reg. 55,796 (Oct. 18, 1977) (emission guideline for existing sulfuric acid production units established in 1977 less stringent than the standard for new sources issued in 1971, 36 Fed. Reg. 24,876, 24,881 (Dec. 23, 1971)); EPA, Final Guideline Document: Control of Fluoride Emissions from Existing Phosphate Fertilizer Plants at 8-1 to 8-12 (Mar. 1977), http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000UNFK.TXT.

Finally, having effectively upended the section 111 regulatory paradigm, EPA then had to deploy *ad hoc* fixes to address the consequences of doing so. 80 Fed. Reg. at 64,821, JA302. Under the new source and existing source rules, overall emissions in a State could *increase* if the State encouraged construction of new sources to replace older, existing sources, because new sources—even though new coal units are required to use carbon capture and sequestration technology—are subject to less stringent standards than existing sources. *Id.* EPA thus ordered States to take steps to *prevent* shifting generation from older plants to newer plants with more efficient technologies, *id.* at 64,822-23, JA303-04, even though that appears to be exactly what Congress intended.

This "fix" again underscores that the Rule has enacted a regulatory program the *opposite* of what Congress conceived. Whereas Congress sought to ensure that emission reductions would be realized as existing sources were retired and replaced with well-controlled new sources, EPA has told States they must impose measures that will prevent this from happening. *Id.*

EPA's inconsistent interpretation of the term "best system of emission reduction" contradicts EPA's own understanding of Congress's intent. When EPA first adopted regulations interpreting and implementing that provision in 1975, it concluded that, because of the interrelationship of sections 111(b) and 111(d), "the general principle (application of best adequately demonstrated control technology, considering costs) will be the same in both cases." 40 Fed. Reg. at 53,341, JA4087. As

EPA explained, Congress's decision to make the existing source performance standard program part of section 111, and not a stand-alone provision, "reflected a decision in conference that a similar approach [to that applied to new sources] (making allowances for the costs of controlling existing sources) was appropriate for the pollutants to be controlled under section 111(d)." *Id.* at 53,342, JA4088. EPA emphasized that both provisions require a "technology-based approach" and that EPA would be able to take advantage of its analysis of the "availability and costs of control technology" for new sources in determining the best "control technology" for existing sources. *Id.* at 53,342, 53,343, JA4088, JA4089.

EPA had it right in its implementing regulations and in all of its prior section 111(d) rulemakings. Reading sections 111(b) and 111(d) as a part of a single program avoids conflicting interpretations of the very same statutory provision and the arbitrary result of standards that are more stringent for existing sources than for new sources—a result Congress could not have intended.

## II.    The Section 112 Exclusion Unambiguously Prohibits the Rule.

The Section 112 Exclusion invalidates the Rule irrespective of the Rule's contents. Under EPA's own longstanding reading of the text in the U.S. Code, the Exclusion prohibits EPA from employing section 111(d) to regulate a source category that is already regulated under section 112. And because it is undisputed that coal-fired generating units are already regulated under section 112, *see* 77 Fed. Reg. 9304

(Feb. 16, 2012), the Exclusion prohibits EPA's attempt in the Rule to invoke section 111(d) to regulate those same plants.

### A.    EPA May Not Employ Section 111(d) To Regulate a Source Category That It Has Chosen To "Regulate[] Under Section [1]12."

The Exclusion's prohibition against employing section 111 to regulate "any air pollutant" emitted from a "source category … regulated under section [1]12" has a straightforward and unambiguous meaning. "Regulated" means "[g]overned by rule, properly controlled or directed, adjusted to some standard, etc." 13 OXFORD ENGLISH DICTIONARY 524. Thus, if a source category is "governed by [a] rule" under section 112, EPA may not require States to set a standard of performance for sources in that category under section 111(d). Or, as the Supreme Court has said, "EPA may not employ [section 111(d)] if existing stationary sources of the pollutant in question are regulated under … § [1]12." *AEP*, 131 S. Ct. at 2537 n.7.

EPA has repeatedly agreed that this prohibition against regulating under section 111(d) any existing "source category … regulated under section [1]12" means what it says. In five analyses spanning three different Administrations—in 1995, 2004, 2005, 2007, and 2014—the agency consistently concluded that this text means that "a standard of performance under CAA section 111(d) cannot be established for any air

pollutant … emitted from a source category regulated under section 112," *repeatedly* describing this as the text's "literal" meaning.[31]

This "literal" reading of the Exclusion is, as EPA itself has explained, consistent with the statutory and legislative history of the CAA's 1990 Amendments. Before 1990, section 112 covered an extremely narrow category of life-threatening pollutants. *See* S. Rep. No. 91-1196, at 20 (1970), *reprinted in* 1 CLEAN AIR ACT AMENDMENTS OF 1970 at i, 20 (Comm. Print 1970), JA4084. But in 1990, Congress greatly expanded the reach of the section 112 program, significantly broadening the definition of pollutants under section 112 to include those "which present, or may present … a threat of adverse human health effects … or adverse environmental effects," and increasing the stringency of regulation on those source categories subject to the section 112 program. CAA § 112(b)(2); *see supra* pp. 8-9. As EPA has said in the past, the House of Representatives (where the current text of the Exclusion originated) responded to this fundamental expansion in section 112 by "chang[ing] the focus of [the Exclusion and] seeking to preclude regulation of those pollutants that are emitted from a particular source category that is actually regulated under section 112." 70 Fed. Reg. at 16,031, JA4545. That is, the House determined that

---

[31] 69 Fed. Reg. 4652, 4685 (Jan. 30, 2004); *see* EPA, Air Emissions from Municipal Solid Waste Landfills—Background Information for Final Standards and Guidelines at 1-6 (Dec. 1995) ("1995 EPA Analysis"), http://www3.epa.gov/ttn/atw/landfill/bidfl.pdf; 70 Fed. Reg. 15,994, 16,031 (Mar. 29, 2005), JA4545; Final Br. of Resp't EPA, *New Jersey v. EPA*, No. 05-1097, 2007 WL 2155494 (D.C. Cir. July 23, 2007) ("2007 EPA Brief"); EPA Legal Memo at 26, JA2765.

existing sources, which have significant capital investments and sunk costs, should not be burdened by both the expanded section 112 program and performance standards under section 111(d). *Id.* at 16,031-32, JA4545-46.

The House, EPA has also explained, was especially concerned about "duplicative or otherwise inefficient regulation" when it came to existing power plants, the source category at issue here. *Id.* at 15,999, JA4513. In the 1990 Amendments, the House drafted a new provision that—similar to the provision now codified at section 112(n)(1)—gave EPA authority to decline entirely to regulate power plants under section 112. *Id.* at 16,031, JA4545. The House revised the Exclusion also to work in tandem with this new provision, so that EPA had a choice between regulating existing power plants under the national standards of section 112 or under the state-by-state standards of section 111(d). *See id.* ("[W]e believe that the House sought to change the focus of section 111(d) by seeking to preclude regulation of those pollutants that are emitted from a particular source category that is actually regulated under section 112."); *id.* ("[T]he House did not want to subject Utility Units to duplicative or overlapping regulation.").

### B.   EPA's Attempts To Escape the Literal Reading of the Exclusion Are Unavailing.

In the Rule, EPA offers two arguments to avoid what it has consistently concluded is the "literal" meaning of the Section 112 Exclusion. *First*, the agency claims for the first time in 20 years that the phrase "regulated under section [1]12" is

ambiguous. *Second*, EPA exhumes an argument it advanced during its unsuccessful

Clean Air Mercury Rule rulemaking that a second "version" of the Exclusion exists in

the 1990 Statutes at Large. Neither argument withstands scrutiny.

### 1.    EPA's New Assertions of Ambiguity Lack Merit.

Despite consistency over 20 years and three Administrations, EPA now claims

to find ambiguous the phrase "source category … regulated under section [1]12." 80

Fed. Reg. at 64,713, JA194. EPA admits it could be read in the way the agency has

always read it. *Id.* at 64,714, JA195. But EPA now claims the phrase could also be read

"only [to] exclud[e] the regulation of [hazardous air pollutant] emissions under CAA

section 111(d) and only when th[e] source category [at issue] is regulated under CAA

section 112." *Id.*

EPA's belated attempt to "manufacture[] ambiguity" and rewrite the Exclusion

is impermissible. *W. Minn. Mun. Power Agency v. FERC*, 806 F.3d 588, 592 (D.C. Cir.

2015) (internal quotation marks omitted). There is no ambiguity in the phrase "source

category … regulated under section [1]12." Clearly, if a source category is subject to

section 112's stringent national hazardous air pollutant standards, that source category

is "regulated under" section 112. EPA's interpretation would read new words into the

Exclusion's plain terms, turning the straightforward prohibition against regulating

under section 111(d) any source category "regulated under section [1]12" into a

prohibition against the regulation of any "source category which is regulated under

section 112 *only where the air pollutant is included on a list published under section 112(b)(1)*."
Those extra words are not in the statute.

EPA's new reading of the statute runs afoul of precedent of this Court and the
Supreme Court. EPA is attempting to "qualif[y] or restrict[]" the phrase "regulated
under section [1]12" when "[n]othing in this language" does so. *W. Minn. Mun. Power
Agency*, 806 F.3d at 592. Moreover, EPA's effort resembles its failed attempt in the
*UARG* litigation to evade "a literal reading" of the CAA. 75 Fed. Reg. 31,514, 31,516
(June 3, 2010). In that case, the Supreme Court rebuked the agency for seeking to
"rewrite clear statutory terms to suit its own sense of how the statute should operate."
*UARG*, 134 S. Ct. at 2446.

EPA attempts to bolster its statutory rewrite with a plea to legislative history,
but this argument cuts against the agency's position. According to EPA, reading the
Exclusion as prohibiting section 111(d) regulation of pollutants not listed under
section 112(b)(1) that are emitted from a source category regulated under section 112
would create an impermissible "gap" in the CAA. Such a "gap," EPA asserts, is
contrary to the intent of those who wrote the 1970 version of the Act. 80 Fed. Reg. at
64,714 (discussing legislative history from the 1970 CAA), JA195.

As a threshold matter, *UARG* forecloses such non-textual appeals to purpose
or legislative history where a statute's literal terms are clear and unambiguous. The
Supreme Court stated unequivocally that an agency's authority "does not include a

power to revise clear statutory terms that turn out not to work in practice." 134 S. Ct. at 2446.

Moreover, EPA ignores the fundamental change in the section 112 program Congress enacted in 1990. As explained above, *supra* pp. 8-9, 63-64, the 1990 Congress expanded section 112 from a program that covered only a small universe of extremely dangerous pollutants into an expansive program that covered 189 listed pollutants. And since 1990, EPA has never identified a single pollutant that the agency believes would meet the definition of pollutant under section 111 but not section 112. *See, e.g.*, 73 Fed. Reg. 44,354, 44,493-95 (July 30, 2008) (considering regulation of carbon dioxide under section 112).[32]

In fact, since the 1990 Amendments, EPA has issued only two section 111(d) regulations, and both were consistent with the Exclusion's plain terms. In the first rule, the Clinton-era EPA expressly acknowledged the Exclusion's prohibition against regulating a source category under section 111(d) where that source category is already regulated under section 112, but explained that its section 111(d) regulation of municipal solid waste landfills was permissible because the landfills were not "actually being regulated under section 112." 1995 EPA Analysis at 1-6. The second rule was the Clean Air Mercury Rule, in which EPA sought first to delist power plants entirely

---

[32] Petitioners believe that both section 111 and section 112 are "ill suited to accommodating greenhouse gases"—for both similar and different reasons. *See UARG*, 134 S. Ct. at 2441 n.5.

under section 112 before regulating those plants under section 111(d). 70 Fed. Reg. at

15,994 (delisting), JA4508; 70 Fed. Reg. 28,606 (May 18, 2005) (imposing standards).[33]

EPA further ignores that with respect to power plants in particular, the 1990

Amendments gave EPA an explicit choice between regulating existing power plants

under the national standards of section 112 or under the state-by-state standards of

section 111(d). *See supra* p. 64. What EPA claims to be a regulatory gap is a regulatory

regime deliberately designed by Congress to avoid double regulation.

### 2. The Failed Clerical Amendment Is Entirely Irrelevant.

EPA's alternative avenue for avoiding the "literal" meaning of the Section 112

Exclusion, as it appears in the U.S. Code, is the argument that a second "version" of

the Exclusion exists in the 1990 Statutes at Large and creates ambiguity. This theory

derives from the fact that in 1990, Congress passed an erroneous "conforming

amendment" that appears in the Statutes at Large but was not included in the U.S.

Code.[34]

---

[33] In the Clean Air Mercury Rule, EPA attempted to use section 111(d) to regulate hazardous air pollutants from coal- and oil-fired electric generating units. In *New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008), this Court held that EPA violated the CAA in the manner it delisted power plants under section 112, and vacated the section 111(d) regulation of those power plants based on the Section 112 Exclusion, *id.* at 582-83.

[34] EPA's claim that the Statutes at Large contains "two versions" of the Section 112 Exclusion can be traced to 2004, when EPA mistook for the Statutes at Large an unofficial compilation of the Clean Air Act littered with errors that was included in the Committee Print of the 1990 Amendments' legislative history. *See* 1 A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990 at 46 (Comm. Print 1993), JA4248. This document renders the relevant section using brackets: "any

EPA's contention is that the non-partisan Office of the Law Revision Counsel of the U.S. House of Representatives, *see* 2 U.S.C. §§ 285a-285g, erred in compiling the U.S. Code. By law, the Code "establish[es] prima facie the laws of the United States." 1 U.S.C. § 204(a). It is controlling unless the Law Revision Counsel has made an error, such that the Code is "inconsistent" with the Statutes at Large. *Stephan v. United States*, 319 U.S. 423, 426 (1943) (per curiam). The Law Revision Counsel did not err.

The issue is the Law Revision Counsel's treatment of a "substantive amendment" and a "conforming amendment" that altered the same text in the Exclusion. As explained in Congress's official legislative drafting guides, there are "substantive amendments" and "conforming amendments," the latter of which make clerical adjustments to "table[s] of contents" and corrections to pre-existing cross-references that are "necessitated by the substantive amendments."[35] *Cf. Koons Buick*

---

air pollutant … which is not included on a list published under section 108(a) [or emitted from a source category which is regulated under section 112] [or 112(b)]." *Id.* In 2004, EPA quoted from this document in the Federal Register, identifying it as the Statutes at Large and, as a result of this error, stated incorrectly that "two amendments are reflected in parentheses in the Statutes at Large." 69 Fed. Reg. at 4685.

[35] *See* Office of the Legislative Counsel, U.S. Senate, Legislative Drafting Manual § 126(b) (Feb. 1997), https://www.law.yale.edu/system/files/documents/pdf/Faculty/SenateOfficeoftheLegislativeCounsel_LegislativeDraftingManual(1997).pdf ("Senate Manual"), JA4300; *accord* Office of the Legislative Counsel, U.S. House of Representatives, House Legislative Counsel's Manual on Drafting Style § 332(b) (Nov. 1995), http://legcounsel.house.gov/HOLC/Drafting_Legislation/Drafting_Guide.html ("House Manual"), JA4273-74.

*Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60-61 (2004) (relying on drafting manuals); *United States v. O'Brien*, 560 U.S. 218, 233-34 (2010) (same).

Consistent with these official drafting manuals, the Law Revision Counsel follows a regular practice of first executing substantive amendments, then executing subsequent conforming amendments and excluding as "could not be executed" conforming amendments rendered unnecessary by previously executed substantive amendments.[36] And that is what happened here.

The Law Revision Counsel correctly executed first a substantive amendment that Congress made to the Exclusion in 1990 (the "Substantive Amendment"). Before 1990, the Exclusion prohibited EPA from regulating under section 111(d) any air pollutant "included on a list published under … [1]08(a) … or [1]12(b)(1)(A)." 42

---

[36] *See, e.g.*, Revisor's Note, 11 U.S.C. § 101; Revisor's Note, 12 U.S.C. § 4520; Revisor's Note, 15 U.S.C. § 2064; Revisor's Note, 18 U.S.C. § 2327; Revisor's Note, 21 U.S.C. § 355; Revisor's Note, 23 U.S.C. § 104; Revisor's Note, 26 U.S.C. § 1201; Revisor's Note, 42 U.S.C. § 1395u; Revisor's Note, 42 U.S.C. § 1395ww; Revisor's Note, 42 U.S.C. § 1396b; Revisor's Note, 42 U.S.C. § 3025; Revisor's Note, 42 U.S.C. § 9875; *see also* Revisor's Note, 7 U.S.C. § 2018; Revisor's Note, 10 U.S.C. § 869; Revisor's Note, 10 U.S.C. § 1407; Revisor's Note, 10 U.S.C. § 2306a; Revisor's Note, 10 U.S.C. § 2533b; Revisor's Note, 12 U.S.C. § 1787; Revisor's Note, 14 U.S.C. ch. 17 Front Matter; Revisor's Note, 15 U.S.C. § 2081; Revisor's Note, 16 U.S.C. § 230f; Revisor's Note, 20 U.S.C. § 1226c; Revisor's Note, 20 U.S.C. § 1232; Revisor's Note, 20 U.S.C. § 4014; Revisor's Note, 22 U.S.C. § 3651; Revisor's Note, 22 U.S.C. § 3723; Revisor's Note, 26 U.S.C. § 105; Revisor's Note, 26 U.S.C. § 219; Revisor's Note, 26 U.S.C. § 4973; Revisor's Note, 29 U.S.C. § 1053; Revisor's Note, 33 U.S.C. § 2736; Revisor's Note, 37 U.S.C. § 414; Revisor's Note, 38 U.S.C. § 3015; Revisor's Note, 40 U.S.C. § 11501; Revisor's Note, 42 U.S.C. § 218; Revisor's Note, 42 U.S.C. § 290bb–25; Revisor's Note, 42 U.S.C. § 300ff–28; Revisor's Note, 42 U.S.C. § 1395x; Revisor's Note, 42 U.S.C. § 1396a; Revisor's Note, 42 U.S.C. § 1396r; Revisor's Note, 42 U.S.C. § 5776; Revisor's Note, 42 U.S.C. § 9601.

U.S.C. § 7411(d) (1989). The reference to section 112(b)(1)(A) prohibited EPA from

regulating under section 111(d) any listed hazardous air pollutants. The Substantive

Amendment instructed:

> *strik[e] "or 112(b)(1)(A)" and insert[] "or emitted from a source category which is regulated under section 112."*

Pub. L. No. 101-549, § 108(g), 104 Stat. 2399, 2467 (1990) (emphasis added), JA4188.

As EPA previously explained to this Court, this amendment substantively "change[d]

the focus of" the Exclusion from precluding the double regulation of listed hazardous

air pollutants to prohibiting the double regulation of any "source category that is

actually regulated under section 112." 2007 EPA Brief, 2007 WL 2155494. This

amendment was appropriately listed, in EPA's own words, "with a variety of

substantive provisions." *Id.* at n.35.

    The Law Revision Counsel then correctly looked to a list of "[c]onforming

[a]mendments" to the CAA. Senate Manual, § 126(d), JA4305; House Manual,

§ 332(b), JA4274. As relevant here, one of those conforming amendments addressed

the Exclusion and instructed:

> *strik[e] "112(b)(1)(A)" and insert[] in lieu thereof "112(b)."*

Pub. L. No. 101-549, § 302(a), 104 Stat. at 2574 ("Conforming Amendments")

(emphasis added), JA4234. This clerical update reflected the fact that certain other

substantive amendments expanding the section 112 regime had renumbered and

restructured section 112(b), rendering obsolete the pre-1990 cross-reference to "112(b)(1)(A)."

Having already executed the Substantive Amendment, the Law Revision Counsel properly found the Conforming Amendment to be extraneous. Because the Substantive Amendment had already deleted the reference to "112(b)(1)(A)," it was impossible to follow the instructions of the Conforming Amendment to "strik[e] '112(b)(1)(A)' and insert[] in lieu thereof '112(b).'" Following its regular practice in such circumstances, the Office of the Law Revision Counsel noted that the Conforming Amendment "could not be executed" and correctly excluded it as a clerical error. *See* Revisor's Note, 42 U.S.C. § 7411. Writing just five years after the amendments, the Clinton-era EPA agreed, explaining that the Conforming Amendment should be disregarded because it was a clearly erroneous clerical update: "a simple substitution of one subsection citation for another, [made] without consideration of other amendments of the section in which it resides." 1995 EPA Analysis at 1-5 to 1-6.

EPA contends that the Law Revision Counsel erred in not somehow giving "effect" to both amendments. 80 Fed. Reg. at 64,714 n.294, JA195. But EPA has identified, and Petitioners are aware of, no instances in which the Law Revision Counsel—or any court or even another agency—gave *any* meaning to a conforming amendment that could not be executed as a result of a previously executed substantive amendment. To the contrary, this Court has made clear that these routine errors—

72

which are common in modern, complex legislation—do not create any statutory "ambiguity." *See Am. Petroleum Inst. v. SEC*, 714 F.3d 1329, 1336-37 (D.C. Cir. 2013). Indeed, if courts were to adopt EPA's approach to interpreting un-executable conforming amendments, then every one of the numerous instances of such amendments would become previously unnoticed versions-in-exile, causing severe disruptions throughout the U.S. Code. *See supra* pp. 69-70 & n.36.

There are several other valid justifications for the Law Revision Counsel's treatment of the Conforming Amendment. To begin, it is well-established that amendments are to be executed in order and that an amendment fails to execute if a prior amendment in the same bill removes or alters the text that the subsequent amendment purports to amend.[37] Moreover, even if the amendments were executed in reverse order, the result would be the same, as the Substantive Amendment would still strike out and replace the cross-reference. And finally, the legislative history of the 1990 Amendments shows that the Conforming Amendment, which had originated in the Senate, was passed in error. Records show that the Senate Managers specifically "recede[d]" to seven substantive changes in section 108 of the House bill, expressly including the section 108(g) provision "amending section 111 of the Clean Air Act

---

[37] *See* Senate Manual § 126(d) ("If after a first amendment to a provision is made … the provision is again amended, the assumption is that the earlier (preceding) amendments have been executed."), JA4305; House Manual § 332(d) ("The assumption is that the earlier (preceding) amendments have been executed."), JA4278.

relating to … existing stationary sources." 136 CONG. REC. 36,067 (Oct. 27, 1990), JA4184.

In any event, even if this Court agrees with EPA's "second version" theory, that would not save the Rule. Assuming there are two "versions" of the Exclusion, EPA would need to give "effect" to "every word" of *both* Exclusions, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979), by prohibiting EPA from regulating under section 111(d) *both* any "source category which is regulated under Section [1]12" (the text in the U.S. Code), *and* any air pollutant listed pursuant to section 112(b)(1) (EPA's view of the Conforming Amendment). The Rule would still be unlawful because the prohibition in the U.S. Code against regulating under section 111(d) any "source category which is regulated under Section [1]12" would remain fully intact.[38]

## III.  The Rule Unlawfully Abrogates Authority Granted to the States by the Clean Air Act.

Section 111(d) grants the authority to "establish[] standards of performance" for existing sources to the States—*not EPA*. CAA § 111(d)(1). EPA is empowered under section 111(b) to adopt "regulations … establishing Federal standards of performance for new sources." In contrast, EPA's authority under section 111(d) is limited to adopting a "procedure" under which "each State shall submit to [EPA] a plan which … establishes standards of performance for any existing source," and to

---

[38] *Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191 (2014), on which EPA relies in the Rule, 80 Fed. Reg. at 64,715, JA196, thus provides no support for the agency's position. That case dealt with a situation where—unlike here—the U.S. Code contained two irreconcilable, substantive commands.

74

"prescrib[ing] a plan for a State in cases where the State fails to submit a satisfactory plan." *Id.* § 111(d)(1), (2).

EPA's 1975 regulations establishing the procedure for section 111(d) state plans, *see* 40 C.F.R. pt. 60, subpt. B, recognize this important division of authority, providing only that EPA will issue a "guideline document" containing an "emission guideline" that "reflects the application of the best system of emission reduction." 40 C.F.R. § 60.22(a), (b)(5). It is States that are to submit plans establishing standards of performance, which may be less stringent than the EPA emission guidelines if a State makes certain demonstrations, including infeasibility or unreasonable cost given a plant's age. *Id.* § 60.24(f). As EPA explained in 1975 when promulgating these procedural regulations, "to emphasize that a legally enforceable standard is *not* intended, the term 'emission limitation' has been *replaced* with the term 'emission guideline.'" 40 Fed. Reg. at 53,341, JA4087 (emphases added).[39]

But under the Rule, EPA assumes for itself the power to establish definitive uniform performance rates. Though EPA uses the term emission "guidelines," it has in fact promulgated national performance rates that set the minimum stringency for standards of performance imposed by the States. 40 C.F.R. pt. 60, subpt. UUUU, Tbl.

---

[39] EPA has approved numerous state plans containing standards of performance less stringent than EPA's guidelines. *See, e.g.*, 49 Fed. Reg. 35,771 (Sept. 12, 1984) (approving Arkansas plan for kraft pulp mill total reduced sulfur emissions); 47 Fed. Reg. 50,868 (Nov. 10, 1982) (approving Georgia plan for same); 47 Fed. Reg. 28,099 (June 29, 1982) (approving California plan for phosphate fertilizer plant fluoride emissions).

1. As EPA admits, the Rule forbids the States to impose emission standards that are less stringent than EPA has mandated through the national performance rates. 80 Fed. Reg. at 64,870 ("[C]onsideration of facility-specific factors and in particular, remaining useful life, does not justify a state making further adjustments to the performance rates … that the guidelines define for affected [units] in a state and that must be achieved by the state plan."), JA351. By establishing a minimum stringency for emission standards imposed by States and then leaving only the work of implementation for the States, EPA has unlawfully rewritten the statutory text in which Congress expressly gave only to the States the authority to "establish[] standards of performance." CAA § 111(d)(1).

For similar reasons, the Rule violates section 111(d)'s express grant of authority to States "to take into consideration, among other factors, the remaining useful life of the existing source to which [a] standard [of performance] applies." *Id.* Consistent with the primacy that section 111(d) affords the States in setting standards of performance, Congress amended the CAA in 1977 to clarify that "the State[s] would be responsible for determining the applicability of … guidelines [under section 111(d)] to any particular source or sources." H.R. Rep. No. 95-294, at 195, *reprinted in* 1997 U.S.C.C.A.N. 1274, JA4115. Part of the power thus guaranteed to the States includes authority to grant variances from an otherwise-applicable standard of performance guideline "to take into consideration, among other factors, the remaining useful life of the existing source." CAA § 111(d).

76

In amending section 111(d)(1), Congress sought to codify the availability of variances that EPA's implementing regulations already provided. *See* EPA, Legal Memorandum Accompanying Clean Power Plan for Certain Issues at 32 (undated), EPA-HQ-OAR-2013-0602-36872, JA3232. EPA previously had recognized the States' right to grant variances from emission guidelines on the basis of "economic hardship" to regulated sources and other factors, 40 Fed. Reg. at 53,343-44, JA4089-90, and had permitted States to "provide for the application of less stringent emissions standards" on a "case-by-case basis," *id.* at 53,347, JA4093; *see also* 40 C.F.R. § 60.24(d), (f). As a result, "[i]n most if not all cases … [there] is likely to be substantial variation in the degree of control required for particular sources, rather than identical standards for all sources." 40 Fed. Reg. at 53,343, JA4089. When it enacted the 1977 amendments, Congress codified this right.

Despite the statute's clear language, the Rule forbids States from relaxing the emission rate the agency set, even where applying it would force a source to shut down before the end of its useful life. Many coal plants have made substantial retrofit investments in the past decade to comply with environmental regulations.[40] Yet the emission rates EPA has established effectively prohibit some States from taking into

---

[40] For example, in the last four years, EPA has required the six largest coal-fired power plants in Kansas to invest more than $3 billion to comply with regional haze, cross-state air pollution, local ozone maintenance, and mercury and air toxics rules. *See* Comments of Kan. Dep't of Health & Env't, at 12-13 (Nov. 17, 2014), EPA-HQ-OAR-2013-0602-23255, JA1549-50; Comments of Kan. Corp. Comm'n, at 30-33 (Oct. 29, 2014), EPA-HQ-OAR-2013-0602-21276, JA490-93.

consideration the remaining useful life of those plants.[41] As a result, these retrofitted plants will have to curtail operations or close long before the financing for these investments is paid off or the benefits of the EPA-required improvements are realized. Congress amended section 111(d)(1) to prevent precisely this situation and this is yet another reason to vacate the Rule.

## IV.    The Rule Unconstitutionally Commandeers and Coerces States and Their Officials into Carrying Out Federal Energy Policy.

EPA's unprecedented decision to attempt to decarbonize the U.S. energy system through section 111 regulation leaves States no choice but to alter their laws and programs governing electricity generation and delivery to accord with and carry out federal policy. Whether implemented by federal plan or state plan, the Rule will not work unless States facilitate the Rule's changes and exercise their "responsibility to maintain a reliable electric system" in the face of the Rule's disruptions. 80 Fed. Reg. at 64,678, JA159. Where a State declines to administer the Rule and thus has a federal plan imposed on it, it still must take a myriad of actions to ensure that the reductions in coal generation that a federal plan will mandate are matched by increases

---

[41] For instance, the Rule requires Kansas to achieve a 25.7% $CO_2$ reduction by 2022 and a 44.2% reduction by 2030 under the rate-based limits, and 18.7% by 2022 and 36.0% by 2030 under the mass-based limits. *See* Goal Computation TSD, App. 5, EPA-HQ-OAR-2013-0602-36849, JA3021-26. As a result, Kansas ratepayers "must continue to pay for coal-fired generation resources (including the recent environmental upgrades) that will either be curtailed or forced to retire early." Comments of Kan. Corp. Comm'n, at 30, JA490.

in more costly forms of EPA-favored generation—leaving States to bear the brunt of citizen complaints about the increased costs and lost jobs.

As a result, the Rule runs roughshod over rights reserved to the States under the Constitution. It commandeers the States' exclusive authority to regulate the intrastate generation and transmission of electricity. And in the end, the States' "choice" whether to maintain reliable electric service for their citizens is no choice at all; it is an unconstitutional "gun to the head" given the consequences if they refuse to carry out this federal policy. *NFIB*, 132 S. Ct. at 2604 (Roberts, C.J.) (plurality opinion); *see also id.* at 2659 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). In States where electricity generation is regulated by constitutionally created bodies, like Louisiana, Georgia, and Arizona, the Rule's intrusion on state power not only violates the U.S. Constitution, but state constitutions as well.

This commandeering and coercion of States and state officials is unconstitutional and requires that the Rule be vacated. At a minimum, statutory constructions that raise constitutional concerns are to be avoided.[42] *See, e.g., Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

---

[42] Other constitutional issues that would be created by EPA's "generation shifting" interpretation of section 111(d) are developed further in the brief of Petitioner-Intervenors.

79

## A.    The Rule Unlawfully Commandeers the States and Their Officials.

At the Rule's heart is an unprecedented mismatch between what EPA requires—partial decarbonization of the U.S. economy—and what EPA has authority to do under section 111(d)—provide for the application of standards of performance to individual power plants. Whether implemented by the States or the federal government, this mismatch creates a unique situation. States will be required in both instances to facilitate the elimination or reduction of massive quantities of fossil-fuel-fired electric generation as there is no federal means of carrying out the numerous planning and regulatory activities necessary to accommodate the retirement of existing sources and the construction and integration of new capacity. In effect, EPA intends in all events for States to clean up its mess by exercising what EPA calls their "responsibility to maintain a reliable electric system" in the face of the Rule's disruptions, which amounts to unconstitutional commandeering of the States and their officials.

"Although the Constitution grants broad powers to Congress, our federalism requires that Congress treat the States in a manner consistent with their status as residuary sovereigns and joint participants in the governance of the Nation." *Alden v. Maine*, 527 U.S. 706, 748 (1999); *see also* U.S. CONST. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). Among the powers that the Constitution denies to the federal government is the power to "use the States as

implements of regulation"—in other words, to commandeer them to carry out federal law. *New York*, 505 U.S. at 161.

On that basis, the Supreme Court in *New York* struck down a provision of the Low-Level Radioactive Waste Policy Amendments Act that required States either to legislate to provide for the disposal of radioactive waste according to the statute or to take title to such waste and assume responsibility for its storage and disposal. *Id.* at 153-54. The Court explained that the federal government may "offer States the choice of regulating [an] activity according to federal standards or having state law pre-empted by federal regulation." *Id.* at 167. But merely providing States flexibility in how to carry out federal policy is unlawful because it "only underscores the critical alternative a State lacks: A State may not decline to administer the federal program." *Id.* at 176-77. *Printz v. United States*, 521 U.S. 898 (1997), reaffirmed and extended these principles to the commandeering of state officials, striking down a federal statute that directed state law enforcement officers to conduct background checks on gun buyers and perform related tasks. State officials, it held, may not be "'dragooned' … into administering federal law." *Id.* at 928 (citation omitted).

The Rule violates this anti-commandeering principle by forcing States and state officials to exercise their sovereign powers by revamping their utility sectors. Under the Rule, state actors will be the ones to account for the Rule's impact on electric reliability, 40 C.F.R. § 60.5745(a)(7), through such means as "[public utility commission] orders," 80 Fed. Reg. at 64,848, JA329, and "state measures" that make

unregulated renewable energy generators "responsible for compliance and liable for violations" if they do not fill the gap, 40 C.F.R. § 60.5780(a)(5)(iii).

Indeed, the Rule pushes substantial duties on even those States that "decline" to administer it, just like the low-level nuclear waste program struck down in *New York*. A federal plan's mandate to retire coal-fired plants or reduce their utilization (including by requiring the purchase of emissions allowances) would force state utility and electricity regulators to respond in the same way as if the State itself had ordered the retirements. Likewise, if EPA orders through a federal plan that power-plant owners construct new electric generating capacity, state officials will be forced to review siting decisions, grant permit applications, and issue certificates of public convenience for EPA's preferred generation sources and for the associated new transmission lines that EPA's transformation of the power sector will require. These state officials—which include, in States like Louisiana, Georgia, and Arizona, state constitutional officers elected to sit on public utility commissions—will be "'dragooned' … into administering federal law." *Printz*, 521 U.S. at 928 (citation omitted).

And political accountability will be frustrated because it is these state officials who "will bear the brunt of public disapproval" for increased costs and lost jobs, because they appear to retain exclusive authority under state law over electricity generation but "cannot regulate in accordance with the views of the local electorate." *New York*, 505 U.S. at 169. EPA lacks the authority to supplant the States in carrying

82

out these aspects of the Rule, so it cannot make the essential trade-off—demanding that States adhere to federal policy at the price of exemption from federal preemption—that the Supreme Court has always required for a program to be truly "cooperative." *See id.* at 176 ("A choice between two unconstitutionally coercive regulatory techniques is no choice at all."). The result is that States have no choice but to act, and state officials lose their ability to "remain accountable to the people." *Id.* at 168.

EPA's response is simply to assert that no State action is required to implement the Rule. 80 Fed. Reg. at 64,881-82, JA362-63. But even under a federal implementation plan, state agencies will have to be involved in decommissioning coal-fired plants, addressing replacement capacity, addressing transmission and integration issues, and undertaking all manner of related regulatory proceedings.[43] *See id.* at 64,678, JA159; *supra* pp. 20-21. In fact, EPA's proposed federal plan expressly relies on state authorities to address reliability issues caused by the Rule. 80 Fed. Reg. at 64,981. In this regard, the Rule fundamentally departs from the statutory scheme upheld in *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 288 (1981), because the mine reclamation program at issue in that case ensured that "the full

---

[43] As noted above, federal law recognizes States' exclusive jurisdiction "over facilities used for the generation of electric energy." *See supra* pp. 38-39. That includes States' "traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like"—the very things the Rule targets. *PG&E*, 461 U.S. at 212.

regulatory burden" of regulation would "be borne by the Federal Government" if a State chose not to regulate. *See also Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 175 (D.C. Cir. 2015) (per curiam) (similar). As this Court has said, a federal plan under the Clean Air Act cannot "commandeer the regulatory powers of the states, along with their personnel and resources." *District of Columbia v. Train*, 521 F.2d 971, 992 (D.C. Cir. 1975), *vacated on other grounds*, *EPA v. Brown*, 431 U.S. 99 (1977).

In short, while EPA makes much of the purported flexibility States have in implementing the Rule, *see, e.g.*, 80 Fed. Reg. at 64,665, JA146, the Constitution requires the federal government to allow States the choice to "decline to administer the federal program," *New York*, 505 U.S. at 177, not a multitude of choices of how to administer the federal program. Because that is the one choice the Rule denies to States, it impinges on the States' sovereign authority and, like the actions under review in *New York* and *Printz*, exceeds the federal government's power.

## B.    The Rule Unlawfully Coerces the States.

Just as the federal government may not commandeer States to carry out federal policy, it also may not coerce them to the same end by denying them "a legitimate choice whether to accept the federal conditions." *NFIB*, 132 S. Ct. at 2602 (Roberts, C.J.) (plurality opinion); *see also id.* at 2659 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). The Rule violates this anti-coercion doctrine by threatening to disrupt the electric systems of States that do not carry out federal policy.

84

Federal action directed at States "has crossed the line distinguishing encouragement from coercion" when it leverages existing and substantial State entitlements to induce the State to implement federal policy. *Id.* at 2603 (internal quotation marks omitted). When "'not merely in theory but in fact,'" such threats amount to "economic dragooning that leaves the States with no real option but to acquiesce" to federal demands, they impermissibly "undermine the status of the States as independent sovereigns in our federal system." *Id.* at 2602, 2604-05 (quoting *South Dakota v. Dole*, 483 U.S. 203, 211-12 (1987)).

That precisely describes the Rule. If a State declines to implement the Rule, EPA will impose a federal plan that does so. 40 C.F.R. § 60.5720. But because the Rule's aggressive emission rates cannot be achieved by the type of operational efficiency improvements that individual sources can make and that can actually be federally administered, States will have to take regulatory action to administer and facilitate generation-shifting, or face electricity shortfalls and the associated consequences for state services and operations, public health and safety, and economy. *See supra* pp. 12-16, 20-21, 78-83. Indeed, EPA is quite clear that it expects state actors to exercise "responsibility to maintain a reliable electric system" in the face of the Rule's disruptions. 80 Fed. Reg. at 64,678, JA159. The Rule places States in an untenable position.

The whole point is to force States to do what is necessary to maintain reliable and affordable electric service by taking regulatory actions that are beyond EPA's

authority. Regardless of whether a State implements its own plan or is subject to the federal plan, in neither instance does the decision to adopt or reject EPA's preferred policies "'remain the prerogative of the States.'" *NFIB*, 132 S. Ct. at 2604 (Roberts, C.J.) (plurality opinion) (alteration in original) (quoting *Dole*, 483 U.S. at 211); *see also id.* at 2659 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). Instead, EPA's "'inducement' … is a gun to the head." *Id.* at 2604 (Roberts, C.J.) (plurality opinion). This prospect of requiring state action in order to maintain reliable electricity for its residents leaves States no choice but to carry out EPA's dictates.

The Rule identifies no precedent for this invasion of state sovereignty. "[H]aving the power to make decisions and to set policy is what gives the State its sovereign nature." *FERC v. Mississippi*, 456 U.S. 742, 761 (1982). But, as in *New York* and *NFIB*, the Rule deprives the States of that core aspect of their sovereignty, requiring them to exercise regulatory authority while stripping them of policymaking discretion. This is not cooperative federalism; the "the Federal Government may not compel the States to implement … federal regulatory programs." *Printz*, 521 U.S. at 925.

## CONCLUSION

For the foregoing reasons, the petitions should be granted and the Rule vacated.

86

Dated:  April 22, 2016

/s/ F. William Brownell
F. William Brownell
Allison D. Wood
Henry V. Nickel
Tauna M. Szymanski
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
Tel:  (202) 955-1500
bbrownell@hunton.com
awood@hunton.com
hnickel@hunton.com
tszymanski@hunton.com

*Counsel for Petitioners Utility Air Regulatory Group and American Public Power Association*

/s/ Peter S. Glaser
Peter S. Glaser
TROUTMAN SANDERS LLP
401 Ninth Street N.W., Suite 1000
Washington, D.C.  20004
Tel:  (202) 274-2998
peter.glaser@troutmansanders.com

Carroll W. McGuffey III
Justin T. Wong
TROUTMAN SANDERS LLP
600 Peachtree Street, N.E., Suite 5200
Atlanta, GA  30308
Tel:  (404) 885-3000
mack.mcguffey@troutmansanders.com
justin.wong@troutmansanders.com

*Counsel for Petitioner National Mining Association*

Respectfully submitted,

/s/ Elbert Lin
Patrick Morrisey
    ATTORNEY GENERAL OF WEST
    VIRGINIA
Elbert Lin
    Solicitor General
    *Counsel of Record*
J. Zak Ritchie
    Assistant Attorney General
State Capitol Building 1, Room 26-E
Charleston, WV  25305
Tel:  (304) 558-2021
Fax:  (304) 558-0140
elbert.lin@wvago.gov

*Counsel for Petitioner State of West Virginia*

/s/ Scott A. Keller
Ken Paxton
    ATTORNEY GENERAL OF TEXAS
Jeffrey C. Mateer
    First Assistant Attorney General
Scott A. Keller
    Solicitor General
    *Counsel of Record*
P.O. Box 12548
Austin, TX  78711-2548
Tel:  (512) 936-1700
scott.keller@texasattorneygeneral.gov

*Counsel for Petitioner State of Texas*

/s/ Peter D. Keisler
Peter D. Keisler
Roger R. Martella, Jr.
C. Frederick Beckner III
Ryan C. Morris
Paul J. Ray
SIDLEY AUSTIN, LLP
1501 K Street, N.W.
Washington, D.C.  20005
Tel:  (202) 736-8027
pkeisler@sidley.com
rmartella@sidley.com
rbeckner@sidley.com

*Counsel for Petitioners Chamber of Commerce of the United States of America; National Association of Manufacturers; American Fuel & Petrochemical Manufacturers; National Federation of Independent Business; American Chemistry Council; American Coke and Coal Chemicals Institute; American Foundry Society; American Forest & Paper Association; American Iron & Steel Institute; American Wood Council; Brick Industry Association; Electricity Consumers Resource Council; Lignite Energy Council; National Lime Association; National Oilseed Processors Association; and Portland Cement Association*

/s/ Andrew Brasher
Luther Strange
  ATTORNEY GENERAL OF ALABAMA
Andrew Brasher
  Solicitor General
  *Counsel of Record*
501 Washington Avenue
Montgomery, AL  36130
Tel:  (334) 353-2609
abrasher@ago.state.al.us

*Counsel for Petitioner State of Alabama*

/s/ John R. Lopez IV
Mark Brnovich
  ATTORNEY GENERAL OF ARIZONA
John R. Lopez IV
  *Counsel of Record*
Dominic E. Draye
Keith J. Miller
  Assistant Attorneys General
Maureen Scott
Janet Wagner
Janice Alward
  Arizona Corp. Commission,
  Staff Attorneys
1275 West Washington
Phoenix, AZ  85007
Tel:  (602) 542-5025
john.lopez@azag.gov
dominic.draye@azag.gov
keith.miller@azag.gov

*Counsel for Petitioner Arizona Corporation Commission*

/s/ Thomas A. Lorenzen

Thomas A. Lorenzen
Sherrie A. Armstrong
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 624-2500
tlorenzen@crowell.com
sarmstrong@crowell.com

*Counsel for Petitioners National Rural Electric Cooperative Association; Big Rivers Electric Corporation; Brazos Electric Power Cooperative, Inc.; Buckeye Power, Inc.; Central Montana Electric Power Cooperative; Central Power Electric Cooperative, Inc., Corn Belt Power Cooperative; Dairyland Power Cooperative; East River Electric Power Cooperative, Inc.; Georgia Transmission Corporation; Kansas Electric Power Cooperative, Inc.; North Carolina Electric Membership Corporation; Northwest Iowa Power Cooperative; Oglethorpe Power Corporation; PowerSouth Energy Cooperative; Prairie Power, Inc.; Rushmore Electric Power Cooperative, Inc.; Seminole Electric Cooperative, Inc.; Southern Illinois Power Cooperative; Sunflower Electric Power Corporation; and Upper Missouri G. & T. Electric Cooperative, Inc.*

/s/ Lee Rudofsky

Leslie Rutledge
  ATTORNEY GENERAL OF ARKANSAS
Lee Rudofsky
  Solicitor General
  *Counsel of Record*
Jamie L. Ewing
  Assistant Attorney General
323 Center Street, Suite 400
Little Rock, AR 72201
Tel: (501) 682-5310
lee.rudofsky@arkansasag.gov

*Counsel for Petitioner State of Arkansas*

/s/ Frederick Yarger

Cynthia H. Coffman
  ATTORNEY GENERAL OF COLORADO
Frederick Yarger
  Solicitor General
  *Counsel of Record*
1300 Broadway, 10th Floor
Denver, CO 80203
Tel: (720) 508-6168
fred.yarger@state.co.us

*Counsel for Petitioner State of Colorado*

89

*Of Counsel*

Rae Cronmiller
Environmental Counsel
NATIONAL ASSOCIATION OF RURAL
ELECTRIC COOPERATIVES
4301 Wilson Blvd.
Arlington, VA 22203
Tel: (703) 907-5500
rae.cronmiller@nreca.coop

*Counsel for Petitioner National Rural Electric Cooperative Association*

/s/ Eric L. Hiser
Eric L. Hiser
JORDEN BISCHOFF & HISER, PLC
7272 E. Indian School Road, Suite 360
Scottsdale, AZ 85251
Tel: (480) 505-3927
ehiser@jordenbischoff.com

*Counsel for Petitioner Arizona Electric Power Cooperative, Inc.*

/s/ Brian A. Prestwood
Brian A. Prestwood
Senior Corporate and Compliance
Counsel
ASSOCIATED ELECTRIC COOPERATIVE,
INC.
2814 S. Golden, P.O. Box 754
Springfield, MO 65801
Tel: (417) 885-9273
bprestwood@aeci.org

*Counsel for Petitioner Associated Electric Cooperative, Inc.*

/s/ Jonathan L. Williams
Pamela Jo Bondi
    ATTORNEY GENERAL OF FLORIDA
Jonathan L. Williams
    Deputy Solicitor General
    *Counsel of Record*
Jonathan A. Glogau
    Special Counsel
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel: (850) 414-3818
Fax: (850) 410-2672
jonathan.williams@myfloridalegal.com
jonathan.glogau@myfloridalegal.com

*Counsel for Petitioner State of Florida*

/s/ Britt C. Grant
Samuel S. Olens
    ATTORNEY GENERAL OF GEORGIA
Britt C. Grant
    Solicitor General
    *Counsel of Record*
40 Capitol Square S.W.
Atlanta, GA 30334
Tel: (404) 656-3300
Fax: (404) 463-9453
bgrant@law.ga.gov

*Counsel for Petitioner State of Georgia*

/s/ David Crabtree
David Crabtree
Vice President, General Counsel
DESERET GENERATION & TRANSMISSION
CO-OPERATIVE
10714 South Jordan Gateway
South Jordan, UT 84095
Tel: (801) 619-9500
Crabtree@deseretpower.com

*Counsel for Petitioner Deseret Generation &*
*Transmission Co-operative*

/s/ John M. Holloway III
John M. Holloway III
SUTHERLAND ASBILL & BRENNAN LLP
700 Sixth Street, N.W., Suite 700
Washington, D.C. 20001
Tel: (202) 383-0100
Fax: (202) 383-3593
jay.holloway@sutherland.com

*Counsel for Petitioners East Kentucky Power*
*Cooperative, Inc.; Hoosier Energy Rural Electric*
*Cooperative, Inc.; Minnkota Power Cooperative,*
*Inc.; and South Mississippi Electric Power*
*Association*

/s/ Timothy Junk
Gregory F. Zoeller
ATTORNEY GENERAL OF INDIANA
Timothy Junk
    Deputy Attorney General
    *Counsel of Record*
Indiana Government Ctr. South
Fifth Floor
302 West Washington Street
Indianapolis, IN 46205
Tel: (317) 232-6247
tim.junk@atg.in.gov

*Counsel for Petitioner State of Indiana*

/s/ Jeffrey A. Chanay
Derek Schmidt
ATTORNEY GENERAL OF KANSAS
Jeffrey A. Chanay
    Chief Deputy Attorney General
    *Counsel of Record*
Bryan C. Clark
    Assistant Solicitor General
120 S.W. 10th Avenue, 3rd Floor
Topeka, KS 66612
Tel: (785) 368-8435
Fax: (785) 291-3767
jeff.chanay@ag.ks.gov

*Counsel for Petitioner State of Kansas*

/s/ Patrick Burchette

Patrick Burchette
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, D.C.  20006
Tel:  (202) 469-5102
Patrick.Burchette@hklaw.com

*Counsel for Petitioners East Texas Electric Cooperative, Inc.; Northeast Texas Electric Cooperative, Inc.; Sam Rayburn G&T Electric Cooperative, Inc.; and Tex-La Electric Cooperative of Texas, Inc.*

/s/ Christopher L. Bell

Christopher L. Bell
GREENBERG TRAURIG LLP
1000 Louisiana Street, Suite 1700
Houston, TX  77002
Tel:  (713) 374-3556
bellc@gtlaw.com

*Counsel for Petitioner Golden Spread Electrical Cooperative, Inc.*

/s/ Mark Walters

Mark Walters
Michael J. Nasi
JACKSON WALKER L.L.P.
100 Congress Avenue, Suite 1100
Austin, TX  78701
Tel:  (512) 236-2000
Fax:  (512) 236-2002
mwalters@jw.com
mnasi@jw.com

*Counsel for Petitioners San Miguel Electric Cooperative, Inc. and South Texas Electric Cooperative, Inc.*

/s/ Joe Newberg

Andy Beshear
ATTORNEY GENERAL OF KENTUCKY
Mitchel T. Denham
Assistant Deputy Attorney General
Joseph A. Newberg, II
Assistant Attorney General
*Counsel of Record*
700 Capitol Avenue
Suite 118
Frankfort, KY  40601
Tel:  (502) 696-5611
joe.newberg@ky.gov

*Counsel for Petitioner Commonwealth of Kentucky*

/s/ Steven B. "Beaux" Jones

Jeff Landry
ATTORNEY GENERAL OF LOUISIANA
Steven B. "Beaux" Jones
*Counsel of Record*
Duncan S. Kemp, IV
Assistant Attorneys General
Environmental Section – Civil Division
1885 N. Third Street
Baton Rouge, LA  70804
Tel:  (225) 326-6085
Fax:  (225) 326-6099
jonesst@ag.state.la.us

*Counsel for Petitioner State of Louisiana*

92

/s/ Randolph G. Holt
Randolph G. Holt
Jeremy L. Fetty
PARR RICHEY OBREMSKEY FRANDSEN &
PATTERSON LLP
Wabash Valley Power Association, Inc.
722 N. High School Road
P.O. Box 24700
Indianapolis, IN  46224
Tel:  (317) 481-2815
R_holt@wvpa.com
jfetty@parrlaw.com

*Counsel for Petitioner Wabash Valley Power
Association, Inc.*

/s/ Megan H. Berge
Megan H. Berge
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 639-7700
megan.berge@bakerbotts.com

*Counsel for Petitioner Western Farmers Electric
Cooperative*

/s/ Steven C. Kohl
Steven C. Kohl
Gaetan Gerville-Reache
WARNER NORCROSS & JUDD LLP
2000 Town Center, Suite 2700
Southfield, MI  48075-1318
Tel:  (248) 784-5000
skohl@wnj.com

*Counsel for Petitioner Wolverine Power Supply
Cooperative, Inc.*

/s/ Donald Trahan
Herman Robinson
    Executive Counsel
Donald Trahan
    *Counsel of Record*
Elliott Vega
LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY
Legal Division
P.O. Box 4302
Baton Rouge, LA  70821-4302
Tel:  (225) 219-3985
Fax:  (225) 219-4068
donald.trahan@la.gov

*Counsel for Petitioner State of Louisiana
Department of Environmental Quality*

/s/ Monica Derbes Gibson
Monica Derbes Gibson
Lesley Foxhall Pietras
LISKOW & LEWIS, P.L.C.
701 Poydras Street, Suite 5000
New Orleans, LA  70139
Tel:  (504) 556-4010
Fax:  (504) 556-4108
mdgibson@liskow.com
lfpietras@liskow.com

*Counsel for Petitioner Louisiana Public Service
Commission*

/s/ Christina F. Gomez
Christina F. Gomez
Lawrence E. Volmert
Garrison W. Kaufman
Jill H. Van Noord
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Tel: (303) 295-8000
Fax: (303) 295-8261
cgomez@hollandhart.com
lvolmert@hollandhart.com
gwkaufman@hollandhart.com
jhvannoord@hollandhart.com

Patrick R. Day
HOLLAND & HART LLP
2515 Warren Avenue, Suite 450
Cheyenne, WY 82001
Tel: (307) 778-4200
Fax: (307) 778-8175
pday@hollandhart.com

Emily C. Schilling
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
Tel: (801) 799-5800
Fax: (801) 799-5700
ecschilling@hollandhart.com

*Counsel for Petitioner Basin Electric Power Cooperative*

/s/ Aaron D. Lindstrom
Bill Schuette
  ATTORNEY GENERAL FOR THE PEOPLE
  OF MICHIGAN
Aaron D. Lindstrom
  Michigan Solicitor General
  *Counsel of Record*
P.O. Box 30212
Lansing, MI 48909
Tel: (515) 373-1124
Fax: (517) 373-3042
lindstroma@michigan.gov

*Counsel for Petitioner People of the State of Michigan*

/s/ Harold E. Pizzetta, III
Jim Hood
  ATTORNEY GENERAL OF THE STATE OF
  MISSISSIPPI
Harold E. Pizzetta
  Assistant Attorney General
Civil Litigation Division
Office of the Attorney General
Post Office Box 220
Jackson, MS 39205
Tel: (601) 359-3816
Fax: (601) 359-2003
hpizz@ago.state.ms.us

*Counsel for Petitioner State of Mississippi*

/s/ Stacey Turner

Stacey Turner
SOUTHERN COMPANY SERVICES, INC.
600 18th Street North
BIN 14N-8195
Birmingham, AL  35203
Tel:  (205) 257-2823
staturne@southernco.com

*Counsel for Petitioners Alabama Power
Company, Georgia Power Company, Gulf Power
Company, and Mississippi Power Company*

/s/ C. Grady Moore, III

C. Grady Moore, III
Steven G. McKinney
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL  35303-4642
Tel:  (205) 251-8100
Fax:  (205) 488-5704
gmoore@balch.com
smckinney@balch.com

*Counsel for Petitioner Alabama Power Company*

/s/ Margaret Claiborne Campbell

Margaret Claiborne Campbell
Angela J. Levin
TROUTMAN SANDERS LLP
600 Peachtree Street, NE, Suite 5200
Atlanta, GA  30308-2216
Tel:  (404) 885-3000
margaret.campbell@troutmansanders.com
angela.levin@troutmansanders.com

*Counsel for Petitioner Georgia Power Company*

/s/ Donna J. Hodges

Donna J. Hodges
  Senior Counsel
MISSISSIPPI DEPARTMENT OF
ENVIRONMENTAL QUALITY
P.O. Box 2261
Jackson, MS  39225-2261
Tel:  (601) 961-5369
Fax:  (601) 961-5349
donna_hodges@deq.state.ms.us

*Counsel for Petitioner Mississippi Department of
Environmental Quality*

/s/ Todd E. Palmer

Todd E. Palmer
Valerie L. Green
MICHAEL, BEST & FRIEDRICH LLP
601 Pennsylvania Ave., N.W., Suite 700
Washington, D.C.  20004-2601
Tel:  (202) 747-9560
Fax:  (202) 347-1819
tepalmer@michaelbest.com
vlgreen@michaelbest.com

*Counsel for Petitioner Mississippi Public Service
Commission*

/s/ Terese T. Wyly

Terese T. Wyly
Ben H. Stone
BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS  39501-1931
Tel:  (228) 214-0413
twyly@balch.com
bstone@balch.com

*Counsel for Petitioner Mississippi Power Company*

/s/ Jeffrey A. Stone

Jeffrey A. Stone
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL  32502
Tel:  (850) 432-2451
JAS@beggslane.com

James S. Alves
2110 Trescott Drive
Tallahassee, FL  32308
Tel:  (850) 566-7607
jim.s.alves@outlook.com

*Counsel for Petitioner Gulf Power Company*

/s/ James R. Layton

Chris Koster
   ATTORNEY GENERAL OF MISSOURI
James R. Layton
   Solicitor General
   *Counsel of Record*
P.O. Box 899
207 W. High Street
Jefferson City, MO  65102
Tel:  (573) 751-1800
Fax:  (573) 751-0774
james.layton@ago.mo.gov

*Counsel for Petitioner State of Missouri*

/s/ Dale Schowengerdt

Timothy C. Fox
   ATTORNEY GENERAL OF MONTANA
Alan Joscelyn
   Chief Deputy Attorney General
Dale Schowengerdt
   Solicitor General
   *Counsel of Record*
215 North Sanders
Helena, MT  59620-1401
Tel:  (406) 444-7008
dales@mt.gov

*Counsel for Petitioner State of Montana*

/s/ James S. Alves

James S. Alves
2110 Trescott Drive
Tallahassee, FL 32308
Tel: (850) 566-7607
jim.s.alves@outlook.com

*Counsel for Petitioner CO$_2$ Task Force of the*
*Florida Electric Power Coordinating Group, Inc.*

/s/ John J. McMackin

John J. McMackin
WILLIAMS & JENSEN
701 8th Street, N.W., Suite 500
Washington, D.C. 20001
Tel: (202) 659-8201
jjmcmackin@wms-jen.com

*Counsel for Petitioner Energy-Intensive*
*Manufacturers Working Group on Greenhouse*
*Gas Regulation*

/s/ William M. Bumpers

William M. Bumpers
Megan H. Berge
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 639-7700
william.bumpers@bakerbotts.com
megan.berge@bakerbotts.com

Kelly McQueen
ENTERGY SERVICES, INC.
425 W. Capitol Avenue, 27th Floor
Little Rock, AR 72201
Tel: (501) 377-5760
kmcque1@entergy.com

*Counsel for Petitioner Entergy Corporation*

/s/ Justin D. Lavene

Douglas J. Peterson
    ATTORNEY GENERAL OF NEBRASKA
Dave Bydlaek
    Chief Deputy Attorney General
Justin D. Lavene
    Assistant Attorney General
    *Counsel of Record*
2115 State Capitol
Lincoln, NE 68509
Tel: (402) 471-2834
justin.lavene@nebraska.gov

*Counsel for Petitioner State of Nebraska*

/s/ John R. Renella

Robert Lougy
    ACTING ATTORNEY GENERAL OF NEW
    JERSEY
David C. Apy
    Assistant Attorney General
John R. Renella
    Deputy Attorney General
    *Counsel of Record*
Division of Law
R.J. Hughes Justice Complex
P.O. Box 093
25 Market Street
Trenton, NJ 08625-0093
Tel. (609) 292-6945
Fax (609)341-5030
john.renella@dol.lps.state.nj.us

*Counsel for Petitioner State of New Jersey*

/s/ Paul J. Zidlicky

Paul J. Zidlicky
SIDLEY AUSTIN, LLP
1501 K Street, N.W.
Washington, D.C.  20005
Tel:  (202) 736-8000
pzidlicky@sidley.com

*Counsel for Petitioners GenOn Mid-Atlantic, LLC; Indian River Power LLC; Louisiana Generating LLC; Midwest Generation, LLC; NRG Chalk Point LLC; NRG Power Midwest LP; NRG Rema LLC; NRG Texas Power LLC; NRG Wholesale Generation LP; and Vienna Power LLC*

/s/ David M. Flannery

David M. Flannery
Kathy G. Beckett
Edward L. Kropp
STEPTOE & JOHNSON, PLLC
707 Virginia Street East
Charleston, WV  25326
Tel:  (304) 353-8000
dave.flannery@steptoe-johnson.com
kathy.beckett@steptoe-johnson.com
skipp.kropp@steptoe-johnson.com

Stephen L. Miller
STEPTOE & JOHNSON, PLLC
700 N. Hurstbourne Parkway, Suite 115
Louisville, KY  40222
Tel:  (502) 423-2000
steve.miller@steptoe-johnson.com

*Counsel for Petitioner Indiana Utility Group*

/s/ Paul M. Seby

Wayne Stenehjem
  ATTORNEY GENERAL OF NORTH
  DAKOTA
Margaret Olson
  Assistant Attorney General
North Dakota Attorney General's Office
600 E. Boulevard Avenue #125
Bismarck, ND  58505
Tel:  (701) 328-3640
maiolson@nd.gov

Paul M. Seby
  Special Assistant Attorney General
  State of North Dakota
GREENBERG TRAURIG, LLP
1200 17th Street, Suite 2400
Denver, CO  80202
Tel:  (303) 572-6500
Fax:  (303) 572-6540
sebyp@gtlaw.com

*Counsel for Petitioner State of North Dakota*

/s/ Eric E. Murphy

Michael DeWine
  ATTORNEY GENERAL OF OHIO
Eric E. Murphy
  State Solicitor
  *Counsel of Record*
30 E. Broad Street, 17th Floor
Columbus, OH  43215
Tel:  (614) 466-8980
eric.murphy@ohioattorneygeneral.gov

*Counsel for Petitioner State of Ohio*

/s/ F. William Brownell
F. William Brownell
Eric J. Murdock
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
Tel:  (202) 955-1500
bbrownell@hunton.com
emurdock@hunton.com

Nash E. Long III
HUNTON & WILLIAMS LLP
Bank of America Plaza, Suite 3500
101 South Tryon Street
Charlotte, NC  28280
Tel:  (704) 378-4700
nlong@hunton.com

*Counsel for Petitioner LG&E and
KU Energy LLC*

/s/ David B. Rivkin, Jr.
E. Scott Pruitt
    ATTORNEY GENERAL OF OKLAHOMA
Patrick R. Wyrick
    Solicitor General of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK  73105
Tel:  (405) 521-4396
Fax:  (405) 522-0669
fc.docket@oag.state.ok.us
scott.pruitt@oag.ok.gov

David B. Rivkin, Jr.
    *Counsel of Record*
Mark W. DeLaquil
Andrew M. Grossman
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
Tel:  (202) 861-1731
Fax:  (202) 861-1783
drivkin@bakerlaw.com

*Counsel for Petitioners State of Oklahoma and
Oklahoma Department of Environmental
Quality*

/s/ P. Stephen Gidiere III

P. Stephen Gidiere III
Thomas L. Casey III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N., Suite 1500
Birmingham, AL 35203
Tel: (205) 251-8100
sgidiere@balch.com

Stephanie Z. Moore
Vice President and General Counsel
LUMINANT GENERATION COMPANY LLC
1601 Bryan Street, 22nd Floor
Dallas, TX 75201

Daniel J. Kelly
Vice President and Associate General
   Counsel
ENERGY FUTURE HOLDINGS CORP.
1601 Bryan Street, 43rd Floor
Dallas, TX 75201

*Counsel for Petitioners Luminant Generation
Company LLC; Oak Grove Management
Company LLC; Big Brown Power Company
LLC; Sandow Power Company LLC; Big
Brown Lignite Company LLC; Luminant
Mining Company LLC; and Luminant Big
Brown Mining Company LLC*

/s/ James Emory Smith, Jr.

Alan Wilson
   ATTORNEY GENERAL OF SOUTH
   CAROLINA
Robert D. Cook
   Solicitor General
James Emory Smith, Jr.
   Deputy Solicitor General
   *Counsel of Record*
P.O. Box 11549
Columbia, SC 29211
Tel: (803) 734-3680
Fax: (803) 734-3677
esmith@scag.gov

*Counsel for Petitioner State of South Carolina*

/s/ Steven R. Blair

Marty J. Jackley
   ATTORNEY GENERAL OF SOUTH
   DAKOTA
Steven R. Blair
   Assistant Attorney General
   *Counsel of Record*
1302 E. Highway 14, Suite 1
Pierre, SD 57501
Tel: (605) 773-3215
steven.blair@state.sd.us

*Counsel for Petitioner State of South Dakota*

/s/ Ronald J. Tenpas
Ronald J. Tenpas
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 739-3000
rtenpas@morganlewis.com

*Counsel for Petitioner Minnesota Power (an operating division of ALLETE, Inc.)*

/s/ Allison D. Wood
Allison D. Wood
Tauna M. Szymanski
Andrew D. Knudsen
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
Tel:  (202) 955-1500
awood@hunton.com
tszymanski@hunton.com
aknudsen@hunton.com

*Counsel for Petitioner Montana-Dakota Utilities Co., a Division of MDU Resources Group, Inc.*

/s/ Tyler R. Green
Sean Reyes
    ATTORNEY GENERAL OF UTAH
Tyler R. Green
    Solicitor General
    *Counsel of Record*
Parker Douglas
    Federal Solicitor
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, UT  84114-2320
pdouglas@utah.gov

*Counsel for Petitioner State of Utah*

/s/ Misha Tseytlin
Brad D. Schimel
    ATTORNEY GENERAL OF WISCONSIN
Misha Tseytlin
    Solicitor General
    *Counsel of Record*
Andrew Cook
    Deputy Attorney General
Delanie M. Breuer
    Assistant Deputy Attorney General
Wisconsin Department of Justice
17 West Main Street
Madison, WI  53707
Tel:  (608) 267-9323
tseytlinm@doj.state.wi.us

*Counsel for Petitioner State of Wisconsin*

/s/ William M. Bumpers
William M. Bumpers
Megan H. Berge
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 639-7700
william.bumpers@bakerbotts.com
megan.berge@bakerbotts.com

*Counsel for Petitioner NorthWestern
Corporation d/b/a NorthWestern Energy*

/s/ Joshua R. More
Joshua R. More
Jane E. Montgomery
Amy Antoniolli
SCHIFF HARDIN LLP
233 South Wacker Drive
Suite 6600
Chicago, IL  60606
Tel:  (312) 258-5500
jmore@schiffhardin.com
jmontgomery@schiffhardin.com
aantoniolli@schiffhardin.com

*Counsel for Petitioner Prairie State Generating
Company, LLC*

/s/ James Kaste
Peter K. Michael
   ATTORNEY GENERAL OF WYOMING
James Kaste
   Deputy Attorney General
   *Counsel of Record*
Michael J. McGrady
Erik Petersen
   Senior Assistant Attorneys General
Elizabeth Morrisseau
   Assistant Attorney General
2320 Capitol Avenue
Cheyenne, WY  82002
Tel:  (307) 777-6946
Fax:  (307) 777-3542
james.kaste@wyo.gov

*Counsel for Petitioner State of Wyoming*

/s/ Sam M. Hayes
Sam M. Hayes
   General Counsel
   *Counsel of Record*
Craig Bromby
   Deputy General Counsel
Andrew Norton
   Deputy General Counsel
NORTH CAROLINA DEPARTMENT OF
ENVIRONMENTAL QUALITY
1601 Mail Service Center
Raleigh, NC  27699-1601
Tel:  (919) 707-8616
sam.hayes@ncdenr.gov

*Counsel for Petitioner North Carolina
Department of Environmental Quality*

/s/ Allison D. Wood
Allison D. Wood
Tauna M. Szymanski
Andrew D. Knudsen
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
Tel:  (202) 955-1500
awood@hunton.com
tszymanski@hunton.com
aknudsen@hunton.com

*Counsel for Petitioner Tri-State Generation and Transmission Association, Inc.*

/s/ William M. Bumpers
William M. Bumpers
Megan H. Berge
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 639-7700
william.bumpers@bakerbotts.com
megan.berge@bakerbotts.com

*Counsel for Petitioner Westar Energy, Inc.*

/s/ Jeffrey R. Holmstead
Jeffrey R. Holmstead
Sandra Y. Snyder
BRACEWELL LLP
2001 M Street, N.W., Suite 900
Washington, D.C.  20036
Tel:  (202) 828-5852
Fax:  (202) 857-4812
jeff.holmstead@bracewelllaw.com

*Counsel for Petitioner American Coalition for Clean Coal Electricity*

/s/ Dennis Lane
Dennis Lane
STINSON LEONARD STREET LLP
1775 Pennsylvania Ave., N.W., Suite 800
Washington, D.C.  20006
Tel:  (202) 785-9100
Fax:  (202) 785-9163
dennis.lane@stinson.com

Parthenia B. Evans
STINSON LEONARD STREET LLP
1201 Walnut Street, Suite 2900
Kansas City, MO  64106
Tel:  (816) 842-8600
Fax:  (816) 691-3495
parthy.evans@stinson.com

*Counsel for Petitioner Kansas City Board of Public Utilities – Unified Government of Wyandotte County/Kansas City, Kansas*

/s/ Geoffrey K. Barnes
Geoffrey K. Barnes
J. Van Carson
Wendlene M. Lavey
John D. Lazzaretti
Robert D. Cheren
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH  44114
Tel:  (216) 479-8646
geoffrey.barnes@squirepb.com

*Counsel for Petitioner Murray Energy
Corporation*

/s/ Andrew C. Emrich
Andrew C. Emrich
HOLLAND & HART LLP
6380 South Fiddlers Green Circle
Suite 500
Greenwood Village, CO  80111
Tel:  (303) 290-1621
Fax:  (866) 711-8046
acemrich@hollandhart.com

Emily C. Schilling
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT  84101
Tel:  (801) 799-5753
Fax:  (202) 747-6574
ecschilling@hollandhart.com

*Counsel for Petitioners Newmont Nevada
Energy Investment, LLC and Newmont USA
Limited*

/s/ Charles T. Wehland
Charles T. Wehland
  *Counsel of Record*
Brian J. Murray
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, IL 60601-1692
Tel: (312) 782-3939
Fax: (312) 782-8585
ctwehland@jonesday.com
bjmurray@jonesday.com

*Counsel for Petitioners The North American Coal Corporation; The Coteau Properties Company; Coyote Creek Mining Company, LLC; The Falkirk Mining Company; Mississippi Lignite Mining Company; North American Coal Royalty Company; NODAK Energy Services, LLC; Otter Creek Mining Company, LLC; and The Sabine Mining Company*

/s/ Robert G. McLusky
Robert G. McLusky
JACKSON KELLY, PLLC
1600 Laidley Tower
P.O. Box 553
Charleston, WV 25322
Tel: (304) 340-1000
rmclusky@jacksonkelly.com

*Counsel for Petitioner West Virginia Coal Association*

105

/s/ Eugene M. Trisko
Eugene M. Trisko
LAW OFFICES OF EUGENE M. TRISKO
P.O. Box 596
Berkeley Springs,  WV 25411
Tel:  (304) 258-1977
Tel:  (301) 639-5238 (cell)
emtrisko7@gmail.com

*Counsel for Petitioner International Brotherhood
of Boilermakers, Iron Ship Builders,
Blacksmiths, Forgers & Helpers*

/s/ Eugene M. Trisko
Eugene M. Trisko
LAW OFFICES OF EUGENE M. TRISKO
P.O. Box 596
Berkeley Springs,  WV 25411
Tel:  (304) 258-1977
Tel:  (301) 639-5238 (cell)
emtrisko7@gmail.com

*Counsel for Petitioner International Brotherhood
of Electrical Workers, AFL-CIO*

/s/ Grant F. Crandall
Grant F. Crandall
General Counsel
UNITED MINE WORKERS OF AMERICA
18354 Quantico Gateway Drive
Triangle, VA  22172
Tel:  (703) 291-2429
gcrandall@umwa.org

Arthur Traynor, III
Staff Counsel
UNITED MINE WORKERS OF AMERICA
18354 Quantico Gateway Drive
Triangle, VA  22172
Tel:  (703) 291-2457
atraynor@umwa.org

Eugene M. Trisko
LAW OFFICES OF EUGENE M. TRISKO
P.O. Box 596
Berkeley Springs, WV  25411
Tel:  (304) 258-1977
emtrisko7@gmail.com

*Counsel for Petitioner United Mine Workers of America*

/s/ Steven P. Lehotsky
Steven P. Lehotsky
Sheldon B. Gilbert
U.S. CHAMBER LITIGATION CENTER, INC.
1615 H Street, N.W.
Washington, D.C.  20062
Tel:  (202) 463-5337
slehotsky@uschamber.com

*Counsel for Petitioner Chamber of Commerce of the United States of America*

/s/ Quentin Riegel
Linda E. Kelly
Quentin Riegel
Leland P. Frost
MANUFACTURERS' CENTER FOR LEGAL
ACTION
733 10th Street, N.W., Suite 700
Washington, D.C. 20001
Tel: (202) 637-3000
qriegel@nam.org

*Counsel for Petitioner National Association of
Manufacturers*

/s/ Richard S. Moskowitz
Richard S. Moskowitz
AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS
1667 K Street, N.W., Suite 700
Washington, D.C. 20006
Tel: (202) 457-0480
rmoskowitz@afpm.org

*Counsel for Petitioner American Fuel &
Petrochemical Manufacturers*

/s/ Karen R. Harned
Karen R. Harned
Executive Director
Elizabeth A. Gaudio
Senior Executive Counsel
NATIONAL FEDERATION OF
INDEPENDENT BUSINESS
SMALL BUSINESS LEGAL CENTER
1201 F Street, N.W., Suite 200
Washington, D.C.  20004
Tel:  (202) 314-2061
karen.harned@nfib.org
elizabeth.milito@nfib.org

*Counsel for Petitioner National Federation of
Independent Business*

/s/ Megan H. Berge
Megan H. Berge
William M. Bumpers
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 639-7700
megan.berge@bakerbotts.com
william.bumpers@bakerbotts.com

*Counsel for Petitioner National Association of
Home Builders*

/s/ Kathryn D. Kirmayer
Kathryn D. Kirmayer
General Counsel
Evelyn R. Nackman
Associate General Counsel
ASSOCIATION OF AMERICAN RAILROADS
425 3rd Street, S.W.
Washington, D.C.  20024
Tel:  (202) 639-2100
kkirmayer@aar.org

*Counsel for Petitioner Association of American
Railroads*

/s/ Chaim Mandelbaum
Chaim Mandelbaum
Litigation Manager
FREE MARKET ENVIRONMENTAL LAW
CLINIC
726 N. Nelson Street, Suite 9
Arlington, VA  22203
Tel:  (703) 577-9973
chaim12@gmail.com

*Counsel for Petitioner Energy and Environment
Legal Institute*

/s/ Catherine E. Stetson
Catherine E. Stetson
Eugene A. Sokoloff
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
Tel:  (202) 637-5600
Fax:  (202) 637-5910
cate.stetson@hoganlovells.com
eugene.sokoloff@hoganlovells.com

*Counsel for Petitioner Denbury Onshore, LLC*

/s/ Adam R.F. Gustafson
C. Boyden Gray
Adam R.F. Gustafson
   *Counsel of Record*
Derek S. Lyons
James R. Conde
BOYDEN GRAY & ASSOCIATES, PLLC
1627 I Street, N.W., Suite 950
Washington, D.C.  20006
Tel:  (202) 955-0620
gustafson@boydengrayassociates.com

*Counsel for Petitioners Competitive Enterprise
Institute; Buckeye Institute for Public Policy
Solutions; Independence Institute; Rio Grande
Foundation; Sutherland Institute; Klaus J.
Christoph; Samuel R. Damewood; Catherine C.
Dellin; Joseph W. Luquire; Lisa R. Markham;
Patrick T. Peterson; and Kristi Rosenquist*

Sam Kazman
Hans Bader
COMPETITIVE ENTERPRISE INSTITUTE
1899 L Street, N.W., 12th Floor
Washington, D.C.  20036
Tel:  (202) 331-1010

*Counsel for Petitioner Competitive Enterprise
Institute*

Robert Alt
BUCKEYE INSTITUTE FOR PUBLIC POLICY
SOLUTIONS
88 E. Broad Street, Suite 1120
Columbus, OH  43215
Tel:  (614) 224-4422
robert@buckeyeinstitute.org

*Counsel for Petitioner Buckeye Institute for
Public Policy Solutions*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and

Circuit Rules 32(e)(1) and 32(e)(2)(C), I hereby certify that the foregoing final form

Opening Brief of Petitioners on Core Legal Issues contains 21,613 words, as counted

by a word processing system that includes headings, footnotes, quotations, and

citations in the count, and therefore is within the word limit set by the Court.

Dated:  April 22, 2016                    /s/ Elbert Lin
                                          Elbert Lin

## CERTIFICATE OF SERVICE

I hereby certify that, on this 22nd day of April 2016, a copy of the foregoing final form Opening Brief of Petitioners on Core Legal Issues was served electronically through the Court's CM/ECF system on all ECF-registered counsel.

/s/ Elbert Lin
Elbert Lin

**ADDENDUM PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND CIRCUIT RULE 32.1(b)(3)**

(ORDER LIST:  577 U.S.)

TUESDAY, FEBRUARY 9, 2016

ORDER IN PENDING CASE

15A773      WEST VIRGINIA, ET AL. V EPA, ET AL.

          The application for a stay submitted to The Chief Justice
and by him referred to the Court is granted.  The Environmental
Protection Agency's "Carbon Pollution Emission Guidelines for
Existing Stationary Sources: Electric Utility Generating Units,"
80 Fed. Reg. 64,662 (October 23, 2015), is stayed pending
disposition of the applicants' petitions for review in the United
States Court of Appeals for the District of Columbia Circuit and
disposition of the applicants' petition for a writ of certiorari,
if such writ is sought.  If a writ of certiorari is sought and
the Court denies the petition, this order shall terminate
automatically.  If the Court grants the petition for a writ of
certiorari, this order shall terminate when the Court enters its
judgment.

          Justice Ginsburg, Justice Breyer, Justice Sotomayor, and
Justice Kagan would deny the application.

(ORDER LIST:  577 U.S.)

TUESDAY, FEBRUARY 9, 2016

ORDER IN PENDING CASE

15A776      BASIN ELEC. POWER COOP., ET AL. V. EPA, ET AL.

      The application for a stay submitted to The Chief Justice and by him referred to the Court is granted.  The Environmental Protection Agency's "Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units," 80 Fed. Reg. 64,662 (October 23, 2015), is stayed pending disposition of the applicants' petitions for review in the United States Court of Appeals for the District of Columbia Circuit and disposition of the applicants' petition for a writ of certiorari, if such writ is sought.  If a writ of certiorari is sought and the Court denies the petition, this order shall terminate automatically.  If the Court grants the petition for a writ of certiorari, this order shall terminate when the Court enters its judgment.

      Justice Ginsburg, Justice Breyer, Justice Sotomayor, and Justice Kagan would deny the application.

(ORDER LIST:  577 U.S.)

TUESDAY, FEBRUARY 9, 2016

ORDER IN PENDING CASE

15A778     MURRAY ENERGY CORP., ET AL. V. EPA, ET AL.

The application for a stay submitted to The Chief Justice
and by him referred to the Court is granted.  The Environmental
Protection Agency's "Carbon Pollution Emission Guidelines for
Existing Stationary Sources: Electric Utility Generating Units,"
80 Fed. Reg. 64,662 (October 23, 2015), is stayed pending
disposition of the applicants' petitions for review in the United
States Court of Appeals for the District of Columbia Circuit and
disposition of the applicants' petition for a writ of certiorari,
if such writ is sought.  If a writ of certiorari is sought and
the Court denies the petition, this order shall terminate
automatically.  If the Court grants the petition for a writ of
certiorari, this order shall terminate when the Court enters its
judgment.

Justice Ginsburg, Justice Breyer, Justice Sotomayor, and
Justice Kagan would deny the application.

(ORDER LIST:  577 U.S.)

TUESDAY, FEBRUARY 9, 2016

ORDER IN PENDING CASE

15A787     CHAMBER OF COMMERCE, ET AL. V. EPA, ET AL.

The application for a stay submitted to The Chief Justice and by him referred to the Court is granted.  The Environmental Protection Agency's "Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units," 80 Fed. Reg. 64,662 (October 23, 2015), is stayed pending disposition of the applicants' petitions for review in the United States Court of Appeals for the District of Columbia Circuit and disposition of the applicants' petition for a writ of certiorari, if such writ is sought.  If a writ of certiorari is sought and the Court denies the petition, this order shall terminate automatically.  If the Court grants the petition for a writ of certiorari, this order shall terminate when the Court enters its judgment.

Justice Ginsburg, Justice Breyer, Justice Sotomayor, and Justice Kagan would deny the application.

(ORDER LIST:  577 U.S.)

TUESDAY, FEBRUARY 9, 2016

ORDER IN PENDING CASE

15A793      NORTH DAKOTA V. EPA, ET AL.

The application for a stay submitted to The Chief Justice
and by him referred to the Court is granted.  The Environmental
Protection Agency's "Carbon Pollution Emission Guidelines for
Existing Stationary Sources: Electric Utility Generating Units,"
80 Fed. Reg. 64,662 (October 23, 2015), is stayed pending
disposition of the applicant's petition for review in the United
States Court of Appeals for the District of Columbia Circuit and
disposition of the applicant's petition for a writ of certiorari,
if such writ is sought.  If a writ of certiorari is sought and
the Court denies the petition, this order shall terminate
automatically.  If the Court grants the petition for a writ of
certiorari, this order shall terminate when the Court enters its
judgment.

Justice Ginsburg, Justice Breyer, Justice Sotomayor, and
Justice Kagan would deny the application.